# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---

OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM and ELECTRICAL WORKERS PENSION FUND LOCAL 103, I.B.E.W., on behalf of themselves and all other similarly situated,

Plaintiffs,

-against-

BANCO SANTANDER S.A., SANTANDER INVESTMENT SECURITIES, INC., SANTANDER HOLDINGS USA, INC. BANCO SANTANDER (MEXICO) S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO SANTANDER MEXICO, SANTANDER INVESTMENT BOLSA, SOCIEDAD DE VALORES, S.A.U., BANCO BILBAO VIZCAYA ARGENTARIA, S.A., BBVA SECURITIES, INC., BBVA COMPASS BANCSHARES, INC., BBVA BANCOMER S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BBVA BANCOMER, GRUPO FINANCIERO BBVA BANCOMER, S.A. DE C.V., JPMORGAN CHASE & CO.,  JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, JP MORGAN SECURITIES LLC, J.P. MORGAN BROKER-DEALER HOLDINGS INC., BANCO J.P. MORGAN, S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, J.P. MORGAN GRUPO FINANCIERO, HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC SECURITIES (USA) INC., HSBC MARKETS (USA) INC., HSBC MÉXICO, S.A., INSTITUCION DE BANCA MÚLTIPLE, GRUPO FINANCIERO HSBC, HSBC NORTH AMERICA HOLDINGS INC., HSBC LATIN AMERICA HOLDINGS (UK) LIMITED, BARCLAYS PLC, BARCLAYS CAPITAL PLC, BARCLAYS CAPITAL INC., BARCLAYS BANK PLC, GRUPO FINANCIERO BARCLAYS MEXICO, S.A. DE C.V., BARCLAYS BANK MEXICO, S.A., CITIGROUP INC., CITIGROUP GLOBAL MARKETS INC., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP GLOBAL MARKETS HOLDINGS INC., BANCO NACIONAL DE MEXICO, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO BANAMEX, BANK OF AMERICA N.A., BANK OF AMERICA CORPORATION, BANKAMERICA INTERNATIONAL FINANCIAL CORPORATION, BANK OF AMERICA MEXICO, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, GRUPO FINANCIERO BANK OF AMERICA, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., DEUTSCHE BANK AMERICAS HOLDING CORP., DEUTSCHE BANK MÉXICO, S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, and "JOHN DOES" 1-10,

Defendants.

Docket No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

JURISDICTION AND VENUE ................................................................................................. 3

    A.  Defendants Exploited the United States Market for MGBs ......................................... 5

PARTIES ...................................................................................................................................... 11

    A.  Plaintiffs ......................................................................................................................... 11

    B.  Defendants ..................................................................................................................... 12

        1.  Banco Santander S.A. ........................................................................................... 12

        2.  Banco Bilbao Vizcaya Argentaria, S.A. ............................................................... 14

        3.  JPMorgan Chase & Co. ........................................................................................ 16

        4.  HSBC ...................................................................................................................... 18

        5.  Barclays .................................................................................................................. 20

        6.  Citigroup ............................................................................................................... 22

        7.  Bank of America .................................................................................................... 23

        8.  Deutsche Bank AG ............................................................................................... 25

        9.  "John Does" 1-10 .................................................................................................. 26

    C.  Defendants' U.S. Dealer-Subsidiaries Sold MGBs in the United States as Agents for their Corporate Parents ......................................................................................................... 27

        1.  Santander Investment Securities .......................................................................... 27

        2.  BBVA Securities, Inc. ............................................................................................ 28

        3.  HSBC Securities (USA) Inc. ................................................................................. 29

        4.  Barclays Capital Inc. and Barclays Capital PLC .................................................. 30

        5.  Deutsche Bank Securities, Inc. ............................................................................. 34

SUBSTANTIVE ALLEGATIONS ............................................................................................ 36

  I.  Background ........................................................................................................................ 36

    A.  The Mexican Government Bond Market ..................................................................... 36

        1.  CETES .................................................................................................................... 38

        2.  BONOS .................................................................................................................. 39

        3.  UDIBONOS ........................................................................................................ 39

        4.  BONDES D .......................................................................................................... 40

  II.  The Role of MGB Market Makers ................................................................................. 40

III. Government Regulators Uncover Evidence of Collusion Among Defendants...........................42

    A.  The Admitted MGB Cartel................................................................................................42

    B.  Defendants' Response to the Investigations..................................................................46

IV. Economic Evidence Confirms that Defendants' Conspired to Rig Bids and Fix Prices in the
    MGB Market ........................................................................................................................47

    A.  Bid Dispersion Analysis Demonstrates that Defendants Rigged the MGB Auction ............47

    B.  Defendants Sold MGBs From the Auctions at Supra-Competitive Prices ..............................50

    C.  Defendants Fixed Bid-Ask Spreads for MGBs ...........................................................51

V.  The Structure of the MGB Market and the Close Relationships Among Defendants' Traders
    Provided an Opportunity to Conspire..............................................................................53

VI. Defendants Conspired to Fix Prices in Multiple Financial Markets during the Class Period ....55

    A.  Barclays ...........................................................................................................................55

    B.  Deutsche Bank.................................................................................................................57

    C.  Bank of America...............................................................................................................59

    D.  HSBC .................................................................................................................................60

    E.  Citigroup ..........................................................................................................................61

    VII. Defendants' Conspiracy Injured Plaintiffs ......................................................................62

CLASS ACTION ALLEGATIONS ................................................................................................63

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT............................................65

CLAIMS FOR RELIEF ....................................................................................................................66

FIRST CLAIM FOR RELIEF ..........................................................................................................66

SECOND CLAIM FOR RELIEF.....................................................................................................68

PRAYER FOR RELIEF ....................................................................................................................69

DEMAND FOR JURY TRIAL.........................................................................................................70

Plaintiffs Oklahoma Firefighters Pension and Retirement System and Electrical Workers Pension Fund Local 103, I.B.E.W., (collectively "Plaintiffs") complain upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 32-126, below) for their violations of law from January 1, 2006 through April 19, 2017 ("Class Period") as follows:

## **INTRODUCTION**

1.      A Mexican government bond ("MGB") is a debt security (like a U.S. Treasury bond) that is issued by the Mexican government during regularly scheduled auctions. The Mexican government uses MGBs to raise capital, fund budget deficits, and control Mexico's monetary supply.

2.      Defendants are horizontal competitors in the MGB market. They are also the exclusive Mexican government-approved market makers for MGBs.

3.      This privilege allowed Defendants to dominate the MGB market. In exchange for market maker status, the Bank of Mexico ("Banxico") requires Defendants to collectively bid for at least 100% of the MGBs offered in each auction. Defendants thus control the supply of MGBs in the over-the-counter market, where they sell the bonds purchased at auction to their customers.

4.      Defendants used this dominant position as the exclusive government approved market markets in the MGB market to unlawfully increase the profitability of their MGB businesses. In April 2017, Mexico's antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), announced that it uncovered evidence of anticompetitive conduct among Defendants in the MGB market. Information leaked from COFECE's investigation in May 2017, revealed that it had accepted at least one Defendant into its cartel leniency program after that Defendant admitted

to participating in a conspiracy to fix MGB prices and agreed to provide evidence against its co-conspirators in exchange for a reduced penalty.[1]

5.      Mexico's securities regulator, the Comisión Nacional Bancaria y de Valores ("CNBV"), independently confirmed COFECE's findings. CNBV announced in August 2017 that it was proceeding with its own investigation of misconduct in the MGB market based on additional evidence it uncovered of collusion among the Defendants.

6.      An analysis of MGB prices and auction results before and after COFECE's announcement show that Defendants conspired to fix MGB prices during the Class Period through at least three means: (a) rigging MGB auctions through collusive bidding and information sharing; (b) selling MGBs purchased at auction at artificially higher prices; and (c) agreeing to fix the "bid-ask spread" artificially wider, overcharging and underpaying customers in every MGB transaction by suppressing the "bid price" at which Defendants offered to buy MGBs and increasing the "ask price" at which they offered to sell. This comprehensive scheme resulted in MGB prices during the Class Period that were **<u>between 20% and 50%</u>** higher than they should have been, generating supra-competitive profits for Defendants at the expense of Plaintiffs and Class members.

7.      Defendants' agreement to restrain trade in the MGB market is part of a broader pattern of collusion and price-fixing by these same Defendants during the Class Period. Regulators across the globe have fined and sanctioned Defendants for conspiring to fix prices in multiple financial markets, including for example by manipulating the London Interbank Offered Rate ("LIBOR") and the Euro Interbank Offered Rate ("Euribor"), the foreign exchange market, and precious metals markets, among others. To date, this has resulted in Defendants Deutsche Bank,

---

[1] *Presentation of Carlos Mena Labarthe, The Leniency Program in Mexico,* http://cofece.socialand-labs.com/tema-original/wp content/uploads/2017/11/leniency_in_mexico_eventoocde_060416.pdf (explaining leniency program requirements).

Bank of America, JPMorgan, HSBC, Citigroup, and Barclays collectively paying over $11 billion in fines and settlements for anticompetitive conduct.

8.      Plaintiffs are domestic consumers of MGBs and Defendants' customers. They collectively transacted tens of millions of dollars' worth of MGB during the Class Period from within the United States directly with Defendants HSBC Securities (USA) Inc., HSBC Bank plc, JPMorgan Chase Bank, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith, Incorporated, BBVA Securities, Inc., Banco Bilbao Vizcaya Argentaria, S.A., Banco Santander, S.A., Santander Investment Bolsa, Sociedad de Valores, S.A., and Citibanamex. Plaintiffs were overcharged and/or underpaid in each of these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

9.      Given COFECE's and CNBV's ongoing investigations, the fact that at least one Defendant has admitted to participating in the cartel alleged herein; and the significant amount of economic evidence presented in this Complaint, Plaintiffs believe further evidentiary support for their claims against Defendants will be revealed following a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a). This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy, and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

11.      Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 26, and 28 U.S.C. § 1391. One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of

the affected interstate trade and commerce described in this Complaint was carried out in this District.

12.     Each Defendant transacted MGBs at artificial prices in a continuous and uninterrupted flow of commerce throughout the United States and with counterparties located in the United States. HSBC, Citigroup, Bank of America Corp., JPMorgan, Barclays, Banco Santander SA, BBVA, Deutsche Bank AG, and their U.S.-based dealer affiliates transacted MGBs directly with investors in the United States, including Plaintiffs, throughout the Class Period.

13.     Defendants' conspiracy to set, fix and maintain artificial MGB prices and impose trade restraints was implemented in the United States. Each Defendant and its U.S.-based subsidiaries and/or dealer affiliates acted in furtherance of and enforced Defendants' price-fixing conspiracy in the United States by, among other things: (a) marketing price-fixed MGBs to U.S. investors; (b) selling MGBs purchased during government-run auctions at artificially higher prices in the United States; and (c) quoting fixed, agreed upon bid and ask prices for MGBs to investors in the United States. These actions restrained trade and interstate commerce by distorting and imposing supra-competitive prices on investors located throughout the United States, including Plaintiffs and the Class.

14.     Defendants utilized U.S. offices and licensed bank branches in this District to exploit the U.S. market for MGBs, for example, by marketing and selling price-fixed MGBs to consumers in this District. As alleged herein, many Defendants' MGB trading operations are headquartered in and/or directed from this District. Accordingly, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

15.     Defendants Banco Santander S.A., JP Morgan Chase & Co., HSBC, Barclays PLC, Citigroup, and Bank of America Corp. registered their New York branch or representative or agency

offices with the New York State Department of Financial Services ("NYSDFS"), acquiring licenses to do business in this state under New York Banking Law § 200-b.

16.     Defendants Bank of America, Citigroup, and HSBC are subject to enhanced supervision by the Board of Governors of the Federal Reserve System. Defendants Bank of America Corp., Citigroup Inc., JP Morgan Chase & Co., and Barclays PLC are members of the Federal Reserve Board ("FRB") of Governors' Large Institution Supervision Coordinating Committee, which is designed to coordinate supervision of the largest, most systematically important financial institutions in the United States.

## A.  Defendants Exploited the United States Market for MGBs

17.     Throughout the Class Period, each Defendant developed a strategy to exploit the U.S. market for MGBs. For example, during the Class Period, each Defendant marketed MGBs to U.S. investors by promoting the supposedly attractive features of these financial products, including their investment-grade credit rating, the relative ease of trading, Mexico's close ties with the U.S. economy, and yields significantly higher than those offered by comparable U.S. treasury securities.[2] At the same time, each Defendant failed to disclose to these investors that it was engaged in a price-fixing conspiracy that caused them to pay higher prices when buying MGBs or receive less money when selling MGBs than they would have absent Defendants' conspiracy.

18.     Defendants' exploitation of the United States market enabled them to trade hundreds of billions of dollars in MGBs with investors located here, resulting in millions of dollars in excess profits that they could not have collected in the absence of their conspiracy.

19.     BBVA, Santander, Deutsche Bank, HSBC, and Barclays, themselves and through their U.S.-based subsidiaries and/or affiliates as agents, undertook substantial efforts aimed at selling

---

[2] See e.g. *Investors turn to Mexico bonds for yield*, Financial Times, (Jan. 15, 2015), available at https://www.ft.com/content/3156a1a0-9cc2-11e4-a730-00144feabdc0.

MGBs to investors in the United States. Below are some (non-exhaustive) examples of actions that these Defendants took to exploit the United States market for price-fixed MGB:

20.     <u>BBVA</u>: BBVA publishes a "Handbook of Mexican Financial Instruments" in English that it distributes to investors in the United States market. The Handbook contains a dedicated twenty-page section describing the MGB auction process, the characteristics of the MGBs described in this Complaint, and the contact information for BBVA personnel from whom MGBs may be purchased by U.S. investors, including MGB specialists such as Alvaro Vaqueiro. In promotional materials, Vaqueiro boasted that BBVA is the leading MGB market maker and emphasized BBVA's "integrated structure" that allows its Mexican affiliate to "increase its cross-border capabilities".[3] BBVA also maintains a dedicated 17-person "institutional investor sales team" for Latin American government debt in its New York offices that focuses on Mexican and Brazilian sovereign debt.[4] BBVA's New York office also houses senior traders specializing in MGBs, such as Gabriel Bochi, who served as Managing Director of LatAm (*i.e.* Latin American) Debt Capital Markets during the Class Period.[5] These efforts enabled BBVA to trade large volumes of MGBs with investors in the United States, with individual sales staff executing "up to $15 million per trade in the sovereign bonds of Latin America, mostly Brazil and Mexico."[6] As a result of these efforts, BBVA transacted MGBs directly with Plaintiff EWPFL (as defined below) in the United States during the Class Period at artificial, fixed prices.

---

[3] *Álvaro Vaqueiro: "Our leadership is not a matter of luck"*, BBVA BANCOMER, (Oct. 9, 2013).

[4] *See LinkedIn profile of Tim Goodell*, LINKEDIN, last visited Jan. 12, 2018, available at https://www.linkedin.com/in/tim-goodell-a971769/.

[5] *See LinkedIn profile of Gabriel Bochi*, LINKEDIN, last visited Jan. 22, 2018, available at https://www.linkedin.com/in/gabriel-bochi-53458344/.

[6] *See LinkedIn profile of Aleksandr Golodner*, LINKEDIN, last visited Feb. 15, 2018, available at https://www.linkedin.com/in/agolodner77/.

21. <u>Santander</u>: Santander regularly publishes and distributes the English-language publication "Fixed Income & Economics Daily" aimed at investors in the United States. The publication regularly highlights MGBs and closes with a solicitation that "any transaction in any security discussed herein should contact and place orders in the United States with SIS [Defendant Santander Investment Securities]".[7] Santander's New York-based LatAm[8] Fixed Income sales desk employed MGB specialists like Brendan Hurley tasked with "communicat[ing] trade ideas to sales force, trading staff, and clients" and  David Duong (formerly of Deutsche Bank and currently of HSBC) to supply "trade ideas for institutional clients."[9] Santander's New York-based marketing operations included strategists who published research concerning the MGB market to support its MGB sales franchise in the United States.[10] As a result of these efforts, Santander transacted MGBs directly with Plaintiff EWPFL in the United States during the Class Period at artificial, fixed prices.

22. <u>Deutsche Bank</u>: Deutsche Bank's Latin American fixed incomes trading and sales operations, which included MGBs, were headquartered in and directed from its New York offices during the Class Period.[11] Deutsche Bank placed numerous senior Latin American debt traders in New York throughout the Class Period, including both Co-Heads of Debt Capital Markets for Latin America who supervised its MGB business.[12] These managers reported to Alberto Adura and Karan

---

[7] *See, e.g., Fixed Income & Economics Daily*, May 11, 2016, SANTANDER, available at https://www.santander.com.br/document/wps/fid160511.pdf

[8] "LatAm" is a short form denoting that a business unit is focused on Latin America.

[9] *LinkedIn profile of Brendan T. Hurley*, LINKEDIN, last visited Jan. 22, 2018, available at https://www.linkedin.com/in/brendan-t-hurley-a283b13/; *LinkedIn profile of David Duong*, LINKEDIN, last visited Jan. 23, 2018, available at https://www.linkedin.com/in/david-duong-cfa/.

[10] *LinkedIn profile of Naveen Kunam*, LINKEDIN, last visited Feb. 15, 2018, available at https://www.linkedin.com/in/naveenkunam/.

[11] *See Press Release Deutsche Bank strengthens Latin America sales and trading in New York*, Deutsche Bank, (Apr. 12, 2010).

[12] *Press Release, Deutsche Bank, Andre Silva Joins Deutsche Bank as Co-Head of Debt Capital Markets for Latin America* (Oct. 13, 2009), available at https://www.businesswire.com/news/home/20091013006033/en/Andre-Silva-Joins-Deutsche-Bank-Co-Head-Debt; *BrokerCheck profile of Andre Silva*, FIN. INDUS. REGULATORY AUTH., available at

Madan (both of whom were hired from co-conspirator Merrill Lynch), who led Deutsche Bank's LatAm debt capital markets team from its offices in New York.[13] The sales staff working in these business units were tasked with selling MGBs to investors located in the U.S. market, including David Duong, who later joined co-conspirators Santander and HSBC.[14] During the Class Period, Deutsche Bank's MGB operations in Mexico worked under the supervision of and directly reported to executives based in New York, including Karan Madan, who was "responsible for the strategic expansion of the Latin America business which led to record revenues and top league table positions."[15]

23.     <u>HSBC</u>: HSBC markets and sells MGBs to investors in the United States from its LatAm Fixed Income business unit that is headquartered in New York.[16] HSBC's global strategy for Latin American sovereign debt, which includes MGBs, is directed from its New York offices. Its Head of LatAm Fixed Income strategy, Alejandro Martinez Cruz (formerly of co-conspirator Citibanamex) supervises these activities from his office in New York.[17] HSBC's Global Markets division employs sales staff specializing in MGBs such as Adam Ades, who "priced Mexican sovereign debt" for customers located in the United States.[18] As a result of these efforts, HSBC

---

https://brokercheck.finra.org/individual/summary/2953003; *BrokerCheck profile of Carlos Euilio Mendoza*, FIN. INDUS. REGULATORY AUTH., available at https://brokercheck.finra.org/individual/summary/2919111.

[13] *Deutsche Poaches Senior Merrill Banker*, Latin Fin., May 1, 2009, available at http://www.latinfinance.com/daily-briefs/2009/5/1/deutsche-poaches-senior-merrill-banker

[14] *LinkedIn profile of David Duong*, LINKEDIN, last visited Jan. 23, 2018, available at https://www.linkedin.com/in/david-duong-cfa/.

[15] *Biography of Karan Madan*, *Latin America Regional Head and Head of Latin America FICC Trading*, Barclays Capital, (Oct. 2011).

[16] *LinkedIn Profile of Alejandro Martinez Cruz*, LINKEDIN, last visited Jan. 24, 2018, available at https://www.linkedin.com/in/alejandro-mart%C3%ADnez-cruz-a87ab02b/

[17] *Id.*

[18] *LinkedIn profile of Adam Ades*, LINKEDIN, last visited Jan. 12, 2018, available at https://www.linkedin.com/in/adam-ades-50a83a32/

transacted MGBs directly with Plaintiffs in the United States during the Class Period at artificial, fixed prices.

24.     Barclays: Barclays' Global Finance for Latin America unit is based in its New York offices. Managers in this business unit specialize in sovereign debt markets in Latin America, including "Mexican Markets."[19] Barclays' Latin American Fixed Income business is based in New York and is headed by Carlos Corona, a former Citigroup trader who now serves as "Director of Global Finance Latin America" in Barclays' New York office.[20] Barclays' MGB marketing, trading and sales efforts were also directed from Barclays Capital's offices located in New York prior to Corona's tenure, including by Karan Madan, who was hired from co-conspirator Deutsche Bank to lead this division from New York.[21] As a result of these efforts, Barclays through Barclays Capital transacted MGBs directly with Plaintiff EWPFL in the United States during the Class Period at artificial, fixed prices.

25.     Defendants' intentional exploitation of the U.S. market for MGBs succeeded. Due to Defendants' marketing and sales activity, foreign investment in Mexico's government debt repeatedly broke records, according to the Institute of International Finance.[22] In many of the MGBs Plaintiffs traded, MGBs held by investors outside of Mexico constitute a substantial majority of all outstanding bonds.

26.     According to data compiled by Banxico in 2014, investors outside of Mexico held a majority of the total amount of CETES (a short term zero-coupon MGB) and BONOS (a longer

---

[19] *LinkedIn profile of Carlos Corona*, LINKEDIN, last visited Jan. 12, 2018, available at https://www.linkedin.com/in/carlos-corona-28041012/

[20] *Id.*

[21] *Biography of Karan Madan, Latin America Regional Head and Head of Latin America FICC Trading*, Barclays Capital, (Oct. 2011).

[22] *Emerging-Market Bond Investors Head to Mexico*, The Wall Street Journal, (Jan. 31, 2016) available at https://www.wsj.com/articles/emerging-market-bond-investors-head-to-mexico-1454272568.

term fixed-rate coupon MGB) outstanding, with a share of 62% and 56% of all outstanding CETES and BONOS, respectively.

27.     As of the end of the Class Period, foreign investors held $110.9 billion worth of MGB. By June 2016, MGB holding by investors outside of Mexico (including tens of billions of dollars' worth held by U.S. investors) totaled 58.5% of all outstanding BONOS, a total of $86.2 billion in notional value.[23]

28.     MGBs account for the overwhelming majority—approximately 86%—of the entire market for Mexican debt securities, which also includes corporate bonds.[24] The following table shows the evolution over the Class Period of Mexican debt securities held by U.S. investors, broken down into short-term debt securities (like CETES) and long-term debt securities (like BONOS):

| Mexican Debt Securities Holding of U.S. Residents in (Thousands of Dollars) [25] | | |
|---|---|---|
| | Short-Term | Long-Term |
| 2006 | 18,000 | 23,812,000 |
| 2007 | 432,000 | 23,911,000 |
| 2008 | 211,000 | 18,950,000 |
| 2009 | 38,000 | 22,555,000 |
| 2010 | 160,000 | 32,081,000 |
| 2011 | 3,586,000 | 45,485,000 |
| 2012 | 8,170,000 | 72,084,000 |
| 2013 | 9,275,000 | 73,534,000 |
| 2014 | 6,556,000 | 92,303,000 |
| 2015 | 3,689,000 | 87,440,000 |
| 2016 | 1,792,000 | 90,111,000 |
| Total | 33,927,000 | 561,966,000 |

29.     Defendants used their U.S.-based dealer subsidiaries, which include Santander Investment Securities, Inc., BBVA Securities, Inc., Compass Capital Markets, HSBC Securities

---

[23] *Fixed-Income and FX Weekly*, BANORTE, (Jun. 6, 2016), available at https://www.banorte.com/cms/casadebolsabanorteixe/analisisyestrategia/estrategiasemanalrentafija/20160606_FIFX Weekly.pdf.

[24] *See Mexico's Bond Market, an Introduction*, S&P DOW JONES INDICES, (May 2015). The remaining 14.1% is made up of debt securities issued by other entities, such as corporations.

[25] Data from *U.S. Portfolio Holdings of Foreign Securities at End-year 2016*, U.S. DEPARTMENT OF THE TREASURY, (Dec. 31, 2016).

(USA) Inc., and Barclays Capital Inc., to sell MGBs with the knowledge of, and for the benefit of, their corporate parents and close affiliates that served as market makers for MGBs as more particularly alleged in Part C, below. Additionally, as more particularly alleged in ¶¶ 20-24, the New York-based affiliates of BBVA, Santander, Deutsche Bank, HSBC, and Barclays supervised, directed, and bore responsibility for the MGB trading and sales strategies of these Defendants.

## PARTIES

### A.  Plaintiffs

30.     Plaintiff Oklahoma Firefighters Pension and Retirement System ("OFPRS"), established in 1981, provides retirement benefits to firefighters in Oklahoma. As of June 30, 2017, OFPRS managed more than $2.5 billion in assets on behalf of approximately 24,000 members and beneficiaries. During the Class Period, OFPRS transacted tens of millions of dollars of MGBs, including BONOS, directly with Defendants HSBC Securities (USA) Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. OFPRS suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

31.     Plaintiff Electrical Workers Pension Fund Local 103, I.B.E.W ("EWPFL"), is a deferred retirement plan that currently provides benefits to nearly 2,500 retired participants. As of 2017, EWPFL managed more than $1 billion in assets. During the Class Period, EWPFL transacted millions of dollars of MGBs, including BONOS, CETES, and UDIBONOS, directly with Defendants Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Banco Bilbao Vizcaya Argentaria, S.A., BBVA Securities, Inc., Banco Santander, S.A., Santander Investment Bolsa, Sociedad de Valores, S.A., HSBC Bank PLC, HSBC Securities (USA) Inc., Citigroup Global Markets Inc., Citibanamex and Barclays Capital Inc. EWPFL suffered monetary losses when it was overcharged or

11

underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

### B. Defendants

#### 1. Banco Santander S.A.

32.     Defendant Banco Santander S.A. is a public banking group with its global headquarters in Santander, Spain.

33.     Banco Santander S.A. derived more than $370 million in profit from its U.S.-based operations in 2016, including from its fixed income sales activities, which includes MGBs.[26]

34.     Banco Santander S.A. owns and operates a New York Branch, which is the same legal entity and an operational extension of Banco Santander S.A. in the United States. Banco Santander's New York Branch reported $1.4 billion in assets in its 2015 U.S. Resolution Plan. It is regulated by both the NYSDFS and the Federal Reserve Board.[27]

35.     Banco Santander S.A. marketed MGBs to and transacted MGBs with U.S. investors from within the United States throughout the Class Period. Plaintiff EWPFL transacted CETES directly with Banco Santander S.A. in New York during the Class Period.

36.     Banco Santander S.A. is a bank holding company under the Bank Holding Company Act of 1956 and a financial holding company pursuant to the Gramm-Leach-Bliley Act of 1999.

37.     Banco Santander S.A. filed its most recent U.S. Resolution Plan on December 16, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.

---

[26] *Santander Annual Report 2016* (2016), *available at*
https://www.santander.com/csgs/Satellite/CFWCSancomQP01/en_GB/pdf/Annual_report_2016.pdf. Currency converted from Euros to American Dollars based on average yearly exchange rate provided by the IRS. https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates

[27] https://www.fdic.gov/regulations/reform/resplans/plans/santander-165-1512.pdf

38.     Defendant Santander Holdings USA, Inc., is a direct, wholly-owned subsidiary of Banco Santander S.A. and is the corporate parent of Defendant Santander Investment Securities, Inc.

39.     Defendant Santander Investment Securities, Inc. ("SIS") is a wholly-owned subsidiary of Banco Santander S.A. and a direct subsidiary of Santander Holdings USA Inc. SIS is based in New York and is a registered broker-dealer and investment advisor. SIS marketed and transacted billions of dollars' worth of MGBs in the United States during the Class Period.

40.     SIS had $1.5 billion in assets regulated by the SEC and the Financial Industry Regulatory Authority ("FINRA") as of 2015.

41.     During the Class Period, SIS employed emerging markets traders in its New York office, including Robert Kessler, who engaged in the "consistently profitable trading [of] Latin American sovereign and corporate debt" and traded in sovereign bonds issued by Mexico, and Bosco Livingston, an emerging markets senior trader specializing in sovereign debt products that include MGBs.[28]

42.     Defendant Santander Investment Bolsa, Sociedad de Valores, S.A. is a wholly-owned subsidiary of Banco Santander S.A. that transacted MGBs in the United States, including BONOS directly with Plaintiff EWPFL, during the Class Period.

43.     Defendant Banco Santander (México), S.A. Institución de Banca Múltiple, Grupo Financiero Santander ("Santander Mexico") is a Mexican wholly-owned subsidiary of Defendant Banco Santander SA. Santander Mexico is the successor-in-interest to Grupo Financiero Santander México, S.A.B. de C.V.

---

[28] https://www.linkedin.com/in/robert-kessler-43151913/; https://www.linkedin.com/in/bosco-pulido-livingston-4328971b/.

44. Santander Mexico was a designated market maker for Mexican government securities throughout the Class Period and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

45. Defendants Banco Santander S.A., Santander Investment Securities Inc., Santander Investment Bolsa, Sociedad de Valores, S.A., and Santander Mexico are referred to collectively as "Santander."

### 2. Banco Bilbao Vizcaya Argentaria, S.A.

46. Defendant Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA S.A.") is an international financial group with its headquarters in Bilbao, Spain.

47. BBVA S.A. focuses its business in five geographical areas: Spain, Mexico, South America, the United States, and Eurasia. Corporate banking and investment banking are considered global businesses for BBVA S.A., and are managed globally and locally at the subsidiary level.

48. BBVA S.A. provides corporate banking, investment banking, and wealth management products and services to U.S.-based customers through its U.S. subsidiaries Compass Bank, BBVA Securities Inc., and its New York Branch.

49. BBVA S.A. had $69.261 billion in assets within the US as of year-end 2014.

50. BBVA S.A. filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.

51. BBVA S.A. reported having three material legal entities in the United States, including: BBVA Compass Bancshares, Inc., Compass Bank, and Compass Capital Markets, Inc.[29]

52. Defendant BBVA Compass Bancshares, Inc. is a direct, wholly-owned subsidiary of BBVA S.A.

---

[29] BBVA S.A. & Compass Bank US Resolution Plan Section I - Public Section (2014) available at https://www.federalreserve.gov/bankinforeg/resolution-plans/bbva-compass-bshrs-3g-20141231.pdf.

53.     Defendant BBVA Securities, Inc. ("BSI") is a wholly-owned subsidiary of BBVA S.A. and is a direct subsidiary of BBVA Compass Bancshares, Inc. BSI is an international investment bank based in New York, New York that provides securities brokerage and research services. BSI is a registered broker-dealer and is regulated by the SEC and FINRA.

54.     BSI marketed and transacted billions of dollars' worth of MGBs in the United States with U.S. investors throughout the Class Period, including CETES, BONOS, and UDIBONOS directly with Plaintiff EWPFL.

55.     BBVA S.A. and its subsidiaries employ traders in the United States who transact in MGBs, such as Surya Bhattacharjee, a Managing Director of Latin American Debt Capital Markets, who is "[r]esponsible for sovereign, quasi-sovereign and supranational issuers across Latin America."[30] BBVA S.A. also marketed MGBs to and transacted MGBs with investors in the United States during the Class Period, including CETES and BONOS directly with Plaintiff EWPFL.

56.     Defendant Grupo Financiero BBVA Bancomer, S.A. de C.V. is a direct, wholly-owned subsidiary of BBVA S.A.

57.     Defendant BBVA Bancomer S.A., Institucion de Banca Multiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer") is a wholly-owned subsidiary of BBVA S.A. and is the principal direct subsidiary of Grupo Financiero BBVA Bancomer, S.A. de C.V. It is based in Mexico City, Mexico and provides various financial products and services to companies, government, and individuals and is the largest bank by assets in Mexico.

58.     BBVA-Bancomer was a designated market maker for MGBs throughout the Class Period and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

---

[30] https://www.linkedin.com/in/surya-bhattacharjee-40baa911/?trk=seokp-title-professional-name

59.     Defendants BBVA S.A., BBVA Compass Bancshares, Inc., BBVA Securities, Inc., Grupo Financiero BBVA Bancomer, S.A. de C.V., and BBVA-Bancomer are collectively referred to as "BBVA."

### 3. JPMorgan Chase & Co.

60.     Defendant JPMorgan Chase & Co. is an American banking and financial services holding company headquartered in New York, New York.

61.     JPMorgan Chase & Co. was the largest bank in the United States as of year-end 2016 with $2.490 trillion in assets.[31] JPMorgan Chase & Co. had $1.4 billion in trading and investing assets within Mexico in 2016, including trades and investments in MGBs. [32]

62.     Defendant J.P. Morgan Broker-Dealer Holdings Inc. is a direct, wholly-owned subsidiary of JPMorgan Chase & Co. and is based in New York.

63.     Defendant JP Morgan Securities LLC is based in New York and is a wholly-owned subsidiary of JPMorgan Chase & Co. and a direct subsidiary of J.P. Morgan Broker-Dealer Holdings Inc. JP Morgan Securities LLC operated an emerging markets desk that sold MGBs to investors located in the United States.

64.     Defendant JPMorgan Chase Bank, National Association is a wholly-owned subsidiary of JPMorgan Chase & Co. that is headquartered in New York. JPMorgan Chase Bank, National Association marketed MGBs to and transacted MGBs with investors throughout the United States during the Class Period, including BONOS with Plaintiff OFPRS.

---

[31] *JPMorgan Chase & Co. Annual Report 2016* (2016), *available at* https://www.jpmorganchase.com/corporate/investor-relations/document/2016-annualreport.pdf.

[32] *Id.* at 109.

65.    Banco J.P. Morgan, S.A. Institución de Banca Múltiple, J.P. Morgan Grupo Financiero ("JPMorgan Mexico") is a wholly-owned subsidiary of JPMorgan Chase & Co. and is based in Mexico.

66.    As ultimate parent and holder of 99.66% voting power, JPMorgan Chase & Co. exercises complete control over the activities of JPMorgan Mexico.[33]

67.    JPMorgan Chase & Co.'s control over JPMorgan Mexico extends even to the latter's personnel recruitment. In a 2012 press release, JPMorgan Chase & Co. announced that it was "making significant investments in recruiting and developing staff" for JPMorgan Mexico.[34]

68.    JPMorgan Chase & Co. provides financial support directly to JPMorgan Mexico. In 2012, JPMorgan Chase & Co. made a $250 million capital increase to JP Morgan Mexico, which "will allow [JPMorgan Mexico] to increase its lending limits in the country and to provide its growing list of clients with more credit opportunities."[35]

69.    JPMorgan Chase & Co. derives benefit from JPMorgan Mexico's operations and considers them to be an extension of its own. In every annual report, JPMorgan Chase & Co. reports on its "Trading and investing" exposure in Mexico, a number that includes "market-making inventory," including MGBs.[36]

---

[33] *See* JPMorgan, Annual Report (Form 10-K), Ex. 21.1 (Mar. 2, 2009), available at http://investor.shareholder.com/jpmorganchase/secfiling.cfm?filingID=950123-09-3840&CIK=19617#Y74757EXV21W1_HTM.

[34] Press Release, JPMorgan, J.P. Morgan Increases Capital in Mexico (June 18, 2012), available at https://investor.shareholder.com/jpmorganchase/releasedetail.cfm?releaseid=683502.

[35] *Id.*

[36] *See, e.g.*, JPMORGAN, ANNUAL REPORT 2016 at 109, available at https://www.jpmorganchase.com/corporate/investor-relations/document/2016-annualreport.pdf; JPMORGAN, ANNUAL REPORT 2015 at 141, available at https://www.jpmorganchase.com/corporate/investor-relations/document/2015-annualreport.pdf.

70.     JPMorgan Mexico was a designated market maker for MGBs throughout the Class Period and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

71.     JPMorgan Chase & Co., J.P. Morgan Broker-Dealer Holdings Inc., JP Morgan Securities LLC, JPMorgan Chase Bank, National Association, and JPMorgan Mexico are collectively referred to as "JPMorgan".

### 4.   HSBC

72.     Defendant HSBC Holdings PLC is a British multinational banking and financial services company, with its headquarters in London, England.

73.     HSBC Holdings PLC is the parent company of one of the world's largest banking and financial services groups, with subsidiaries providing services in 75 countries and territories and approximately 13,000 employees in the United States.[37] HSBC Holdings PLC's ADRs are listed on the NYSE.

74.     HSBC Holdings PLC's Global Banking & Markets, Americas includes employees of both HSBC Securities (USA), Inc. and HSBC Mexico, S.A. For example, the New York-based CEO, Chairman of the Board, and President of HSBC Securities (USA), Inc., Thierry Roland, is also the Group General Manager and Chief Executive Officer of HSBC Global Banking & Markets, Americas.[38]

75.     Defendant HSBC Bank PLC is a wholly-owned subsidiary of HSBC Holdings PLC that transacted MGBs with investors in the United States during the Class Period, including directly with Plaintiff EWPFL.

---

[37] *HSBC Holdings plc Annual Report and Accounts 2016* (2016), *available at* http://www.hsbc.com/investor-relations/group-results-and-reporting/annual-report.

[38] https://www.us.hsbc.com/content/dam/hsbc/us/docs/pdf/HSI_Form_ADV_Update_August_2017.pdf.

76.     Defendant HSBC North America Holdings Inc. is the holding company for HSBC Holdings PLC's operations in the United States with assets of $307.8 billion as of June 2017. Through its subsidiaries, HSBC North America Holdings Inc. held $6.899 billion in corporate and foreign bonds as of December 21, 2015, including MGBs.

77.     Defendant HSBC Securities (USA) Inc. is a subsidiary of HSBC North America Holdings Inc., a direct subsidiary of HSBC Markets (USA) Inc., and an investment banking firm based in New York, New York. HSBC Securities (USA) Inc. employs personnel specializing in MGB sales and trading and sold substantial quantities of price-fixed MGB in the United States during the Class Period.

78.     HSBC Securities (USA) Inc. is a registered broker-dealer under the Securities Exchange Act of 1934, and a registered investment adviser under the Investment Advisers Act of 1940.

79.     HSBC Securities (USA) Inc. markets MGBs to and transacts with investors located in the United States on behalf of its parent companies, including directly with Plaintiffs OFPRS and EWPFL during the Class Period.

80.     HSBC North America Holdings Inc. and its subsidiaries employ traders who transact in MGBs in their New York office, including Manual Astaburuga, an emerging markets trader for HSBC NY Global Banking and Markets and Christian Caruso, an emerging markets fixed income trader.[39]

81.     Defendant HSBC North America Holdings, Inc. is a wholly-owned subsidiary of HSBC Holdings PLC.

---

[39] https://www.linkedin.com/in/manuel-astaburuaga-b2673794/?trk=seokp-title-professional-name; https://www.linkedin.com/in/christiancaruso/?trk=seokp-title-professional-cta

82.     Defendant HSBC Markets (USA) Inc. is wholly-owned subsidiary of HSBC Holdings PLC.

83.     Defendant HSBC Latin America Holdings (UK) Limited is a wholly-owned subsidiary of HSBC Holdings PLC.

84.     Defendant HSBC Mexico, S.A., Institucion De Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico") is a direct subsidiary of HSBC Latin America Holdings (UK) Limited and a wholly-owned subsidiary of HSBC Holdings PLC. HSBC Mexico was a designated market maker for MGBs throughout the Class Period and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

85.     Defendants HSBC Holdings PLC, HSBC North America Holdings Inc., HSBC Securities (USA), HSBC Bank PLC, HSBC Markets (USA) Inc., HSBC Latin America Holdings (UK) Limited, and HSBC Mexico are collectively referred to as "HSBC."

### 5. Barclays

86.     Defendant Barclays PLC is a multinational bank and financial services company headquartered in London, England. Barclays PLC has operations in over 40 countries and employs approximately 120,000 people.

87.     Barclays PLC identified nine material entities in their most recent US resolution plan, as required by the Dodd-Frank Wall Street Reform and Consumer Protection Act, including: Barclay's Capital Inc. and Barclays Bank PLC - New York Branch.

88.     As of year-end 2016 Barclay's PLC held approximately $37 billion in government bonds, including MGBs.[40]

---

[40] *Barclays PLC Annual Report 2016* (2016), *available at*
https://www.home.barclays/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2016/Barclays%20PLC%20Annual%20Report%202016.pdf. Currency converted from Euros to American Dollars.

89.     Defendant Barclays Capital Inc. is incorporated in the state of Connecticut and is a wholly-owned subsidiary of Barclays PLC. Barclays Capital Inc. is a U.S. registered securities broker-dealer with the SEC, a futures commission merchant, a commodity pool operator, a commodity trading advisor registered with the CFTC, and a municipal advisor registered with the SEC. Barclays Capital Inc. is headquartered in New York, New York, with registered domestic branch offices in 18 U.S. cities.

90.     Barclays Capital Inc.'s activities include transactions in asset-backed securities, agency mortgage-backed securities, listed equities, international debt securities, corporate related securities, resale and repurchase agreements, and securities borrowing and lending. Barclays Capital Inc.'s core business lines are equities trading, fixed income credit, fixed income rates, fixed income securitized products, and prime services.

91.     At year-end 2016, Barclays Capital Inc. held $7.56 billion in government securities, including MGBs, and $7.32 billion in government securities designated for sale.[41]

92.     Barclays Capital Inc. marketed MGBs to and transacted MGBs with investors located in the United States during the Class Period on behalf of Barclays PLC, including CETES and BONOS directly with Plaintiff EWPFL.

93.     Defendant Barclays Capital PLC, a wholly-owned subsidiary of Barclays Bank PLC, and operating under the trade name Barclays Investment Bank, provides investment banking advisory services, foreign exchange securities lending, and loan syndication services with three offices in the U.S.

94.     Barclays Capital PLC's macro markets line of business is supported by trading desks that specialize in the trading of government bonds, including MGBs.[42]

---

[41] https://www.sec.gov/Archives/edgar/data/851376/000110465917013061/a17-7323_1full.pdf

[42] https://www.investmentbank.barclays.com/markets/macro.html

95.     Defendant Barclays Bank PLC is a direct subsidiary of Barclays PLC which together with its subsidiaries provides financial products and services in the Americas.

96.     Barclays PLC and its subsidiaries employ traders in their New York Office who transact in MGBs, including Robert Lombardi, an emerging markets credit trader for Barclays Capital PLC and Vasi Ardelean, a fixed income trader in Latin American bonds.[43]

97.     Defendant Grupo Financiero Barclays Mexico, S.A. de C.V. is a wholly-owned subsidiary of Barclays PLC and based in Mexico.

98.     Defendant Barclays Bank Mexico, S.A. ("Barclays Mexico") is a wholly-owned subsidiary of Grupo Financiero Barclays Mexico, S.A. de C.V. Throughout the Class Period Barclays Mexico was a designated market maker for MGBs and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

99.     Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Barclays Capital PLC, Grupo Financiero Barclays Mexico, S.A. de C.V., and Barclays Mexico are collectively referred to as "Barclays."

### 6. Citigroup

100.     Defendant Citigroup Inc. is a multinational investment banking and financial services corporation headquartered in New York, New York.

101.     Citigroup Inc. reported approximately $16 billion in investment securities and trading account assets, including MGBs, at year-end 2016.

102.     Defendant Citigroup Global Markets Holdings Inc. is a direct subsidiary of Citigroup Inc. and is based in New York.

---

[43] https://www.linkedin.com/in/robert-lombardi-6500709/?trk=seokp-title-professional-cta;
https://www.linkedin.com/in/vasi-ardelean-8a6046b/?trk=seokp-title-professional-name.

103.     Defendant Citigroup Financial Products Inc. is a wholly-owned subsidiary of Citigroup Global Market Holdings Inc. and is based in New York.

104.     Defendant Citigroup Global Markets Inc. is a wholly-owned subsidiary of Citigroup Inc. and a direct subsidiary of Citigroup Financial Products Inc. It provides investment banking and financial advisory services. Citigroup Global Markets Inc. is based in New York, NY.

105.     Citigroup Global Markets Inc. marketed MGBs to and transacted MGBs with investors in the United States during the Class Period, including directly with Plaintiffs OFPRS and EWPFL.

106.     Defendant Banco Nacional de Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero Banamex ("Citibanamex"), operating under the trade name Citibanamex, is a wholly-owned subsidiary of Citigroup Inc. It was a designated market maker for MGBs throughout the Class Period and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

107.     Citibanamex marketed MGBs to and transacted MGBs with investors in the United States during the Class Period, including directly with Plaintiff EWPFL.

108.     Defendants Citigroup Inc., Citigroup Global Markets Holdings Inc., Citigroup Financial Products Inc. Citigroup Global Markets, Inc., and Citibanamex are collectively referred to as "Citigroup."

### 7.  Bank of America

109.     Defendant Bank of America Corporation is an American global bank headquartered in Charlotte, North Carolina.

110.     Bank of America Corporation reported holding $430 million in Mexican securities and other investments, including MGBs, at year-end 2016.[44]

111.     Bank of America Corporation completed its purchase of Defendant Merrill Lynch Pierce Fenner & Smith Incorporated on January 1, 2008 and continued operating Merrill Lynch Pierce Fenner & Smith's debt and equity underwriting and sales and trading businesses after that date.

112.     Defendant Bank of America N.A. is a banking institution that marketed MGBs to and transacted MGBs with investors in the United States.

113.     Defendant BankAmerica International Financial Corporation is a U.S.-based subsidiary of Bank of America N.A. and is the direct parent of Defendant Bank of America Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero Bank of America ("Bank of America Mexico").

114.     Bank of America Mexico was a designated market maker for MGBs throughout the Class Period and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

115.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is based in New York and is a wholly-owned subsidiary of Bank of America Corporation. It is the successor to Banc of America Securities, which traded MGBs in the United States including directly with Plaintiff EWPFL during the Class Period.

116.     Defendants Bank of America Corporation, Bank of America N.A., BankAmerica International Financial Corporation, Bank of America Mexico, and Merrill Lynch, Pierce, Fenner & Smith Incorporated are collectively referred to as "Bank of America.".

---

[44] *Bank of America Corporation 2016 Annual Report* (2016), available at http://media.corporate-ir.net/media_files/IROL/71/71595/BOAML_AR2016.pdf

### 8. Deutsche Bank AG

117.     Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany. Deutsche Bank AG maintains a substantial presence in the United States, including in the United States market for MGBs.

118.     Deutsche Bank AG's U.S. headquarters is in New York. Its New York branch is located at 60 Wall Street, New York, NY 10005. Deutsche Bank AG considers its New York branch to be a "material entity" within the United States. Deutsche Bank AG's U.S.-based dealers trade in Latin American sovereign debt products, including MGBs.

119.     Deutsche Bank AG, New York Branch acts as an agent of Deutsche Bank AG in the United States and in this District. Deutsche Bank AG, New York Branch has been registered with NYSDFS and licensed to do business in this state since 1978. Deutsche Bank AG is also registered with the Board of Governors of the Federal Reserve System. Deutsche Bank AG's New York branch has more than 1,700 employees and total assets exceeding $152 billion.

120.     Traders in Deutsche Bank AG's New York offices participated in numerous conspiracies to fix prices in financial markets during the Class Period.[45]

121.     Deutsche Bank AG's Fixed Income and Currencies business is considered one of its "core businesses."[46] The business markets and trades MGBs from its offices in the United States, where it provides interest rate products with its U.S. clients and maintains a Fixed Income Proprietary Trading team that trades MGBs.[47]

---

[45] *Matter of Deutsche Bank AG, Deutsche Bank AG New York Branch*, Consent Order Under New York Banking Law §§ 44 and 44-a, (Apr. 23, 2015).

[46] *Deutsche Bank Names Co-Head of Fixed Income*, NEW YORK TIMES, (Feb. 5, 2014), available at https://dealbook.nytimes.com/2014/02/05/deutsche-bank-names-new-co-head-of-fixed-income/.

[47] *Press Release Credit Suisse Appoints Jon Kinol as Global Head of Interest Rate Products*, Credit Suisse, (Feb. 16, 2010) available at https://www.credit-suisse.com/corporate/en/articles/media-releases/41416-201002.html.

122.    Defendant Deutsche Bank Securities Inc. is a wholly-owned subsidiary of Deutsche Bank AG that is based in New York and traded substantial quantities of MGBs from within the United States during the Class Period.[48]

123.    Defendant Deutsche Bank Americas Holding Corp. is based in New York and is a wholly-owned subsidiary of Deutsche Bank AG.

124.    Defendant Deutsche Bank México, S.A., Institution de Banca Múltiple ("Deutsche Bank Mexico") is a direct subsidiary of Deutsche Bank Americas Holding Corp. and a wholly-owned indirect subsidiary of Deutsche Bank AG.

125.    Deutsche Bank Mexico was a designated market maker for MGBs during the Class Period and is presently under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

126.    Deutsche Bank AG, Deutsche Bank Securities, Inc., Deutsche Bank Americas Holding Corp., and Deutsche Bank Mexico are collectively referred to as "Deutsche Bank".

### 9.  "John Does" 1-10

127.    John Doe 1 is the entity that received leniency under Mexico's cartel leniency program as reported in May 2017 by Bloomberg. John Doe 1 was a member of the conspiracy described in this Complaint.

128.    John Does 2-4 were designated MGB market makers during the Class Period and joined the conspiracy described in this Complaint.

129.    John Does 5-10 are individuals and entities that joined the conspiracy to fix prices in the market for MGBs that is described in this Complaint.

---

[48] *Notes to Consolidated Statement of Financial Condition*, Deutsche Bank Securities, Inc., at 16 (June 30, 2014), available at https://www.db.com/usa/docs/DBSI-Unaudited-SOFC-6-30-14.pdf.

130.    **The Market Makers:** Defendants Santander Mexico, BBVA-Bancomer, JPMorgan Mexico, HSBC Mexico, Barclays Mexico, Citibanamex, Bank of America Mexico, and Deutsche Bank Mexico were designated market makers in the MGB market during the Class Period. These entities are referred to collectively as "Market Makers" or "Dealers".

### C. Defendants' U.S. Dealer-Subsidiaries Sold MGBs in the United States as Agents for their Corporate Parents

131.    Each Defendant acted through its U.S.-based subsidiaries to buy and sell MGB at fixed, artificial bid-ask spreads to investors located in the United States, including in transactions with Plaintiffs. In each instance, the corporate parents benefitted from, knew of, and exercised control over the conduct of their dealer-subsidiaries as more particularly alleged below.

### 1.  Santander Investment Securities

132.    According to SEC filings, Defendant Banco Santander, S.A. "engage[s] in securities activities in the United States directly through [its] broker-dealer subsidiaries, Santander Securities Corporation and Santander Investment Securities Inc." [49]

133.    As ultimate corporate parent and holder of 100% voting power, Banco Santander, S.A. exercises complete control over the activities of SIS. [50]

134.    Banco Santander, S.A.'s control over SIS extends to the latter's payroll management policies. In 2010, Banco Santander, S.A. established a deferred compensation plan for SIS employees, which includes payment in shares of parent company stock. [51]

---

[49] *See, e.g.*, Banco Santander, S.A., Annual Report (Form 20-F) at 92 (Mar. 24, 2017); Banco Santander, S.A., Annual Report (Form 20-F) at 107 (May 2, 2016).

[50] *See, e.g.*, Banco Santander, S.A., Annual Report (Form 20-F) at F-256 (Mar. 24, 2017) (noting Banco Santander, S.A.'s 100% voting power over SIS through 2015 and 2016).

[51] Santander Investment Securities, Inc., Notes to Statement of Financial Condition as of Dec. 31, 2016 at 11, available at https://www.sec.gov/Archives/edgar/data/931371/000093137117000002/NotesStatementFinCondition.pdf.

135.     Banco Santander, S.A. provides financial support to SIS through a Revolving Subordinated Loan Agreement, effective June 8, 2016, with an average interest rate of 2.7%.[52]

136.     As ultimate parent, Banco Santander, S.A. receives financial benefit directly from SIS's USA operations. For instance, Banco Santander, S.A.'s 2013 U.S. Consolidated Balance Sheet includes the assets of SIS, expressly grouped together with those of the parent's New York branch under the title "Santander NY."[53]

### 2.  BBVA Securities, Inc.

137.     BBVA S.A. trades Latin American debt securities including MGBs in the United States on its own account and through its wholly-owned dealer subsidiary, BSI.

138.     BBVA S.A. supports BSI by providing financing and managerial support. These activities allow BSI to trade MGBs as agent for both BBVA S.A and BBVA-Bancomer. For example, BBVA S.A. provided BSI with a $150 million line of credit to use for trade settlement purposes at an interest rate of 0.5%.[54] BSI's "legal, compliance, accounts payable, internal auditing, and human resource services", and leasing of office space, among other functions, are provided by BBVA S.A. through its New York Branch.[55]

139.     BSI and BBVA-Bancomer both buy and sell MGBs with the knowledge of and for the benefit of BBVA, S.A. The revenue generated by the MGB-related sales and trading are reported in BBVA, S.A.'s consolidated financial statements.[56]

---

[52] *Id.* at 8.

[53] Banco Santander, S.A., Resolution Plan for U.S. Operations, Dec. 31, 2013, available at https://www.federalreserve.gov/bankinforeg/resolution-plans/bc-santander-3g-20131231.pdf.

[54] *Id.*

[55] *Id.*

[56] *See Quarterly Report 1Q 2017, Banco Bilbao Vizcaya Argentaria, S.A., Content Index*, last visited Mar. 6, 2018, available at https://accionistaseinversores.bbva.com/microsites/2017_Inf_1T/en/business-areas/index.html.

140.     BSI trades MGBs with investors in the United States as agent for both BBVA, S.A. and BBVA-Bancomer. For example, in its year-end Statement of Financial Condition for 2017, BSI reported that it "acts as agent on behalf of BBVA [S.A.] and [BBVA] Bancomer in fixed income securities transactions. Fees earned related to this agreement are calculated based on the costs of the team plus a mark-up."[57] These "fixed income securities transactions" include MGBs.

141.     In its capacity as agent for BBVA, S.A. and BBVA Bancomer, BSI transacted millions of dollars' worth of MGBs, including BONOS and CETES, directly with Plaintiff EWPFL during the Class Period.

### 3.   HSBC Securities (USA) Inc.

142.     HSBC Securities (USA) Inc. markets and trades MGBs in the United States with U.S. investors as agent of HSBC Holdings plc and HSBC Mexico.

143.     HSBC Holdings plc directs investors in fixed income products in the United States to a website where it "offers access to a wide variety of fixed income products" including "Sovereign Bonds: Issues by a national government and denominated in a foreign currency" through HSBC Securities (USA), Inc.[58] The "sovereign bonds" sold on this website include MGBs. HSBC Bank USA, National Association (a wholly-owned subsidiary of HSBC Holdings plc) hosts this website.

144.     HSBC Holdings PLC is organized into four "principal business lines" that carry out its businesses in the markets where it operates, including the MGB market in the United States. HSBC Holdings PLC's "Global Banking & Markets, Americas" is the business line that encompasses the MGB-related activities of both Defendants HSBC Securities (USA), Inc., which

---

[57] *Id.*

[58] *Fixed Income Products*, HSBC Bank USA, National Association, (last visited Mar. 6, 2018), available at https://www.us.hsbc.com/investments/products/fixed-income/.

markets MGB directly to and transacts with U.S. investors (including both Plaintiffs OFPRS and EWPFL), as well as Defendant HSBC Mexico.

145.    The MGB marketing and trading activities of HSBC Securities (USA) Inc. and HSBC Mexico are organized within the Global Banking and Markets Division. Samir Assaf is the Group Managing Director and Chief Executive of HSBC Holdings plc's international Global Banking and Markets business line and is employed by HSBC Holdings PLC. In the Americas, Thierry Roland supervises Global Banking and Markets' business in North America and Latin America from his position in HSBC Securities (USA) Inc. in New York. HSBC Holdings plc reports consolidated revenue from its "Credit," "Debt Capital Markets," and "Securities Services" businesses under the heading of its Global Banking and Markets division.[59] These consolidated reports include revenue generated by HSBC Mexico and HSBC Securities (USA), Inc.'s MGB marketing and trading activities.

### 4.    Barclays Capital Inc. and Barclays Capital PLC

146.    Barclays Capital Inc. transacted MGBs with investors located in the United States during the Class Period on behalf of Barclays PLC, including directly with Plaintiff EWPFL.

147.    Barclays Capital Inc. relies on the support of Barclays PLC to conduct its business.[60] Employees of Barclays Capital Inc. are eligible to receive stock of Barclays PLC as compensation,[61] which illustrates the fact that Barclays Capital Inc. and its employees are agents acting in furtherance of Barclays PLC.

---

[59] *See Global Banking and Markets Investor Update*, Samir Assaf, at p. 8, 12 (Jun. 2013), available at http://www.hsbc.com/-/media/HSBC-com/InvestorRelationsAssets/PresentationsAndWebcasts/2013/170613-global-banking-and-markets-investor-update.ashx (reporting revenues from sales of debt securities within Global Banking and Markets).

[60] Barclays Capital Inc., Statement of Financial Condition, 22-24 (Dec. 31, 2016), *available at* https://www.sec.gov/Archives/edgar/data/851376/000110465917013061/a17-7323_1full.pdf.

[61] Barclays Capital Inc., Statement of Financial Condition, 24 (Dec. 31, 2016), *available at* https://www.sec.gov/Archives/edgar/data/851376/000110465917013061/a17-7323_1full.pdf.

148.     Barclays Capital PLC's macro markets line of business is supported by trading desks who specialize in the trading of government bonds, including MGBs.[62]

149.     Barclays PLC has an extensive presence in the United States and refers to the U.K. and the U.S. as its "two home markets." According to Barclays PLC, it is "anchored in the two financial centres of the world, London and New York."[63]

150.     At all times during the Class Period, Barclays Mexico acted as an agent of and was controlled by Barclays PLC. Barclays Mexico states that it acts on behalf of Barclays PLC in its Notes to Financial Statements for the first quarter of 2016:

> The presence of Barclays in Mexico is part of a larger business strategy of Barclays PLC globally, with a distinct business model based on continuing relationships with clients that require experience identifying investment opportunities and solutions. Barclays Capital exemplifies teamwork and transparency in everything it does.
>
> Barclays Mexico has a business strategy built around developing relationships with clients that demand solutions and experience in identifying opportunities for their business. To do this, the bank has a team of experts in the areas of investment banking, treasury services, debt and capital markets advisory, etc.[64]

151.     Further, employees of Barclays Mexico also received Barclays PLC stock as compensation,[65] illustrating that Barclays Mexico and its employees were motivated by a desire to benefit Barclays PLC.

152.     Barclays Mexico's activities were overseen and regulated by Barclays Bank PLC and Barclays PLC. In the notes to Barclays Mexico's financial statements, it reads: "The activities of the

---

[62] https://www.investmentbank.barclays.com/markets/macro.html

[63] Business Structure, https://www.home.barclays/about-barclays/business-structure.html (last visited March 12, 2018).

[64] Barclays Bank México, S.A. de C.V., Notas a los Estados Financieros (March 31, 2016), *available at* https://www.investmentbank.barclays.com/content/dam/barclaysmicrosites/ibpublic/documents/investment-bank/barclays-mexico-financial-reporting/2016/Q1/Banco/Notas%20Barclays%20Bank%20Mexico%20%20Marzo%202016.pdf.

[65] Barclays Bank México, S.A., Sistema de Remuneración §7(II) (2017), *available at* https://www.investmentbank.barclays.com/content/dam/barclaysmicrosites/ibpublic/documents/investment-bank/barclays-mexico-financial-reporting/legal-information/Sistema%20de%20Remuneraci%C3%B3n%20Barclays%20Bank%20VFinal.pdf.

institution are regulated by a series of guidelines established by Barclays Bank PLC, the holding company of the Group based in London, and by applicable law in Mexico."

153.     Supervisory and reporting lines for Barclays Mexico weaved through Barclays Capital Inc. and other affiliates of Barclays PLC. For example, Barclays' head of Mexico operations, Raul Martinez-Ostos, served as Chairman and President of Barclays Mexico and was based in Mexico City,[66] but reported to Ivan Ritossa of Barclays Capital PLC, who was based in London and was Barclays' Head of Latin America, Central and Eastern Europe, Middle East and Africa.[67]

154.     Barclays Capital Inc. also hired Karan Madan as head of its Latin America region and head of Latin America fixed income, currency and commodities trading (including MGB trading) from the offices of Barclays Capital Inc. in New York.[68] In announcing the bank's hiring of Mr. Madan in 2011, Jerry del Missier, the Co-Chief Executive of Corporate & Investment Banking at Barclays PLC, stated that, "Latin America has been a strategic focus of the firm for the past decade and this appointment demonstrates our ongoing commitment to further developing our platform in the region."

155.     In addition, the intermingling of board memberships throughout and across the subsidiaries of Barclays PLC further illustrates the control that Barclays PLC has over the operations of its subsidiaries, and the MGB business specifically. For instance, Gerard LaRocca served on the Board of Barclays Mexico, but was based in New York and was the Chief Executive Officer of

---

[66] Barclays Bank México, S.A., Composición del Consejo de Administración (Feb. 13, 2015), *available at* https://www.investmentbank.barclays.com/content/dam/barclaysmicrosites/ibpublic/documents/investment-bank/barclays-mexico-financial-reporting/2015/Q1/BANCO/Consejo%20de%20Adm%C3%B3n%20Barclays%20Bank%20M%C3%A9xico%20Marzo%202015.pdf.

[67] Prabha Natarajan, *Barclays hires head of Mexico operations*, MarketWatch, Mar. 27, 2012, https://www.marketwatch.com/story/barclays-hires-head-of-mexico-operations-2012-03-27.

[68] Liz Moyer, *Barclays Hires Latin America Banker Karan Madan*, Wall St. J., May 17. 2011, https://blogs.wsj.com/deals/2011/05/17/barclays-hires-latin-america-banker-karan-madan/.

Barclays Capital Inc. and the manager of the New York branch of Barclays Bank PLC.[69] Mr. LaRocca reported to Rich Ricci, the Co-Chief Executive of Barclays Capital PLC, Co-Chief Executive of Corporate and Investment Banking of Barclays PLC, and a member of the Executive Committee for Barclays PLC.[70] Joseph Regan also served on the Board of Barclays Mexico, but was based in New York and served as a Managing Director with Barclays Capital Inc. and as controller for the Americas.[71]

156.    One of the primary sources of funding for Barclays Mexico is lines of credit with Barclays PLC.[72]

157.    Barclays PLC also depends on the profits of its U.S. and Mexican subsidiaries, which are reported in the consolidated earnings of Barclays PLC. For example, in 2017 Barclays PLC reported income of £6.87 billion from its U.S. operations (which include its U.S.-based subsidiaries) and an additional £572 million from the Americas (excluding the U.S.), which includes Barclays Mexico.[73] These sums accounted for more than 35% of Barclays PLC's reported income.

158.    Barclays PLC and its subsidiaries employ traders in their New York Office who transact in MGBs.[74]

---

[69] Barclays Bank México, S.A., Composición del Consejo de Administración (Feb. 13, 2015), *available at* https://www.investmentbank.barclays.com/content/dam/barclaysmicrosites/ibpublic/documents/investment-bank/barclays-mexico-financial-reporting/2015/Q1/BANCO/Consejo%20de%20Adm%C3%B3n%20Barclays%20Bank%20M%C3%A9xico%20Marzo%202015.pdf.

[70] Barclays PLC, Annual Report 2011 (Feb. 2012), *available at* https://www.home.barclays/content/dam/barclaypublic/docs/InvestorRelations/AnnualReports/AR2011/barclays-plc-annual-report-2011.pdf.

[71] *Id.*

[72] Barclays Bank México, S.A., Informe de la Administración Barclays Bank Mexico (March 2016), *available at* https://www.investmentbank.barclays.com/content/dam/barclaysmicrosites/ibpublic/documents/investment-bank/barclays-mexico-financial-reporting/2016/Q1/Banco/Informe%20Admon%20Banco%20Marzo%202016.pdf.

[73] Barclays PLC, 2017 Annual Report, 248 (Feb. 2018), *available at* https://www.home.barclays/content/dam/barclaypublic/docs/InvestorRelations/AnnualReports/AR2017/Barclays%20PLC%20Annual%20Report%202017.pdf.

[74] https://www.linkedin.com/in/robert-lombardi-6500709/?trk=seokp-title-professional-cta.

### 5. Deutsche Bank Securities, Inc.

159.     Deutsche Bank AG's Fixed Income and Currencies business is considered one of its "core businesses."[75] The business markets and sells MGB from its offices in the United States, where it provides interest rate products to its U.S. clients and maintains a Fixed Income Trading team that trades MGBs.[76] Deutsche Bank Securities, Inc. markets and sells MGBs as part of Deutsche Bank AG's Fixed Income and Currencies business.

160.     Deutsche Bank Securities Inc. engages in a high volume of securities transactions, including clearing activities, currency transactions, interest rate derivatives, and swaps, on behalf of U.S. investors and with counterparties located in the United States and in this District. For example, in its Consolidated Financial Statements for 2014, Deutsche Bank Securities Inc. reported that it held billions of dollars in emerging market sovereign debt, which included substantial MGB holdings.[77]

161.     Deutsche Bank AG exercised control over Deutsche Bank Mexico and Deutsche Bank Securities Inc. throughout the Class Period. For example, during the Class Period, Luis Antonio Betancourt Barrios was employed by Deutsche Bank Mexico and served as the Head of Trading for Mexico, a position within Deutsche Bank's broader Global Markets division. Mr. Betancourt Barrios was based in Mexico and oversaw Mexican traders, such as Jorge Classing,[78] a Director in the Emerging Markets Fixed Income Trading unit in Mexico City, but reported directly

---

[75] *Deutsche Bank Names Co-Head of Fixed Income*, NEW YORK TIMES, (Feb. 5, 2014), available at https://dealbook.nytimes.com/2014/02/05/deutsche-bank-names-new-co-head-of-fixed-income/.

[76] *Press Release Credit Suisse Appoints Jon Kinol as Global Head of Interest Rate Products*, Credit Suisse, (Feb. 16, 2010) available at https://www.credit-suisse.com/corporate/en/articles/media-releases/41416-201002.html.

[77] *Notes to Consolidated Statement of Financial Condition*, Deutsche Bank Securities, Inc., at 16 (June 30, 2014), available at https://www.db.com/usa/docs/DBSI-Unaudited-SOFC-6-30-14.pdf.

[78] Press Release, *Deutsche Bank Strengthens Sales and Trading Teams in Latin America*, BusinessWire (April 20, 2010), *available at* https://www.businesswire.com/news/home/20100420007064/en/Deutsche-Bank-Strengthens-Sales-Trading-Teams-Latin.

to both Christian Binaghi, a Managing Director with Deutsche Bank AG in New York who oversaw all Latin America trading, including sovereign debt trading, and Tito Vidaurri a Managing Director and Country Manager for Deutsche Bank Mexico.[79] When the hiring of Mr. Betancourt Barrios was announced in 2006, Mr. Binaghi noted that, "Mexico is a key financial market for Deutsche Bank in Latin America and therefore a vital growth area for us," while Mr. Vidaurri added, "[t]his hire demonstrates our commitment to Mexico as we continue to develop and expand our capabilities, products and services in this market."

162.    Of particular importance to Deutsche Bank AG was making Mexican investments, including MGBs, available to the bank's clients in the United States. In announcing the addition of three new hires to the bank's Latin America Sales & Trading team in New York, Karan Madan, a Managing Director and Head of Global Markets Latin America with Deutsche Bank AG in New York, explained that, "As momentum in Latin America continues, we are adding professionals who will help our clients gain exposure to the region."[80]

163.    Deutsche Bank AG also hired Raul Martinez-Ostos, who later moved to Barclays Mexico, to serve in Mexico City as a Director in the Latin America Debt Capital Markets division, and reported to Marcelo Blanco, the Head of Debt Capital Markets, Latin America.[81] Mr. Martinez was also expected to work closely with Deutsche Bank AG's New York-based debt capital markets team on Mexican public and private sector debt origination coverage.

---

[79] Press Release, *Luis Antonio Betancourt Barrios Joins Deutsche Bank as Head of Trading in Mexico*, BusinessWire (July 10, 2006), *available at* https://www.businesswire.com/news/home/20060710005982/en/Luis-Antonio-Betancourt-Barrios-Joins-Deutsche-Bank.

[80] Press Release, *Deutsche Bank Strengthens Latin America Sales and Trading Team in New York*, BusinessWire (April 12, 2010), *available at* https://www.businesswire.com/news/home/20100412006538/en/Deutsche-Bank-Strengthens-Latin-America-Sales-Trading.

[81] Press Release, *Deutsche Bank Adds to Latin America Debt Capital Markets Team; Raul Martinez-Ostos Jaye Hired as Director in Deutsche Bank's Mexico City Office*, BusinessWire (July 17, 2003), *available at* https://www.businesswire.com/news/home/20030717005470/en/Deutsche-Bank-Adds-Latin-America-Debt-Capital.

164. These intertwined operating and reporting relationships between Deutsche Bank Securities Inc., Deutsche Bank Mexico, and Deutsche Bank AG evidence Deutsche Bank AG's control of its subsidiaries and their integrated MGB business. Deutsche Bank AG states that its "strong local platform in Mexico is part of Deutsche Bank's long-term strategy to develop a global franchise in a large, important and growing economy." Deutsche Bank Mexico provides a full array of financial and advisory products to Mexican corporate and institutional clients through local employees and "through the Deutsche Bank global platform."[82]

165. Deutsche Bank AG seeks to leverage these intertwined relationships on its website and in marketing materials. For instance, the bank states that it has had a presence in Mexico since Deutsche Bank AG opened a representative office there in 1957, and that it was named the "Best Investment Bank in Mexico" in 2013.[83]

166. Deutsche Bank AG reports the revenues and profits generated by Deutsche Bank Mexico on its financial statements.[84] For example, in 2015, Deutsche Bank AG had net revenue attributable to Mexico of $95 million.[85]

## SUBSTANTIVE ALLEGATIONS

### I.   Background

#### A.   The Mexican Government Bond Market

167. The Mexican government issues debt securities to raise capital, fund deficits in the budget, and control the nation's money supply.

---

[82] Deutsche Bank – a strong partner in Mexico, https://www.db.com/mexico/en/content/company.html (last visited March 12, 2018).

[83] Deutsche Bank: Mexico, https://www.db.com/mexico/ (last visited March 12, 2018).

[84] Credit Opinion: Deutsche Bank Mexico, S.A., Moody's Investor Service (June 11, 2015), *available at* https://www.db.com/mexico/docs/Moody-s-2015.pdf.

[85] Deutsche Bank AG, 2015 Annual Report, at 387 (March 2, 2016), *available at* https://www.db.com/ir/en/download/Deutsche_Bank_Annual_Report_2015.pdf.

168.     All MGBs have core features in common that distinguish them as a single class of debt securities. Most notably, they are all backed by the Mexican government, are all issued via auctions dominated by Defendants, and are all sold to investors by Defendants, who control an overwhelming majority of the MGB supply available in the United States.

169.     The market for MGBs is structured as a three-tiered pyramid. The Mexican government, sitting at the top of the pyramid, issues MGBs in regularly scheduled auctions. Auctions are announced on a weekly basis on the last day of the week prior to the auction. Auctions always take place two days prior to the settlement date, *i.e.* the date on which the MGBs are delivered. Settlement dates fall on Thursdays unless Thursday is a holiday, in which case MGBs settle on the closest previous or following working day (with preference for the previous day). As a result, auctions usually take place on Tuesdays.

170.     The Defendants, as the exclusive government-approved market makers, are the middle layer of the pyramid. Defendants participate in the government-run MGB auctions, where they simultaneously submit bid schedules indicating the amount of MGBs they are willing to buy and for what price. These bids are supposed to be confidential. To ensure that bid schedules are not disclosed or shared with other bidders prior to each auction, bid schedules are submitted either in a sealed envelope or through encrypted electronic files. Sample bid schedules for each type of MGB published by Banxico appear in Appendix A.

171.     The third and final level of the pyramid is MGB consumers, like Plaintiffs and the Class. Consumers cannot participate in the government-run MGB auctions. Instead, they must purchase MGBs from the Defendants or other market participants that want to sell them. Plaintiffs here transacted directly with the Defendants. *See Parties*. A.

172.     MGBs can have different features depending on the instrument's face value, maturity, and coupon payment. The face value is set before the security is issued and represents the

amount the issuer pays to the holder of the security at maturity. The maturity date is the date which the face value of a bond is to be paid in full. The maturity date is set when the bond is issued. The length of time between when a bond is issued and when it matures determines its "tenor." A bond's coupon payment determines how much, if any, of the interest earned on the par value is paid before the bond matures. Finally, the yield is the annual rate of return of an investment in a bond if the investor holds the bond until maturity.

173.    Coupon-bonds pay interest at set intervals, known as the "coupon period," and also entitle the holder to payment of the face value at maturity. For example, a coupon-bond might have a face value of $1,000 and provide coupon payments of 5% per year. For this bond, the issuer will pay the holder of the bond $50 each year in interest payments until the bond matures. At maturity, the issuer pays the bond holder the face value of the bond, $1,000.

174.    In contrast, a zero-coupon bond is a bond that is issued at a discount to its face value and does not pay interest until maturity. Instead, the difference between the purchase price and the face value of the bond represents the yield earned by the holder. For example, assume an investor pays $98,382.75 to purchase a zero-coupon bond with a face value of $100,000 that matures in 120 days. When the investor redeems the bond at maturity it will receive the full $100,000 face value, $1,617.25 more than what it paid to purchase that bond. The extra $1,617.25 represents the amount of interest the issuer paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

### 1.  CETES

175.    Federal Treasury Certificates ("CETES") are short-term zero-coupon bonds issued by the Mexican government. Like other zero-coupon bonds, they trade at a discount to their face value, with the difference between the purchase price and the face value representing the yield. CETES have maximum tenors of one-year and are normally issued with maturities between 28 and 364 days. CETES have a par value of 10 pesos and are normally quoted by their yield rate.

176.    CETES are issued in "multi-price" auctions during which Banxico arranges Defendants' bids in order from highest price to lowest price and allocates bonds in descending order based on the quantity requested. The auction stops once the amount of bonds awarded equals the amount offered during that auction.

177.    CETES are the principal means that the Mexican government uses to raise short-term funds. They are considered an attractive short-term investment because they are highly liquid, fungible, and pay higher yields than U.S. Treasury Bills of the same maturity.

### 2.   BONOS

178.    Mexican Federal Government Development Bonds ("BONOS") are fixed-rate coupon bonds with maturities greater than one year. BONOS pay a fixed semi-annual coupon payment and have a par value of 100 pesos. BONOS are priced in terms of yield to maturity.

179.    BONOS may be issued for any maturity period that is a multiple of 182 days. To date, BONOS have been issued with maturities of 3, 5, 10, 20 and 30 years. They are commonly known as BONOS M3, M5, M10, M20 and M30, depending on the tenor. Interest rates on BONOS are announced prior to issuance. BONOS are issued in "single-price" auctions, which function similar to the multi-price auction described above, except that all bonds are sold at the final price where the auction stops.

180.    BONOS are more attractive for long-term investors because they offer periodic interest payments that are higher than the interest generally available through U.S. Treasury bonds.

### 3.   UDIBONOS

181.    Federal Government Development Bonds ("UDIBONOS") are inflation-hedged coupon bonds that pay interest rates fixed by the Mexican government. However, these bonds offer a return which protects investors against inflation by paying a return in real terms every six months based on a real interest rate which is determined on the issue date of each security. UDIBONOS are

suitable for institutional investors like insurance companies and pension funds since these securities allow savings growth in real terms. UDIBONOS are issued in single-price auctions and pay interest every six months in Mexican pesos. They have a par value of 100 UDIs, which are inflation investment units tied to Mexico's National Consumer Price Index.

### 4. BONDES D

182.    Federal Government Development Bonds ("BONDES D") are MGBs that can be issued with any maturity in multiples of 28 days, but are normally issued with maturities of 3, 5, or 7 years. BONDES D are issued in multi-price auctions, have a par value of 100 pesos, and pay a coupon every month.

183.    The interest paid on BONDES D is determined by compounding on a daily basis the rate at which banks and brokerage firms carry out their overnight trades repurchase agreements. BONDES D are therefore known as variable rate bonds.

## II.    The Role of MGB Market Makers

184.    Defendants participate in Banxico's "Market Maker Program." In this capacity, Defendants are responsible for providing liquidity to the MGB market. Banxico grants special privileges to market makers, who are required to commit to obligations in both the government-run auctions and in MGB transactions with investors.

185.    For example, at MGB auctions, Defendants commit to "present bids at competitive prices in each primary auction of securities."[86] They also commit to "permanently quote purchase (bid) and sale (offer) prices to [consumers] in order to provide liquidity and facilitate investment in

---

[86] *The Mexican Government Securities Market*, Banxico, Section 5.1., available at http://www.banxico.org.mx/elib/mercado-valores-gub-en/OEBPS/Text/ven.html

this market."[87] In both instances, Defendants are supposed to independently bid and offer competitive rates and refrain from colluding.

186.     Market makers must submit competitive bids in at least the following amounts in each MGB auction: (1) 20% of the amount offered by the Mexican government, or (2) 1 divided by the number of market makers for that security, whichever is lower. These minimum bidding requirements ensure that, in each auction, Defendants collectively submit bids for at least 100% of the MGBs issued. For example, the Mexican government issued approximately $1.3 billion of BONOS in a June 16, 2016 auction. Eight different market makers submitted bids (the identity of the bidders is not public). Thus, each of the eight market makers was required to submit competitive bids for at least 12.5 percent (1 divided by 8), or $162 million of the BONOS issued on that date.

187.     Market makers agree to present two-way quotes (both for bid and ask) to consumers for each MGB, in all their maturities. They perform this function in major financial markets where MGBs trade, including in the United States, as alleged in the Jurisdiction and Parties sections, above.

188.     Market makers earn profits (in addition to fees and commissions) by selling MGBs purchased during government-run auctions to consumers. They also earn profits by collecting the difference between the price of MGB they buy outside of auctions (*i.e.* the "bid" price) and the price that they sell MGB (*i.e.* the "ask" price). The difference between the bid price and the ask price is known as the "bid-ask spread."

189.     Consumer MGB transactions occur almost entirely over-the-counter and transactions usually take place by telephone. That is, investors seeking to purchase or sell MGBs must pick up the phone and call an MGB salesperson or trader employed by one of the Defendants, who then provides a "quote." Because Defendants are the only authorized market makers for

---

[87] *Id.*

MGBs, Defendants exercise near-total control of MGB supply. This is confirmed by an analysis of bid-ask quotes in the over-the-counter MGB market, which shows that Defendants controlled approximately 82% of the market during the Class Period. This percentage is even larger and exceeds 85% once quotes from interdealer brokers (who broker trades between Defendants) and the Mexican Finance Ministry (which sometimes trades MGBs, but not with consumers) are excluded. This high degree of market control created an opportunity for Defendants to conspire.

## III.   Government Regulators Uncover Evidence of Collusion Among Defendants

### A. The Admitted MGB Cartel

190.    On April 19, 2017, the Investigative Authority of COFECE announced that it had uncovered evidence of price-fixing and collusion in the "government bond intermediation market" where Defendants are the exclusive market makers.

191.    The head of COFECE's Investigatory Authority, Carlos Mena Labarthe, stated: "the damage to public finance and investors could be serious, considering that every year the government places hundreds of billions of Mexican pesos in these markets and that the daily volume of the instruments traded may reach approximately 100 billion Mexican pesos."[88]

192.    COFECE expanded its investigation in May 2017 based on the initial evidence. Bloomberg reported that the antitrust regulator had "zeroed in on 7 banks, including three from the U.S. as part of a widening investigation into price manipulation in the nation's bond market." [89]

---

[88] *Proposición Con Punto de Acuerdo por se Exhorta Respetuosamente a la Comisión Federal de Competencia Económica, Cofece, a Informar Sobre la Investigación Relativa al Número de Expediente 10-006-2016, por la Posible Comisión de Prácticas Monopólicas Absolutas en e Mercado de la Intermediación de Valores de Deuda, Emitidos por el Gobierno Mexicano,* Senator Isidro Pedraza Chávez, at 3 (Nov. 22, 2017).

[89] *Seven Dealers Said to Be Focus of Mexico Bond Collusion Probe,* Bloomberg, (May 16, 2017), available at https://www.bloomberg.com/news/articles/2017-05-16/seven-dealers-said-to-be-focus-of-mexico-bond-collusion-probe.

These banks are Defendants Banco Santander SA, BBVA, JPMorgan, HSBC, Barclays, Citigroup, and Bank of America—7 of the 8 MGB market makers.

193.    None of the banks denied this report,[90] and they have all acknowledged that they are subjects of COFECE's investigation in the months since the announcement.[91]

194.    Bloomberg also reported in the same article that one unidentified Defendant had applied for, and been granted, leniency under Mexico's cartel leniency program.[92]

195.    This was a significant development. Mexico only offers leniency for antitrust violations where an applicant can show that it: "(1) Directly participated in a cartel or did so on behalf a company; and (2) Engaged or is engaging in a cartel; or (3) Contributed, fostered, induced or participated in the commission of a cartel." [93]

196.    In addition to the above requirements, the leniency applicant must "deliver sufficient information to COFECE which would allow for the initiation of an investigation procedure or to assume the existence of [] cartel conduct."[94] The program does not authorize leniency for participating in unilateral conduct or for disclosing insufficient information to launch an investigation. Thus, the fact that at least one entity has been granted leniency establishes that a cartel existed in the MGB market.

---

[90] *See Investigan a Siete Bancos en el Pais por Practicas Monopolicas,* http://www.globalinfo.mx/investigan-a-siete-bancos-en-el-pais-por-practicas-monopolicas/

[91] *Request to the Federal Competition Commission Económica, COFECE, to Report on Investigation Number 10-006-2016, into the Possible Commission of Anticompetitive Practices in the Market for Debt Securities Issued by the Mexican Government,* (Nov. 23, 2017) available at http://www.senado.gob.mx/sgsp/gaceta/63/3/2017-11-23-1/assets/documentos/PA_PRD_COFECE.pdf.

[92] *See Seven Dealers Said to Be Focus of Mexico Bond Collusion Probe,* Bloomberg, (May 16, 2017).

[93] *Presentation of Carlos Mena Labarthe, The leniency program in Mexico,* COFECE, Latin American and Caribbean Competition Forum, (Apr. 2016), available at https://cofece.mx/wp-content/uploads/2017/11/leniency_in_mexico_eventoocde_060416.pdf.

[94] *Id.*

197.     Mexican newspaper "El Financiero," soon reported that all Defendants were facing scrutiny as part of the probe: "in the market in which there are currently $6.2 trillion pesos of securities in circulation, **all, yes all**, of the participants are being investigated." The head of COFECE's Investigatory Authority confirmed this during an interview quoted in the same article, stating that "we are analyzing **all the financial intermediaries** that participated."[95]

198.     Sources with direct knowledge of COFECE's investigation disclosed to El Financiero that it "includ[ed] both the primary bond market, that is, the auctions made by the government, as well as the secondary [consumer] market." The time period for the investigation is ten years prior to the date the investigation began, *i.e.* starting with October 28, 2006.[96]

199.     El Financiero also interviewed an insider employed by one of the Defendants under investigation. The source explained that the problem with the MGB market is "the structure of the market, which privileges the largest participants" who enjoy total control over the supply.[97]

200.     Other reports corroborate Bloomberg's and El Financiero's reporting. For example, financial reporter Darío Celis published a report on the COFECE investigation on May 8, 2017 in the newspaper "Excelsior."[98] In the report, Celis wrote that "Beyond what the official and informal spokespersons of the financial sector announce, I inform you that many actors involved are going to adhere to the immunity program of the Cofece to avoid jail and high fines."[99]

201.     Celis followed up with further details on the progress and scope of COFECE's investigation on May 18, 2017. He reported that one of the individuals under investigation is

---

[95] http://www.elfinanciero.com.mx/mercados/investigaran-a-todos-en-el-mercado-de-bonos.html (Apr. 19, 2017)

[96] *Id.*

[97] *Id.*

[98] http://www.dineroenimagen.com/2017-05-08/86388.

[99] *Id.*

Guillermo Vega, Managing Director of Trading, Mexico for BBVA in New York City.[100] Vega joined BBVA after being fired by Citi Banamex for front-running client MGB orders and is reported to have maintained substantial contacts with his former colleagues at Citi Banamex such as his "right-hand man" Luis Sayeg.[101]

202.    Further information leaked to the press concerning the governmental investigations, and on May 25, 2017, Celis reported that COFECE had moved on to the next phase of its investigation, where it was collecting emails and phone records for the last ten years from the Defendants.

203.    Shortly after COFECE announced that it had uncovered evidence of collusion, CNBV, Mexico's securities regulator, began its own parallel investigation into Defendants' conduct in the MGB market during the summer of 2017.[102]

204.    In July 2017, Bloomberg reported that both COFECE and CNBV had requested records of electronic chats and other communications from the institutions under investigation.

205.    The reports reveal that the MGB market is dominated by a handful of individuals that work for or have worked for the Defendants, and who rotate employment among the market makers while continuing to conspire together.[103]

206.    Both the COFECE and CNBV investigations are still ongoing. In November 2017, COFECE requested a fourth 120-day extension of the investigation, further demonstrating that it has uncovered evidence of collusion by Defendants and required more time to analyze the evidence and produce a final report.

---

[100] See https://www.linkedin.com/in/guillermo-vega-baa3b132/ (last visited Jan. 22, 2018).

[101] http://www.dineroenimagen.com/2017-05-10/86471

[102] *Ahora la CNVB analiza investigar a bancos por malas practices,* Dinero en Imagen, (May 26, 2017) available at http://www.dineroenimagen.com/2017-05-26/87096

[103] http://www.dineroenimagen.com/2017-05-25/87037.

**B.  Defendants' Response to the Investigations**

207.    Defendants, through their trade association, Asociación de Bancos de México A.C. (*i.e.*, the Association of Banks in Mexico), which is run by Defendant Santander, rallied to oppose COFECE's investigation into the MGB market and worked to undermine COFECE by arguing that COFECE lacked the expertise to break up their conspiracy. These widely-reported efforts led to the sudden ouster of Carlos Mena Labarthe, who had been leading the investigation since its beginning and who made COFECE's initial announcement of its investigation on April 19, 2017.[104]

208.    Defendants took other countermeasures as well. They scrambled to put together the industry's first "code of conduct" modeled after the FX code of conduct, a similar guideline adopted by foreign exchange traders to restore public confidence after similar price-fixing scandals roiled that industry.[105]

209.    This code of conduct was announced in October 2017. For the first time, the code of conduct banned price-fixing, collusion, and sharing of sensitive customer information among the Defendants in the MGB market.[106]

210.    The Code of Conduct was designed to prevent a recurrence of the unlawful collusive practices executed by Defendants in the MGB market during the Class Period. It was a direct response to COFECE's and the CNBV's investigation and was based on evidence obtained during these investigations.

---

[104] *Id.*

[105] *See* Part VI, below*,* for an overview of Defendants' other price-fixing conspiracies that were active during the Class Period.

[106] http://www.ejecentral.com.mx/crean-codigo-de-conducta-para-bancos-va-contra-monopolios/.

IV.    **Economic Evidence Confirms that Defendants' Conspired to Rig Bids and Fix Prices in the MGB Market**

211.    As described above, COFECE and the CNBV both uncovered evidence that Defendants conspired to fix MGB prices in government-run MGB auctions as well as in transactions with MGB consumers. *See* Part III, above. Economic analysis confirms these regulatory findings, demonstrating that Defendants' conspired to: (a) share pricing information and submit fixed bids during MGB auctions; (b) to sell MGBs purchased at auction to investors at artificially higher prices; and (c) to fix the bid-ask spread artificially wider in MGB transactions.

**A.  Bid Dispersion Analysis Demonstrates that Defendants Rigged the MGB Auction**

212.    Banxico rules require that bids in MGB auctions be confidential. *See* Part I, above. This means that each Defendant must independently determine their bidding schedule according to their own views of MGB prices and the expected demand in the auction, without reference to bidding schedules submitted by other Market Makers.

213.    Plaintiffs analyzed Defendants' misconduct during MGB auctions using data acquired from Banxico, which included the highest and lowest bid in each auction between January 1, 2006 (the earliest date for which data is available) and November 28, 2017.

214.    First, Plaintiffs estimated the average amount of dispersion (*i.e.*, variability) among Defendants' bids by taking the difference between the highest and lowest bid accepted in each auction. A lower amount of dispersion means that bids in the MGB auction are grouped closer together, while higher levels of dispersion indicate a wider range among bids.

215.    Next, Plaintiffs compared the amount of dispersion among bids in MGB auctions between January 2006 and April 18, 2017, before COFECE disclosed the existence of Defendants' conspiracy (the "Pre-Announcement Period"), to those occurring after COFECE's announcement between April 19, 2017 and November 28, 2017 (the "Post-Announcement Period").

216.    Dispersion is widely-accepted as measure of certainty about bond prices.[107] For example, bid dispersion should be higher when there is more uncertainty about prices, such as during a competitive auction where the participants do not know each other's bids. In contrast, collusion will reduce amount of dispersion because it provides certainty about prices.

217.    Thus, absent collusion, there should be no difference between the amount of dispersion observed during MGB auctions in the Pre- and Post-Announcement Period because the amount of price uncertainty in the MGB market should remain the same. COFECE's investigation should have no impact on bid dispersion unless Defendants were colluding to rig the auctions.

| Instrument | Tenor | Average Bidding Dispersion (Peso for Bonos and % for Cetes) | | |
|---|---|---|---|---|
| | | Pre-Announcement Period | Post-Announcement Period | % Increase from Pre- to Post-Announcement Period |
| Bonos | All | 0.49 | 0.55 | 12% |
| Bonos | 30-Year | 0.78 | 0.86 | 10% |
| Bonos | 20-Year | 0.60 | 0.80 | 33% |
| Bonos | 10-Year | 0.52 | 0.59 | 13% |
| Bonos | 3-Year | 0.21 | 0.23 | 10% |
| Cetes | All | 0.07 | 0.10 | 43% |
| Cetes | 1-Year | 0.06 | 0.07 | 17% |
| Cetes | 6-Month | 0.05 | 0.06 | 20% |
| Cetes | 3-Month | 0.06 | 0.09 | 50% |
| Cetes | 1-Month | 0.10 | 0.17 | 70% |

**FIGURE 1**

218.    Figure 1 above demonstrates that bid dispersion in terms of yield (for CETES) and price (for BONOS) increased significantly across all tenors following COFECE's announcement. For all BONOS, this increase in bid dispersion was 12.24% on average, and substantially higher in

---

[107] Paul F. Malvey, Christine M. Archibald & Sean T. Flynn, *Uniform-Price Auctions: Evaluation of the Treasury Experience*, U.S. Treasury Office Mkt. Fin. 22, (1995) ("[T]here is a direct relationship between uncertainty regarding the common value of a good and the dispersion of bids: the greater the uncertainty, the greater the dispersion of bids; or alternatively, the lower the uncertainty, the tighter the dispersion of bids.").

certain tenors. For example, the increase in bid dispersion was 33% for 20-year BONOS. For CETES, the results were even more striking, increasing by more than 42% on average in the wake of COFECE's announcement. These dramatic changes are indicative of collusion among the Defendants to rig MGB auctions during the Class Period.



**FIGURE 2**

219.    The changes in bid dispersion between the Pre-Announcement Period and Post-Announcement Period are not the result of macroeconomic factors, such as the global financial crisis. To rule out the effects of broader market conditions, Plaintiffs adjusted the bid dispersion results using the 10-year U.S. Treasury Note Volatility Index. Because yields in the MGB and U.S. Treasures markets are highly correlated, large spikes in the 10-year U.S. Treasury Note Volatility Index are indicative of changes in market conditions that would also impact MGB prices.

220.    Figure 2 above shows that bidding dispersion increased to an even greater degree (by approximately 36%) in the Post-Announcement Period after adjusting for market volatility. This analysis confirms that the greater degree of clustering among bids and low bid dispersion during the Class Period cannot be explained by legitimate macroeconomic factors such as calmer economic

conditions and instead reflects collusion in the bidding process. Volatility adjusted bid dispersion

analyses for other BONOS tenors are provided in Appendix B.

### B.  Defendants Sold MGBs From the Auctions at Supra-Competitive Prices

221.    Rigging the MGB auctions allowed Defendants to control the supply of MGBs,

including the prices they paid for bonds purchased from the Mexican government and amount

allocated to each co-conspirator. Defendants profited from this aspect of their conspiracy by

agreeing to sell MGBs following the auction at fixed artificially higher prices.



**FIGURE 3**

222.    For example, Figure 3 above displays the average normalized spot price of 30-year

BONOS throughout the trading day on both "Auction Days" (the orange line) when new 30-year

bonds are issued and "Non-Auction Days" (the purple line) between October 2006 and April 2017.

Figure 3 illustrates that the price of 30-year BONOS increases dramatically—by between 20 and 60

basis points (0.20% to 0.60%)—immediately once those MGBs become available for sale and

continue to rise following the auctions. Tellingly, these price movements are absent on Non-Auction

Days, when Defendants do not have new supply to sell.

223.     Charts reflecting similar price movements for 10-year BONOS and for 3-month, 6-month, and 1-year CETES are provided in Appendix C. As with the data presented in Figure 3, prices for these MGBs increase dramatically and continue to rise only on Auction Days, immediately following the auction. These price increases represent risk free profits to the Defendants at the expense of consumers who purchased MGBs.

### C.  Defendants Fixed Bid-Ask Spreads for MGBs

224.     Defendants also profited from selling bonds on Non-Auction days by agreeing to fix the bid-ask spread at which they transacted with consumers, including Plaintiffs and other Class members, artificially wider.

225.     As is the convention in over-the-counter markets, Defendants offer "two-way" quotes for MGBs that simultaneously reflect the price they would "bid" to purchase a certain bond from a customer and "ask" for in a sale. For example, a customer might call a Defendant to request the price of a certain 10-year BONO. The Defendant would respond with a quote reflecting two prices (*e.g.* 99.95/100.05). The lower price (*i.e.*, 99.95) is the bid price the Defendant would pay for that bond while the higher price (*i.e.*, 100.05) is what they would willing to accept to sell that bond to the customer. The difference between the bid price and the ask price (*i.e.*, the difference between 99.95 and 100.05) is the "bid-ask spread," which in this example is 10 basis points or 0.10%

226.     Absent collusion, dealers will compete against each other by offering "narrower" (*i.e.* smaller) spreads to customers. For example, another Defendant wanting to make a sale to the customer above could offer a "narrower" spread of 8 basis points (*e.g.* 99.96/100.04) to secure that customer's business by offering them a better price.

227.     In each example, the bid-ask spread reflects the Defendant's profits (not including fees and commissions) from the transaction. Wider bid-ask spreads, therefore, result in greater

51

profits because Defendants can buy MGBs at a lower price from their customers and sell those bonds to others for more money.



**FIGURE 4**

228.     Figure 4 above compares the bid-ask spread Defendants charged on 3-year, 5-year, 10-year, 20-year, and 30-year BONOS during the Pre-Announcement Period, (the orange bars) to those during the Post-Announcement Period (the purple bars). As with the bid dispersion analysis in Figure 1 above, there should be no discernable difference between bid-ask spreads Defendants charged consumers before and after COFECE announced that it uncovered their conspiracy if they were quoting prices independently.

229.     However, Figure 4 shows that the spreads Defendants charged consumers suddenly and dramatically *narrowed* in response to COFECE's announcement. The magnitude of this change is highly significant. In all tenors, **spreads were 29% to more than 50% wider** during the Class Period than they were in the Post-Announcement Period. This difference represents pure supra-competitive profits that Defendants extracted from MGB transactions with Plaintiffs and other Class members.



**FIGURE 5**

230.    The same change in spreads width is observed in Defendants' CETES quotes. Figure 5 compares the median spread Defendants charged during the Pre-Announcement Period (the orange bars) with the median spread Defendants quoted during the Post-Announcement Period (the purple bars) for the 6-month, 9-month, and 12-month CETES (the only short-term tenors for which bid-ask price data is available). Again, Defendants suddenly narrowed spreads in the wake of COFECE's announcement, indicating that they had previously been colluding to quote wider spreads to customers, resulting in supra-competitive profits at Plaintiffs' and Class members' expense.

**V.    The Structure of the MGB Market and the Close Relationships Among Defendants' Traders Provided an Opportunity to Conspire**

231.    Defendants employ MGB traders who are well acquainted with each other and have often formed relationships with other MGB traders by working together at the same bank. Many

price-fixing conspiracies in financial markets in recent years demonstrate that traders who formerly worked together often function as conduits through which price-fixing agreements develop.[108]

232.    This revolving door among the Defendants' MGB trading desks solidified a conspiratorial link between the Defendants and provided an opportunity for collusion in the MGB market. This structure forms a web of connections that provided Defendants with the contacts, connections, and open lines of communication that often help facilitate price-fixing agreements.

233.    For example, Guillermo Vega, Luis Sayeg, and Jaime Zenizo have been reported as subjects of COFECE's investigation.[109] All three traders worked together trading MGBs with Citibanamex until Vega left to trade MGBs at BBVA's New York offices. Zenizo left Citibanamex for a role as Head Trader at HSBC Mexico.[110]

234.    Banco Santander hired Juan A. Minuesa from co-conspirator BBVA as a fixed income trader in their New York office.[111] Minuesa previously worked as an MGB trader at BBVA for eight years before switching to Santander. Former Barclays government debt securities trader Pablo Limón has since moved to a similar role at Santander.

235.    Former Citibanamex government securities traders Jaime Zenizo now works at HSBC Bank Mexico where he performs a similar role.

236.    BBVA also hired traders who had previously worked for other Defendants. For example, Eric Olson was hired by Defendant BBVA Securities, Inc. as the Managing Director of Latin American Credit Trading & Sales in their New York office in 2011. Olson had previously been

---

[108] *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 476 (S.D.N.Y. 2017) (finding movement of traders between defendants supported inference of conspiracy by "tying the firms closer together").

[109] http://www.dineroenimagen.com/2017-05-25/87037.

[110] https://www.linkedin.com/in/jaime-zenizo-dorbecker-37698015/.

[111] https://www.linkedin.com/in/juan-a-minuesa-5b9b0838/

employed by Defendant HSBC for six years as a Director of their Latin American Local Markets Desk in HSBC's New York office.[112]

237.    HSBC hired MGB trade Manuel Astaburuga away from co-conspirator BBVA after working at BBVA for three and a half years.

238.    Barclays also hired traders who had previously worked for other Defendants. For example, senior Barclays trader Robert Lombardi was previously employed as an emerging markets debt trader for eight years by Defendant Bank of America prior to joining Barclays.

## VI.    Defendants Conspired to Fix Prices in Multiple Financial Markets during the Class Period

239.    Regulators across the globe have imposed massive fines and sanctions against several of the Defendants for colluding to fix prices in multiple financial markets. The government findings and settlements demonstrate that Defendants developed a practice of conspiring to increase profits by fixing prices for their benefit and at the expense of consumers. These Defendants include Barclays, Citigroup, HSBC, JPMorgan, Bank of America, and Deutsche Bank.

### A.  Barclays

240.    In 2015, Barclays entered settlements with multiple government regulators, including the Department of Justice ("DOJ"), CFTC, Federal Reserve Bank of New York ("Federal Reserve"), NYSDFS, United Kingdom's Financial Conduct Authority ("FCA"), and Switzerland's Competition Commission ("COMCO"), paying more than $3 billion in fines and penalties to settle charges related to its participation in conspiracies to manipulate multiple financial benchmarks during the Class Period.

241.    These investigations revealed that the conspiracy described in this Complaint is not the first time that Barclays has conspired with the other Defendants here. Specifically, Barclays

---

[112] https://www.linkedin.com/in/eric-olson-30291735/

traders formed a self-described "Cartel" along with traders of Defendants JPMorgan and Citigroup, using electronic chat rooms and coded language to manipulate FX benchmarks including the World Markets/Reuters Closing Spot Rates ("WM/R Rates"), the most widely referenced FX benchmarks in the world. Aspects of this price-fixing scheme bear strong resemblance to the conspiracy to rig the MGB market. For instance, members of "The Cartel" manipulated the exchange rates by agreeing to withhold bids or offers to avoid moving the exchange rate in a direction adverse to open positions held by co-conspirators. Barclays and its co-conspirators also protected each other's trading positions by agreeing not to buy or sell at certain times.

242.    Barclays and Defendants Citigroup and JPMorgan each pled guilty to a one-count felony charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere. Defendants who joined "The Cartel" banks paid out a total of over $2.5 billion to the DOJ alone. Barclays paid fines of $710 million to the DOJ, $485 million to the NYSDFS, $400 million to the CFTC, $342 million to the Federal Reserve, and $441 million to the FCA.

243.    In 2015, the CFTC ordered Barclays to pay a $115 million penalty for the conduct of their New York traders directed at manipulating the U.S. ISDAfix benchmark rate, a benchmark used to price certain swaps transactions, commercial real estate mortgages, and structured debt securities. Barclays traders used large notional amounts of bids and offers to "push the market" and affect the reference rates right before the critical fixing time to affect the published ISDAfix rate. Barclays traders also made false ISDAfix submissions to swaps brokers with the intent of moving the ISDAfix rate to benefit their own trading positions.

244.    The CFTC also found that Barclays conspired to manipulate at least four separate benchmark interest rates for years during the Class Period. Specifically, Barclays was found to have engaged in regular and pervasive conduct from 2007 through at least 2009 aimed at manipulating

benchmark rates including U.S. Dollar LIBOR, Yen LIBOR, Pound Sterling LIBOR, and Euribor (the LIBOR equivalent for the Euro money market).

245.     As part of this conspiracy, Barclays traders colluded with traders at other banks including Defendants Deutsche Bank and Citigroup to submit false benchmark submissions on key dates when many derivatives contracts were settled, allowing the conspirators to collect increase the profitability of their own derivatives positions. Barclays was ordered to pay $200 million to the CFTC, $160 million to the DOJ, and $92.8 million to the FCA for its role in these conspiracies.

**B.  Deutsche Bank**

246.     In 2015, Deutsche Bank entered settlements with multiple government regulators, including the DOJ, CFTC, NYSDFS, and European Commission ("EC"), paying more than $3.55 billion in fines and penalties to settle charges related to its participation in conspiracies to fix prices of multiple financial products during the Class Period. In many instances, Deutsche Bank conspired with co-Defendants here.

247.     The CFTC found that Deutsche Bank conspired to manipulate at least six separate benchmark interest rates for years during the Class Period. Specifically, the CFTC found that from 2005 through 2011 Deutsche Bank engaged in "systemic and pervasive misconduct directed at manipulating critical, international financial benchmark rates" including Yen LIBOR, Sterling LIBOR, Swiss Franc LIBOR, U.S. Dollar LIBOR, TIBOR, and Euribor.

248.     Among other practices, Deutsche Bank encouraged manipulation by placing derivatives traders with "obvious conflicts of interest" in charge of submitting benchmark rates. These derivatives traders aligned trading positions with conspirators at other banks, ensuring that the cartel would benefit by manipulating these benchmark rates. With respect to Deutsche Bank's admitted role in the conspiracy to manipulate Euribor, Deutsche Bank's "star trader" was

particularly successful because he leveraged "friendships and past working relationships with derivatives traders at other Euribor panel banks to further his attempts to manipulate Euribor."

249.     Deutsche Bank's misconduct was pervasive and driven by traders, submitters, and managers in its Global Finance and Foreign Exchange business unit located around the world, including in New York, London, and Frankfurt. These traders, responsible for both determining Deutsche Bank's LIBOR or Euribor submissions and trading derivatives positions, frequently made or requested false submissions to increase the profitability of those derivatives positions.

250.     Deutsche Bank management coordinated and organized manipulative conduct among traders and submitters, including those in New York, during weekly "Monday Risk Calls." Traders in the United States joined these weekly conference calls, set up to plan false submissions and corresponding trading strategies across bank divisions and locations to maximize profits.

251.     Deutsche Bank frequently conspired with HSBC. The EC specifically identified HSBC as a member of the "Euro Interest Rate Derivatives Cartel" formed with Deutsche Bank and six other major banks to fix the prices of Euro interest rate derivatives.

252.     Deutsche Bank's admitted participation in the LIBOR manipulation conspiracy extended to supervisors and managers who coordinated LIBOR submissions with other banks, including Defendant Bank of America. For instance, the Deutsche Bank supervisor in charge of LIBOR submissions coordinated artificially low submissions with Bank of America on multiple occasions. Deutsche Bank paid over $3.4 billion in fines to the CFTC, DOJ, NYSDFS, FCA, and EC as a result of their manipulative conduct.

253.     Additionally, The Federal Reserve fined Deutsche Bank $136.95 million for its manipulation of the WM/R Rates. The Federal Reserve found that Deutsche Bank engaged in "disclosures of trading positions and, on some occasions, discussions of coordinated trading

strategies with traders of other institutions" and "discussions about possible FX benchmark fix-related trading with traders of other institutions."

254.    Deutsche Bank also manipulated prices of precious metals and related derivatives in the United States. For example, in June 2017 Deutsche Bank trader David Liew pleaded guilty to Commodity Exchange Act violations associated with the concerted manipulation of silver and gold futures contract prices traded on the Chicago Mercantile Exchange.

255.    This is not the first time that Deutsche Bank bond traders have been implicated in a collusion scheme with another Defendant. Deutsche Bank recently paid $65.5 million together with Defendant Bank of America to settle accusations that these banks colluded with other co-Defendants here to fix prices in the over-the-counter market for sub-sovereign, supranational, and agency bonds.[113]

### C.  Bank of America

256.    Bank of America conspired with co-Defendants HSBC and Deutsche Bank to manipulate various benchmark rates during the Class Period. Bank of America executed a Consent Order on November 11, 2014, with the Office of the Comptroller of the Currency ("OCC") admitting its participation in a conspiracy to manipulate key benchmarks in the spot foreign exchange market, the WM/R Rates and the ECB spot FX reference rates. These benchmarks were used to set the prices of trillions of dollars in spot FX transactions daily.

257.    Bank of America paid $250 million and admitted to using secret group chat rooms to conspire with competitors at other banks to manipulate spot FX prices to benefit its trading positions. As part of the settlement, the OCC found that Bank of America executed "coordinated trading strategies" with traders at other banks to rig the WM/R fixing and the ECB spot FX

---

[113] *See In re SSA Bonds*, 16-cv-03711-ER (S.D.N.Y.), ECF No. 290 at 1.

reference rates in its favor, conspired with traders at other banks to trigger customer stop loss orders, and shared sensitive customer order information with rival banks to trade in advance of customer orders for its own benefit. Bank of America further admitted to compliance failures in its derivatives trading business, which caused its membership in the conspiracy to continue without scrutiny from at least 2008 through 2013.

258.    In September 2017, Bank of America admitted that traders on its swaps desk traded futures contracts on the CME for their own benefit in advance of large block orders from customers, an unlawful practice known as "front-running" that extracts illicit profit for the bank at the expense of its own customer.  Bank of America engaged in this conduct from at least February 2008 through December 2010. Bank of America further admitted that traders eavesdropped on calls between customers and sales staff so that traders could profit by trading ahead of its customers.

259.    Bank of America traders made misleading statements to investigators from the CME, causing its misconduct to go undetected for years. For example, Bank of America claimed that there was not enough time between customer orders and order execution for it to trade ahead of customer orders. Bank of America's counsel wrote to CME investigators that traders "did not have advance knowledge of a block trade such as to enable them to engage in any trading prior to the execution of the block," even though traders were actually listening in on the phone calls while orders were placed. The CFTC later found that these statements were false, that Bank of America failed to supervise traders on its Swaps Desk, and fined Bank of America $2.5 million.

**D.  HSBC**

260.    HSBC was fined over $35 million by the European Commission for colluding with other banks, including Deutsche Bank and JPMorgan, to manipulate Euribor in 2016.  The Commission found that HSBC conspired with other members of the panel to fix Euribor in a direction that benefitted their trading positions. Additionally, the Commission found that as part of

the conspiracy HSBC and the other panel banks exchanged sensitive information on their trading positions and coordinated strategies to maximize their ability to manipulate prices. The fine marked the culmination of a five-year investigation by the European Commission into Euribor panel banks that resulted in over $1 billion in fines.

261.     In November of 2014 the CFTC imposed a $275 million civil monetary penalty on HSBC for conspiring with four other banks to manipulate global foreign exchange benchmark rates, including the WM/R Rates, to benefit their trading positions. The CFTC collectively imposed over $1.4 billion in civil monetary penalties against the five banks involved. The FCA, in a related matter, imposed a $343 million fine on HSBC for failing to "manage obvious risks around confidentiality, conflicts of interest and trading conduct" with their foreign exchange traders. The FCA found that HSBC and four other defendant banks shared client information and manipulated benchmark rates to benefit their trading positions.

### E.  Citigroup

262.     In 2014 Citigroup admitted to conspiring with other banks including Defendants Barclays, JPMorgan, and HSBC to manipulate certain FX benchmark rates, including the WM/R Rates to benefit their own trading positions during the Class Period. Citigroup paid fines of $925 million to the DOJ, $350 million to the OCC, and $310 million to the CFTC as a result of the investigations into their manipulative conduct.

263.     As part of the conspiracy, Citigroup FX traders leveraged relationships they had developed with traders at other banks and used exclusive, invite-only chat rooms to communicate, often disclosing confidential customer order information and trading positions. Citibank traders and traders at other banks altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to affect the FX benchmark rates.

264.     Citigroup FX traders exchanged the size and direction of the bank's net orders with FX traders at other banks and used this information to attempt to coordinate trading strategies. The traders at times then used this information to enable one or more traders to manipulate the FX benchmark rates prior to and during the benchmark fixing period.

265.     In 2016 Citigroup admitted to engaging in conduct from at least 2007 through 2012 aimed at manipulating ISDAfix and was ordered to pay a $250 million fine by the CFTC. Citigroup traders used large notional amounts of bids and offers to "push the market" and affect the reference rates right before the critical fixing time to affect the published ISDAfix rate. Citigroup traders also made false ISDAfix submissions to swaps brokers with the intent of moving the ISDAfix rate to benefit their own trading positions.

266.     In 2016 the CFTC ordered Citigroup to pay a $175 million fine after Citigroup admitted to conduct directed at manipulating the YEN LIBOR and TIBOR rates from at least 2008 through 2010. The CFTC found that Citigroup traders regularly made manipulative requests to interdealer brokers who were positioned to influence other panel banks, requests to traders at other panel banks, and internal requests to Citigroup's submitters to benefit their trading positions.

## VII.     Defendants' Conspiracy Injured Plaintiffs

267.     Plaintiffs OFPRS and EWPFL are domestic consumers of MGBs. They collectively purchased tens of millions of dollars' worth of MGBs in the United States during the Class Period, directly from Defendants Merrill Lynch, Pierce, Fenner & Smith, Incorporated, JPMorgan Chase Bank, National Association, BBVA, S.A., BSI, Banco Santander, S.A., Santander Investment Bolsa, Sociedad de Valores, S.A., HSBC Bank PLC, HSBC Securities (USA) Inc., Citigroup Global Markets Inc., Citibanamex, and Barclays Capital Inc. *See* ¶¶ 30-31, above.

268.     As described above, Defendants and their co-conspirators fixed the prices of MGBs during the Class Period for their own profit by: (a) rigging the MGB auction process; (b) conspiring

to sell bonds purchased during such auctions at artificially higher prices; and (c) agreeing to fix the bid-ask spread charged to consumers artificially wider. *See* Parts III-IV, above.

269.    As a direct result of Defendants' and their co-conspirators' misconduct, Plaintiffs were overcharged each time they purchased MGBs from Defendants and underpaid each time they sold MGBs to Defendants. Thus, Plaintiffs were injured and suffered harm in each MGB transaction conducted during the Class Period.

## CLASS ACTION ALLEGATIONS

270.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:[114]

> All persons that entered into an MGB transaction between at least January 1, 2006, and April 19, 2017 (the "Class Period"), where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted in the United States or its territories.

> Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this Complaint, and the United States government.

271.     The Class is so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically-dispersed Class members transacted in MGB during the Class Period.

272.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each

---

[114] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

273.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate Class representatives and have no interest adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust litigation.

274.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

> a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix outcomes and rig MGB auctions;
>
> b. whether Defendants' conspired to sell MGBs purchased at auction to consumers at artificially higher prices and buy MGBs from consumers at artificially lower prices;
>
> c. whether Defendants fixed prices of MGB available for sale to U.S. investors by, for example, conspiring to quote wider fixed bid-ask spreads;
>
> d. the character, duration, and nature of the acts performed by the Defendants in furtherance of their conspiracy;
>
> e. whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class by imposing supra-competitive costs on them that were higher than would otherwise have been available absent Defendants' conspiracy;
>
> f. the appropriate measure of damages sustained by Plaintiffs and Class members.

275.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous

individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

276.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

277.     The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

278.     The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, telephone calls, secret bidding schedules, and meetings conducted behind closed doors to conceal their agreements to artificially raise the prices of MGB—was intentionally self-concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their unlawful conduct.

279.     Defendants used affirmative acts of concealment to hide their violations of law from Plaintiffs and the Class, including: (1) secretly disseminating confidential bidding schedules to each other and agreeing on bids in MGB auctions; (2) implicitly representing that each Defendant was bidding competitively in the auction for MGB such that the final price represented a competitive auction; and (3) charging inflated spreads to customers without disclosing that the charges reflected an agreed price set by Defendants rather than a competitive price.

280.     Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. For instance, Defendants' bidding schedules are considered highly sensitive information that cannot be accessed by the public, which enabled Defendants' conspiracy to remain undetected for years. Similarly, Defendants' participation in the market maker program required that they submit competitive bids in auctions and compete when offering MGB to consumers. By participating in the market maker program, Defendants therefore represented that the prices they charged were determined by competitive forces rather than fixed by a conspiracy.

281.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

### CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
**(Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)**
**(Against all Defendants)**

282.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

283.     Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

284.     During the Class Period, Defendants—a group of horizontal competitors in the MGB market—entered into a series of agreements designed to generate unlawful profits for themselves in MGB transactions by conspiring to, among other things: (a) share pricing information and submit fixed bids during MGB auctions in violation of Banxico rules; (b) sell MGBs purchased at auction to consumers at artificially higher prices; and (c) fix the bid-ask spread artificially wider in MGB transactions with Plaintiffs and Class members.

285.     This conspiracy to restrain trade and fix prices in the MGB market caused Plaintiffs and members of the Class to be overcharged or underpaid in their MGB transactions. Plaintiffs and Class members also were deprived of the ability to obtain MGB for competitive prices during the Class Period owing to Defendants' conspiracy and their complete control of MGB supply. Plaintiffs and members of the Class thus paid more or received less than they would have for MGBs absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

286.     This horizontal price-fixing conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the MGB market. There is no legitimate business justification for, and no pro-competitive benefits caused by, Defendants' conspiracy to rig bids in auctions or fix MGB prices charged to investors or any of the overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pre-textual or could have been achieved by less restrictive means.

287.     As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

288.     Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act and under § 4 of the Clayton Act.

289.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment in Violation of the Common Law)
### (Against All Defendants)

290.    Plaintiffs incorporate by reference and re-alleges the preceding allegations, as though fully set forth herein.

291.    Plaintiffs OFPRS and EWPFL (and other Class members) transacted MGBs during the Class Period directly with Defendants HSBC Securities (USA) Inc., HSBC Bank plc, JPMorgan Chase Bank, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith, Incorporated, BBVA Securities, Inc., BBVA, S.A., Banco Santander, S.A., Santander Investment Bolsa, Sociedad de Valores, S.A., and Citibanamex.

292.    These transactions were supposed to be priced based on competitive market forces and reflect honest competition by the Defendants.

293.    However, as alleged above, rather than competing honestly and aggressively with each other, Defendants colluded to fix the prices charged or remitted to Plaintiffs and the Class in purchases and sales of MGBs.

294.    Defendants' collusion enabled them to collect supra-competitive profits on every transaction of MGBs with Plaintiffs and the Class. At the same time, it caused Plaintiffs and the Class to pay more (in the case of MGB purchases) and receive less (in the case of MGB sales) on their MGB transactions with Defendants.

295.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and the Class, and equity and good conscience require the Defendants to make restitution.

296.    Plaintiffs and the Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## PRAYER FOR RELIEF

Plaintiffs demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate §1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.    That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.    That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and the Class;

F.    That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

G.    That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

H.    That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  March 30, 2018
White Plains, New York

Respectfully submitted,

LOWEY DANNENBERG P.C.

/s/Vincent Briganti
Vincent Briganti
Christian Levis
Roland R. St. Louis, III
44 South Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email:  vbriganti@lowey.com
          clevis@lowey.com
          rstlouis@lowey.com

Joseph J. Tabacco, Jr.
Todd Seaver
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
Email: jtabacco@bermantabacco.com
          tseaver@bermantabacco.com

Patrick T. Egan
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617)542-1194
Email: pegan@bermantabacco.com

*Counsel for Plaintiffs and the Proposed Class*

70