**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MEXICAN GOVERNMENT BONDS ANTITRUST LITIGATION | Master Docket No. 18-cv-02830 (JPO) |
| | <u>CLASS ACTION</u> |
| This Document Relates to: | |
| ALL ACTIONS | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

JURISDICTION AND VENUE .................................................................................................... 3

   A.  Defendants Exploited the United States Market for MGBs. ............................................. 5

   B.  Defendants Directed and Controlled their MGB Trading and Sales Businesses from the United States. .................................................................................................................... 12

PARTIES ..................................................................................................................................... 20

   A.  Plaintiffs ........................................................................................................................ 20

   B.  Defendants .................................................................................................................... 25

     1.  The Santander Defendants ......................................................................................... 25

     2.  The BBVA Defendants ............................................................................................. 27

     3.  The JPMorgan Defendants ........................................................................................ 29

     4.  The HSBC Defendants .............................................................................................. 30

     5.  The Barclays Defendants ........................................................................................... 32

     6.  The Citi Defendants .................................................................................................. 35

     7.  The Bank of America Defendants .............................................................................. 36

     8.  The Deutsche Bank Defendants ................................................................................ 37

     9.  The Credit Suisse Defendants ................................................................................... 38

     10.  The ING Defendants ................................................................................................. 40

     11.  "John Does" 1-10 ..................................................................................................... 41

   C.  Defendants' Dealer-Subsidiaries Sold MGBs in the United States as Agents for their Corporate Parents ......................................................................................................... 42

     1.  Santander Investment Securities and Santander Investment Bolsa, Sociedad de Valores, S.A. . ..................................................................................................................... 42

     2.  BBVA Securities, Inc. ............................................................................................... 43

     3.  HSBC Securities (USA) Inc. ..................................................................................... 44

     4.  Barclays Capital Inc. ................................................................................................. 46

     5.  Deutsche Bank Securities, Inc. ................................................................................. 49

     6.  ING Financial Markets LLC ..................................................................................... 51

SUBSTANTIVE ALLEGATIONS .............................................................................................. 52

   I.  Background ..................................................................................................................... 52

   A.  The Mexican Government Bond Market ........................................................................ 52

     1.  CETES ...................................................................................................................... 54

     2.  BONOS .................................................................................................................... 56

     3.  UDIBONOS .............................................................................................................. 58

4.    BONDES D ...............................................................................................59

II. The Role of MGB Market Makers........................................................................60

III. Government Regulators Uncover Evidence of Collusion Among Defendants .....................62

A. The Admitted MGB Cartel...............................................................................62

B. Defendants' Response to the Investigations ......................................................65

IV. Economic Evidence Confirms that Defendants Conspired to Rig Bids and Fix Prices in the
    MGB Market ................................................................................................66

A. Bid Dispersion Analysis Demonstrates that Defendants Rigged the MGB Auction ..............66

B. Defendants Sold MGBs From the Auctions at Supra-Competitive Prices ...........................72

C. Defendants Fixed Bid-Ask Spreads for MGBs .........................................................75

V. The Structure of the MGB Market and the Close Relationships Among Defendants' Traders
   Provided an Opportunity to Conspire ................................................................77

VI. Defendants Conspired to Fix Prices in Multiple Financial Markets during the Class Period.80

A. Barclays ....................................................................................................80

B. Deutsche Bank.............................................................................................82

C. Bank of America ..........................................................................................84

D. HSBC .......................................................................................................86

E. Citigroup ...................................................................................................86

F. JPMorgan ..................................................................................................87

G. Santander and BBVA....................................................................................89

VII. Defendants' Conspiracy Injured Plaintiffs...........................................................89

CLASS ACTION ALLEGATIONS ..............................................................................90

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT....................................92

CLAIMS FOR RELIEF ...........................................................................................93

FIRST CLAIM FOR RELIEF ....................................................................................93

SECOND CLAIM FOR RELIEF.................................................................................94

PRAYER FOR RELIEF ...........................................................................................96

DEMAND FOR JURY TRIAL....................................................................................96

Plaintiffs Oklahoma Firefighters Pension Retirement System, Electrical Workers Pension Fund Local 103, I.B.E.W., Manhattan and Bronx Surface Transit Operating Authority Pension Plan, Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust, Boston Retirement System, Southeastern Pennsylvania Transportation Authority Pension Plan, Government Employees Retirement System of the Virgin Islands, and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund (collectively "Plaintiffs") complain upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, against Defendants (defined in Parties, Part B, below) for their violations of law from January 1, 2006 through April 19, 2017 ("Class Period") as follows:

**INTRODUCTION**

1.      A Mexican government bond ("MGB") is a debt security (like a U.S. Treasury bond) that is issued by the Mexican government during regularly scheduled auctions. The Mexican government uses MGBs to raise capital, fund budget deficits, and control Mexico's monetary supply.

2.      Defendants are horizontal competitors in the MGB market. Defendants were also the exclusive Mexican government-approved market makers for MGBs during the Class Period.

3.      This privilege allowed Defendants to dominate the MGB market. In exchange for market maker status, the Bank of Mexico ("Banxico") requires Defendants to collectively bid for at least 100% of the total amount of MGBs for sale in each auction. Defendants thus control the supply of MGBs to investors in the over-the-counter market, where they sell the bonds purchased at auction to their customers.

4.      Defendants used this dominant position as the exclusive government approved market makers in the MGB market to unlawfully increase the profitability of their MGB trading and sales businesses. In April 2017, Mexico's antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), announced that it had uncovered evidence of anticompetitive conduct

among Defendants in the MGB market. Information leaked from COFECE's investigation in May 2017, revealed that it had accepted at least one Defendant into its cartel leniency program after that Defendant admitted to participating in a conspiracy to fix MGB prices and agreed to provide evidence against its co-conspirators in exchange for a reduced penalty.

5.     Mexico's securities regulator, the Comisión Nacional Bancaria y de Valores ("CNBV"), independently confirmed COFECE's findings. CNBV announced in August 2017 that it was proceeding with its own investigation of misconduct in the MGB market based on additional evidence it uncovered of collusion among the Defendants.

6.     An analysis of MGB prices and auction results before and after COFECE's announcement show that Defendants conspired to fix MGB prices during the Class Period through at least three means: (a) rigging MGB auctions through collusive bidding and information sharing; (b) selling MGBs purchased at auction at artificially higher prices; and (c) agreeing to fix the "bid-ask spread" artificially wider, overcharging and underpaying investors in every MGB transaction by suppressing the "bid price" at which Defendants offered to buy MGBs and increasing the "ask price" at which Defendants offered to sell MGBs. This comprehensive scheme resulted in MGB spreads during the Class Period that were **between 20% and 50%** wider than they should have been, generating supra-competitive profits for Defendants at the expense of Plaintiffs and Class members.

7.     Defendants' agreement to restrain trade in the MGB market is part of a broader pattern of collusion and price-fixing in multiple financial markets by these same Defendants during the Class Period. Regulators across the globe have fined and sanctioned Defendants for conspiring to fix prices in multiple financial markets, including for example by manipulating the London Interbank Offered Rate ("LIBOR") and the Euro Interbank Offered Rate ("Euribor"), the foreign exchange market, and precious metals markets, among others. To date, this has resulted in

Defendants Deutsche Bank, Bank of America, JPMorgan, HSBC, Citigroup, and Barclays collectively paying over $11 billion in fines and settlements for anticompetitive conduct.

8.      Plaintiffs are domestic investors in MGBs and Defendants' customers. They collectively traded hundreds of millions of dollars' worth of MGBs in the United States during the Class Period, directly with Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Bank of America, National Association, Bank of America Corporation, JPMorgan Chase Bank, National Association, J.P. Morgan Securities LLC, J.P. Morgan Securities plc, Banco Bilbao Vizcaya Argentaria, S.A., BBVA Securities, Inc., BBVA-Bancomer, Banco Santander, S.A., Santander Investment Bolsa, Sociedad de Valores, S.A., HSBC Bank PLC, HSBC Securities (USA) Inc., Citigroup Global Markets Inc., Citigroup Global Markets Limited, Citibank, N.A., Barclays Bank PLC, Banco Barclays S.A., Barclays Capital Securities Limited, Barclays Capital Inc., Deutsche Bank AG, and ING Financial Markets LLC.

9.      Given COFECE's and CNBV's ongoing investigations, the fact that at least one Defendant has admitted to participating in the cartel alleged herein; and the significant amount of economic evidence presented in this Complaint, Plaintiffs believe further evidentiary support for their claims against Defendants will be revealed following a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a). This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy, and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

11.     Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 26, and 28 U.S.C. § 1391. One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

12.     Defendants transacted MGBs at artificial prices in a continuous and uninterrupted flow of commerce throughout the United States and with counterparties located in the United States. HSBC Holdings plc, Citigroup Inc., ING Bank N.V., Bank of America Corporation, JPMorgan Chase & Co., Barclays PLC, Banco Santander, S.A., Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA S.A."), Deutsche Bank AG, Credit Suisse AG, and their U.S.-based dealer affiliates transacted MGBs directly with investors in the United States, including Plaintiffs, throughout the Class Period. *See* Part A and C, below.

13.     Defendants' conspiracy to set, fix and maintain artificial MGB prices and impose trade restraints was implemented in the United States. Each Defendant and its U.S.-based subsidiaries and/or dealer affiliates acted in furtherance of and enforced Defendants' price-fixing conspiracy in the United States by, among other things: (a) marketing price-fixed MGBs to U.S. investors; (b) selling MGBs purchased during government-run auctions at artificially higher prices in the United States; and (c) quoting fixed, agreed upon bid and ask prices for MGBs to investors in the United States. These actions restrained trade and interstate commerce by distorting and imposing supra-competitive prices on investors located throughout the United States, including Plaintiffs and the Class.

14.     Defendants utilized U.S. offices and licensed bank branches in this District to exploit the U.S. market for MGBs, for example, by marketing and selling price-fixed MGBs to consumers in this District. As alleged herein, many Defendants' MGB trading operations are headquartered in

4

and/or directed from this District. Accordingly, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and a substantial portion of the affected interstate trade and commence described herein was carried out in this District.

15.    Defendants Banco Santander, S.A., JPMorgan Chase & Co., HSBC Holdings plc, Barclays PLC, Citigroup, and Bank of America Corporation registered their New York branch or representative or agency offices with the New York State Department of Financial Services ("NYSDFS"), acquiring licenses to do business in this state under New York Banking Law § 200-b.

16.    Defendants Bank of America Corporation, Credit Suisse Group AG, Deutsche Bank AG, Citigroup Inc., JPMorgan Chase & Co., and Barclays PLC are members of the Federal Reserve Board ("FRB") of Governors' Large Institution Supervision Coordinating Committee, which is designed to coordinate supervision of the largest, most systematically important financial institutions in the United States.

### A. Defendants Exploited the United States Market for MGBs.

17.    Throughout the Class Period, each Defendant developed a strategy to exploit the U.S. market for MGBs. For example, during the Class Period, each Defendant marketed MGBs to U.S. investors by promoting the supposedly attractive features of these financial products, including their investment-grade credit rating, the relative ease of trading, Mexico's close ties with the U.S. economy, and yields significantly higher than those offered by comparable U.S. treasury securities. At the same time, each Defendant failed to disclose to these investors that it was engaged in a conspiracy that caused investors to pay higher prices when buying MGBs or receive less money when selling MGBs than they would have absent Defendants' conspiracy.

18.    Defendants' exploitation of the United States market enabled them to trade hundreds of billions of dollars in MGBs with investors located here, resulting in millions of dollars in excess profits that they could not have collected in the absence of their conspiracy.

19.    BBVA S.A., Banco Santander, S.A., Deutsche Bank AG, HSBC Holdings plc, Barclays PLC, ING Bank N.V., and Credit Suisse AG, themselves and through their U.S.-based subsidiaries and/or affiliates as agents, aggressively marketed MGBs to investors in the United States and developed a market for these products here. Below are some (non-exhaustive) examples of actions that these Defendants took to exploit the United States market for price-fixed MGBs:

20.    <u>BBVA</u>: BBVA S.A. publishes a "Handbook of Mexican Financial Instruments" in English that it distributes to investors in the United States market. The Handbook contains a dedicated twenty-page section describing the MGB auction process, the characteristics of the MGBs described in this Complaint, and the contact information for personnel from whom MGBs may be purchased by U.S. investors, including MGB specialists such as Alvaro Vaqueiro. In promotional materials, Vaqueiro boasted that BBVA-Bancomer is the leading MGB market maker and emphasized BBVA's "integrated structure" that allows its Mexican affiliate, BBVA-Bancomer, to "increase its cross-border capabilities." BBVA also maintains a dedicated 17-person "institutional investor sales team" for Latin American government debt in its New York offices that focuses on Mexican and Brazilian sovereign debt. The head of that team, Tim Goodell, boasts that "BBVA's local banks have held the #1 market share in local currency government debt in Mexico and Peru." BBVA's New York office also houses senior traders specializing in MGBs, such as Gabriel Bochi, who served as Managing Director of LatAm (*i.e.* Latin American) Debt Capital Markets during the Class Period. These activities enabled BBVA S.A. to trade large volumes of MGBs with investors in the United States, with U.S.-based individual sales staff executing "up to $15 million per trade in the sovereign bonds of Latin America, mostly Brazil and Mexico." As a result of these activities, BBVA S.A. transacted MGBs, including BONOS, directly with Plaintiff EWPFL[1] and CETES, BONOS,

---

[1] Plaintiffs are defined in the Parties section, Part A, below.

and UDIBONOS[2] through its dealer-subsidiary, BBVA Securities, Inc., with Plaintiffs EWPFL, BRS, MaBSTOA, and MTADBPPMT in the United States during the Class Period at artificial, fixed prices.

21.    Santander: Santander regularly publishes and distributes the English-language marketing publication "Fixed Income & Economics Daily" aimed at investors in the United States. The publication regularly highlights MGBs and closes with a solicitation that "any transaction in any security discussed herein should contact and place orders in the United States with SIS [Defendant Santander Investment Securities]." Santander's New York-based LatAm Fixed Income sales desk employed MGB specialists like Brendan Hurley tasked with "communicat[ing] trade ideas to sales force, trading staff, and clients" and David Duong (formerly of Deutsche Bank and currently of HSBC) to supply "trade ideas for institutional clients." Santander's New York-based marketing operations included strategists who published research concerning the MGB market to support its MGB sales franchise in the United States. Banco Santander, S.A.'s Global Head of Latin American Credit Trading, a division that trades MGBs, was led by Alfredo Mordezki from New York and Madrid during the Class Period. As a result of these activities, Banco Santander, S.A. transacted MGBs, including CETES, BONOS, and UDIBONOS, directly with Plaintiffs MTADBPPMT, EWPFL, and MaBSTOA. Banco Santander, S.A. also transacted BONOS and CETES through its dealer-subsidiary Santander Investment Bolsa, Sociedad de Valores, S.A. in the United States during the Class Period with Plaintiffs EWPFL, BRS, and UFCW Tri-State at artificial, fixed prices.

22.    Deutsche Bank: Deutsche Bank's Latin American fixed income trading and sales operations, which included MGBs, were headquartered in and directed from its New York offices during the Class Period. Juan Oberhauser Waring served as "Director of Operations in Latin

---

[2] See Part I.A., below, for a description of MGBs, including CETES, BONOS, UDIBONOS, and BONDES D.

America" from Deutsche Bank AG's New York offices, where he supervised staff who traded and sold MGBs in both the United States and in Mexico. Deutsche Bank placed numerous senior Latin American debt trading and sales staff in New York throughout the Class Period, including both Co-Heads of Debt Capital Markets for Latin America who supervised its MGB business. These managers reported to Alberto Adura and Karan Madan (both of whom were hired from co-conspirator Merrill Lynch), who led Deutsche Bank's LatAm debt capital markets team from its offices in New York. The sales staff working in these business units were tasked with selling MGBs to investors located in the U.S. market, including David Duong before he later took similar roles at co-conspirator Santander and then co-conspirator HSBC. During the Class Period, Deutsche Bank's MGB sales staff in the U.S. and Mexico worked under the supervision of and directly reported to executives based in New York, including Karan Madan, who was "responsible for the strategic expansion of the Latin America business which led to record revenues and top league table positions." Deutsche Bank AG's MGB trading operations were also managed and directed from New York throughout the Class Period by New York-based executives such as Manuel Maximino, who was responsible for "leading the Latin American Derivatives and Fixed Income Trading segment" from Deutsche Bank AG's New York offices. Maximino is the "main contact for a full range of structured trades" and regularly "traveled within that region to direct sales." Deutsche Bank AG also sent New York-based staff to Deutsche Bank Mexico's offices in Mexico City, further integrating its MGB sales and trading operations in Mexico with its Latin American headquarters in New York. As a result of these activities, Deutsche Bank AG directly transacted substantial quantities of MGBs, including BONOS directly with Plaintiffs UFCW Tri-State and EWPFL and UDIBONOS directly with Plaintiff SEPTA in the United States at artificial, fixed prices.

23.    HSBC: HSBC markets and sells MGBs to investors in the United States from its LatAm Fixed Income business unit that is headquartered in New York. HSBC's global strategy for

Latin American sovereign debt, which includes MGBs, is directed from its New York offices. Its Head of LatAm Fixed Income strategy, Alejandro Martinez Cruz (formerly of co-conspirator Citibanamex) supervises these activities from his office in New York. HSBC's Global Markets division employs sales staff specializing in MGBs such as Adam Ades, who "priced Mexican sovereign debt" for customers located in the United States. Diego Teran, who served as Global Markets Head Trader at HSBC Mexico, rotated between HSBC Mexico and HSBC Bank USA in the United States. As a result of these activities, HSBC Bank PLC transacted MGBs, including BONOS, directly with Plaintiffs EWPFL, UFCW Tri-State, and BRS in the United States, and BONOS, CETES, and UDIBONOS through its dealer-subsidiary HSBC Securities (USA) Inc. with Plaintiffs EWPFL, GERS, SEPTA Pension Plan, MTADBPPMT, OFPRS, UFCW Tri-State, MaBSTOA, and BRS in the United States during the Class Period at artificial, fixed prices. HSBC Holdings plc also traded MGBs through its former dealer-subsidiary HSBC Bank Brasil S.A. directly with Plaintiff BRS.

24.   <u>Barclays</u>: Barclays' Global Finance for Latin America unit is based in its New York offices. Managers in this business unit specialize in sovereign debt markets in Latin America, including "Mexican Markets." Barclays' Latin American Fixed Income business is based in New York and is headed by Carlos Corona, a former Citigroup trader who now serves as "Director of Global Finance Latin America" in Barclays' New York office. Barclays' MGB marketing, trading and sales activities were also directed from Barclays Capital Inc.'s offices located in New York prior to Corona's tenure, including by Karan Madan, who was hired from co-conspirator Deutsche Bank to lead this division from New York. As a result of these activities, Barclays Bank PLC transacted BONOS directly with Plaintiff EWPFL and transacted BONOS and CETES through its wholly-owned dealer-subsidiary Barclays Capital, Inc. with Plaintiffs EWPFL and SEPTA Pension Plan in the United States during the Class Period at artificial, fixed prices. Barclays Bank PLC also transacted

MGBs in the United States with MaBSTOA and MTADBPPMT through its dealer subsidiary Barclays Capital Securities Limited and with UFCW Tri-State through its wholly-owned subsidiary Banco Barclays S.A. during the Class Period at artificial, fixed prices.

25.     ING: ING Groep N.V., through its main operating entity ING Bank, N.V., is organized into distinct business units. Its MGB sales and trading operations are organized under ING Bank N.V.'s Wholesale Banking business. The United States and Mexico are both part of the Wholesale Banking business' Americas region, which is based in the United States. ING Bank N.V.'s Wholesale Banking business operates offices in Atlanta, Dallas, Houston, Los Angeles, and New York. Through these offices, ING Bank N.V. aims to connect American investors to Latin American markets, boasting that it has a "local presence in more than 40 countries [and] ING is your best connection between America and the rest of the world." It also operates in the United States through its wholly owned subsidiary ING Financial Holdings Corporation, through which ING Bank, N.V. "offers a full array of wholesale financial products," including MGBs, to U.S. investors. As a result of these activities, ING Bank, N.V. and ING Groep N.V. traded MGBs, including BONOS, through its dealers-subsidiary ING Financial Markets LLC with Plaintiffs SEPTA Pension Plan and BRS in the United States during the Class Period at artificial, fixed prices.

26.     Credit Suisse: Credit Suisse AG and its subsidiaries employ traders in the United States who transact in MGBs, such as Yang Huan (Allen) Zhao, the Regional Chief Operating Officer for Emerging Markets Trading across U.S., Mexico, and Latin America. Zhao works in Credit Suisse AG's New York City office where he "Manage[s] all aspect[s] of trading operations including business strategy, new business development, and strategic initiatives. Zhao also "Played [a] major role in building [Credit Suisse's] Mexico and Latin American franchise," and "Expanded trading capabilities and established new revenue streams and business opportunities" from Credit Suisse AG's offices in New York. Credit Suisse's Global Markets Division offers global securities

sales, trading and execution, prime brokerage and comprehensive investment research services to financial institutions, corporations, governments, and institutional investors around the world. The Global Markets Division encompasses Credit Suisse's U.S.-based subsidiaries, who transact MGBs on behalf of Credit Suisse AG.

27.     Defendants' intentional exploitation of the U.S. market for MGBs succeeded. Due to Defendants' marketing and sales activity, foreign investment in Mexico's government debt repeatedly broke records during the Class Period, according to the Institute of International Finance. In many of the MGBs Plaintiffs traded, MGBs held by investors outside of Mexico constitute a substantial majority of all outstanding bonds.

28.     According to data compiled by Banxico in 2014, investors outside of Mexico held a majority of the total amount of CETES (a short term zero-coupon MGB) and BONOS (a longer term fixed-rate coupon MGB) outstanding, with a share of 62% and 56% of all outstanding CETES and BONOS, respectively.

29.     By the end of the Class Period, investors outside of Mexico, including U.S. investors, held $119 billion worth of MGBs. By June 2016, MGB holding by investors outside of Mexico (including tens of billions of dollars' worth held by U.S. investors) totaled 58.5% of all outstanding BONOS.

30.     MGBs account for the overwhelming majority—approximately 86%—of the entire market for Mexican debt securities, which also includes corporate bonds. The following table uses data taken from the U.S. Department of the Treasury to show the evolution over the Class Period of Mexican debt securities held by U.S. investors, broken down into short-term debt securities (like CETES) and long-term debt securities (like BONOS):

| Mexican Debt Securities Holding of U.S. Residents in (Thousands of Dollars) | | |
|---|---|---|
| | Short-Term | Long-Term |
| 2006 | 18,000 | 23,812,000 |
| 2007 | 432,000 | 23,911,000 |
| 2008 | 211,000 | 18,950,000 |
| 2009 | 38,000 | 22,555,000 |
| 2010 | 160,000 | 32,081,000 |
| 2011 | 3,586,000 | 45,485,000 |
| 2012 | 8,170,000 | 72,084,000 |
| 2013 | 9,275,000 | 73,534,000 |
| 2014 | 6,556,000 | 92,303,000 |
| 2015 | 3,689,000 | 87,440,000 |
| 2016 | 1,792,000 | 90,111,000 |

31.     Defendants used their U.S.-based dealer subsidiaries, which include Santander Investment Securities, Inc., BBVA Securities, Inc., HSBC Securities (USA) Inc., ING Financial Markets LLC, and Barclays Capital Inc., to sell MGBs with the knowledge of, and for the benefit of, their corporate parents and close affiliates that served as market makers for MGBs as more particularly alleged in Part C, below.

32.     Additionally, as more particularly alleged below, the U.S.-based affiliates of BBVA, Santander, Deutsche Bank, HSBC, ING, and Barclays supervised, directed, and were responsible for the MGB trading and sales strategies of those Defendants.

**B. Defendants Directed and Controlled their MGB Trading and Sales Businesses from the United States.**

33.     <u>Citibanamex and Citibank Mexico, S.A.</u>: Citigroup Inc. operates in Mexico both directly and through Citibanamex, over which it exercises control. U.S.-based Citigroup Inc. executives make critical business decisions for Citibanamex, such as a multi-billion dollar investment in expanding Citibanamex's footprint announced by Citigroup Inc. CEO Michael Corbat in September 2014. In announcing the move, Corbat highlighted the integrated structure of Citibanamex with Citigroup Inc., commenting that "The integration of Citi and Banamex allows us

to attend to our clients in an outstanding manner and bring the benefits from our global network to a market with tremendous potential."

34.    Citigroup Inc. is organized into separate business lines, which encompass activities undertaken by staff employed by its subsidiaries including Citibanamex and Citibank Mexico, S.A. Accordingly, when Citibanamex and Citibank Mexico, S.A. employees engage in MGB transactions with investors, they do so as part of Citigroup Inc.'s integrated "Institutional Clients Group" and report to superiors who are based at Citigroup, Inc.'s headquarters in New York.

35.    Citigroup Inc. advertises the advantages that it gains from organizing itself by business line. For instance, on "Citigroup.com" it writes that "Citi's Institutional Clients Group is comprised of diverse, talented professionals globally located in more than 100 countries and territories…[n]o other institution can match our combination of global insights, client relationship management services, geographic services, geographic reach, and local and cross-border expertise." Citibanamex and Citibank Mexico, S.A. employees who transact MGBs do so as part of Citigroup Inc.'s Institutional Clients Group.

36.    Citigroup Inc. directs the activities of its wholly-owned Mexico-based subsidiaries, Citibanamex and Citibank Mexico, S.A. During the Class Period, it reported to shareholders that it "built a globally consistent approach to ethics training and set global standards for suitability and sales practices," including its MGB sales practices, and applied a "consistent framework for assessing performance" which encompassed governance, culture, controls, and technology. Citigroup Inc. developed, implemented, and approved these standards from its headquarters in New York, and applied them to its Mexico-based subsidiaries, Citibanamex and Citibank Mexico, S.A. The risk, audit, and compliance functions for both Citibanamex and Citibank Mexico, S.A. are also carried out by Citigroup Inc. from its offices located in the United States.

37.     Citigroup Inc.'s control of Citibanamex and Citibank Mexico, S.A. extends to compliance issues and to critical personnel decisions. This control extends to the most important strategic considerations and personnel decisions for Citibanamex. For example, Citigroup Inc. fired Manuel Medina-Mora, a longtime executive of Citibanamex after widespread scandals roiled its reputation in Mexico, and appointed Jane Fraser as the Chief Executive Officer, Latin America in 2014. In this role she is "responsible for all businesses in the 23 countries where Citi is present in this important region, including Mexico." Citigroup Inc. does not distinguish between Citigroup Inc. and Citibanamex when describing Fraser's role in supervising Citibanamex's operations, further illustrating Citigroup Inc.'s control over Citibanamex.

38.     In an interview after Citigroup Inc. installed Fraser to lead Citibanamex and Citibank Mexico, S.A., Fraser noted that Mexico "is the largest market Citi has outside the U.S."

39.     Citigroup Inc.'s control over its Mexico-based subsidiaries extended from the beginning of the Class Period. Citigroup Inc. has exercised supervision and control over critical functions for Citibanamex since it acquired its predecessor Banamex in 2001, when it executed a "full integration" strategy that merged key functions of Citibanamex into Citigroup Inc., including compliance and risk management. Since then, Citibanamex's compliance functions are supervised and directed from Citigroup Inc.'s offices in Miami by personnel such as Daniela Ortega Sosa. From her office at Citigroup's Miami location, Sosa provides "[o]versight of the management and execution of the Compliance Program for Citi's Mexico franchise" and "[s]trategic consulting to all Banamex business units and affiliates on compliance and regulatory issues" in Mexico, including Citibanamex and its market making activities for MGBs.

40.     New York-based executives develop and implement Citigroup Inc.'s, Citibanamex's, and Citibank Mexico, S.A.'s strategy for Latin America & Mexico. Presently, Helen Pan leads

strategy as Head of Strategy, Latin America & Mexico, where she is based in both New York, New York and Mexico City, Mexico.

41.     Citigroup Inc. reported that its Mexican operations, which were organized under Citibanamex and Citibank Mexico, S.A., resulted in strong profits and consistent revenue growth. These results were reported in Citigroup Inc.'s consolidated financial statements throughout the Class Period.

42.     JPMorgan Mexico: JPMorgan Chase & Co. is "managed on a line of business basis." This means that JPMorgan Chase & Co. is organized into four business segments so that employees within each business line report through a chain of command that corresponds to the business line, without regard to whether the employee is formally employed by a separately incorporated subsidiary. JPMorgan Chase & Co.'s MGB sales and trading staff, as well as JPMorgan Mexico personnel responsible for MGB market making, are organized under its Corporate & Investment Bank business line and report up to senior managers that direct this business line from JPMorgan Chase & Co.'s headquarters in New York. For example, Jorge Rivera is the Executive Director of Fixed Income and FX Sales for JPMorgan Chase & Co., which includes MGB sales and marketing to U.S. institutional investors like Plaintiffs and is based in New York.

43.     When trading fixed income products with investors like Plaintiffs, JPMorgan Chase & Co. distributes a "Disclosure to Wholesale Fixed Income, Currency, Commodities, and Equities Products Clients." The disclosure "clarif[ies] the nature of the trading relationship between you and the Corporate & Investment Bank at JPMorgan Chase & Co. and its affiliates," which include subsidiaries such as JP Morgan Securities LLC and JPMorgan Mexico.

44.     In its 2016 Annual Report, Jamie Dimon, Chairman and CEO of JPMorgan Chase & Co., boasted that "JPMorgan Chase is a major international bank in Mexico, with revenue of more

than $400 million, serving Mexican, American, and international clients who do business there,"
including MGB sales and trading.

45.     JPMorgan Chase & Co. deploys a "comprehensive set of metrics" to govern culture
and conduct risk across all of its subsidiaries that are developed and managed from its headquarters
in New York. It states that it monitors employee behavior regularly to oversee employee conduct
within its global markets business, which includes MGB market making, sales, and trading at
JPMorgan Mexico. JPMorgan Chase & Co. develops "firmwide structures for risk governance" that
apply to its subsidiaries worldwide.

46.     JPMorgan Chase & Co.'s website has a dedicated section about its Latin America
business where it boasts of its "uniquely combine[d] integrated teams" and "deep local expertise and
a committed, persistent presence."

47.     <u>Bank of America Mexico</u>: Bank of America Corporation has operated in Mexico
since 1951, when it opened its first office in Mexico City. Worldwide, Bank of America Corporation
is organized and operated as five business segments: Consumer and Business Banking, Consumer
Real Estate Services, Global Banking, Global Markets, and Global Wealth and Investment
Management. It reports the results for these business segments across all of its subsidiaries.
Personnel within each business segment report through a chain of command corresponding to their
business segment, without regard to whether the employee is formally employed by a separately
incorporated subsidiary. Each of these business segments is headquartered in, and directed from,
Bank of America Corporation's offices in the United States.

48.      Bank of America Corporation's MGB market making, marketing, sales, and trading
operations are organized under its Global Markets business segment, which "offers sales and trading
services, including research, to institutional investor clients [*i.e.* Plaintiffs and the Class] in support of
their investing and trading activities." Bank of America Corporation's Fixed Income trading and

sales operations are organized under the Global Markets business segment. This includes personnel who conduct MGB market making, sales, and trading activities as employees of Bank of America Mexico. Trading personnel report to senior executives based in the United States such as James DeMare, Head of Global Fixed Income, who has led fixed income trading beginning in 2014. Prior to 2014, David Sobotka led Fixed Income trading as well as business units that "deal with business clients and institutional investors." Sobotka was also based in the United States.

49.     Bank of America Mexico's MGB marketing and sales staff are organized under Bank of America Corporation's "Americas, Fixed Income, Currencies, and Commodities Sales & Structuring" division. They are directed by executives at Bank of America Corporation's offices in New York. Since 2010, Karen Fang has been responsible for developing and implementing strategy for this division in her post as Managing Director and Head of Americas FICC Sales & Structuring at Bank of America Corporation. Fang directs strategy from Bank of America Corporation's offices in the United States, where she is based.

50.     HSBC Mexico: HSBC Holdings plc is organized into four global businesses. MGB market making, sales, and trading activities are housed within its Global Banking & Markets business. This means that all MGB sales, marketing, and trading staff report through HSBC Holdings plc's Global Banking & Markets business, without regard to the legal entity that formally these employees.

51.     HSBC Holdings plc separately reports its results and annual performance for each of its four global businesses across all of its separately incorporated subsidiaries.

52.     HSBC Holdings plc's MGB market making, sales, and trading operations are managed and supervised by senior staff principally located in New York. HSBC Holdings plc's Global Banking & Markets, Americas division includes employees of both HSBC Securities (USA), Inc. and HSBC Mexico, S.A. For example, the New York-based CEO, Chairman of the Board, and

President of HSBC Securities (USA), Inc., Thierry Roland, is also the Group General Manager and Chief Executive Officer of HSBC Global Banking & Markets, Americas. HSBC Holdings plc reports that Roland is responsible for managing HSBC Global Banking & Markets activities for Canada, the United States, and Mexico from his offices in New York.

53.     HSBC Global Banking & Markets uses an integrated strategy and is "emerging markets led, finance focused, and internationally connected." HSBC Holdings plc reported that its Global Banking & Markets is based in the United States, and that "New York as the hub for the Americas business, including Canada and Latin America."

54.     HSBC Securities Services is a division of HSBC Holdings plc that is organized within its Global Banking & Markets business and trades MGBs with investors in the United States on behalf of HSBC Holdings plc. During the Class Period, HSBC Securities Service, Americas was led by personnel, including Alexis Vasquez Meissner from 2014 to the present and Paulomi Shah from 2012 to 2014. Both Vasquez Meissner and Shah were based in New York.

55.     Deutsche Bank Mexico: Deutsche Bank AG is organized into five "corporate businesses" across its various subsidiaries. These corporate businesses are operated separately and further organized across Deutsche Bank AG's various subsidiaries according the geographic region. During the Class Period, Deutsche Bank AG's MGB marketing, sales, and trading operations were housed within its Corporate Banking & Securities business in the Americas region, including operations carried out by Deutsche Bank Mexico and Deutsche Bank Securities, Inc.

56.     As more particularly alleged above in Part A above, the personnel who managed and directed Corporate Banking & Securities in the Americas, including MGB marketing, sales, and trading operations, were stationed in New York during the Class Period.

57.     Barclays Mexico: Barclays PLC is organized by "business segment." Each of these business segments is managed separately and reports results separately. As of 2014, the business

segments were Personal and Corporate Banking, Africa Banking, Barclaycard, Investment Bank, and Barclays Non-Core.

58.     Barclays PLC's Investment Bank business segment is further divided into Markets, Banking, and Research units. The Research unit includes analysts employed by various Barclays entities, including Barclays Capital Inc. employees in the United States, and offers coverage of MGBs for investors.

59.     Barclays PLC sells and trades MGBs through the Markets unit housed in its Investment Bank business segment, which includes the Latin American Fixed Income trading and sales operations. These operations are carried out by employees employed by Barclays Capital Inc., Barclays Mexico, and Barclays PLC, with senior managers located at Barclays PLC's and Barclays Capital Inc.'s offices in New York. Barclays Mexico employees performs fixed income sales, marketing, and trading, including in MGBs, and are organized under Barclays PLC's Investment Bank division, and are described in Part A above.

60.     <u>ING Mexico</u>: ING Groep N.V., operating through its top-level operating entity ING Bank N.V., regards itself as a global financial institution that is principally organized into "two main business lines," Retail Banking and Commercial Banking. In the Americas, ING Bank N.V. operates through ING Financial Holdings LLC, which conducts wholesale banking on behalf of ING Bank N.V. ING Bank N.V.'s MGB marketing, sales, and trading operations undertaken by ING Mexico and ING Financial Markets LLC, were organized within the Commercial Banking business line in the Americas unit.

61.     Senior staff located in the United States directed the activities of the Americas unit. For example, Jorge Amato led the Americas unit's in his role as Head of Emerging Market Credit Trading, while Michael Dwyer served as Regional Head of Sales for the Americas Division. Both

Amato and Dwyer were based in the United States, and each oversaw ING Bank N.V.'s trading and sales operations in the Americas respectively, including MGB trading and sales.

62.   <u>Credit Suisse Mexico</u>: During the Class Period, Credit Suisse AG reported that it was an "integrated bank" pursing a "client-focused integrated bank strategy." Credit Suisse AG pursued this strategy through its worldwide operations, which were organized into divisional and regional businesses. Credit Suisse AG conducted MGB market making, sales, and trading activities through its Investment Banking business.

63.   The Investment Banking business deployed a "single point of contact" approach to its client securities business. Credit Suisse AG's client securities business included its fixed income business, which conducted MGB sales and trading activities both in the United States through Credit Suisse AG's New York branch and in Mexico through Credit Suisse (Mexico) S.A. It also operated a substantial US Fixed Income business.

64.   Credit Suisse AG's and Credit Suisse (Mexico) S.A.'s MGB trading and sales operations are directed from the Investment Banking business's New York regional headquarters, which serves as the base of operations for the Investment Banking business's operations in the Americas region.

## PARTIES

### A. Plaintiffs

65.   Plaintiff Oklahoma Firefighters Pension and Retirement System ("OFPRS"), established in 1981, provides retirement benefits to firefighters in Oklahoma. As of June 30, 2017, OFPRS managed more than $2.5 billion in assets on behalf of approximately 24,000 members and beneficiaries. During the Class Period, OFPRS transacted tens of millions of dollars of MGBs, including BONOS, directly with Defendants HSBC Securities (USA) Inc., JPMorgan Chase Bank, National Association, and Citigroup Global Markets Inc. OFPRS suffered monetary losses when it

was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to

fix MGB prices in the United States.

66.     Plaintiff Electrical Workers Pension Fund Local 103, I.B.E.W ("EWPFL"), is a

deferred retirement plan that currently provides benefits to nearly 2,500 retired participants. As of

2017, EWPFL managed more than $1 billion in assets. During the Class Period, EWPFL transacted

millions of dollars of MGBs, including BONOS, CETES, and UDIBONOS, directly with

Defendants Merrill Lynch, Pierce, Fenner & Smith, Incorporated,[3] BBVA S.A., BBVA Securities,

Inc., Santander Investment Bolsa, Sociedad de Valores, S.A., Banco Santander, S.A.,[4] HSBC Bank

PLC, HSBC Securities (USA) Inc., Citigroup Global Markets Inc., Citigroup Global Markets

Limited,[5] and Barclays Capital Inc. EWPFL suffered monetary losses when it was overcharged or

underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the

United States.

67.     Plaintiff Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA")

Pension Plan is a single-employer pension plan sponsored by the Manhattan and Bronx Surface

Transit Operating Authority, a subsidiary of Metropolitan Transportation Authority ("MTA") New

York City Transit. MaBSTOA provides retirement, disability, cost-of-living adjustments, and death

benefits to over 15,000 plan members, beneficiaries, and retirees. MaBSTOA presently manages

approximately $2.9 billion in assets. During the Class Period, MaBSTOA transacted in millions of

dollars of MGBs, including BONOS, CETES, and UDIBONOS, directly with Defendants BBVA

Securities Inc., Citigroup Global Markets, Inc., Citibank, N.A., Barclays Capital Securities Limited,

Banco Santander, S.A., and HSBC Securities (USA) Inc. MaBSTOA suffered monetary losses when

---

[3] Banc of America Securities merged into Merrill Lynch, Pierce, Fenner & Smith Incorporated during the Class Period.

[4] Banco Santander, S.A. was known as Banco Santander Central Hispano, S.A. until 2007, when it changed its name.

[5] Citigroup Global Markets Limited is Citigroup Inc.'s international broker-dealer.

it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

68.     Plaintiff MTA Defined Benefit Pension Plan Master Trust ("MTADBPPMT") consists of a cost-sharing multiple employer plan that includes certain MTA Long Island Rail Road non-represented employees hired after December 31, 1987, MTA Metro-North Railroad non-represented employees, certain employees of the former MTA Long Island Bus hired prior to January 23, 1983, MTA Police, MTA Long Island Rail Road represented employees hired after December 1, 1987, certain MTA Metro-North Railroad represented employees, MTA Staten Island Railway represented and non-represented employees and certain employees of the MTA Bus Company, as well as a single employer plan that covers employees of MTA Long Island Rail Road hired prior to January 1, 1988. MTADBPPMT presently manages approximately $5.04 billion in assets for over 29,000 plan members, beneficiaries, and retirees. During the Class Period, MTA transacted in millions of dollars of MGBs, including BONOS, CETES, and UNIBONOS directly with Defendants BBVA Securities Inc., Banco Santander, S.A., Citigroup Global Markets Inc., J.P. Morgan Securities Ltd.,[6] Barclays Capital Securities Limited, and HSBC Securities (USA) Inc. MTADBPPMT suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

69.     Plaintiff Boston Retirement System ("BRS") is a governmental defined benefit pension system that administers retirement benefits to over 34,000 members, beneficiaries, and retirees. BRS' membership includes all employees of the City of Boston as well as its autonomous agencies. BRS presently manages approximately $6 billion in assets. During the Class Period, BRS transacted in millions of dollars of MGBs, including BONOS and UDIBONOS, directly with

---

[6] J.P. Morgan Securities Ltd. changed its name to J.P. Morgan Securities plc in 2012.

Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, BBVA Securities, Inc., HSBC Bank PLC, HSBC Securities (USA) Inc., ING Financial Markets LLC, Citigroup Global Markets, Inc., J.P. Morgan Securities LLC,[7] J.P Morgan Securities plc, and Santander Investment Bolsa, Sociedad de Valores, S.A. BRS also transacted BONOS with HSBC Bank Brasil S.A.[8] BRS suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

70.     Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") Pension Plan is a pension fund sponsored by SEPTA on behalf of its employees with over 14,000 plan members, beneficiaries, and retirees. SEPTA provides public transportation services to Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania. At the end of 2016, the SEPTA Pension Plan had over $1.6 billion in assets under management. During the Class Period, SEPTA Pension Plan transacted in tens of millions of dollars of MGBs, including BONOS and UDIBONOS, directly with Defendants HSBC Securities (USA) Inc., Citigroup Global Markets Inc., Citibank, N.A., Deutsche Bank AG, JPMorgan Chase Bank, National Association, Bank of America N.A.,[9] Barclays Capital Inc., BBVA-Bancomer, and ING Financial Markets LLC. SEPTA Pension Plan suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

71.     Plaintiff Government Employees' Retirement System of the Virgin Islands ("GERS") is a pension system with over $700 million in assets under management for the benefit of more than 8,669 active members and more than 8,498 retirees and pensioners. During the Class Period, GERS transacted in tens of millions of dollars of MGBs, including BONOS, directly with

---

[7] BRS transacted with J.P. Morgan Securities Inc., which changed its name to J.P. Morgan Securities LLC in 2010.

[8] HSBC Holdings plc sold HSBC Bank Brasil S.A. on July 1, 2016 to Banco Bradesco S.A.

[9] Bank of America National Trust & Savings Association was acquired by Bank of America, N.A. in 1999.

Defendants JPMorgan Chase Bank, National Association, HSBC Securities (USA) Inc., and Citigroup Global Markets, Inc. GERS suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

72.     Plaintiff United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("UFCW Tri-State") is headquartered in Plymouth Meeting, Pennsylvania. Established in 1958, it is a Taft-Hartley, multi-employer defined benefit pension trust fund. UFCW Tri-State provides retirement benefits to present and former unionized employees of numerous food and service employers, including Acme Markets, Shop Rite, and others. As of December 31, 2016, UFCW Tri-State managed more than approximately $400,000,000 in net assets on behalf of more than 33,000 plan participants. During the Class Period, UFCW Tri-State bought MGBs, including BONOS, directly from HSBC Bank PLC, Banco Barclays S.A., HSBC Securities (USA) Inc., J.P. Morgan Securities LLC, J.P. Morgan Securities plc, J.P. Banco Merrill Lynch de Investimiento S.A.,[10] Bank of America Corporation,[11] Santander Investment Bolsa, Sociedad de Valores, S.A., and Deutsche Bank AG. UFCW Tri-State also transacted BONOS with HSBC Securities Services[12] at artificial prices from within the United States. UFCE Tri-State suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices in the United States.

---

[10] Banco Merrill Lynch de Investimiento S.A. changed its named to Bank of America Merrill Lynch Banco Múltiplo S.A. in 2011.

[11] Merrill Lynch & Co Inc. was acquired by Defendant Bank of America Corporation in 2013.

[12] HSBC Securities Services is a division of HSBC Holdings plc's Global Banking & Markets division, which was "one of the world's leading custodians providing custody and clearing services and funds administration to both domestic and cross-border investors."

### B.  Defendants

### 1.  The Santander Defendants

73.    Defendant Banco Santander, S.A. is a public banking group with its global headquarters in Santander, Spain.

74.    Banco Santander, S.A. derived more than $370 million in profit from its U.S.-based operations in 2016, including from its fixed income sales activities, which includes MGBs.

75.    Banco Santander, S.A. owns and operates a New York Branch, which is the same legal entity and an operational extension of Banco Santander, S.A. in the United States. Banco Santander's New York Branch reported $11.4 billion in assets in its 2015 U.S. Resolution Plan. It is regulated by both the NYSDFS and the Federal Reserve Board. It also trades MGBs in the United States directly with U.S. investors.

76.    Banco Santander, S.A. is a bank holding company under the Bank Holding Company Act of 1956 and a financial holding company pursuant to the Gramm-Leach-Bliley Act of 1999.

77.    Banco Santander, S.A. filed its most recent U.S. Resolution Plan on December 16, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.

78.    Defendant Santander Holdings USA, Inc., is a direct, wholly-owned subsidiary of Banco Santander, S.A. and is the corporate parent of Defendant Santander Investment Securities, Inc.

79.    Defendant Santander Investment Securities, Inc. ("SIS") is a wholly-owned subsidiary of Banco Santander, S.A. and a direct subsidiary of Santander Holdings USA Inc. SIS is based in New York and is a registered broker-dealer and investment advisor. SIS marketed and transacted billions of dollars' worth of MGBs in the United States during the Class Period.

80.    SIS had $1.5 billion in assets regulated by the SEC and the Financial Industry Regulatory Authority ("FINRA") as of 2015.

81.     During the Class Period, SIS employed emerging markets traders in its New York office, including Robert Kessler, who engaged in the "consistently profitable trading [of] Latin American sovereign and corporate debt" and traded in sovereign bonds issued by Mexico, and Bosco Livingston, an emerging markets senior trader specializing in sovereign debt products that include MGBs.

82.     Defendant Santander Investment Bolsa, Sociedad de Valores, S.A. is a wholly-owned subsidiary of Banco Santander, S.A. Prior to 2013, it was known as Santander Central Hispano Bolsa, S.V., S.A.

83.     Defendant Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander Mexico") is a Mexican wholly-owned subsidiary of Defendant Banco Santander, S.A. Santander Mexico is the successor-in-interest to Grupo Financiero Santander México, S.A.B. de C.V.

84.     Banco Santander, S.A. exercises complete control over Santander Mexico. It holds 99.99% of the voting rights for Santander Mexico. Héctor Blas Grisi Checa serves as CEO, Executive President, General Director and Director of Santander Mexico. He also serves as Head of the Mexico region at Banco Santander, S.A. Banco Santander, S.A.'s Vice Chairman, Rodrigo Echenique Gordillo, also serves as a Director on the Board of Santander Mexico.

85.     Santander Mexico was a designated market maker for Mexican government securities during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

86.     Defendants Banco Santander, S.A., Santander Investment Securities Inc., Banco Santander, Santander Investment Bolsa, Sociedad de Valores, S.A., Banco Santander, S.A., and Santander Mexico are referred to collectively as "Santander."

### 2. The BBVA Defendants

87.    Defendant BBVA S.A. is a global financial institution headquartered in Bilbao, Spain.

88.    BBVA S.A. focuses its business in five geographical areas: Spain, Mexico, South America, the United States, and Turkey. Corporate and Investment Banking ("CIB") is considered a global business for BBVA S.A., and BBVA S.A. Accordingly, it does not split its CIB business into distinct geographical regions. BBVA S.A.'s, BBVA-Bancomer, and BBVA Securities, Inc.'s MGB market making, trading, and sales operations are part of its CIB global business.

89.    BBVA S.A. provides corporate banking, investment banking, and wealth management products and services to U.S.-based customers through its U.S. subsidiaries Compass Bank, BBVA Securities Inc., and its New York Branch.

90.    BBVA S.A. had $69.261 billion in assets within the U.S. as of year-end 2014.

91.    BBVA S.A. filed its most recent U.S. Resolution Plan on December 31, 2015 as required by Title I, Section 165(d) of the Dodd-Frank Act.

92.    BBVA S.A. reported having three material legal entities in the United States, including: BBVA Compass Bancshares, Inc., Compass Bank, and Compass Capital Markets, Inc.

93.    Defendant BBVA Compass Bancshares, Inc. is a direct, wholly-owned subsidiary of BBVA S.A.

94.    Defendant BBVA Securities, Inc. ("BSI") is a wholly-owned subsidiary of BBVA S.A. and is a direct subsidiary of BBVA Compass Bancshares, Inc. BSI is an international investment bank based in New York, New York that provides securities brokerage and research services. BSI is a registered broker-dealer and is regulated by the SEC and FINRA and traded MGBs in this capacity with investors located in the United States.

95.    BBVA S.A. and its subsidiaries employ traders in the United States who transact in MGBs, such as Surya Bhattacharjee, a Managing Director of Latin America Debt Capital Markets,

who is "[r]esponsible for sovereign, quasi-sovereign and supranational issuers across Latin America." BBVA S.A. also marketed MGBs to and transacted MGBs with investors in the United States during the Class Period.

96.     Defendant Grupo Financiero BBVA Bancomer, S.A. de C.V. is a direct, wholly-owned subsidiary of BBVA S.A.

97.     Defendant BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer") is a wholly-owned subsidiary of BBVA S.A. and is the principal direct subsidiary of Grupo Financiero BBVA Bancomer, S.A. de C.V. It is based in Mexico City, Mexico, has a local unit in the United States known as BBVA Bancomer USA, and provides various financial products and services to companies, government, and individuals. BBVA-Bancomer is the largest bank by assets in Mexico.

98.     BBVA S.A. exercises complete control over BBVA-Bancomer. It has 100% voting rights for Grupo Financiero BBVA Bancomer, S.A. de C.V. and BBVA-Bancomer. Eduardo Osuna is the Vice Chairman of BBVA-Bancomer and is the Chief Executive Officer of both BBVA-Bancomer and Grupo Financiero BBVA Bancomer, S.A. de C.V. Osuna is also employed as the Country Manager for Mexico at BBVA S.A. Luis Robles Miaja is the Chairman of the Board of Grupo Financiero BBVA Bancomer, S.A. de C.V. and has served as President of the Board for BBVA-Bancomer since 2012.

99.     BBVA-Bancomer was a designated market maker for MGBs during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

100.    Defendants BBVA S.A., BBVA Compass Bancshares, Inc., BBVA Securities, Inc., Grupo Financiero BBVA Bancomer, S.A. de C.V., and BBVA-Bancomer are collectively referred to as "BBVA."

### 3. The JPMorgan Defendants

101.    Defendant JPMorgan Chase & Co. is an American banking and financial services holding company headquartered in New York, New York.

102.    JPMorgan Chase & Co. was the largest bank in the United States as of year-end 2016 with $2.490 trillion in assets. JPMorgan Chase & Co. had $1.4 billion in trading and investing assets within Mexico in 2016, including trades and investments in MGBs.

103.    Defendant J.P. Morgan Broker-Dealer Holdings Inc. is a direct, wholly-owned subsidiary of JPMorgan Chase & Co. and is based in New York.

104.    Defendant JP Morgan Securities LLC is based in New York and is a wholly-owned subsidiary of JPMorgan Chase & Co. and a direct subsidiary of J.P. Morgan Broker-Dealer Holdings Inc. JP Morgan Securities LLC operated an emerging markets desk that sold MGBs to investors located in the United States, including to Plaintiff BRS.

105.    Defendant JPMorgan Chase Bank, National Association is a wholly-owned subsidiary of JPMorgan Chase & Co. that is headquartered in New York. JPMorgan Chase Bank, National Association marketed MGBs to and transacted MGBs with investors throughout the United States during the Class Period.

106.    JPMorgan Chase Bank, National Association also transacted MGBs in the United States through an investment banking affiliate, J.P. Morgan Securities, plc. JPMorgan Chase Bank National Association authorizes J.P. Morgan Securities plc to transact financial instruments, including MGBs, with customers located in the United States and Europe. J.P. Morgan Securities plc and J.P. Morgan Securities LLC are principal subsidiaries of JPMorgan Chase & Co.

107.    Banco J.P. Morgan, S.A., Institución de Banca Múltiple, J.P. Morgan Grupo Financiero ("JPMorgan Mexico") is a wholly-owned subsidiary of JPMorgan Chase & Co. and is based in Mexico.

108.    As ultimate parent and holder of 99.66% voting power, JPMorgan Chase & Co. exercises complete control over the activities of JPMorgan Mexico.

109.    JPMorgan Chase & Co.'s control over JPMorgan Mexico extends even to the latter's personnel recruitment. In a 2012 press release, JPMorgan Chase & Co. announced that it was "making significant investments in recruiting and developing staff" for JPMorgan Mexico.

110.    JPMorgan Chase & Co. provides financial support directly to JPMorgan Mexico. In 2012, JPMorgan Chase & Co. made a $250 million capital increase to JP Morgan Mexico, which "will allow [JPMorgan Mexico] to increase its lending limits in the country and to provide its growing list of clients with more credit opportunities."

111.    JPMorgan Chase & Co. derives benefit from JPMorgan Mexico's operations and considers them to be an extension of its own. In its annual reports, JPMorgan Chase & Co. reports on its "Trading and investing" exposure in Mexico, a number that includes "market-making inventory," including MGBs.

112.    JPMorgan Mexico was a designated market maker for MGBs during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

113.    JPMorgan Chase & Co., J.P. Morgan Broker-Dealer Holdings Inc., J.P. Morgan Securities LLC, JPMorgan Chase Bank, National Association, and JPMorgan Mexico are collectively referred to as "JPMorgan."

### 4.  The HSBC Defendants

114.    Defendant HSBC Holdings PLC is a British multinational banking and financial services company, with its headquarters in London, England.

115.    HSBC Holdings PLC is the parent company of one of the world's largest banking and financial services groups, with subsidiaries providing services in 70 countries and territories and

approximately 13,000 employees in the United States. HSBC Holdings PLC's ADRs are listed on the NYSE.

116.    Defendant HSBC Bank PLC is a wholly-owned subsidiary of HSBC Holdings PLC that transacted MGBs with investors in the United States during the Class Period.

117.    Defendant HSBC North America Holdings Inc. is the holding company for HSBC Holdings PLC's operations in the United States with assets of $307.8 billion as of June 2017. Through its subsidiaries, HSBC North America Holdings Inc. held $6.899 billion in corporate and foreign bonds as of December 21, 2015, including MGBs.

118.    Defendant HSBC Securities (USA) Inc. is a subsidiary of HSBC North America Holdings Inc., a direct subsidiary of HSBC Markets (USA) Inc., and an investment banking firm based in New York, New York. HSBC Securities (USA) Inc. employs personnel specializing in MGB sales and trading and sold substantial quantities of price-fixed MGB in the United States during the Class Period.

119.    HSBC Securities (USA) Inc. is a registered broker-dealer under the Securities Exchange Act of 1934, and a registered investment adviser under the Investment Advisers Act of 1940.

120.    HSBC Securities (USA) Inc. markets MGBs to and transacts with investors located in the United States on behalf of its parent companies, including at least HSBC Bank PLC and HSBC Holdings PLC.

121.    HSBC North America Holdings Inc. and its subsidiaries employ traders who transact in MGBs in their New York office, including Manual Astaburuaga, an emerging markets trader for HSBC NY Global Banking and Markets and Christian Caruso, an emerging markets fixed income trader.

31

122.     Defendant HSBC North America Holdings, Inc. is a wholly-owned subsidiary of HSBC Holdings PLC.

123.     Defendant HSBC Markets (USA) Inc. is wholly-owned subsidiary of HSBC Holdings PLC.

124.     Defendant HSBC Latin America Holdings (UK) Limited is a wholly-owned subsidiary of HSBC Holdings PLC.

125.     Defendant HSBC México, S.A., Institución De Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico") is a direct subsidiary of HSBC Latin America Holdings (UK) Limited and a wholly-owned subsidiary of HSBC Holdings plc. HSBC Holdings plc lists HSBC Mexico as a principal subsidiary.

126.     HSBC Holdings plc exercises significant control over HSBC Mexico. For example, it reported that it extended a line of credit totaling $1.2 billion to HSBC Mexico.

127.     HSBC Mexico was a designated market maker for MGBs during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

128.     Defendants HSBC Holdings PLC, HSBC North America Holdings Inc., HSBC Securities (USA), HSBC Bank PLC, HSBC Markets (USA) Inc., HSBC Latin America Holdings (UK) Limited, and HSBC Mexico are collectively referred to as "HSBC."

### 5.   The Barclays Defendants

129.     Defendant Barclays PLC is a multinational bank and financial services company headquartered in London, England. Barclays PLC has operations in over 40 countries and employs approximately 120,000 people.

130.     Barclays PLC identified nine material entities in their most recent US resolution plan, as required by the Dodd-Frank Wall Street Reform and Consumer Protection Act, including: Barclay's Capital Inc. and Barclays Bank PLC - New York Branch.

131.     Defendant Barclays Capital Inc. is incorporated in the state of Connecticut and is a wholly-owned subsidiary of Barclays PLC. Barclays Capital Inc. is a U.S. registered securities broker-dealer with the SEC, a futures commission merchant, a commodity pool operator, a commodity trading advisor registered with the CFTC, and a municipal advisor registered with the SEC. Barclays Capital Inc. is headquartered in New York, New York, with registered domestic branch offices in 18 U.S. cities.

132.     Barclays Capital Inc.'s activities include transactions in asset-backed securities, agency mortgage-backed securities, listed equities, international debt securities, corporate related securities, resale and repurchase agreements, and securities borrowing and lending. Barclays Capital Inc.'s core business lines are equities trading, fixed income credit, fixed income rates, fixed income securitized products, and prime services.

133.     At year-end 2016, Barclays Capital Inc. held $7.56 billion in government securities, including MGBs, and $7.32 billion in government securities designated for sale.

134.     Defendant Barclays Bank PLC, operating under the trade name Barclays Investment Bank, provides investment banking advisory services, foreign exchange securities lending, and loan syndication services with three offices in the U.S.

135.     Barclays Bank PLC's macro markets line of business is supported by trading desks that specialize in the trading of government bonds, including MGBs.

136.     Barclays Bank PLC is a direct subsidiary of Barclays PLC which together with its subsidiaries provides financial products and services in the Americas.

137.    Barclays PLC and its subsidiaries employ traders in their New York Office who transact in MGBs, including Robert Lombardi, an emerging markets credit trader for Barclays Investment Bank (which is a division of Barclays Bank PLC) and Vasi Ardelean, a fixed income trader in Latin American bonds.

138.    Defendant Banco Barclays S.A. is a subsidiary of Defendant Barclays PLC headquartered in Sao Paulo, Brazil that provides investment banking services and other financial services in Brazil and internationally. Banco Barclays S.A. transacted in MGBs with U.S. investors during the Class Period on behalf of Barclays PLC, including UFCW Tri-State.

139.    Defendant Barclays Capital Securities Limited is a subsidiary of Defendant Barclays Bank PLC headquartered in London, United Kingdom that marketed and transacted BONOS with US investors, including directly with Plaintiff MaBSTOA.

140.    Defendant Grupo Financiero Barclays México, S.A. de C.V. is a wholly-owned subsidiary of Barclays PLC and based in Mexico.

141.    Defendant Barclays Bank México, S.A., Institución de Banca Múltiple, Grupo Financiero Barclays México ("Barclays Mexico") is a wholly-owned subsidiary of Grupo Financiero Barclays Mexico, S.A. de C.V. During the Class Period, Barclays Mexico was a designated market maker for MGBs and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

142.    Barclays PLC owns 100% of the voting rights for both Grupo Financiero Barclays México, S.A. de C.V. and Barclays Mexico. José Antonio González Flores is President of both Grupo Financiero Barclays México, S.A. de C.V. and Barclays Mexico.

143.    Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., Barclays Capital Securities Limited, Grupo Financiero Barclays Mexico, S.A. de C.V., Banco Barclays SA, and Barclays Mexico are collectively referred to as "Barclays."

### 6.  The Citi Defendants

144.    Defendant Citigroup Inc. is a multinational investment banking and financial services corporation headquartered in New York, New York.

145.    Citigroup Inc. reported approximately $16 billion in investment securities and trading account assets, including MGBs, at year-end 2016.

146.    Defendant Citigroup Global Markets Holdings Inc. is a direct subsidiary of Citigroup Inc. and is based in New York.

147.    Defendant Citigroup Financial Products Inc. is a wholly-owned subsidiary of Citigroup Global Market Holdings Inc. and is based in New York.

148.    Defendant Citigroup Global Markets Inc. is a wholly-owned subsidiary of Citigroup Inc. and a direct subsidiary of Citigroup Financial Products Inc. It provides investment banking and financial advisory services. Citigroup Global Markets Inc. is based in New York, NY.

149.    Citigroup Global Markets Inc. marketed MGBs to and transacted MGBs with investors in the United States during the Class Period, including directly with Plaintiffs.

150.    Defendant Grupo Financiero Banamex, S.A. de C.V., is a wholly-owned subsidiary of Citigroup Inc.

151.    Defendant Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex ("Citibanamex"), operating under the trade name Citibanamex, is a wholly-owned subsidiary of Citigroup Inc. It was a designated market maker for MGBs during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

152.    Defendants Citigroup Inc., Citigroup Global Markets Holdings Inc., Citigroup Financial Products Inc. Citigroup Global Markets Inc., Citibank Mexico, S.A., and Citibanamex are collectively referred to as "Citigroup."

### 7. **The Bank of America Defendants**

153.     Defendant Bank of America Corporation is an American global bank headquartered in Charlotte, North Carolina.

154.     Bank of America Corporation reported holding $430 billion in debt securities at year-end 2016. It also held $180 billion in trading account assets, which includes debt securities held for trading and sales such as MGBs.

155.     Bank of America Corporation completed its purchase of Defendant Merrill Lynch Pierce Fenner & Smith Incorporated on January 1, 2008 and continued operating Merrill Lynch Pierce Fenner & Smith Incorporated's debt and equity underwriting and sales and trading businesses after that date.

156.     Defendant Bank of America, National Association ("Bank of America, N.A.") is a banking institution that marketed MGBs to and transacted MGBs with investors in the United States.

157.     Defendant BankAmerica International Financial Corporation is a U.S.-based subsidiary of Bank of America N.A. and is the direct parent of Defendant Bank of America México, S.A., Institucion de Banca Multiple, Grupo Financiero Bank of America ("Bank of America Mexico").

158.     Bank of America Mexico was a designated market maker for MGBs during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

159.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is based in New York and is a wholly-owned subsidiary of Bank of America Corporation. It is the successor to Banc of America Securities, which also traded MGBs in the United States.

36

160.     Defendants Bank of America Corporation, Bank of America N.A., BankAmerica International Financial Corporation, Bank of America Mexico, and Merrill Lynch, Pierce, Fenner & Smith Incorporated are collectively referred to as "Bank of America."

### 8.   The Deutsche Bank Defendants

161.     Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.

162.     Deutsche Bank AG's U.S. headquarters is in New York. Its New York branch is located at 60 Wall Street, New York, NY 10005. Deutsche Bank AG considers its New York branch to be a "material entity" within the United States. Deutsche Bank AG's U.S.-based dealers trade in Latin American sovereign debt products, including MGBs.

163.     Deutsche Bank AG, New York Branch acts as an agent of Deutsche Bank AG in the United States and in this District. Deutsche Bank AG, New York Branch has been registered with NYSDFS and licensed to do business in this state since 1978. Deutsche Bank AG is also registered with the Board of Governors of the Federal Reserve System. Deutsche Bank AG's New York branch has more than 1,700 employees and total assets exceeding $152 billion.

164.     Traders in Deutsche Bank AG's New York offices participated in numerous conspiracies to fix prices in financial markets during the Class Period.

165.     Deutsche Bank AG's Fixed Income and Currencies business is considered one of its "core franchises." The business markets and trades MGBs from its offices in the United States, where it provides interest rate products with its U.S. clients and maintains a Fixed Income Proprietary Trading team that trades MGBs.

166.     Defendant Deutsche Bank Securities Inc. is a wholly-owned subsidiary of Deutsche Bank AG that is based in New York and traded substantial quantities of MGBs from within the United States during the Class Period.

167.    Defendant Deutsche Bank Americas Holding Corp. is based in New York and is a wholly-owned subsidiary of Deutsche Bank AG.

168.    Defendant Deutsche Bank México, S.A., Institution de Banca Múltiple ("Deutsche Bank Mexico") is a direct subsidiary of Deutsche Bank Americas Holding Corp. and a wholly-owned indirect subsidiary of Deutsche Bank AG.

169.    Deutsche Bank AG controls 100% of capital and voting rights in Deutsche Bank Mexico.

170.    Deutsche Bank Mexico was a designated market maker for MGBs during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

171.    Deutsche Bank AG, Deutsche Bank Securities, Inc., Deutsche Bank Americas Holding Corp., and Deutsche Bank Mexico are collectively referred to as "Deutsche Bank."

### 9.    The Credit Suisse Defendants

172.    Defendant Credit Suisse Group AG, together with its subsidiaries, provides various financial services worldwide and is headquartered in Zurich, Switzerland.

173.    Credit Suisse Group AG is divided into six segments: Swiss Universal Bank, International Wealth Management, Asia Pacific, Global Markets, Investment Banking & Capital Markets, and Strategic Resolution Unit. Its Global Markets Division marketed and sold MGBs, including in the United States, during the Class Period.

174.    Defendant Credit Suisse AG is a subsidiary of Credit Group AG and a multinational investment bank and financial services company.

175.    Credit Suisse AG filed its most recent U.S. Resolution plan on July 1, 2015 in which it reported seven material entities operating in the U.S.

176.    Recent financial reports show that Credit Suisse AG and its subsidiaries held nearly $1.35 billion worth of foreign government debt securities, including MGBs.

177.    Credit Suisse AG's CEO, Tidjane Thiam, oversees the day-to-day operational management of Credit Suisse overall and directly oversees Brian Chin, the CEO of Global Markets. Brian Chin also sits on the board of Credit Suisse's U.S. subsidiaries.

178.    Credit Suisse AG and its subsidiaries marketed MGBs to and transacted MGBs with U.S. investors from within the United States throughout the Class Period.

179.    Credit Suisse AG's New York Branch is a New York licensed subsidiary of Credit Suisse, AG.

180.    Defendant Credit Suisse Financiero Credit Suisse (Mexico), S.A. de C.V., was established by Credit Suisse AG to expand its local presence in Mexico. Credit Suisse AG also operates the following subsidiaries in Mexico: Banco Credit Suisse (Mexico) S.A., Casa de Bolsa Credit Suisse (Mexico), S.A. de C.V., Credit Suisse Servicios (Mexico) S.A. de C.V.

181.    Defendant Banco Credit Suisse (Mexico) S.A. is a wholly owned subsidiary of Credit Suisse AG. Banco Credit Suisse (Mexico), S.A. provides various banking services in Mexico with its headquarters in Mexico City, Mexico.

182.    Banco Credit Suisse (Mexico) S.A. operates through Investment Banking, and Stock Brokering and Securities Distribution segments. It offers investment, market analysis, and investment fund services.

183.    Banco Credit Suisse (Mexico) S.A. was a designated market maker for MGBs during the Class Period and is under investigation by COFECE, the CNBV, and the Secretaria de Hacienda for participating in the conspiracy to fix MGB prices as alleged herein.

184.     Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Financiero Credit Suisse (Mexico), S.A. de C.V., and Banco Credit Suisse (Mexico) S.A. are collectively referred to as "Credit Suisse."

### 10. The ING Defendants

185.     Defendant ING Bank, N.V. is a global financial institution with its headquarters in Amsterdam, the Netherlands. It is a wholly-owned subsidiary of Defendant ING Groep N.V.

186.     Through its subsidiaries ING Bank, N.V. is active in the United States market for MGBs. As of December 2017, ING Bank, N.V. and its subsidiaries held €34.844 billion in government bonds, which includes MGBs.

187.     ING Bank N.V. operates in the United States through its wholly owned subsidiary ING Financial Holdings Corporation and its subsidiaries which offer a full array of wholesale financial products and financial markets products to corporate and institutional clients, including the purchase and sale of MGBs.

188.     According to its 2017 annual report ING Financial Holdings Corporation employed 519 people in their U.S. offices and earned €732 million through U.S.-based activities. ING Financial Holdings Corporation held €42.571 billion in assets within the United States as of December 2017.

189.     Defendant ING Bank Mexico S.A. ("ING Mexico) was a wholly-owned direct subsidiary of Defendant ING Bank, N.V. that offered commercial banking services from its headquarters in Mexico City. ING Mexico was organized under ING Bank, N.V.'s "Americas" region servicing customers in both the United States and Mexico. ING Mexico was a designated market maker of MGBs from at least the beginning of the Class Period through at least 2011.

190.     Since 2011, ING Bank, N.V. has remained active as a dealer in the MGB market through its ING Wholesale Banking business unit. ING Bank, N.V. advertises ING Wholesale Banking as a network geared toward institutional investors that "meets your international needs with

a local presence in 40 countries," including the United States and Mexico. It "serve[s] a wide range of organi[z]ations, including corporates, multinational corporations, financial institutions, governments, and supranational bodies."

191.    Defendant ING Financial Markets LLC is a subsidiary of ING Bank N.V. that offers investment banking and financial advisory services with its headquarters in New York, New York.

192.    ING Financial Markets LLC is a registered broker-dealer and is regulated by the SEC and FINRA. In this capacity, ING Financial Markets LLC undertakes MGB sales and trading in the United States with U.S. investors on behalf of ING Bank, N.V.

193.    ING Financial Markets LLC employs traders in the United States who transact in MGBs including Christina Antonio and Stephanie Baciuska, fixed income traders in ING Financial Markets LLC's New York office. Antonio had previously been employed as a trader with co-conspirators Bank of America and JPMorgan. Baciuska had also previously been employed by co-conspirator Bank of America.

194.    Defendants ING Bank N.V., ING Financial Markets LLC, and ING Bank Mexico S.A. are referred to collectively as "ING."

        **11. "John Does" 1-10**

195.    John Doe 1 is the entity that received leniency under Mexico's cartel leniency program as reported in May 2017 by Bloomberg. John Doe 1 was a member of the conspiracy described in this Complaint.

196.    John Does 2-10 are individuals and entities that joined the conspiracy to fix prices in the market for MGBs that is described in this Complaint.

197.    **The Market Makers:** Defendants Santander Mexico, BBVA-Bancomer, JPMorgan Mexico, HSBC Mexico, Barclays Mexico, Citibanamex, Bank of America Mexico, Deutsche Bank Mexico, Banco Credit Suisse (Mexico), S.A., and ING Bank Mexico S.A. were designated market

makers in the MGB market during the Class Period. These entities are referred to collectively as "Market Makers" or "Dealers."

### C. Defendants' Dealer-Subsidiaries Sold MGBs in the United States as Agents for their Corporate Parents

198.    Each Defendant acted through its U.S.-based subsidiaries to transact MGBs at fixed, artificial prices with investors located in the United States, including with Plaintiffs. In each instance, the corporate parents benefitted from, knew of, and exercised control over the conduct of their dealer-subsidiaries as more particularly alleged below.

#### 1. Santander Investment Securities and Santander Investment Bolsa, Sociedad de Valores, S.A.

199.    According to SEC filings, Defendant Banco Santander, S.A. "engage[s] in securities activities in the United States directly through [its] broker-dealer subsidiaries, Santander Securities Corporation and Santander Investment Securities Inc."

200.    As ultimate corporate parent and holder of 100% voting power, Banco Santander, S.A. exercises complete control over the activities of SIS.

201.    Banco Santander, S.A.'s control over SIS extends to the latter's payroll management policies and compensation structure. In 2010, Banco Santander, S.A. established a deferred compensation plan for SIS employees, which includes payment in shares of Banco Santander, S.A.

202.    Banco Santander, S.A. provides financial support to SIS through a Revolving Subordinated Loan Agreement, effective June 8, 2016, with an average interest rate of 2.7%.

203.    Banco Santander, S.A. also trades MGBS in the United States through wholly-owned subsidiary Santander Investment Bolsa, Sociedad de Valores, S.A.

204.    Banco Santander, S.A. owns 100% of Santander Investment Bolsa, Sociedad de Valores, S.A. and exercises 100% voting power.

205.     Santander Investment Bolsa, Sociedad de Valores, S.A. reported that it "has been engaged specifically by Banco Santander, S.A. to execute orders for the latter's retail clients." Santander Investment Bolsa, Sociedad de Valores, S.A. also reported in 2014 that it transacts fixed income instruments "on behalf of Banco Santander, S.A."

206.     Banco Santander's control over SIB extends to internal risk management policy.  "As a subsidiary of Banco Santander, Santander Investment Bolsa, Sociedad de Valores, S.A. is subject to the action framework established by it.

207.     Banco Santander, Santander Investment Bolsa, Sociedad de Valores, S.A. transacts MGBs, including with investors in the United States, as part of Banco Santander, S.A.'s Corporate Banking business. Banco Santander, S.A. boasts that this Corporate Banking business has a "leadership" position in debt capital markets in the Americas, which includes both the United States and Mexico, and which includes Banco Santander, Santander Investment Bolsa, Sociedad de Valores, S.A.'s MGB trading and sales.

208.     As ultimate parent, Banco Santander, S.A. receives financial benefit directly from SIS's and Santander Investment Bolsa, Sociedad de Valores, S.A.'s U.S. MGB trading and sales operations. For instance, Banco Santander, S.A.'s 2013 U.S. Consolidated Balance Sheet includes the assets of SIS, expressly grouped together with those of the parent's New York branch under the title "Santander NY," and also includes revenues generated by Santander Investment Bolsa, Sociedad de Valores, S.A., including MGB sales and trading revenues derived from trading MGBs with U.S. investors.

### 2.   BBVA Securities, Inc.

209.     BBVA S.A. trades Latin American debt securities including MGBs in the United States on its own account and through its wholly-owned dealer subsidiary, BSI.

43

210.    BBVA S.A. supports BSI by providing financing and managerial support. These activities allow BSI to trade MGBs as agent for both BBVA S.A and BBVA-Bancomer. For example, BBVA S.A. provided BSI with a $150 million line of credit to use for trade settlement purposes at a below-market interest rate of 0.5%. BSI's "legal, compliance, accounts payable, internal auditing, and human resource services," and leasing of office space, among other functions, are provided by BBVA S.A. through its New York Branch.

211.    BSI and BBVA-Bancomer both buy and sell MGBs with the knowledge of and for the benefit of BBVA, S.A. The revenue generated by the MGB-related sales and trading are reported in BBVA, S.A.'s consolidated financial statements.

212.    BSI trades MGBs with investors in the United States as agent for both BBVA, S.A. and BBVA-Bancomer. For example, in its year-end Statement of Financial Condition for 2017, BSI reported that it "acts as agent on behalf of BBVA [S.A.] and [BBVA] Bancomer in fixed income securities transactions. Fees earned related to this agreement are calculated based on the costs of the team plus a mark-up." These "fixed income securities transactions" include MGBs.

213.    BBVA S.A. controls a total of 100% of the voting rights for BSI.

214.    In its capacity as agent for BBVA, S.A. and BBVA-Bancomer, BSI transacted millions of dollars' worth of MGBs, including BONOS and CETES, directly with Plaintiff EWPFL during the Class Period.

### 3.   HSBC Securities (USA) Inc.

215.    HSBC Securities (USA) Inc. markets and trades MGBs in the United States with U.S. investors as agent of HSBC Holdings plc and HSBC Mexico.

216.    HSBC Holdings plc directs investors in fixed income products in the United States to a website where it "offers access to a wide variety of fixed income products" including "Sovereign Bonds: Issues by a national government and denominated in a foreign currency" through HSBC

Securities (USA), Inc. The "sovereign bonds" included on this website include MGBs. HSBC Bank USA, National Association (a wholly-owned subsidiary of HSBC Holdings plc) hosts this website.

217.    HSBC Holdings PLC is organized into four "principal business lines" that carry out its businesses in the markets where it operates, including the MGB market in the United States. HSBC Holdings PLC's "Global Banking & Markets, Americas" is the business line that encompasses the MGB-related activities of both Defendants HSBC Securities (USA), Inc., which markets MGBs directly to and transacts with U.S. investors (including with multiple Plaintiffs), as well as Defendant HSBC Mexico.

218.    The MGB marketing and trading activities of HSBC Securities (USA) Inc. and HSBC Mexico are organized within the Global Banking and Markets, Americas Division, *see* Part B, above. Samir Assaf is the Group Managing Director and Chief Executive of HSBC Holdings plc's international Global Banking and Markets business line and is employed by HSBC Holdings PLC. In the Americas, Thierry Roland supervises Global Banking and Markets' business in North America and Latin America from his position in HSBC Securities (USA) Inc. in New York. HSBC Holdings plc reports consolidated revenue from its "Credit," "Debt Capital Markets," and "Securities Services" businesses under the heading of its Global Banking and Markets division. These consolidated reports include revenue generated by HSBC Mexico and HSBC Securities (USA), Inc.'s MGB marketing, sales, and trading activities.

219.    HSBC Holdings plc finances HSBC Securities (USA), Inc.'s activities in the United States, including MGB trading and sales. It regularly finances these operations. For example, it extended a $5.0 billion loan to HSBC Securities (USA), Inc. in 2017 through HSBC USA Inc., a wholly-owned subsidiary of HSBC Holdings plc, and made similar financing arrangements available to HSBC Securities (USA), Inc. during the Class Period.

### 4. Barclays Capital Inc.

220.    Barclays Capital Inc. transacted MGBs with investors located in the United States during the Class Period on behalf of Barclays PLC, including directly with Plaintiffs.

221.    A recent 20-F filing by Barclays PLC lists Barclays Capital Inc. as one of its "Principal subsidiaries," noting "[s]ubsidiaries are entities over which [Barclays PLC] has control." Barclays PLC has defines "control" as:

      1)  power over the relevant activities of the investee, for example through voting or other rights,

      2)  exposure to, or rights to, variable returns from its involvement with the investee, and

      3)  the ability to affect those returns through its power over the investee.

222.    Further, Barclays Capital Inc. has significant financial obligations to Barclays Bank. Barclays Capital Inc.'s corporate identity is also closely intertwined with that of Barclays Bank; among other things, Barclays Capital Inc. does not have its own website, and Barclays Capital Inc.'s CEO is also the New York branch manager for Barclays Bank.

223.    Barclays Capital Inc. relies on the support of Barclays PLC to conduct its business. Employees of Barclays Capital Inc. are eligible to receive stock of Barclays PLC as compensation, which illustrates the fact that Barclays Capital Inc. and its employees are agents act in furtherance of Barclays PLC.

224.    Barclays Bank PLC's macro markets line of business is supported by trading desks who specialize in the trading of government bonds, including MGBs.

225.    Barclays PLC refers to the U.K. and the U.S. as its "two home markets." According to Barclays PLC, it is "anchored in the two financial centres of the world, London and New York."

226.    At all times during the Class Period, Barclays Mexico acted as an agent of and was controlled by Barclays PLC. Barclays Mexico states that it acts on behalf of Barclays PLC in its Notes to Financial Statements for the first quarter of 2016:

> The presence of Barclays in Mexico is part of a larger business strategy of Barclays PLC globally, with a distinct business model based on continuing relationships with clients that require experience identifying investment opportunities and solutions. Barclays Capital exemplifies teamwork and transparency in everything it does.
>
> Barclays Mexico has a business strategy built around developing relationships with clients that demand solutions and experience in identifying opportunities for their business. To do this, the bank has a team of experts in the areas of investment banking, treasury services, debt and capital markets advisory, etc.

227.    Further, employees of Barclays Mexico also received Barclays PLC stock as compensation, illustrating that Barclays Mexico and its employees were motivated by a desire to benefit Barclays PLC.

228.    Barclays Mexico's activities were overseen and regulated by Barclays Bank PLC and Barclays PLC. In the notes to Barclays Mexico's financial statements, it reads: "The activities of the institution are regulated by a series of guidelines established by Barclays Bank PLC, the holding company of the Group based in London, and by applicable law in Mexico."

229.    Supervisory and reporting lines for Barclays Mexico weaved through Barclays Capital Inc. and other affiliates of Barclays PLC. For example, Barclays' head of Mexico operations, Raul Martinez-Ostos, served as Chairman and President of Barclays Mexico and was based in Mexico City, but reported to Ivan Ritossa of Barclays Bank PLC, who was based in London and was Barclays' Head of Latin America, Central and Eastern Europe, Middle East and Africa.

230.    Barclays Capital Inc. also hired Karan Madan as head of its Latin America region and head of Latin America fixed income, currency and commodities trading (including MGB trading) from the offices of Barclays Capital Inc. in New York. In announcing the bank's hiring of Mr. Madan in 2011, Jerry del Missier, the Co-Chief Executive of Corporate & Investment Banking at

Barclays PLC, stated that, "Latin America has been a strategic focus of the firm for the past decade and this appointment demonstrates our ongoing commitment to further developing our platform in the region."

231.    In addition, the intermingling of board memberships throughout and across the subsidiaries of Barclays PLC further illustrates the control that Barclays PLC has over the operations of its subsidiaries, and the MGB business specifically. For instance, Gerard LaRocca served on the Board of Barclays Mexico, but was based in New York and was the Chief Executive Officer of Barclays Capital Inc. and the manager of the New York branch of Barclays Bank PLC. Mr. LaRocca reported to Rich Ricci, the Co-Chief Executive of Barclays Capital PLC (now a division of Barclays Bank PLC), Co-Chief Executive of Corporate and Investment Banking of Barclays PLC, and a member of the Executive Committee for Barclays PLC. Joseph Regan also served on the Board of Barclays Mexico, but was based in New York and served as a Managing Director with Barclays Capital Inc. and as controller for the Americas.

232.    One of the primary sources of funding for Barclays Mexico is lines of credit with Barclays PLC.

233.    Barclays PLC also depends on the profits of its U.S. and Mexican subsidiaries, which are reported in the consolidated earnings of Barclays PLC. For example, in 2017 Barclays PLC reported income of £6.87 billion from its U.S. operations (which include its U.S.-based subsidiaries) and an additional £251 million from the Americas (excluding the U.S.), which includes Barclays Mexico. These sums accounted for more than 35% of Barclays PLC's reported income.

234.    Barclays PLC and its subsidiaries employ traders in their New York Office who transact in MGBs.

### 5. Deutsche Bank Securities, Inc.

235.    Deutsche Bank AG's Fixed Income and Currencies business is considered one of its "core franchises." The business markets and sells MGB from its offices in the United States, where it provides interest rate products to its U.S. clients and maintains a Fixed Income Trading team that trades MGBs. Deutsche Bank Securities, Inc. markets and sells MGBs as part of Deutsche Bank AG's Fixed Income and Currencies business.

236.    Deutsche Bank Securities Inc. engages in a high volume of securities transactions, including clearing activities, currency transactions, interest rate derivatives, and swaps, on behalf of U.S. investors and with counterparties located in the United States and in this District. For example, in its Consolidated Financial Statements for 2014, Deutsche Bank Securities Inc. reported that it held billions of dollars in emerging market sovereign debt, which included substantial MGB holdings.

237.    Deutsche Bank AG exercised control over Deutsche Bank Mexico and Deutsche Bank Securities Inc. throughout the Class Period. For example, during the Class Period, Luis Antonio Betancourt Barrios was employed by Deutsche Bank Mexico and served as the Head of Trading for Mexico, a position within Deutsche Bank's broader Global Markets division. Betancourt Barrios was based in Mexico and oversaw Mexican traders, such as Jorge Classing, a Director in the Emerging Markets Fixed Income Trading unit in Mexico City. Barrios reported directly to both Christian Binaghi, a Managing Director with Deutsche Bank AG in New York who oversaw all Latin America trading, including sovereign debt trading, and Tito Vidaurri a Managing Director and Country Manager for Deutsche Bank Mexico. When the hiring of Mr. Betancourt Barrios was announced in 2006, Mr. Binaghi noted that, "Mexico is a key financial market for Deutsche Bank in Latin America and therefore a vital growth area for us," while Mr. Vidaurri added, "[t]his hire

demonstrates our commitment to Mexico as we continue to develop and expand our capabilities, products and services in this market."

238.    Deutsche Bank AG prioritized connecting its customers to Mexican financial products, including MGBs, in the United States. In announcing the addition of three new hires to the bank's Latin America Sales & Trading team in New York, Karan Madan, a Managing Director and Head of Global Markets Latin America with Deutsche Bank AG in New York, explained that, "As momentum in Latin America continues, we are adding professionals who will help our clients gain exposure to the region."

239.    Deutsche Bank AG also hired Raul Martinez-Ostos, who later moved to Barclays Mexico, to serve in Mexico City as a Director in the Latin America Debt Capital Markets division. Martinez-Ostos reported to Marcelo Blanco, the Head of Debt Capital Markets, Latin America. Martinez-Ostos was also expected to work closely with Deutsche Bank AG's New York-based debt capital markets team on Mexican public and private sector debt origination coverage.

240.    These intertwined operating and reporting relationships between Deutsche Bank Securities Inc., Deutsche Bank Mexico, and Deutsche Bank AG evidence Deutsche Bank AG's control of its subsidiaries and their integrated MGB business. Deutsche Bank AG states that its "strong local platform in Mexico is part of Deutsche Bank's long-term strategy to develop a global franchise in a large, important and growing economy." Deutsche Bank Mexico provides a full array of financial and advisory products to Mexican corporate and institutional clients through local employees and "through the Deutsche Bank global platform."

241.    Deutsche Bank AG seeks to leverage these intertwined relationships on its website and in marketing materials. For instance, the bank states that it has had a presence in Mexico since Deutsche Bank AG opened a representative office there in 1957, and that it was named the "Best Investment Bank in Mexico" in 2013.

50

242.     Deutsche Bank AG reports the revenues and profits generated by Deutsche Bank Mexico on its financial statements. For example, in 2015, Deutsche Bank AG had net revenue attributable to Mexico of $95 million.

### 6.   ING Financial Markets LLC

243.     ING Financial Markets LLC is a wholly-owned subsidiary of New York-based ING Financial Holdings Corporation, which is a wholly-owned subsidiary of ING Groep N.V. ING Groep N.V., through ING Bank N.V., finances ING Financial Markets LLC's activities in the United States, including its MGB sales and trading activities. ING Financial Markets LLC reported that it was "involved in secured financing and other transactions with affiliates and has significant related-party balances with affiliates" during the Class Period.

244.     ING Bank N.V. monitored ING Financial Markets LLC's market making, sales, and trading activities, including its MGB-related activities in the United States. ING Bank N.V. reports that it has a centralized Financial Markets Risk Committee that "sets risk limits both on an aggregated level and on a desk level" for all trading activities across ING Bank N.V.'s Financial Markets Division, which includes ING Financial Markets LLC. Accordingly, ING Financial Markets LLC transacted MGBs in the United States, including with Plaintiffs, with the knowledge of ING Bank N.V. and ING Groep N.V.

245.     ING Bank N.V. exercises significant control over ING Financial Markets LLC's activities in the United States. ING Financial Markets LLC reported that it "has a management agreement with an affiliate, whereby the affiliate provides certain trading, sales, accounting, operations, and other administrative support to" ING Financial Markets LLC. ING Groep N.V. included ING Bank N.V., ING Financial Holdings Corporation, and ING Financial Markets LLC in its consolidated financial reports. These financial reports comprise the accounts of all entities in

which it owns, either directly or indirectly, more than half of the voting power or over which it has control of their operating and financial policies through situations including, but not limited to:

- Ability to appoint or remove a majority of the board of directors;

- Power to govern such policies under statute or agreement; and

- Power over more than half of the voting rights through an agreement with other investors.

246.    ING Groep N.V. does not report intercompany transactions, such as intercompany transfers of MGBs or funds to finance MGB trading and sales, separately in its financial statements.

247.    ING Groep N.V. owns 100% of the voting rights for both ING Bank N.V. and ING Financial Holdings Corporation. ING Financial Holdings Corporation is the sole shareholder of ING Financial Markets LLC.

## SUBSTANTIVE ALLEGATIONS

I.    Background

A.    The Mexican Government Bond Market

248.    Mexican Government Bonds ("MGBs") are debt securities issued by the Mexican government to raise capital, fund deficits in the budget, and control the nation's money supply.

249.    All MGBs have core features in common that distinguish them as a single class of debt securities. Most notably, they are all backed by the Mexican government, are all issued via auctions dominated by Defendants, and are all sold to investors by Defendants, who control an overwhelming majority of the MGB supply available in the United States.

250.    The market for MGBs is structured as a three-tiered pyramid. The Mexican government, sitting at the top of the pyramid, issues MGBs in regularly scheduled auctions. Auctions are announced on a weekly basis on the last day of the week prior to the auction. Auctions always take place two days prior to the settlement date, *i.e.* the date on which the MGBs are

delivered. Settlement dates fall on Thursdays unless Thursday is a holiday, in which case MGBs

settle on the closest previous or following working day (with preference for the previous day). As a

result, auctions usually take place on Tuesdays.

251.    The Defendants, as the exclusive government-approved market makers, are the

middle layer of the pyramid. Defendants participate in the government-run MGB auctions, where

they simultaneously submit bid schedules indicating the amount of MGBs they are willing to buy

and for what price. These bids are supposed to be confidential. To ensure that bid schedules are not

disclosed or shared with other bidders prior to each auction, bid schedules are submitted either in a

sealed envelope or through encrypted electronic files. Sample bid schedules for each type of MGB

published by Banxico appear in Appendix A.

252.    The third and final level of the pyramid is MGB consumers, like Plaintiffs and the

Class. Consumers do not participate in the government-run MGB auctions. Instead, they purchase

MGBs from the Defendants. Plaintiffs here transacted directly with the Defendants. *See Parties.* A.,

above.

253.    MGBs have features such as the instrument's face value, maturity, and coupon

payment. The face value is set before the security is issued and represents the amount the issuer pays

to the holder of the security at maturity. The maturity date is the date which the face value of a bond

is to be paid in full. The maturity date is set when the bond is issued. The length of time between

when a bond is issued and when it matures determines its "tenor." A bond's coupon payment

determines how much, if any, of the interest earned on the par value is paid before the bond

matures. Finally, the yield is the annual rate of return of an investment in a bond if the investor

holds the bond until maturity.

254.    Coupon-bonds pay interest at set intervals, known as the "coupon period," and also

entitle the holder to payment of the face value at maturity. For example, a coupon-bond might have

a face value of $1,000 and provide coupon payments of 5% per year. For this bond, the issuer will pay the holder of the bond $50 each year in interest payments until the bond matures. At maturity, the issuer pays the bond holder the face value of the bond, $1,000.

255.    In contrast, a zero-coupon bond is a bond that is issued at a discount to its face value and does not pay interest to the holder until maturity. Instead, the difference between the purchase price and the face value of the bond represents the yield earned by the holder. For example, assume an investor pays $98,382.75 to purchase a zero-coupon bond with a face value of $100,000 that matures in 120 days. When the investor redeems the bond at maturity it will receive the full $100,000 face value, $1,617.25 more than what it paid to purchase that bond. The extra $1,617.25 represents the amount of interest the issuer paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

256.    Each time the Mexican government offers a new bond for sale that bond is referred to as a "new issuance." If the government decides to sell more of the same bond at a later date it can "reopen" that issuance and create additional bonds.

257.    For example, in 2007 the Mexican government issued 4.7 billion pesos of new 20-year bonds that paid an 8% semi-annual coupon payment maturing in June 2027. The government identified these bonds a unique identifying code, M 270603. Ten years later, the Mexican government reopened that issuance (code number M 270603) creating 8 billion pesos more of the same bond that it sold at an auction held on April 10, 2017.

### 1.  CETES

258.    Federal Treasury Certificates, known as "CETES," are short-term zero-coupon bonds issued by the Mexican government. Like other zero-coupon bonds, they trade at a discount to their face value, with the difference between the purchase price and the face value representing the

yield. CETES have maximum tenors of one-year and are normally issued with maturities between 28 and 364 days. CETES have a par value of 10 pesos and are normally quoted by their yield rate.

259.     CETES are issued in "multi-price" auctions during which Banxico arranges Defendants' bids in order from highest price to lowest price and allocates bonds in descending order based on the quantity requested. The auction stops once the amount of bonds awarded equals the amount offered during that auction.

260.     CETES are the principal means that the Mexican government uses to raise short-term funds. They are considered an attractive short-term investment because they are highly liquid, fungible, and pay higher yields than U.S. Treasury Bills of the same maturity. CETES represent approximately 16% of the outstanding amount of MGBs on the market.

261.     Data compiled by Banxico show that investors located outside of Mexico invested significantly in CETES during the Class Period, as reflected in the graph below:

**CETES Held by Investors Outside of Mexico During the Class Period
(Thousands of Pesos)[13]**



### 2. BONOS

262.    Mexican Federal Government Development Bonds, known as "BONOS," are fixed-rate coupon bonds with maturities greater than one year. BONOS pay a fixed semi-annual coupon payment and have a par value of 100 pesos.

263.    BONOS may be issued for any maturity period that is a multiple of 182 days. To date, BONOS have been issued with maturities of 3, 5, 10, 20 and 30 years. They are commonly known as BONOS M3, M5, M10, M20 and M30, depending on the tenor. Interest rates on BONOS are announced prior to issuance. BONOS are issued in "single-price" auctions, which function

---

[13] As of July 16, 2018, Banxico listed the U.S. dollar to Mexican peso exchange rate as 1.00 USD/18.836 MXN. The graphs in this section come from Banxico's interactive website, located at http://www.banxico.org.mx/SieInternet/consultarDirectorioInternetAction.do?accion=consultarCuadro&idCuadro=CF70&sector=7&locale=en.

similar to the multi-price auction described above, except that all bonds are sold at the final price where the auction stops.

264.    BONOS are more attractive for long-term investors because they offer periodic interest payments that are higher than the interest generally available through U.S. Treasury bonds. BONOS represent approximately 54% of the outstanding amount of MGBs on the market.

265.    Data compiled by Banxico show that, both in the terms of the amount of investment and the percentage of investors, investors in BONOS outside of Mexico grew increasingly significant through the Class Period, as reflected in the chart below:

**BONOS Held by Investors Outside of Mexico During the Class Period**
**(Thousands of Pesos)**



266.    In the great majority of BONOS auctions (598 of the 623 auctions during the Class Period), Banxico reopens existing BONOS issues instead of creating new issuances. This creates an

additional incentive for Defendants to collude in auctions, since they generally already hold some of the same BONOS being auctioned and therefore stand to benefit from the results of the auction.

### 3.   UDIBONOS

267.    Federal Government Development Bonds, known as "UDIBONOS," are inflation-hedged coupon bonds that pay interest rates fixed by the Mexican government. However, these bonds offer a return which protects investors against inflation by paying a return in real terms every six months based on a real interest rate which is determined on the issue date of each security. UDIBONOS are suitable for institutional investors like insurance companies and pension funds since these securities allow savings growth in real terms. UDIBONOS are issued in single-price auctions and pay interest every six months in Mexican pesos. They have a par value of 100 UDIs, which are inflation investment units tied to Mexico's National Consumer Price Index. UDIBONOS represent approximately 5% of the outstanding amount of MGBs on the market.

268.    Data compiled by Banxico shows that investors in UDIBONOS outside of Mexico were significant during the Class Period, as illustrated by the chart below:

**UDIBONOS Held by Investors Outside of Mexico During the Class Period**
**(Thousands of Pesos)**



### 4. BONDES D

269.     Federal Government Development Bonds ("BONDES D") are MGBs that can be issued with any maturity in multiples of 28 days, but are normally issued with maturities of 3, 5, or 7 years. BONDES D are issued in multi-price auctions, have a par value of 100 pesos, and pay a coupon every month.  BONDES D represent approximately 25% of the outstanding amount of MGBs on the market.

270.     The interest paid on BONDES D is determined by compounding on a daily basis the rate at which banks and brokerage firms carry out their overnight repurchase agreements. BONDES D are therefore known as variable rate bonds.

271.     Data compiled by Banxico show that investors in BONDES D located outside of Mexico were significant during the Class Period, as illustrated by the chart below:

**BONDES D Held by Investors Outside of Mexico During the Class Period**
**(Thousands of Pesos)**



## II.   The Role of MGB Market Makers

272.    Defendants participated in Banxico's "Market Maker Program." In this capacity, Defendants are responsible for providing liquidity to the MGB market. Banxico grants special privileges to market makers, who are required to commit to obligations in both the government-run auctions and in MGB transactions with investors.

273.    For example, at MGB auctions, Defendants commit to "present bids at competitive prices in each primary auction of securities." They also commit to "permanently quote purchase (bid) and sale (offer) prices to [consumers] in order to provide liquidity and facilitate investment in this market." In both instances, Defendants are supposed to bid independently and offer competitive rates and refrain from colluding.

274.     Each market maker must submit competitive bids in at least the following amounts in each MGB auction: (1) 20% of the amount offered by the Mexican government; or (2) 1 divided by the number of market makers for that security, whichever is lower. These minimum bidding requirements ensure that, in each auction, Defendants collectively submit bids for at least 100% of the MGBs issued. For example, the Mexican government issued approximately $1.3 billion of BONOS in a June 16, 2016 auction. Eight different market makers submitted bids (the identity of the bidders is not public). Thus, each of the eight market makers was required to submit competitive bids for at least 12.5 percent (1 divided by 8), or $162 million of the BONOS issued on that date.

275.     Market makers agree to present two-way quotes (both for bid and ask) to consumers for each MGB, in all their maturities. They perform this function in major financial markets where MGBs trade, including in the United States, as alleged in the Jurisdiction and Parties sections, above.

276.     Market makers earn profits (in addition to fees and commissions) by selling MGBs purchased during government-run auctions to investors. They also earn profits by collecting the difference between the price of MGB they buy outside of auctions (*i.e.* the "bid" price) and the price that they sell MGB (*i.e.* the "ask" price). The difference between the bid price and the ask price is known as the "bid-ask spread."

277.     Consumer MGB transactions occur almost entirely over-the-counter and transactions usually take place by telephone. That is, investors seeking to purchase or sell MGBs must contact an MGB salesperson or trader employed by one of the Defendants, who then provides a "quote." Because Defendants are the only authorized market makers for MGBs, Defendants exercise near-total control of MGB supply. This is confirmed by an analysis of bid-ask quotes in the over-the-counter MGB market, which shows that Defendants were responsible for more than 82% of quotes in the over-the-counter market during the Class Period. This percentage is even larger and

exceeds 88% once quotes from interdealer brokers (who broker trades between Defendants) and the Mexican Finance Ministry (which sometimes trades MGBs, but not with consumers) are excluded.

278.     Defendants also controlled a dominant market share in the auctions where MGBS are issued. For instance, Market Makers in BONOS controlled 91% of the total number of BONOS sold at auction during the Class Period. Similarly, the Market Makers for UDIBONOS controlled 73% of the total amount of UDIBONOS sold at auction during the Class Period.

279.     This high degree of market concentration enjoyed by a small group of market makers makes the MGB market susceptible to collusion.

## III.    Government Regulators Uncover Evidence of Collusion Among Defendants

### A. The Admitted MGB Cartel

280.     On April 19, 2017, the Investigative Authority of COFECE announced that it had uncovered evidence of price-fixing and collusion in the "government bond intermediation market" where Defendants are the exclusive market makers.

281.     The head of COFECE's Investigatory Authority, Carlos Mena Labarthe, stated: "the damage to public finance and investors could be serious, considering that every year the government places hundreds of billions of Mexican pesos in these markets and that the daily volume of the instruments traded may reach approximately 100 billion Mexican pesos."

282.     COFECE expanded its investigation in May 2017 based on the initial evidence. Bloomberg reported that the antitrust regulator had "zeroed in on 7 banks, including three from the U.S. as part of a widening investigation into price manipulation in the nation's bond market." Bloomberg reports that these banks include at least Defendants Banco Santander Mexico, BBVA-Bancomer, JPMorgan Mexico, HSBC Mexico Barclays Mexico, Citibanamex, and Bank of America Mexico.

283.     None of the banks referenced by Bloomberg denied this report, and they have acknowledged that they are subjects of COFECE's investigation in the months since the announcement.

284.     Bloomberg also reported in the same article that one unidentified Defendant had applied for, and been granted, leniency under Mexico's cartel leniency program.

285.     This was a significant development. Mexico only offers leniency for antitrust violations where an applicant can show that it: "(1) Directly participated in a cartel or did so on behalf a company; and (2) Engaged or is engaging in a cartel; or (3) Contributed, fostered, induced or participated in the commission of a cartel." The graphic below comes from Carlos Mena Labarthe's presentation at the Latin American and Caribbean Competition Forum in 2016:



THE LENIENCY PROGRAM IN MEXICO

| Any economic agent that has: | | Any economic agent or individual that has: |
| --- | --- | --- |
| Directly participated in a cartel or on behalf a company | Engaged or is engaging in a cartel | Contributed, fostered, induced or participated in the commission of a cartel |
| May acknowledge such actions before the Commission and apply for the sanction reduction benefit established in the FECL (imposition of a minimum fine), provided that: | | |
| ✓It is the first | ✓It cooperates fully and continuously | ✓   It terminates  its participation |

286.     In addition to the above requirements, the leniency applicant must "deliver sufficient information to COFECE which would allow for the initiation of an investigation procedure or to assume the existence of [] cartel conduct." The program does not authorize leniency for participating in unilateral conduct or for disclosing insufficient information to launch an investigation. Thus, the fact that at least one entity has been granted leniency establishes that a cartel existed in the MGB market.

287.    Mexican newspaper "El Financiero," soon reported that all Defendants were facing scrutiny as part of the probe: "in the market in which there are currently $6.2 trillion pesos of securities in circulation, **all, yes all**, of the participants are being investigated." The head of COFECE's Investigatory Authority confirmed this during an interview quoted in the same article, stating that "we are analyzing **all the financial intermediaries** that participated."

288.    Sources with direct knowledge of COFECE's investigation disclosed to El Financiero that it "includ[ed] both the primary bond market, that is, the auctions made by the government, as well as the secondary [consumer] market." The time period for the investigation is ten years prior to the date the investigation began, *i.e.* starting with October 28, 2006.

289.    El Financiero also interviewed an insider employed by one of the Defendants under investigation. The source explained that the problem with the MGB market is "the structure of the market, which privileges the largest participants" who enjoy total control over the supply.

290.    Other reports corroborate Bloomberg's and El Financiero's reporting. For example, financial reporter Darío Celis published a report on the COFECE investigation on May 8, 2017 in the newspaper "Excelsior." In the report, Celis wrote that "Beyond what the official and informal spokespersons of the financial sector announce, I inform you that many actors involved are going to adhere to the immunity program of the Cofece to avoid jail and high fines."

291.    Celis followed up with further details on the progress and scope of COFECE's investigation on May 18, 2017. He reported that one of the individuals under investigation is Guillermo Vega, Managing Director of Trading, Mexico for BBVA in New York City. The article reports that Vega joined BBVA after being fired by Citibanamex for front-running client MGB orders and is reported to have maintained substantial contacts with his former colleagues at Citibanamex such as his "right-hand man" Luis Sayeg.

292.    Further information leaked to the press concerning the governmental investigations, and on May 25, 2017, Celis reported that COFECE had moved on to the next phase of its investigation, where it was collecting emails and phone records for the last ten years from the Defendants.

293.    Shortly after COFECE announced that it had uncovered evidence of collusion, CNBV, Mexico's securities regulator, began its own parallel investigation into Defendants' conduct in the MGB market during the summer of 2017.

294.    The Mexican media have also reported leaked information that CNBV's investigation resulted in an unknown confidential witness testifying before CNBV concerning collusion among Defendants in the MGB market during the Class Period. In return, the CNBV promised a reduced fine and more lenient sanctions.

295.    In July 2017, Bloomberg reported that both COFECE and CNBV had requested records of electronic chats and other communications from the institutions under investigation.

296.    The reports reveal that the MGB market is dominated by a handful of individuals that work for or have worked for the Defendants, and who rotate employment among the market makers while continuing to conspire together.

297.    Both the COFECE and CNBV investigations are still ongoing. In November 2017, COFECE requested a fourth 120-day extension of the investigation, further demonstrating that it has uncovered evidence of collusion by Defendants and required more time to analyze the evidence and produce a final report.

### B.  Defendants' Response to the Investigations

298.    Defendants, through their trade association, Asociación de Bancos de México A.C. (*i.e.*, the Association of Banks in Mexico), which is run by Defendant Santander, rallied to oppose COFECE's investigation into the MGB market and worked to undermine COFECE by arguing that

COFECE lacked the expertise to break up their conspiracy. These widely-reported efforts led to the sudden ouster of Carlos Mena Labarthe, who had been leading the investigation since its beginning and who made COFECE's initial announcement of its investigation on April 19, 2017.

299.   Defendants took other countermeasures as well. They scrambled to put together the industry's first "code of conduct" modeled after the FX code of conduct, a similar guideline adopted by foreign exchange traders to restore public confidence after similar price-fixing scandals roiled that industry.

300.   This code of conduct was announced in October 2017. For the first time, the code of conduct banned price-fixing, collusion, and sharing of sensitive customer information among the Defendants in the MGB market.

301.   The Code of Conduct was designed to prevent a recurrence of the unlawful collusive practices executed by Defendants in the MGB market during the Class Period. It was a direct response to COFECE's and the CNBV's investigation and was based on evidence obtained during these investigations.

## IV.   Economic Evidence Confirms that Defendants Conspired to Rig Bids and Fix Prices in the MGB Market

302.   As described above, COFECE and the CNBV both uncovered evidence that Defendants conspired to fix MGB prices in government-run MGB auctions as well as in transactions with MGB consumers. *See* Part III, above. Economic analysis confirms these regulatory findings, demonstrating that Defendants conspired to: (a) share pricing information and submit fixed bids during MGB auctions; (b) to sell MGBs purchased at auction to investors at artificially higher prices; and (c) to fix the bid-ask spread artificially wider in MGB transactions.

### A.   Bid Dispersion Analysis Demonstrates that Defendants Rigged the MGB Auction

303.   Banxico rules require that bids in MGB auctions be confidential. *See* Part I, above. This means that each Defendant must independently determine their bidding schedule according to

their own views of MGB prices and the expected demand in the auction, without reference to bidding schedules submitted by other Market Makers.

304.    Plaintiffs analyzed Defendants' misconduct during MGB auctions using data acquired from Banxico, which included the highest and lowest bid in each auction between January 1, 2006 (the earliest date for which data is available) and November 28, 2017.

305.    First, Plaintiffs estimated the average amount of dispersion (*i.e.*, variability) among Defendants' bids by taking the difference between the highest and lowest bid accepted in each auction. A lower amount of dispersion means that bids in the MGB auction are grouped closer together, while higher levels of dispersion indicate a wider range among bids.

306.    Next, Plaintiffs compared the amount of dispersion among bids in MGB auctions between January 2006 and April 18, 2017, before COFECE disclosed the existence of Defendants' conspiracy (the "Pre-Announcement Period"), to those occurring after COFECE's announcement between April 19, 2017 and November 28, 2017 (the "Post-Announcement Period").

307.    Dispersion is widely-accepted as a measure of certainty about bond prices.[14] For example, bid dispersion should be higher when there is more uncertainty about prices, such as during a competitive auction where the participants do not know each other's bids. In contrast, collusion will reduce amount of dispersion because it provides certainty about prices.

308.    Thus, absent collusion, there should be no significant differences between the amount of dispersion observed during MGB auctions in the Pre- and Post-Announcement Periods. COFECE's investigation should have no impact on bid dispersion unless Defendants were colluding to rig the auctions.

---

[14] Paul F. Malvey, Christine M. Archibald & Sean T. Flynn, *Uniform-Price Auctions: Evaluation of the Treasury Experience*, U.S. Treasury Office Mkt. Fin. 22, (1995) ("[T]here is a direct relationship between uncertainty regarding the common value of a good and the dispersion of bids: the greater the uncertainty, the greater the dispersion of bids; or alternatively, the lower the uncertainty, the tighter the dispersion of bids.").

| Instrument | Tenor | Average Bidding Dispersion (Peso for BONOS and % for CETES) | | |
|---|---|---|---|---|
| | | Pre-Announcement Period | Post-Announcement Period | % Increase from Pre- to Post-Announcement Period |
| BONOS | All | 0.49 | 0.55 | 12% |
| BONOS | 30-Year | 0.78 | 0.86 | 10% |
| BONOS | 20-Year | 0.60 | 0.80 | 33% |
| BONOS | 10-Year | 0.52 | 0.59 | 13% |
| BONOS | 3-Year | 0.21 | 0.23 | 10% |
| CETES | All | 0.07 | 0.10 | 43% |
| CETES | 1-Year | 0.06 | 0.07 | 17% |
| CETES | 6-Month | 0.05 | 0.06 | 20% |
| CETES | 3-Month | 0.06 | 0.09 | 50% |
| CETES | 1-Month | 0.10 | 0.17 | 70% |

**FIGURE 1**

309.    Figure 1 above demonstrates that bid dispersion in terms of yield (for CETES) and price (for BONOS) increased significantly across all tenors following COFECE's announcement. For all BONOS, this increase in bid dispersion was 12.24% on average, and substantially higher in certain tenors. For example, the increase in bid dispersion was 33% for 20-year BONOS. For CETES, the results were even more striking, increasing by more than 42% on average in the wake of COFECE's announcement. These dramatic changes are indicative of collusion among the Defendants to rig MGB auctions during the Class Period.

68



**FIGURE 2**

310.    The changes in bid dispersion between the Pre-Announcement Period and Post-Announcement Period are not the result of macroeconomic factors, such as the global financial crisis. To rule out the effects of broader market conditions, Plaintiffs adjusted the bid dispersion results using the 10-year U.S. Treasury Note Volatility Index. Because yields in the MGB and U.S. Treasures markets are highly correlated, large spikes in the 10-year U.S. Treasury Note Volatility Index are indicative of changes in market conditions that would also impact MGB prices.

311.    Figure 2 above shows that bidding dispersion increased to an even greater degree (by approximately 36%) in the Post-Announcement Period after adjusting for market volatility. This analysis confirms that the greater degree of clustering among bids and low bid dispersion during the Class Period cannot be explained by legitimate macroeconomic factors such as calmer economic conditions and instead reflects collusion in the bidding process. Volatility adjusted bid dispersion analyses for other BONOS tenors are provided in Appendix B.

312.    Differences in sample size similarly fail to account for the difference in bid dispersion between the Class Period and the Post-Announcement Period. Plaintiffs confirmed the

results of the bid dispersion analysis presented above using the Welch's t-test, a generally accepted statistical test that accounts for differences in sample size between two data sets. The test shows that differences in sample size do not explain the greater degree of clustering among bids and low bid dispersion during the Class Period compared to the Post-Announcement Period.



**FIGURE 3**

313.     Coordinating bids also increased Defendants' success during MGB auctions. For example, Figure 3 above displays Defendants' average "fill rate"—*i.e.*, the percentage of bonds allocated to Defendants relative to the total amount they bid for—in MGB auctions during the Pre- and Post-Announcement Period as compared to non-market makers such as the Mexican finance ministry (known as the Secretaria de Hacienda y Credito Publico ("SHCP")), and certain pension administrators licensed by the SHCP.

314.     Figure 3 shows that Defendants consistently had a higher fill rate in auctions for BONOS, UDIBONOS, and BONDES D during the Pre-Announcement Period than during the Post-Announcement Period when compared to others. Defendants' higher fill rate before COFECE's announcement that it had found evidence of collusion and had launched an

investigation is indicative of collusion during the bidding process and reflects information sharing among the market makers regarding the amount of bonds each was willing buy and at what price.



**FIGURE 4**

315.     Collusion is also reflected by the lack of volatility among Defendants' fill rates in MGB auctions. Volatility is a statistical measure of the amount of uncertainty associated with changes in a particular value. Higher volatility indicates greater uncertainty, while lower levels of volatility reflect greater confidence.

316.     Figure 4 above compares the volatility of Defendants' fill rates in BONOS and UDIBONOS auctions to those of non-market makers, such as Mexican state-run pension funds during the Class Period. Figure 4 shows that Defendants' fill rates in MGB auctions are significantly less volatile than those of non-market makers. This reflects collusion in the bidding process as Defendants consistently achieved better results (*i.e.*, they received a greater percentage of the bonds they asked for) than those outside the cartel.

**B.  Defendants Sold MGBs From the Auctions at Supra-Competitive Prices**

317.    Rigging the MGB auctions allowed Defendants to control the supply of MGBs, including the prices they paid for bonds purchased from the Mexican government and amount allocated to each co-conspirator. Defendants profited from this aspect of their conspiracy by agreeing to sell MGBs following the auction at fixed artificially higher prices.



**FIGURE 5**

318.    For example, Figure 5 above displays the average normalized spot price of 30-year BONOS throughout the trading day on both "Auction Days" (the orange line) when new 30-year bonds are issued and "Non-Auction Days" (the purple line) between October 2006 and April 2017. Figure 5 illustrates that the price of 30-year BONOS increases dramatically—by between 20 and 60 basis points (0.20% to 0.60%)—immediately once those MGBs become available for sale and continue to rise following the auctions. Tellingly, these price movements are absent on Non-Auction Days, when Defendants do not have new inventory of MGBs to sell.

319.    Charts reflecting similar price movements for 10-year BONOS and for 3-month, 6-month, and 1-year CETES are provided in Appendix C. As with the data presented in Figure 5, prices for these MGBs increase dramatically and continue to rise on Auction Days, immediately following the auction. These price increases represent risk free profits to the Defendants at the expense of consumers who purchased MGBs.

320.    Defendants also capitalized on these higher prices by exploiting Banxico's Market Maker Option Program. This program allowed Defendants to purchase additional MGBs the day *after* an auction at the previous day's auction price, regardless of how prices changed in the interim.

321.    To participate, Defendants submit bids for a certain amount of additional MGBs. Banxico then issues additional bonds equal to 25% of the total volume sold in the previous auction. These bonds are distributed pro-rata among all Defendants that submitted bids based on the amount of bonds requested.[15]

322.    This allowed Defendants to make risk-free profits by purchasing additional bonds at yesterday's lower auction price before selling to consumers at artificially inflated prices. Accordingly, data shows that Defendants participated in the Market Maker Option Program with a very high frequency, requesting additional bonds after more than 70% of auctions during the Class Period.

---

[15] Before March 2006, the amount of MGBs available in the Market Maker Option Program was 20% of the total issuance in the previous day's auction.



**FIGURE 6**

323.     Figure 6 above displays Defendants' average fill rate in the Market Maker Option

Program —*i.e.*, the percentage of bonds allocated to Defendants who submitted requests relative to

the total amount they requested—during the Pre- and Post-Announcement Periods. This chart

shows that Defendants were significantly more successful in receiving their desired allocation of

BONOS and UDIBONOS from the Market Maker Option Program during the Pre-Announcement

Period. That rate decreased substantially after COFECE revealed the existence of Defendants'

conspiracy.

324.     Defendants' higher fill rate during the Pre-Announcement Period reflects collusion

and an agreement not to compete for bonds issued through the Market Maker Option Program.

Because Defendants stand to make risk-free profits by purchasing bonds today at yesterday's price,

bidding should be highly competitive as all Defendants would benefit receiving a large allocation.

Defendants' ability to secure the desired amount of bonds more than 50% of the time indicates an

agreement to apportion the allocation prior to submitting bids to Banxico.

**C.  Defendants Fixed Bid-Ask Spreads for MGBs**

325.    Defendants also profited from selling bonds on Non-Auction days by agreeing to fix the bid-ask spread at which they transacted with consumers, including Plaintiffs and other Class members, artificially wider.

326.    As is the convention in over-the-counter markets, Defendants offer "two-way" quotes for MGBs that simultaneously reflect the price they would "bid" to purchase a certain bond from a customer and "ask" for in a sale. For example, a customer might call a Defendant to request the price of a certain 10-year BONO. The Defendant would respond with a quote reflecting two prices (*e.g.* 99.95/100.05). The lower price (*i.e.*, 99.95) is the bid price the Defendant would pay for that bond while the higher price (*i.e.*, 100.05) is what they would willing to accept to sell that bond to the customer. The difference between the bid price and the ask price (*i.e.*, the difference between 99.95 and 100.05) is the "bid-ask spread," which in this example is 10 basis points or 0.10%

327.    Absent collusion, dealers will compete against each other by offering "narrower" (*i.e.* smaller) spreads to customers. For example, another Defendant wanting to make a sale to the customer above could offer a "narrower" spread of 8 basis points (*e.g.* 99.96/100.04) to secure that customer's business by offering them a better price.

328.    In each example, the bid-ask spread reflects the Defendant's profits (not including fees and commissions) from the transaction. Wider bid-ask spreads, therefore, result in greater profits because Defendants can buy MGBs at a lower price from their customers and sell those bonds to others for more money.



**FIGURE 7**

329.    Figure 7 above compares the bid-ask spread Defendants charged on 3-year, 5-year,

10-year, 20-year, and 30-year BONOS during the Pre-Announcement Period, (the orange bars) to

those during the Post-Announcement Period (the purple bars). As with the bid dispersion analysis in

Figure 1 above, there should be no discernable difference between bid-ask spreads Defendants

charged consumers before and after COFECE announced that it uncovered their conspiracy if they

were quoting prices independently.

330.    However, Figure 7 shows that the spreads Defendants charged consumers suddenly

and dramatically *narrowed* in response to COFECE's announcement. The magnitude of this change is

highly significant. In all tenors, **spreads were 29% to more than 50% wider** during the Class

Period than they were in the Post-Announcement Period. This difference represents pure supra-

competitive profits that Defendants extracted from MGB transactions with Plaintiffs and other

Class members.



**FIGURE 8**

331.    The same change in spreads width is observed in Defendants' CETES quotes. Figure 8 compares the median spread Defendants charged during the Pre-Announcement Period (the orange bars) with the median spread Defendants quoted during the Post-Announcement Period (the purple bars) for the 6-month, 9-month, and 12-month CETES (the only short-term tenors for which bid-ask price data is available). Again, Defendants suddenly narrowed spreads in the wake of COFECE's announcement, indicating that they had previously been colluding to quote wider spreads to customers, resulting in supra-competitive profits at Plaintiffs' and Class members' expense.

**V.    The Structure of the MGB Market and the Close Relationships Among Defendants' Traders Provided an Opportunity to Conspire**

332.    Defendants employ MGB traders who are well acquainted with each other and have often formed relationships with other MGB traders by working together at the same bank. Many

price-fixing conspiracies in financial markets in recent years demonstrate that traders who formerly worked together often function as conduits through which price-fixing agreements develop.[16]

333.    This revolving door among the Defendants' MGB trading desks solidified a conspiratorial link between the Defendants and provided an opportunity for collusion in the MGB market. This structure forms a web of connections that provided Defendants with the contacts, connections, and open lines of communication that often help facilitate price-fixing agreements.

334.    For example, Guillermo Vega, Luis Sayeg, and Jaime Zenizo have been reported as subjects of COFECE's investigation. All three traders worked together trading MGBs with Citibanamex until Vega left to trade MGBs at BBVA's New York offices. Zenizo left Citibanamex for a role as Head Trader at HSBC Mexico.

335.    Juan Oberhauser Waring was the Managing Director of Operations for the Latin America region in Deutsche Bank AG's offices during the Class Period until he later served as a Director of Deutsche Bank Mexico. Deutsche Bank hired him from co-conspirator JPMorgan Mexico, where he was Vice-President of operations for Latin American Emerging Markets. Deutsche Bank AG also hired Luis Antonio Betancourt Barrios to join its Global Markets division as Head of Trading from Mexico from co-conspirator JPMorgan Mexico.

336.    Also in 2009, Deutsche Bank hired Andre Silva as Co-Head of Debt Capital Markets for Latin America. Silva had previously served in a similar position with Defendant JP Morgan.

337.    Defendant Merrill Lynch also hired traders who had previously worked for other Defendants. For example, in 2010, Merrill Lynch hired LatAm strategist Gabriel Bochi, formerly of JP Morgan. In 2008, Deutsche Bank hired Katharyn Boyle Meyer as a Latin American Local Markets Trader. Boyle Meyer had previously served in a similar role at Defendant Citigroup.

---

[16] *See, e.g., In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 476 (S.D.N.Y. 2017) (finding movement of traders between defendants supported inference of conspiracy by "tying the firms closer together").

338.     Banco Santander hired Juan A. Minuesa from co-conspirator BBVA as a fixed income trader in their New York office. Minuesa previously worked as an MGB trader at BBVA for eight years before switching to Santander. Former Barclays government debt securities trader Pablo Limón has since moved to a similar role at Santander. Banco Santander Mexico's current Head of Fixed Income joined the bank in 2016 after spending six years in the same position at co-conspirator Deutsche Bank. Prior to his tenure at Deutsche Bank, he served as Head of Fixed Income at co-conspirator Bank of America Merrill Lynch.

339.     Former Citibanamex government securities traders Jaime Zenizo now works at HSBC Bank Mexico where he performs a similar role.

340.     BBVA also hired traders who had previously worked for other Defendants. For example, Defendant BSI hired Eric Olson as the Managing Director of Latin American Credit Trading & Sales in its New York office in 2011. Olson had previously been employed by Defendant HSBC for six years as a New-York based Director of their Latin American Local Markets Desk in HSBC's New York office, and by Deutsche Bank as Head of LatAm Cross-border Trading.

341.     Defendant JP Morgan also hired traders who previously worked for other Defendants. In 2009, JP Morgan hired Eugenio Alarcon as an Executive Director of Public Finance. Alarcon had previously served as a LatAm Debt Capital Markets trader at Defendant Deutsche Bank and as an official at SHCP.

342.     HSBC hired MGB trader Manuel Astaburuaga from co-conspirator BBVA after he worked at BBVA for three and a half years. Julio Ignacio Sarre was a Managing Director within HSBC's Global Banking and Markets Division in Mexico, where he was principally responsible for MGB sales and trading from 2004 through 2015. HSBC hired him from co-conspirator Bank of America, where he served as Head of Trading, Global Markets Mexico, after serving as Head of Fixed Income Trading at co-conspirator JPMorgan Mexico.

343.     In 2010, HSBC hired Ricardo Rubio as Regional Head of Financial Institutions for Latin America. Previously, Rubio served as an Executive Director of Latin American Debt Capital Markets at Defendant JP Morgan. In 2017, Rubio was again hired by JPMorgan.

344.     Barclays also hired traders who had previously worked for other Defendants. For example, senior Barclays trader Robert Lombardi was previously employed as an emerging markets debt trader for eight years by Defendant Bank of America prior to joining Barclays. In 2012, Barclays hired Carlos Corona as a Director of Global Finance Latin America. Corona had previously served as a Global Markets Director at Defendant Citigroup. Also in 2012, Barclays hired Raul Martinez-Ostos as its Mexico country head. Martinez-Ostos had previously served as a Director with Defendant Deutsche Bank's Latin American Capital Markets division.

345.     Financial news outlets have noted this uncommonly high degree of turnover among Defendants, with one Financial News London reporter remarking in a 2014 article that "a game of musical chairs is being played within the Latin America trading teams of the world's largest investment banks."

## VI.   Defendants Conspired to Fix Prices in Multiple Financial Markets during the Class Period

346.     Regulators across the globe have imposed massive fines and sanctions against several of the Defendants for colluding to fix prices in multiple financial markets. The government findings and settlements demonstrate that Defendants developed a practice of conspiring to increase profits by fixing prices for their benefit and at the expense of consumers. These Defendants include Barclays, Citigroup, HSBC, JPMorgan, Bank of America, and Deutsche Bank.

### A.   Barclays

347.     In 2015, Barclays entered settlements with multiple government regulators, including the Department of Justice ("DOJ"), CFTC, Federal Reserve Bank of New York ("Federal Reserve"), NYSDFS, United Kingdom's Financial Conduct Authority ("FCA"), and Switzerland's Competition

Commission ("COMCO"), paying more than $3 billion in fines and penalties to settle charges related to its participation in conspiracies to manipulate multiple financial benchmarks during the Class Period.

348.   These investigations revealed that the conspiracy described in this Complaint is not the first time that Barclays has conspired with the other Defendants here. Specifically, Barclays traders formed a self-described "Cartel" along with traders of Defendants JPMorgan and Citigroup, using electronic chat rooms and coded language to manipulate FX benchmarks including the World Markets/Reuters Closing Spot Rates ("WM/R Rates"), the most widely referenced FX benchmarks in the world. Aspects of this price-fixing scheme bear strong resemblance to the conspiracy to rig the MGB market. For instance, members of "The Cartel" manipulated the exchange rates by agreeing to withhold bids or offers to avoid moving the exchange rate in a direction adverse to open positions held by co-conspirators. Barclays and its co-conspirators also protected each other's trading positions by agreeing not to buy or sell at certain times.

349.   Barclays and Defendants Citigroup and JPMorgan each pled guilty to a one-count felony charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere. Defendants who joined "The Cartel" banks paid out a total of over $2.5 billion to the DOJ alone. Barclays paid fines of $710 million to the DOJ, $485 million to the NYSDFS, $400 million to the CFTC, $342 million to the Federal Reserve, and $441 million to the FCA.

350.   In 2015, the CFTC ordered Barclays to pay a $115 million penalty for the conduct of their New York traders directed at manipulating the U.S. ISDAfix benchmark rate, a benchmark used to price certain swaps transactions, commercial real estate mortgages, and structured debt securities. Barclays traders used large notional amounts of bids and offers to "push the market" and affect the reference rates right before the critical fixing time to affect the published ISDAfix rate.

Barclays traders also made false ISDAfix submissions to swaps brokers with the intent of moving the ISDAfix rate to benefit their own trading positions.

351.    The CFTC also found that Barclays conspired to manipulate at least four separate benchmark interest rates for years during the Class Period. Specifically, Barclays was found to have engaged in regular and pervasive conduct from 2007 through at least 2009 aimed at manipulating benchmark rates including U.S. Dollar LIBOR, Yen LIBOR, Pound Sterling LIBOR, and Euribor (the LIBOR equivalent for the Euro money market).

352.    As part of this conspiracy, Barclays traders colluded with traders at other banks including Defendants Deutsche Bank and Citigroup to submit false benchmark submissions on key dates when many derivatives contracts were settled, allowing the conspirators to collectively increase the profitability of their own derivatives positions. Barclays was ordered to pay $200 million to the CFTC, $160 million to the DOJ, and $92.8 million to the FCA for its role in these conspiracies.

**B.  Deutsche Bank**

353.    In 2015, Deutsche Bank entered settlements with multiple government regulators, including the DOJ, CFTC, NYSDFS, and European Commission ("EC"), paying more than $3.55 billion in fines and penalties to settle charges related to its participation in conspiracies to fix prices of multiple financial products during the Class Period. In some instances, Deutsche Bank conspired with co-Defendants here, including Barclays, HSBC, and JPMorgan.

354.    The CFTC found that Deutsche Bank conspired to manipulate at least six separate benchmark interest rates for years during the Class Period. Specifically, the CFTC found that from 2005 through 2011 Deutsche Bank engaged in "systemic and pervasive misconduct directed at manipulating critical, international financial benchmark rates" including Yen LIBOR, Sterling LIBOR, Swiss Franc LIBOR, U.S. Dollar LIBOR, TIBOR, and Euribor.

355.     Among other practices, Deutsche Bank encouraged manipulation by placing derivatives traders with "obvious conflicts of interest" in charge of submitting benchmark rates. These derivatives traders aligned trading positions with conspirators at other banks, ensuring that the cartel would benefit by manipulating these benchmark rates. With respect to Deutsche Bank's admitted role in the conspiracy to manipulate Euribor, Deutsche Bank's "star trader" was particularly successful because he leveraged "friendships and past working relationships with derivatives traders at other Euribor panel banks to further his attempts to manipulate Euribor."

356.     Deutsche Bank's misconduct was pervasive and driven by traders, submitters, and managers in its Global Finance and Foreign Exchange business unit located around the world, including in New York, London, and Frankfurt. These traders, responsible for both determining Deutsche Bank's LIBOR or Euribor submissions and trading derivatives positions, frequently made or requested false submissions to increase the profitability of those derivatives positions.

357.     Deutsche Bank management coordinated and organized manipulative conduct among traders and submitters, including those in New York, during weekly "Monday Risk Calls." Traders in the United States joined these weekly conference calls, set up to plan false submissions and corresponding trading strategies across bank divisions and locations to maximize profits.

358.     Deutsche Bank frequently conspired with HSBC. The EC specifically identified HSBC as a member of the "Euro Interest Rate Derivatives Cartel" formed with Deutsche Bank and six other major banks to fix the prices of Euro interest rate derivatives.

359.     Deutsche Bank's admitted participation in the LIBOR manipulation conspiracy extended to supervisors and managers who coordinated LIBOR submissions with other banks, including Defendant Bank of America. For instance, the Deutsche Bank supervisor in charge of LIBOR submissions coordinated artificially low submissions with Bank of America on multiple

occasions. Deutsche Bank paid over $3.4 billion in fines to the CFTC, DOJ, NYSDFS, FCA, and EC as a result of its manipulative conduct.

360.     Additionally, The Federal Reserve fined Deutsche Bank $136.95 million for its manipulation of the WM/R Rates. The Federal Reserve found that Deutsche Bank engaged in "disclosures of trading positions and, on some occasions, discussions of coordinated trading strategies with traders of other institutions" and "discussions about possible FX benchmark fix-related trading with traders of other institutions."

361.     Deutsche Bank also manipulated prices of precious metals and related derivatives in the United States. For example, in June 2017 Deutsche Bank trader David Liew pleaded guilty to Commodity Exchange Act violations associated with the concerted manipulation of silver and gold futures contract prices traded on the Chicago Mercantile Exchange.

362.     This is not the first time that Deutsche Bank bond traders have been implicated in a collusion scheme with another Defendant. Deutsche Bank recently paid $65.5 million together with Defendant Bank of America to settle accusations that these banks colluded with other co-Defendants here to fix prices in the over-the-counter market for sub-sovereign, supranational, and agency bonds.

## C.  Bank of America

363.     Bank of America conspired with co-Defendants HSBC and Deutsche Bank to manipulate various benchmark rates during the Class Period. Bank of America executed a Consent Order on November 11, 2014, with the Office of the Comptroller of the Currency ("OCC") admitting its participation in a conspiracy to manipulate key benchmarks in the spot foreign exchange market, the WM/R Rates and the ECB spot FX reference rates. These benchmarks were used to set the prices of trillions of dollars in spot FX transactions daily.

364.    Bank of America paid $250 million and admitted to using secret group chat rooms to conspire with competitors at other banks to manipulate spot FX prices to benefit its trading positions. As part of the settlement, the OCC found that Bank of America executed "coordinated trading strategies" with traders at other banks to rig the WM/R fixing and the ECB spot FX reference rates in its favor, conspired with traders at other banks to trigger customer stop loss orders, and shared sensitive customer order information with rival banks to trade in advance of customer orders for its own benefit. Bank of America further admitted to compliance failures in its derivatives trading business, which caused its membership in the conspiracy to continue without scrutiny from at least 2008 through 2013.

365.    In September 2017, Bank of America admitted that traders on its swaps desk traded futures contracts on the CME for their own benefit in advance of large block orders from customers, an unlawful practice known as "front-running" that extracts illicit profit for the bank at the expense of its own customer.  Bank of America engaged in this conduct from at least February 2008 through December 2010. Bank of America further admitted that traders eavesdropped on calls between customers and sales staff so that traders could profit by trading ahead of its customers.

366.    Bank of America traders made misleading statements to investigators from the CME, causing its misconduct to go undetected for years. For example, Bank of America claimed that there was not enough time between customer orders and order execution for it to trade ahead of customer orders. Bank of America's counsel wrote to CME investigators that traders "did not have advance knowledge of a block trade such as to enable them to engage in any trading prior to the execution of the block," even though traders were actually listening in on the phone calls while orders were placed. The CFTC later found that these statements were false, that Bank of America failed to supervise traders on its Swaps Desk, and fined Bank of America $2.5 million.

### D. HSBC

367.    HSBC was fined over $35 million by the European Commission for colluding with other banks, including Deutsche Bank and JPMorgan, to manipulate Euribor in 2016.  The Commission found that HSBC conspired with other members of the panel to fix Euribor in a direction that benefitted their trading positions. Additionally, the Commission found that as part of the conspiracy HSBC and the other panel banks exchanged sensitive information on their trading positions and coordinated strategies to maximize their ability to manipulate prices. The fine marked the culmination of a five-year investigation by the European Commission into Euribor panel banks that resulted in over $1 billion in fines.

368.    In November of 2014 the CFTC imposed a $275 million civil monetary penalty on HSBC for conspiring with four other banks to manipulate global foreign exchange benchmark rates, including the WM/R Rates, to benefit their trading positions. The CFTC collectively imposed over $1.4 billion in civil monetary penalties against the five banks involved. The FCA, in a related matter, imposed a $343 million fine on HSBC for failing to "manage obvious risks around confidentiality, conflicts of interest and trading conduct" with their foreign exchange traders. The FCA found that HSBC and four other defendant banks shared client information and manipulated benchmark rates to benefit their trading positions.

### E. Citigroup

369.    In 2014 Citigroup admitted to conspiring with other banks including Defendants Barclays, JPMorgan, and HSBC to manipulate certain FX benchmark rates, including the WM/R Rates to benefit their own trading positions during the Class Period. Citigroup paid fines of $925 million to the DOJ, $350 million to the OCC, and $310 million to the CFTC as a result of the investigations into their manipulative conduct.

370.    As part of the conspiracy, Citigroup FX traders leveraged relationships they had developed with traders at other banks and used exclusive, invite-only chat rooms to communicate, often disclosing confidential customer order information and trading positions. Citibank traders and traders at other banks altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to affect the FX benchmark rates.

371.    Citigroup FX traders exchanged the size and direction of the bank's net orders with FX traders at other banks and used this information to attempt to coordinate trading strategies. The traders at times then used this information to enable one or more traders to manipulate the FX benchmark rates prior to and during the benchmark fixing period.

372.    In 2016 Citigroup admitted to engaging in conduct from at least 2007 through 2012 aimed at manipulating ISDAfix and was ordered to pay a $250 million fine by the CFTC. Citigroup traders used large notional amounts of bids and offers to "push the market" and affect the reference rates right before the critical fixing time to affect the published ISDAfix rate. Citigroup traders also made false ISDAfix submissions to swaps brokers with the intent of moving the ISDAfix rate to benefit their own trading positions.

373.    In 2016 the CFTC ordered Citigroup to pay a $175 million fine after Citigroup admitted to conduct directed at manipulating the YEN LIBOR and TIBOR rates from at least 2008 through 2010. The CFTC found that Citigroup traders regularly made manipulative requests to interdealer brokers who were positioned to influence other panel banks, requests to traders at other panel banks, and internal requests to Citigroup's submitters to benefit their trading positions.

### F.   JPMorgan

374.    Between 2013 and 2018, JPMorgan settled with multiple government regulators, including the DOJ, CFTC, Federal Reserve, the UK FCA, and the European Commission ("EC")

paying more than $1.3 billion in fines and penalties to settle charges related to its participation in conspiracies to fix prices of multiple financial products during the Class Period.

375.    The EC fined JPMorgan for benchmark manipulation at least 3 times: $108,317,191 for manipulating Japanese yen LIBOR submissions with co-Defendants Citigroup and Deutsche Bank and others;  $13,188,368 for forming a cartel with co-Defendant Credit Suisse and others to quote an artificially wide bid-ask spread for Swiss franc interest rate derivatives; and $361,507,272 for conspiring with co-Defendant HSBC and others to fix price components for euro interest rate derivatives, as well as exchanging highly-sensitive proprietary customer information in electronic chat rooms and instant messaging services.

376.    In November 2014, JPMorgan settled with multiple regulators for conspiring with co-Defendants HSBC, Citigroup, and Bank of America and others for forming a self-described "cartel" to manipulate spot FX prices and benefit the trading positions of supposed rivals employed at co-conspirator banks. JPMorgan agreed to pay penalties of $310 million to the CFTC and $352,830,752 to the UK FCA and consented to an order by the Office of Comptroller of the Currency ("OCC") requiring it to cease and desist its "unsafe or unsound banking practices." In May 2014, JPMorgan pleaded guilty to a criminal Sherman Act violation for the same misconduct, agreeing to pay the DOJ $100 million, and consented to a Federal Reserve cease and desist order requiring it to pay a $342 million penalty and submit a senior management oversight plan, programs for compliance, risk management, and internal audits, progress reports, and an annual controls review.

377.    In June 2018, JPMorgan settled with the CFTC for repeatedly attempting to manipulate the U.S. Dollar International Swaps and Derivatives Association ("ISDA") Fix over a period of five years, to benefit its positions in cash-settled options and interest rate swaps. JPMorgan agreed to pay a $65 million penalty.

### G. Santander and BBVA

378.    In February 2018, the Spanish antitrust regulator Comisión Nacional de los Mercados y la Competencia ("CNMC") fined Santander and BBVA for conspiring with horizontal competitors to fix the price of derivatives used to hedge the interest rate risks associated with syndicated lending for project finance. The CNMC found that conspirators coordinated interest rate floors with one another in telephone calls and emails before communicating with their clients. The CNMC fined Santander $29,551,562 and BBVA $24,482047 for these violations.

### VII.    Defendants' Conspiracy Injured Plaintiffs

379.    Plaintiffs are domestic consumers of MGBs. They collectively purchased and sold hundreds of millions of dollars' worth of MGBs in the United States during the Class Period, directly with Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Bank of America, National Association, Bank of America Corporation, JPMorgan Chase Bank, National Association, J.P. Morgan Securities LLC, J.P. Morgan Securities plc, Banco Bilbao Vizcaya Argentaria, S.A., BBVA Securities, Inc., BBVA-Bancomer, Banco Santander, S.A., Santander Investment Bolsa, Sociedad de Valores, S.A., HSBC Bank PLC, HSBC Securities (USA) Inc., Citigroup Global Markets Inc., Citigroup Global Markets Limited, Citibank, N.A., Barclays Bank PLC, Banco Barclays S.A., Barclays Capital Securities Limited, Barclays Capital Inc., Deutsche Bank AG, and ING Financial Markets LLC.

380.    As described above, Defendants and their co-conspirators fixed the prices of MGBs during the Class Period for their own profit by: (a) rigging the MGB auction process; (b) conspiring to sell bonds purchased during such auctions at artificially higher prices; and (c) agreeing to fix the bid-ask spread charged to consumers artificially wider. *See* Parts III-V, above.

381.    As a direct result of Defendants' and their co-conspirators' misconduct, Plaintiffs were overcharged each time they purchased MGBs from Defendants and underpaid each time they

sold MGBs to Defendants. Thus, Plaintiffs were injured and suffered harm in each MGB

transaction conducted during the Class Period, including but not limited to, the transactions set out

in Appendix D.

## CLASS ACTION ALLEGATIONS

382.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on their own behalf and as representatives of the following Class:[17]

> All persons that entered into an MGB transaction between at least January 1,
> 2006, and April 19, 2017 (the "Class Period"), where such persons were
> either domiciled in the United States or its territories or, if domiciled outside
> the United States or its territories, transacted in the United States or its
> territories.

> Excluded from the Class are Defendants and their employees, agents,
> affiliates, parents, subsidiaries and co-conspirators, whether or not named in
> this Complaint, and the United States government.

383.     The Class is so numerous that individual joinder of all members is impracticable.

While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are

informed and believe that at least thousands of geographically-dispersed Class members transacted

in MGBs during the Class Period.

384.     Plaintiffs' claims are typical of the claims of the other members of the Class.

Plaintiffs and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as complained of herein. The injuries and damages of each

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws

as alleged herein.

385.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.

Plaintiffs are adequate Class representatives and have no interest adverse to the interests of absent

---

[17] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the
definition of the Class, including, without limitation, membership criteria and the Class Period.

Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust litigation.

386.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

> a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix outcomes and rig MGB auctions;
>
> b. whether Defendants' conspired to sell MGBs purchased at auction to consumers at artificially higher prices and buy MGBs from consumers at artificially lower prices;
>
> c. whether Defendants fixed prices of MGB available for sale to U.S. investors by, for example, conspiring to quote wider fixed bid-ask spreads;
>
> d. the character, duration, and nature of the acts performed by the Defendants in furtherance of their conspiracy;
>
> e. whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class by imposing supra-competitive costs on them that were higher than would otherwise have been available absent Defendants' conspiracy; and
>
> f. the appropriate measure of damages sustained by Plaintiffs and Class members.

387.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create

91

a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

388.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

<h2 style="text-align:center">EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT</h2>

389.    The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

390.    The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, telephone calls, secret bidding schedules, and meetings conducted behind closed doors to conceal their agreements to artificially raise the prices of MGB—was intentionally self-concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their unlawful conduct.

391.    Defendants used affirmative acts of concealment to hide their violations of law from Plaintiffs and the Class, including: (1) secretly disseminating confidential bidding schedules to each other and agreeing on bids in MGB auctions; (2) implicitly representing that each Defendant was bidding competitively in the auction for MGB such that the final price represented a competitive auction; and (3) charging inflated spreads to customers without disclosing that the charges reflected an agreed price set by Defendants rather than a competitive price.

392.    Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. For instance, Defendants' bidding schedules are considered highly sensitive information that cannot be accessed by the public, which enabled

92

Defendants' conspiracy to remain undetected for years. Similarly, Defendants' participation in the market maker program required that they submit competitive bids in auctions and compete when offering MGB to consumers. By participating in the market maker program, Defendants therefore represented that the prices they charged were determined by competitive forces rather than fixed by a conspiracy.

393.    As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Conspiracy to Restrain Trade in Violation of §§ 1 and 3 of the Sherman Act)**
**(Against all Defendants)**

394.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

395.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 and § 3 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

396.    During the Class Period, Defendants—a group of horizontal competitors in the MGB market—entered into a series of agreements designed to generate unlawful profits for themselves in MGB transactions by conspiring to, among other things: (a) share pricing information and submit fixed bids during MGB auctions in violation of Banxico rules; (b) sell MGBs purchased at auction to consumers at artificially higher prices; and (c) fix the bid-ask spread artificially wider in MGB transactions with Plaintiffs and Class members.

93

397.     This conspiracy to restrain trade and fix prices in the MGB market caused Plaintiffs and members of the Class to be overcharged or underpaid in their MGB transactions. Plaintiffs and Class members also were deprived of the ability to obtain MGB for competitive prices during the Class Period owing to Defendants' conspiracy and their complete control of MGB supply. Plaintiffs and members of the Class thus paid more or received less than they would have for MGBs absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

398.     This horizontal price-fixing conspiracy is a *per se* violation of § 1 and § 3 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the MGB market. There is no legitimate business justification for, and no pro-competitive benefits caused by, Defendants' conspiracy to rig bids in auctions or fix MGB prices charged to investors or any of the overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

399.     As a direct, material, and proximate result of Defendants' violation of § 1 and § 3 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

400.     Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 and § 3 of the Sherman Act and under § 4 of the Clayton Act.

401.     Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment in Violation of the Common Law)
### (Against All Defendants)

402.     Plaintiffs incorporate by reference and re-alleges the preceding allegations, as though fully set forth herein.

94

403.     Plaintiffs (and other Class members) transacted MGBs during the Class Period directly with Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Bank of America, National Association, Bank of America Corporation, JPMorgan Chase Bank, National Association, J.P. Morgan Securities LLC, J.P. Morgan Securities plc, Banco Bilbao Vizcaya Argentaria, S.A., BBVA Securities, Inc., BBVA-Bancomer, Banco Santander, S.A., Santander Investment Bolsa, Sociedad de Valores, S.A., HSBC Bank PLC, HSBC Securities (USA) Inc., Citibank, N.A., Citigroup Global Markets Inc., Citigroup Global Markets Limited, Barclays Bank PLC, Banco Barclays S.A., Barclays Capital Securities Limited, Barclays Capital Inc., Deutsche Bank AG, and ING Financial Markets LLC.

404.     These transactions were supposed to be priced based on competitive market forces and reflect honest competition by the Defendants.

405.     However, as alleged above, rather than competing honestly and aggressively with each other, Defendants colluded to fix the prices charged or remitted to Plaintiffs and the Class in purchases and sales of MGBs.

406.     Defendants' collusion enabled them to collect supra-competitive profits on every transaction of MGBs with Plaintiffs and the Class. At the same time, it caused Plaintiffs and the Class to pay more (in the case of MGB purchases) and receive less (in the case of MGB sales) on their MGB transactions with Defendants.

407.     It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and the Class, and equity and good conscience require the Defendants to make restitution.

408.     Plaintiffs and the Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## PRAYER FOR RELIEF

Plaintiffs demands relief as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate §1 and §3 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*;

C.      That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and the Class;

F.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

G.      That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

H.      That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  July 18, 2018
White Plains, New York

Respectfully submitted,

LOWEY DANNENBERG P.C.

/s/Vincent Briganti
Vincent Briganti
Christian Levis
Roland R. St. Louis, III
44 South Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email:  vbriganti@lowey.com
            clevis@lowey.com
            rstlouis@lowey.com

*Interim Class Counsel*

Joseph J. Tabacco, Jr.
Todd Seaver
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
Email: jtabacco@bermantabacco.com
            tseaver@bermantabacco.com

Patrick T. Egan
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617)542-1194
Email: pegan@bermantabacco.com

Scott Martin
HAUSFELD LLP
33 Whitehall Street
14th Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
Email: smartin@hausfeld.com

Michael D. Hausfeld
Hilary K. Scherrer
HAUSFELD LLP

97

1700 K Street, NW
Washington, DC 20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
        hscherrer@hausfeld.com

Michael P. Lehmann
HAUSFELD LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com

Fred T. Isquith
Regina M. Calcaterra
Thomas H. Burt
Betsy S. Manifold
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
Email: isquith@whafh.com
        calcaterra@whafh.com
        burt@whafh.com
        manifold@whafh.com

Christopher M. Burke
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax:  (619) 233-0508
Email:  cburke@scott-scott.com

Thomas K. Boardman
SCOTT & SCOTT ATTORNEYS AT LAW LLP
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 519-0523
Fax:  (212) 223-6334
Email:  tboardman@scott-scott.com

John Radice
Daniel Rubenstein

98

RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Tel.: (646) 245-8502
Fax: (609) 385-0745
Email:  jradice@radicelawfirm.com
        drubenstein@radicelawfirm.com

Eric L. Young
SHEPHERD FINKELMAN
MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Tel.: (610) 891-9880
Fax: (866) 300-7367
Email:  eyoung@sfmslaw.com

Lesley E. Weaver
Matthew S. Weiler
Emily C. Aldridge
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
Email:  lweaver@bfalaw.com
        mweiler@bfalaw.com
        ealdridge@bfalaw.com

Javier Bleichmar
BLEICHMAR FONTI & AULD LLP
7 Times Square, 27th Floor
New York, NY 10036
Tel.: (212) 789-1340
Fax: (212) 205-3960
Email: jbleichmar@bfalaw.com

William J. Ban
Michael A. Toomey
BARRACK, RODOS & BACINE
11 Times Square
640 8th Avenue, 10th Floor
New York, NY 10022
Tel.: (212) 688-0782
Fax: (212) 688-0782
Email:  wban@barrack.com
        mtoomey@barrack.com

Jeffrey A. Barrack
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838
Email:  jbarrack@barrack.com
        jgittleman@barrack.com

*Additional Counsel for Plaintiffs*