UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────────

IN RE: MEXICAN GOVERNMENT
BONDS ANTITRUST LITIGATION

18-CV-2830 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In this consolidated putative class action, Plaintiffs — eight U.S. pension funds — allege that Defendants — ten banks and related entities — conspired to manipulate the market for certain debt securities issued by the Mexican government. Specifically, Plaintiffs allege that Defendants rigged the auction process by which the Mexican government issues the bonds and conspired to manipulate the pricing of the bonds on the secondary market, in violation of Sections 1 and 3 the Sherman Act and the common law of unjust enrichment. Defendants move to dismiss the complaint for failure to state a claim, and a subset of Defendants also move to dismiss the complaint for lack of personal jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), respectively. Because the Court agrees that Plaintiffs have failed to state a claim against any Defendant, the claims are dismissed.

**I.    Background**

The following facts are taken from the complaint and presumed true for the purposes of the motion to dismiss.

### A. Factual Background

#### 1. The Mexican Bond Market

Mexican government bonds ("MGBs") are debt securities issued and backed by the Mexican government. (Dkt. No. 75 ("CAC") ¶¶ 248–249.) The Bank of Mexico ("Banxico") issues MGBs via auctions that typically occur once a week. (CAC ¶¶ 249–250.) After auction, MGBs may be resold by auction winners to consumers and thereafter bought or sold on the secondary market. (CAC ¶ 252.) This case concerns four instruments categorized as MGBs: "CETES" (CAC ¶¶ 258–261);[1] "BONOS" (CAC ¶¶ 262–266);[2] "UDIBONOS" (CAC ¶¶ 267–268);[3] and "BONDES D" (CAC ¶¶ 269–271.)[4] The distinguishing characteristics of each of these instruments, though not critical for the purposes of the present motion, are described in the footnotes.

MGB auctions usually occur on Tuesdays, and Banxico announces them on the last day of the week prior. (CAC ¶ 250.) In advance of the auction, participants submit "bid schedules"

---

[1] CETES are short-term, zero-coupon bonds. (CAC ¶ 258.) They have maximum tenors of one year and a par value of ten pesos. (*Id.*) CETES represent approximately 16% of the outstanding MGBs on the market. (CAC ¶ 260.)

[2] BONOS are fixed-rate coupon bonds with maturities greater than one year. (CAC ¶ 262.) They pay a semi-annual coupon payment and have a par value of 100 pesos. (*Id.*) To date, BONOS have been issued with maturities of three, five, ten, twenty, and thirty years. (CAC ¶ 263.) They represent approximately 54% of the outstanding MGBs on the market. (CAC ¶ 264.)

[3] UDIBONOS are inflation-hedged coupon bonds that pay a return every six months based on a real interest rate determined on the issue date of the security. (CAC ¶ 267.) Their par value is 100 UDIs. (*Id.*) (UDIs are "inflation investment units" tied to Mexico's National Consumer Price Index. (*Id.*)) UDIBONOS represent approximately 5% of the outstanding MGBs on the market. (*Id.*)

[4] BONDES D are variable rate bonds with a par value of 100 pesos. (CAC ¶ 269.) They can be issued with any maturity in multiples of twenty-eight days but are typically issued with maturities of three, five, or seven years. (*Id.*) They pay a coupon every month and represent approximately 25% of the outstanding MGBs on the market. (*Id.*)

indicating the amount and price of MGBs they would like to buy. (CAC ¶ 251.) Banxico rules prohibit auction participants from sharing their bid schedules with one another (CAC ¶ 303), and the schedules are submitted by either sealed envelope or encrypted electronic file to ensure their confidentiality (CAC ¶ 251).

CETES and BONDES D are issued in "multi-price" auctions. (CAC ¶¶ 259, 269.) Bids are arranged in order from highest price to lowest price, and the bonds are allocated in descending order based on the quantity requested by each bidder until the bonds offered at that auction are exhausted. (CAC ¶ 259.) BONOS and UDIBONOS are issued in "single-price" auctions. (CAC ¶¶ 263, 267.) In a single-price auction, the bids are similarly arranged in order from highest to lowest price, and the bonds allocated in descending order based on the quantity requested. But a single-price auction differs from a multi-price auction in that all bonds are sold at the final price where the auction stops. (CAC ¶ 263.)

Some of the Defendants[5] — referred to hereafter as the "Market Maker Defendants" — participate in the "Market Maker Program" for MGBs. (CAC ¶ 3.) The program helps guarantee liquidity in the MGB market. (CAC ¶ 272.) The Market Maker Defendants were the exclusive approved market makers for MGBs during the class period. (CAC ¶ 2.) Market makers receive certain privileges and incur corresponding obligations. (CAC ¶ 273.) For example, they must submit competitive bids in MGB auctions for the lower of either 20% of the amount of MGBs offered at the auction or the market maker's per capita share among all market makers for that auction. (CAC ¶ 274.) They may participate in the "Market Maker Option Program," which

---

[5] The Market Maker Defendants are: (1) Santander Mexico, (2) BBVA-Bancomer, (3) JPMorgan Mexico, (4) HSBC Mexico, (5) Barclays Mexico, (6) Citibanamex, (7) Bank of America Mexico, (8) Deutsche Bank Mexico, (9) Banco Credit Suisse (Mexico), S.A., and (10) ING Bank Mexico S.A. (CAC ¶ 197.)

3

allows participants to purchase additional MGBs the day after an auction at the previous day's auction price. (CAC ¶ 320.) To do so, a market maker submits a bid for a certain amount of additional MGBs at the prior's day auction price. (CAC ¶ 321.) Banxico then issues additional bonds equal to 25% of the total volume sold at the previous auction, distributed pro rata among all participants that submitted bids based on the amount of bonds requested. (*Id.*)

Market makers are also obligated to present "two-way quotes . . . to consumers for each MGB, in all their maturities." (CAC ¶ 275.) They are thereby obligated to participate in not only the government-run auctions for newly issued MGBs but also the secondary market for extant MGBs. The difference between the quoted price at which the market maker will buy a given MGB outside an auction (the "bid" price) and the quoted price at which it will sell the same MGB (the "ask" price) is called the bid-ask spread. (CAC ¶ 276.) Market makers can earn profits by collecting the difference between the bid and ask price — i.e., by collecting the spread. (*Id.*)

### 2. The Alleged Conspiracy

Plaintiffs are eight pension funds that transacted in MGBs with certain of the defendants from January 1, 2006, to April 19, 2017 (the putative class period). (CAC at 1, ¶¶ 65–72.) Defendants are the ten market makers for MGBs, in addition to forty-two of the market markers' corporate affiliates, parents, and subsidiaries, and ten unnamed individuals and entities. (*See* CAC ¶¶ 73–197.)

In essence, Plaintiffs allege that Defendants conspired to manipulate the MGB markets in three main respects. First, they allege that the market makers shared bids in advance of auctions in order to artificially depress auction prices. Second, they allege that the market makers conspired to artificially inflate the prices at which they resold newly issued MGBs purchased at

the auctions. Finally, they allege that market makers conspired to fix the MGB bid-ask spreads artificially wide. (CAC ¶ 6.) In support of this theory, they allege three main types of evidence.

### a. Regulatory Investigations

On April 19, 2017, Mexico's antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), announced that it had discovered evidence of price fixing and collusion in the "government bond intermediation market." (CAC ¶ 280.) In May 2017, COFECE expanded its investigation. (CAC ¶ 282.) Bloomberg reported that the regulator had "zeroed in on 7 banks, including three from the U.S., as part of a widening investigation into price manipulation," and named Defendants Banco Santander Mexico, BBVA-Bancomer, JPMorgan Mexico, HSBC Mexico, Barclays Mexico, Citibanamex, and Bank of America Mexico as subjects of the inquiry. (*Id.*) Since this announcement, each of the banks has acknowledged that it is subject to the inquiry. (CAC ¶ 283.) Bloomberg additionally reported that one unidentified Defendant was cooperating with COFECE's investigation in exchange for a more lenient punishment. (*See* CAC ¶ 284.) Mexico, Plaintiffs allege, extends leniency to antitrust cooperators only if the party can show that it participated in or contributed to the commission of a cartel and can "deliver sufficient information to COFECE which would allow for the initiation of an investigation procedure or to assume the existence of cartel conduct." (CAC ¶¶ 285–286 (alteration omitted).)

Other media reports provide some insight, Plaintiffs allege, into the contours of the investigation. According to *El Financiero*, a Mexican newspaper, the COFECE investigation included both the bond auctions and the secondary market, and focused on the period from October 28, 2006, to present. (CAC ¶ 288.) A different financial reporter wrote that Guillermo Vega, a Managing Director at BBVA in New York, was among the individuals under

investigation.  (CAC ¶ 291.)  Vega had previously been fired by Citibanamex for misconduct related to client MGB orders.  (*See id.*)  On May 25, 2017, the same reporter stated that COFECE had moved forward with the investigation and was collecting emails and phone records.  (CAC ¶ 292.)

In August 2017, the Comisión Nacional Bancaria y de Valores ("CNBV"), Mexico's securities regulator, announced that it was also proceeding with a misconduct investigation in the MGB market.  (CAC ¶¶ 5, 293.)  The Mexican media reported leaked information that an unknown witness had testified before CNBV regarding collusion among Defendants.  (CAC ¶ 294.)  At the time the Consolidated Amended Complaint was filed, both investigations were ongoing.  (CAC ¶ 297.)

### b. Statistical Evidence

Plaintiffs also present statistical analyses that they argue corroborate their allegations of conspiracy.  Broadly speaking, the statistical analyses they proffer fall into two categories.  The first category shows comparisons of data from before and after COFECE announced its investigation.  Plaintiffs allege that these longitudinal comparisons suggest that Defendants changed their behavior in response to COFECE's announcement, supporting the inference that they were engaged in illicit anticompetitive conduct before the announcement.

Plaintiffs' first analysis of this nature is a comparison of the difference between the highest and lowest bid in a given auction — what they call the "bid dispersion" — during the "Pre-Announcement Period" and the bid dispersion in the "Post-Announcement Period."[6]  (CAC ¶ 306.)  Their results show an increase in bid dispersion from the Pre- to Post-Announcement

---

[6] For the purpose of this analysis, the Pre-Announcement Period is defined as January 1, 2006, to April 18, 2017, and the Post-Announcement Period is defined as April 19, 2017, to November 28, 2017.  (CAC ¶ 306.)

Period in certain tenors of BONOS and CETES. (CAC at 68 fig.1.) This, Plaintiffs urge, demonstrates an increase in price uncertainty after COFECE's announcement, buttressing the claim that prior to the announcement Defendants were sharing their bid sheets. (CAC ¶¶ 307–309.) Plaintiffs also offer a graph alleging that the bid dispersion of ten-year BONOS increased from the Pre- to Post-Announcement Periods, even once the data was adjusted for macroeconomic factors like the global financial crisis, suggesting that the changes in bid dispersion illustrated in the first analysis were not the result of exogenous factors. (CAC at 69 fig.2, ¶ 311.)

Next, Plaintiffs allege certain data regarding Market Maker Defendants' "fill rates" at MGB auctions. The fill rate is the percentage of bonds allocated to a bidder relative to the total amount for which they bid. (CAC ¶ 313.) Plaintiffs' graphical allegations show the difference between the average fill rate of market makers and non-market makers for BONOS, UDIBONOS, and BONDES D during the Pre-Announcement Period compared to the same measures during the Post-Announcement Period.[7] (CAC at 70 fig.3.) The figures show that the difference in fill rate between the two groups was narrower during the Post-Announcement period. (*See id.*) Plaintiffs allege that the change in Defendants' relative success in the auction reflects collusive conduct in the period preceding the announcement. (CAC ¶ 314.)

Another graph shows the fill rate for Defendants in the Market Maker Option Program during the Pre- and Post-Announcement Periods.[8] (*See* CAC at 74 fig.6.) Defendants had a

---

[7] For the purposes of this analysis the Pre-Announcement Period is defined as July 1, 2016, to April 19, 2017, and the Post-Announcement Period is defined as April 20, 2017 to January 30, 2018. (*See* CAC at 70 fig.3)

[8] For the purposes of this analysis, the Pre-Announcement Period is defined as January 1, 2006, to April 19, 2017, and the Post-Announcement Period is defined as April 20, 2017, to April 5, 2018. (*See* CAC at 74 fig.6.)

higher fill rate of BONOS and UDIBONOS during the Pre-Announcement Period than during the Post-Announcement Period. (*Id.*)

Finally, Plaintiffs allege that the median bid-ask spread Defendants quoted for various tenors of BONOS and CETES narrowed from the Pre-Announcement Period to the Post-Announcement Period.[9] (CAC at 76 fig.7, 77 fig.8.)

The two remaining graphs are not comparisons of Pre- and Post-Announcement Periods, but rather purport to show data from entirely before the COFECE announcement. The first alleges differences between the fill rate volatility of market makers and non-market makers during the Class Period. (CAC at 71 fig.4., ¶¶ 315–316.) It shows that during this period, market makers had less fill rate volatility in auctions for BONOS and UDIBONOS than did non-market makers. (CAC at 71 fig.4.) The relative lack of volatility for market makers, the Plaintiffs allege, supports the inference that Defendants were engaged in collusive conduct that contributed to their "better results" in the auctions. (CAC ¶ 316.)

The last set of statistical allegations relates to the resale of MGBs purchased at auctions. It depicts the "average normalized spot price" of thirty-year BONOS throughout the trading day on auction days and non-auction days, during the period between October 2006 and April 2017. (CAC at 72 fig.5.) The "average normalized spot price" purports to show price movements over the course of the day, rather than a comparison of absolute, day-to-day prices. (*See id.*) On non-auction days, the spot price remained relatively stable, increasing very slightly over the course of the day. (*See id.*) On auction days, the graph shows, among other things, an increase in the average normalized spot price between 11:30 a.m. and 12:00 p.m., just after the announcement of auction results. (*See id.*) In other words, the price of thirty-year BONOS

---

[9] The Pre- and Post-Announcement Periods are not defined for these charts.

jumped immediately after auctions, relative to the immediately pre-auction price. These price movements, Plaintiffs allege, support the inference that Defendants conspired to sell MGBs following the auction at artificially high prices. (CAC ¶ 317.) Similar trends are evident in graphs depicting the same data for three-month CETES, six-month CETES, one-year CETES, and ten-year BONOS, during the period from January 2005 to April 2017. (CAC app. C.)

Plaintiffs do not allege that any of their quantitative analyses show statistically significant results.

### 3. Other Evidence

Plaintiffs offer other assorted allegations in service of their claims. In short, they allege that Defendants' MGB traders often know one another and frequently move laterally among employment with different Defendants (*see* CAC ¶¶ 332–345), and that certain Defendants have been fined or sanctioned for various other antitrust violations, including manipulating benchmark rates like LIBOR and Euribor, manipulating the precious metals and derivatives markets, and several other conspiracies. (*See* CAC ¶¶ 346–378.)

### B. Procedural Background

Plaintiffs filed the operative Consolidated Amended Complaint on July 18, 2018, seeking damages and injunctive relief under Sections 1 and 3 of the Sherman Act, disgorgement of the "ill-gotten gains" from the conspiracy under the common law of unjust enrichment, and certification under Federal Rule of Civil Procedure 23 of a class of all U.S. persons who entered into MGB transactions with Defendants during the class period.[10] (CAC at 96).

---

[10] Specifically, the proposed class definition is:

> All persons that entered into an MGB transaction between at least January 1, 2006, and April 19, 2017 (the "Class Period"), where such persons were either domiciled in the United States or its

9

Defendants moved jointly on September 17, 2018, to dismiss the Consolidated Amended Complaint for failure to state a claim, and a subset of Defendants known as the Foreign Defendants[11] moved to dismiss the claims for lack of personal jurisdiction and improper venue. (*See* Dkt. Nos. 113, 114, 144.) Defendants argue that the complaint impermissibly relies on "group pleading" by failing to differentiate among Defendants; that the complaint does not allege a plausible antitrust conspiracy; that Plaintiffs lack antitrust standing to assert their claims; that the Foreign Trade Antitrust Improvements Act bars the auction-rigging claims; that the claims are partially time-barred; and that Plaintiffs fail to state a claim for unjust enrichment. Because the Court is persuaded by the first of these arguments, the motion to dismiss for failure to state a

---

territories or, if domiciled outside the United States or its territories, transacted in the United States or its territories. Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this Complaint, and the United States government.

(CAC ¶ 382.)

[11] Foreign Defendants include: Bank of America México, S.A., Institución de Banca Múltiple; the BBVA Foreign Defendants (Banco Bilbao Vizcaya Argentaria, S.A.; BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer; BBVA Compass Bancshares, Inc.; Grupo Financiero BBVA Bancomer, S.A. de C.V.); the Barclays Foreign Defendants (Barclays Bank México, S.A., Institución de Banca Múltiple, Grupo Financiero Barclays México; Barclays Bank PLC; Barclays Capital Securities Limited; Barclays PLC; Grupo Financiero Barclays México, S.A. de C.V.); the Citi Foreign Defendants (Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex; Grupo Financiero Banamex, S.A. de C.V.); the Credit Suisse Foreign Defendants (Banco Credit Suisse (Mexico) S.A.; Credit Suisse AG; Credit Suisse Group AG; Grupo Financiero Credit Suisse (Mexico), S.A. de C.V.); the Deutsche Bank Foreign Defendants (Deutsche Bank AG; Deutsche Bank México, S.A., Institution de Banca Múltiple); the HSBC Foreign Defendants (HSBC Holdings PLC; HSBC Bank PLC; HSBC Latin America Holdings (UK) Limited; HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC); the ING Foreign Defendants (ING Bank N.V.; ING Groep N.V.); the J.P. Morgan Foreign Defendants (Banco J.P. Morgan, S.A., Institución de Banca Múltiple, J.P. Morgan Grupo Financiero; J.P. Morgan Securities plc); and the Santander Foreign Defendants (Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Banco Santander Mexico"); Banco Santander, S.A.; Santander Investment Bolsa, Sociedad de Valores, S.A.U.). (*See* Dkt. No. 144 at 1 n.1.)

claim is granted, and the motion to dismiss for lack of personal jurisdiction is denied as moot.[12]

## II.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter" that, if taken to be true, would "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, in the antitrust context, "[a] plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *In re GSE Bonds Antitrust Litig.* (*GSE Bonds*), No. 19 Civ. 1704, 2019 WL 4071070, at *4 (S.D.N.Y. Aug. 29, 2019) (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.* (*Citigroup*), 709 F.3d 129, 136 (2d Cir. 2013)). Of course, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S.

---

[12] Ordinarily, courts address challenges to personal jurisdiction and other threshold matters before addressing the merits of a claim. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431–32 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the . . . parties (personal jurisdiction)."). But "in cases such as this one with multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012). Bypassing the question of personal jurisdiction is especially appropriate when, as here, "the personal jurisdictional challenges are based on factual allegations that are . . . still under development." *Id.*; *see also In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2015 WL 4634541, at *16 (S.D.N.Y. Aug. 4, 2015) (bypassing personal jurisdiction inquiry), *amended* No. 11 MDL 2262, 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015); *First Capital Asset Mgmt., Inc. v. Brickelbush, Inc.,* 150 F. Supp. 2d 624, 631 (S.D.N.Y. 2001) (same), *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004); 4 Charles Alan Wright et al., Federal Practice and Procedure § 1067.6 (4th ed. 2019) ("[A] court simply may avoid the [personal jurisdiction] issue by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction . . . .").

at 678. Rather, the complaint must contain specific factual allegations that, if true, "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

An antitrust plaintiff can overcome a motion to dismiss in two ways. "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level. But, in many antitrust cases, this type of 'smoking gun' can be hard to come by, especially at the pleading stage." *Citigroup*, 709 F.3d at 136 (citation omitted). Accordingly, a complaint may provide a basis for inferring an agreement by alleging "conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Id.* (citations omitted). Plus factors may include facts like "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications. Generally, however, alleging parallel conduct alone is insufficient, even at the pleading stage." *Id.* (citations omitted).

### III.   Discussion

#### A.   Sherman Act Claims

Defendants argue that the allegations impermissibly treat the defendants as a single, undifferentiated bloc and fail to put forth specific allegations of specific conduct by specific entities or individuals. (Dkt. No. 114 at 24–25.)

An antitrust complaint that "fail[s] to connect each or any individual entity to the overarching conspiracy, or[,] alternatively, satisf[ies] the requirements for imputing another affiliated entity's liability" cannot ordinarily survive a motion to dismiss. *Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 Civ. 1667, 2014 WL 1396524, at *20 (S.D.N.Y. Apr. 9, 2014). Allegations about the defendants "as a general collective bloc, or generalized claims of parallel

12

conduct, must . . . be set aside . . . as impermissible group pleading." *In re Interest Rate Swaps Antitrust Litig.*, No. 16 MD 2704, 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (dismissing claims because plaintiffs had "resort[ed] to . . . group pleading"). To be sure, a plaintiff need not "adduce direct evidence (such as a chatroom transcript) for each and every defendant named. . . . But there must be something in the complaint that ties each defendant to the conspiracy." *GSE Bonds*, 2019 WL 4071070, at *7. Thus, without "a coherent explanation for each defendant['s] participation in the alleged conspiracy, an antitrust claim can stand only against those defendants as to whom the [c]omplaint offers some specific, individual showing of" anticompetitive conduct. *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 556 (S.D.N.Y. 2017).

Plaintiffs argue that, at the motion to dismiss stage, they need not allege specific conduct by each defendant, but rather "need only plausibly allege each defendant's involvement in a conspiracy." (Dkt. No. 146 at 39.) But to say that a defendant need only "*plausibly* allege *each* defendant's involvement" is to beg the question. (*Id.* (emphases added).) Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim. For example, Plaintiffs quote *Hinds Cty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106 (S.D.N.Y. 2011), for the proposition that the complaint "need not be detailed with overt acts by each defendant," *id.* at 115. Yet, in *Hinds*, the court undertook a painstaking, defendant-by-defendant analysis of the allegations, and ultimately dismissed most of the claims because the complaint did not furnish allegations against each individual defendant that satisfied the strictures of Rule 8. *See, e.g., id.* at 116 ("[T]he Complaint must plead facts which, taken as true, would tend to show not only that

a transaction in question was fixed, but also that [the defendant] knew of and participated in the malfeasance.  The absence of any such specific factual allegations here is fatal to the . . . claim."); *id.* at 118 ("The . . . Complaint fails . . . to allege any illegal conduct specifically attributable to [the next defendant], nor does it allege veil-piercing or alter ego fact patterns sufficient to permit [the defendant] to be held liable for its former subsidiary's alleged transgressions.").  Similarly, in *Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018), also cited by Plaintiffs, the complaint stated a claim only because the allegations involved specific instances of conspiratorial conduct by each defendant or its employees, *id.* at 317 & n.11 (collecting allegations of specific conduct).  And in *GSE Bonds*, 2019 WL 4071070, cited by Plaintiffs in a supplemental submission (*see* Dkt. No. 157 at 3), the court selectively dismissed claims against defendants as to which there were no "allegations relating to specific actions," while permitting claims against defendants implicated in chats to go forward.  *Id.* at *7.  These cases — each cited by Plaintiffs — exemplify the requirement that an antitrust complaint must provide some basis for inferring that the specific defendants participated in the alleged conspiracy.

Here, even if Plaintiffs have alleged the plausible existence of an antitrust conspiracy — a question the Court does not reach — they have not alleged anything that would "plausibly suggest that the *particular* defendants named in this suit were part of that conspiracy."  *Id.* at *8 (emphasis added).  Indeed, the complaint contains almost no individualized allegations at all.

Consider first the only allegation Plaintiffs characterize as direct evidence of a conspiracy: that an unnamed entity is participating in a government "leniency program" in connection with the COFECE investigation into the MGB market.  (Dkt. No. 146 at 12–13.)  The unnamed entity's cooperation with government investigators, Plaintiffs argue, is direct evidence

of the conspiracy because a precondition of acceptance into the Mexican government's program is the cooperator's membership in a "cartel." (*Id.*) But even if the Court were to indulge the inferential leap from cooperation to culpability, Plaintiffs fail to allege which, if any, of the Defendants is the beneficiary of the leniency program. And even if one Defendant's participation in the program suggested *that* Defendant's culpability, that allegation would not, without more, be direct evidence of a conspiracy implicating the fifty-one *other* institutional defendants, or the unnamed individual defendants.

In the absence of direct evidence, Plaintiffs are left to rely on allegations of circumstantial evidence. But here, again, Plaintiffs have failed to articulate a link between their allegations and the specific defendants named in the complaint. Plaintiffs characterize their statistical analyses as evidence of parallel conduct in bidding and bid-ask quoting. (*See* Dkt. No. 146 at 16–17.) As Defendants rightfully emphasize, though, the statistical analyses proffered by Plaintiffs are simply "group pleading in another form." (Dkt. No. 114 at 25.) Some of Plantiffs' statistical analyses do not distinguish between Defendants and non-defendant auction participants *at all*. (*See* CAC at 68 fig.1, 69 fig.2, 72 fig.5.) Those that do distinguish rely on "averages" and medians among the market makers that obscure any given Defendant's contribution to an observed trend. (*See* CAC at 70 fig.3, 71 fig.4, 74 fig.6, 76 fig.7, 77 fig.8.)

These aggregated statistics are not irrelevant to Plaintiffs' claim that a conspiracy existed. But because the statistical analyses lump together the market makers, at best, the allegations evidence a "conspiracy [that] could well have involved some of [the Defendants], or none of them, or a mix of the named defendants and other" market participants. *GSE Bonds*, 2019 WL 4071070, at *8. Thus, in the absence of any other allegations that would allow the Court to infer the participation of the individual Defendants — for example, allegations of specific conduct by

15

specific defendants, or allegations that because of market makers' role, privileges, and concomitant obligations in the MGB market, only they and their corporate affiliates *could* have plausibly engineered the alleged conspiracy[13] — the group statistical pleadings cannot carry the day. *Cf. Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42, 2013 WL 6481195, at *17 (E.D.N.Y. Sept. 20, 2013) ("[D]ue to the nature of the freight forwarding industry the price-fixing conspiracies alleged herein would not have worked unless there was involvement from both the parent company and its subsidiaries . . . ."); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016) (explaining that aggregate statistical trends were circumstantial evidence of trading by the defendants because they were the "only entities" that could have produced the observed phenomenon).

Finally, relying principally on public media reports, Plaintiffs allege that the Mexican regulatory authorities' investigations in the MGB markets constitute a "plus factor." (CAC ¶¶ 280–297.) Plaintiffs characterize these reports as establishing that COFECE and CNBV were investigating Defendants and had uncovered some evidence of wrongdoing. (Dkt. No. 146 at 18–19.)

It is far from clear that an ongoing government investigation involving Defendants would, in the absence of more substantial allegations, weigh in favor of the complaint's plausibility. *Cf. In re Commodity Exch., Inc.,* 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016) ("[T]he mere fact that regulatory entities have investigated, and may still be investigating, the possibility

---

[13] In their brief in opposition to the motion to dismiss, Plaintiffs argue that "[u]nless all Market Makers agreed to participate in the conspiracy, other market participants would have no trouble finding more favorable price quotes." (Dkt. No. 146 at 20.) But they cite no allegations for this conclusion, and it is not self-evident from Plaintiffs' other allegations why this would be so. After all, the market makers were not the only participants in the MGB auctions. Nor, of course, were they the only participants in the secondary market for MGBs, and the complaint provides no allegations regarding each individual Defendant's market share.

16

of misconduct . . . is not a plus factor." (internal quotation marks omitted)); *In re London Silver*, 213 F. Supp. 3d at 561 ("[T]he mere fact that regulatory entities are investigating the possibility of . . . misconduct . . . is not a plus factor." (internal quotation marks omitted)); *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MD 2481, 2014 WL 4277510, at *34 (S.D.N.Y. Aug. 29, 2014) (holding that "inquiries or investigations alone can[not] plausibly support an alleged § 1 conspiracy"), *supplemented*, No. 13 MD 2481, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *and aff'd*, 833 F.3d 151 (2d Cir. 2016); *Hinds Cty.*, 620 F. Supp. 2d at 514 ("This Court agrees that the various investigations, inquiries, and subpoenas do not make the [complaint's] allegations plausible, for the purposes of deciding a motion to dismiss under the standards as laid out in *Twombly* and *Iqbal*."). *But see GSE Bonds*, 2019 WL 4071070, at *6 (holding, in the context of a claim involving allegations of direct evidence, that "the plausibility of the alleged conspiracy is bolstered, at least to some extent, by the ongoing Department of Justice investigation into the same alleged misconduct."). But the Court need not decide whether the allegations of ongoing government investigations carry any water in alleging a plausible antitrust conspiracy, because the reports cited by Plaintiffs state nothing about wrongdoing *on behalf* of Defendants here. Several of the market makers — to say nothing of the dozens of corporate affiliates named in the complaint — are not mentioned *at all* as subjects of the inquiry, beyond the generic assertion that *all participants* in the *entire MGB market* were potentially subject to the government's scrutiny. (CAC ¶ 287.) The report describes seven Defendants as the "focus of the probe," but even as to them, it states that "[n]one of [them] has been accused of wrongdoing." *See* Isabella Cota et al., *Seven Banks Said to Be Focus of Mexico Bond Collusion Probe*, Bloomberg (May 16, 2017), https://www.bloomberg.com/news/articles/2017-05-16/seven-dealers-said-to-be-focus-of-mexico-bond-collusion-probe. And, even if the Court were

17

to credit the investigations as a plus factor supporting the involvement of certain Defendants in an antitrust conspiracy, plus factors in the absence of parallel conduct or direct evidence are insufficient to state an antitrust claim.

For the same reason, the allegations that the Defendants shared a common motive to conspire, which would, at best, constitute a plus factor, fail to move the needle. (*See* Dkt. No. 146 at 19–20.) Similarly unavailing is Plaintiffs' allegation that the horizontal mobility of employees among Defendants constitutes a plus factor because it fostered a professional and social network that afforded Defendants the "opportunity to conspire." (CAC ¶¶ 332–345.) Moreover, Plaintiffs do not allege that those personnel took part in the alleged conspiracy, and "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993). And though, as Plaintiffs emphasize, some Defendants have conspired in other markets in recent years, the Second Circuit has expressly rejected this sort of "if it happened there, it could have happened here" reasoning. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam). These arguments therefore cannot revive Plaintiffs' deficient pleadings.

Because Plaintiffs' group pleading is fatal to their Sherman Act claims, the Court declines to reach the myriad other issues raised by Defendants.

### B.   Unjust Enrichment Claims

Finally, Defendants argue that to the extent the antitrust claims have been found lacking, so too must the unjust enrichment claims. (*See* Dkt. No. 114 at 39.) "[W]ithout a viable underlying claim of illegality, an unjust enrichment claim must be dismissed." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017) (citation and internal quotation marks omitted); *see also In re Aluminum Warehousing*, 2014 WL 4743425, at *4

(dismissing unjust enrichment claims predicated on dismissed antitrust violations); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) (dismissing an unjust enrichment claim because it "'hinges on . . . practices claimed by plaintiff to be illegal' . . . [but] the allegations of illegality in the complaint fail" (first alteration in original) (quoting *Sands v. Ticketmaster-N.Y., Inc.*, 616 N.Y.S.2d 362, 364 (1st Dep't 1994)). Plaintiffs do not seriously contest this principle's application here. Though they assert that the elements of an unjust enrichment claim and an antitrust claim are not coextensive, the difference they identify (that Plaintiffs need not be "efficient enforcers" to prevail on their unjust enrichment claim) is not the basis of this dismissal and is therefore inapposite. (*See* Dkt. No. 146 at 46.) Dismissal of the Sherman Act claims compels dismissal of the unjust enrichment claims as well.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim is GRANTED. Foreign Defendants' motion to dismiss for lack of personal jurisdiction is DENIED as moot. Within twenty-one days of the date of this Opinion and Order, Plaintiffs shall file a letter informing the Court whether they intend to move for leave to file a Second Consolidated Amended Complaint and, if so, explaining why leave should be granted.

The Clerk of Court is directed to close the motion at Docket Number 113.

SO ORDERED.

Dated: September 30, 2019
       New York, New York

                                                              _____
                                                              J. PAUL OETKEN
                                                              United States District Judge