## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MEXICAN GOVERNMENT BONDS ANTITRUST LITIGATION | Master Docket No. 18-cv-02830 (JPO) |
| | <u>CLASS ACTION</u> |
| This Document Relates to: | |
| ALL ACTIONS | |

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................... 1

II.     PARTIES ....................................................................................................................... 6

    A.  Plaintiffs ................................................................................................................. 6

    B.  Defendants ............................................................................................................ 10

        1.  Santander Mexico ........................................................................................ 10

        2.  BBVA-Bancomer .......................................................................................... 11

        3.  Citibanamex ................................................................................................. 11

        4.  Deutsche Bank Mexico ................................................................................ 12

        5.  HSBC Mexico ............................................................................................... 12

        6.  Bank of America Mexico .............................................................................. 13

        7.  JPMorgan Mexico ........................................................................................ 14

        8.  Barclays Mexico ........................................................................................... 15

        9.  UBS Mexico .................................................................................................. 15

        10. "John Does" 1-10 ......................................................................................... 16

    C.  The Structure of Defendants' MGB Trading and Sales Businesses. ................... 16

        1.  MGB Traders ................................................................................................ 17

        2.  MGB Sales Staff ........................................................................................... 20

        3.  Designated Broker-Dealer Affiliates ........................................................... 21

        4.  MGB Investors .............................................................................................. 23

III.    JURISDICTION AND VENUE .................................................................................. 24

    A.  Each Defendant Purposefully Availed Itself of the United States Market for MGBs. .......................... 26

    B.  Santander Mexico Purposefully Availed Itself of the United States MGB Market. ............................... 28

    C.  BBVA-Bancomer Purposefully Availed Itself of the United States MGB Market. ............................... 33

    D.  Citibanamex Purposefully Availed Itself of the United States MGB Market. ..................................... 41

    E.  Deutsche Bank Mexico Purposefully Availed Itself of the United States MGB Market. ....................... 46

    F.  HSBC Mexico Purposefully Availed Itself of the United States MGB Market. ................................... 51

    G.  Bank of America Mexico Purposefully Availed Itself of the United States MGB Market. .................... 57

    H.  JPMorgan Mexico Purposefully Availed Itself of the United States MGB Market. ............................. 62

    I.  Barclays Mexico Purposefully Availed Itself of the United States MGB Market. ................................ 68

    J.  UBS Mexico Purposefully Availed Itself of the United States MGB Market. ..................................... 73

IV.     SUBSTANTIVE ALLEGATIONS .............................................................................. 78

    I.  Background ............................................................................................................ 78

    A.  The Mexican Government Bond Market ............................................................... 78

        1.  CETES .......................................................................................................... 81

        2.  BONOS ......................................................................................................... 82

        3.  UDIBONOS .................................................................................................. 84

    4.     BONDES D ........................................................................................... 85

    B.   The MGB Market Makers ................................................................................ 86

V.       FEATURES OF THE MGB MARKET MADE IT HIGHLY SUSCEPTIBLE TO COLLUSION 87

VI.      COFECE FORMALLY CHARGED DEFENDANTS WITH ABSOLUTE MONOPOLISTIC PRACTICES IN THE MGB MARKET ............................................................................ 94

    A.   The Admitted MGB Cartel ............................................................................. 94

    B.   Defendants' Response to the Investigations ................................................... 98

    C.   COFECE's 32-Month Investigation Resulted in Formal Charges Against 7 Defendants and 11 Individuals for Engaging in *Per Se* Illegal Conduct. .................................... 99

       1.    COFECE Formally Charged Seven Defendants with Engaging in Absolute Monopolistic Practices in the MGB Market. ....................................................................... 99

       2.    COFECE Formally Charged 11 of Defendants' Former MGB Traders with Engaging in Absolute Monopolistic Practices in the MGB Market ............................................... 99

       3.    Absolute Monopolistic Practices are *Per Se* Illegal Under the Sherman Act. ................... 103

VII.     CHAT MESSAGES AMONG DEFENDANTS' MGB TRADERS SHOW THAT THEY CONSPIRED TO FIX PRICES IN THE MGB MARKET. ............................................. 105

VIII.    ECONOMIC EVIDENCE CONFIRMS THAT DEFENDANTS' CONSPIRACY CAUSED ARTIFICIAL PRICES IN THE MGB MARKET ....................................................... 121

    A.   Bid Dispersion Analysis Demonstrates that Defendants Used the MGB Auction Process to Concentrate MGB Supply. ............................................................................. 121

    B.   Defendants Sold MGBs From the Auctions at Supra-Competitive Prices ........................... 127

    C.   Defendants Fixed Bid-Ask Spreads for MGBs. ........................................................ 130

IX.      DEFENDANTS WERE PART OF GLOBAL BANKS WITH WEAK OVERSIGHT AND CONTROLS. ........................................................................................... 134

    A.   Barclays ................................................................................................ 135

    B.   Deutsche Bank ......................................................................................... 136

    C.   Bank of America ....................................................................................... 139

    D.   HSBC .................................................................................................. 140

    E.   Citigroup .............................................................................................. 141

    F.   JPMorgan .............................................................................................. 142

    G.   Santander and BBVA .................................................................................. 143

    H.   UBS AG ................................................................................................ 143

X.       CLASS ACTION ALLEGATIONS ................................................................... 145

XI.      CLAIMS FOR RELIEF .................................................................................. 148

FIRST CLAIM FOR RELIEF ............................................................................... 148

SECOND CLAIM FOR RELIEF ............................................................................ 150

XII.     PRAYER FOR RELIEF .................................................................................. 151

XIII.    DEMAND FOR JURY TRIAL ........................................................................... 151

Plaintiffs Oklahoma Firefighters Pension Retirement System, Electrical Workers Pension Fund Local 103, I.B.E.W., Manhattan and Bronx Surface Transit Operating Authority Pension Plan, Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust, Boston Retirement System, Southeastern Pennsylvania Transportation Authority Pension Plan, Government Employees Retirement System of the Virgin Islands, and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund (collectively "Plaintiffs") complain upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, against Defendants (defined in Part II.B., below) for their violations of law from January 1, 2006 through April 19, 2017 ("Class Period") as follows:

## I.    INTRODUCTION

1.      A Mexican government bond ("MGB") is a debt security (like a U.S. Treasury bond) that is issued by the Mexican government. The Mexican government uses MGBs to raise capital, fund budget deficits, and control Mexico's monetary supply.

2.      Defendants are horizontal competitors in the MGB market. They operated MGB trading desks that earned profits based on the difference between the prices at which they purchased MGBs and the prices at which they sold MGBs to customers.

3.      Defendants were part of an exclusive group of Mexican government-approved market makers for MGBs during the Class Period. This privilege allowed Defendants to dominate the MGB market. In exchange for market maker status, the Bank of Mexico ("Banxico") requires Defendants to collectively bid for at least 100% of the total amount of MGBs for sale in each auction. Defendants thus control the supply of MGBs to investors in the secondary market, where they sell the bonds purchased at auction to their customers. Each Defendant was also required to maintain a minimum of 7% market share in the MGB market, as measured by transaction volume,

1

to stay in the market maker program. Defendants far exceeded that requirement, accounting for approximately 80% of dealer activity in the secondary market during the Class Period.

4.      Defendants abused their dominant position in the MGB market to unlawfully increase the profitability of their MGB trading and sales businesses by imposing greater transaction costs on their customers, including Plaintiffs and the Class. After a more than two-year long investigation, Mexico's antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), formally charged seven Defendants with engaging in "absolute monopolistic practices" in the MGB market. Mexican antitrust law uses the term "absolute monopolistic practices" to refer to agreements among horizontal competitors to: (1) fix prices; (2) restrain supply; (3) allocate markets; (4) rig bids; or (5) exchange information for the purpose of fixing prices, restraining supply, rigging bids, or allocating markets.

5.      Two cooperating co-conspirators have provided Plaintiffs with direct, "smoking-gun" evidence showing how Defendants' conspiracy operated. The cooperation materials produced to date show that Defendants, rather than competing for MGB customers, instead operated as an MGB cartel that distorted the MGB market for their shared benefit and to the detriment of investors in the MGB market, including their customers such as Plaintiffs and the Class.

6.      The evidence consists of electronic chatroom transcripts, transaction data, and other materials showing that Defendants' MGB trading desks operated as a single unitary desk. Using shared language that they developed over years of colluding in the MGB market, Defendants viewed themselves as a single unit whose interests were best served by coordinating amongst themselves. Instead of competing in the MGB market, Defendants conspired to maximize their profits and minimize their losses. Defendants' MGB traders recognized that their conspiracy allowed them to secure additional illicit profits as reflected in the following chat:

<u>February 2, 2012</u>



7.      Had they operated independently, each Defendant would have had limited information about customer inflows and outflows and thus would have been unable to coordinate prices and trading positions ahead of anticipated investor demand. Defendants' MGB traders dealt with these obstacles by sharing sensitive customer information and coordinating their trading positions. They accomplished this by staying in constant communication via "permanent" Bloomberg chatrooms,[1] over the phone, and in-person meetings so that they could coordinate trading and share sensitive information. The example chat below illustrates how these traders agreed with each other to align positions and coordinate trading at the start of each trading day to make unlawful profits at customers' expense:

<u>July 10, 2013</u>



---

[1] A permanent chatroom refers to a chatroom that is always open to the participants.

[2] "27" is shorthand for the BONO maturing in 2027, and "16" is shorthand for the BONO maturing in 2016.

████████████████████████████

████████████████████████████

8.     This behavior should not occur among horizontal competitors. Absent a conspiracy, MGB dealers should compete for customer flow by offering superior prices and trade recommendations to their clients at the expense of their rival dealers.

9.     Defendants' conspiracy resulted in higher transaction costs for uninformed market participants on the other side of their MGB transactions—*i.e.*, investors like Plaintiffs and the Class. This is confirmed by an analysis of MGB prices and auction results before and after COFECE announced the existence of its investigation in April 2017, which shows that Defendants: (a) rigged MGB auctions through collusive bidding and information sharing to control the flow of MGB supply; (b) sold new MGBs purchased at auction into the secondary market at artificially higher prices; (c) agreed to fix the "bid-ask spread" artificially wider, overcharging and underpaying investors in every MGB transaction by suppressing the "bid price" at which Defendants offered to buy MGBs and increasing the "ask price" at which Defendants offered to sell MGBs. This comprehensive scheme resulted in MGB spreads during the Class Period that were **consistently more than 20%** wider than they should have been, generating supra-competitive profits for Defendants at the expense of Plaintiffs and Class members.

10.     Defendants' agreement to restrain trade in the MGB market is part of a broader pattern of collusion and price-fixing in multiple financial markets by these same banks during the Class Period. This pattern of confirmed misconduct demonstrates that Defendants failed to implement meaningful oversight and internal controls governing trading staff. Defendants' lax

---

[3] Netzahualcoyotl was a 15th century Aztec military leader and poet who formed and successfully led a military alliance of indigenous city-states against the Tepanecs. The Tepanecs were the dominant military force in pre-Aztec Mexico until they were defeated by the Aztec coalition led by Netzahualcoyotl.

compliance standards led to their involvement in multiple anticompetitive conspiracies in numerous financial markets during the Class Period. Regulators across the globe have fined and sanctioned Defendants for conspiring to fix prices in multiple financial markets, including for example by manipulating the London Interbank Offered Rate ("LIBOR") and the Euro Interbank Offered Rate ("Euribor"), the foreign exchange market, precious metals markets, and several major bond markets, among others. To date, this has resulted in Defendants' corporate parents Deutsche Bank AG, Bank of America Corporation, JPMorgan Chase & Co., HSBC Holdings plc, Citigroup Inc., Barclays PLC, and UBS AG collectively paying over $11 billion in fines and settlements for anticompetitive conduct.

11.     Plaintiffs are domestic investors in MGBs, and Defendants' MGB customers. The following Defendants transacted hundreds of millions of dollars' worth of MGBs in the United States with Plaintiffs: Bank of America Mexico, JPMorgan Mexico, BBVA-Bancomer, Santander Mexico, HSBC Mexico, Citibanamex, Barclays Mexico, Deutsche Bank Mexico, and UBS Mexico. Defendants' conspiracy to restrain the MGB market at the same time that they were pricing, sourcing, and entering into MGB transactions with Plaintiffs caused Plaintiffs to pay more when purchasing MGBs and receive less when selling MGBs than they would have in a competitive market.

12.     Given COFECE's formal findings that Defendants engaged in absolute monopolistic practices in the MGB market, the two-and-a-half years of investigative work that COFECE relied on in reaching this conclusion, the materials provided by the two cooperating banks, and the significant amount of economic evidence presented in this Complaint, Plaintiffs believe further evidentiary support for their claims against Defendants will be revealed following a reasonable opportunity for discovery.

13.     The cooperating co-conspirators have provided Plaintiffs with hundreds of chat messages reflecting collusive conduct by Defendants. Although these chats are illustrative rather than exhaustive, and cooperation remains ongoing, they provide evidence that each of the Defendants was an active participant in the conspiracy to restrain the MGB market during the Class Period.

## II.     PARTIES

### A.  Plaintiffs

14.     Plaintiff Oklahoma Firefighters Pension and Retirement System ("OFPRS"), established in 1981, provides retirement benefits to firefighters in Oklahoma. As of June 30, 2017, OFPRS managed more than $2.5 billion in assets on behalf of approximately 24,000 members and beneficiaries. During the Class Period, the following Defendants traded MGBs with OFPRS in the United States: HSBC Mexico, JPMorgan Mexico, and Citibanamex. OFPRS suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices, including hundreds of billions of dollars' worth of MGBs that Defendants transacted in the United States.

15.     Plaintiff Electrical Workers Pension Fund Local 103, I.B.E.W ("IBEW 103"), is a deferred retirement plan that currently provides benefits to nearly 2,500 retired participants. As of 2017, IBEW 103 managed more than $1 billion in assets. During the Class Period, the following Defendants traded millions of dollars of MGBs, including BONOS, CETES, and UDIBONOS, with IBEW 103 in the United States: Bank of America Mexico,[4] BBVA-Bancomer, Santander Mexico,[5] HSBC Mexico, Citibanamex,[6] and Barclays Mexico. IBEW 103 suffered monetary losses

---

[4] Banc of America Securities merged into Merrill Lynch, Pierce, Fenner & Smith Incorporated during the Class Period.

[5] Banco Santander, S.A. was known as Banco Santander Central Hispano, S.A. until 2007, when it changed its name.

[6] Citigroup Global Markets Limited is Citigroup Inc.'s international broker-dealer.

when it was overcharged or underpaid in these transactions as a direct result of Defendants'
conspiracy to fix MGB prices, including hundreds of billions of dollars' worth of MGBs that
Defendants transacted in the United States.

16.     Plaintiff Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA")
Pension Plan is a single-employer pension plan sponsored by the Manhattan and Bronx Surface
Transit Operating Authority, a subsidiary of Metropolitan Transportation Authority ("MTA") New
York City Transit. MaBSTOA provides retirement, disability, cost-of-living adjustments, and death
benefits to over 15,000 plan members, beneficiaries, and retirees. MaBSTOA presently manages
approximately $2.9 billion in assets. During the Class Period, the following Defendants transacted in
millions of dollars' worth of MGBs, including BONOS, CETES, and UDIBONOS, with
MaBSTOA in the United States: BBVA-Bancomer, Citibanamex, Barclays Mexico, Santander
Mexico, and HSBC Mexico. MaBSTOA suffered monetary losses when it was overcharged or
underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices,
including hundreds of billions of dollars' worth of MGBs that Defendants transacted in the United
States.

17.     Plaintiff MTA Defined Benefit Pension Plan Master Trust ("MTADBPPMT")
consists of a cost-sharing multiple employer plan that includes certain MTA Long Island Rail Road
non-represented employees hired after December 31, 1987, MTA Metro-North Railroad non-
represented employees, certain employees of the former MTA Long Island Bus hired prior to
January 23, 1983, MTA Police, MTA Long Island Rail Road represented employees hired after
December 1, 1987, certain MTA Metro-North Railroad represented employees, MTA Staten Island
Railway represented and non-represented employees and certain employees of the MTA Bus
Company, as well as a single employer plan that covers employees of MTA Long Island Rail Road
hired prior to January 1, 1988. MTADBPPMT presently manages approximately $5.04 billion in

assets for over 29,000 plan members, beneficiaries, and retirees. During the Class Period, the following Defendants transacted millions of dollars' worth of MGBs, including BONOS, CETES, and UDIBONOS, with MTADBPPMT in the United States: BBVA-Bancomer, Santander Mexico, Citibanamex, JPMorgan Mexico,[7] Barclays Mexico, and HSBC Mexico. MTADBPPMT suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices, including hundreds of billions of dollars' worth of MGB transactions that Defendants entered into in the United States.

18.    Plaintiff Boston Retirement System ("BRS") is a governmental defined benefit pension system that administers retirement benefits to over 34,000 members, beneficiaries, and retirees. BRS's membership includes all employees of the City of Boston as well as its autonomous agencies. BRS presently manages approximately $6 billion in assets. During the Class Period, the following Defendants transacted in millions of dollars' worth of MGBs, including BONOS and UDIBONOS, with BRS in the United States: Bank of America Mexico, BBV-Bancomer., HSBC Mexico, Citibanamex, JPMorgan Mexico,[8] and Santander Mexico. BRS suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices, including hundreds of billions of dollars' worth of MGB transactions that Defendants entered into in the United States.

19.    Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") Pension Plan is a pension fund sponsored by SEPTA on behalf of its employees with over 14,000 plan members, beneficiaries, and retirees. SEPTA provides public transportation services to Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania. At the end of 2016, the SEPTA Pension Plan had over $1.6 billion in assets under management. During the Class Period,

---

[7] J.P. Morgan Securities Ltd. changed its name to J.P. Morgan Securities plc in 2012.

[8] J.P. Morgan Securities Inc. which changed its name to J.P. Morgan Securities LLC in 2010.

the following Defendants transacted tens of millions of dollars' worth of MGBs, including BONOS and UDIBONOS, with SEPTA in the United States: HSBC Mexico, Citibanamex, Deutsche Bank Mexico, JPMorgan Mexico, Bank of America Mexico, Barclays Mexico, and BBVA-Bancomer. SEPTA Pension Plan suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices, including hundreds of billions of dollars' worth of MGB transactions that Defendants entered into in the United States.

20.     Plaintiff Government Employees' Retirement System of the Virgin Islands ("GERS") is a pension system with over $700 million in assets under management for the benefit of more than 8,669 active members and more than 8,498 retirees and pensioners. During the Class Period, the following Defendants transacted in tens of millions of dollars' worth of MGBs with GERS in the United States and its territories: JPMorgan Mexico, HSBC Mexico, and Citibanamex. GERS suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices, including hundreds of billions of dollars' worth of MGB transactions that Defendants entered into in the United States.

21.     Plaintiff United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("UFCW Tri-State") is headquartered in Plymouth Meeting, Pennsylvania. Established in 1958, it is a Taft-Hartley, multi-employer defined benefit pension trust fund. UFCW Tri-State provides retirement benefits to present and former unionized employees of numerous food and service employers, including Acme Markets, Shop Rite, and others. As of December 31, 2016, UFCW Tri-State managed more than approximately $400,000,000 in net assets on behalf of more than 33,000 plan participants. During the Class Period, the following Defendants traded millions of dollars' worth of MGBs, including BONOS, with UFCW Tri-State in

the United States: HSBC Mexico, Barclays Mexico, HSBC Mexico, JPMorgan Mexico,[9] Bank of America Mexico,[10] Santander Mexico, and Deutsche Bank Mexico. UFCW Tri-State suffered monetary losses when it was overcharged or underpaid in these transactions as a direct result of Defendants' conspiracy to fix MGB prices, including hundreds of billions of dollars' worth of MGB transactions that Defendants entered into in the United States.

## B. Defendants

### 1. Santander Mexico

22.     Defendant Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander Mexico") is a Mexican corporation headquartered in Mexico City, and the successor-in-interest to Grupo Financiero Santander México, S.A.B. de C.V.

23.     Santander Mexico is a wholly-owned subsidiary of global financial institution Banco Santander, S.A.

24.     Banco Santander, S.A. includes the assets of Santander Mexico, Santander Investment Bolsa, Sociedad de Valores, S.A., Santander Investment Securities Inc., and its other subsidiaries on its consolidated financial statements. Santander Investment Bolsa, Sociedad de Valores, S.A., and Santander Investment Securities Inc. are each wholly-owned subsidiaries of Banco Santander, S.A.

25.     Santander Mexico served as a designated Market Maker for MGBs during the Class Period. It was formally charged by COFECE with participating in the conspiracy to fix MGB prices alleged in this Complaint.

---

[9] Banco Merrill Lynch de Investimiento S.A. changed its named to Bank of America Merrill Lynch Banco Múltiplo S.A. in 2011.

[10] Merrill Lynch & Co Inc. was acquired by Defendant Bank of America Corporation in 2013.

26.     During the Class Period, Santander Mexico, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

### 2. BBVA-Bancomer

27.     Defendant BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer") is a Mexican corporation and a wholly-owned subsidiary of global financial institution BBVA S.A.

28.     BBVA S.A. includes the assets of BBVA-Bancomer, BBVA Securities Inc., and its other wholly-owned subsidiaries on its consolidated financial statements. BBVA Securities Inc. is a wholly-owned subsidiary of BBVA S.A.

29.     BBVA-Bancomer was a designated Market Maker for MGBs during the Class Period. It was formally charged by COFECE with participating in the conspiracy to fix MGB prices alleged in this Complaint.

30.     During the Class Period, BBVA-Bancomer, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

### 3. Citibanamex

31.     Defendant Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex ("Citibanamex"), operating under the trade name Citibanamex, is a Mexican corporation and a wholly-owned subsidiary of global financial institution Citigroup Inc.

32.     Citigroup Inc. includes the assets of Citibanamex, Citigroup Global Markets Inc., and its other wholly-owned subsidiaries on its consolidated financial statements. Citigroup Global Markets Inc. is a wholly-owned subsidiary of Citigroup Inc.

33.     Citibanamex was a designated Market Maker for MGBs during the Class Period. It was formally charged by COFECE with participating in the conspiracy to fix MGB prices alleged in this Complaint.

34.     During the Class Period, Citibanamex, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

### 4.  Deutsche Bank Mexico

35.     Defendant Deutsche Bank México, S.A., Institution de Banca Múltiple ("Deutsche Bank Mexico") is a Mexican corporation and wholly-owned subsidiary of global financial institution Deutsche Bank AG.

36.     Deutsche Bank AG includes the assets of Deutsche Bank Mexico, Deutsche Bank Securities Inc., and its other subsidiaries on its consolidated financial statements. Deutsche Bank Securities Inc. is a wholly-owned subsidiary of Deutsche Bank AG.

37.     Deutsche Bank Mexico was a designated Market Maker for MGBs during the Class Period. It was formally charged by COFECE with participating in the conspiracy to fix MGB prices alleged in this Complaint.

38.     During the Class Period, Deutsche Bank Mexico, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

### 5.  HSBC Mexico

39.     Defendant HSBC México, S.A., Institución De Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico") is a Mexican corporation and a wholly-owned subsidiary of global financial institution HSBC Holdings plc. HSBC Holdings plc lists HSBC Mexico as a principal subsidiary.

40.     HSBC Holdings plc includes the assets of HSBC Mexico, HSBC Securities (USA) Inc., and its other subsidiaries on its consolidated financial statements. HSBC Securities (USA) Inc. is a wholly-owned subsidiary of HSBC Holdings plc.

41.     HSBC Mexico was a designated Market Maker for MGBs during the Class Period. HSBC Mexico was under investigation by COFECE for participating in the conspiracy to fix MGB prices alleged in this Complaint. It received subpoenas from COFECE in connection with its investigation of the conspiracy to fix MGB prices alleged in this Complaint and provided evidence to assist COFECE with its investigation.

42.     During the Class Period, HSBC Mexico, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

### 6.     Bank of America Mexico

43.     Defendant Bank of America México, S.A., Institución de Banca Multiple, Grupo Financiero Bank of America ("Bank of America Mexico") is a Mexican corporation and a wholly-owned subsidiary of global financial institution Bank of America Corporation.

44.     Bank of America Corporation publishes reports about its business and that of its subsidiaries under the collective trade name "Bank of America Merrill Lynch."

45.     Bank of America Merrill Lynch includes the assets of Bank of America Mexico, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and its other wholly-owned subsidiaries on its consolidated financial statements. Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated are each wholly-owned subsidiaries of Bank of America Corporation.

46.     Bank of America Mexico was a designated Market Maker for MGBs during the Class Period. It was formally charged by COFECE with participating in the conspiracy to fix MGB prices alleged in this Complaint.

47.     During the Class Period, Bank of America Mexico, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

### 7. JPMorgan Mexico

48.     Defendant Banco J.P. Morgan, S.A., Institución de Banca Múltiple, J.P. Morgan Grupo Financiero ("JPMorgan Mexico") is a Mexican corporation and a subsidiary of global financial institution JPMorgan Chase & Co.

49.     JPMorgan Chase & Co. includes the assets of JPMorgan Mexico, JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and its other subsidiaries on its consolidated financial statements. JPMorgan Mexico, JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC are each wholly-owned subsidiaries of JPMorgan Chase & Co.

50.     JPMorgan Mexico was a designated Market Maker for MGBs during the Class Period. It was formally charged by COFECE with participating in the conspiracy to fix MGB prices alleged in this Complaint.

51.     During the Class Period, JPMorgan Mexico, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

52.     Defendants JPMorgan Chase & Co., J.P. Morgan Broker-Dealer Holdings Inc., J.P. Morgan Securities LLC, and JPMorgan Chase Bank, National Association are corporate affiliates of JPMorgan Mexico.

### 8. Barclays Mexico

53.     Defendant Barclays Bank México, S.A., Institución de Banca Múltiple, Grupo Financiero Barclays México ("Barclays Mexico") is a Mexican corporation and a wholly-owned subsidiary of global financial institution Barclays PLC.

54.     Barclays PLC includes the assets of Barclays Mexico, Barclays Bank PLC, Barclays Capital Inc., and its other wholly-owned subsidiaries on its consolidated financial statements. Barclays Bank PLC and Barclays Capital Inc. are wholly-owned subsidiaries of Barclays PLC.

55.     Barclays Mexico was a designated Market Maker for MGBs during the Class Period. It was formally charged by COFECE with participating in the conspiracy to fix MGB prices alleged in this Complaint.

56.     During the Class Period, Barclays Mexico, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

57.     Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., and Barclays Capital Securities Limited are corporate affiliates of Barclays Mexico.

### 9. UBS Mexico

58.     Defendant UBS Bank Mexico, S.A., Institucion de Banca Múltiple, UBS Grupo Financiero ("UBS Mexico") is a Mexican corporation and a wholly-owned subsidiary of global financial institution UBS AG.

59.     UBS AG includes the assets of UBS Mexico, UBS Securities LLC, and its other subsidiaries on its consolidated financial statements. UBS Securities LLC is a wholly-owned subsidiary of UBS AG.

60.     UBS Mexico actively participated in the MGB market during the Class Period.

61.     UBS Mexico received subpoenas from COFECE in connection with its investigation of the conspiracy to fix MGB prices alleged in this Complaint and provided evidence to assist COFECE with its investigation.

62.     During the Class Period, UBS Mexico, acting on its own and jointly with its affiliates, transacted MGBs in the United States and with persons domiciled in the United States, as further detailed below.

### 10.  "John Does" 1-10

63.     John Doe 1 is the entity or individual that received leniency under Mexico's cartel leniency and immunity program, described in Part VI, below. John Doe 1 was a member of the conspiracy described in this Complaint.

64.     John Does 2-10 are individuals and entities that joined the conspiracy to fix prices in the market for MGBs that is described in this Complaint.

65.     **The MGB Market Makers:** Defendants Santander Mexico, BBVA-Bancomer, HSBC Mexico, Citibanamex, Bank of America Mexico, Barclays Mexico, JPMorgan Mexico, and Deutsche Bank Mexico were designated MGB market markers during all or most of the Class Period. These entities are referred to collectively as "MGB Market Makers."

### C. The Structure of Defendants' MGB Trading and Sales Businesses.

66.     There is an industry-standard organizational structure used by dealers in the MGB market. Each Defendant operated its MGB trading and sales business using a similar version of this structure. The structure of each Defendant's MGB trading and sales business includes several players, including: (1) MGB traders, who are tasked with pricing customer MGB trades, managing the bank-wide risk positions with respect to MGBs (including by managing inventory held available for trading), and assisting the salesforce with promoting MGBs to customers; (2) a salesforce, tasked with managing customer relationships, relaying information about the MGB market from the MGB

trading staff to the customers, and communicating prices for potential customer MGB trades; and (3) a designated broker-dealer affiliate, which serves in a passive role as an internal clearinghouse to route MGBs and cash to and from customers each time the bank executes an MGB trade.

### 1.  MGB Traders

67.     The MGB Market Makers' activities in both the MGB auction process and the MGB secondary market were carried out by their respective MGB trading desks. Accordingly, the same desk responsible for submitting bids in MGB auctions were also responsible for determining prices charged to investors in the MGB secondary market and supplying trade ideas to the bank's salesforce to attract customers.

68.     Each Defendant compensated its MGB traders based on the profitability of the MGB trading desk. Profits were updated daily by looking to the MGB trading desk's profit and loss statements, known to MGB traders as "PnL," "P&L", or other forms of shorthand.

69.     MGB traders earn profits by selling MGBs to investors at higher prices than they purchase MGBs. The goal of Defendants' MGB traders was simply to buy low and sell high, as frequently as possible, and book the difference as profit. Accordingly, MGB traders actively assist the bank's salesforce attract MGB customers because more MGB customers leads to more transactions on which MGB traders can book profits.

70.     In a competitive market, MGB dealers should quote competitive MGB prices to customers, while also supplying trade recommendations to clients to earn greater market share. An MGB dealer who fails to quote competitive prices for any reason (such as by quoting artificial prices to customers that are influenced by a conspiracy), would lose customers (and the repeat business that the customer brings) over time to rivals. An MGB dealer must be able to attract a sufficient MGB customer base (known among traders as "flow"), while also booking trading profits based on

the difference between the cost of MGBs to the bank and the revenue generated from customer sales.

71.     Beyond buying MGBs at low prices and selling them to investors at higher prices, Defendants' MGB traders supplied the bank's MGB salesforce with expertise specific to the MGB market. They accomplished this in a number of ways.

72.     First, MGB traders were often tasked with discussing events in the MGB market directly with significant customers in the United States, such as institutional investors and large asset managers.

73.     Second, Defendants furnished their respective U.S.-based sales personnel with market color and trade ideas to attract more customers. Because much of the Defendants' MGB customer base consisted of U.S. investors, their traders prepared these updates in English and sent them to sales personnel employed by a corporate affiliate but organized within the same internal fixed income trading and sales division. For example, ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████  ██████████████████████████████████████████ ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

74.     Because the United States was a critical market for each Defendant' MGB business, *see* Part III, below, they regular sent MGB traders to New York City to meet with clients and network with investors in the U.S. MGB market. For example, ██████████████████████ ████████████████████████████████████████████████████████████

█████████████████████████, encouraged co-conspirators to take personal visits to New York to discuss MGBs with the sizeable MGB investor base located here. The following chat occurred between ████████, an MGB trader from UBS Mexico, and ██████████████ was visiting New York:

**January 17, 2013**



75.     As explained above, Defendants actively helped market MGBs in the United States because MGB transactions with customers generated additional profits for the MGB trading desk. The resulting gain or loss on MGB trades executed with investors, including those located in the United States, were recorded on the profit and loss statements of the Defendant's MGB trading desk, which was in turn the primary metric that Defendants used to determine compensation. *See* above.

### 2. MGB Sales Staff

76.     In addition to traders, each Defendant maintains a salesforce assigned to cover certain geographical areas for discrete kinds of products. For example, a salesperson within a Latin American or Emerging Market Fixed Income division located in New York would typically work as part of a sales team assigned to serve customers in the United States interested in buying bonds from Latin American countries.

77.     The salesforce was responsible for routing customer inquiries to the appropriate trading desk. For example, when a customer located in the United States contacts a New York salesperson about purchasing MGBs, the salesperson would route the customer request to a Defendant's MGB trading desk.

78.     In the MGB market, sales employees serve as liaisons between customers in their coverage area and the bank's trading desk assigned to manage that particular product line. Sales employees interact with customers, respond to inquiries, forward information, manage relationships, and relay information, but are not authorized to determine MGB prices or to manage MGB inventory. They are also not expected to have the same level of expertise about the MGB market as the Defendants' MGB traders.

79.     Defendants' MGB traders were in constant communication with their respective salesforce in the United States to communicate trade ideas to attract more customers and price U.S.-based MGB transactions. They are organized within the same internal division of the bank. Each of the Defendants structured its MGB trading and sales operations in this manner, as explained in more detail below.

80.     Below is an example of a communication between a JPMorgan sales employee and a JPMorgan Mexico MGB trader after a customer within the sales employee's coverage area requested

an MGB quote. It is an accurate reflection of the communications between sales employees and MGB traders prior to each customer MGB trade:

**June 13, 2013**



### 3. Designated Broker-Dealer Affiliates

81.     In addition to sales staff and trading staff, Defendants also used certain designated broker-dealer entities to route customer trades. These broker-dealer affiliates did not actually employ any individuals who were responsible for marketing, trading, or pricing MGBs. Instead, Defendants use these broker-dealer affiliates as a clearinghouse in cross-border transactions, mainly for regulatory and bookkeeping reasons.

82.     The broker-dealer entity, however, plays only a passive role in the process and does not actively engage with MGB customers, determine MGB prices, or manage MGB inventory.

83.     For example, JPMorgan Chase & Co., the corporate parent of JPMorgan Securities LLC and Defendant JPMorgan Mexico, designated an affiliate, "JPMorgan Securities plc," as the broker-dealer affiliate it used to route MGB trades with customers in the U.S. market during the Class Period. Although JPMorgan Securities plc is listed as a nominal counterparty to transactions with investors in the United States, JPMorgan Securities plc has no active involvement in MGB transactions arranged with U.S. customers except to passively receive MGBs from JPMorgan Mexico, which are immediately routed to the U.S. customer's account at prices determined by MGB traders at JPMorgan Mexico. Thus, each MGB transaction listed in a customer's trading records that lists "JPMorgan Securities plc" (or another entity that served as the broker-dealer affiliate that JPMorgan Mexico used to route MGB trades) as a counterparty actually has an accompanying,

second transaction for the same amount and price with JPMorgan Mexico. This two-trade structure involves two equivalent "back-to-back" trades that are executed simultaneously.

84.     The following is an actual example using Plaintiff BRS's own trading records. As of September 2009, JPMorgan Chase & Co.'s MGB trading business used JPMorgan Securities Inc., a broker-dealer incorporated in the United States, as the designated broker-dealer entity used to route MGB trades with U.S. customers. Plaintiff BRS's transaction records reflect a purchase of 82,500 BONOS maturing on December 13, 2018 from JPMorgan Securities Inc. occurring on September 14, 2009 for 8,472,923.90 Mexican pesos. The price for this transaction was actually determined by an MGB trader employed by JPMorgan Mexico, who sent the price to a salesperson located in the United States assigned to BRS's territory, who then relayed the quoted price to BRS. The moment that BRS agreed to the price, the transaction was considered binding and the parties had entered into an enforceable contract. At this point, JPMorgan Mexico became obligated to deliver 82,500 BONOS maturing on December 13, 2018 in exchange for 8,472,923.90 Mexican pesos. BRS simultaneously took on a reciprocal obligation to deliver 8,472,923.90 Mexican pesos in exchange for 82,500 BONOS maturing on December 13, 2018.

85.     The BONOS used to complete this transaction also came from JPMorgan Mexico's MGB inventory. JPMorgan's internal business records reflect a transaction occurring just before BRS's purchase, in which JPMorgan Mexico transferred 82,500 BONOS maturing on December 13, 2018 to JPMorgan Securities Inc., for 8,472,923.90 Mexican pesos, to execute the trade with BRS. These BONOS were then immediately sold to BRS for the same amount of money. Accordingly, the actual transaction occurred between BRS in the United States and JPMorgan Mexico, using JPMorgan Mexico's MGB inventory, at prices determined by an MGB trader employed at JPMorgan Mexico's MGB trading desk. This example involves entities affiliated with Defendant JPMorgan

22

Mexico, but it reflects the structure of each of each of the Defendants' MGB trading and sales business during the Class Period.

86.     At the conclusion of the trade, the resulting gain or loss from the transaction is recorded in the profit and loss records of the Defendant's MGB trading desk. In the example above, if JPMorgan Mexico purchased the 82,500 BONOS maturing on December 13, 2018 for less than 8,472,923.90 Mexican pesos, then the MGB trading desk at JPMorgan Mexico recognized a gain from the transaction in its profit and loss records.

87.     Because broker-dealer entities do not have an active role in arranging, pricing, or sourcing MGB transactions and serve purely an accounting function, they do not collect a fee or markup for routing MGBs to and from customers.[11] Rather, MGB prices are determined solely by traders located at the Defendant's MGB trading desk in Mexico.

### 4.  MGB Investors

88.     MGB investors include hedge funds, pension funds, insurance companies, and (to a lesser extent) individuals. They purchase MGBs from one of the Defendants and then collect periodic interest. They also receive the face value of the instrument if they hold the MGB until maturity.

89.     MGB investors also sell MGBs before maturity. They may sell MGBs before maturity for a number of reasons, such as to rebalance their investment portfolio (*i.e.* to gain exposure to longer term or shorter term instruments, or to free up assets to invest in other products), to book a profit (when the MGBs have increased in value since the time of purchase), or to free up funds for distributions to stakeholders.

---

[11] The sole exceptions are transactions brokered by BBVA Securities Inc., which it sometimes executes as agent for BBVA-Bancomer in exchange for a mark-up it collects from BBVA-Bancomer. BBVA Securities Inc. wrote in its year-end statement of Financial Condition for 2017 that it "acts as agent on behalf of BBVA [S.A.] and [BBVA-] Bancomer in fixed income securities transactions. Fees earned related to this agreement are calculated based on the costs of the team plus a mark-up."

90.    There is no centralized exchange that investors can use to trade MGBs. Accordingly, MGB investors typically call a salesperson at a large international bank with an active presence in the MGB market when the investor wishes to trade MGBs, and rely on their dealer to arrange MGB trades at a competitive price.

## III.    JURISDICTION AND VENUE

91.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a). This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy, and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

92.    Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 26, and 28 U.S.C. § 1391. One or more Defendants resided, transacted business, was found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

93.    Defendants transacted MGBs at artificial prices in a continuous and uninterrupted flow of commerce throughout the United States and with counterparties located in the United States. HSBC Mexico, Citibanamex, Bank of America Mexico, JPMorgan Mexico, Barclays Mexico, Santander Mexico, BBVA-Bancomer, Deutsche Bank Mexico, and UBS Mexico, acting on their own or jointly with their corporate affiliates organized within the same respective bank-wide fixed income division, transacted MGBs directly with investors in the United States, including Plaintiffs, throughout the Class Period. *See* Part A and C, below.

24

94.     Defendants' conspiracy to set, fix, and maintain artificial MGB prices and impose trade restraints was implemented in the United States. Each Defendant and its U.S.-based subsidiaries and/or broker-dealer affiliates acted in furtherance of and enforced Defendants' price-fixing conspiracy in the United States by, among other things: (a) marketing price-fixed MGBs to U.S. investors; (b) pricing and distributing MGBs purchased during government-run auctions at artificially higher prices in the United States; (c) quoting fixed, agreed upon bid and ask prices for MGBs to investors in the United States; and (d) collecting unlawfully obtained overcharges from customer accounts located in the United States. These actions restrained trade and interstate commerce by distorting and imposing supra-competitive prices on investors located throughout the United States, including Plaintiffs and the Class.

95.     Defendants utilized U.S. offices and licensed bank branches in this District to exploit the U.S. market for MGBs, for example, by marketing and selling price-fixed MGBs to consumers in this District. As alleged in this Complaint, Defendants relied upon their corporate affiliates within the same bank-wide fixed-income divisions to help develop a customer base to engage in MGB transactions at artificial prices within the United States. In fact, Defendants were the entities responsible for pricing and sourcing MGBs for all customer MGB trades executed with their respective banks. Accordingly, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and a substantial portion of the affected interstate trade and commence described herein was carried out in this District.

96.     Defendants' corporate parents Banco Santander, S.A., JPMorgan Chase & Co., HSBC Holdings plc, Barclays PLC, Citigroup, and Bank of America Corporation registered their New York branch or representative or agency offices with the New York State Department of Financial Services ("NYSDFS"), acquiring licenses to do business in this state under New York

Banking Law § 200-b. Defendants relied on employees stationed at these New York offices to arrange price-fixed MGB transactions with investors in the United States.

97.     Bank of America Corporation, Deutsche Bank AG, Citigroup Inc., JPMorgan Chase & Co., and Barclays PLC are members of the Federal Reserve Board ("FRB") of Governors' Large Institution Supervision Coordinating Committee, which is designed to coordinate supervision of the largest, most systematically important financial institutions in the United States.

**A. Each Defendant Purposefully Availed Itself of the United States Market for MGBs.**

98.     Throughout the Class Period, each Defendant exploited the U.S. market for MGBs. Defendants marketed MGBs to U.S. investors by promoting attractive features of these financial products, including their investment-grade credit rating, the relative ease of trading, Mexico's close ties with the U.S. economy, yields significantly higher than those offered by comparable U.S. treasury securities, and their expertise in and access to the MGB market through their participation in Banxico's exclusive Market Maker program. At the same time, each Defendant failed to disclose to these investors that the same MGB traders who made pricing decisions, sourced inventory, and provided trade recommendations were engaged in a conspiracy that caused investors to pay higher prices when buying MGBs and receive less money when selling MGBs than they would have absent Defendants' conspiracy.

99.     Defendants' exploitation of the United States market enabled them to trade hundreds of billions of dollars in MGBs with investors located here, resulting in millions of dollars in excess profits that they could not have collected in the absence of their conspiracy.

100.     Defendants' efforts to develop the U.S. MGB market caused the United States to become the leading export market for MGBs in the world by a wide margin.

101.     According to data compiled by Banxico in 2014, investors outside of Mexico held a majority of the total amount of CETES (a short term zero-coupon MGB) and BONOS (a longer

term fixed-rate coupon MGB) outstanding, with a share of 62% and 56% of all outstanding CETES and BONOS, respectively.

102.    The following table uses data taken from the U.S. Department of the Treasury to show the evolution over the Class Period of Mexican debt securities held by U.S. investors, broken down into short-term debt securities (*i.e.* CETES) and long-term debt securities (*i.e.* BONOS and UDIBONOS):

| MGB Holdings of U.S. Residents in (Thousands of Dollars) | | |
|---|---|---|
| | Short-Term | Long-Term |
| 2006 | 18,000 | 23,812,000 |
| 2007 | 432,000 | 23,911,000 |
| 2008 | 211,000 | 18,950,000 |
| 2009 | 38,000 | 22,555,000 |
| 2010 | 160,000 | 32,081,000 |
| 2011 | 3,586,000 | 45,485,000 |
| 2012 | 8,170,000 | 72,084,000 |
| 2013 | 9,275,000 | 73,534,000 |
| 2014 | 6,556,000 | 92,303,000 |
| 2015 | 3,689,000 | 87,440,000 |
| 2016 | 1,792,000 | 90,111,000 |

103.    By the end of the Class Period, investors outside of Mexico, including U.S. investors, held $119 billion worth of MGBs. By June 2016, MGB holdings by investors outside of Mexico (including tens of billions of dollars' worth held by U.S. investors) totaled 58.5% of all outstanding BONOS.

104.    Unlike other financial products, such as derivatives,[12] there is a finite supply of MGBs. Also unlike derivatives, there is a single source of MGB supply—the Mexican government. The Mexican government only allows approved dealers in its Market Maker program to consistently

---

[12] A derivative is a financial instrument traded between two or more parties, the value of which is derived from an underlying asset or benchmark.

access new MGB supply via programs like the Market Maker option program[13] and the syndicated

auction program. These characteristics of MGBs make them similar to physical products that must

be held in inventory and delivered to customers in order to execute a sale. Accordingly, the

Defendants needed to, and did, transfer MGB supply into the forum to execute MGB transactions

with investors located in this District and in the United States.

105.    Because each of the Defendants operated a large MGB trading business with a

substantial portion of its customer base in the U.S. market, they had extensive contacts with the

United States. The examples below form an illustrative, though non-exhaustive list of facts

demonstrating how each Defendant formed purposeful contacts with this District and the United

States.

**B.  Santander Mexico Purposefully Availed Itself of the United States MGB Market.**

106.    Santander Mexico is a part of Santander Group's Global Fixed Income Division,

which provides for the origination, structuring, distribution and execution of debt products,

including MGBs.[14]

107.    The United States was one of Santander Mexico's largest, if not its largest export

market for MGBs by volume throughout the Class Period. It exported billions of dollars' worth of

MGBs into the United States market throughout the Class Period.

108.    The traders stationed at Santander Mexico's MGB trading desk, including ███████

████████████████████████████████████████████████████████████ , were

responsible for determining prices quoted to customers located in the United States for MGB

---

[13] The Market Maker option program allows approved MGB Market Makers to acquire newly-issued MGBs at the same price set in auctions.

[14] Santander Group is the trade name that Banco Santander uses to describe itself and all of its subsidiaries in filings with regulators, including the Securities and Exchange Commission.

transactions with Santander Mexico.[15] These U.S. MGB customer trades were typically arranged by employees organized under Santander's Fixed Income Sales unit (a subunit of Santander Group's Global Fixed Income Division).

109.    In addition to quoting prices for U.S.-based customers for MGBs, Santander Mexico also distributed MGBs in the United States (when a customer purchased MGBs) or cash funds in the United States (when a customer sold MGBs) in order to facilitate MGB transactions with U.S. customers during the Class Period.

110.    Santander Mexico worked jointly with Santander Investment Securities Inc. ("SIS") and Santander Investment Bolsa, Sociedad de Valores, S.A. to conduct MGB transactions in the United States market. The process worked as follows: employees located in the United States, and specifically, SIS (headquartered in Manhattan), were responsible for assisting Santander Mexico's MGB trading desk by facilitating MGB transactions, managing customer relationships, and routing MGB prices determined by Santander Mexico's MGB traders to customers located in the United States.

111.    For example, Lei J. Huang is employed as a Sales and Trading Analyst at SIS. His responsibilities include assisting Santander Mexico fixed income traders and acting as a liaison between clients, counterparties, and Santander Mexico. Alyce Andrews, an executive director at SIS, is responsible for connecting institutional funds to investment opportunities in Latin America, such as MGBs.

112.    MGB traders at Santander Mexico provided SIS's salesforce with trade recommendations for U.S.-based customers in real-time. For example, ███████████████████ ██████████████████████████████████████ distributed MGB trade

---

[15] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

information to U.S.-based sales employees at SIS so that this information could be disseminated to U.S. customers. In turn, sales employees at SIS held out Santander Mexico's MGB traders to U.S. customers for their expertise in the MGB market, and routinely included Santander Mexico's MGB traders in sales calls with U.S. customers. The interaction between Santander Mexico, SIS, and U.S. MGB investors that takes place during the MGB trading day (*i.e.* 8:00 A.M. Eastern and 5:00 P.M. Eastern) is illustrated below in Figure S1:

Figure S1 – Santander CIB's U.S. MGB Marketing Process



113.     Traders at Santander Mexico also determined pricing each time a sales employee at SIS arranged an MGB transaction with a U.S.-based customer.

114.     These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by SIS (or vice-versa, when the sales employee would initiate an interaction with the U.S. customer), located in New York. The sales associate would then contact a trader at Santander Mexico, ██████████████████████, to ask for a price to quote the customer for the contemplated MGB transaction.

115.     Next, the trader at Santander Mexico—fully aware that the trader was speaking with a colleague working for Santander's salesforce from its New York office and was pricing a customer

trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that Santander Mexico sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

116.     The salesperson at SIS would relay the price quote to the customer. If the customer agreed to the price, then the MGB transaction was binding and the parties (the U.S. investor and Santander Mexico) were now obligated to exchange cash and MGBs at the quoted price. The salesperson then informed the MGB trader at Santander Mexico, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

117.     The trader at Santander Mexico then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction.

118.     During the Class Period, Santander Mexico used an affiliate named "Santander Investment Bolsa, Sociedad de Valores" as the designated broker-dealer affiliate used to route MGBs and cash between Santander Mexico and U.S. MGB customers. Santander Investment Bolsa, Sociedad de Valores had no active role in these transactions, other than to serve as a passive "purchaser" of MGBs that immediately "sold" the same amount of MGBs for the same price to the MGB customer (in the case of a sale to a customer) or vice-versa (in the case of a purchase from a customer).

119.     When selling MGBs to the customer, Santander Mexico sent the appropriate amount of MGBs to Santander Investment Bolsa, Sociedad de Valores for use in the customer transaction, while simultaneously recording an immediate "back-to-back" transaction to send the MGBs from

Santander Investment Bolsa, Sociedad de Valores to the customer. The same process occurred in reverse in instances where Santander Mexico purchased MGBs from the U.S. customer.

120.     Santander Mexico also received the proceeds from the sale, and incorporated the gain or loss arising from the transaction with the U.S. customer in its profit and loss records used to measure the performance of its MGB trading desk.

121.     Thus, MGB transactions arranged by SIS or nominally involving Santander Investment Bolsa, Sociedad de Valores with customers in the U.S. market actually occurred between Santander Mexico and the U.S. customer, even though SIS or Santander Investment Bolsa, Sociedad de Valores is often listed as the nominal counterparty to the customer transaction. This entire process occurs electronically and was repeated at least thousands of times throughout the Class Period (*i.e.* each time an investor in the United States executed an MGB transaction with a Santander Group entity).

122.     The process that Santander Mexico used to execute MGB transactions with customers in the United States is illustrated in Figure S2, below:

Figure S2 – Santander Mexico's MGB Trade Process



123.     Using the process described above, Santander Mexico repeatedly over the course of the Class Period distributed MGBs, MGB pricing quotes, and MGB-related information into the U.S. market to engage in domestic MGB transactions with U.S. investors, and then recorded the proceeds as profit or loss. As alleged in this Complaint, these MGB transactions occurred at artificial, fixed prices as a result of Defendants' conspiracy.

124.     For example, on August 3, 2011, a trader employed by Santander Mexico and stationed in Santander Mexico's MGB desk priced a transaction in which Plaintiff BRS purchased 3,400,000 in face value (MXN) of BONOS maturing on November 18, 2038 for $321,240.14. After determining the price for this transaction, the trader from Santander Mexico transmitted the price quote to a salesperson based in SIS's New York headquarters so that the quote could be conveyed to Plaintiff BRS. Next, the trader at Santander Mexico recorded a transaction transferring the BONOS to Santander Investment Bolsa, Sociedad de Valores, and an immediate "back-to-back" transaction for the same amount of BONOS at the same price to BRS. Santander Mexico collected the proceeds from the transaction and booked the resulting gain or loss in its profit and loss records.

**C. BBVA-Bancomer Purposefully Availed Itself of the United States MGB Market.**

125.     Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA S.A."), the corporate parent of Defendant BBVA-Bancomer, is an international financial group with its headquarters in Bilbao, Spain.

126.     BBVA S.A. focuses its business in five geographical areas: Spain, Mexico, South America, the United States and Eurasia. It also maintains a "global" business unit that includes employees operating under various affiliates domiciled in geographic regions that are important to BBVA S.A.'s business. BBVA S.A. refers to this global business as Corporate & Investment Banking ("BBVA CIB").

127.     BBVA CIB is an internal BBVA S.A. business line that caters to institutional investors and other large clients that do business or invest in multiple geographic markets. On its website, BBVA S.A. highlights the global, multi-entity nature of its BBVA CIB business line, writing "As part of a multinational banking group, we offer unparalleled coverage and products for CIB and Commercial clients," and "with over 3,250 employees in 24 countries, we offer a wide range of advisory services and solutions bolstered by BBVA's[16] global platform and expertise."

128.     BBVA S.A. also highlights that various entities within BBVA CIB help connect U.S. investors to other markets, through BBVA S.A.'s network of local market and product experts. For example, the website contains the following quote from Michael Adler, Head of BBVA CIB for the United States: "Our fantastic team of U.S. bankers and product specialists work closely with our well-established global teams to provide unparalleled service for companies throughout the world. It is a powerful combination."

129.     One of BBVA CIB's "well-established global teams" is the MGB trading desk operated by Defendant BBVA-Bancomer. The employees at this trading desk are considered product specialists with respect to MGBs, and BBVA CIB's sales employees in the United States work to connect MGB customers in the United States to BBVA-Bancomer's MGB trading desk.

130.     The United States was one of BBVA-Bancomer's largest, if not its largest, MGB export market by volume during the Class Period.

131.     BBVA CIB's U.S. MGB sales business works as follows. A Latin American bond salesforce, made up of employees of BBVA Securities Inc. ("BSI"), is based in Manhattan. This 17-person "institutional investor sales team" is assigned to promote and market MGBs to customers in the United States market. This team is led by Tim Goodell, who promotes MGBs through various

---

[16] The website does not distinguish between entities that form BBVA CIB, instead referring to this business under the collective term "BBVA."

channels including at the Twitter handle "@BuyMyBonds." Mr. Goodell's team focuses especially on promoting government bonds issued by Mexico and Brazil to U.S. investors. Mr. Goodell and his salesforce highlight BBVA CIB's capacity and expertise in the MGB market (through BBVA-Bancomer), boasting in marketing publications that "BBVA's local banks have held the #1 market share in local currency government debt in Mexico and Peru.".

132.     BSI's institutional investor sales team leverages BBVA-Bancomer's leading position as one of the largest MGB Market Makers by trading large volumes of MGBs with customers located in the United States. For example, a member of BSI's institutional investor sales team wrote on an online professional profile that individual sales personnel on the team execute "up to $15 million per trade in the sovereign bonds of Latin America, mostly Brazil and Mexico."

133.     In promotional materials, Alvaro Vaqueiro, who has dual roles as Head of Mexico for BBVA CIB and Managing Director of Rates[17] and FX for BBVA-Bancomer, emphasized BBVA CIB's "integrated structure" that enabled BBVA-Bancomer to "increase its cross-border capabilities."

134.     BBVA-Bancomer actively assists BSI's salesforce with marketing and promoting MGBs to customers in the United States MGB market. For example, BBVA-Bancomer publishes and distributes a "Handbook of Mexican Financial Instruments" in English to customers in the United States. The Handbook contains a dedicated twenty-page section describing the MGB auction process, the characteristics of the MGBs described in this Complaint, and the contact information for personnel from whom U.S. investors interested in purchasing MGBs can learn further information.

---

[17] BBVA-Bancomer's Rates business includes its MGB trading desk.

135.    BBVA-Bancomer's MGB traders, ██████████████████████,[18] also regularly contribute information about BBVA-Bancomer's MGB inventory, conditions in the MGB market, and trade recommendations to BSI's New York-based salesforce throughout each trading day. For example, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████ These clients included investors located in the United States, and the sales teams that ████████ furnished this information to included BSI's salesforce located in New York City.

136.    The interaction between BBVA-Bancomer, BSI's salesforce, and MGB investors in the U.S. market that takes place during the MGB trading day is illustrated below in Figure B1:

### Figure B1 – BBVA CIB's U.S. MGB Marketing Process



137.    Traders at BBVA-Bancomer determined pricing each time a sales employee at BSI arranged an MGB transaction with a U.S.-based customer.

---

[18] ████████████████████████████████████████████████████████████ ████████████

138.     These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by BSI (or vice-versa, when the sales employee would initiate an interaction with the U.S. customer), located in New York. The sales associate would then contact a trader at BBVA-Bancomer, such as ███████████████, to ask for a price to quote the customer for the contemplated MGB transaction.

139.     Next, the trader at BBVA-Bancomer—fully aware that the trader was speaking with a colleague working for BSI's salesforce from its Manhattan office and was pricing a customer trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that BBVA-Bancomer sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

140.     The salesperson located at BSI's New York office would relay the price quote to the customer. If the customer agreed to the price, then the MGB transaction was binding and the parties (the U.S. investor and BBVA-Bancomer) were now obligated to exchange cash in for MGBs at the quoted price.

141.     The salesperson then informed the MGB trader at BBVA-Bancomer, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

142.     The trader at BBVA-Bancomer then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction.

143.     When selling MGBs to the customer, BBVA-Bancomer sent the appropriate amount of MGBs to the U.S. customer's account for use in the customer transaction. The same process occurred in reverse in instances where BBVA-Bancomer purchased MGBs from the U.S. customer.

144.    BBVA-Bancomer also received the proceeds from the sale, and incorporated the gain or loss arising from the transaction with the U.S. customer in its profit and loss records used to measure the performance of its MGB trading desk.

145.    This entire trade process occurs electronically, and was repeated at least thousands of times throughout the Class Period (*i.e.* virtually every time an investor in the United States executed an MGB transaction with BBVA-Bancomer).

146.    The process that BBVA-Bancomer used to execute MGB transactions with customers in the United States is illustrated in Figure B2, below:

Figure B2 – BBVA-Bancomer's MGB Trade Process



147.    The process illustrated in Figure B2 above applied to Plaintiffs' MGB trades directly with BBVA-Bancomer. For example, on June 17, 2015, BBVA-Bancomer sold 975,600 BONOS maturing on December 5, 2024 for $80,464.67 to Plaintiff SEPTA.

148.    On January 23, 2015, BBVA-Bancomer sold 3,000,000 BONOS maturing on June 14, 2018 for $207,740.82 to Plaintiff SEPTA. MGB traders at BBVA-Bancomer determined the price charged to SEPTA on this transaction and sent the BONOS used to complete the transaction

into the United States for depositing into SEPTA's account. BBVA-Bancomer booked the proceeds of this transaction in its profit and loss records for its MGB trading book.

149. On February 6, 2015, BBVA-Bancomer purchased 1,200,000 BONOS maturing on December 7, 2023 for $94,704.92 from Plaintiff SEPTA. MGB traders at BBVA-Bancomer determined the price paid to SEPTA on this transaction, and sent the cash used to complete the transaction into the United States for depositing into SEPTA's account. BBVA-Bancomer booked the proceeds of this transaction in its profit and loss records for its MGB trading book. BBVA-Bancomer also executed MGB trades with customers in the U.S. MGB market by executing "back-to-back" transactions, in which it sent MGBs (for sales to customers) or cash (for purchased from customers) to BSI, and booked a second trade at the same price to complete the transaction with the customer. On these transactions, MGB traders at BBVA-Bancomer determined the prices charged to customers, and booked the proceeds of the transactions in its profit and loss records. BSI collected a "markup" for arranging these transactions from BBVA-Bancomer, though the price charged to the customer was determined by MGB traders at BBVA-Bancomer.[19] The process that BBVA-Bancomer used to execute these transactions is illustrated in Figure B3, below:

---

[19] This arrangement was unique among Defendants. When the other Defendants executed MGB trades with customers in the U.S. market via similar "back-to-back" transactions with broker-dealer affiliates, there was no markup or agency fee collected.



Figure B3 – BBVA-Bancomer's "Back-to-Back" MGB Trade Process

150.    BBVA-Bancomer executed MGB transactions in the United States with Plaintiffs following the process illustrated above. For example, on September 11, 2013, a trader employed by BBVA-Bancomer and stationed at BBVA-Bancomer's MGB desk priced a transaction in which Plaintiff IBEW 103 purchased 8,000,000 BONOS maturing on December 19, 2013. After determining the price for this transaction, the trader from BBVA-Bancomer transmitted the price quote to a salesperson employed by BSI so that the quote could be conveyed to IBEW 103. Next, the trader at BBVA-Bancomer recorded a transaction transferring the BONOS to BSI, and an immediate "back-to-back" transaction for the same amount of BONOS to IBEW 103, while collecting a markup from BBVA-Bancomer. BBVA-Bancomer collected the proceeds from the transaction and booked the resulting gain or loss in its profit and loss records.

### D.  Citibanamex Purposefully Availed Itself of the United States MGB Market.

151.    During the Class Period, Citibanamex was a part of Citigroup's Institutional Clients Group. Within the Institutional Clients Group, the Fixed Income Markets business provided for the structuring and distribution of fixed income securities, including MGBs.

152.    The United States was one of Citibanamex's largest, if not its largest, export market for MGBs by volume throughout the Class Period. It exported billions of dollars' worth of MGBs into the United States market throughout the Class Period.

153.    The traders stationed at Citibanamex's MGB trading desk, ██████████████ ████████████████████████████████ were responsible for determining prices quoted to customers located in the United States for MGB transactions with Citibanamex.[20] These U.S. MGB customer trades were typically arranged by employees organized under Citigroup's Rates Sales and Trading unit.

154.    ████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████

155.    In addition to quoting prices for U.S.-based customers for MGBs, Citibanamex also distributed MGBs in the United States (when a customer purchased MGBs) or cash funds in the United States (when a customer sold MGBs) in order to execute MGB transactions with U.S. customers during the Class Period. *See* Part II.C., above.

156.    Citibanamex worked transacted MGBs in the United States market as follows: employees located in the United States, and specifically broker-dealer Citigroup Global Markets Inc. (headquartered in Manhattan), were responsible for assisting Citibanamex's MGB trading desk by

---

[20] ████████████████████████████████████████████████ ██████████████████████████████████████████

facilitating MGB transactions, managing customer relationships, and routing MGB prices

determined by Citibanamex's MGB traders to customers located in the United States.

157.    For example, during the Class Period, Jimmy Brice and Jaclyn Glazer were employed

in New York as Directors for Rates Sales and Trading. Their responsibilities included assisting

Citibanamex Rates traders, providing clients with MGB trade ideas, and acting as a liaison between

clients, counterparties, and Citibanamex.

158.    MGB traders at Citibanamex provided Citigroup Global Markets Inc.'s salesforce

with trade recommendations for U.S.-based customers in real-time. For example, employees such as

trader ███████████ distributed MGB trade information to U.S.-based sales employees at

Citigroup Global Markets Inc. so that this information could be disseminated to U.S. customers. In

turn, sales employees at Citigroup Global Markets Inc. held out Citibanamex's MGB traders to U.S.

customers for their expertise in the MGB market, and routinely included Citibanamex's MGB

traders in sales calls with U.S. customers. The interaction between Citibanamex, Citigroup Global

Markets Inc., and U.S. MGB investors that takes place during the MGB trading day (*i.e.* 8:00 A.M.

Eastern and 5:00 P.M. Eastern) is illustrated below in Figure C1:

Figure C1 – Citigroup Institutional Clients Group's U.S. MGB Marketing Process



159.    Traders at Citibanamex also determined pricing each time a sales employee at Citigroup Global Markets Inc. arranged an MGB transaction with a U.S.-based customer.

160.    These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by Citigroup Global Markets Inc. (or vice-versa, when the sales employee would initiate an interaction with the U.S. customer), located in New York. The sales associate would then contact a trader at Citibanamex, such as ███████, to ask for a price to quote the customer for the contemplated MGB transaction.

161.    Next, the trader at Citibanamex—fully aware that the trader was speaking with a colleague working for Citigroup Global Markets Inc.'s salesforce from its New York office and was pricing a customer trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and then conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that Citibanamex sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

162.    The salesperson located at Citigroup Global Markets Inc. would relay the price quote to the customer. If the customer agreed to the price, then the MGB transaction was binding and the parties (the U.S. investor and Citibanamex) were now obligated to exchange cash for MGBs at the quoted price. The salesperson then informed the MGB trader at Citibanamex, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

163.    The trader at Citibanamex then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction.

164.    Citibanamex also received the proceeds from the sale, and incorporated the gain or loss arising from the transaction with the U.S. customer in its profit and loss records used to measure the performance of its MGB trading desk.

165.    This entire process occurs electronically, and was repeated at least thousands of times throughout the Class Period (*i.e.* virtually every time an investor in the United States executed an MGB transaction with Citigroup Global Markets Inc.).

166.    The process that Citibanamex used to execute MGB transactions with customers in the United States is illustrated in Figure C2, below:

Figure C2 – Citibanamex's MGB Trade Process



167.    The process illustrated in Figure C2 above applied to Plaintiffs' MGB trades directly with Citibanamex. For example, on December 7, 2015, Citibanamex sold CETES to Plaintiff IBEW Local 103.

168.    Citibanamex also executed MGB trades with customers in the U.S. MGB market by executing "back-to-back" transactions, in which it sent MGBs (for sales to customers) or cash (for purchased from customers) to Citigroup Global Markets Inc. and booked a second trade at the same

price to complete the transaction with the customer. On these transactions, MGB traders at

Citibanamex determined the prices charged to customers and then booked the proceeds of the

transactions in its profit and loss records. The process that Citibanamex used to execute these

transactions is illustrated in Figure C3, below:



Figure C3 – Citigroup Institutional Clients Group's
"Back-to-Back" MGB Trade Process

169.    Using the process described above, Citibanamex repeatedly over the course of the

Class Period distributed MGBs, MGB pricing quotes, and MGB-related information into the U.S.

market to engage in domestic MGB transactions with U.S. investors, then recorded the proceeds as

profit or loss. As alleged in this Complaint, these MGB transactions occurred at artificial, fixed

prices as a result of Defendants' conspiracy.

170.    For example, on August 16, 2006, a trader employed by Citibanamex and stationed

on Citibanamex's MGB desk priced a transaction in which Plaintiff BRS purchased 7,790,000 in face

value (MXN) of BONOS, maturing on December 20, 2012, for $763,868.20, routed through

Citigroup Global Markets Inc.

171.    In each of these transactions, an MGB trader at Citibanamex transmitted a price quote to a salesperson based in New York so that the quote could be conveyed to the counterparty Plaintiff. Citibanamex collected the proceeds from each transaction and booked the resulting gain or loss in its profit and loss records.

### E. Deutsche Bank Mexico Purposefully Availed Itself of the United States MGB Market.

172.    During the Class Period, Deutsche Bank Mexico was a part of Deutsche Bank AG's Global Markets business division. Within Global Markets, the Rates business provided for the structuring and distribution of fixed income securities, including MGBs. In 2016, pursuant to a business reorganization plan, Global Markets was subsumed into Corporate & Investment Banking ("CIB").

173.    The United States was one of Deutsche Bank Mexico's largest, if not its largest, export market for MGBs by volume throughout the Class Period. It exported billions of dollars' worth of MGBs into the United States market throughout the Class Period.

174.    The traders stationed at Deutsche Bank Mexico's MGB trading desk, including trader ███████████████████████████████████████ were responsible for determining prices quoted to customers located in the United States for MGB transactions.[21] These U.S. MGB customer trades were typically arranged by employees organized under Deutsche Bank AG's Rates Sales unit.

175.    In addition to quoting prices for U.S.-based customers for MGBs, Deutsche Bank Mexico also distributed MGBs in the United States (when a customer purchased MGBs) or cash

---

[21] ████████████████████████████████████████████████████████
████

funds in the United States (when a customer sold MGBs) in order to facilitate MGB transactions with U.S. customers during the Class Period. *See* Part II.C., above.

176.    Deutsche Bank Mexico worked jointly with its affiliates to conduct MGB transactions in the United States market. The process worked as follows: employees located in the United States, and specifically broker-dealer Deutsche Bank Securities Inc. ("DBSI," headquartered in Manhattan) and Deutsche Bank AG's New York Branch (located at the same address in Manhattan), were responsible for assisting Deutsche Bank Mexico's MGB trading desk by facilitating MGB transactions, managing customer relationships, and routing MGB prices determined by Deutsche Bank Mexico's MGB traders to customers located in the United States.

177.    For example, during the Class Period, Jenny Xiao was employed as a Vice President of Institutional Rates Sales at DBSI. Her responsibilities included assisting Deutsche Bank Mexico Rates traders by forwarding MGB trade ideas and acting as a liaison between U.S. MGB clients and Deutsche Bank Mexico.

178.    MGB traders at Deutsche Bank Mexico provided DBSI's and Deutsche Bank AG's salesforce with trade recommendations for U.S.-based customers in real-time. For example, employees such as trader ███████ distributed MGB trade information to U.S.-based sales employees at DBSI and Deutsche Bank's New York Branch so that this information could be disseminated to U.S. customers. In turn, sales employees at DBSI and Deutsche Bank's New York Branch held out Deutsche Bank Mexico's MGB traders to U.S. customers for their expertise in the MGB market, and routinely included Deutsche Bank Mexico's MGB traders in sales calls with U.S. customers. The interaction between Deutsche Bank Mexico, DBSI, and U.S. MGB investors that

takes place during the MGB trading day (*i.e.* 8:00 A.M. Eastern and 5:00 P.M. Eastern) is illustrated below in Figure D1:

Figure D1 – Deutsche Bank Rates' U.S. MGB Marketing Process



179.     Traders at Deutsche Bank Mexico also determined pricing each time a sales employee at DBSI or Deutsche Bank arranged an MGB transaction with a U.S.-based customer.

180.     These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by DBSI or Deutsche Bank's New York Branch (or vice-versa, when the sales employee would initiate an interaction with the U.S. customer). The salesperson would then contact a trader at Deutsche Bank Mexico to ask for a price to quote the customer for the contemplated MGB transaction.

181.     Next, the trader at Deutsche Bank Mexico—fully aware that the trader was speaking with a colleague working for Deutsche Bank AG's salesforce from its New York office and was pricing a customer trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that Deutsche Bank Mexico sent into the United States were

artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

182.    The salesperson located at DBSI or Deutsche Bank's New York Branch would relay the price quote to the customer. If the customer agreed to the price, then the MGB transaction was binding and the parties (the U.S. investor and Deutsche Bank Mexico) were now obligated to exchange cash for MGBs at the quoted price. The salesperson then informed the MGB trader at Deutsche Bank Mexico, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

183.    The trader at Deutsche Bank Mexico then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction.

184.    Deutsche Bank Mexico also received the proceeds from the sale, and incorporated the gain or loss arising from the transaction with the U.S. customer in its profit and loss records used to measure the performance of its MGB trading desk.

185.    Thus, MGB transactions arranged by DBSI or Deutsche Bank AG's New York Branch with customers in the U.S. market actually occurred between Deutsche Bank Mexico and the U.S. customer, even though DBSI or Deutsche Bank's New York Branch is often listed as the nominal counterparty to the customer transaction. This entire process occurs electronically and was repeated at least thousands of times throughout the Class Period.

186.     The process that Deutsche Bank Mexico used to execute MGB transactions with customers in the United States is illustrated in Figure D2, below:

Figure D2 – Deutsche Bank's "Back-to-Back" MGB
Trade Process



* The parties are now bound to exchange cash and MGBs

187.     Using the process described above, Deutsche Bank Mexico repeatedly over the course of the Class Period distributed MGBs, MGB pricing quotes, and MGB-related information into the U.S. market to engage in domestic MGB transactions with U.S. investors, then recorded the proceeds as profit or loss. As alleged in this Complaint, these MGB transactions occurred at artificial, fixed prices as a result of Defendants' conspiracy.

188.     For example, on September 19, 2013, a trader employed by Deutsche Bank Mexico and stationed on Deutsche Bank Mexico's MGB desk priced a transaction in which Plaintiff SEPTA purchased 2,640,000 in face value (MXN) of BONOS maturing on June 9, 2022 for $221,284.80, routed through Deutsche Bank AG's New York Branch.

189.     The trader at Deutsche Bank Mexico sent the MGBs used to complete the transaction to Deutsche Bank AG's New York Branch, and booked a second "back-to-back" transaction sending these MGBs to SEPTA's account at the same price.

190.     Similarly, on October 31, 2013, a trader employed by Deutsche Bank Mexico and stationed on Deutsche Bank Mexico's MGB desk priced a transaction in which Plaintiff BRS purchased 50,000 BONOS maturing on October 2, 2023 for $50,600.00, routed through DBSI.

191.     The trader at Deutsche Bank Mexico sent the MGBs used to complete the transaction to DBSI, and booked a second "back-to-back" transaction sending these MGBs to SEPTA's account at the same price.

192.     In each of these transactions, an MGB trader at Deutsche Bank Mexico transmitted a price quote to a salesperson based in New York so that the quote could be conveyed to the counterparty Plaintiff. Deutsche Bank Mexico collected the proceeds from each transaction and booked the resulting gain or loss in its profit and loss records.

**F. HSBC Mexico Purposefully Availed Itself of the United States MGB Market.**

193.     Defendant HSBC Mexico is part of the HSBC Group's[22] Global Banking and Markets Division.[23]

194.     The United States was one of HSBC Mexico's largest, if not its largest MGB export market by volume throughout the Class Period. It exported billions of dollars' worth of MGBs into the United States market throughout the Class Period.

---

[22] HSBC Group is a trade name that HSBC Holdings plc uses to describe itself and its subsidiaries in filings with regulators and reports to shareholders.

195.    MGB traders employed by HSBC Mexico, including ███████████, worked as part of HSBC's LatAm Fixed Income Division during the Class Period.[24] These traders were responsible for determining the prices quoted to customers located in the United States on their MGB transactions arranged by sales employees also operating as part of the HSBC's LatAm Fixed Income Division and routed through corporate affiliates, including HSBC Securities (USA) Inc.

196.    In addition to determining prices for customer MGB transactions executed in the United States, HSBC Mexico also distributed MGBs into the United States (when a customer purchased MGBs) or cash into the United States (when a customer sold MGBs) to complete MGB transactions with customers throughout the Class Period.

197.    HSBC Mexico worked jointly with HSBC Securities (USA) Inc. to conduct MGB business in the United States market. The process worked as follows. Sales employees housed within HSBC's LatAm Fixed Income Division were based at HSBC Securities (USA) Inc.'s corporate headquarters in Manhattan. These sales employees were responsible for managing customer relationships, taking sales calls, and routing customer inquiries to traders stationed at HSBC Mexico's MGB trading desk. For example, Katie Bouazza, Head of Latin America, Global Banking and Markets, is based in New York and is responsible for all of HSBC's coverage and product teams for Latin American financial products. In this role, Bouazza supervises a salesforce that provides

---

[24] HSBC's LatAm Fixed Income Division is an internal business line within the HSBC's larger Global Banking and Markets Division. Both divisions are run by employees stationed at various HSBC-affiliated subsidiaries, and neither is its own legal entity. HSBC's corporate structure, which emphasizes multi-entity, division-based business lines working together to exploit key geographic markets, is intentional. For example, HSBC USA Inc. (a wholly-owned, U.S.-headquartered subsidiary of HSBC Holdings plc) discloses that HSBC Group's Global Banking and Markets Division "supports HSBC [Holdings plc's] global strategy by leveraging the HSBC Group's advantages and scale, strength in developed and emerging markets and product expertise in order to focus on delivering international products to U.S. clients and local products to international clients, with New York as the hub for the Americas business." *See* HSBC USA Inc., Form 10-k, Securities and Exchange Commission, p.5 (2017); *see also id.* at p. 6 ("With a focus on providing client connectivity between the emerging markets" *e.g.,* Mexico, "and developed markets," *e.g.,* the United States, "[HSBC Global Banking and Markets] aims to develop a comprehensive understanding of each client's financial requirements with a long-term relationship management approach.").

U.S. investors with access to Latin American bond markets, including the MGB market.[25] In a 2017 filing with the Securities and Exchange Commission ("SEC"), HSBC Bank Inc. explained that "New York [i]s the hub for [HSBC Global Banking and Markets'] Americas business, including Canada and Latin America."[26]

198.    Traders from HSBC Mexico played an active role in the sales and marketing process within the United States. Employees from HSBC Mexico often contributed research on the MGB market to include in marketing materials that HSBC Securities (USA) Inc. distributed to clients in the United States. For example, HSBC Securities (USA) Inc. and HSBC Mexico jointly wrote, published, and distributed an annual publication titled "Latin America Rates Guide" to advise customers about investing in MGBs. In each of these publications, an MGB specialist employed at HSBC Mexico provided research and trade recommendations for clients based in the United States in a dedicated section about Mexico's government debt program.

199.    Traders at HSBC Mexico also regularly provided informal trade recommendations for U.S. investors in real-time, alerting them of developments in the MGB market. For example, ███████████ regularly sent real-time updates in English about the MGB market to sales employees at HSBC Securities (USA) Inc., so that this information could be distributed to MGB customers in the U.S. market. Traders at HSBC Mexico were held out to customers as specialists in the MGB market, and regularly participated in sales calls and customer meetings to promote the MGB market with customers located in the United States.

---

[25] HSBC's website does not specify which legal entity employs Bouazza, or the Latin American bond salesforce that she leads. Rather, it simply lists her role as "Head of Global Banking, Latin America," within HSBC's Global Banking and Markets division.

[26] HSBC USA Inc., Annual Report (Form 10-K) (2017), at 5.

200.     The interaction between HSBC Mexico, HSBC Securities (USA) Inc.'s salesforce, and MGB investors in the U.S. market that takes place during the MGB trading day is illustrated below in Figure H1:

Figure H1 – HSBC Global Banking and Markets' U.S.
MGB Marketing Process



201.     Traders at HSBC Mexico also played a critical role in the trade pricing and execution process each time HSBC Securities (USA) Inc. arranged an MGB transaction with a customer in the U.S. market.

202.     These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by HSBC Securities (USA) Inc. (or vice-versa, when the sales employee would initiate a transaction with a U.S. customer), stationed at its headquarters in New York. The salesperson would then contact a trader at HSBC Mexico, such as ███████████, to ask for a price to quote the customer for the contemplated MGB transaction.

203.     Next, the trader at HSBC Mexico—fully aware that the trader was speaking with a colleague located in HSBC Securities (USA) Inc.'s New York office and was pricing a customer trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing

54

information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that HSBC Mexico sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

204.    The salesperson located at HSBC Securities (USA) Inc. would relay the price quote to the customer and, if the customer agreed to the transaction, then the MGB transaction became binding and the parties (the U.S. customer and HSBC Mexico) were now obligated to exchange cash and MGBs for the quoted price. The sales person then informed the MGB trader at HSBC Mexico, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

205.    The trader at HSBC Mexico then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction. When selling MGBs to the customer, HSBC Mexico sent the appropriate amount of MGBs into the United States to HSBC Securities (USA) Inc. for use in the customer transaction. HSBC Mexico also received the proceeds from the sale, and then incorporated the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

206.    When buying MGBs from a customer, HSBC Mexico sent money into the United States to pay for the MGBs and received the MGB inventory being sold by the customer. HSBC Mexico then incorporated the gain or loss resulting from the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

207.    Thus, MGB transactions brokered by HSBC Securities (USA), Inc. with customers in the U.S. MGB market actually occurred between HSBC Mexico and the U.S. customer, even though HSBC Securities (USA) Inc. is often listed as the nominal counterparty to the customer transaction. This entire process occurs electronically and was repeated at least thousands of times throughout the Class Period multiple times each trading day (*i.e.* each time an investor in the United States executed

55

an MGB transaction with an HSBC Group entity). The process that HSBC Mexico used to execute

MGB transactions with customers in the United States is illustrated in Figure H2, below:



Figure H2 – HSBC's "Back-to-Back" MGB Trade Process

208.     Using the process described above, HSBC Mexico repeatedly over the course of the

Class Period distributed artificial MGB pricing quotes, MGB inventory to use in price-fixed MGB

transactions, and MGB-related information into the United States. It then recorded the results of

these transactions in its profit and loss records. As alleged in this Complaint, these MGB

transactions occurred at artificial, fixed prices as a result of Defendants' conspiracy to rig the market

for MGBs.

209.     For example, on June 4, 2007, a trader employed by HSBC Mexico and stationed in

HSBC Mexico's MGB desk priced a contemplated MGB transaction with Plaintiff BRS, in which

BRS purchased 31,450,000 in face value (MXN) of BONOS maturing on December 7, 2023 for

$3,052,952.69, routed through HSBC Securities (USA) Inc.

210.     After determining the price for this transaction, the trader from HSBC Mexico

transmitted the price quote to a salesperson in New York within HSBC's LatAm Fixed Income

Division so that the quote could be conveyed to Plaintiff BRS. The salesperson conveyed the quote to BRS, and BRS agreed to the trade. At this point, the transaction became binding and BRS was required to deliver cash while HSBC Mexico was required to deliver BONOS maturing in December 2023.

211.    Next, the trader at HSBC Mexico recorded a transaction in which it transferred 31,450,00 in face value (MXN) of BONOS to HSBC Securities (USA), Inc. in New York, and simultaneously entered a "back-to-back" transaction between HSBC Securities (USA), Inc. and BRS at the same price. HSBC Mexico collected the proceeds from the transaction and recorded the resulting gain or loss in its business records.

### G.  Bank of America Mexico Purposefully Availed Itself of the United States MGB Market.

212.    Defendant Bank of America Mexico is part of Bank of America Merrill Lynch's Global Markets business segment. Global Markets handled sales, trading, and market making for government debt, including MGBs.

213.    The United States was one of Bank of America Mexico's largest, if not its largest MGB export market by volume throughout the Class Period. Bank of America Mexico exported billions of dollars' worth of MGBs into the United States market throughout the Class Period.

214.    MGB traders employed by Bank of America Mexico, including ▮▮▮▮▮▮▮▮, worked as part of Bank of America Merrill Lynch's Global Markets business during the Class Period.[27] These traders were responsible for determining the prices quoted to customers located in the United States on their MGB transactions routed through corporate affiliates, including Bank of America, N.A. f/k/a Bank of America, National Trust and Savings Association, and Merrill Lynch,

---

[27] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Pierce, Fenner & Smith Incorporated ("Merrill Lynch") f/k/a Banc of America Securities LLC, and arranged by sales personnel employed by Merrill Lynch.

215.    In addition to determining prices for customer MGB transactions executed in the United States, Bank of America Mexico also distributed MGBs into the United States (when a customer purchased MGBs) or cash into the United States (when a customer sold MGBs) to complete MGB transactions with customers throughout the Class Period.

216.    Bank of America Mexico worked jointly with Bank of America, N.A. and Merrill Lynch to conduct MGB business in the United States market. The process worked as follows. Sales employees housed within Bank of America Merrill Lynch's Global Markets business were based at Merrill Lynch's headquarters in Manhattan. These sales employees were responsible for managing customer relationships, taking sales calls, and routing customer inquiries to traders stationed at Bank of America Mexico's MGB trading desk.

217.    For example, Michele Harrington and Stephanie Traikos worked in Fixed Income sales and trading roles from Merrill Lynch's New York offices during the Class Period. Harrington and Traikos liaised between United States MGB investors, including Plaintiffs and the Class, and Bank of America Mexico's MGB traders, including ███████ .

58

218.     MGB traders at Bank of America Mexico provided Merrill Lynch's salesforce with

trade recommendations for U.S.-based customers in real-time. For example, Bank of America

Mexico employees such as ████████ distributed information about the MGB market to U.S.-

based sales employees at Merrill Lynch so that this information could be disseminated to U.S.

customers. In turn, sales employees at Merrill Lynch held out Bank of America Mexico's MGB

traders to U.S. customers for their expertise in the MGB market, and routinely included Bank of

America Mexico's MGB traders in sales calls with U.S. customers. The interaction between Bank of

America Mexico, New York-based Global Markets sales personnel, and U.S. MGB Investors that

takes place during the MGB trading day (*i.e.* 8:00 A.M. Eastern and 5:00 P.M. Eastern) is illustrated

below, in Figure A1:

Figure A1 – Bank of America Merrill Lynch U.S. MGB Marketing Process



219.     Traders at Bank of America Mexico played a critical role in the trade pricing and

execution process each time Merrill Lynch arranged an MGB transaction with a customer in the U.S.

market.

220.     These transactions worked as follows. First, an investor located in the United States

would contact a salesperson employed by Merrill Lynch (or vice-versa, when the sales employee

59

would initiate a transaction with a U.S. customer). The salesperson would then contact a trader at Bank of America Mexico, such as ██████████, to ask for a price to quote the customer for the contemplated MGB transaction.

221.    Next, the trader at Bank of America Mexico—fully aware that the trader was speaking with a colleague located in Merrill Lynch's New York office and was pricing a customer trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that Bank of America Mexico sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

222.    The salesperson located at Merrill Lynch would relay the price quote to the customer and, if the customer agreed to the transaction, then the MGB transaction became binding and the parties (the U.S. customer and Bank of America Mexico) were now obligated to exchange cash and MGBs for the quoted price. The salesperson then informed the MGB trader at Bank of America Mexico, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

223.    The trader at Bank of America Mexico then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction. When selling MGBs to the customer, Bank of America Mexico sent the appropriate amount of MGBs into the United States to Bank of America, N.A. or Merrill Lynch for use in the customer transaction. Bank of America Mexico also received the proceeds from the sale, and then incorporated the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

224.    When buying MGBs from a customer, Bank of America Mexico sent money into the United States to pay for the MGBs and received the MGB inventory being sold by the customer. Bank of America Mexico then incorporated the gain or loss resulting from the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

225.    Thus, MGB transactions routed through Bank of America, N.A. or Merrill Lynch with customers in the U.S. MGB market actually occurred between Bank of America Mexico and the U.S. customer, even though Bank of America, N.A. or Merrill Lynch (or one of their corporate predecessors) is often listed as the nominal counterparty to the customer transaction. This entire process occurs electronically, and was repeated at least thousands of times throughout the Class Period multiple times each trading day (*i.e.* virtually every time an investor in the United States executed an MGB transaction with a Bank of America Merrill Lynch entity).

226.    The process that Bank of America Mexico used to execute MGB transactions with customers in the United States is illustrated in Figure A2, below:



Figure A2 – Bank of America Merrill Lynch's "Back-to-Back" MGB Trade Process

227.    Using the process described above, Bank of America Mexico repeatedly over the course of the Class Period distributed artificial MGB pricing quotes, MGB inventory to use in price-fixed MGB transactions, and MGB-related information into the United States. It then recorded the results of these transactions in its profit and loss records (*i.e.* "PnL"). As alleged in this Complaint, these MGB transactions occurred at artificial, fixed prices as a result of Defendants' conspiracy to rig the market for MGBs.

228.    For example, on February 16, 2011, a trader employed by Bank of America Mexico and stationed on Bank of America Mexico's MGB desk priced an MGB transaction with Plaintiff BRS, in which BRS purchased 11,000,000 in face value (MXN) of BONOs maturing December 13, 2018 for $979,480.68, routed through Merrill Lynch.

229.    After determining the price for this transaction, the trader from Bank of America Mexico transmitted the price quote to a salesperson in New York within Merrill Lynch's Global Markets business so that the quote could be conveyed to Plaintiff BRS. The salesperson conveyed the quote to BRS, and BRS agreed to the trade. At this point, the transaction became binding and BRS was required to deliver cash while Bank of America Mexico was required to deliver BONOS.

230.    Next, the trader at Bank of America Mexico recorded a transaction in which it transferred 11,000,000 MXN in face value (MXN) of BONOS to Merrill Lynch in New York, and simultaneously entered a "back-to-back" transaction between Merrill Lynch and BRS at the same price. Bank of America Mexico collected the proceeds from the transaction and recorded the resulting gain or loss in its business records.

### H. JPMorgan Mexico Purposefully Availed Itself of the United States MGB Market.

231.    Defendant JPMorgan Mexico is part of JPMorgan Chase & Co.'s Corporate & Investment Bank ("CIB") business segment. Within CIB, the Fixed Income Markets business handled sales, trading, and market making for government debt, including MGBs.

232.    The United States was one of JPMorgan Mexico's largest, if not its largest MGB export market by volume throughout the Class Period. JPMorgan Mexico exported billions of dollars' worth of MGBs into the United States market throughout the Class Period.

233.    MGB traders employed by JPMorgan Mexico, including ▇▇▇▇▇▇▇▇, worked as part of JPMorgan Chase & Co.'s Fixed Income Markets business during the Class Period.[28] These traders were responsible for determining the prices quoted to customers located in the United States on their MGB transactions routed through corporate affiliates, including JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities Inc.

234.    In addition to determining prices for customer MGB transactions executed in the United States, JPMorgan Mexico also distributed MGBs into the United States (when a customer purchased MGBs) or cash into the United States (when a customer sold MGBs) to complete MGB transactions with customers throughout the Class Period.

235.    JPMorgan Mexico worked jointly with JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC to conduct MGB business in the United States market. The process worked as follows. Sales employees housed within JPMorgan Chase & Co.'s Fixed Income Markets business were based at JPMorgan Chase Bank, N.A.'s and J.P. Morgan Securities LLC's offices in New York. These sales employees were responsible for managing customer relationships, taking sales calls, and routing customer inquiries to traders stationed at JPMorgan Mexico's MGB trading desk.

236.    For example, Executive Directors Jorge Rivera and Karl Yeh worked in Fixed Income sales roles from JPMorgan Chase & Co.'s New York offices during the Class Period. Rivera and Yeh liaised between United States MGB investors, including Plaintiffs and the Class, and JPMorgan Mexico's MGB traders, including ▇▇▇▇▇▇▇.

---

[28] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

237.    MGB traders at JPMorgan Mexico provided JPMorgan Chase Bank, N.A.'s and J.P. Morgan Securities LLC's salesforce with trade recommendations for U.S.-based customers in real-time. For example, employees such as trader ██████████ distributed MGB trade information to U.S.-based sales employees at JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC so that this information could be disseminated to U.S. customers. In turn, sales employees at JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC held out JPMorgan Mexico's MGB traders to U.S. customers for their expertise in the MGB market, and routinely included JPMorgan Mexico's MGB traders in sales calls with U.S. customers. The interaction between JPMorgan Mexico, New York-based Fixed Income Markets sales personnel, and U.S. MGB Investors that takes place during the MGB trading day (*i.e.* 8:00 A.M. Eastern and 5:00 P.M. Eastern) is illustrated below, in Figure J1:

Figure J1 – JPMorgan Chase & Co.'s U.S. MGB Marketing Process



238.    Traders at JPMorgan Mexico played a critical role in the trade pricing and execution process each time JPMorgan Chase Bank, N.A. or J.P. Morgan Securities LLC arranged an MGB transaction with a customer in the U.S. market.

239.    These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by JPMorgan Chase Bank, N.A. or J.P. Morgan Securities

LLC (or vice-versa, when the sales employee would initiate a transaction with a U.S. customer). The salesperson would then contact a trader at JPMorgan Mexico, such as ████████, to ask for a price to quote the customer for the contemplated MGB transaction.

240.    Next, the trader at JPMorgan Mexico—fully aware that the trader was speaking with a colleague located in JPMorgan Chase Bank, N.A. or J.P. Morgan Securities LLC and was pricing a customer trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that JPMorgan Mexico sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

241.    The salesperson located at JPMorgan Chase Bank, N.A. or J.P. Morgan Securities LLC would relay the price quote to the customer and, if the customer agreed to the transaction, then the MGB transaction became binding and the parties (the U.S. customer and JPMorgan Mexico) were now obligated to exchange cash and MGBs for the quoted price. The salesperson then informed the MGB trader at JPMorgan Mexico, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

242.    The trader at JPMorgan Mexico then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction. When selling MGBs to the customer, JPMorgan Mexico sent the appropriate amount of MGBs into the United States to JPMorgan Chase Bank, N.A. or J.P. Morgan Securities LLC for use in the customer transaction. JPMorgan Mexico also received the proceeds from the sale, and then incorporated the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

243.    When buying MGBs from a customer, JPMorgan Mexico sent money into the United States to pay for the MGBs and received the MGB inventory being sold by the customer. JPMorgan Mexico then incorporated the gain or loss resulting from the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

244.    Thus, MGB transactions brokered by JPMorgan Chase Bank, N.A. or J.P. Morgan Securities LLC with customers in the U.S. MGB market actually occurred between JPMorgan Mexico and the U.S. customer, even though JPMorgan Chase Bank, N.A. or J.P. Morgan Securities LLC is often listed as the nominal counterparty to the customer transaction. This entire process occurs electronically, and was repeated at least thousands of times throughout the Class Period multiple times each trading day (*i.e.* virtually every time an investor in the United States executed an MGB transaction with a JPMorgan Chase & Co. entity).

245.    The process that JPMorgan Mexico used to execute MGB transactions with customers in the United States is illustrated in Figure J2, below:

Figure J2 – JPMorgan's "Back-to-Back" MGB Trade Process



* The parties are now bound to exchange cash and MGBs

246.     Using the process described above, JPMorgan Mexico repeatedly over the course of the Class Period distributed artificial MGB pricing quotes, MGB inventory to use in price-fixed MGB transactions, and MGB-related information into the United States. It then recorded the results of these transactions in its profit and loss records (*i.e.* "PnL"). As alleged in this Complaint, these MGB transactions occurred at artificial, fixed prices as a result of Defendants' conspiracy to rig the market for MGBs.

247.     For example, on March 15, 2011, a trader employed by JPMorgan Mexico and stationed on JPMorgan Mexico's MGB desk priced an MGB transaction with Plaintiff GERS, in which GERS purchased 13,230,000 in face value (MXN) of BONOs maturing May 31, 2029 for $1,154,709.05, routed through JPMorgan Chase Bank, N.A.

248.     After determining the price for this transaction, the trader from JPMorgan Mexico transmitted the price quote to a salesperson in New York within JPMorgan Chase Bank, N.A.'s Fixed Income Markets business so that the quote could be conveyed to Plaintiff GERS. The salesperson conveyed the quote to GERS, and GERS agreed to the trade. At this point, the transaction became binding and GERS was required to deliver cash while JPMorgan Mexico was required to deliver BONOS.

249.     Next, the trader at JPMorgan Mexico recorded a transaction in which it transferred 13,230,000 in face value (MXN) of BONOS to JPMorgan Chase Bank, N.A. in New York, and simultaneously entered a "back-to-back" transaction between JPMorgan Chase Bank, N.A. and GERS at the same price. JPMorgan Mexico collected the proceeds from the transaction and recorded the resulting gain or loss in its business records.

250.     Similarly, on September 14, 2009, a trader employed by JPMorgan Mexico and stationed on JPMorgan Mexico's MGB desk priced an MGB transaction in which Plaintiff BRS purchased 8,250,000 in face value (MXN) of BONOS maturing on December 13, 2018 for

$633,139.28, routed through J.P. Morgan Securities LLC (then known as J.P. Morgan Securities Inc.).

251.    After determining the price for this transaction, the trader from JPMorgan Mexico transmitted the price quote to a salesperson in New York within J.P. Morgan Securities LLC's Fixed Income Markets business so that the quote could be conveyed to Plaintiff BRS. The salesperson conveyed the quote to BRS, and BRS agreed to the trade. At this point, the transaction became binding and BRS was required to deliver cash while JPMorgan Mexico was required to deliver BONOS.

252.    Next, the trader at JPMorgan Mexico recorded a transaction in which it transferred 8,250,000 in face value (MXN) of BONOS to J.P. Morgan Securities LLC in New York, and simultaneously entered a "back-to-back" transaction between J.P. Morgan Securities LLC and BRS at the same price. JPMorgan Mexico collected the proceeds from the transaction and recorded the resulting gain or loss in its business records.

### I.    Barclays Mexico Purposefully Availed Itself of the United States MGB Market.

253.    Defendant Barclays Mexico is part of Barclays PLC's Investment Bank business division, formerly known as Barclays Capital. Within Investment Bank, the Credit business handled sales, trading, and market making for government debt, including MGBs.

254.    The United States was one of Barclays Mexico's largest, if not its largest MGB export market by volume throughout the Class Period. Barclays Mexico exported billions of dollars' worth of MGBs into the United States market throughout the Class Period.

255.    MGB traders employed by Barclays Mexico, including trader ███████████, worked as part of Barclays Investment Bank's Credit business during the Class Period.[29] These traders were

---

[29] ████████████████████████████████████████████████████████████.

responsible for determining the prices quoted to customers located in the United States on their

MGB transactions with corporate affiliates, including Barclays Capital Inc. and Barclays Bank PLC's

New York Branch.

256.    In addition to determining prices for customer MGB transactions executed in the

United States, Barclays Mexico also distributed MGBs into the United States (when a customer

purchased MGBs) or cash into the United States (when a customer sold MGBs) to complete MGB

transactions with customers throughout the Class Period.

257.    Barclays Mexico worked jointly with Barclays Capital Inc. and Barclays Bank PLC's

New York Branch to conduct MGB business in the United States market. The process worked as

follows. Sales employees housed within Barclays Investment Bank's Credit business were based at

Barclays Capital Inc.'s corporate offices in New York and at Barclays Bank PLC's New York

Branch. These sales employees were responsible for managing customer relationships, taking sales

calls, and routing customer inquiries to traders stationed at Barclays Mexico's MGB trading desk.

258.    For example, Robert McNulty and Ana Sarmiento served in Fixed Income Sales

roles for Barclays Investment Bank from New York during the Class Period. McNulty and

Sarmiento liaised between United States MGB investors, including Plaintiffs and the Class, and

Barclays Mexico's MGB traders, including ████████.

259.    MGB traders at Barclays Mexico provided Barclays Capital Inc.'s and Barclays Bank

PLC's New York Branch's salesforce with trade recommendations for U.S.-based customers in real-

time. For example, employees such as trader ████████ distributed MGB trade information to

U.S.-based sales employees at Barclays Capital Inc. and Barclays Bank PLC's New York Branch so

that this information could be disseminated to U.S. customers. In turn, sales employees at Barclays

Capital Inc. and Barclays Bank PLC's New York Branch held out Barclays Mexico's MGB traders to

U.S. customers for their expertise in the MGB market, and routinely included Barclays Mexico's

MGB traders in sales calls with U.S. customers. The interaction between Barclays Mexico, New York-based Barclays Investment Bank Fixed Income Sales, and U.S. MGB Investors that takes place during the MGB trading day (*i.e.* 8:00 A.M. Eastern and 5:00 P.M. Eastern) is illustrated below, in Figure BR1:

Figure BR1 – Barclays PLC's U.S. MGB Marketing Process



260.    Traders at Barclays Mexico played a critical role in the trade pricing and execution process each time Barclays Capital Inc. or Barclays Bank PLC's New York Branch arranged an MGB transaction with a customer in the U.S. market.

261.    These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by Barclays Capital Inc. or Barclays Bank PLC's New York Branch (or vice-versa, when the sales employee would initiate a transaction with a U.S. customer). The salesperson would then contact a trader at Barclays Mexico, such as ███████████, to ask for a price to quote the customer for the contemplated MGB transaction.

262.    Next, the trader at Barclays Mexico—fully aware that the trader was speaking with a colleague located in Barclays Capital Inc.'s New York office or Barclays Bank PLC's New York Branch and was pricing a customer trade for execution in the United States—determined a price to

bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that Barclays Mexico sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

263.    The salesperson located at Barclays Capital Inc. or Barclays Bank PLC's New York Branch would relay the price quote to the customer and, if the customer agreed to the transaction, then the MGB transaction became binding and the parties (the U.S. customer and Barclays Mexico) were now obligated to exchange cash and MGBs for the quoted price. The sales person then informed the MGB trader at Barclays Mexico, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

264.    The trader at Barclays Mexico then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction. When selling MGBs to the customer, Barclays Mexico sent the appropriate amount of MGBs into the United States to Barclays Capital Inc. or Barclays Bank PLC's New York Branch for use in the customer transaction. Barclays Mexico also received the proceeds from the sale, and then incorporated the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

265.    When buying MGBs from a customer, Barclays Mexico sent money into the United States to pay for the MGBs and received the MGB inventory being sold by the customer. Barclays Mexico then incorporated the gain or loss resulting from the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

266.    Thus, MGB transactions brokered by Barclays Capital Inc. or Barclays Bank PLC's New York Branch with customers in the U.S. MGB market actually occurred between Barclays

71

Mexico and the U.S. customer, even though Barclays Capital Inc. or Barclays Bank PLC is often listed as the nominal counterparty to the customer transaction. This entire process occurs electronically, and was repeated at least thousands of times throughout the Class Period multiple times each trading day (*i.e.* virtually every time an investor in the United States executed an MGB transaction with an Barclays entity).

267.    The process that Barclays Mexico used to execute MGB transactions with customers in the United States is illustrated in Figure BR2, below:

Figure BR2 – Barclays' "Back-to-Back" MGB Trade
Process



* The parties are now bound to exchange cash and MGBs

268.    Using the process described above, Barclays Mexico repeatedly over the course of the Class Period distributed artificial MGB pricing quotes, MGB inventory to use in price-fixed MGB transactions, and MGB-related information into the United States. It then recorded the results of these transactions in its profit and loss records. As alleged in this Complaint, these MGB transactions occurred at artificial, fixed prices as a result of Defendants' conspiracy to rig the market for MGBs.

269.     For example, on January 7, 2013, a trader employed by Barclays Mexico and stationed on Barclays Mexico's MGB desk priced an MGB transaction with Plaintiff BRS, in which BRS purchased 134,000 BONOS maturing March 8, 2044 for $146,884.10, routed through Barclays Capital Inc.

270.     After determining the price for this transaction, the trader from Barclays Mexico transmitted the price quote to a salesperson in New York within Barclays Capital Inc.'s Fixed Income Sales business so that the quote could be conveyed to Plaintiff BRS. The salesperson conveyed the quote to BRS, and BRS agreed to the trade. At this point, the transaction became binding and BRS was required to deliver cash while Barclays Mexico was required to deliver BONOS.

271.     Next, the trader at Barclays Mexico recorded a transaction in which it transferred 134,000 BONOS to Barclays Capital Inc. in New York, and simultaneously entered a "back-to-back" transaction between Barclays Capital Inc. and BRS at the same price. Barclays Mexico collected the proceeds from the transaction and recorded the resulting gain or loss in its business records.

## J.   UBS Mexico Purposefully Availed Itself of the United States MGB Market.

272.     Defendant UBS Mexico is part of the UBS Group's[30] Investment Bank business division. Within Investment Bank, the Foreign Exchange, Rates and Credits business handled sales and trading for government debt, including MGBs.

273.     The United States was one of UBS Mexico's largest, if not its largest MGB export market by volume throughout the Class Period. UBS Mexico exported billions of dollars' worth of MGBs into the United States market throughout the Class Period.

---

[30] UBS AG uses the term UBS Group to describe the operations of itself and all of its subsidiaries in public filings with regulators and reports to shareholders.

274.    MGB traders employed by UBS Mexico, including trader ███████████, worked as part of UBS' Foreign Exchange, Rates and Credits business during the Class Period. ██████



████████████ These offshore sales teams included personnel employed at UBS AG's New York Branch and New York-headquartered broker-dealer UBS Securities LLC, each of which was based in Manhattan. Their clients included U.S.-based investors, like Plaintiffs and the Class.

275.    In addition to determining prices for customer MGB transactions executed in the United States, UBS Mexico also distributed MGBs into the United States (when a customer purchased MGBs) or cash into the United States (when a customer sold MGBs) to complete MGB transactions with customers throughout the Class Period.

276.    UBS Mexico worked jointly with UBS Securities LLC to conduct MGB business in the United States market. The process worked as follows. Sales employees housed within UBS Group's Foreign Exchange, Rates and Credits business were based at UBS Securities LLC's corporate offices and at UBS AG's New York Branch, both of which are located in Manhattan. These sales employees were responsible for managing customer relationships, taking sales calls, and routing customer inquiries to traders stationed at UBS Mexico's MGB trading desk.

277.    For example, Mark Ratcliffe, a Managing Director for UBS Investment Bank, served in several Foreign Exchange, Rates and Credits sales leadership positions from New York during the Class Period. Ratcliffe oversaw a team of Global Rates Sales personnel for UBS Investment Bank, including Todd Harper. During the Class Period, Ratcliffe and Harper liaised between United States

---

[31] ████████████████████████████████
████████

MGB investors, including Plaintiffs and the Class, and UBS Mexico's MGB traders, including

███████████████████████ .

278.     MGB traders at UBS Mexico provided UBS Securities LLC's and UBS AG's

salesforce with trade recommendations for U.S.-based customers in real-time. For example,

employees such as traders ████████████████████ distributed MGB trade information to

U.S.-based sales employees at UBS Securities LLC and UBS AG's New York Branch so that this

information could be disseminated to U.S. customers. In turn, sales employees at UBS Securities

LLC and UBS AG's New York Branch held out UBS Mexico's MGB traders to U.S. customers for

their expertise in the MGB market, and routinely included UBS Mexico's MGB traders in sales calls

with U.S. customers. The interaction between UBS Mexico, New York-based UBS Investment Bank

Rates Sales, and U.S. MGB Investors that takes place during the MGB trading day (*i.e.* 8:00 A.M.

Eastern and 5:00 P.M. Eastern) is illustrated below, in Figure U1:



Figure U1 – UBS Investment Bank's U.S. MGB Marketing Process

279.     Traders at UBS Mexico played a critical role in the trade pricing and execution

process each time UBS Securities LLC or UBS AG's New York Branch arranged an MGB

transaction with a customer in the U.S. market.

280.     These transactions worked as follows. First, an investor located in the United States would contact a salesperson employed by UBS Securities LLC or UBS AG's New York Branch (or vice-versa, when the sales employee would initiate a transaction with a U.S. customer). The salesperson would then contact a trader at UBS Mexico, such as ███████, to ask for a price to quote the customer for the contemplated MGB transaction.

281.     Next, the trader at UBS Mexico—fully aware that the trader was speaking with a colleague located in UBS Securities LLC's New York office or UBS AG's New York Branch and was pricing a customer trade for execution in the United States—determined a price to bid (in the case of a customer sale) or offer (in the case of a customer purchase) for the requested MGBs, and conveyed this pricing information to the salesperson via chatroom or over the phone. As alleged in this Complaint, the MGB prices that UBS Mexico sent into the United States were artificial because they were influenced by a conspiracy among Defendants, rather than competitive market forces.

282.     The salesperson located at UBS Securities LLC or UBS AG's New York Branch would relay the price quote to the customer and, if the customer agreed to the transaction, then the MGB transaction became binding and the parties (the U.S. customer and UBS Mexico) were now obligated to exchange cash and MGBs for the quoted price. The sales person then informed the MGB trader at UBS Mexico, so that the MGB trader could deliver the necessary MGBs (in the case of a sale to the customer) or prepare to receive the MGBs in inventory (in the case of a purchase from the customer).

283.     The trader at UBS Mexico then distributed (in the case of a customer purchase) or received (in the case of a customer sale) the MGBs transferred in the transaction. When selling MGBs to the customer, UBS Mexico sent the appropriate amount of MGBs into the United States to UBS Securities LLC or UBS AG's New York Branch for use in the customer transaction. UBS

Mexico also received the proceeds from the sale, and then incorporated the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

284.    When buying MGBs from a customer, UBS Mexico sent money into the United States to pay for the MGBs and received the MGB inventory being sold by the customer. UBS Mexico then incorporated the gain or loss resulting from the transaction in its profit and loss records used to measure the performance of its MGB trading desk.

285.    Thus, MGB transactions brokered by UBS Securities LLC or UBS AG with customers in the U.S. MGB market actually occurred between UBS Mexico and the U.S. customer, even though UBS Securities LLC or UBS AG is often listed as the nominal counterparty to the customer transaction. This entire process occurs electronically and was repeated at least thousands of times throughout the Class Period multiple times each trading day (*i.e.* virtually every time an investor in the United States executed an MGB transaction with an UBS Group entity).

286.    The process that UBS Mexico used to execute MGB transactions with customers in the United States is illustrated in Figure U2, below:



Figure U2 – UBS' "Back-to-Back" MGB Trade Process

287.     Using the process described above, UBS Mexico repeatedly over the course of the Class Period distributed artificial MGB pricing quotes, MGB inventory to use in price-fixed MGB transactions, and MGB-related information into the United States. It then recorded the results of these transactions in its profit and loss records. As alleged in this Complaint, these MGB transactions occurred at artificial, fixed prices as a result of Defendants' conspiracy to rig the market for MGBs.

288.     For example, on March 9, 2010, a trader employed by UBS Mexico and stationed on UBS Mexico's MGB desk priced an MGB transaction with Plaintiff BRS, in which BRS purchased 226,000 BONOs maturing January 15, 2020 for $230,520.00, routed through UBS Securities LLC.

289.     After determining the price for this transaction, the trader from UBS Mexico transmitted the price quote to a salesperson in New York within UBS Securities LLC's or UBS AG's New York Branch's Global Rates Sales business so that the quote could be conveyed to Plaintiff BRS. The salesperson conveyed the quote to BRS, and BRS agreed to the trade. At this point, the transaction became binding and BRS was required to deliver cash while UBS Mexico was required to deliver BONOS.

290.     Next, the trader at UBS Mexico recorded a transaction in which it transferred 226,000 BONOS to UBS Securities LLC in New York, and simultaneously entered a "back-to-back" transaction between UBS Securities LLC and BRS at the same price. UBS Mexico collected the proceeds from the transaction and recorded the resulting gain or loss in its business records.

## IV.   **SUBSTANTIVE ALLEGATIONS**

## I.   **Background**

### A.     **The Mexican Government Bond Market**

291.     Mexican Government Bonds ("MGBs") are debt securities issued by the Mexican government to raise capital, fund deficits in the budget, and control the nation's money supply.

292.     All MGBs have core features in common that distinguish them as a single class of debt securities. Most notably, they are all backed by the Mexican government, are all issued via auctions dominated by Defendants, and are all sold to investors by Defendants, who control an overwhelming majority of the MGB supply available in the United States.

293.     The market for MGBs is structured as a three-tiered pyramid. The Mexican government, sitting at the top of the pyramid, issues MGBs in regularly scheduled auctions. Auctions are announced on a weekly basis on the last day of the week prior to the auction. Auctions always take place two days prior to the settlement date, *i.e.* the date on which the MGBs are delivered. Settlement dates fall on Thursdays unless Thursday is a holiday, in which case MGBs settle on the closest previous or following working day (with preference for the previous day). As a result, auctions usually take place on Tuesdays.

294.     The Defendants, as the exclusive government-approved Market Makers, are the middle layer of the pyramid. Defendants participate in the government-run MGB auctions, where they simultaneously submit bid schedules indicating the amount of MGBs they are willing to buy and for what price. These bids are supposed to be confidential. To ensure that bid schedules are not disclosed or shared with other bidders prior to each auction, bid schedules are submitted either in a sealed envelope or through encrypted electronic files. Sample bid schedules for each type of MGB published by Banxico appear in Appendix A.

295.     Defendants also have special access to newly-issued MGBs through syndicated auctions and through Banxico's market maker option program, which is described below. Only approved MGB Market Makers can access MGBs through these programs.

296.     The third and final level of the pyramid is MGB consumers, like Plaintiffs and the Class. Consumers do not participate in the government-run MGB auctions. Instead, they purchase

MGBs from the Defendants. Plaintiffs here transacted directly with the Defendants. *See* Part II.A., above.

297.    MGBs have features such as the instrument's face value, maturity, and coupon payment. The face value is set before the security is issued and represents the amount the issuer pays to the holder of the security at maturity. The maturity date is the date which the face value of a bond is to be paid in full. The maturity date is set when the bond is issued. The length of time between when a bond is issued and when it matures determines its "tenor." A bond's coupon payment determines how much, if any, of the interest earned on the par value is paid before the bond matures. Finally, the yield is the annual rate of return of an investment in a bond if the investor holds the bond until maturity.

298.    Coupon-bonds pay interest at set intervals, known as the "coupon period," and also entitle the holder to payment of the face value at maturity. For example, a coupon-bond might have a face value of $1,000 and provide coupon payments of 5% per year. For this bond, the issuer will pay the holder of the bond $50 each year in interest payments until the bond matures. At maturity, the issuer pays the bond holder the face value of the bond, $1,000.

299.    In contrast, a zero-coupon bond is a bond that is issued at a discount to its face value and does not pay interest to the holder until maturity. Instead, the difference between the purchase price and the face value of the bond represents the yield earned by the holder. For example, assume an investor pays $98,382.75 to purchase a zero-coupon bond with a face value of $100,000 that matures in 120 days. When the investor redeems the bond at maturity it will receive the full $100,000 face value, $1,617.25 more than what it paid to purchase that bond. The extra $1,617.25 represents the amount of interest the issuer paid to borrow $98,382.75 for 120 days, or approximately 5% annually.

300.     Each time the Mexican government offers a new bond for sale that bond is referred to as a "new issuance." If the government decides to sell more of the same bond at a later date it can "reopen" that issuance and create additional bonds.

301.     For example, in 2007 the Mexican government issued 4.7 billion pesos of new 20-year bonds that paid an 8% semi-annual coupon payment maturing in June 2027. The government identified these bonds a unique identifying code, M 270603. Ten years later, the Mexican government reopened that issuance (code number M 270603) creating 8 billion pesos more of the same bond that it sold at an auction held on April 10, 2017.

### 1.   CETES

302.     Federal Treasury Certificates, known as "CETES," are short-term zero-coupon bonds issued by the Mexican government. Like other zero-coupon bonds, they trade at a discount to their face value, with the difference between the purchase price and the face value representing the yield. CETES have maximum tenors of one-year and are normally issued with maturities between 28 and 364 days. CETES have a par value of 10 pesos and are normally quoted by their yield rate.

303.     CETES are issued in "multi-price" auctions during which Banxico arranges bids in order from highest price to lowest price and allocates bonds in descending order based on the quantity requested. The auction stops once the amount of bonds awarded equals the amount offered during that auction.

304.     CETES are the principal means that the Mexican government uses to raise short-term funds. They are considered an attractive short-term investment because they are more liquid than other short-term debt securities issued by emerging market countries, fungible, and pay higher yields than U.S. Treasury Bills of the same maturity. CETES represent approximately 16% of the outstanding amount of MGBs on the market.

305.     Data compiled by Banxico show that investors located outside of Mexico invested

significantly in CETES during the Class Period, as reflected in the graph below:

**CETES Held by Investors Outside of Mexico During the Class Period
(Thousands of Pesos)[32]**



2. **BONOS**

306.     Mexican Federal Government Development Bonds, known as "BONOS," are fixed-

rate coupon bonds with maturities greater than one year. BONOS pay a fixed semi-annual coupon

payment and have a par value of 100 pesos.

307.     BONOS may be issued for any maturity period that is a multiple of 182 days. To

date, BONOS have been issued with maturities of 3, 5, 10, 20 and 30 years. They are commonly

---

[32] As of July 16, 2018, Banxico listed the U.S. dollar to Mexican peso exchange rate as 1.00 USD/18.836 MXN. The graphs in this section come from Banxico's interactive website, located at
http://www.banxico.org.mx/SieInternet/consultarDirectorioInternetAction.do?accion=consultarCuadro&idCuadro=C
F70&sector=7&locale=en.

known as BONOS M3, M5, M10, M20 and M30, depending on the tenor. Interest rates on BONOS are announced prior to issuance. BONOS are issued in "single-price" auctions, which function similar to the multi-price auction described above, except that all bonds are sold at the final price where the auction stops.

308.    BONOS are more attractive for long-term investors because they offer periodic interest payments that are higher than the interest generally available through U.S. Treasury bonds. BONOS represent approximately 54% of the outstanding amount of MGBs on the market.

309.    Data compiled by Banxico show that, both in the terms of the amount of investment and the percentage of investors, investors in BONOS outside of Mexico grew increasingly significant through the Class Period, as reflected in the chart below:

**BONOS Held by Investors Outside of Mexico During the Class Period
(Thousands of Pesos)**



310.     In the great majority of BONOS auctions (598 of the 623 auctions during the Class Period), Banxico reopens existing BONOS issues instead of creating new issuances. This creates an additional incentive for Defendants to collude in auctions, since they generally already hold some of the same BONOS being auctioned and therefore stand to benefit from the results of the auction.

### 3. UDIBONOS

311.     Federal Government Development Bonds, known as "UDIBONOS," are inflation-hedged coupon bonds that pay interest rates fixed by the Mexican government. However, these bonds offer a return which protects investors against inflation by paying a return in real terms every six months based on a real interest rate which is determined on the issue date of each security. UDIBONOS are suitable for institutional investors like insurance companies and pension funds since these securities allow savings growth in real terms. UDIBONOS are issued in single-price auctions and pay interest every six months in Mexican pesos. They have a par value of 100 UDIs, which are inflation investment units tied to Mexico's National Consumer Price Index.

312.     Data compiled by Banxico shows that investors in UDIBONOS outside of Mexico were significant during the Class Period, as illustrated by the chart below:

**UDIBONOS Held by Investors Outside of Mexico During the Class Period**
**(Thousands of Pesos)**



#### 4. **BONDES D**

313.   Federal Government Development Bonds ("BONDES D") are MGBs that can be issued with any maturity in multiples of 28 days, but are normally issued with maturities of 3, 5, or 7 years. BONDES D are issued in multi-price auctions, have a par value of 100 pesos, and pay a coupon every month.

314.   The interest paid on BONDES D is determined by compounding on a daily basis the rate at which banks and brokerage firms carry out their overnight repurchase agreements. BONDES D are therefore known as variable rate bonds.

315.   Data compiled by Banxico show that investors in BONDES D located outside of Mexico were significant during the Class Period, as illustrated by the chart below:

**BONDES D Held by Investors Outside of Mexico During the Class Period
(Thousands of Pesos)**



### B.  The MGB Market Makers

316.    Defendants participated in Banxico's "Market Maker Program." In this capacity,
Defendants are responsible for providing liquidity to the MGB market. Banxico grants special
privileges to Market Makers, who are required to commit to obligations in both the government-run
auctions and in MGB transactions with investors.

317.    For example, at MGB auctions, Defendants commit to "present bids at competitive
prices in each primary auction of securities." They also commit to "permanently quote purchase
(bid) and sale (offer) prices to [consumers] in order to provide liquidity and facilitate investment in
this market." In both instances, Defendants are supposed to bid independently and offer
competitive rates and refrain from colluding.

318.    Each Market Maker must submit competitive bids in at least the following amounts in each MGB auction: (1) 20% of the amount offered by the Mexican government; or (2) 1 divided by the number of Market Makers for that security, whichever is lower. These minimum bidding requirements ensure that, in each auction, Defendants collectively submit bids for at least 100% of the MGBs issued. For example, the Mexican government issued approximately $1.3 billion of BONOS in a June 16, 2016 auction. Eight different Market Makers submitted bids (the identity of the bidders is not public). Thus, each of the eight Market Makers was required to submit competitive bids for at least 12.5 percent (1 divided by 8), or $162 million of the BONOS issued on that date.

319.    Market Makers agree to present two-way quotes (both for bid and ask) to consumers for each MGB, in all their maturities. They perform this function in major financial markets where MGBs trade, including in the United States, as alleged in Part III, above.

320.    Market Makers earn profits by selling MGBs to investors at a higher prices than they purchased the same MGBs. They also earn profits by collecting the difference between the price of MGB they buy outside of auctions (*i.e.* the "bid" price) and the price that they sell MGB (*i.e.* the "ask" price). The difference between the bid price and the ask price is known as the "bid-ask spread."

## V.    FEATURES OF THE MGB MARKET MADE IT HIGHLY SUSCEPTIBLE TO COLLUSION

321.    Several features of the MGB market made it particularly susceptible to collusion among Defendants.

322.    *First,* the MGB market is highly opaque. There is no centralized exchanges on which market participants can trade MGBs and view current MGB prices, and consumer MGB transactions occur almost entirely over-the-counter and usually take place by telephone. That is, investors seeking to purchase or sell MGBs must contact an MGB salesperson or trader employed by one of the Defendants, who then provides a "quote."

87

323.     Because the Market Maker Defendants are the only authorized Market Makers for MGBs, this small group of dealers exercises near-total control of MGB supply. Banxico required each MGB Market Maker to competitively bid for at least 12.5% of all MGBs offered in each auction, as well as demonstrate that it maintained at least 7% market share in the secondary market at the end of each quarter. The market maker Defendants far exceeded these requirements in both auctions and in the secondary market, leading them to each have a significant portion of market share individually, and a substantial majority of market share collectively.

324.     The market maker Defendants controlled a dominant market share in the auctions where MGBS are issued. For instance, Market Makers in BONOS controlled 91% of the total number of BONOS sold at auction during the Class Period. Similarly, the Market Makers for UDIBONOS controlled 73% of the total amount of UDIBONOS sold at auction during the Class Period.

325.     Plaintiffs analyzed dealer activity as measured by the frequency of bid-ask quotes in the MGB secondary market. This analysis showed that the Market Maker Defendants were responsible for approximately 75% of quotes in the over-the-counter market during the Class Period. This percentage is even larger and reaches 80% once quotes from interdealer brokers (who broker trades exclusively between dealers) and governmental entities associated with the Mexican finance ministry (which sometimes trade MGBs, but not with consumers) are excluded.

326.     This high degree of market concentration enjoyed by a small group of dealers makes the MGB market susceptible to collusion.

327.     *Second*, the MGB market is characterized by relatively low liquidity (*i.e.* approximately $1 trillion in volume annually),[33] but with large customer flows driven by offshore investors.

---

[33] For comparison, the average *daily* trading volume in the U.S. Treasury market regularly exceeded $500 billion for most of the Class Period.

328.    Defendants' MGB trading desks are operated in a manner consistent with the investor-driven nature of the MGB market. Defendants' MGB trading desks followed a "flow trading" model. In flow trading, dealers generally earn profits by anticipating customer demand, selling bonds for a higher price to customers than they were purchased. By contrast, proprietary trading, or "prop trading," involves taking large risk positions in a given market and profiting from correctly anticipating market movements ahead of time.

329.    The key to generating profits in a flow trading model is to buy low and sell high as frequently as possible. In the flow trading model, knowledge about expected customer flows is considered market sensitive information because it allows dealers to anticipate supply and demand, and therefore price, in the market ahead of time.

330.    In a bond market characterized by flow trading, such as the MGB market, large dealers possess superior information than other market participants because they have additional information about future supply and demand via their customer base. Normally, this advantage to large dealers is counterbalanced by the fact that other competing dealers often have their own sources of information via their own customer base. Thus, the expected level of supply and demand in the market cannot be anticipated by any given dealer operating with only its own customer information because the dealer cannot be sure whether its own customer flow will be offset by the customer flow of rival dealers.

331.    The flow-trading oriented nature of the MGB market furnished Defendants' MGB traders with a common incentive to pool information about expected customer flows in order to avoid holding positions that would be adversely affected by a rival dealer's customer flow (and, conversely, to take positions that would benefit from the rival dealer's customer flow).

332.    By developing a common understanding that each member of the conspiracy was expected to share customer order flow information with their rivals, the Defendants' MGB traders

89

were able to avoid taking trading positions that would be adversely affected by supply and demand, in the expectation that the favor would be reciprocated in the future. The chat transcripts that Plaintiffs have reviewed to date, as well as COFECE's Statement of Objections issued to seven Defendants, demonstrate that this is exactly what occurred in the MGB market during the Class Period. *See* Part VI-VII, below.

333.   Knowledge about expected customer flows is dangerous in the hands of rival dealers because it allows rival dealers to anticipate customer flows, establish trading positions that benefit from increased activity, and adjust pricing.

334.   Pervasive sharing of customer flow information distorts supply and demand in markets and imposes higher transaction costs on investors. This concept is particularly well understood by dealers in government bond markets. For example, the European Primary Dealers Association was a trade association consisting of the twenty largest primary dealers in the Eurozone. It wrote the following in a position paper it submitted to the Italian Treasury during the Class Period:

> the dealer (and indeed its customer) will be very concerned about other market participants being able to react ahead of the dealer trying to liquidate its position which it may have obtained in a transaction with a customer. A dealer concerned about this situation will either not provide liquidity or widen his quote in order to compensate for the increased risk. Either will lead to further decrease in liquidity.

335.   As the excerpt above also explains, the consequence of trading ahead of anticipated customer flows is higher transaction costs for investors in the relevant market. This principle has also been recognized in the MGB market specifically. In the wake of COFECE's announcement that it was investigating Defendants for anticompetitive conduct in the MGB market, Banxico (in collaboration with other regulators and with dealers active in Mexican financial markets) issued the first formal code of conduct governing approved MGB Market Makers in November 2017. The code of conduct contains a section concerning "The Exchange of Information" among dealers, with

90

the preamble stating that this section intends to prohibit the exchange of sensitive information to "avoid distortions in the market." The section also states that "market participants should avoid sharing or transmitting confidential or privileged information with the objective of coordinating their behavior in the market, colluding, or fixing prices, or other forms of limiting or eliminating competition in the market."

336.    In the MGB market, this dynamic created a common incentive among the Approved MGB Market Makers to disclose sensitive customer flow information to each other ahead of time.

337.    *Third,* each Defendant's MGB traders engaged in a high degree of interfirm communications. These communications took place via interbank chatrooms, telephone calls, and in-person meetings. *See* Parts VI-VII, below.

338.    Defendants compounded these risks by failing to adequately monitor their trading staff, as demonstrated in Part IX, below (describing how Defendants' weak oversight and compliance standards facilitated anticompetitive conduct by traders during the Class Period).

339.    *Fourth*, Defendants employed MGB traders who had close relationships with MGB traders at other Defendants from prior positions working together at the same bank. Defendants failed to protect against the risk of anticompetitive conduct among these traders by failing to implement adequate antitrust compliance policies, as alleged in Part IX, below. Many price-fixing conspiracies in financial markets in recent years demonstrate that traders who formerly worked together often function as conduits through which price-fixing agreements develop.

340.    This revolving door among the Defendants' MGB trading desks solidified a conspiratorial link between the Defendants and provided an opportunity for collusion in the MGB market. This structure forms a web of connections that provided Defendants with the contacts, connections, and open lines of communication that often help facilitate price-fixing agreements.

341.    For example, Guillermo Vega, Luis Sayeg, and Jaime Zenizo have been reported as subjects of COFECE's investigation. All three traders worked together trading MGBs with Citibanamex until Vega left to trade MGBs at BBVA-Bancomer. Zenizo left Citibanamex for a role as Head Trader at HSBC Mexico.

342.    Juan Oberhauser Waring was the Managing Director of Operations for the Latin America region in Deutsche Bank AG's offices during the Class Period until he later served as a Director of Deutsche Bank Mexico. Deutsche Bank hired him from co-conspirator JPMorgan Mexico, where he was Vice-President of operations for Latin American Emerging Markets. Deutsche Bank AG also hired Luis Antonio Betancourt Barrios to join its Global Markets division as Head of Trading for Mexico from co-conspirator JPMorgan Mexico.

343.    Also in 2009, Deutsche Bank AG hired Andre Silva as Co-Head of Debt Capital Markets for Latin America. Silva had previously served in a similar position with Defendant JPMorgan Chase & Co.

344.    Bank of America Merrill Lynch also hired traders who had previously worked for other Defendants. For example, in 2010, Bank of America Merrill Lynch hired LatAm strategist Gabriel Bochi, formerly of JPMorgan Chase & Co. In 2008, Deutsche Bank hired Katharyn Boyle Meyer as a Latin American Local Markets Trader. Boyle Meyer had previously served in a similar role at Citigroup Inc..

345.    SIS hired Juan A. Minuesa from BSI as Head of Markets, US in its New York office. Minuesa previously worked as a fixed income trader at BBVA S.A. for eight years. Former Barclays Mexico MGB trader Pablo Limón has since moved to a similar role at Santander Mexico. Banco Santander Mexico's current Head of Fixed Income joined the bank in 2016 after spending six years in the same position at co-conspirator Deutsche Bank Mexico. Prior to his tenure at Deutsche Bank Mexico, he served as Head of Fixed Income at co-conspirator Bank of America Mexico.

346.   Former Citibanamex government securities traders Jaime Zenizo now works at HSBC Bank Mexico where he performs a similar role.

347.   BBVA S.A. also hired traders who had previously worked for other Defendants. For example, Defendant BSI hired Eric Olson as the Managing Director of Latin American Credit Trading & Sales in its New York office in 2011. Olson had previously been employed by HSBC Holdings plc for six years as a New-York based Director of their Latin American Local Markets Desk in HSBC Holdings plc's New York office, and by Deutsche Bank AG as Head of LatAm Cross-border Trading.

348.   Defendant JPMorgan Chase & Co. also hired traders who previously worked for other Defendants. In 2009, JPMorgan Chase & Co. hired Eugenio Alarcon as an Executive Director of Public Finance. Alarcon had previously served as a LatAm Debt Capital Markets trader at DBSI and as an official at SHCP.

349.   Julio Ignacio Sarre was a Managing Director within HSBC's Global Banking and Markets Division in Mexico, where he worked from 2004 through 2015. HSBC hired him from co-conspirator Bank of America Mexico, where he served as Head of Trading, Global Markets Mexico, after serving as Head of Fixed Income Trading at co-conspirator JPMorgan Mexico.

350.   In 2010, HSBC Global Banking and Markets hired Ricardo Rubio as Regional Head of Financial Institutions for Latin America. Previously, Rubio served as an Executive Director of Latin American Debt Capital Markets at Defendant JPMorgan Chase & Co. In 2017, Rubio was again hired by JPMorgan Chase & Co.

351.   Barclays Bank PLC also hired traders who had previously worked for other Defendants. For example, senior Barclays Bank PLC trader Robert Lombardi was previously employed as an emerging markets debt trader for eight years by Bank of America Merrill Lynch prior to joining Barclays Bank PLC. In 2012, Barclays Bank PLC hired Carlos Corona as a Director

of Global Finance Latin America. Corona had previously served as a Global Markets Director at Citigroup Inc. Also in 2012, Barclays Bank PLC hired Raul Martinez-Ostos as its Mexico country head. Martinez-Ostos had previously served as a Director with Defendant Deutsche Bank AG's Latin American Capital Markets division.

352.    Financial news outlets have noted this uncommonly high degree of turnover among Defendants, with one Financial News London reporter remarking in a 2014 article that "a game of musical chairs is being played within the Latin America trading teams of the world's largest investment banks."

## VI.   COFECE FORMALLY CHARGED DEFENDANTS WITH ABSOLUTE MONOPOLISTIC PRACTICES IN THE MGB MARKET

### A.  The Admitted MGB Cartel

353.    On April 19, 2017, the Investigative Authority of COFECE announced that it had uncovered evidence of price-fixing and collusion in the "government bond intermediation market" where Defendants are the exclusive Market Makers.

354.    When announcing COFECE's investigation, the former head of COFECE's Investigatory Authority, Carlos Mena Labarthe, stated: "the damage to public finance and investors could be serious, considering that every year the government places hundreds of billions of Mexican pesos in these markets and that the daily volume of the instruments traded may reach approximately 100 billion Mexican pesos."

355.    COFECE expanded its investigation in May 2017 based on the initial evidence. Bloomberg reported that the antitrust regulator had "zeroed in on 7 banks, including three from the U.S. as part of a widening investigation into price manipulation in the nation's bond market." Bloomberg reports that these banks include at least Defendants Banco Santander Mexico, BBVA-

Bancomer, JPMorgan Mexico, HSBC Mexico, Barclays Mexico, Citibanamex, and Bank of America Mexico.

356.    None of the banks referenced by Bloomberg denied this report, and they have acknowledged that they are subjects of COFECE's investigation in the months since the announcement.

357.    Bloomberg also reported in the same article that at least one unidentified entity had applied for, and been granted, leniency under Mexico's cartel leniency and immunity program.

358.    This was a significant development. Mexico only offers leniency for antitrust violations for applicants who: (1) acknowledge that they are or have been engaged, participated, contributed, facilitated or instigated an absolute monopolistic practice,[34] (2) report the cartel, (3) hand over evidence, and (4) fully and permanently cooperate, initially during the investigation and subsequently during the trial-like procedure.[35] The first successful applicant may receive a total or partial reduction of the applicable fines and criminal immunity.[36] Subsequent successful applicants can receive criminal immunity, but remain subject to a reduced fine.[37]

359.    The program does not authorize leniency to applicants which only participated in unilateral conduct, engaged in a relative monopolistic practice,[38] or failed to provide sufficient information to launch an investigation.

---

[34] Absolute monopolistic practices in Mexico are described in Part VI.C., below.

[35] *COFECE's Leniency and Immunity Program: Frequently Asked Questions,* COFECE, p. 3 (Nov. 2017) ("FAQ") (explaining that "given the seriousness of these practices, absolute monopolistic practices are illegal per se"). If COFECE's investigative authority determines that the evidence collected during its investigation supports a probable commission of an absolute monopolistic practice, it may proceed to a trial-like procedure before an independent COFECE panel.

[36] *Id.* The leniency and immunity program does not offer immunity or reduced liability in civil suits by injured consumers.

[37] *Id.*

[38] As explained below, a relative monopolistic practice under Mexican law is a practice that is subject to Mexico's equivalent of the rule of reason (*e.g.* vertical restrains, joint ventures, etc.).

Case 1:18-cv-02830-JPO   Document 163   Filed 12/09/19   Page 99 of 158

360. The program requires successful applicants to both acknowledge and demonstrate with evidence that the applicant participated in an absolute monopolistic practice.[39] An applicant that fails to demonstrate that it participated in an absolute monopolistic practice are ineligible for the program.[40] For example, a third-party or whistleblower who observes the commission of an absolute monopolistic practice can submit a complaint to COFECE, but is not eligible for the leniency and immunity program.

361. Sources with direct knowledge of COFECE's investigation disclosed to El Financiero that it "includ[ed] both the primary bond market, that is, the auctions made by the government, as well as the secondary [consumer] market." The time period for the investigation is ten years prior to the date the investigation began, *i.e.* starting with October 28, 2006.

362. El Financiero also interviewed an insider employed by one of the Defendants under investigation. The source explained that the problem with the MGB market is "the structure of the market, which privileges the largest participants" who enjoy total control over the supply.

363. Reports revealed that other individuals beyond the original leniency applicant are participating in COFECE's leniency program. Financial reporter Darío Celis, the same journalist who accurately reported that COFECE was also investigating the secondary market for MGBs and also first reported that an entity applied for the leniency and immunity program, published a report on the COFECE investigation on May 8, 2017 in the newspaper "Excelsior." In the report, Celis wrote that "Beyond what the official and informal spokespersons of the financial sector announce, I inform you that many actors involved are going to adhere to the immunity program of the Cofece to avoid jail and high fines."

---

[39] FAQ, at 8.

[40] *See id.*

364.    COFECE's leniency program provides that a successful applicant may extend the benefits of the program to "other individuals and companies provided that they belong to the same economic interest group as a company that applied to the program."[41]  For example, a company that applies to the leniency program can apply for cartel leniency on behalf of executives or employees of the company.[42]

365.    Celis followed up with further details on the progress and scope of COFECE's investigation on May 18, 2017. He reported that one of the individuals under investigation is Guillermo Vega, Managing Director of Trading, Mexico for BBVA-Bancomer. The article reports that Vega joined BBVA-Bancomer after being fired by Citibanamex for front-running client MGB orders and is reported to have maintained substantial contacts with his former colleagues at Citibanamex such as his "right-hand man" Luis Sayeg.

366.    Further information leaked to the press concerning the governmental investigations, and on May 25, 2017, Celis reported that COFECE had moved on to the next phase of its investigation, where it was collecting emails and phone records for the last ten years from the Defendants.

367.    Shortly after COFECE announced that it had uncovered evidence of collusion, CNBV, Mexico's securities regulator, began its own parallel investigation into Defendants' conduct in the MGB market during the summer of 2017.

368.    The Mexican media have also reported leaked information that CNBV's investigation resulted in an unknown confidential witness testifying before CNBV concerning collusion among Defendants in the MGB market during the Class Period. In return, the CNBV promised a reduced fine and more lenient sanctions.

---

[41] FAQ, at 5.

[42] *Id.*

369.    In July 2017, Bloomberg reported that both COFECE and CNBV had requested records of electronic chats and other communications from the institutions under investigation.

370.    The reports reveal that the MGB market is dominated by a handful of individuals that work for or have worked for the Defendants, and who rotate employment among the Market Makers while continuing to conspire together.

### B.  Defendants' Response to the Investigations

371.    Defendants, through their trade association, Asociación de Bancos de México A.C. (*i.e.*, the Association of Banks in Mexico), which is spear-headed by Defendant Santander Mexico, rallied to oppose COFECE's investigation into the MGB market and worked to undermine COFECE by arguing that COFECE lacked the expertise to break up their conspiracy. These widely-reported efforts led to the sudden ouster of Carlos Mena Labarthe, who had been leading the investigation since its beginning and who made COFECE's initial announcement of its investigation on April 19, 2017.

372.    Defendants took other countermeasures as well. They scrambled to put together the industry's first "code of conduct" modeled after the FX code of conduct, a similar guideline adopted by foreign exchange dealers to restore public confidence after similar price-fixing scandals roiled that industry.

373.    This code of conduct was announced in October 2017 and published in November 2017. For the first time, the code of conduct banned price-fixing, collusion, and sharing of sensitive customer information among the Defendants in the MGB market.

374.    The code of conduct was designed to prevent a recurrence of the unlawful collusive practices executed by Defendants in the MGB market during the Class Period. It was a direct response to COFECE's and the CNBV's investigation and was based on evidence obtained during these investigations.

C. **COFECE's 32-Month Investigation Resulted in Formal Charges Against 7 Defendants and** ███████████████████████████████████.

1. **COFECE Formally Charged Seven Defendants with Engaging in Absolute Monopolistic Practices in the MGB Market.**

375.    On September 23, 2019, COFECE issued a Statement of Objections ("SOO" or "Statement of Objections") to the following Defendants: Bank of America Mexico, BBVA Mexico, JPMorgan Mexico, Citibanamex, Santander Mexico, Deutsche Bank Mexico, and Barclays Mexico. The SOO is only meant to provide a summary of the evidence so that the Defendants can prepare a written response, rather than a comprehensive recital of all of the evidence that COFECE collected. Nevertheless, it spans 600 single-spaced pages.[43]

376.    The SOO also confirmed that at least one unidentified entity applied to COFECE's leniency program on May 18, 2015 (the "Leniency Applicant(s)"). *See* Part VI, above (describing the requirements of COFECE's leniency program).

377.    After determining that the Leniency Applicant(s) met all of the requirements, COFECE accepted the applicant(s) into the leniency program. The identity of the Leniency Applicant(s) remains unknown to Plaintiffs.

378.    As alleged more specifically below, the term "absolute monopolistic practice" refers to the same conduct that would constitute a *per se* violation of the United States' Sherman Antitrust Act.



2.    ████████████████████████████████████████████████████████

379.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[43] COFECE issued a different version of the Statement of Objections to each Defendant.



380.

381.

382.



383.

384.

385.

386.

387. 

388.

389.

390.

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

### 3. Absolute Monopolistic Practices are *Per Se* Illegal Under the Sherman Act.

391.     Mexico reformed its statutory framework governing competition in 1992 to help facilitate completion of the North American Free Trade Agreement ("NAFTA"). To serve NAFTA's purpose of facilitating increased trade and cross-border investment among Mexico, the United States, and Canada, the Mexican legislature harmonized Mexican antitrust law with U.S. antitrust law by condemning certain anticompetitive practices as illegal *per se*.[44]

392.     There are five horizontal trade restraints under Mexican law that qualify as "absolute monopolistic practices." Agreements by horizontal competitors to engage in these practices (or a combination of such practices) are illegal *per se*.[45] They are the equivalent of, and closely analogous to, practices that the United States Department of Justice refers to as "hardcore cartels."[46] Under Department of Justice guidelines, "hardcore cartels" consist of horizontal agreements among competitors that U.S. federal courts have deemed illegal *per se* under the Sherman Act.[47]

---

[44] *See, e.g.,* Kathleen Murtaugh Collins, Harmonizing the Antitrust Laws of NAFTA Signatories, 17 Loy. L.A. Int'l & Comp. L. Rev. 157, 183-184 (1994). Available at: http://digitalcommons.lmu.edu/ilr/vol17/iss1/5. In contrast to absolute monopolistic practices, Mexican law deals separately with "relative monopolistic practices" under a legal framework that is the equivalent of the "rule of reason" under U.S. law. *See e.g.,* James E. Crawford, *"The Harmonization of Law and Mexican Antitrust: Cooperation or Resistance?,"* Indiana Journal of Global Legal Studies: Vol. 4: Iss. 2, Article 6, at 423 (1997) (explaining that "[t]he distinction between *per se* and rule of reason analysis in U.S. antitrust jurisprudence has been harmonized into Mexico's new [*i.e.* post-NAFTA] regime.").

[45] *See FAQ*, p. 1 (explaining that "given the seriousness of these practices, absolute monopolistic practices are illegal *per se*").

[46] *See, e.g., Anti-Cartel Enforcement Template*, International Competition Network, Cartels Working Group, Subgroup 2: Enforcement Techniques, United States Department of Justice Antitrust Division, ¶2.B. (Nov. 17, 2016).

[47] *See id.* at ¶ 2.D.

393.    Under Mexican law, "absolute monopolistic practices" consist of contracts, agreements, arrangements, or combinations among horizontal competitors, which have the following purposes or effect:[48]

    i.   Price-Fixing - To fix, raise, coordinate, or manipulate the sale or purchase price of goods or services supplied or demanded in the markets;

    ii.   Output Restriction – To agree not to produce, process, distribute, market, or acquire more than a restricted or limited amount of goods or the provision or transaction of a limited or restricted number, volume, or frequency of services;

    iii.   Market Allocation - To divide, distribute, allocate, or impose portions or segments of a current or potential market of goods and services, in terms of given or to be determined group of customers, suppliers, time spans, or spaces;

    iv.   Bid Rigging - To establish, arrange, or coordinate bids or abstentions from tenders, contests, auctions, or purchase calls; and

    v.   Exchanging information to facilitate the objectives listed above - To exchange information with the purpose or effect of fixing prices, restricting output, allocating markets, or rigging bids.[49]

394.    Accordingly, after a nearly three-year long investigation, COFECE determined that at least seven Defendants, the Leniency Applicant, and █████████████████████ engaged in conduct constituting a *per se* violation of the Sherman Act.

395.    COFECE charged the Defendants with engaging in absolute monopolistic practices from 2010 through 2014. However, Sergio Lopez, head of COFECE's investigative authority, announced on October 14, 2019 that COFECE found evidence of collusion to manipulate MGB prices during a span of ten years.[50]

---

[48] *See COFECE Investigates the Market for Financial Intermediation of Mexican Government Securities*, COFECE, (Apr. 19, 2017); *see also See Mexico: Overview – The Antitrust Review of the Americas 2018, Global Competition Review,* at pp. 5-6 (Sep. 8, 2017).

[49] *See FAQ,* p. 4.

[50] *Mexico's Big Banks Unveiled in Bond Market Collusion Probe*, BLOOMBERG, Oct. 14, 2019.

## VII.   CHAT MESSAGES AMONG DEFENDANTS' MGB TRADERS SHOW THAT THEY CONSPIRED TO FIX PRICES IN THE MGB MARKET.

396.    Chatroom transcripts show that the Defendants conspired to fix prices in the MGB market by, among other things, pooling market-sensitive information (such as large customer flows), information about their present and future trading positions, coordinating their MGB trading, and agreeing on prices to quote customers. These traders earned illicit gains for themselves at the expense of uninformed market participants, including Plaintiffs and the Class.

397.    Defendants' traders were in constant communication via permanent interbank chatrooms,[51] telephone, and in-person meetings, where they pooled information to stay a step ahead of comparably uninformed investors (*i.e.* their customers). Chat messages reflect that the conspiring traders knew and anticipated that their gains would come at the expense of their customers in the MGB market.

398.    For example, several of Defendants' traders formed a group that they referred to as the "hamster squad." These traders coordinated to align positions in anticipation of customer flows and pool their respective risk limits in order to have an outsized effect on the MGB market. These effects were particularly pronounced because the MGB market is relatively illiquid.

399.    The following chat messages are examples showing the types of communications that occurred among Defendants' MGB traders repeatedly throughout the Class Period, on a daily basis, throughout the trading day. In these chat messages, the traders share trading positions and anticipated customer flows from rival MGB dealers that could only have been learned from privately communicating with those rival dealers themselves:

---

[51] Permanent chatrooms are chatrooms that remain open every day for an extended period of time. In Bloomberg chat messages, the designation "Pchat" appears at the front of such permanent chatrooms.

<u>**January 17, 2013**</u>



<u>**December 15, 2010**</u>

400.    Defendants' MGB traders often reported where flows were headed so that their co-conspirators could take advantage by establishing a trading position that would benefit from the anticipated flow ahead of time. For example, the transcript below comes from a permanent Bloomberg chatroom that included UBS Mexico's ███, Barclays Mexico's ███, HSBC's ███, and Deutsche Bank Mexico's ███. In these chats, the traders disclose to the group

---

[52] The term "steepen" is commonly used to describe a situation where the yield curve in the MGB market becomes more pronounced (*i.e.* when the yield on later maturities rises relative to the yield on earlier maturities). A curve is a chart that plots MGB prices across different maturities (*i.e* with the maturity across the X axis and the yield across the Y axis).

that they should take specific positions in the MGB market. These recommendations are unaccompanied by any explanation or analysis, which suggests that they are instead based on sensitive customer order information:

**July 9, 2013**



**June 28, 2013**

**July 12, 2013**

401.     The members of the "hamster squad" shared information with each other about the trading positions and customer flows of other members of the conspiracy. In the example below,

JPMorgan Mexico's ███ reveals to UBS Mexico's ███ that BBVA-Bancomer intends to "███ ███" by buying BONOS maturing in 2024:

**April 23, 2013**



402.    In the chat below, JPMorgan Mexico's ████ disclose to BBVA-Bancomer's ██████ that there are large customer flows in longer MGB tenors. Recognizing that this was market sensitive information, ███ asks █████ to keep this information confidential:

**March 24, 2011**

403.    Citibanamex's ██████ also regularly shared sensitive information with other members of the MGB cartel, including JPMorgan Mexico's ██████, so that the traders could trade ahead of customer flows.

**April 18, 2013**



404.    Chat messages show that Defendants' traders learned information about the current and future trading positions of other members of the MGB cartel. In the chat below, JPMorgan Mexico's ▇ discloses to Deutsche Bank Mexico' ▇ about the trading positions of BBVA-Bancomer and Citibanamex.

**February 13, 2012**

**June 5, 2013**

405.    Defendants' MGB traders recognized that the trade recommendations they provided to their respective sales teams to send to clients could be used as a potent weapon to manipulate supply and demand, thereby distorting MGB prices. Accordingly, they regularly shared these recommendations with each other ahead of time so that they coordinate buying and selling interest in a manner that benefitted the cartel. Several illustrative examples appear below.

406.    The chat below occurred just after Deutsche Bank Mexico's ████████ sent Barclays Mexico's ████████ a proposed trade recommendation he was about to send to Deutsche Bank's sales team for distribution to clients. The traders agree to use their sales commentaries to create selling interest among their MGB customers:

**March 17, 2011**



407.    In the following chat, ████████ agree to send recommendations to their sales teams to encourage clients to wait until after that day's MGB auction to buy MGBs:

**April 4, 2011**



110



408.     In the following chat, Bank of America Mexico's [redacted] asked for help manipulating

the yield of BONOS maturing in 2016 artificially higher (and thus lowering the price). The traders

agree to accelerate market movements in their favor by coordinating their recommendations to the

"gringos" [*i.e.* to their respective U.S. clientele]:

**July 15, 2011**





409.     Deutsche Bank Mexico's [redacted] (among others) remained in constant contact with

other members of the conspiracy to learn information about those traders' positions. This way, the

members of the conspiracy were able to coordinate positions and avoid injuring other members of

the cartel.

---

[53] Banxico reopens MGBs during syndicated placements, in which only MGB Market Makers can participate.

[54] MGB prices are reset by an independent pricing service at the end of each trading day based on actual transaction prices. Transactions occurring in the last hour of the trading day are given the most weight in this calculation.

410.    As explained above, Deutsche Bank Mexico's ▮▮▮▮▮▮ maintained relationships with competing MGB traders from his experience ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Chat messages indicate that ▮▮▮▮ was in regular contact with other members of the MGB cartel about their trading positions and the prices they were quoting in the MGB market.

411.    For example, in the following chat, Barclays Mexico's ▮▮▮▮ discloses that he intends to build a spread position by buying BONOS maturing in 2021 and selling BONOS maturing in 2020 at a difference of 12.5 basis points ("12 ½" in shorthand). However, Deutsche Bank's ▮▮▮▮ asks him to avoid buying BONOS maturing in 2021 prior to that day's auction, because doing so would "hurt many" [*i.e.* other members of the MGB cartel] by driving yields lower:

**April 13, 2011**



412.    In the transcript below, ▮▮▮▮ reveals to ▮▮▮▮ the identity of the dealer currently selling a BONO maturing in December 2023. Although the identity of the dealer is redacted, the context suggests that the dealer is another member of the MGB cartel because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

to avoid harming the other trader's position by quoting aggressive prices to sell BONOS, *i.e.* to

"stop f*cking him."

<u>**August 15, 2011**</u>



413.    In addition to sharing sensitive customer order flow information and coordinating

trading positions, Defendants' traders also agreed to fix the prices that they quoted to MGB

customers, including in the following example chats:

<u>**June 9, 2011**</u>



<u>**August 30, 2011**</u>





**May 2, 2012**

**June 24, 2013**

**June 13, 2013**

---

■ Afores are large retirement fund administrators that manage employee benefits in partnership with the Mexican federal government. They have a similar role in Mexico as the Social Security system plays in the United States, except that each employee has her own account in an Afore and these accounts are partially funded by the Mexican federal government.

[56] ▮ made this statement in the permanent chatroom with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



414.    JPMorgan Mexico's ▮▮▮ also copied and pasted the same customer request to Citibanamex's ▮▮▮ in a separate chatroom.

415.    Barclays Mexico's ▮▮▮ communicated daily through a permanent chatroom with Bank of America Mexico's ▮▮▮ in which the traders discussed current MGB prices that they were quoting customers, coordinated trading positions and shared customer order flow information, and asked each other to refrain from competing in the MGB market.

**January 7, 2011**

**June 3, 2011**

**June 4, 2013**



416.    Other members of the MGB conspiracy coordinated in real time to avoid quoting competitive prices in the MGB market, including in the example chats below:

**January 17, 2011**

**April 18, 2013**

**May 31, 2013**

417.    Later in the same chat quoted above, JPMorgan Mexico's ▮ warned BBVA-Bancomer's ▮ that foreign customers were interested in buying BONOS maturing in 2018, and told him the price at which the customer wanted to trade:

<u>May 31, 2013</u>



418.     In the chat below, JPMorgan Mexico's ████████ shares trading positions with Citibanamex's ████████, who agrees to accommodate ███ by refraining from quoting prices while ███ closes a trading position:

<u>September 21, 2012</u>

…

419.     Defendants' MGB traders also shared positions with each other and customer flow information throughout the trading day, including leading into MGB auctions as in the chat excerpted below:

**February 10, 2011**



420.    Sharing trading positions is against the economic self-interest of any individual dealer in the absence of a conspiracy because rivals can use this information to profit at the expense of the dealer who shared its trading position. For example, in the chat below, ██████████████ ████ learn that ██████████ (██████████████████████████████████████ ████ was buying BONOS maturing in 2024, thereby acquiring a long position. The traders plan to "destroy" ████████████ position, *i.e.*, aggressively sell the BONO maturing in 2024 to reduce the value of ███████ long position.

**March 17, 2011**

421.    Later in the month, the traders reflect again on their shared "mission" to attack ████ ████████ long position, this time by decreasing the price of the BONO maturing in 2015.

**March 28, 2011**



422.     Chat messages show that Defendants' MGB traders communicated regularly on the phone about their trading positions and to coordinate MGB prices, included the examples below:

**August 2011**



423.     Other chat messages reflect that Defendants' MGB traders met regularly outside of the office and planned meetings even as they discussed their respective bank's proprietary information. In the chat below, BBVA-Bancomer's ▮▮▮ discloses that BBVA-Bancomer is anticipating a decrease in the official Mexican interest rate in June 2013:

**April 9, 2013**






424.    Information about an anticipated drop in the official interest rate was highly sensitive information due to its ability to affect bond prices. In the chat below, JPMorgan Mexico's █ immediately informs UBS Mexico's █ about the anticipated interest rate change:

**April 9, 2013**



425.    COFECE issued a different version of the Statement of Objections to each bank and individual charged with engaging in absolute monopolistic practices in the MGB market. Each version has redacted sections reflecting conspiratorial communications by other members of the conspiracy. To date, Plaintiffs have only seen two versions of the Statement of Objections.

426.    The Statement of Objections contains hundreds of additional pages of chat messages implicating other parties that COFECE charged with engaging in absolute monopolistic practices in the MGB market. The complete Statement of Objections includes a section listing additional chat transcripts evidencing the participation of █████████████████████████ in absolute monopolistic practices in the MGB market.

427. The complete Statement of Objections also contains sections listing additional chat messages evidencing the participation of Santander Mexico's , respectively, in absolute monopolistic practices in the MGB market.

428. The complete Statement of Objections also contains sections listing additional chat messages evidencing the participation of Citibanamex's ████████████████, respectively, in absolute monopolistic practices in the MGB market.

## VIII. ECONOMIC EVIDENCE CONFIRMS THAT DEFENDANTS' CONSPIRACY CAUSED ARTIFICIAL PRICES IN THE MGB MARKET

429. As described above, COFECE and the CNBV both uncovered evidence that Defendants conspired to fix MGB prices, and chat messages produced by two cooperating Defendants show how Defendants colluded via interbank chatrooms. *See* Part VI-VII, above. Economic analysis confirms that Defendants' unlawful conduct caused investors to pay artificially higher transactions costs on their MGB trades with Defendants, and demonstrates that Defendants conspired to: (a) share pricing information and submit fixed bids during MGB auctions; (b) sell MGBs purchased at auction to investors at artificially higher prices; and (c) fix the bid-ask spread artificially wider in MGB transactions.

### A. Bid Dispersion Analysis Demonstrates that Defendants Used the MGB Auction Process to Concentrate MGB Supply.

430. Banxico rules require that bids in MGB auctions be confidential. *See* Part IV, above. This means that each Defendant must independently determine their bidding schedule according to their own views of MGB prices and the expected demand in the auction, without reference to bidding schedules submitted by other Market Makers.

431.     Plaintiffs analyzed Defendants' misconduct during MGB auctions using data acquired from Banxico, which included the highest and lowest bid in each auction between January 1, 2006 (the earliest date for which data is available) and November 28, 2017.

432.     First, Plaintiffs estimated the average amount of dispersion (*i.e.*, variability) among Defendants' bids by taking the difference between the highest and lowest bid accepted in each auction. A lower amount of dispersion means that bids in the MGB auction are grouped closer together, while higher levels of dispersion indicate a wider range among bids.

433.     Next, Plaintiffs compared the amount of dispersion among bids in MGB auctions between January 2006 and April 18, 2017, before COFECE disclosed the existence of Defendants' conspiracy (the "Pre-Announcement Period"), to those occurring after COFECE's announcement between April 19, 2017 and November 28, 2017 (the "Post-Announcement Period").

434.     Dispersion is widely-accepted as a measure of certainty about bond prices.[57] For example, bid dispersion should be higher when there is more uncertainty about prices, such as during a competitive auction where the participants do not know each other's bids. In contrast, collusion will reduce amount of dispersion because it provides certainty about prices.

435.     Thus, absent collusion, there should be no significant differences between the amount of dispersion observed during MGB auctions in the Pre- and Post-Announcement Periods. COFECE's investigation should have no impact on bid dispersion unless Defendants were colluding to rig the auctions.

---

[57] Paul F. Malvey, Christine M. Archibald & Sean T. Flynn, *Uniform-Price Auctions: Evaluation of the Treasury Experience*, U.S. Treasury Office Mkt. Fin. 22, (1995) ("[T]here is a direct relationship between uncertainty regarding the common value of a good and the dispersion of bids: the greater the uncertainty, the greater the dispersion of bids; or alternatively, the lower the uncertainty, the tighter the dispersion of bids.").

| Instrument | Tenor | Average Bidding Dispersion (Peso for BONOS and % for CETES) | | |
|---|---|---|---|---|
| | | Pre-Announcement Period | Post-Announcement Period | % Increase from Pre- to Post-Announcement Period |
| BONOS | All | 0.49 | 0.55 | 12% |
| BONOS | 30-Year | 0.78 | 0.86 | 10% |
| BONOS | 20-Year | 0.60 | 0.80 | 33% |
| BONOS | 10-Year | 0.52 | 0.59 | 13% |
| BONOS | 3-Year | 0.21 | 0.23 | 10% |
| CETES | All | 0.07 | 0.10 | 43% |
| CETES | 1-Year | 0.06 | 0.07 | 17% |
| CETES | 6-Month | 0.05 | 0.06 | 20% |
| CETES | 3-Month | 0.06 | 0.09 | 50% |
| CETES | 1-Month | 0.10 | 0.17 | 70% |

**FIGURE 1**

436.    Figure 1 above demonstrates that bid dispersion in terms of yield (for CETES) and

price (for BONOS) increased significantly across all tenors following COFECE's announcement.

For all BONOS, this increase in bid dispersion was 12.24% on average, and substantially higher in

certain tenors. For example, the increase in bid dispersion was 33% for 20-year BONOS. For

CETES, the results were even more striking, increasing by more than 42% on average in the wake of

COFECE's announcement. These dramatic changes are indicative of collusion among the

Defendants to rig MGB auctions during the Class Period.



**FIGURE 2**

437.     The changes in bid dispersion between the Pre-Announcement Period and Post-Announcement Period are not the result of macroeconomic factors, such as the global financial crisis. To rule out the effects of broader market conditions, Plaintiffs adjusted the bid dispersion results using the 10-year U.S. Treasury Note Volatility Index. Because yields in the MGB and U.S. Treasures markets are highly correlated, large spikes in the 10-year U.S. Treasury Note Volatility Index are indicative of changes in market conditions that would also impact MGB prices.

438.     Figure 2 above shows that bidding dispersion increased to an even greater degree (by approximately 36%) in the Post-Announcement Period after adjusting for market volatility. This analysis confirms that the greater degree of clustering among bids and low bid dispersion during the Class Period cannot be explained by legitimate macroeconomic factors such as calmer economic conditions and instead reflects collusion in the bidding process. Volatility adjusted bid dispersion analyses for other BONOS tenors are provided in Appendix B.

439.     Differences in sample size similarly fail to account for the difference in bid dispersion between the Class Period and the Post-Announcement Period. Plaintiffs confirmed the

results of the bid dispersion analysis presented above using the Welch's t-test, a generally accepted statistical test that accounts for differences in sample size between two data sets. The test shows that differences in sample size do not explain the greater degree of clustering among bids and low bid dispersion during the Class Period compared to the Post-Announcement Period.



**FIGURE 3**

440.     Coordinating bids also increased Defendants' success during MGB auctions. For example, Figure 3 above displays Defendants' average "fill rate"—*i.e.*, the percentage of bonds allocated to Defendants relative to the total amount they bid for—in MGB auctions during the Pre- and Post-Announcement Period as compared to non-market makers such as the Mexican finance ministry (known as the Secretaria de Hacienda y Credito Publico ("SHCP")), and certain pension administrators licensed by the SHCP.

441.     Figure 3 shows that Defendants consistently had a higher fill rate in auctions for BONOS, UDIBONOS, and BONDES D during the Pre-Announcement Period than during the Post-Announcement Period when compared to others. Defendants' higher fill rate before COFECE's announcement that it had found evidence of collusion and had launched an

investigation is indicative of collusion during the bidding process and reflects information sharing among the Market Makers regarding the amount of bonds each was willing buy and at what price.



**FIGURE 4**

442.    Collusion is also reflected by the lack of volatility among Defendants' fill rates in MGB auctions. Volatility is a statistical measure of the amount of uncertainty associated with changes in a particular value. Higher volatility indicates greater uncertainty, while lower levels of volatility reflect greater confidence.

443.    Figure 4 above compares the volatility of Defendants' fill rates in BONOS and UDIBONOS auctions to those of non-Market Makers, such as Mexican state-run pension funds during the Class Period. Figure 4 shows that Defendants' fill rates in MGB auctions are significantly less volatile than those of non-Market Makers. This reflects collusion in the bidding process as Defendants consistently achieved better results (*i.e.*, they received a greater percentage of the bonds they asked for) than those outside the cartel.

**B.  Defendants Sold MGBs From the Auctions at Supra-Competitive Prices**

444.     Rigging the MGB auctions allowed Defendants to control the supply of MGBs, including the prices they paid for bonds purchased from the Mexican government and amount allocated to each co-conspirator. Defendants profited from this aspect of their conspiracy by agreeing to sell MGBs following the auction at fixed artificially higher prices.



**FIGURE 5**

445.     For example, Figure 5 above displays the average normalized spot price of 30-year BONOS throughout the trading day on both "Auction Days" (the orange line) when new 30-year bonds are issued and "Non-Auction Days" (the purple line) between October 2006 and April 2017. Figure 5 illustrates that the price of 30-year BONOS increases dramatically—by between 20 and 60 basis points (0.20% to 0.60%)—immediately once those MGBs become available for sale and continue to rise following the auctions. Tellingly, these price movements are absent on Non-Auction Days, when Defendants do not have new inventory of MGBs to sell.

127

446.   Charts reflecting similar price movements for 10-year BONOS and for 3-month, 6-month, and 1-year CETES are provided in Appendix C. As with the data presented in Figure 5, prices for these MGBs increase dramatically and continue to rise on Auction Days, immediately following the auction. These price increases represent risk-free profits to the Defendants at the expense of consumers who purchased MGBs.[58]

447.   Defendants also capitalized on these higher prices by exploiting Banxico's Market Maker Option Program. This program allowed Defendants to purchase additional MGBs the day *after* an auction at the previous day's auction price, regardless of how prices changed in the interim.

448.   To participate, Defendants submit bids for a certain amount of additional MGBs. Banxico then issues additional bonds equal to 25% of the total volume sold in the previous auction. These bonds are distributed pro-rata among all Defendants that submitted bids based on the amount of bonds requested.[59]

449.   This allowed Defendants to make risk-free profits by purchasing additional bonds at yesterday's lower auction price before selling to consumers at artificially inflated prices. Accordingly, data shows that Defendants participated in the Market Maker Option Program with a very high frequency, requesting additional bonds after more than 70% of auctions during the Class Period.

---

[58] Banxico has not released post-auction data covering the period after November 28, 2017.

[59] Before March 2006, the amount of MGBs available in the Market Maker Option Program was 20% of the total issuance in the previous day's auction.



**FIGURE 6**

450.     Figure 6 above displays Defendants' average fill rate in the Market Maker Option

Program —*i.e.*, the percentage of bonds allocated to Defendants who submitted requests relative to

the total amount they requested—during the Pre- and Post-Announcement Periods. This chart

shows that Defendants were significantly more successful in receiving their desired allocation of

BONOS and UDIBONOS from the Market Maker Option Program during the Pre-Announcement

Period. That rate decreased substantially after COFECE revealed the existence of Defendants'

conspiracy.

451.     Defendants' higher fill rate during the Pre-Announcement Period reflects collusion

and an agreement not to compete for bonds issued through the Market Maker Option Program.

Because Defendants stand to make risk-free profits by purchasing bonds today at yesterday's price,

bidding should be highly competitive as all Defendants would benefit receiving a large allocation.

Defendants' ability to secure the desired amount of bonds more than 50% of the time indicates an

agreement to apportion the allocation prior to submitting bids to Banxico.

### C. Defendants Fixed Bid-Ask Spreads for MGBs.

452.    Defendants also profited from their conspiracy by agreeing to fix the bid-ask spread at which they transacted with consumers, including Plaintiffs and other Class members, artificially wider.

453.    As is the convention in over-the-counter markets, Defendants offer "two-way" quotes for MGBs that simultaneously reflect the price they would "bid" to purchase a certain bond from a customer and "ask" for in a sale. For example, a customer might call a Defendant to request the price of a certain 10-year BONO. The Defendant would respond with a quote reflecting two prices (*e.g.* 99.95/100.05). The lower price (*i.e.*, 99.95) is the bid price the Defendant would pay for that bond while the higher price (*i.e.*, 100.05) is what they would willing to accept to sell that bond to the customer. The difference between the bid price and the ask price (*i.e.*, the difference between 99.95 and 100.05) is the "bid-ask spread," which in this example is 10 basis points or 0.10%

454.    Absent collusion, dealers will compete against each other by offering "narrower" (*i.e.* smaller) spreads to customers. For example, another Defendant wanting to make a sale to the customer above could offer a "narrower" spread of 8 basis points (*e.g.* 99.96/100.04) to secure that customer's business by offering them a better price.

455.    In each example, the bid-ask spread corresponds to the Defendant's profits from the transaction. Wider bid-ask spreads, therefore, result in greater profits because Defendants can buy MGBs at a lower price from their customers and sell those bonds to others for more money.

456.    The Defendants' business model in the MGB market is based on buying low and selling high, as many times as possible. Wider bid-ask spreads also allow the Defendants to earn greater profits from each transaction because they equate to a higher sale price to the customer (*i.e.* a higher "ask" price).



**FIGURE 7**

457.    Figure 7 above compares the bid-ask spread Defendants charged on 3-year, 5-year, 10-year, 20-year, and 30-year BONOS during the Class Period, (the orange bars) to those during the Post-Investigation Period (the purple bars). As with the bid dispersion analysis in Figure 1 above, there should be no discernable difference between bid-ask spreads Defendants charged consumers before and after COFECE announced that it was investigating anticompetitive conduct by dealers in the MGB market if they were quoting prices independently.

458.    However, Figure 7 shows that the spreads Defendants charged consumers dramatically *narrowed* in response to COFECE's investigation. The magnitude of this change is highly significant. In all tenors, spreads were wider during the Class Period than they were in the post-Announcement Period, and became **more than 20% wider** in the 5-year, 10-year, 20-year, and 30-year tenors. These results are statistically significant at a confidence level of 99.9% for all tenors observed. This difference represents pure supra-competitive profits that Defendants extracted from MGB transactions with Plaintiffs and other Class members.

131



**FIGURE 8**

459.    The same change in spreads width is observed in Defendants' CETES quotes. Figure
8 compares the median spread Defendants charged during the Class Period (the orange bars) with
the median spread Defendants quoted during the post-Announcement Period (the purple bars) for
the 6-month, 9-month, and 12-month CETES (the only short-term tenors for which bid-ask price
data is available). Again, Defendants narrowed spreads in the wake of COFECE's investigation,
indicating that they had previously been colluding to quote wider spreads to customers, resulting in
supra-competitive profits at Plaintiffs' and Class members' expense. These results were statistically
significant at a confidence level of 99.9% for all tenors observed.

460.    These results cannot be explained by macroeconomic events that occurred between
2007 and 2009. Plaintiffs also examined the bid-ask spreads quoted by Defendants from January 1,
2010 through April 19, 2017. Again, these results show that the Defendants' quoted significantly
narrower spreads in the wake of COFECE's announcement.



**FIGURE 9**



**FIGURE 10**

461.     Plaintiffs also observed quotes submitted by non-Defendant dealers with a presence in the MGB market. Given that the Defendants collectively controlled the large majority of the MGB market through their membership in Banxico's Market Maker program, one would expect that Defendants would have been able to quote narrower bid-ask spreads than non-Defendant dealers.

133

462.     This is what occurred during the post-Announcement Period, when the Defendants charged significantly narrower bid-ask spreads than non-Defendant dealers. Moreover, non-Defendant dealers did not change their quoting behavior after news of COFECE's investigation became public, indicating again that the Defendants quoted artificially wider bid-ask spreads during the Class Period.[60] These results are displayed in Figure 11, below:



**FIGURE 11**

463.     Changes in liquidity also do not explain the results outlined above. The Bank of Mexico releases data about liquidity in the MGB market. Liquidity has remained relatively constant at around $1 trillion annually from the beginning of the Class Period through 2014, when liquidity began to decline slightly.

## IX.    DEFENDANTS WERE PART OF GLOBAL BANKS WITH WEAK OVERSIGHT AND CONTROLS.

464.     Regulators across the globe have imposed massive fines and sanctions against several of the Defendants' corporate parents for colluding to fix prices in multiple financial markets. The

---

[60] Quote data from non-Defendant dealers for short-term MGBs (*i.e.* CETES) was not available.

government findings and settlements demonstrate that these banks developed a practice of conspiring to increase profits by fixing prices for their benefit and at the expense of consumers. These banks include Barclays, Citigroup, HSBC, JPMorgan, Bank of America, Deutsche Bank, and UBS.

### A.  Barclays

465.    In 2015, Barclays entered settlements with multiple government regulators, including the Department of Justice ("DOJ"), CFTC, Federal Reserve Bank of New York ("Federal Reserve"), NYSDFS, United Kingdom's Financial Conduct Authority ("FCA"), and Switzerland's Competition Commission ("COMCO"), paying more than $3 billion in fines and penalties to settle charges related to its participation in conspiracies to manipulate multiple financial benchmarks during the Class Period.

466.    These investigations revealed that the conspiracy described in this Complaint is not the first time that Barclays has conspired with the other Defendants here. Specifically, Barclays traders formed a self-described "Cartel" along with traders of Defendants JPMorgan and Citigroup, using electronic chat rooms and coded language to manipulate FX benchmarks including the World Markets/Reuters Closing Spot Rates ("WM/R Rates"), the most widely referenced FX benchmarks in the world. Aspects of this price-fixing scheme bear strong resemblance to the conspiracy to rig the MGB market. For instance, members of "The Cartel" manipulated the exchange rates by agreeing to withhold bids or offers to avoid moving the exchange rate in a direction adverse to open positions held by co-conspirators. Barclays and its co-conspirators also protected each other's trading positions by agreeing not to buy or sell at certain times.

467.    Barclays, Citigroup, and JPMorgan each pled guilty to a one-count felony charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere. Defendants who joined "The Cartel" banks paid out a total of over

$2.5 billion to the DOJ alone. Barclays paid fines of $710 million to the DOJ, $485 million to the NYSDFS, $400 million to the CFTC, $342 million to the Federal Reserve, and $441 million to the FCA.

468.    In 2015, the CFTC ordered Barclays to pay a $115 million penalty for the conduct of their New York traders directed at manipulating the U.S. ISDAfix benchmark rate, a benchmark used to price certain swaps transactions, commercial real estate mortgages, and structured debt securities. Barclays traders used large notional amounts of bids and offers to "push the market" and affect the reference rates right before the critical fixing time to affect the published ISDAfix rate. Barclays traders also made false ISDAfix submissions to swaps brokers with the intent of moving the ISDAfix rate to benefit their own trading positions.

469.    The CFTC also found that Barclays conspired to manipulate at least four separate benchmark interest rates for years during the Class Period. Specifically, Barclays was found to have engaged in regular and pervasive conduct from 2007 through at least 2009 aimed at manipulating benchmark rates including U.S. Dollar LIBOR, Yen LIBOR, Pound Sterling LIBOR, and Euribor (the LIBOR equivalent for the Euro money market).

470.    As part of this conspiracy, Barclays traders colluded with traders at other banks including Deutsche Bank and Citigroup to submit false benchmark submissions on key dates when many derivatives contracts were settled, allowing the conspirators to collectively increase the profitability of their own derivatives positions. Barclays was ordered to pay $200 million to the CFTC, $160 million to the DOJ, and $92.8 million to the FCA for its role in these conspiracies.

**B.  Deutsche Bank**

471.    In 2015, Deutsche Bank entered settlements with multiple government regulators, including the DOJ, CFTC, NYSDFS, and European Commission ("EC"), paying more than $3.55 billion in fines and penalties to settle charges related to its participation in conspiracies to fix prices

of multiple financial products during the Class Period. In some instances, Deutsche Bank conspired with other banks, including Barclays, HSBC, and JPMorgan.

472.    The CFTC found that Deutsche Bank conspired to manipulate at least six separate benchmark interest rates for years during the Class Period. Specifically, the CFTC found that from 2005 through 2011 Deutsche Bank engaged in "systemic and pervasive misconduct directed at manipulating critical, international financial benchmark rates" including Yen LIBOR, Sterling LIBOR, Swiss Franc LIBOR, U.S. Dollar LIBOR, TIBOR, and Euribor.

473.    Among other practices, Deutsche Bank encouraged manipulation by placing derivatives traders with "obvious conflicts of interest" in charge of submitting benchmark rates. These derivatives traders aligned trading positions with conspirators at other banks, ensuring that the cartel would benefit by manipulating these benchmark rates. With respect to Deutsche Bank's admitted role in the conspiracy to manipulate Euribor, Deutsche Bank's "star trader" was particularly successful because he leveraged "friendships and past working relationships with derivatives traders at other Euribor panel banks to further his attempts to manipulate Euribor."

474.    Deutsche Bank's misconduct was pervasive and driven by traders, submitters, and managers in its Global Finance and Foreign Exchange business unit located around the world, including in New York, London, and Frankfurt. These traders, responsible for both determining Deutsche Bank's LIBOR or Euribor submissions and trading derivatives positions, frequently made or requested false submissions to increase the profitability of those derivatives positions.

475.    Deutsche Bank management coordinated and organized manipulative conduct among traders and submitters, including those in New York, during weekly "Monday Risk Calls." Traders in the United States joined these weekly conference calls, set up to plan false submissions and corresponding trading strategies across bank divisions and locations to maximize profits.

137

476.    Deutsche Bank frequently conspired with HSBC. The EC specifically identified HSBC as a member of the "Euro Interest Rate Derivatives Cartel" formed with Deutsche Bank and six other major banks to fix the prices of Euro interest rate derivatives.

477.    Deutsche Bank's admitted participation in the LIBOR manipulation conspiracy extended to supervisors and managers who coordinated LIBOR submissions with other banks, including Defendant Bank of America. For instance, the Deutsche Bank supervisor in charge of LIBOR submissions coordinated artificially low submissions with Bank of America on multiple occasions. Deutsche Bank paid over $3.4 billion in fines to the CFTC, DOJ, NYSDFS, FCA, and EC as a result of its manipulative conduct.

478.    Additionally, The Federal Reserve fined Deutsche Bank $136.95 million for its manipulation of the WM/R Rates. The Federal Reserve found that Deutsche Bank engaged in "disclosures of trading positions and, on some occasions, discussions of coordinated trading strategies with traders of other institutions" and "discussions about possible FX benchmark fix-related trading with traders of other institutions."

479.    Deutsche Bank also manipulated prices of precious metals and related derivatives in the United States. For example, in June 2017 Deutsche Bank trader David Liew pleaded guilty to Commodity Exchange Act violations associated with the concerted manipulation of silver and gold futures contract prices traded on the Chicago Mercantile Exchange.

480.    This is not the first time that Deutsche Bank bond traders have been implicated in a collusion scheme with another Defendant. Deutsche Bank recently paid $65.5 million together with Bank of America to settle accusations that these banks colluded with other banks to fix prices in the over-the-counter market for sub-sovereign, supranational, and agency bonds.

## C.  Bank of America

481.    Bank of America conspired with HSBC and Deutsche Bank to manipulate various benchmark rates during the Class Period. Bank of America executed a Consent Order on November 11, 2014, with the Office of the Comptroller of the Currency ("OCC") admitting its participation in a conspiracy to manipulate key benchmarks in the spot foreign exchange market, the WM/R Rates and the ECB spot FX reference rates. These benchmarks were used to set the prices of trillions of dollars in spot FX transactions daily.

482.    Bank of America paid $250 million and admitted to using secret group chat rooms to conspire with competitors at other banks to manipulate spot FX prices to benefit its trading positions. As part of the settlement, the OCC found that Bank of America executed "coordinated trading strategies" with traders at other banks to rig the WM/R fixing and the ECB spot FX reference rates in its favor, conspired with traders at other banks to trigger customer stop loss orders, and shared sensitive customer order information with rival banks to trade in advance of customer orders for its own benefit. Bank of America further admitted to compliance failures in its derivatives trading business, which caused its membership in the conspiracy to continue without scrutiny from at least 2008 through 2013.

483.    In September 2017, Bank of America admitted that traders on its swaps desk traded futures contracts on the CME for their own benefit in advance of large block orders from customers, an unlawful practice known as "front-running" that extracts illicit profit for the bank at the expense of its own customer.  Bank of America engaged in this conduct from at least February 2008 through December 2010. Bank of America further admitted that traders eavesdropped on calls between customers and sales staff so that traders could profit by trading ahead of its customers.

484.    Bank of America traders made misleading statements to investigators from the CME, causing its misconduct to go undetected for years. For example, Bank of America claimed that there

was not enough time between customer orders and order execution for it to trade ahead of customer orders. Bank of America's counsel wrote to CME investigators that traders "did not have advance knowledge of a block trade such as to enable them to engage in any trading prior to the execution of the block," even though traders were actually listening in on the phone calls while orders were placed. The CFTC later found that these statements were false, that Bank of America failed to supervise traders on its Swaps Desk, and fined Bank of America $2.5 million.

### D.  HSBC

485.    HSBC was fined over $35 million by the European Commission for colluding with other banks, including Deutsche Bank and JPMorgan, to manipulate Euribor in 2016.  The Commission found that HSBC conspired with other members of the panel to fix Euribor in a direction that benefitted their trading positions. Additionally, the Commission found that as part of the conspiracy HSBC and the other panel banks exchanged sensitive information on their trading positions and coordinated strategies to maximize their ability to manipulate prices. The fine marked the culmination of a five-year investigation by the European Commission into Euribor panel banks that resulted in over $1 billion in fines.

486.    In November of 2014 the CFTC imposed a $275 million civil monetary penalty on HSBC for conspiring with four other banks to manipulate global foreign exchange benchmark rates, including the WM/R Rates, to benefit their trading positions. The CFTC collectively imposed over $1.4 billion in civil monetary penalties against the five banks involved. The FCA, in a related matter, imposed a $343 million fine on HSBC for failing to "manage obvious risks around confidentiality, conflicts of interest and trading conduct" with their foreign exchange traders. The FCA found that HSBC and four other defendant banks shared client information and manipulated benchmark rates to benefit their trading positions.

### E. Citigroup

487.    In 2014 Citigroup admitted to conspiring with other banks including Barclays, JPMorgan, and HSBC to manipulate certain FX benchmark rates, including the WM/R Rates to benefit their own trading positions during the Class Period. Citigroup paid fines of $925 million to the DOJ, $350 million to the OCC, and $310 million to the CFTC as a result of the investigations into their manipulative conduct.

488.    As part of the conspiracy, Citigroup FX traders leveraged relationships they had developed with traders at other banks and used exclusive, invite-only chat rooms to communicate, often disclosing confidential customer order information and trading positions. Citibank traders and traders at other banks altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to affect the FX benchmark rates.

489.    Citigroup FX traders exchanged the size and direction of the bank's net orders with FX traders at other banks and used this information to attempt to coordinate trading strategies. The traders at times then used this information to enable one or more traders to manipulate the FX benchmark rates prior to and during the benchmark fixing period.

490.    In 2016 Citigroup admitted to engaging in conduct from at least 2007 through 2012 aimed at manipulating ISDAfix and was ordered to pay a $250 million fine by the CFTC. Citigroup traders used large notional amounts of bids and offers to "push the market" and affect the reference rates right before the critical fixing time to affect the published ISDAfix rate. Citigroup traders also made false ISDAfix submissions to swaps brokers with the intent of moving the ISDAfix rate to benefit their own trading positions.

491.    In 2016 the CFTC ordered Citigroup to pay a $175 million fine after Citigroup admitted to conduct directed at manipulating the YEN LIBOR and TIBOR rates from at least 2008 through 2010. The CFTC found that Citigroup traders regularly made manipulative requests to

interdealer brokers who were positioned to influence other panel banks, requests to traders at other panel banks, and internal requests to Citigroup's submitters to benefit their trading positions.

### F.   JPMorgan

492.     Between 2013 and 2018, JPMorgan settled with multiple government regulators, including the DOJ, CFTC, Federal Reserve, the UK FCA, and the European Commission ("EC") paying more than $1.3 billion in fines and penalties to settle charges related to its participation in conspiracies to fix prices of multiple financial products during the Class Period.

493.     The EC fined JPMorgan for benchmark manipulation at least 3 times: $108,317,191 for manipulating Japanese yen LIBOR submissions with Citigroup and Deutsche Bank and others; $13,188,368 for forming a cartel with Credit Suisse and others to quote an artificially wide bid-ask spread for Swiss franc interest rate derivatives; and $361,507,272 for conspiring with HSBC and others to fix price components for euro interest rate derivatives, as well as exchanging highly-sensitive proprietary customer information in electronic chat rooms and instant messaging services.

494.     In November 2014, JPMorgan settled with multiple regulators for conspiring with HSBC, Citigroup, and Bank of America and others for forming a self-described "cartel" to manipulate spot FX prices and benefit the trading positions of supposed rivals employed at co-conspirator banks. JPMorgan agreed to pay penalties of $310 million to the CFTC and $352,830,752 to the UK FCA and consented to an order by the Office of Comptroller of the Currency ("OCC") requiring it to cease and desist its "unsafe or unsound banking practices." In May 2014, JPMorgan pleaded guilty to a criminal Sherman Act violation for the same misconduct, agreeing to pay the DOJ $100 million, and consented to a Federal Reserve cease and desist order requiring it to pay a $342 million penalty and submit a senior management oversight plan, programs for compliance, risk management, and internal audits, progress reports, and an annual controls review.

495.     In June 2018, JPMorgan settled with the CFTC for repeatedly attempting to manipulate the U.S. Dollar International Swaps and Derivatives Association ("ISDA") Fix over a period of five years, to benefit its positions in cash-settled options and interest rate swaps. JPMorgan agreed to pay a $65 million penalty.

### G.  Santander and BBVA

496.     In February 2018, the Spanish antitrust regulator Comisión Nacional de los Mercados y la Competencia ("CNMC") fined Santander and BBVA for conspiring with horizontal competitors to fix the price of derivatives used to hedge the interest rate risks associated with syndicated lending for project finance. The CNMC found that conspirators coordinated interest rate floors with one another in telephone calls and emails before communicating with their clients. The CNMC fined Santander $29,551,562 and BBVA $24,482047 for these violations.

### H.  UBS AG

497.     In 2011, UBS AG paid $160 million to US federal and state agencies for anticompetitive activity in the municipal bond investments market from 2001 through 2006. UBS admitted, acknowledged, and accepted responsibility for illegal anticompetitive conduct by its former employees who entered into unlawful agreements to manipulate the bidding process and rig bids on municipal investment contracts.

498.     In 2012, UBS Japan pled guilty to felony wire fraud and admitted its role in manipulating LIBOR benchmark interest rates. The bank agreed to pay a $100 million fine and signed a plea agreement with the DOJ. In addition, UBS AG, the parent company of UBS Japan headquartered in Zurich, has entered into a non-prosecution agreement (NPA) with the DOJ requiring UBS AG to pay an additional $400 million penalty and to admit and accept responsibility for its misconduct.

499.    In 2015, UBS AG paid a $203 million criminal penalty for breaching this NPA with the DOJ. The DOJ found that UBS participated in collusive conduct and engaged in deceptive FX trading and sales practices even after it signed the NPA.  The department also considered that UBS's post-LIBOR compliance and remediation efforts failed to detect the illegal conduct until an article was published pointing to potential misconduct in the FX markets.

500.    In connection with its FX market activity, UBS also paid the Federal Reserve and Connecticut Department of Banking a total of $342 million for "unsafe and unsound business practices."

## X.    DEFENDANTS' CONSPIRACY INJURED PLAINTIFFS.

501.    Plaintiffs are domestic consumers of MGBs. They collectively purchased and sold hundreds of millions of dollars' worth of MGBs in the United States during the Class Period, with Defendants Bank of America Mexico, JPMorgan Mexico, BBVA-Bancomer, Santander Mexico, HSBC Mexico, Citibanamex, Barclays Mexico, Deutsche Bank Mexico, and UBS Mexico.

502.    As described above, Defendants and their co-conspirators fixed the prices of MGBs during the Class Period for their own profit by: (a) rigging the MGB auction process; (b) conspiring to sell bonds purchased during such auctions at artificially higher prices; (c) agreeing to fix the bid-ask spread charged to consumers artificially wider, and (d) agreeing to avoid competing in the MGB market. *See* Parts VI-VIII, above.

503.    As a direct result of Defendants' and their co-conspirators' misconduct, Plaintiffs were overcharged each time they purchased MGBs from Defendants and underpaid each time they sold MGBs to Defendants. Thus, Plaintiffs were injured and suffered harm in each MGB transaction conducted during the Class Period, including but not limited to, the transactions set out in Appendix D.

## XI.   **CLASS ACTION ALLEGATIONS**

504.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on their own behalf and as representatives of the following Class:[61]

> All persons that entered into an MGB transaction with a Defendant or an
> affiliate of a Defendant between at least January 1, 2006, and April 19, 2017
> (the "Class Period"), where such persons were either domiciled in the United
> States or its territories or, if domiciled outside the United States or its
> territories, transacted in the United States or its territories.
>
> Excluded from the Class are Defendants and their employees, agents,
> affiliates, parents, subsidiaries and co-conspirators, whether or not named in
> this Complaint, and the United States and Mexican federal governments.

505.    The Class is so numerous that individual joinder of all members is impracticable.

While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are

informed and believe that at least thousands of geographically-dispersed Class members transacted

in MGBs during the Class Period.

506.   Plaintiffs' claims are typical of the claims of the other members of the Class.

Plaintiffs and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as complained of herein. The injuries and damages of each

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws

as alleged herein.

507.   Plaintiffs will fairly and adequately protect the interests of the members of the Class.

Plaintiffs are adequate Class representatives and have no interest adverse to the interests of absent

Class members. Plaintiffs have retained counsel competent and experienced in class action litigation,

including antitrust litigation.

---

[61] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the
definition of the Class, including, without limitation, membership criteria and the Class Period.

508.     Common questions of law and fact exist as to all members of the Class, which

predominate over any questions affecting solely individual members of the Class. These common

questions of law and fact include, without limitation:

> a. whether Defendants and their co-conspirators engaged in a combination
> or conspiracy to fix outcomes and rig MGB auctions;
>
> b. whether Defendants' conspired to sell MGBs purchased at auction to
> consumers at artificially higher prices and buy MGBs from consumers at
> artificially lower prices;
>
> c. whether Defendants fixed prices of MGB available for sale to U.S.
> investors by, for example, conspiring to quote wider fixed bid-ask spreads;
>
> d. the character, duration, and nature of the acts performed by the
> Defendants in furtherance of their conspiracy;
>
> e. whether Defendants' unlawful conduct caused injury to the business and
> property of Plaintiffs and the Class by imposing supra-competitive costs on
> them that were higher than would otherwise have been available absent
> Defendants' conspiracy; and
>
> f. the appropriate measure of damages sustained by Plaintiffs and Class
> members.

509.     A class action is superior to other methods for the fair and efficient adjudication of

this controversy because joinder of all Class members is impracticable. Treatment as a class will

permit a large number of similarly-situated persons to adjudicate their common claims in a single

forum simultaneously, efficiently, and without the duplication of effort and expense that numerous

individual actions would engender. Class treatment will also permit the adjudication of claims by

many Class members who could not afford individually to litigate claims such as those asserted in

this Complaint. The cost to the court system of adjudication of such individualized litigation would

be substantial. The prosecution of separate actions by individual members of the Class would create

a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the

Defendants.

510.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## XII.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

511.     The applicable statutes of limitations relating to the claims for relief alleged herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

512.     The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, telephone calls, secret bidding schedules, and meetings conducted behind closed doors to conceal their agreements to artificially raise the prices of MGB—was intentionally self-concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their unlawful conduct.

513.     Defendants used affirmative acts of concealment to hide their violations of law from Plaintiffs and the Class, including: (1) secretly disseminating confidential bidding schedules to each other and agreeing on bids in MGB auctions; (2) implicitly representing that each Defendant was bidding competitively in the auction for MGB such that the final price represented a competitive auction; and (3) charging inflated spreads to customers without disclosing that the charges reflected an agreed price set by Defendants rather than a competitive price.

514.     Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. For instance, Defendants' bidding schedules are considered highly sensitive information that cannot be accessed by the public, which enabled Defendants' conspiracy to remain undetected for years. Similarly, Defendants' participation in the Market Maker program required that they submit competitive bids in auctions and compete

independently when offering MGB to consumers. By participating in the Market Maker program, Defendants therefore represented that the prices they charged were determined by competitive forces rather than fixed by a conspiracy.

515.    As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts until April 19, 2017 when COFECE disclosed that it had found evidence of anticompetitive conduct by dealers in the MGB market. Despite monitoring their investments and regularly following financial media, Plaintiffs could not have discovered same by exercise of due diligence. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## XIII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Conspiracy to Restrain Trade in Violation of §§ 1 and 3 of the Sherman Act)**
**(Against all Defendants)**

516.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

517.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 and § 3 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

518.    During the Class Period, Defendants—a group of horizontal competitors in the MGB market—entered into a series of agreements designed to generate unlawful profits for themselves in MGB transactions by conspiring to, among other things: (a) share pricing information and submit fixed bids during MGB auctions in violation of Banxico rules; (b) sell MGBs purchased

at auction to consumers at artificially higher prices; and (c) fix the bid-ask spread artificially wider in MGB transactions with Plaintiffs and Class members.

519.    This conspiracy to restrain trade and fix prices in the MGB market caused Plaintiffs and members of the Class to be overcharged or underpaid in their MGB transactions. Plaintiffs and Class members also were deprived of the ability to obtain MGB for competitive prices during the Class Period owing to Defendants' conspiracy and their complete control of MGB supply. Plaintiffs and members of the Class thus paid more or received less than they would have for MGBs absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

520.    This horizontal price-fixing conspiracy is a *per se* violation of § 1 and § 3 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the MGB market. There is no legitimate business justification for, and no pro-competitive benefits caused by, Defendants' conspiracy to rig bids in auctions or fix MGB prices charged to investors or any of the overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

521.    As a direct, material, and proximate result of Defendants' violation of § 1 and § 3 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

522.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 and § 3 of the Sherman Act and under § 4 of the Clayton Act.

523.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

**(Unjust Enrichment in Violation of the Common Law)**
**(Against All Defendants)**

524.    Plaintiffs incorporate by reference and re-alleges the preceding allegations, as though fully set forth herein.

525.    Plaintiffs (and other Class members) transacted MGBs during the Class Period directly with Defendants.

526.    These transactions were supposed to be priced based on competitive market forces and reflect honest competition by the Defendants.

527.    However, as alleged above, rather than competing honestly and aggressively with each other, Defendants colluded to fix the prices charged or remitted to Plaintiffs and the Class in purchases and sales of MGBs.

528.    Defendants' collusion enabled them to collect supra-competitive profits on every transaction of MGBs with Plaintiffs and the Class. At the same time, it caused Plaintiffs and the Class to pay more (in the case of MGB purchases) and receive less (in the case of MGB sales) on their MGB transactions with Defendants.

529.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and the Class, and equity and good conscience require the Defendants to make restitution.

530.    Plaintiffs and the Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## XIV.   PRAYER FOR RELIEF

Plaintiffs demands relief as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate §1 and §3 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*;

C.      That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and the Class;

F.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

G.      That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

H.      That the Court directs such further relief as it may deem just and proper.

## XV.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  September 9, 2019               Respectfully submitted,
White Plains, New York

LOWEY DANNENBERG P.C.

/s/ Vincent Briganti
Vincent Briganti
Christian Levis
Roland R. St. Louis, III
44 South Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email:  vbriganti@lowey.com
       clevis@lowey.com
       rstlouis@lowey.com

*Interim Class Counsel*

Joseph J. Tabacco, Jr.
Todd Seaver
Carl N. Hammarskjold
Colleen L. Cleary
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
Email: jtabacco@bermantabacco.com
      tseaver@bermantabacco.com
      chammarskjold@bermantabacco.com
      ccleary@bermantabacco.com


Patrick T. Egan
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617)542-1194
Email: pegan@bermantabacco.com

Scott Martin
HAUSFELD LLP
33 Whitehall Street
14th Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322

152

Email: smartin@hausfeld.com

Michael D. Hausfeld
Hilary K. Scherrer
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
        hscherrer@hausfeld.com


Michael P. Lehmann
HAUSFELD LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com

Fred T. Isquith
Regina M. Calcaterra
Thomas H. Burt
Betsy S. Manifold
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
Email: isquith@whafh.com
        calcaterra@whafh.com
        burt@whafh.com
        manifold@whafh.com

Christopher M. Burke
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax:  (619) 233-0508
Email:  cburke@scott-scott.com

Thomas K. Boardman
SCOTT & SCOTT ATTORNEYS AT LAW LLP
230 Park Avenue, 17th Floor
New York, NY 10169

153

Tel.: (212) 519-0523
Fax:  (212) 223-6334
Email:  tboardman@scott-scott.com

John Radice
Daniel Rubenstein
RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Tel.: (646) 245-8502
Fax: (609) 385-0745
Email:  jradice@radicelawfirm.com
        drubenstein@radicelawfirm.com


Eric L. Young
SHEPHERD FINKELMAN
MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Tel.: (610) 891-9880
Fax: (866) 300-7367
Email:  eyoung@sfmslaw.com

Lesley E. Weaver
Matthew S. Weiler
Emily C. Aldridge
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
Email:  lweaver@bfalaw.com
        mweiler@bfalaw.com
        ealdridge@bfalaw.com

Javier Bleichmar
BLEICHMAR FONTI & AULD LLP
7 Times Square, 27th Floor
New York, NY 10036
Tel.: (212) 789-1340
Fax: (212) 205-3960
Email: jbleichmar@bfalaw.com

William J. Ban
Michael A. Toomey
BARRACK, RODOS & BACINE
11 Times Square

154

640 8th Avenue, 10th Floor
New York, NY 10022
Tel.: (212) 688-0782
Fax: (212) 688-0782
Email:  wban@barrack.com
        mtoomey@barrack.com

Jeffrey A. Barrack
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838
Email:  jbarrack@barrack.com
        jgittleman@barrack.com

*Additional Counsel for Plaintiffs*