UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE MEXICAN GOVERNMENT BONDS ANTITRUST LITIGATION | : : : | Master Docket No. 18-cv-02830 (JPO) |
| This document relates to: | : : | |
| ALL ACTIONS | : : | CLASS ACTION |
| | : : : : : : | ORAL ARGUMENT REQUESTED |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF MOVING DEFENDANTS' JOINT MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 4

          A.     Plaintiffs ...................................................................................... 4

          B.     Defendants .................................................................................. 4

          C.     Jurisdictional Allegations ......................................................... 5

LEGAL STANDARDS ................................................................................................. 6

ARGUMENT ................................................................................................................ 7

I.     DEFENDANTS ARE NOT SUBJECT TO SPECIFIC JURISDICTION
       IN NEW YORK ........................................................................................ 7

          A.     Plaintiffs Fail To Allege that Defendants Purposefully Availed
                Themselves of the Forum ......................................................... 8

          B.     Plaintiffs Fail To Allege that Defendants Purposefully Directed
                 Their Conduct at The Forum Because New York Was Not the
                "Nucleus" or "Focal Point" of the Alleged Conspiracy ........... 17

II.    PLAINTIFFS' FAILURE TO ALLEGE VENUE UNDER THE
       CLAYTON ACT PRECLUDES PERSONAL JURISDICTION OVER
       DEFENDANTS ........................................................................................ 21

III.   PLAINTIFFS CANNOT RELY ON A NATIONWIDE CONTACTS
       ANALYSIS .............................................................................................. 24

IV.   DEFENDANTS ARE NOT SUBJECT TO GENERAL JURISDICTION
       IN NEW YORK ........................................................................................ 25

          A.     Defendants Are Not "At Home" in New York .......................... 25

          B.     That Defendants' Corporate Parents Registered Their New York
                Branches With the NYSDFS Does Not Subject Defendants to
                General Jurisdiction in New York ............................................ 26

V.    CONSIDERATIONS OF FAIR PLAY, SUBSTANTIAL JUSTICE, AND
       INTERNATIONAL COMITY SUPPORT DISMISSAL ................................... 27

VI.   PLAINTIFFS ARE NOT ENTITLED TO JURISDICTIONAL
       DISCOVERY .......................................................................................... 30

CONCLUSION ............................................................................................................ 30

i

# <u>TABLE OF AUTHORITIES</u>

## CASES

*7 West 57th Street Realty Co. v. Citigroup, Inc.*,
   No. 13 Civ. 981 (PGG), 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771
   F. App'x 498 (2d Cir.), *cert. denied*, 140 S. Ct. 71 (2019).................................. 10, 24, 30

*In re Aluminum Warehousing Antitrust Litigation*,
   90 F. Supp. 3d 219 (S.D.N.Y. 2015) ..........................................................................30

*In re Aluminum Warehousing Antitrust Litigation*,
   No. 13-md-2481 (KBF), 2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015)......................7, 29

*Asahi Metal Industry Co. v. Superior Court*,
   480 U.S. 102 (1987) ...................................................................................................28

*Beach v. Citigroup Alternative Investments LLC*,
   No. 12 Civ. 7717 (PKC), 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014).............................8

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007)...........................................................................................8

*In re Braskem S.A. Securities Litigation*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) .........................................................................16

*Bristol-Myers Squibb Co. v. Superior Court of California*,
   137 S. Ct. 1773 (2017)....................................................................................................7

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016)............................................................................ 25, 26, 28

*Charles Schwab Corp. v. Bank of America Corp.*,
   883 F.3d 68 (2d Cir. 2018)...................................................................................passim

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) .............................................................................................24, 25

*Daniel v. American Board of Emergency Medicine*,
   428 F.3d 408 (2d Cir. 2005)....................................................................................21, 24

*Daventree Ltd. v. Republic of Azerbaijan*,
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) .........................................................................29

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. 2018) ..................................................................passim

*Dennis v. JPMorgan Chase & Co.*,
    No. 16-CV-6496 (LAK), 2020 WL 729789 (S.D.N.Y. Feb. 13, 2020) ................ 2, 15, 30

*Ellicott Machinery Corp. v. John Holland Party Ltd.*,
    995 F.2d 474 (4th Cir. 1993) .......................................................................27

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019) .........................................................15

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*,
    No. 13 Civ. 7789 (LGS), 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) .........................27

*Gerstle v. National Credit Adjusters, LLC*,
    76 F. Supp. 3d 503 (S.D.N.Y. 2015) ..........................................................11

*Gucci American, Inc., v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ......................................................................25

*J. McIntyre Machinery, Ltd. v. Nicastro*,
    564 U.S. 873 (2011) .................................................................................16

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998) ......................................................................30

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
    No. 12 Civ. 3419 (GBD), 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ................... 9, 30

*Laydon v. Mizuho Bank, Ltd.*,
    No. 12 Civ. 3419 (GBD), 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) ................ 29, 30

*Leasco Data Processing Equipment Corp. v. Maxwell*,
    468 F.2d 1326 (2d Cir. 1972) ....................................................................29

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
    No. 11 MDL 2262 (NRB) 2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016) .......................26

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
    No. 11 MDL 2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ......................11

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
    No. 11 MDL 2262 NRB, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ........ 12, 18, 21, 26

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ......................................................................27

*Lopez v. Shopify, Inc.*,
    No. 16-Civ-9761 (VEC) (AJP), 2017 WL 2229868 (S.D.N.Y. May 23, 2017) ..............19

*Madison Capital Markets, LLC* v. *Starneth Europe B.V.*,
    No. 15 Civ. 7213, 2016 WL 4484251 (S.D.N.Y. Aug. 23, 2016)....................................28

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)......................................................................................27, 29

*In re Mexican Government Bonds Antitrust Litigation*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019) ...........................................................................1

*In re Nazi Era Cases Against German Defendants Litigation*,
    153 F. App'x 819 (3d Cir. 2005).....................................................................................28

*News America Marketing In-Store, Inc. v. Insignia Systems, Inc.*,
    No. 03 Civ. 8555 (RCC), 2006 WL 2807189 (S.D.N.Y. Sept. 28, 2006) .......................22

*Penguin Group (USA) Inc. v. American Buddha*,
    609 F.3d 30 (2d Cir. 2010)...............................................................................................6

*Pincione v. D' Alfonso*,
    506 F. App'x 22 (2d Cir. 2012).....................................................................................22

*In re Platinum & Palladium Antitrust Litigation*,
    No. 14-CV-9391-GHW, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017)....................17, 30

*Rush v. Savchuk*,
    444 U.S. 320 (1980) .........................................................................................................7

*Sonera Holding B.V. v. Cukurova Holding A.S.*,
    750 F.3d 221 (2d Cir. 2014)...........................................................................................26

*In re SSA Bonds Antitrust Litigation*,
    No. 16 Civ. 3711 (ER), 2019 WL 4917608 (S.D.N.Y. Oct. 4, 2019) ......................passim

*Sullivan v. Barclays PLC*,
    No. 13-cv-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017).............. 9, 15, 24, 30

*Sunward Electonics, Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004)..............................................................................................24

*Tatoian v. Junge*,
    No. 13-CV-1255 (VLB), 2013 WL 6195486 (D. Conn. Nov. 26, 2013) ........................10

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013)..............................................................................................7

*Turnage v. Messersmith Manufacturing, Inc.*,
    No. 14-CV-124 (KS), 2015 WL 197419 (S.D. Miss. Jan. 14, 2015)...............................16

*Tymoshenko v. Firtash*,
    No. 11-CV-2794 (KMW), 2013 WL 1234943 (S.D.N.Y. Mar. 27, 2013) ...................... 29

*Walden v. Fiore*,
    571 U.S. 277 (2014) ................................................................................................ 7, 8, 13

*Waldman v. Palestine Liberation Organization*,
    835 F.3d 317 (2d Cir. 2016) ................................................................................. 8, 10, 18

## STATUTES

15 U.S.C. § 22 .......................................................................................................................... 22

## OTHER AUTHORITIES

Who We Supervise, Department of Financial Services,
    https://myportal.dfs.ny.gov/web/guest-applications/who-we-supervise .......................... 26

Moving Defendants[1] respectfully submit this joint memorandum of law in support of their motion to dismiss with prejudice the Second Consolidated Amended Class Action Complaint (Doc. 163) (the "Amended Complaint" or "SAC") for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3).

## PRELIMINARY STATEMENT

Plaintiffs' Amended Complaint suffers from a fatal jurisdictional defect: all alleged misconduct occurred in Mexico, and none was expressly aimed at the United States.[2]  In short, the SAC alleges that Mexican banks—through a handful of Mexico-based individual traders—conspired in Mexico to (1) rig Mexican government bond ("MGB") auctions, and (2) fix the price of MGBs on the secondary market "in every MGB transaction."  (SAC ¶ 9.)  Plaintiffs now also include page after page of boilerplate and conclusory allegations purporting to show how each defendant "purposefully availed itself of the United States MGB Market."  (SAC ¶¶ 106-290.)  But these allegations cannot hide—and, in fact, help to show—that plaintiffs rely on a theory of specific jurisdiction that is fatally flawed for two main reasons.

First, plaintiffs fail to allege that any of the defendants—Mexican companies conducting business in Mexico—purposefully availed themselves of this forum.  The Amended Complaint

---

[1] Moving Defendants are: Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander México"), BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer"), Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex ("Citibanamex"), Deutsche Bank México, S.A., Institución de Banca Múltiple ("Deutsche Bank México"), HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC ("HSBC México"), and Bank of America México, S.A., Institución de Banca Múltiple, Grupo Financiero Bank of America ("Bank of America México").

[2] Plaintiffs' previous complaint (the Consolidated Amended Class Action Complaint or "CAC") named as defendants both foreign and domestic entities.  The foreign defendants moved to dismiss the CAC for lack of personal jurisdiction and improper venue.  This Court denied that motion as moot following its decision to grant a separate motion to dismiss for failure to state a claim filed on behalf of all defendants.  *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 392 (S.D.N.Y. 2019) ("*MGB I*").  The SAC names as defendants only foreign entities, all of which join the present motion to dismiss for lack of personal jurisdiction and improper venue.

makes apparent that all alleged suit-related conduct—the supposed bid-rigging and price-fixing––took place in Mexico.  Plaintiffs do not allege that any misconduct occurred within the United States or that anyone in the United States participated in the alleged conspiracy.  Moreover, plaintiffs identify just <u>one</u>[3] direct transaction in an allegedly manipulated MGB, and they fail to plead a nexus between <u>any</u> purported transaction and the alleged conspiracy.

Instead, plaintiffs attempt to recast defendants' alleged activities in Mexico as domestic, contending that the alleged conspiracy impacted <u>every</u> MGB transaction over an 11-year period and that MGB transactions between non-defendant entities and U.S. customers were "actually [transactions] between [each defendant] and the U.S. customers."[4]  This is so, according to plaintiffs, because Mexico-based traders employed by Mexican-bank defendants allegedly marketed MGBs to U.S. investors, quoted MGB prices to salespeople employed by U.S.-based affiliates, and distributed MGBs to those affiliates.  This flailing attempt to convert foreign conduct into domestic jurisdiction fails, and <u>two</u> courts in this District recently rejected virtually identical arguments.  *See In re SSA Bonds Antitrust Litig.*, No. 16 Civ. 3711 (ER), 2019 WL 4917608, at *2, 9 (S.D.N.Y. Oct. 4, 2019) ("*SSA II*") (dismissing for lack of personal jurisdiction complaint alleging that foreign defendants marketed SSA bonds to U.S. investors, conveyed artificial SSA bond prices to U.S.-based salespeople, and distributed the bonds to the United States); *Dennis v. JPMorgan Chase & Co*., No. 16-CV-6496 (LAK), 2020 WL 729789 (S.D.N.Y. Feb. 13, 2020) ("*BBSW II*") (rejecting plaintiffs' attempt to attribute trades of U.S.

---

[3] Plaintiffs identify a total of four direct transactions with two defendants.  (SAC ¶¶ 147-49, 167.)  But only one of those transactions appears in Appendix D, which lists plaintiffs' purported transactions allegedly occurring on "Days Impacted by Defendants' Manipulative Conduct."  That transaction was allegedly between Citibanamex and plaintiff Electrical Workers Pension Fund Local 103, I.B.E.W. ("IBEW 103"), but Citibanamex has no record of such a transaction.  *See* de Iturbide Decl. ¶¶ 19, 20 (Citibanamex); *see also infra*, n.19.  Citations to Moving Defendants' declarations in this brief refer to those filed on February 21, 2020.

[4] SAC ¶¶ 121, 185, 207, 225, 244, 266, 285.

broker dealers to foreign defendants).  Nothing here merits a different result.

Second, plaintiffs fail to allege that the purported conspiracy was expressly aimed at the United States.  *See, e.g., Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018).  Plaintiffs rely on general allegations about the size of the U.S. MGB market and conclusory assertions that, because Mexico-based traders interacted with New York-based affiliates, they must have known that their interactions pertained to transactions with U.S. customers.  These allegations are contradicted by other, more specific allegations in the Amended Complaint and have in any event been rejected by numerous courts in this District as insufficient to plead specific jurisdiction.  The cited chat excerpts provide no evidence that the Mexican traders aimed their allegedly conspiratorial conduct at the United States, much less New York.  To the contrary, those chats and plaintiffs' overall allegations about the MGB market on their face undermine the notion that this forum was the focal point of an alleged conspiracy.

Finally, plaintiffs' remaining jurisdictional allegations are inadequate.  Plaintiffs fail to establish proper venue under the Clayton Act because they do not allege that defendants—all of which are foreign entities—"transact business" in the Southern District of New York.  Having failed to meet this requirement, plaintiffs cannot alternatively rely on the general venue statute (or any other statute) to assert venue.  There is also no legal basis to assert that defendants are subject to general jurisdiction in New York or that conspiracy jurisdiction applies here.  And exercising jurisdiction would violate due process and threaten international comity.

Accordingly, this Court should dismiss with prejudice plaintiffs' claims against all defendants for lack of personal jurisdiction and improper venue.  Any request for jurisdictional discovery should be denied because plaintiffs have failed to make out a prima facie case for personal jurisdiction.

## BACKGROUND[5]

### A. Plaintiffs

Plaintiffs are eight pension funds that allegedly transacted in MGBs[6] with defendants or defendants' affiliates between January 1, 2006, and April 19, 2017 (the "Class Period"). Only two plaintiffs are based in New York, while the other six are based in Massachusetts, Pennsylvania, Oklahoma, or the Virgin Islands. (*See* SAC ¶¶ 14-21.)

### B. Defendants

Moving Defendants are six banks headquartered in and organized under the laws of Mexico.[7] No Moving Defendant has branches or offices anywhere in New York, and no Moving Defendant had branches or offices anywhere in the United States that transacted in MGBs at any time during the Class Period.[8] All Moving Defendants maintain separate books and records and a separate corporate existence from their affiliates and subsidiaries.[9] Each Moving Defendant's

---

[5] A more comprehensive summary of plaintiffs' factual allegations is set forth in the Background section of Defendants' Joint Merits Brief.

[6] Plaintiffs identify four types of MGBs: Federal Treasury Certificates ("Cetes"), which are short-term zero coupon bonds that mature in less than a year; Mexican Federal Government Development Bonds ("Bonos"), which are medium and long-term bonds denominated in pesos that mature in three to 30 years; Federal Government Development Bonds ("Udibonos"), which are medium and long-term bonds denominated in inflation-indexed units; and Federal Government Development Bonds ("Bondes D"), which are medium-term floating-rate bonds that normally mature in three to seven years. (SAC ¶¶ 302-15.) Plaintiffs do not allege that any of them transacted in Bondes D. (*See id.* ¶¶ 14-21.)

[7] Borja Decl. ¶ 3 (Santander México); Carrillo Decl. ¶ 3 (BBVA-Bancomer); de Iturbide Decl. ¶ 4 (Citibanamex); Hegewisch Decl. ¶ 4 (Deutsche Bank México); Perez Decl. ¶ 4 (HSBC México); Jimeno Decl. ¶ 4 (Bank of America México).

[8] Borja Decl. ¶¶ 4-6 (Santander México); Carrillo Decl. ¶ 5 (BBVA-Bancomer); de Iturbide Decl. ¶ 6 (Citibanamex); Hegewisch Decl. ¶ 8 (Deutsche Bank México); Perez Decl. ¶ 6 (HSBC México); Jimeno Decl. ¶ 6 (Bank of America México). BBVA-Bancomer has a small office in Texas, but that office does not engage in any MGB transactions, and does not transact in any instruments with U.S.-based persons. *See* Carrillo Decl. ¶ 5 (BBVA-Bancomer).

[9] Borja Decl. ¶ 12 (Santander México); Carrillo Decl. ¶ 9 (BBVA-Bancomer); de Iturbide Decl. ¶ 7 (Citibanamex); Hegewisch Decl. ¶ 11 (Deutsche Bank México); Perez Decl. ¶ 9 (HSBC México); Jimeno Decl. ¶ 12 (Bank of America México).

trading desk responsible for the market making and trading of MGBs is, and during the Class Period was, located in Mexico.[10]  Each individual allegedly appearing in the chats cited in the SAC was (at least while employed by a respective Moving Defendant) based in Mexico during the Class Period.[11]  No Moving Defendant conducts regular business in the United States.[12]

## C. Jurisdictional Allegations

The SAC does not allege that any supposed conspiratorial conduct occurred in the United States.  Rather, plaintiffs contend that defendants are subject to personal jurisdiction in New York because they carried out the following activities in Mexico: "(a) marketing price-fixed MGBs to U.S. investors; (b) pricing and distributing MGBs [] in the United States; (c) quoting fixed, agreed-upon bid and ask prices for MGBs to investors in the United States; and (d) collecting unlawfully obtained overcharges from customer accounts located in the United States."  (SAC ¶ 94.)  Plaintiffs then repeat near-verbatim boilerplate allegations as to each defendant over some 50 pages, purporting to describe defendants' interactions with their U.S.-based affiliates in an attempt to tie defendants to this forum.  (*See id.* ¶¶ 106-290.)  These generic allegations include identical charts (substituting only the names of the defendants) purportedly depicting each defendant's MGB marketing and trade processes.[13]  The SAC identifies just one direct transaction in an allegedly manipulated MGB.  (*See id.*, App'x D; *see also infra* Section

---

[10] Borja Decl. ¶ 11 (Santander México); Carrillo Decl. ¶ 6 (BBVA-Bancomer); de Iturbide Decl. ¶ 10 (Citibanamex); Hegewisch Decl. ¶ 10 (Deutsche Bank México); Perez Decl. ¶ 8 (HSBC México); Jimeno Decl. ¶ 9 (Bank of America México);

[11] Carrillo Decl. ¶¶ 11, 12 (BBVA-Bancomer); de Iturbide Decl. ¶ 13 (Citibanamex); Hegewisch Decl. ¶¶ 13, 14 (Deutsche Bank México); Perez Decl. ¶ 10 (HSBC México); Jimeno Decl. ¶ 13 (Bank of America México).

[12] *See, e.g.*, Borja Decl. ¶¶ 4-11 (Santander México); Carrillo Decl. ¶¶ 4-8 (BBVA-Bancomer); de Iturbide Decl. ¶¶ 5, 6, 8 (Citibanamex); Hegewisch Decl. ¶¶ 8-9 (Deutsche Bank México); Perez Decl. ¶¶ 5-7 (HSBC México); Jimeno Decl. ¶¶ 5-8 (Bank of America México).

[13] *See, e.g.*, SAC ¶¶ 136, 149, 158, 168, 178, 186, 200, 207, 218, 226, 237, 245, 259, 267, 278, 286.

1(A)(2).)  Plaintiffs do not contend that the traders identified in the chats priced any particular trades or allege any other facts plausibly linking their specific transactions to the alleged conspiracy.

Plaintiffs also allege that U.S. investors made up a "substantial portion" of each defendant's MGB customer base.  (SAC ¶ 105.)  They assert that defendants traded "hundreds of billions of dollars" in MGBs with U.S. investors, and that the United States eventually became the "leading export market" for MGBs.  (*Id.* ¶¶ 99-100.)  But, despite having access to "hundreds of chat messages" provided by cooperating defendants (*id.* ¶ 13), plaintiffs have identified no potential references to U.S. investors other than a single off-hand mention of "gringos" on a date where no identified trade took place.  (*Compare id.* ¶ 408 *with id.*, App'x D.)  Plaintiffs further allege that some of defendants' corporate parents—which are not themselves defendants— "registered their New York branch or representative or agency offices with the New York State Department of Financial Services ("NYSDFS")" and that these corporate parents "acquir[ed] licenses to do business in this state under New York Banking Law § 200-b."  (*Id.* ¶ 96.)

## LEGAL STANDARDS

Plaintiffs bear the burden of establishing that this Court has jurisdiction over each defendant.  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  To meet that burden, the SAC "'must make a prima facie showing that jurisdiction exists,'" which entails "'making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'"  *Schwab*, 883 F.3d at 81 (alteration in original) (quoting *Penguin Grp.*, 609 F.3d at 34-35).  Further, plaintiffs "must establish the court's jurisdiction with respect to each claim asserted."  *Id.* at 83 (citations omitted).  When resolving a motion to dismiss for lack of personal jurisdiction, courts need not "accept as true a legal conclusion couched as a factual allegation" or "draw argumentative

inferences in the plaintiff's favor," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (citations omitted), and plaintiffs may not "rely on conclusory statements without any supporting facts, as such allegations would 'lack the factual specificity necessary to confer jurisdiction.'" *SSA II*, 2019 WL 4917608, at *4 (quoting *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014)).

To comport with due process, personal jurisdiction over a defendant must be general (all-purpose) or specific (case-linked). *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017). Either way, the inquiry is defendant-specific, *Rush v. Savchuk*, 444 U.S. 320, 332 (1980), and focuses on the contacts "that the 'defendant himself' creates with the forum State," *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "[T]he Court may look beyond the pleadings to affidavits and supporting materials submitted by the parties." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 6472656, at *2 (S.D.N.Y. Oct. 23, 2015).

## <u>ARGUMENT</u>

## I.   DEFENDANTS ARE NOT SUBJECT TO SPECIFIC JURISDICTION IN NEW YORK

Plaintiffs fail to allege that any suit-related conduct occurred within, or specifically targeted, New York or the United States. *See Walden*, 571 U.S. at 284 (holding that for a court to exercise specific jurisdiction, "the defendant's suit-related conduct must create a substantial connection with the forum State." (emphasis added)). Where no substantial connection exists between the forum and the defendants' suit-related activities, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb*, 137 S. Ct. at 1781. The specific jurisdiction inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation,'" not the relationship between the defendant and the

7

U.S.-based plaintiffs. *Walden*, 571 U.S. at 283-85 (citation omitted). Moreover, courts must consider only those contacts giving rise to the injuries claimed by class representatives, not those that may have hypothetically injured any absent, putative class members. *Beach v. Citigroup Alt. Invs. LLC*, No. 12 Civ. 7717 (PKC), 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014).

Plaintiffs must establish specific jurisdiction through one of two methods: (1) purposeful availment, by demonstrating that defendants' in-forum contacts actually gave rise to plaintiffs' claims, or (2) purposeful direction by "show[ing] that the defendants' conduct" outside the forum "was intentional and expressly aimed at the forum state with the knowledge that substantial injury would be felt there." *SSA II*, 2019 WL 4917608, at *8; *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (explaining that purposeful availment considers defendants' "activity within the forum state" whereas purposeful direction analyzes the "in-state effects of out-of-state activity"). Plaintiffs' jurisdictional allegations fail to satisfy either method.

## A. Plaintiffs Fail To Allege that Defendants Purposefully Availed Themselves of the Forum

### 1. No Alleged Misconduct Purportedly Showing Purposeful Availment Occurred in the United States

Plaintiffs cannot establish that defendants purposefully availed themselves of this forum because (1) all alleged conduct that purportedly gives rise to plaintiffs' claims—the auction-rigging and the price-fixing—occurred in Mexico, and (2) all alleged conduct otherwise purporting to show purposeful availment (the marketing, price-quoting, and distributing) <u>also</u> occurred in Mexico and is not suit-related. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) ("The exercise of specific jurisdiction depends on in-state activity that '<u>gave rise to the episode-in-suit</u>.'" (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011))).

<u>First</u>, plaintiffs fail to plead purposeful availment because the individual traders

responsible for carrying out the alleged conspiracy were based in Mexico at all relevant times.[14]
*Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *45 (S.D.N.Y. Feb. 21, 2017) (finding that suit-related conduct did not create a substantial connection with the forum because "[t]he substance of, and participants in, any false Euribor quotes are anchored squarely in Europe").  Plaintiffs summarily contend that the alleged conspiracy was "implemented" in the United States (SAC ¶ 94), but they offer no supporting factual allegations, and indeed have withdrawn their claims against defendants' U.S.-based affiliates.  Moreover, they do not—and cannot—allege facts describing any alleged conspiratorial conduct in the United States or identifying any individual located in the United States who participated in the alleged conspiracy.  *See Sullivan*, 2017 WL 685570, at *45 (finding no personal jurisdiction where plaintiffs "[did] not allege[] that any United States branch or employee of [defendant] participated in the scheme to rig the Euribor" nor "that [defendant] directly communicated with any United States co-conspirator about fixing the Euribor" (emphasis added)).

Plaintiffs attempt to remedy this problem by alleging that defendants "sent MGB traders to New York City to meet with clients and network with investors," (SAC ¶ 74), but nowhere do they allege that these meetings relate to the alleged misconduct.  The alleged trips to New York are therefore not suit-related; these types of "boilerplate allegations" of routine business travel have repeatedly been rejected in this District as an insufficient basis for personal jurisdiction.  *SSA II*, 2019 WL 4917608, at *7 (disregarding similar allegations because plaintiffs did not "present facts [showing] that the trips were used to plan the manipulation"); *see also Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.* ("*Laydon VI*"), No. 12 Civ. 3419 (GBD), 2017 WL 1113080, at *4 (S.D.N.Y. Mar. 10, 2017) (holding that a defendant's employee's visits to the

---

[14] *See supra*, n.10, n.11.

forum with alleged co-conspirator did not amount to suit-related conduct absent facts suggesting the trip involved the market manipulation alleged); *see also 7 W. 57th St. Realty Co. v. Citigroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015) ("Plaintiff must demonstrate that the Foreign Banks' <u>suit-related</u> conduct creates minimum contacts with New York . . . not simply that the Foreign Banks have a presence here or conduct business activities here in general."), *aff'd*, 771 F. App'x 498 (2d Cir.), *cert. denied*, 140 S. Ct. 71 (2019).  The one innocuous chat plaintiffs identify where a Mexico-based trader is visiting the United States involves no indication of misconduct and suggests that the trader did not regularly visit the United States at all.  (*See* SAC ¶ 74.)

Second, plaintiffs do not allege that defendants' alleged marketing to U.S. investors, quoting of prices to U.S.-based affiliates, and distributing of MGBs to their U.S. affiliates, which plaintiffs identify as evidence of purposeful availment, took place in the United States.[15]  Indeed, multiple courts in this District have held that allegations of manipulating rates abroad and then marketing or submitting assets at those rates <u>to</u> the United States do not establish that suit-related conduct occurred <u>in</u> the United States.  *See SSA II*, 2019 WL 4917608, at *8 (finding that no alleged conspiratorial conduct occurred "within New York" where plaintiffs alleged that defendants "engaged in marketing, pricing, [] approving USD SSA bond transactions[,] [and] providing a constant flow of information to and from New York-based salespeople"); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 206 (S.D.N.Y. 2018) ("*BBSW I*") (holding that all

---

[15] Plaintiffs also allege that defendants "collect[ed] unlawfully obtained overcharges from customer accounts located in the United States." (SAC ¶ 94.)  These allegations are makeweight because, like the allegations about marketing, price-quoting, and distributing MGBs, recording proceeds as profit and loss neither occurred in the United States nor gave rise to plaintiffs' claims.  *Waldman*, 835 F.3d at 335 ("The relevant 'suit-related conduct' by the defendants was the conduct that could have subjected them to liability.").  And, even assuming that funds ever were collected directly from accounts in the United States, which the SAC does not adequately allege, "receipt of plaintiff's funds only constitute[s] a 'passive act which cannot logically confer jurisdiction.'"  *Tatoian v. Junge*, No. 13-CV-1255 (VLB), 2013 WL 6195486, at *6 (D. Conn. Nov. 26, 2013).

suit-related conduct "took place entirely outside of the United States" where defendants
marketed products at allegedly manipulated rates to the United States); *In re LIBOR-Based Fin.
Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2016 WL 7378980, at *9 (S.D.N.Y. Dec.
20, 2016) ("*LIBOR VI*") (dismissing on personal jurisdiction grounds where "allegations fail[ed]
to address whether defendants determined, or transmitted, a false LIBOR submission from the
United States").

    Even had marketing to U.S. customers, quoting prices to U.S.-based affiliates, and
distributing MGBs to those affiliates constituted in-forum conduct—and they do not—plaintiffs
do not allege that this conduct had any connection to defendants' alleged auction-rigging or
price-fixing, much less plaintiffs' own transactions.  Plaintiffs' boilerplate refrain that "the MGB
prices that [each defendant] sent into the United States were artificial because they were
influenced by a conspiracy among defendants"[16] is wholly conclusory and cannot confer
jurisdiction.  *See SSA II*, 2019 WL 4917608, at *6, *9 (disregarding conclusory allegations that
foreign defendants conveyed artificial bond prices to their New York affiliates); *Sullivan*, 2017
WL 685570, at *45 (disregarding defendant's "assortment of U.S. ties" because plaintiffs
provided "no allegations that link[ed] the elements of [their claims] to [defendant's] conduct
within the United States"); *see also Gerstle v. Nat'l Credit Adjusters, LLC*, 76 F. Supp. 3d 503,
510 (S.D.N.Y. 2015) (rejecting allegations as conclusory based on "the use of the same
boilerplate description for the actions of [all defendants]").  *SSA II* is directly on point.  The
purposeful availment allegations in the complaint at issue there—which the court rejected as

---

[16] SAC ¶¶ 115, 139, 161, 181, 203, 221, 240, 262, 281.

conclusory—were virtually identical to those alleged here.[17]

Indeed, finding that "defendants should be subject to personal jurisdiction on the basis of marketing or sales lacking a 'link . . . to the allegedly tortious activity' would improperly create 'de facto universal jurisdiction.'"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *30 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*") (citation omitted).  Although plaintiffs provide a list of allegedly manipulated transactions,[18] they allege no facts suggesting misconduct in connection with any instances of marketing or quoting prices. *See id.* at *32 (holding that jurisdiction over an offshore LIBOR submitter who conveyed quotes to an in-forum "requester" is proper only where plaintiffs connect a particular conveyance to their claims).  In short, plaintiffs fail to plead purposeful availment because they allege no misconduct occurring in the United States.

2.  *Allegations About Defendants' Transactions in the United States Do Not Support a Finding of Purposeful Availment*

Allegations about defendants' actual transactions in the United States also fail to establish

---

[17] For example, Judge Ramos singled out—and rejected as inadequate—the following excerpt from plaintiffs' brief (which reiterated the allegations in the complaint):

> "[Plaintiff's] decisions to buy and sell USD SSA bonds were made in the United States, after placing inquiries with U.S.-based salespeople working at the Dealer Defendants, who then passed the inquiry to the Dealer Defendants' London-based traders for a price.  The U.S.-based salespeople then received the price and gave it to [plaintiff's] domestic investment manager in the United States.  Finally, the purchase or sale transaction was executed in the United States, and either the USD SSA bond or the sale proceeds were delivered to [plaintiffs] in the United States.  The Dealer Defendants' London desks knew they were pricing a trade for a U.S.-based investor and that the price would be conveyed back to the U.S.-based investor and result in a transaction executed in the United States, as they intended."

*SSA II*, 2019 WL 4917608, at *2 (citation omitted).  Here, Plaintiffs similarly allege that investors located in the United States would "contact a salesperson . . . located in New York [who] would then contact a trader [in Mexico] . . . to ask for a price . . . ."  *See, e.g.*, SAC ¶ 114.  The trader, "fully aware that [they were] pricing a customer trade for execution in the United States would in turn determine[] a price . . . for the requested MGBs and convey[] this pricing information to the salesperson" who would "relay the price quote to the customer."  *See, e.g.*, SAC ¶¶ 115-116.  "The trader . . . then distributed . . . or received . . . the MGBs transferred in the transaction."  *See, e.g.*, SAC ¶ 117.

[18] SAC, App'x D.

purposeful availment because (1) plaintiffs do not even allege that they transacted with most defendants, (2) plaintiffs offer no non-conclusory explanation linking any of their alleged transactions to the purported conspiracy, and (3) plaintiffs' conclusory assertion that in-forum transactions were profit-motivated is insufficient.

First, although plaintiffs initially claim that they "transacted" with each defendant (SAC ¶ 11), they do not identify any relevant transactions between themselves and Santander México, Deutsche Bank México, HSBC México, Bank of America México, JPMorgan México, Barclays México, BBVA-Bancomer, or UBS México (see id., App'x D (listing no direct transactions with these defendants)).[19]  Rather, plaintiffs merely contend that these defendants marketed MGBs to U.S. customers, quoted MGB prices to U.S.-based affiliates, distributed MGBs to those affiliates, and recorded the resulting gain or loss of those exchanges.  (SAC ¶ 94.)  This conduct comes nowhere close to establishing the necessary "substantial connection" between the purported conspiracy and the forum.  Walden, 571 U.S. at 284.  Plaintiffs' theory of purposeful availment as to these defendants fails on this basis alone.  See, e.g., Schwab, 883 F.3d at 86-87 (affirming dismissal against foreign defendants not alleged to have transacted directly with the plaintiffs).  Put differently, because plaintiffs fail to "allege facts that specifically show that [these] Defendants sold [MGBs] in New York," they "have not alleged purposeful availment."  SSA II,

---

[19] Plaintiffs allege no direct transactions whatsoever between themselves and Santander México, Deutsche Bank México, HSBC México, Bank of America México, JPMorgan México, Barclays México, and UBS México. Plaintiffs allege a single direct transaction between Citibanamex and plaintiff IBEW 103 on December 7, 2015. Citibanamex's records reflect no direct trades with IBEW 103 on December 7, 2015 or on any other date. (See de Iturbide Decl. ¶ 19 (Citibanamex).)  Nor could IBEW 103 have engaged in any such trade.  Citibanamex cannot enter into a direct trade with a counterparty unless they are parties to an investment agreement, and Citibanamex has no record of such an agreement with IBEW 103.  (Id. ¶ 20.)  Plaintiffs also allege three direct transactions between BBVA-Bancomer and Plaintiff Southeastern Pennsylvania Transportation Authority (SAC ¶¶ 147-49), but—setting aside the sweeping and conclusory assertion that every MGB transaction over an 11-year period was somehow impacted—they do not allege that those transactions occurred on "Days Impacted by Defendants' Manipulative Conduct," (id., App'x D).

2019 WL 4917608, at *9 (citing *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 695 (S.D.N.Y. 2019) ("*CDOR*")).

Bereft of evidence that defendants entered into any relevant transaction in the United States, plaintiffs suggest that MGB transactions executed by US.-based affiliates—which plaintiffs dropped as defendants in this case—"actually occurred"[20] between the Mexico-based defendants and U.S. customers.  This is conclusory and unsupported by any well-pleaded facts. Plaintiffs' assertion that defendants' U.S.-based broker-dealer affiliates played only a "passive role" in the MGB trade process (SAC ¶ 66) is flatly inconsistent with plaintiffs' allegations that these affiliates <u>employed</u>[21] the salespeople responsible for "managing [MGB] customer relationships," (SAC ¶ 66), "interact[ing] with [MGB] customers, respond[ing] to inquiries, and forward[ing] information" (SAC ¶ 78).  And according to the SAC, it was these U.S.-based salespeople who "would <u>initiate</u> [the transaction or interaction] with a U.S. customer."[22] Plaintiffs' attempt to separate the U.S.-based affiliates from the salespeople they employed is unavailing.

Regardless, defendants' quoting of prices and other purported activities fall woefully short of alleging the agency or alter ego relationship required to establish specific jurisdiction over indirect counterparties.  *Schwab*, 883 F.3d at 86 (rejecting "sparse" allegations of an agency relationship, including claims that defendants "controlled or otherwise directed or materially participated in the operations" of their broker-dealers affiliates and "reaped proceeds or other

---

[20] SAC ¶¶ 121, 185, 207, 225, 244, 266, 285.

[21] SAC ¶¶ 138, 156, 176, 202, 216, 239, 261, 280.  The SAC alleges that only Santander México's affiliates' structure differed; Santander Investment Securities Inc. employed and housed the sales teams responsible for trading MGBs in the United States, while Santander Investment Bolsa, Sociedad de Valores, S.A. executed the transactions with U.S.-based customers.  (*See* SAC ¶ 122.)

[22] SAC ¶¶ 138, 160, 180, 202, 220, 239, 261, 280 (emphasis added).

financial benefits from the broker-dealers' sales").  Earlier this month, a court in this District rejected similar attempts to improperly impute the contacts of non-party affiliates to foreign defendants.  *BBSW II*, 2020 WL 729789, at \*2-3.  Plaintiffs there alleged that foreign defendants' traders served as "product specialists," while employees at non-party U.S.-based affiliates were responsible only for "managing customer relationships and executing trade documentation with clients."[23]  The court summarily held that those allegations "[did] not permit a reasonable inference that [foreign defendants] controlled the nonparties with respect to alleged sales to [plaintiff]." *BBSW II*, 2020 WL 729789, at \*3.  Allegations here merit the same result.

Second, even had plaintiffs alleged direct transactions with each defendant, their purposeful availment theory still fails because they do not connect any specific transaction to the alleged conspiracy.  *See, e.g.*, *SSA II*, 2019 WL 4917608, at \*14 (dismissing for lack of personal jurisdiction because complaint was "devoid of any facts that show [how] specific transactions in New York . . . were in furtherance of the alleged conspiracy").  Plaintiffs allege no facts explaining how their trades were impacted by the alleged conspiracy—they do not even claim that the individual traders involved in the chats priced any particular trade.  Plaintiffs' inability to identify a specific, non-conclusory "nexus between the alleged business transactions in New York and the claims of this antitrust case" is dispositive.  *Id.* at \*6; *see also Sullivan*, 2017 WL 685570, at \*44 (dismissing claims because plaintiffs failed to "allege a United States nexus to [defendant's] Euribor manipulation" despite the fact that some of the defendant's Euribor-related trade counterparties, including plaintiffs, were located in the United States); *CDOR*, 368 F. Supp. 3d at 695 (rejecting plaintiffs' argument that "Foreign Defendants purposefully availed

---

[23] BBSW Second Amended Class Action Complaint, Dkt. 281 ¶ 320.  *BBSW II* also recognized that attributing the contacts of one sister corporation to another is more difficult than attributing contacts of a subsidiary to a parent. 2020 WL 729789, at \*3 n.13.

themselves of the United States by 'transacting CDOR-Based Derivatives with investors in the

U.S. while manipulating CDOR'" because plaintiffs did not link manipulation to their specific

injuries (quoting Pl's Opp. Br.)).[24]

      The Second Circuit's holding in *Schwab* reinforced that transactions in the United States

cannot confer jurisdiction over defendants unless plaintiffs show a "causal relationship" between

those transactions and the alleged Mexico-based conspiracy.  883 F.3d at 84 (dismissing on

personal jurisdiction grounds claims pertaining to false LIBOR submissions even where

defendants sold LIBOR-based instruments in California because defendants' trading activities

"did not cause Defendants' false LIBOR submissions to the BBA in London, nor did the

transactions in some other way give rise to [plaintiff's claims]"); *see also BBSW I*, 343 F. Supp.

3d at 205, 207 (following *Schwab* and finding no purposeful availment because "the alleged

manipulation of BBSW—an Australian benchmark interest rate—was not caused by any

transactions that any Defendant entered into in the United States").  Plaintiffs cannot cure this

fatal pleading deficiency by claiming in conclusory fashion that the "comprehensive scheme"

resulted in "overcharging and underpaying investors in <u>every</u> MGB transaction."  (SAC ¶ 9

(emphasis added.)  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y.

_____

[24] Even one isolated direct trade specifically linked to plaintiffs' claims (which plaintiffs have not identified) would not confer jurisdiction without "something more." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 888-89 (2011) (Breyer, J., concurring) (holding that "[a] single isolated sale" in the forum state, even if it gives rise to plaintiffs' claims, is not sufficient to confer personal jurisdiction, unless accompanied by "something more"); *see also Turnage v. Messersmith Mfg., Inc.*, No. 14-CV-124 (KS), 2015 WL 197419, at *3 (S.D. Miss. Jan. 14, 2015) ("Even if Defendant had directly sold and installed the subject boiler system to Plaintiff's employer, a single isolated sale is not sufficient to establish specific personal jurisdiction.").  "Something more" can include "special state-related design, advertising, advice, [or] marketing," or something else that shows that a defendant "'purposefully avail[ed] itself of the privilege of conducting activities'" within the forum state. *J. McIntyre Mach.*, 564 U.S. at 889 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  As previously discussed, defendants' alleged New York contacts are practically non-existent. *See supra*, at 4-5.  And allegations related to the marketing of MGBs in the United States do not comprise "something more" where the alleged conduct was neither suit-related, *see supra* Section I(A)(1), nor purposefully directed at the United States, *see infra* Section I(B).

2017) (rejecting similarly "sweeping and conclusory allegations" as a basis for jurisdiction).[25]

  <u>Third</u>, plaintiffs cannot forgo their burden to plead the requisite "causal relationship" between the conspiracy and U.S.-based transactions by broadly alleging that those transactions furthered defendants' general purpose of "increas[ing] the profitability of their MGB trading." (SAC ¶ 4.)  Courts have roundly rejected such allegations as insufficient to plead purposeful availment.  *See Schwab*, 883 F.3d at 87 ("[F]inancial self-interest is not the same as furthering a conspiracy through [in-forum] sales.").  The Second Circuit ruled that in-forum transactions not causally linked to the conspiracy are not suit-related <u>even if</u> defendants "also [conspired] 'to earn profits' from that manipulation."  *Id.*  Likewise, in *BBSW I*, the court explicitly rejected a purposeful availment theory based on the "profit-motivated" nature of the alleged conspiracy, holding that "*Schwab* controls here and precludes a finding of personal jurisdiction . . . through the Foreign Defendants' direct transactions in BBSW-Based Derivatives with plaintiffs."  343 F. Supp 3d at 205 (recognizing that the conspiracy in *Schwab* "was indeed [profit-motivated]").

 **B.   Plaintiffs Fail To Allege that Defendants Purposefully Directed Their Conduct at The Forum Because New York Was Not the "Nucleus" or "Focal Point" of the Alleged Conspiracy**

  Plaintiffs' purposeful direction ("effects test") theory fares no better because (1) general allegations about the size of the U.S. market cannot confer jurisdiction, and (2) plaintiffs allege that defendants aimed their purported misconduct globally, not expressly at New York.  *See In re Platinum & Palladium Antitrust Litig.*, No. 14-CV-9391-GHW, 2017 WL 1169626, at \*42 (S.D.N.Y. Mar. 28, 2017) (holding that to establish specific jurisdiction under a purposeful

---

[25] As in *Schwab*, the fact that plaintiffs' theory of purposeful availment does not distinguish between defendants that allegedly transacted with plaintiffs directly and those that did not "only bolsters [the] conclusion" that none of the purported transactions are suit-related.  883 F.3d at 84.

direction theory, "[t]he forum <u>must be</u> the 'focal point' or 'nucleus' of plaintiff's alleged harm" (emphasis added)); *see also Waldman*, 835 F.3d at 340 (rejecting purposeful direction argument because the United States was not the "focal point of the [misconduct] alleged").

<u>First</u>, general allegations about the size of the United States MGB market,[26] even if taken as true, do not establish that defendants' conduct in Mexico was "expressly aimed" at the United States, much less New York.  These allegations at best show that the purported misconduct may have had a foreseeable effect on the United States, but "it is bedrock law that merely foreseeable effects of defendants' conduct do not support personal jurisdiction."  *LIBOR IV*, 2015 WL 6243526, at *32; *see also Schwab*, 883 F.3d at 88 ("That the effects of LIBOR manipulation were likely to reach an economy as large as California's does not mean that Defendants' conduct in London was 'expressly aimed' at that state."); *Waldman*, 835 F.3d at 337-38, 340 (finding no personal jurisdiction even where the alleged misconduct "continuously hit Americans" because defendants appeared to target "people from all over the world").  Courts in this District have repeatedly rejected personal jurisdictional arguments premised on the theory that alleged out-of-forum misconduct involving globally traded securities resulted in foreseeable harm to U.S. investors.  *See, e.g.*, *BBSW I*, 343 F. Supp. 3d at 207-08 ("Plaintiffs' allegations that the United States was a substantial market for BBSW-Based Derivatives speak only to the foreseeability of the effect of the Foreign Defendants' conduct in the United States [and cannot] be a basis for . . . personal jurisdiction over Foreign Defendants.").[27]

---

[26] For example, plaintiffs allege—verbatim as to each defendant—that "[t]he United States was one of [defendant's] largest, if not its largest MGB export market by volume."  (SAC ¶¶ 107, 130, 152, 173, 194, 213, 232, 254, 273.)

[27] Plaintiffs in *BBSW I* also argued that "Defendants planned their conduct based on each bank's 'net BBSW exposure'" such that "the net BBSW exposure calculation always included U.S. transactions" and resulted in the "perpetual[] victimiz[ation] of U.S. customers."  343 F. Supp. 3d at 206-07 (alterations in original).  Even these allegations—more robust than anything plaintiffs allege here—were rejected because the effect on the U.S. market was still nothing more than foreseeable under *Schwab*.  *Id.* at 208.

Second, the SAC repeatedly undermines any notion that defendants' traders expressly aimed their conduct at New York.  Plaintiffs' own allegations regarding the structure of defendants' MGB businesses, for example, explain that it was the sales teams around the world that were "assigned to cover certain geographic areas" (SAC ¶ 76), whereas the Mexico-based trading desks allegedly managed the global trading activity for MGBs.[28]  The very chat plaintiffs present as illustrative of defendants' business structure shows a Taiwan-based salesperson requesting a quote from a trading desk in Mexico.  (SAC ¶ 80.)  Given the global nature of the business, "it cannot be said that New York 'is the focal point of the [claims] alleged in this litigation.'"  *Lopez v. Shopify, Inc.*, No. 16-Civ-9761 (VEC) (AJP), 2017 WL 2229868, at *9 (S.D.N.Y. May 23, 2017) (quoting *Waldman*, 835 F.3d at 340).

Plaintiffs cannot salvage their purposeful direction theory simply by alleging that the unidentified Mexico-based traders were "fully aware [that they were speaking with a New York-based affiliate] and pricing a customer trade for execution in the United States."[29]  In *SSA II*, the court rejected similar allegations that foreign defendants had "artificially priced and approved USD SSA bonds knowing the trades were for a U.S. investor" because, like here, plaintiffs provided "no factual support for the proposition that Defendants directed any actions at New York specifically."  2019 WL 4917608, at *9 (emphasis added) (citation omitted).  Even if plaintiffs could adequately allege that defendants targeted their conduct at specific U.S. counterparties, which they have not done here, it does not follow that defendants expressly targeted the forum.  *BBSW I*, 343 F. Supp. 3d at 207 (finding no jurisdiction where "[t]here are

---

[28] Plaintiffs allege, for example, that the Mexico-based traders were tasked with "managing the bank-wide risk positions with respect to MGBs" (SAC ¶ 66), and were driven to attract as many customers as possible without any geographic restrictions (*see* SAC ¶¶ 69-70, 75, 329).

[29] SAC ¶¶ 115, 139, 161, 181, 203, 221, 240, 262, 281.

no allegations that the Foreign Defendants expressly aimed their conduct at the forum—just that they expressly aimed their conduct at counterparties to BBSW-Based Derivative transactions around the world, some of whom happened to be in the United States" and that such conduct was "connected more readily to the counterparties on their BBSW-Based Derivatives transactions, not the forum in which such transactions took place." (emphasis added)).

The purported chats—setting aside what they fail to allege about the merits of the case—do not depict conduct with any clear geographic aim, much less show that New York served as the focal point or nucleus of the purported conspiracy. Despite receiving "hundreds" of chats from cooperating defendants, plaintiffs are able to identify only one chat allegedly referencing U.S.-based investors. (SAC ¶ 408.) The chat involves two traders purportedly "coordinating their recommendations to the 'gringos.'" (*Id.*) The chat does not indicate, among other things, who the "gringos" are, whether a transaction with the "gringos" ever occurred, or whether any broader scheme to expressly target "gringos" (let alone the forum in which they allegedly resided) existed. And other chats strongly suggest no such scheme existed. Plaintiffs identify only seven chats containing any sort of geographic element: two reference "foreigners" (SAC ¶¶ 402, 417), one references an "offshore" investor (SAC ¶ 403), one references a "local" investor (SAC ¶ 413), one involves the aforementioned Taiwan-based salesperson (SAC ¶ 80), one is the "gringos" chat (SAC ¶ 408), and one merely reflects that a trader traveled to New York for routine networking (SAC ¶ 74). None of the chats even remotely suggest that the traders involved were expressly aiming their alleged conspiracy at Americans or the United States. These chats show, if anything, that traders distinguished between foreigners and locals, not between Americans and the rest of the world.

The SAC's remaining jurisdictional allegations similarly portray a global business, not

one centered on New York or the United States.  When plaintiffs try to suggest the predominance of the U.S. market, they do so with general references to the holdings of "investors outside of Mexico."[30]  They also concede multiple times that the traders at Mexico-based trading desks "interact[ed] with <u>local and offshore</u> sales teams and their clients," not just U.S.-based sales teams (SAC ¶¶ 73, 274), and that "the MGB market is characterized by . . . large customer flows driven by <u>offshore</u> investors" (SAC ¶ 327 (emphasis added)).  And plaintiffs do not allege that MGB traders followed special procedures when quoting prices for potential U.S. transactions (as opposed to local or other foreign transactions) or otherwise differentiated their conduct based on an investor's place of origin.  It therefore "does not stand to reason . . . that foreign defendants aimed their [allegedly] manipulative conduct at the United States or any particular forum state." *LIBOR IV*, 2015 WL 6243526, at \*32; *see also SSA II*, 2019 WL 4917608, at \*3, \*9 (refusing to find purposeful direction even where some of the allegedly manipulated bonds were called "Yankee Bonds" because they were predominantly issued and traded in the United States).

## II.   PLAINTIFFS' FAILURE TO ALLEGE VENUE UNDER THE CLAYTON ACT PRECLUDES PERSONAL JURISDICTION OVER DEFENDANTS

Even if the Court were to find that exercising personal jurisdiction comports with due process (which it does not), dismissal of plaintiffs' claims is warranted because plaintiffs fail to allege venue under Section 12 of the Clayton Act.[31]  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423-25 (2d Cir. 2005); *see also SSA II*, 2019 WL 4917608, at \*5 ("The fact that Plaintiffs cannot establish § 12's venue requirement over the Foreign Dealer Defendants means that the Court <u>must</u> find that it lacks jurisdiction over the Foreign Dealer Defendants." (emphasis

---

[30] SAC ¶¶ 101, 103, 305, 309, 312, 315.

[31] Plaintiffs bring this case pursuant to Section 1 of the Sherman Act, which prohibits conspiracies restraining trade. (SAC ¶ 517.)  "Although Plaintiffs allege violations of the Sherman Act, the private right of action to pursue antitrust claims is provided by the Clayton Act."  *SSA II*, 2019 WL 4917608, at \*4 (citation omitted).

added)); *News Am. Mktg. In-Store, Inc. v. Insignia Sys., Inc.*, No. 03 Civ. 8555 (RCC), 2006 WL 2807189, at *2 (S.D.N.Y. Sept. 28, 2006) (dismissing claims against out-of-state corporation on personal jurisdiction grounds where, as here, plaintiff relied on the Clayton Act to establish venue but failed to meet the requirements of Section 12).

Because no Moving Defendant is "an inhabitant" of New York,[32] plaintiffs can establish venue only by alleging that Moving Defendants are "found or transact[] business" there.  15 U.S.C. § 22.  The phrase "transact[] business" refers to business of a "substantial character," which requires "some amount of business continuity and certainly more than a few isolated and peripheral contacts."[33]  *BBSW I*, 343 F. Supp. 3d at 198-99 (quoting *Gates v. Wilkinson*, No. 01 Civ. 3145 (GBD), 2003 WL 21297296, at *1 (S.D.N.Y. June 4, 2003)); *see also Pincione v. D' Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012).  Only contacts with the specific judicial district in which the suit is brought are relevant, *Daniel*, 428 F.3d at 430, and plaintiffs may not rely on transactions or business contacts of other entities in defendants' corporate families, *BBSW I*, 343 F. Supp. 3d at 199 ("Allegations that certain of these defendants are parent companies of subsidiaries that transact business in New York do not suffice to show that the parent companies transact business in New York." (citing cases)).

Plaintiffs do not satisfy Section 12's venue requirements as to any defendant here. Plaintiffs fail to adequately allege that any defendant is "found" or "transacts business" in the Southern District of New York because, as described above, defendants' alleged business contacts with the Southern District of New York are *de minimis*.  Each Moving Defendant and

---

[32] For a corporation, "inhabitant" means its place of incorporation. *See, e.g.*, *SSA II*, 2019 WL 4917608, at *4 n.4. None of the defendants is incorporated in the Southern District of New York.  *See supra*, n.7.

[33] "To 'be found' in a district requires more than 'transacting business' there." *SSA II*, 2019 WL 4917608, at *4 n.5 (citing *United States v. Watchmakers of Switz. Info. Ctr.*, 133 F. Supp. 40, 42 (S.D.N.Y. 1955)).  Because plaintiffs fail to allege that defendants transact business in this district, they also fail to allege that Defendants are found here.

each Moving Defendant's trading desk responsible for trading MGBs was based in Mexico during the Class Period, and no Moving Defendant has (or had during the Class Period) a branch or office in the Southern District of New York.  *See supra* at 4; *see BBSW I*, 343 F. Supp. 3d at 199 (dismissing claims on venue grounds where defendant maintained an office in Connecticut but had no established contacts in the Southern District of New York).  Plaintiffs allege that defendants marketed MGBs to U.S. investors, quoted MGB prices to New York-based affiliates, distributed MGBs to their U.S. affiliates, and directly traded MGBs with two defendants on a total of four occasions (SAC ¶¶ 147-49, 167), but these isolated and peripheral contacts do not amount to "business of a substantial character," *see SSA II*, 2019 WL 4917608, at *5 (rejecting plaintiffs' Clayton Act venue argument where "[t]he alleged trading activities included setting artificial prices that U.S. affiliates used to execute USD SSA bond transactions . . . in New York," where "all Venue Defendants, except [one] directly executed bond transactions with members of the Class in New York," and where "all the Venue Defendants periodically attended bond conferences and in-person client meetings in New York to promote the USD SSA business").  Moreover, plaintiffs do not provide the requisite factual corroboration for the transactions that allegedly took place in this district.  *Id.* (holding that allegations of New York-based bond transactions unsupported by documentary evidence failed to provide the requisite factual corroboration to meet the "transacts business" standard).  Plaintiffs' allegations are thus the type of "legal conclusion couched as factual allegation" that a court need not accept as true. *Id.*  (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Because plaintiffs fail to satisfy the Clayton Act's venue requirement, they may not alternatively rely on the general venue statute, 28 U.S.C. § 1391, to establish personal jurisdiction.  *See, e.g.*, *SSA II*, 2019 WL 4917608, at *4 ("[I]f venue is not proper under the

Clayton Act, then Plaintiffs cannot rely on § 1391(d) to apply the Clayton Act's worldwide service provisions and establish personal jurisdiction over the Defendants."); *BBSW I*, 343 F. Supp. 3d at 198 ("[J]urisdiction lies only in cases in which the venue provision of <u>Section 12</u>, not the general venue statute, is satisfied.").[34]

## III.    PLAINTIFFS CANNOT RELY ON A NATIONWIDE CONTACTS ANALYSIS

To the extent plaintiffs attempt to establish personal jurisdiction over defendants based on their "nationwide contacts" with the United States as a whole, rather than with New York specifically, that attempt also fails.[35]  Nationwide service of process is unavailable here because plaintiffs fail to allege venue under the Clayton Act.[36]  *Daniel*, 428 F.3d at 423-25 (holding that Section 12's worldwide "service of process provision applies . . . only in cases in which its venue provision is satisfied").  Moreover, the Supreme Court's focus on due process as a matter of fundamental fairness and reasonableness to the defendant compels the rejection of the nationwide contacts approach here. *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (such

---

[34] Any attempt to establish personal jurisdiction using other statutes also fails.  Plaintiffs' failure to plead venue under the Clayton Act precludes reliance on Fed. R. Civ. P. 4(k)(1)(C), which establishes personal jurisdiction "when authorized by federal statute."  Nor can plaintiffs rely on Fed. R. Civ. P. 4(k)(2) (commonly known as the federal long-arm statute) because they "did not provide a certification that Defendants are not subject to jurisdiction in any one state." *SSA II*, 2019 WL 4917608, at *12.  Section 302(a)(1) of New York's long-arm statute is also unavailable because, similar to the due process inquiry, it requires a "substantial relationship" between plaintiffs' claims and each defendant's business activity within New York, which plaintiffs cannot show. *Id.* at *5-6; *see supra*, Part I(A).  Finally, section 302(a)(2) of New York's long-arm statute requires that defendants engage in tortious conduct within New York, and section 302(a)(3) of the statute requires that the alleged tort originate within New York, *SSA II*, 2019 WL 4917608, at *7-8, neither of which is alleged in the SAC.

[35] Ultimately, the resolution of this issue is unnecessary if this Court agrees that plaintiffs have failed to identify any contacts with the United States (or New York) sufficient to establish personal jurisdiction over any defendant. Indeed, the alleged New York contacts effectively cover all alleged United States contacts.

[36] *Compare 7 W. 57th St. Realty Co.*, 2015 WL 1514539, at *7 n.2, 10-11 (analyzing New York-based contacts after determining that the Clayton Act's nationwide service of process provision did not apply) *with Sullivan*, 2017 WL 685570, at *42 (applying nationwide contacts analysis only because defendants did not challenge venue under the Clayton Act).  If the Court were to apply a nationwide contacts analysis, it would only apply to plaintiffs' antitrust claim and not their unjust enrichment claim, which is not subject to the Clayton Act's nationwide service of process provision. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to each claim asserted.").

"exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit").[37]

## IV. DEFENDANTS ARE NOT SUBJECT TO GENERAL JURISDICTION IN NEW YORK

Plaintiffs conceded in the last round of briefing that no defendant named here is subject to general jurisdiction in New York.  (*See* Pl's Opp., Dkt. 145 (forgoing general jurisdiction argument).)  But, because plaintiffs allege in the SAC that certain defendants' corporate parents registered with the NYSDFS (SAC ¶ 96), defendants again address any potential general jurisdiction arguments that plaintiffs may raise based on these allegations.

### A. Defendants Are Not "At Home" in New York

A defendant is subject to general jurisdiction in a forum "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render [it] essentially at home in the forum State." *Daimler*, 571 U.S. at 122.  For a corporate defendant, "the place of incorporation and principal place of business are paradig[m] bases for general jurisdiction." *Id.* at 137.  The Second Circuit has held that a corporation is "essentially at home" only in its place of incorporation and principal place of business "except in a truly 'exceptional' case."[38]  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016).

It is undisputed that each Moving Defendants is incorporated in Mexico and that no

---

[37] The Second Circuit has yet to rule on whether a nationwide service of process provision, like the one in the Clayton Act, allows plaintiffs to establish personal jurisdiction using a nationwide contacts analysis consistent with due process.  *See Gucci Am., Inc., v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014).

[38] None of the facts alleged by plaintiffs come close to meeting the standard necessary to establish an "exceptional case."  *Daimler*, 571 U.S. at 139 n.19 (offering as an example the relocation of a Philippine corporation's operations to Ohio during World War II); *see also Brown*, 814 F.3d at 629.

Moving Defendant has its principal place of business in New York.  (*See* SAC ¶¶ 22-62.)  Nor, as a matter of law, could defendants' alleged *de minimis* contacts with New York "shift the company's primary place of business (or place of incorporation) away from" its home country.[39] *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014) (quoting *Daimler*, 571 U.S. at 138) (holding that "even a company's 'engage[ment] in a substantial, continuous, and systematic course of business' is alone insufficient to render it at home in a forum").  Courts in this District have repeatedly held that foreign-incorporated banks are not "at home" in New York for the purposes of general jurisdiction.  *See, e.g.*, *SSA II*, 2019 WL 4917608, at *8 (finding no general jurisdiction over any foreign bank defendants); *BBSW I*, 343 F. Supp. 3d at 202 (same); *LIBOR IV*, 2015 WL 6243526, at *26-27 (same).

## B.  That Defendants' Corporate Parents Registered Their New York Branches With the NYSDFS Does Not Subject Defendants to General Jurisdiction in New York

Plaintiffs allege that certain defendants' corporate parents[40] "registered their New York branch or representative or agency offices with [NYSDFS] . . . under N.Y. Banking Law § 200-b."  (SAC ¶ 96.)  Setting aside the fact that plaintiffs allege no agency or alter ego relationship between defendants and their corporate parents, registration with the NYSDFS, "without an express consent to general jurisdiction" is insufficient to confer general jurisdiction and would result in "*Daimler*'s ruling [being] robbed of meaning by a back-door thief."  *Brown*, 814 F.3d at 639-40; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB)

---

[39] Similarly, allegations that certain defendants' U.S. corporate parents are members of the Federal Reserve Board of Governors' Large Institution Supervision Coordinating Committee (SAC ¶ 97) do not "shift" their primary place of business to New York.

[40] These corporate parents include Banco Santander, S.A., HSBC Holdings plc, Citigroup Inc., and Bank of America Corporation—the respective parents of Santander Mexico, HSBC Mexico, Citibanamex, and Bank of America Mexico.  Neither Citigroup Inc., nor Bank of America Corporation is registered with the NYSDFS under New York Banking Law § 200-b.  *See* Who We Supervise, Department of Financial Services, https://myportal.dfs.ny.gov/web/guest-applications/who-we-supervise (last visited Feb. 17, 2020).

2016 WL 1558504, at *7 (S.D.N.Y. Apr. 15, 2016) ("[P]laintiffs['] conten[tion] that certain

defendants consented to general jurisdiction in New York by registering with the New York

State Department of Financial Services . . . flies in the face of the plain language of the statute");

*BBSW I*, 343 F. Supp. 3d at 210-11 & n.501 (collecting cases and concluding that defendants did

not consent to general personal jurisdiction in New York by registering under § 200); *In re*

*Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 1268267, at

*2 (S.D.N.Y. Mar. 31, 2016) (holding that registering under § 200-b "contains nothing from

which consent to jurisdiction might be implied").

## V.  CONSIDERATIONS OF FAIR PLAY, SUBSTANTIAL JUSTICE, AND INTERNATIONAL COMITY SUPPORT DISMISSAL

Even if plaintiffs demonstrated sufficient contacts with the forum to establish personal

jurisdiction—and for the many reasons discussed above, they do not—exercising personal

jurisdiction in this case would not "comport[] with 'traditional notions of fair play and

substantial justice.'"  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir.

1996) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Relevant factors

include:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the

interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining

convenient and effective relief[.]"  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d

161, 170 (2d Cir. 2013) (quoting *Metro. Life Ins.*, 84 F.3d at 568).  Another relevant

consideration is whether exercising jurisdiction would threaten "international rapport."  *Daimler*,

571 U.S. at 142.  Where defendants' contacts with the forum state are weak, the reasonableness

inquiry will "have a greater effect [] on the outcome of the due process inquiry."  *Metro. Life*

*Ins.*, 84 F.3d at 568; *see also Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 479

(4th Cir. 1993) (finding that the underwhelming nature of the defendant's minimum contacts

27

with the forum state required "a more concerned focus on the [reasonableness] prong of the due

process analysis").

       Plaintiffs' far-fetched theory of jurisdiction is unreasonable under these factors.

Exercising jurisdiction in this District would establish a perilous precedent because this case

involves: Mexican banks with no ties to the United States vis-à-vis this case; an alleged

conspiracy involving bonds issued by the Mexican government and regulated by Mexican

governmental authorities; and sophisticated U.S.-based plaintiffs unable to link any of their

transactions to that alleged conspiracy based in Mexico. *See Brown*, 814 F.3d at 625

("[C]onstitutional due process principles generally restrict the power of a state to endow its

courts with personal jurisdiction over foreign corporate parties . . . with regard to matters not

arising within the state."); *see also Madison Capital Mkts., LLC* v. *Starneth Eur. B.V.*, No. 15

Civ. 7213, 2016 WL 4484251, at *12 (S.D.N.Y. Aug. 23, 2016) ("It is not reasonable to compel

[foreign defendants] to travel to New York . . . where there is no jurisdictional nexus between

that state and plaintiff's claims.").

       The "unique burdens placed upon one who must defend oneself in a foreign legal system"

touch on more than just technology and transportation costs; those burdens thus still have

"significant weight in assessing the reasonableness of stretching the long arm of personal

jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114

(1987); *see also In re Nazi Era Cases Against German Defendants Litig.*, 153 F. App'x 819, 825

(3d Cir. 2005) ("Forcing a wholly foreign company with no day-to-day operations [in the United

States] to litigate in New York is no small burden.").  And this District's interest in adjudicating

the dispute is diminished where none of the defendants, and only <u>two of eight</u> named plaintiffs,

are based in New York. *See Asahi*, 480 U.S. at 114 (recognizing that the court's interest in

asserting jurisdiction was "slight" where plaintiff was based outside the forum); *Metro. Life Ins.*, 84 F.3d at 574 (finding that the dispute "implicates absolutely no interest of the State of Vermont" where plaintiff was based in New York and where the "acts and omissions that serve as the basis for [plaintiff's] suit occurred in Texas, Missouri, and Florida"). For similar reasons, plaintiffs' interests in proceeding in this District are minimal. *See id.* (finding no evidence that "subjecting the defendant to suit in Vermont" would serve plaintiffs' interest and concluding that choice of law concerns are irrelevant to a jurisdictional inquiry).

The alleged contacts here are so attenuated that exercising jurisdiction would not "merely be inconvenient," it "would violate our basic sense of fair play and substantial justice—and deprive the defendants of the due process guaranteed by the Constitution." *Metro. Life Ins.*, 84 F.3d at 575. Plaintiffs apparently seek to establish jurisdiction based on some strained agency theory, without any allegations—let alone plausible ones—that defendants controlled their U.S.-based, non-defendant affiliates. Attributing the contacts of one affiliate to another based on conclusory allegations of marketing, price-quoting, and distributing "would not comport with notions of fair play and substantial justice." *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2015 WL 1515358, at *6 (S.D.N.Y. Mar. 31, 2015) ("*Laydon V*").[41]

---

[41] Nor can plaintiffs establish "conspiracy jurisdiction." A party seeking to invoke conspiracy jurisdiction must allege (1) the existence of a conspiracy, (2) that each defendant participated in the conspiracy, and (3) that a co-conspirator committed "overt acts in furtherance of the conspiracy" within the forum. *SSA II*, 2019 WL 4917608, at *9; *see also Schwab*, 883 F.3d at 86-87. Plaintiffs must also plead facts sufficient to allege an agency relationship among the defendants, which they do not even attempt, to comport with due process, Fed. Rules Civ. P. 4(k)(1)(C), 4(k)(2), and the New York Long Arm Statute. *See, e.g., Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1341 n.11, 1343 (2d Cir. 1972) *abrogated in part on other grounds by Morrison v. Nat'l Austl. Bank.*, 561 U.S. 247 (2010); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 762–63 (S.D.N.Y. 2004) (rejecting theory of conspiracy jurisdiction because, as a "preliminary" matter, "the factual allegations as to the existence of an agency relationship [were] insufficient"). In other words, plaintiffs allege none of the required elements. And, in any event, New York courts are properly skeptical of applying conspiracy jurisdiction where, as here, no other basis exists. *See In re Aluminum Warehousing Antitrust Litig.*, 13-md-2481 (KBF), 2015 WL 892255, at *5 (S.D.N.Y. Mar. 3, 2015) (rejecting conspiracy jurisdiction because "the rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law" to a separate conspiracy jurisdiction doctrine); *Tymoshenko v. Firtash*, 11-CV-2794 (KMW), 2013 WL 1234943, at *2-4 (S.D.N.Y. Mar. 27, 2013)

## VI.   PLAINTIFFS ARE NOT ENTITLED TO JURISDICTIONAL DISCOVERY

Any potential request for jurisdictional discovery should be denied because plaintiffs have failed to plead a prima facie case of personal jurisdiction.  *See, e.g.*, *Laydon VI*, 2017 WL 1113080, at *8 ("[D]istrict courts in this Circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a prima facie case of jurisdiction.").  In similar cases concerning alleged overseas anti-competitive conduct, courts in this District have consistently dismissed claims for lack of personal jurisdiction without permitting jurisdictional discovery.[42]  The case for jurisdictional discovery is even weaker here because this is "far from a situation in which plaintiffs are required to guess at the bases for jurisdiction."  *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 239 (S.D.N.Y. 2015) (denying jurisdictional discovery where plaintiffs similarly "had the benefit of the massive discovery conducted by various governmental agencies"); *see also Sullivan*, 2017 WL 685570, at *4-5, *49 (denying jurisdictional discovery where plaintiffs already had access to the European Commission's "statement of objections" outlining defendants' possible participation in Euribor scheme).  Simply put, plaintiffs may not make "conclusory non-fact-specific jurisdictional allegations" against foreign defendants "and thus obtain extensive discovery on that issue." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice and any request for jurisdictional discovery should be denied.

---

(recognizing that conspiracy jurisdiction "has been widely criticized by courts and scholars" and declining to consider co-conspirators' contacts for the purpose of establishing personal jurisdiction over a foreign defendant).

[42] *See, e.g.*, *BBSW II*, 2020 WL 729789, at *7; *SSA II*, 2019 WL 4917608, at *13-14; *BBSW I*, 343 F. Supp. 3d at 211-12; *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *50; *7 W. 57th St. Realty Co.*, 2015 WL 1514539, at *30; *Laydon V*, 2015 WL 1515358, at *7.

Dated: February 21, 2020    Respectfully submitted,


       /s/ Boris Bershteyn_____
       Boris Bershteyn
       Susan Saltzstein
       Kamali P. Willett
       Leonardo Villalobos
       SKADDEN, ARPS, SLATE, MEAGHER &
       FLOM LLP
       4 Times Square
       New York, New York 10036
       Tel:  (212) 735-3000
       Fax:  (212) 735-2000
       boris.bershteyn@skadden.com
       susan.saltzstein@skadden.com
       kamali.willett@skadden.com
       leonardo.villalobos@skadden.com

       *Attorneys for Defendant HSBC México, S.A.,*
       *Institución de Banca Múltiple, Grupo Financiero*
       *HSBC*

/s/ Adam S. Hakki
Adam S. Hakki
K. Mallory Brennan
Dennis D. Kitt
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
Fax: (212) 848-7179
ahakki@shearman.com
mallory.brennan@shearman.com
dennis.kitt@shearman.com

*Attorneys for Defendant Bank of America México, S.A., Institución de Banca Múltiple, Grupo Financiero Bank of America*

/s/ Arthur J. Burke
Arthur J. Burke
Paul S. Mishkin
Adam G. Mehes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 450-4800
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
adam.mehes@davispolk.com

*Attorneys for Defendant BBVA Bancomer, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer*

/s/ Alan Schoenfeld_____
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
AND DORR LLP
250 Greenwich Street, 45 Floor
New York, New York 10007
Tel:  (212) 937-7294
Fax:  (212) 230-8888
alan.schoenfeld@wilmerhale.com

Steven F. Cherry
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, District of Columbia 20006
Tel:  (202) 663-6321
Fax:  (202) 663-6363
steven.cherry@wilmerhale.com

*Attorneys for Defendant Banco Santander (México)*
*S.A. Institución de Banca Múltiple, Grupo*
*Financiero Santander México*

33

/s/ Lev L. Dassin
Lev L. Dassin
Roger A. Cooper
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel:  (212) 225-2000
Fax:  (212) 225-3999
ldassin@cgsh.com
racooper@cgsh.com

Leah Brannon
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, District of Columbia 20037
Tel:  (202) 974-1500
Fax:  (202) 974-1999
lbrannon@cgsh.com

*Attorneys for Defendant Banco Nacional de
México, S.A., Institución de Banca Multiple, Grupo
Financiero Banamex*

/s/ John Terzaken_____
John Terzaken
Karen M. Porter
Jonathan R. Myers
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, District of Columbia 20001
Tel:  (202) 636-5500
Fax:  (202) 636-5502
john.terzaken@stblaw.com
karen.porter@stblaw.com
jonathan.myers@stblaw.com

Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Tel:  (212) 455-3539
Fax:  (212) 455-2502
jyoungwood@stblaw.com

*Attorneys for Defendant Deutsche Bank México,*
*S.A. Institución de Banca Múltiple*