UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: MEXICAN GOVERNMENT BONDS ANTITRUST LITIGATION | No.: 18-cv-02830 (JPO) |
| | ORAL ARGUMENT REQUESTED |
| This Document Pertains To: | |
| *ALL ACTIONS* | |

**MOVING DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

**<u>TABLE OF CONTENTS</u>**

<b>Page</b>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 4

    A.    The Mexican Government Bonds Market................................................... 4

    B.    The Parties ................................................................................................. 5

    C.    The Consolidated Amended Complaint...................................................... 6

    D.    Mexican Government Investigations ......................................................... 7

    E.    The Second Consolidated Amended Complaint ...................................... 10

ARGUMENT .................................................................................................................. 12

I.    PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST CONSPIRACY. ................................................................................... 12

    A.    Plaintiffs Fail to Allege a Plausible Auction Conspiracy. ....................... 14

    B.    Plaintiffs Fail to Allege a Plausible Spread-Widening Conspiracy. ........ 23

    C.    Plaintiffs Fail to Plausibly Allege That Any Conspiracy Existed During 2006–2010 and 2013–2017. ........................................................ 28

II.    PLAINTIFFS DO NOT HAVE ANTITRUST STANDING............................... 29

    A.    Plaintiffs Lack Standing to Assert Any of Their Antitrust Claims. .......... 30

    B.    Plaintiffs Lack Standing to Assert Claims Regarding MGBs They Did Not Trade. ....................................................................................... 34

    C.    Plaintiffs Lack Standing to Assert Claims Arising Out of Transactions with Non-Defendants............................................................ 35

III.    THE FTAIA BARS PLAINTIFFS' AUCTION CONSPIRACY CLAIMS........ 39

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT. ................................................................................... 41

V.    MOST OF PLAINTIFFS' CLAIMS ARE TIME-BARRED. .............................. 42

    A.    Plaintiffs' Antitrust Claims Are Partially Time-Barred........................... 42

    B.    Plaintiffs' Unjust Enrichment Claims Are Partially Time-Barred............ 48

CONCLUSION ............................................................................................................... 50

**<u>TABLE OF AUTHORITIES</u>**

Page

**Cases**

*Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987) ........................................13, 16

*Austin v. Ford Models, Inc.*, 149 F.3d 148 (2d Cir. 1998), *abrogated in part on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .......................46

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999)................................17, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................4, 12, 15, 23

*Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*, 2017 WL 4402564 (S.D.N.Y. Sept. 30, 2017), *aff'd*, 942 F.3d 88 (2d Cir. 2019)..................................................................41

*Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389 (9th Cir. 2017)..................19

*Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019) ...............41

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) ......................................15

*Butala v. Agashiwala*, 916 F. Supp. 314 (S.D.N.Y. 1996) ...........................................47

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537 (2d Cir. 1993).........................................................................................................22, 23

*Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346 (S.D.N.Y. 2018)................26

*Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d 759 (W.D.N.C. 2011)............................................................................................................25

*City of Tulsa v. Bank of Okla.*, 280 P.3d 314 (Okla. 2011) ........................................49

*Cole v. Lawrence*, 701 A.2d 987 (Pa. Super. Ct. 1997).................................................49

*In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ....................................................................20, 21, 23, 29

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217 (S.D.N.Y. 2018).............................................................16, 17, 22, 25

*Contant v. Bank of Am. Corp.*, 2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018)............37

*In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)..........29

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005)......................30, 35

*De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274 (S.D.N.Y. 2013) ...................................44

*Dentsply Int'l Inc. v. Dental Brands for Less LLC,* 2016 WL 6310777 (S.D.N.Y. Oct. 27, 2016) ...................................................................................................33

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)..........................................20, 23

*Fertitta v. Knoedler Gallery, LLC,* 2015 WL 374968 (S.D.N.Y. Jan. 29, 2015) .........................49

*Fire & Police Pension Ass'n. of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681 (S.D.N.Y. 2019)..................................................................................31, 47

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042 (D. Minn. 1992)................................................................................................16

*In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291 (S.D. Fla. 2010) ..............29

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y 2015)................................................................................................40

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017)............................................................................42

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68 (2d Cir. 2013) ...................................29

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) ...................................................29, 31

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007)..........21

*Gross v. New Balance Athletic Shoe*, 955 F. Supp. 242 (S.D.N.Y. 1997)...................................35

*Harry v. Total Gas & Power N. Am. Inc.*, 244 F. Supp. 3d 402 (S.D.N.Y. 2017), *aff'd as modified*, 889 F.3d 104 (2d Cir. 2018) ................................................34, 37

*Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104 (2d Cir. 2018) ...................29, 31, 32, 33

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106 (S.D.N.Y. 2011)...............21, 47

*Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411 (S.D.N.Y. 2000) .....................41

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)................................................17

*In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069 (S.D.N.Y. May 23, 2018) ............30

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017).......28, 43, 45, 47

*In re Iowa Ready-Mix.*, 768 F. Supp. 2d 961 (N.D. Iowa 2011) ...................................................14

*Johnson v. Nyack Hosp.*, 86 F.3d 8 (2d Cir. 1996) .......................................................................42

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ........................................................43

*Kruman v. Christie's Int'l PLC*, 284 F.3d 384 (2d Cir. 2002), *abrogated in part on other grounds by F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ...................40

*Latino Quimica-Amtex v. Akzo Nobel Chems. B.V.*, 2005 WL 2207017 (S.D.N.Y. Sept. 8, 2005) ..........................................................................................................41

*Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)...............................36

*Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir.).................................................................................................41

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ....................................................................................................48

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016)...................................................................................35, 36, 37

*In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014).............29

*In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530 (S.D.N.Y. 2016).......20, 28

*In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885 (S.D.N.Y. 2018)............32

*Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014)........................39, 40, 41

*Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430 (S.D.N.Y. 2015)..........49

*Masquat v. Daimler Chrysler Corp.*, 195 P.3d 48 (Okla. 2008)....................................................49

*Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013)............................................. *passim*

*In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380 (S.D.N.Y. 2019) ............. *passim*

*Moll v. U.S. Life Title Ins. Co. of N.Y.*, 700 F. Supp. 1284 (S.D.N.Y. 1988) ...............................44

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 23 F. Supp. 3d 203 (S.D.N.Y. 2014).........................................................................................................34

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015)..............12, 23

*In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198 (S.D.N.Y. 2019) ............................................26

*In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298 (S.D.N.Y. 2017), *aff'd sub nom. Prime Int'l Trading v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019).......................42

*O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222 (S.D.N.Y. 1989)............................44

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999)............................................................................................35

*In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011).........14, 17

*Patterson v. U.S. Virgin Islands*, 2013 WL 12250859 (D.V.I. May 8, 2013) ...............................49

*Pearl v. City of Long Beach*, 296 F.3d 76 (2d Cir. 2002)............................................................44

*In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ...........................................................................................................20, 35

*Pricaspian Dev. Corp. v. Total S.A.*, 2009 WL 4163513 (S.D.N.Y. Nov. 25, 2009), *aff'd*, 397 F. App'x 673 (2d Cir. 2010).....................................................................48

*In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139 (D. Conn. Sept. 7, 2005) .......................45

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014)...........................................................................................34

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007)....................................................................44

*Sentinel Prods. Corp. v. Mobile Chem. Co.*, 2001 WL 92272 (D. Mass. Jan. 17, 2001) .............49

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ..........................................................33

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ...............................................................................34

*In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ..........34

*Smith v. Baptist Found. of Okla.*, 50 P.3d 1132 (Okla. 2002) ......................................................50

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521 (S.D.N.Y. 2017).................................................................................35, 36, 37, 38, 39

*In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018) ........29, 31, 32, 34

*In re SSA Bonds Antitrust Litig.*, 2019 WL 4917608 (S.D.N.Y. Oct. 4, 2019) ................24, 25, 26

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) .......................................46

*State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988).......................................43

*Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ....................35, 37, 38, 39

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505 (D. Del. 2010)..............22

*United States v. Citizens & S. Nat. Bank*, 422 U.S. 86 (1975).....................................................16

*Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41 (2d Cir. 1982)..........................................22

*Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, 127 F. Supp. 3d 156
(S.D.N.Y. 2015) .............................................................................................4

*Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491 (S.D.N.Y. 2013), *aff'd*, 542 F.
App'x 81 (2d Cir. 2013)................................................................47

*Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402 (E.D.N.Y. 2013) ......................................41

*In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...........................................14, 21

## Statutes and Rules

15 U.S.C. § 6a ..........................................................................................................39

15 U.S.C. § 6a(1) ....................................................................................................40

15 U.S.C. § 15b .......................................................................................................42

Fed. R. Civ. P. 12(b)(6)...........................................................................................1

CPLR § 202.............................................................................................................48

Mexican Federal Economic Competition Law, arts. 18, 44-46, 78, 79, 80-85, 124..............8, 9, 19

## Other Authorities

United Mexican States Constitution, art. 28 .................................................................9

6 Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles &
Their Application* ¶ 1413 (4th ed. 2016 & Supp. 2017) ..........................................16

Moving Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Second Consolidated Amended Class Action Complaint ("SAC") (ECF No. 163) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

On September 30, 2019, the Court dismissed the Consolidated Amended Complaint (the "CAC") in this action in its entirety for failure to state a claim. *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380 (S.D.N.Y. 2019) ("*MGB I*"). Substantively, the SAC differs from the CAC in only two respects:  it (1) relies upon confidential, preliminary investigatory statements by the Investigative Authority of the Comisión Federal de Competencia Económica ("COFECE"), Mexico's antitrust regulator, and (2) cites to electronic chat messages that Plaintiffs apparently received from two settling defendants.

For at least six independent reasons, neither of these additions can revive Plaintiffs' dismissed claims:

*First*, neither the statements by COFECE's Investigative Authority, contained in a "Statement of Objections" ("SO"), nor the chats cited in the SAC bolster the plausibility of Plaintiffs' allegations because their substance does not align with the two theories of liability or the timetable presented in this action.  Plaintiffs allege that nine banks in Mexico conspired to (i) rig auctions of Mexican Government Bonds ("MGBs"), and (ii) widen bid-ask spreads offered

---

[1] Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex ("Citibanamex"); Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander Mexico"); Bank of America México, S.A., Institución de Banca Multiple, Grupo Financiero Bank of America ("Bank of America Mexico"); BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer"); Deutsche Bank México, S.A., Institución de Banca Múltiple ("Deutsche Bank Mexico"); HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico").  The Second Consolidated Amended Class Action Complaint names Bank of America México, S.A., Institucion de Banca Multiple, Grupo Financiero Bank of America as a defendant; the entity's name is Bank of America México, S.A., Institucion de Banca Múltiple. "Grupo Financiero Bank of America" merged into Bank of America México and ceased to exist on November 1, 2010.

to buy-side customers in secondary market trading of MGBs.  But the SO makes no mention of an investigation into either.  Instead, the SO and cited chats focus on sporadic and largely bilateral communications related to the secondary market for MGBs within Mexico, including, most notably, *inter-dealer* trading.  Plaintiffs make only vague references to the SO's substance precisely because it does not articulate a case of auction-rigging or bid-ask spread manipulation.  Meanwhile, the cherry-picked passages from chats quoted in the SAC reflect sporadic information exchanges, discussions of social arrangements, or communications with *clients* or *counterparties* that are entirely devoid of meaningful context.  The vast majority involve only two traders, and all occur between December 2010 and July 2013.  These communications in no way suggest the existence of a conspiracy among Defendants, let alone the unitary and sprawling conspiracy Plaintiffs seek to plead—a conspiracy that supposedly spanned all MGB products for over eleven years.  Indeed, two of the Defendants are not even alleged to have been named in the SO.  Simply put, the new factual allegations do not render more plausible the widespread conspiracy Plaintiffs allege.  Plaintiffs are thus left to rely on the very same conclusory group pleading and flawed economic analysis that the Court squarely rejected in *MGB I*.

*Second*, Plaintiffs fail to acknowledge that the SO does not contain findings by COFECE, but rather preliminary, non-binding observations by COFECE's Investigative Authority.  Those observations will be subject to detailed responses by the banks involved and the ultimate determination by COFECE's seven commissioners.  As the Court observed in dismissing the CAC, "[i]t is far from clear that an ongoing government investigation . . . in the absence of more substantial allegations, weigh[s] in favor of the [CAC]'s plausibility."  *MGB I*, 412 F. Supp. 3d at 390.  Ultimately, the SO does little more than reconfirm the existence of the COFECE

investigation as to seven of the nine Defendants and thus should carry no weight on a motion to dismiss.

*Third*, Plaintiffs' new allegations do nothing to cure their standing problems.  Plaintiffs fail to plead any instances in which they bought or sold MGBs purportedly affected by a supposed auction conspiracy.  Nor do they plausibly allege that any of their MGB trades were impacted by an alleged conspiracy to widen bid-ask spreads.  Plaintiffs further lack standing to sue over their MGB transactions with non-defendants because they are not efficient enforcers of the antitrust laws with respect to those transactions.

*Fourth*, Plaintiffs' new allegations reconfirm that their auction-rigging claims are barred by the Foreign Trade and Antitrust Improvements Act ("FTAIA").  Plaintiffs fail to plead the requisite connection between alleged misconduct in Mexico and the injuries that Plaintiffs allegedly sustained in the United States.  There is no dispute that MGB auctions take place entirely in Mexico, and the new SO and chat allegations pertain to conduct only in Mexico, by Mexican employees of Mexican entities.  Consistent with the lack of nexus to the United States, the SAC dropped from the case all non-Mexican defendant entities.

*Fifth*, Plaintiffs' unjust enrichment claims should be dismissed because, among other things, they derive from and are duplicative of Plaintiffs' defective antitrust claims.

*Finally*, although Plaintiffs are attempting to sue over MGB purchases dating all the way back to January 1, 2006, the applicable statutes of limitations bar the majority of their claims.

For these reasons and the additional reasons set forth below, Moving Defendants respectfully request that the Court dismiss the SAC, Plaintiffs' "third bite at the apple," with prejudice.

**FACTUAL BACKGROUND**

The factual background below is based on the allegations in the SAC, the materials referenced and relied upon in the SAC, and certain matters of public record, all of which may be considered in deciding a motion to dismiss.[2]

### A.    The Mexican Government Bonds Market

*Mexican Government Bonds*.  MGBs are "debt securit[ies] (like a U.S. Treasury bond) that [are] issued by the Mexican government" during "regularly scheduled auctions."  (SAC ¶¶ 1, 293.)  These debt securities come in a variety of maturity periods, or "tenors," ranging from 30 days to 30 years (*id.* ¶¶ 297, 302, 307), and differ in face value and coupon payments (*id.* ¶¶ 297-299).  These features combine to determine a particular bond's yield.  (*Id.* ¶ 297.)

There are four main types of MGBs:  (i) "Cetes" are short term zero coupon bonds that mature in less than a year; (ii) "Bondes D" are medium-term floating-rate bonds that normally mature in three to seven years; (iii) "Udibonos" are medium and long-term bonds denominated in inflation-indexed units; and (iv) "Bonos" are medium and long-term bonds denominated in pesos that mature in three to 30 years.  (SAC ¶¶ 302-15.)  Plaintiffs allegedly traded only Cetes, Udibonos, and Bonos; they do not allege that they traded Bondes D.  (*Id.* ¶¶ 14-21, App'x D.)

*Auctions*.  MGBs are issued in periodic auctions that usually occur on Tuesdays.  (SAC ¶ 293.)  As in U.S. Treasury auctions, MGB auction participants simultaneously submit confidential bids for specified quantities of MGBs.  (*Id.* ¶ 294.)  The winning bidders ordinarily receive their bonds two days after the auction.  (*Id.* ¶ 293.)

---

[2] *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 n.13 (2007) (courts may take "notice of the full contents of the published articles" quoted in complaint); *Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts may take judicial notice of "documents filed with governmental entities and available on their official websites").

Mexico's Ministry of Finance has appointed certain banks to serve as "market-makers" for particular tenors of MGBs.  (SAC ¶¶ 3, 65, 316.)  These market-makers are required to place auction bids for at least their minimum share of each type of MGB for which they serve as a market-maker.  (*Id.* ¶ 318.)  A market-maker's minimum share is the lower of (i) 20 percent of the total quantity available at the auction, or (ii) the market-maker's per capita share among all market-makers if there are more than five market-makers for the relevant MGB.  (*Id.*)  Market-makers can also participate in the Bank of Mexico's ("Banxico") Market-Maker Option Program, which grants market-makers an option to buy more of an issuance the day after it is auctioned.  (*Id.* ¶¶ 104, 295.)

MGB auctions are not limited to government-designated market-makers.  (SAC ¶¶ 440, 443; pp. 125-26, Figures 3 & 4.)  Auction participants also include numerous non-defendant banks, pension funds, and governmental entities.  (*See id.* ¶¶ 3, 440, 443; pp. 125-26, Figures 3 & 4.)

***Secondary Market***.  Once MGBs have been auctioned by Banxico, they begin trading in a secondary market.  (SAC ¶¶ 319-20.)  Government-appointed market-makers are required to sustain this secondary market by standing ready to buy and sell MGBs upon demand.  (*See id.* ¶¶ 316-17, 319.)  The difference between the price at which market-makers offer to buy and sell MGBs is called the "bid-ask spread."  (*Id.* ¶ 320.)  The SAC still does not identify the share of secondary market trading conducted by government-appointed market-makers, as opposed to other market participants.

### B.    The Parties

Plaintiffs are eight U.S. pension funds that allegedly traded one or more types of MGBs in the secondary market during the alleged conspiracy period.  (SAC ¶¶ 14-21.)  Plaintiffs assert claims under the Sherman Act and the common law of unjust enrichment on behalf of a proposed

class of all U.S. entities that transacted in MGBs with Defendants between January 1, 2006 and April 19, 2017.  (*Id.* ¶¶ 504, 516-30.)

Defendants are nine Mexican banks.  Some, but not all, served as government-designated market-makers for MGBs during the proposed class period.  (SAC ¶¶ 3, 22-62.)  All nine Defendants are based in Mexico.  (*Id.* ¶¶ 22-62.)  As the SAC acknowledges, those Defendants that did serve as market-makers were *not* the exclusive MGB market-makers during the Class Period.[3]

### C.    The Consolidated Amended Complaint

The original complaint in this action was filed on March 30, 2018, and Plaintiffs filed their CAC on July 18, 2018 against ten Mexican financial institutions and their affiliates in the United States and Europe.  The CAC alleged but failed to plead two distinct Mexico-based types of manipulation of MGBs:  (i)  submitting artificially low auction bids for MGBs and then re-selling the auctioned MGBs at "artificially higher prices" in the secondary market; and (ii)  "fix[ing] the 'bid-ask spread' artificially wider" in secondary market trading.  (CAC ¶ 6.) Allegedly, conspiracies to engage in both types of conduct lasted over eleven years, from January 1, 2006 through April 19, 2017.  (*Id.* ¶ 382.)  The CAC relied primarily on news articles referencing an investigation by COFECE into conduct in the MGB market (*id.* ¶¶ 280-97), as well as a series of charts that purported to show that, on average and without controlling for other factors, MGB markets behaved somewhat differently in the eleven-year period before the announcement of the government investigation than in the eight-to-twelve month period

---

[3] Plaintiffs admit in the SAC that Defendants were only "*part of* the group of Mexican government-approved market-makers for MGBs during the class period."  (SAC ¶ 3 (emphasis added).)  Indeed, the CAC alleged that both Banco Credit Suisse (México) S.A. and ING Bank México S.A.—both named as defendants in the CAC but dropped from the SAC—were designated market-makers during the class period.  (CAC ¶¶ 183, 189.)  Defendant UBS Bank México, S.A., Institución de Banca Múltiple, UBS Grupo Financiero ("UBS Mexico"), on the other hand, was *not* an MGB market-maker during the class period.  (SAC ¶ 65.)

afterwards (*id.* ¶¶ 302-31, Figures 1-8.).  The CAC included no allegations of conspiratorial activities in the United States.

On September 30, 2019, the Court granted the defendants' motion to dismiss the CAC. *MGB I*, 412 F. Supp. 3d at 382.  The Court observed that a complaint must "tie[] each defendant to the conspiracy" alleged to survive a motion to dismiss, but that the CAC lacked any "individualized allegations" that might "plausibly suggest that the *particular* defendants named" participated in the alleged conspiracy.  *Id.* at 388-89 (emphasis in original).[4]  Specifically, the Court found that news stories indicating that certain unnamed defendants sought leniency from COFECE did not amount to "direct evidence" implicating all of the CAC defendants.  *Id.* at 389. With respect to the CAC's statistical analyses, the Court dismissed them as "group pleading in another form" because they "lump together the market makers" and "rely on 'averages' and medians . . . that obscure any given Defendant's contribution to an observed trend."  *Id.* at 389-90.  Finally, the Court found the CAC's vague citation of news articles about the COFECE investigation "state nothing about wrongdoing *on behalf* of Defendants here."  *Id.* at 391 (emphasis in original).

D.      **Mexican Government Investigations**

*COFECE's Statement of Objections*.  COFECE announced it was investigating conduct under Mexican law concerning the MGB market in April 2017.  (SAC ¶ 353.)  As part of the investigation, COFECE's Investigative Authority collected and reviewed Defendants' chat messages, emails, and phone calls from October 2006 to April 2017.  (*Id.* ¶¶ 361, 366, 369.)

On September 23, 2019, after spending more than two years reviewing these materials,

---

[4] Unless otherwise noted, all emphasis is added, and internal citations and quotation marks are omitted.

COFECE's Investigative Authority issued an SO[5] to seven of the nine Defendants.[6]  (SAC

¶ 375.)  Defendants HSBC Mexico and UBS Mexico were not issued an SO, even though these

entities produced documents to COFECE's Investigative Authority during its investigation.  (*Id.*

¶¶ 41, 61.)  Under Mexican law, the issuance of an SO by COFECE's Investigative Authority

represents an interim determination that certain conduct warrants a deeper review.[7]  Importantly,

as the head of COFECE's Investigative Authority explained, the issuance of an SO does not

mean any of the implicated entities broke the law, and does not signal that they will ultimately be

found liable.[8]  Rather, the issuance of an SO triggers the first opportunity for the investigated

parties to formally present their views of the case to COFECE; for this reason, an SO must

describe all potentially anticompetitive conduct that is being investigated, as well as all related

evidence that has been uncovered.[9]  Despite the issuance of an SO, COFECE may ultimately

conclude that there was no violation at all, as it has done in the past.[10]  Liability is not found

unless a majority of COFECE's seven commissioners issues a final judgment against a party, and

---

[5] The SO is not issued by COFECE, but by its Investigative Authority, and only amounts to the first stage of an internal administrative procedure.  *See* Mexican Federal Economic Competition Law, art. 78, 80, at 43-44, https://www.cofece.mx/cofece/images/Documentos_Micrositios/Federal_Economic_Competition_Law.pdf. COFECE's judgment is determined by its seven-member Commission after Defendants that received an SO are allowed to respond.  *Id.* art. 83-85, at 44-46.

[6] The seven Defendants named in the SO are:  Santander Mexico; BBVA-Bancomer; Citibanamex; Deutsche Bank Mexico; Bank of America Mexico; JP Morgan Mexico; Barclays Mexico.  (*See* SAC ¶ 375.)  Each of these seven Defendants received a copy of the SO with a different set of redactions, limiting the information disclosed to that involving the recipient.

[7] *See* Mexican Federal Economic Competition Law, art. 78, 80-85, at 43-46.

[8] *See* Alicia Salgado Said, *Hoy se hace público el dictamen de probable responsabilidad y ha sido notificado a los probables responsables y tienen un periodo de 45 días hábiles para formular su contestación, Sergio López*, ENFOQUE NOTICIAS (Oct. 14, 2019, 20:15), https://enfoquenoticias.com.mx/emisiones/hoy-se-hace-p-blico-el-dictamen-de-probable-responsabilidad-y-ha-sido-notificado-los (minutes 5:00-6:43 of the corresponding interview), translation available at Brennan Decl., Ex. A.

[9] Mexican Federal Economic Competition Law, art. 79.

[10] *See, e.g.*, COFECE's Board's Final Statement regarding File IO-004-2013 dated November 3, 2016, https://www.cofece.mx/CFCResoluciones/docs/Asuntos%20Juridicos/V181/0/3662967.pdf (ultimately finding that certain economic agents participating in the market for corn within the state of Colima were not liable for the absolute monopolistic practices described in a previously issued SO).

even in that event, COFECE's resolution can be challenged and revoked by a Federal Court. Mexican Federal Economic Competition Law, art. 18, 83; United Mexican States Constitution, art. 28.  Consistent with the presumption of innocence, the SO is confidential under Mexican law, despite the settling defendants' apparent agreement to share the document with Plaintiffs.[11]

The SO focuses on electronic chat communications that took place from 2010 to 2013 between certain traders in Mexico who participate in the Mexican secondary market for MGBs. The SAC quotes excerpted samples of chats produced to COFECE, almost all of which were bilateral, meaning that the communications were between two banks, as opposed to communications among three or more banks.  Even viewed in the light most favorable to Plaintiffs, these chats at most reflect standalone episodes in which two individuals shared information, transacted as counterparties (either as traders or as a client/broker relationship), or arranged social gatherings.[12]  Moreover, Plaintiffs do not and cannot allege that COFECE's Investigative Authority found evidence of a unitary conspiracy of any kind among Defendants, concerning either MGB auctions or bid-ask spreads.  Rather, the SO appears to depict episodic communications primarily concerning the domestic secondary market, including the inter-dealer market.  (*See, e.g.*, SAC ¶¶ 404, 412, 420-21.)  Neither the CAC nor the SAC asserts claims with respect to the inter-dealer market, which is not surprising given that Plaintiffs are not dealers and

---

[11] Mexican Federal Economic Competition Law, art. 124 (stating that, during the investigation, the investigative file is restricted, and that during further stages of the procedure—including the trial-like procedure—only those with standing may have access to the file, except that deemed confidential information), 125 (consistently barring COFECE's public officers from expressing or disclosing information related to the files or ongoing procedures until the Commission's final resolution has been disclosed to the corresponding parties).  Consistently, COFECE's Transparency Council has barred outside access to the file.  *See* Índice de los Expedientes considerados como Reservados, first semester 2019, https://cofece.mx/cofece/images/Transparencia/ExpReservados/Informe_IER-1S2019_COT.ods.

[12] In addition to bilateral chats, COFECE's Investigative Authority's investigative file also includes chats from a permanent chatroom including traders from Defendants Barclays Mexico, Deutsche Bank Mexico, HSBC Mexico, and UBS Mexico.  (SAC ¶¶ 7, 400.)  As noted above, only two of those parties are Moving Defendants (HSBC Mexico and Deutsche Bank Mexico), and two of these Defendants (HSBC Mexico and UBS Mexico) were not named in the SO.

did not trade in that market.  Plaintiffs do not and cannot allege that the SO addresses a

conspiracy with respect to MGB auctions or a conspiracy to inflate bid-ask spreads in any

market, confirming a complete mismatch between the contents of the SO and the SAC's

allegations.

　　　*CNBV's Investigation*.  CNBV, Mexico's securities regulator, also began investigating

during the summer of 2017 trades executed by certain Defendants in the MGB market within

Mexico.  (SAC ¶ 367.)  Like COFECE, CNBV also had access to Defendants' chat messages and

other communications.  (*Id.* ¶ 369.)  In November 2018, CNBV imposed fines on seven banks,

two brokers, and eight traders for allegedly simulating trades in order to increase trading

volumes and for recordkeeping violations, but after a review of relevant chats and transactions,

"did not find evidence of price manipulation" or anything even remotely relevant to Plaintiffs'

allegations here.[13]  To date, this is the only final resolution issued by a Mexican authority in

connection with MGBs.

　　　**E.    The Second Consolidated Amended Complaint**

　　　Plaintiffs filed their SAC on December 9, 2019.  The SAC's theory of liability is

fundamentally the same as that asserted in the dismissed CAC.  Plaintiffs continue to allege two

vast, but distinct, Mexico-based conspiracies, lasting from January 1, 2006 to April 17, 2017, to

(i) submit artificially low bids for all MGB auctions and then re-sell all the auctioned MGBs at

"artificially higher prices," and (ii) "fix the 'bid-ask spread' artificially wider" for all secondary

---

[13] The following entities were reportedly fined by the CNBV:  banks Citibanamex, BBVA-Bancomer, Barclays Mexico, Credit Suisse Mexico, Deutsche Bank Mexico, and Bank of America Mexico; brokers Tradition and Enlace; and eight undisclosed traders.  Michael O'Boyle, *Mexico fines global banks for inflating bond trading volumes*, REUTERS (Nov. 14, 2018), https://www.reuters.com/article/mexico-bonds-manipulation/mexico-fines-global-banks-for-inflating-bond-trading-volumes-idUSL2N1XO22J.  Moving Defendants HSBC Mexico and Santander Mexico, and Defendant UBS Mexico, were not fined by CNBV.

market trades.  (SAC ¶¶ 9, 429, 518.)  As before, Plaintiffs do not allege that any conspiratorial

activities occurred in the United States or any conspiracy with respect to the inter-dealer market.

The SAC's only new substantive allegations concern the Investigative Authority's

issuance of the SO, described above, as well as 37 excerpted electronic chat messages that

Plaintiffs claim to have selected from among "hundreds" of chat messages produced by two

cooperating defendants.  (SAC ¶ 13.)  Plaintiffs also assert that the two cooperating defendants

provided them copies of their respective versions of the SO, but the SAC is conspicuously silent

on whether the SO's theory of liability concerned auctions or bid-ask spreads in secondary

market trading.  Indeed, the SAC says only that the SO claims seven defendants engaged in

"absolute monopolistic practices" in violation of Mexican competition law.  (*Id.* ¶¶ 4, 12, 378,

394-95.)  The SAC also claims that the SO indicates that potential violations took place between

2010 and 2014, but says nothing about activity before or after that time.  Consistent with this

assertion, all 37 chat excerpts cited in the SAC are dated between December 2010 and July 2013,

a far narrower period than the eleven-year conspiracy the SAC claims.  The quoted chats

themselves reflect episodic conversations, almost all of which involve no more than two traders,

and contain no discussion whatsoever of an industry-wide conspiracy to suppress all auction bids

or to inflate bid-ask spreads in the secondary market.[14]

---

[14] An employee of HSBC Mexico, which was not served with an SO, allegedly participated in five chats.
(SAC ¶¶ 7, 400, 413.)  The five chats involve a total of *two* other traders—one of which is a UBS Mexico employee
that was also not served with an SO—and all take place within an 18-*day* period.  None of the chats mention a single
auction, a single bid, or a single price, let alone an agreement.  The one HSBC Mexico chat mentioning a spread is
an isolated statement that elicits no response from any other trader.  (SAC ¶ 413.)  In any event, this chat relates to a
transaction with "Afores," not Plaintiffs.  (*See* SAC ¶ 413 & n.55.)

# ARGUMENT

## I.    PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE ANTITRUST CONSPIRACY.

The SAC suffers from the same dispositive flaws as the CAC, which this Court dismissed for failing to state a claim against *any* Defendant.  *MGB I*, 412 F. Supp. 3d at 382.  The SAC relies on the same theories of liability that the Court already rejected, asserting that nine financial institutions, over an eleven-year period, engaged in a massive scheme to (1) "rig[] MGB auctions" and then sell all "new MGBs purchased at auction into the secondary market at artificially higher prices," and (2) "fix the 'bid-ask spread' artificially wider" for all secondary market trades.  (SAC ¶ 9.)  Plaintiffs attempt to cure the CAC's total "absence of parallel conduct or direct evidence" of conspiracy (*MGB I*, 412 F. Supp. 3d at 391) by adding references to the SO that do not relate to the conspiracies they claim occurred and quoting cherry-picked electronic chat messages from a three-year period that cannot bear the weight of Plaintiffs' claims.  (*See* SAC ¶¶ 353-428.)  Plaintiffs also continue to rely on exactly the same flawed auction and trading data that the Court has already rejected as "group pleading in another form." *MGB I*, 412 F. Supp. 3d at 389.

To plead an antitrust violation, Plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  "The ultimate existence of an 'agreement' under antitrust law [] is a legal conclusion, not a factual allegation." *Mayor of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013).  Plaintiffs must therefore plead "evidentiary facts" that sustain a plausible inference of an unlawful agreement, including "who, did what, to whom (or with whom), where, and when."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015).

As the Court previously recognized, an antitrust claimant can rely on either "direct evidence" of a conspiracy, such as "a recorded phone call in which two competitors agreed to fix prices at a certain level," or on "circumstantial evidence" of a conspiracy by adequately pleading both that (i) the defendants engaged in parallel conduct that "raises a suggestion of a preceding agreement," and (ii) additional facts and circumstances, or "plus factors," indicate that the at-issue conduct "flowed from a preceding agreement rather than from [defendants'] own business priorities." *Citigroup*, 709 F.3d at 136, 138.  Courts routinely hold that "alleging parallel conduct alone is insufficient, even at the pleadings stage," *id.* at 136, because parallel conduct often results from "coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4.  Plaintiffs fail under both approaches.

As an initial matter, the sheer scale of Plaintiffs' multi-faceted conspiracy theory highlights its implausibility.  Plaintiffs' claims rest on proving the existence of a vast conspiracy in place for eleven years among nine large financial institutions that supposedly colluded to suppress bids for *every* auction, inflate prices on *every* trade where the auctioned bonds were resold, and inflate bid-ask spreads on *all* secondary market trades.  If such a far-reaching and complex conspiracy existed, then presumably numerous communications reflecting efforts to plan, coordinate, and enforce that conspiracy would also exist.  *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("long term" conspiracies involving "complex relationships among competitors" are more susceptible to direct proof than conspiracies that are "short term and relatively simple in operation").  Further, one would expect the multi-year investigations by COFECE's Investigative Authority and the CNBV into Defendants' conduct in the MGB market to have uncovered examples of such communications, if they existed.  And even if the Mexican

regulatory authorities had somehow overlooked these communications, surely Plaintiffs' own review of "hundreds" of interdealer chat messages from two cooperating defendants (SAC ¶ 13) would have yielded a trove of documentation of the conspiracy.

Yet Plaintiffs are unable to cite any statement by the Investigative Authority suggesting the existence of an auction-related conspiracy or a bid-ask spread conspiracy, and the handful of chats excerpted in the SAC come nowhere close to suggesting such a comprehensive, multi-market scheme. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 368-70 (S.D.N.Y. 2016) (allegations regarding defendants' conduct at "only one point in time" were insufficient to "support the broad scheme alleged"); *In re Optical Disk Drive Antitrust Litig.*,  2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (allegations of discrete incidents of bid-rigging, even if true, were a "far cry from establishing plausibility for a broad six year conspiracy"); *In re Iowa Ready-Mix.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) (dismissing claim where plaintiffs' allegations were missing the "'larger picture' from which inferences of a wider conspiracy can be drawn").

A.      **Plaintiffs Fail to Allege a Plausible Auction Conspiracy.**

The SAC reasserts the same auction conspiracy that the Court has already rejected.  (*See* SAC ¶ 9.)  As before, Plaintiffs' alleged auction conspiracy encompasses *all auctions* over an *eleven-year period*, in which *nine* institutions supposedly coordinated to suppress their bids, *and all transactions* in which the same nine institutions colluded to resell the auctioned bonds to customers in the United States at inflated prices.  (*Id.* ¶¶ 9, 22-65, 504.)  Plaintiffs assert that the Defendants conspired to rig several thousand MGB auctions and millions of dealer-to-customer transactions for hundreds of different maturities—a herculean feat that Defendants supposedly accomplished by "secretly disseminating confidential bidding schedules to each other and

agreeing on bids in MGB auctions" and then "pricing and distributing MGBs purchased during government-run auctions at artificially higher prices."  (*Id.* ¶¶ 9, 94, 513.)

The alleged scope of this conspiracy is enormous and would have required extensive coordination, but the SAC proffers no direct or circumstantial evidence of a conspiracy to "rig" MGB auctions or subsequently inflate prices.  None of the excerpted chats in the SAC indicate a conspiratorial agreement among any of the Defendants to fix auction bids at artificially low levels and re-sell auctioned bonds at artificially high prices; nor can Plaintiffs point to any statement from COFECE alleging such a conspiracy.  The chats and the SO primarily show episodic information exchanges and occasional trading behavior at the potential expense of other participants in the *Mexican* secondary market, including in particular *other dealers*, not the manipulation of auctions, bid-ask spreads or other prices for customers in the United States.

### 1.     Plaintiffs fail to allege direct evidence of an auction conspiracy.

Plaintiffs' conclusory insistence that the COFECE investigation and the Investigative Authority's SO constitute direct evidence of their allegations is unsupported and demonstrably incorrect.  Direct evidence of a conspiracy is "explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011); *Citigroup*, 709 F.3d at 136 (direct evidence is "smoking gun" evidence such as "a recorded phone call in which two competitors agreed to fix prices at a certain level").  Plaintiffs are unable to cite a single statement from COFECE—in the SO or otherwise—that establishes the existence of an auction-related conspiracy.[15]

---

[15] Tellingly, Plaintiffs recycle their allegation from the CAC that an unsourced news report, pre-dating the SO, claimed that COFECE's investigation encompassed auctions (SAC ¶ 361), but fail to mention in the SAC that the SO makes no reference to evidence of an auction conspiracy.

Nor does Plaintiffs' cherry-picked selection of 37 chats, which are carefully excerpted and devoid of context, constitute direct evidence of an auction conspiracy.  A number of these chats reflect routine exchanges of market information or market color (*e.g.*, SAC ¶¶ 399, 424), which are insufficient to demonstrate an antitrust conspiracy.  *United States v. Citizens & S. Nat. Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not itself a *per se* violation of the Sherman Act."); *Apex Oil Co.*, 822 F.2d at 257-58 ("[E]vidence of the mere exchange of information by competitors cannot establish a conspiracy."); *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1047-48 (D. Minn. 1992) (exchanges of salary information—without allegations of agreements to fix prices or how the conspiracy was accomplished—were insufficient to plead a conspiracy to fix salaries).  Only *four* bilateral chats, among a total of *four* individuals at *four* institutions[16] mention auctions at all, and *none* of those chats discuss planned auction bids, an agreement among any two banks—let alone all nine Defendants—to suppress bids, or an agreement to inflate prices after auctions.  (*See id.* ¶¶ 399, 407, 411, 419.)  And merely mentioning an auction—the manner by which MGBs are issued— does not suggest that the auction was manipulated.  *See In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 222-23, 225-26 (S.D.N.Y. 2018) ("*Gold II*") (references to prices do not automatically equate to an agreement to manipulate).  It is simply implausible that the vast conspiracy alleged could have existed without explicit agreements.  *See* 6 Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 1413 (4th ed. 2016 & Supp. 2017) (a "long-term cartel" involving many

---

[16] One of these institutions—UBS Mexico—is not even being investigated for wrongdoing by COFECE. Defendants BBVA-Bancomer, Citibanamex, JP Morgan Mexico, HSBC Mexico, and Santander Mexico do not participate in and are never mentioned in these chats.

entities and auctions could not arise, much less survive, without "explicit agreements" among the participants).

The SAC also fails to allege that the four individuals in the chats mentioning auctions even had the ability to collude to fix the auctions.  Indeed, only one of the chat participants—a trader at Barclays Mexico—is actually alleged to have had any role in determining auction bid pricing.[17]  (SAC ¶ 388.)  Plaintiffs therefore fail to plausibly allege that these chat participants, as a group, possessed the ability to control bids for a single MGB auction, much less all auctions for an eleven-year period.  *See Gold II*, 328 F. Supp. 3d at 229 (communications among traders did not suggest a fix-suppression conspiracy when one of the traders was not alleged to have submitted fix prices at that time); *cf. In re Baby Food Antitrust Litig.*, 166 F.3d 112, 133-34 (3d Cir. 1999) (evidence of "chit chat" among persons with no pricing authority should be given little, if any, weight).

In sum, the handful of chats that Plaintiffs cite in the SAC fall well short of direct evidence of the purported auction conspiracy.  Discrete instances of sharing market information and a handful of bilateral chats that do not even mention planned auction bids do not plausibly plead an auction conspiracy of any kind, let alone the pervasive and widespread conspiracy alleged.  *See In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (allegations of sporadic misconduct involving a "subset of defendants" could not plausibly establish a "continuing agreement among all defendants"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 351 (3d Cir. 2010) (rejecting allegations that "may allege a 'pernicious industry practice,' but [] do not plausibly imply an industry-wide conspiracy").

---

[17] The SAC identifies only one other individual, a trader at Santander Mexico, as having any role in "determining bids" for his employer "in MGB auctions," but this individual does not appear in any of the chats excerpted in the SAC.  (SAC ¶ 389.)

      **2.**     **Plaintiffs fail to allege parallel conduct suggestive of an auction conspiracy.**

Plaintiffs again fail to adequately plead "parallel conduct" by Defendants suggestive of an auction conspiracy. *See MGB I*, 412 F. Supp. 3d at 389-90. The SAC is devoid of any allegations of parallel conduct whatsoever, much less parallel conduct that meets the *Twombly* standard. Although Plaintiffs persist in claiming that Defendants rigged bids for thousands of MGB auctions over eleven years, they do not identify a *single* instance in which Defendants submitted parallel bids, despite having access to hundreds of chat messages and two versions of the 600-page SO issued by COFECE's Investigative Authority. (SAC ¶¶ 13, 375.) Nor do they allege that the quoted chat participants (save one) had *any* role in setting their employers' auction bids, much less the ability to coordinate bids across nine different institutions. (*See supra* at 17.)

Bereft of evidence of parallel conduct, Plaintiffs instead rely on the same flawed statistical analyses that the Court already rejected as inadequate in dismissing the CAC. (SAC ¶¶ 429-51, Figures 1-6; *MGB I*, 412 F. Supp. 3d at 389-90) The charts in the SAC are virtually identical to those relied on in the CAC. (*Compare* SAC ¶¶ 429-51, Figures 1-6, *with* CAC ¶¶ 302-24, Figures 1-6; *see also* Defendant's Memorandum of Law in Support of Their Motion to Dismiss for Failure to State a Claim, ECF No. 114, at 14-20.) Just as in the CAC, these charts merge the underlying data into averages that obscure all variation in bids, fill rates, and pricing of individual auction participants, rendering the charts "group pleading in another form." *MGB I*, 412 F. Supp. 3d at 389. The Court rightly rejected these charts as inadequate evidence of parallel conduct in the CAC, and the same result is warranted here.

      **3.**     **Plaintiffs fail to allege any meaningful "plus factors."**

The Court need not consider the supposed plus factors recited in the SAC because Plaintiffs plead no parallel conduct. (*See supra* Section I.A.2.) As the Court concluded in

dismissing the CAC, "in the absence of parallel conduct or direct evidence, [plus factors] are insufficient to state an antitrust claim." *MGB I*, 412 F. Supp. 3d at 391; *accord Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("Plus factors are relevant only if the complaint adequately alleges parallel conduct among the defendants.").

Nevertheless, even if Plaintiffs adequately alleged parallel conduct—and they do not— their auction conspiracy theory would still fail because the SAC fails to allege "plus factors" that enhance the plausibility of their theory. These so-called "plus factors" are allegations that do not themselves support an inference of conspiracy and are only sufficient to state a claim when combined with "very specific allegations about the nature of the defendants' parallel conduct." *Citigroup*, 709 F.3d at 137.

None of the so-called "plus factors" Plaintiffs allege give rise to any plausible inference of conspiracy.

***Regulatory Investigations***. The CAC leaned heavily upon news reporting of CNBV and COFECE's investigations into the MGB market. (CAC ¶¶ 280-97.) As the Court noted in dismissing the CAC, the mere existence of an investigation, without more, is not a plus factor. *MGB I*, 412 F. Supp. 3d at 390-91. Subsequent events confirm the Court's determination.

CNBV closed its investigation without finding evidence of price manipulation. (*See supra* at 10.) And while COFECE's Investigative Authority issued an SO (*see* SAC ¶ 375), nowhere do Plaintiffs cite any statement from COFECE—in the SO or otherwise—concerning an auction conspiracy or manipulation in the primary bond market.[18] Instead, Plaintiffs repeat their

---

[18] Plaintiffs also mischaracterize the SO as a "summary" of COFECE's evidence. (SAC ¶ 375.) An SO in fact is intended to contain *all* the evidence COFECE's Investigative Authority has found. *See* Mexican Federal Economic Competition Law, art. 79, sec. III, at 44, (stating that the SO "*shall contain at least* . . . [t]he investigated facts [and] . . . "[t]he evidentiary elements and other means of conviction that are included in the investigation file and their analysis"). In other words, the SO details all the evidence that COFECE found that could potentially support liability against seven of the nine Defendants and certain individuals who worked for those Defendants. (SAC

claim from the CAC—which was filed before the SO was issued—that "sources with direct knowledge of COFECE's investigation" say that the investigation encompassed the auction market. (*Compare id.* at ¶ 361, *with* CAC ¶ 288.) The SAC adds only an allegation that the SO "charged" seven Defendants for "engaging in absolute monopolistic practices" to "fix MGB prices." (SAC ¶ 395.) This mischaracterizes the SO, which is not a "charging" document but rather an indication that the process is continuing (*see supra* at 8), and conspicuously avoids specifying what "practices" or what segment of the MGB market is at issue.

The paucity of auction-related chats provided by the two settling defendants (*see supra* at 16), which presumably were also available to COFECE, strongly suggest that the Investigative Authority focused on the Mexican secondary market, including the inter-dealer market, not auctions. (*See, e.g.*, SAC ¶¶ 404, 412, 420-21.) An investigation concerning a market different from the one Plaintiffs allege was manipulated is not probative. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (allegations of anticompetitive conduct in Europe, with no link to the conduct at issue in litigation, did not make plaintiffs' claims plausible); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *13 (S.D.N.Y. Mar. 28, 2017) (ongoing government investigations into possible manipulation of precious metals benchmarks did not constitute circumstantial evidence of a conspiracy in the defendants' particular market); *In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631, 661 (S.D.N.Y. 2016) ("*Gold I*") (same); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 560 (S.D.N.Y. 2016) ("*Silver I*") (same).

In any event, the mere issuance of the SO, an interim step in COFECE's process that does not suggest wrongdoing has been found (*see supra* at 8), is not a "plus factor." As the head of

---

¶¶ 375, 379.) None of that evidence supports Plaintiffs' theories in this case.

COFECE's Investigative Authority reiterated, there have been no determinations of wrongdoing by any party.  (*Id.*)  The existence of a government investigation in itself does not qualify as a plus factor.  *MGB I*, 412 F. Supp. 3d at 390-91; *see In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 373 (existence of multiple government investigations did not render conspiracy allegations plausible); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) (government investigations and guilty pleas alone do not "replace a plaintiff's independent proffer of facts which would tend to support the illegal conduct alleged"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (the existence of government investigations "carries no weight in pleading an antitrust conspiracy claim").  Under settled law, "the mere fact that regulatory entities have investigated, and may still be investigating, the possibility of misconduct" is not a "plus factor."  *See, e.g.*, *Gold I*, 213 F. Supp. 3d at 662.

   *Interfirm communications*.  Plaintiffs' attempt to rely on excerpted chats in order to demonstrate a "high level of inter-firm communications" also falls flat.  *See Citigroup*, 709 F.3d at 136.  None of the chats cited in the SAC discuss fixing auction prices in advance of an auction, nor do they contain agreements to inflate prices thereafter.  (*See, e.g.*, SAC ¶¶ 399, 419.) Moreover, the SAC acknowledges that Defendants serve as market-makers in the MGB market and "are responsible for providing liquidity to the MGB market."  (*Id.* ¶ 316.)  Plaintiffs also allege that this market is "highly opaque" and offers "no centralized exchanges on which market participants can . . . view current MGB prices."  (*Id.* ¶ 322.)  These allegations provide a procompetitive rationale for interfirm communications:  market-makers must have the ability to transact with each other and are therefore actual or potential counterparties.  Thus, the mere existence of some interfirm communications among these traders alone elicits no inference of

anticompetitive behavior.  In any event, these chats demonstrate no "connection between the content and the price-fixing conspiracy alleged" and therefore are of little to no probative value. *Gold II*, 328 F. Supp. 3d at 228 ("[T]he probative value of [inter-defendant communications] depends on the participants, the information exchanged, and the context . . . .").

***Relationships between traders***.  The Court has already rejected as "unavailing" Plaintiffs' assertion that the "horizontal mobility of employees among Defendants" made a conspiracy among MGB traders employed by Defendants more likely.  *MGB I*, 412 F. Supp. 3d at 391.  Plaintiffs nevertheless repeat these allegations in the SAC (SAC ¶¶ 6, 339, 340, 379),[19] but "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993); *see also MGB I*, 412 F. Supp. 3d at 391; *accord Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 47 (2d Cir. 1982) (an antitrust plaintiff must show "more than the existence of a climate in which such a conspiracy may have been formed"); *cf. Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 516 (D. Del. 2010) ("an atmosphere of informal cooperation" was insufficient to prove a conspiratorial agreement); *see also In re Baby Food Antitrust Litig.*, 166 F.3d at 133-34 (employees "do not often operate in a vacuum or 'plastic bubble'; they sometimes engage in the long-standing tradition of social discourse").

***Unrelated markets***.  The Court has already deemed Plaintiffs' gratuitous references in the CAC to prior cases and investigations involving LIBOR, FX, and precious metals as inadequate to "revive Plaintiffs' deficient pleadings."  *MGB I*, 412 F. Supp. 3d at 391.  Plaintiffs reallege

---

[19] Plaintiffs again include as examples of interfirm relationships individuals who are not part of COFECE's investigation (*e.g.*, SAC ¶ 399).

these facts in the SAC.  (*See, e.g.*, SAC ¶¶ 10, 346-78.)  They should be rejected again.  It is well established that "evidence of [certain] Defendants' wrongdoing with respect to LIBOR and FX and the existence of regulatory investigations into the precious metals markets do[es] not substantiate Plaintiffs' antitrust claims" with respect to other markets.  *Gold I*, 213 F. Supp. 3d at 661.  The Second Circuit has emphatically rejected such allegations that "if it happened there, it could have happened here."  *See In re Elevato*r, 502 F.3d at 52.

*Other plus factors*.  Plaintiffs' remaining "plus factor" allegations likewise fail to support a plausible inference of conspiracy.  Plaintiffs describe the "highly opaque" nature of the MGB market (SAC ¶ 322), "high degree of market concentration" (*id.* ¶ 326), and "relatively low liquidity" (*id.* ¶ 327), but these vague observations change nothing of substance from the dismissed CAC and are not suggestive of a conspiracy.  *See Capital Imaging*, 996 F.2d at 545.  Courts routinely reject similar allegations as insufficient.  *See, e.g.*, *Citigroup*, 709 F.3d at 139 (allegation that "90% of one market segment was dominated" by defendants was not a plus factor); *accord In re Musical Instruments*, 798 F.3d at 1198 (allegations of "substantial market power" do not suggest defendants "illegally agreed among themselves to restrain competition").

Equally unpersuasive is Plaintiffs' bare assertion that Defendants conspired to maximize their profits and minimize their losses.  (SAC ¶ 6.)  Because a "common motive for increased profits always exists," *In re Musical Instruments*, 798 F.3d at 1194 n.8, this Court has already found that this assertion "fail[s] to move the needle."  *MGB I*, 412 F. Supp. 3d at 391.

### B.      Plaintiffs Fail to Allege a Plausible Spread-Widening Conspiracy.

Plaintiffs' separate sweeping claim that Defendants "agreed to fix the 'bid-ask spread'" on "every MGB transaction" over an eleven-year period (SAC ¶ 9) is implausible on its face, and the SAC alleges no direct or circumstantial evidence capable of "nudg[ing] [plaintiffs'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547.  Plaintiffs' selective

chat excerpts are not "direct evidence" of a spread-widening conspiracy because they fail to describe the contours of any alleged agreement, hardly mention bid-ask spreads, and are demonstrably unrelated to any of Plaintiffs' alleged MGB transactions.  And the Court already rejected Plaintiffs' purported statistical analyses of bid-ask spreads, which are simply recycled in the SAC.

### 1.       The alleged spread-widening conspiracy is implausible.

Plaintiffs allege no plausible means by which Defendants could have effectuated the "comprehensive scheme" that resulted in the alleged pervasive, daily, eleven-year conspiracy to widen bid-ask spreads in all transactions across different tenors of MGBs.  (*See* SAC ¶ 9.) Plaintiffs do not allege any mechanism—like a benchmark or other price-setting structure— through which dealers could have *systemically* manipulated the MGB secondary market.  In the absence of such a *systematic* mechanism, a conspiracy to widen bid-ask spreads had to operate on a transaction-by-transaction level.  That would require an overwhelming volume of near- constant communication among Defendants, something the SAC comes nowhere close to alleging.

Judge Ramos recently dismissed an antitrust action premised on a similarly implausible theory in *In re SSA Bonds Antitrust Litigation*, in which plaintiffs also alleged that systemic manipulation occurred on an individual basis, rather than by manipulation of a benchmark.  2019 WL 4917608, at *11 (S.D.N.Y. Oct. 4, 2019) ("*SSA II*").  Judge Ramos found that plaintiffs failed to state a claim because the chats cited by the *SSA II* plaintiffs did not "signal a widespread multi-bank conspiracy."  *Id.*

Plaintiffs have the same problem here.  None of the chats cited in the SAC suggest a widespread conspiracy of the type they claim, involving investors who "must contact an MGB salesperson or trader employed by one of the Defendants, who then provides a 'quote'" because

"[t]here is no centralized exchange[] on which market participants can trade MGBs and view current MGB prices, and consumer MGB transactions occur almost entirely over-the-counter and usually take place by telephone."  (SAC ¶ 322); *cf. SSA II*, 2019 WL 4917608, at *11 ("[p]laintiffs explain that investors operate in a dealer-to-customer market where investors call SSA bond traders individually and get quotes").  And although Plaintiffs contend that market-makers were required to "maintain[] at least 7% market share in the secondary market at the end of each quarter" (*id.* ¶ 323), they concede that non-defendant dealers actually accounted for at least 25% of quotes[20] in the secondary market (*see id.* ¶¶ 325, 462 (depicting chart of median bid-ask spread quotes from exclusively non-defendant dealers)).  These allegations do not save Plaintiffs' claims: "the sheer breadth and scope of the conspiracy alleged . . . alone renders [them] facially implausible." *Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d 759, 765 (W.D.N.C. 2011) (dismissing antitrust claims where plaintiffs' theory would "necessitate such organization and cooperation as to be practically impossible, let alone implausible").

> ### 2. Plaintiffs fail to allege direct evidence of a spread-widening conspiracy.

Plaintiffs' references to a handful of chats cannot make their sweeping, market-wide conspiracy allegations more plausible.  Almost all the chats are bilateral (involving just two individuals), and Plaintiffs identify no chat that suggests a comprehensive, spread-widening conspiracy involving all Defendants.  *See Gold II*, 328 F. Supp. 3d at 230-31 (finding that chats showing "two traders at Deutsche Bank and UBS episodically coordinat[ing] positions and

---

[20] Plaintiffs allege that "Market Maker Defendants were responsible for approximately 75% of quotes in the over-the-counter market during the Class Period."  (SAC ¶ 325.)  This allegation pertains to the mere "frequency of bid-ask quotes in the MGB secondary market," *id.*, and says nothing about the nominal value of actual trades.  Therefore, even taking this allegation as true, it provides little insight into Defendants' collective market share, let alone each Defendant's individual market share.

engag[ing] in market manipulation . . . does not make it plausible that they or others employed by the same banks engaged in a much larger, much more ambitious multi-year conspiracy with four other financial institutions.").  Plaintiffs never explain how these episodic, bilateral information exchanges plausibly establish a pervasive scheme to inflate bid-ask spreads for every MGB transaction over an eleven-year period.  Nor could they.  The chats say nothing about any overarching spread-widening agreement, much less when such an agreement was made, where, or by whom, or how all nine Defendants would have ensured each other's compliance.

The SAC provides no factual allegations on these points.  Their absence is dispositive. *See SSA II*, 2019 WL 4917608, at *11 (chats that "merely show[] opportunistic attempts at collusion by individual traders [] are not evidence of an overarching conspiracy committed by the Foreign Dealer Defendants"); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 209 (S.D.N.Y. 2019) (Oetken, J.) (dismissing price-fixing claims where evidence was "insufficiently detailed to constitute direct evidence suggesting that an agreement was made"); *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358-59 (S.D.N.Y. 2018) (finding complaint inadequate where plaintiff did not allege "during what time period the conspiracy was formed, or who among the defendants' employees created the conspiracy . . . or who agreed with whom, to what, and when.").

Plaintiffs' reliance on the chats is also misplaced because none of the chats referencing spreads coincided with dates when Plaintiffs purportedly transacted in MGBs.[21]  And Defendants BBVA-Bancomer and Santander Mexico are not alleged to have been involved in *any chats*

---

[21] Chats referencing any sort of spread are referenced in SAC ¶¶ 411 (chat dated 4/13/11), 413 (chats dated 6/9/11, 8/30/11, 5/2/12, 6/24/13, 6/13/13), 416 (chat dated 1/17/11), and possibly in ¶¶ 399 (chat dated 1/17/13), 403 (chat dated 4/18/13), 415 (chat dated 1/7/11), 419 (chat dated 2/10/11).  None of the transactions identified by Plaintiffs in Appendix D occurred on these dates.  (At least one of the relevant chats relates to "Afores," Mexican pension funds, which—as Plaintiffs concede—are not MGBs.  (SAC ¶ 413 & n.55.))

referencing spreads *at all*.  In sum, the addition of the excerpted chats to the SAC does not render

Plaintiffs' pervasive, eleven-year spread-widening conspiracy any more plausible.

> ### 3.     Plaintiffs fail to allege circumstantial evidence of a spread-widening conspiracy.

The Court has already rejected the only allegations in the SAC specific to Plaintiffs'

spread-widening theory:  statistical analyses that the Court found improperly "lump[ed] together

the market makers," making it impossible to ascertain the actual participants in the purported

conspiracy.  *MGB I*, 412 F. Supp. 3d at 390.  Though Plaintiffs promised to "develop[] enhanced

economic analyses using new, non-aggregated transaction-level MGB pricing data that will

permit Plaintiffs to plausibly link each Defendant to the alleged conspiracy" (ECF No. 159, at 3),

the SAC does no such thing.  Instead, Plaintiffs recycled substantively identical charts in the

SAC (*compare* SAC ¶¶ 452-63, Figures 7-10, *with* CAC ¶¶ 325-31, Figures 7-8) and added just

one "new" chart, which allegedly shows the *median* bid-ask spreads for non-defendants for

selected types of MGBs.  (SAC ¶ 463, Figure 11.)  The Court already rejected Plaintiffs' reliance

on medians because it improperly "obscure[d] any given Defendant's contribution to an observed

trend."  *MGB I*, 412 F. Supp. 3d at 390.  This new chart merely highlights the flaws in Plaintiffs'

theory of an overarching conspiracy.  *See supra* Section I.B.1.

Nor can Plaintiffs rely on the SO issued by COFECE's Investigative Authority.  Plaintiffs

cite no statement in the SO or from COFECE regarding a spread-widening conspiracy, and there

is no basis to infer from Plaintiffs' deliberately ambiguous references to "absolute monopolistic

practices" that all nine Defendants engaged in an eleven-year spread-widening conspiracy.  This

is yet another "inferential leap" that Plaintiffs invite the Court to make based on "group pleading

in another form," and the Court should decline the invitation, just as it did in dismissing the

CAC.  *MGB I*, 412 F. Supp. 3d at 389 (declining "to indulge the inferential leap" as to any

individual Defendant's culpability because "that [culpability], without more, would not be direct evidence of a conspiracy implicating [any other Defendants]").[22]

    **C.**    **Plaintiffs Fail to Plausibly Allege That Any Conspiracy Existed During 2006–2010 and 2013–2017.**

Plaintiffs' flimsy allegations of purported MGB auction or bid-ask spread conspiracies are strained beyond credulity when Plaintiffs claim a continuous, eleven-year conspiracy, lasting from January 1, 2006 to April 19, 2017. The "facts" alleged in the SAC leave huge gaps within this timeframe. For example, Plaintiffs cite only chat messages dating between December 2010 and July 2013. (*See, e.g.*, SAC ¶¶ 399-400, 402, 404.) And Plaintiffs concede that the SO issued by COFECE's Investigative Authority only refers to potential misconduct between 2010 and 2014. (*See id.* ¶ 395.) Though Plaintiffs' so-called statistical analyses purport to cover the broader timeframe, these analyses still amount to improper group pleading (*see MGB I*, 412 F. Supp. 3d at 389) and cannot support the weight of Plaintiffs' claims.

In sum, the SAC pleads no facts whatsoever to support Plaintiffs' assertion that conspiratorial conduct occurred between January 2006 and December 2010, or between July 2013 and April 2017. Courts routinely impose temporal limitations on antitrust conspiracy claims where a complaint fails to plausibly allege wrongdoing throughout the entire proposed conspiracy period. *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 472 (S.D.N.Y. 2017) ("*IRS I*") (dismissing as implausible a "conspiracy among the Dealer Defendants, during 2007–2012"); *Silver I*, 213 F. Supp. 3d at 558 n.19 (limiting class period to 2007 through 2013 because there was "absolutely no basis, apart from conjecture, to assume that

_____

[22] The SO confirmed that the Court was right to reject Plaintiffs' group pleading of conspiracy. COFECE's investigation did not uncover sufficient evidence to include HSBC Mexico and UBS Mexico in the SO, which strongly suggests that neither was involved in any MGB-related conspiracy and undermines Plaintiffs' theory that all Defendants were engaged in a unitary, all-encompassing conspiracy.

Defendants' conduct continued beyond" that period); *Gold I*, 213 F. Supp. 3d at 660 n.24

(dismissing pre-2006 and post-2012 portions of conspiracy claims); *In re Credit Default Swaps*

*Antitrust Litig.*, 2014 WL 4379112, at *14 (S.D.N.Y. Sept. 4, 2014) (dismissing conspiracy

claims that pre-dated fall 2008); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at

*12 (N.D. Cal. Jan. 21, 2014) (dismissing pre-2002 portion of conspiracy claims); *In re Fla.*

*Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1319-20 (S.D. Fla. 2010) (dismissing

pre-2008 portion of conspiracy claims).  Thus, even if the remainder of Plaintiffs' claims survive

dismissal—and they should not—the Court should at a minimum dismiss Plaintiffs' pre-

December 2010 and post-July 2013 claims.

## II.     PLAINTIFFS DO NOT HAVE ANTITRUST STANDING.

Even if Plaintiffs had pleaded plausible antitrust claims, they would still lack antitrust

standing to assert them.  "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a

[claim] by its terms fails to establish this requirement [courts] must dismiss it as a matter of law."

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013).

To plead antitrust standing, Plaintiffs must allege facts sufficient to demonstrate both that

they suffered an "antitrust injury" and are "efficient enforcers of the antitrust laws."  *Harry v.*

*Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018).  An "antitrust injury"

consists of "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the

type of injury contemplated by the statute."  *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979,

at *6 (S.D.N.Y. Aug. 28, 2018) ("*SSA I*").  Whether a plaintiff is an efficient enforcer of the

antitrust laws depends upon (i) the directness of the plaintiff's injury, (ii) the existence of more

direct victims of the anticompetitive conduct, (iii) the extent to which the plaintiff's alleged

damages are "highly speculative," and (iv) the potential for duplicative recovery or complex

questions regarding apportionment of damages.  *See Gelboim v. Bank of Am. Corp.*, 823 F.3d

759, 778 (2d Cir. 2016).  Any one of these factors can preclude efficient enforcer standing.  *See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005); *In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *9-11 (S.D.N.Y. May 23, 2018) ("*IRS II*").  Plaintiffs have not adequately alleged either an "injury-in-fact" or that they are efficient enforcers.[23]

### A.     Plaintiffs Lack Standing to Assert Any of Their Antitrust Claims.

Plaintiffs allege again in the SAC that Defendants colluded to "(a) rig[] MGB auctions through collusive bidding and information sharing to control the flow of MGB supply; (b) s[ell] new MGBs purchased at auction into the secondary market at artificially higher prices; [and] (c) agree[] to fix the 'bid-ask spread' artificially wider, overcharging and underpaying investors in every MGB transaction by suppressing the 'bid price' at which Defendants offered to buy MGBs and increasing the 'ask price' at which Defendants offered to sell MGBs."  (SAC ¶ 9.) Plaintiffs still have not pled antitrust standing with respect to any of those theories.

### 1.     Auction rigging.

Plaintiffs' auction-rigging claims assert that Defendants conspired to submit artificially low bids at MGB auctions "through collusive bidding and information sharing."  (SAC ¶ 9.)  The SAC still contains no allegations, however, that Plaintiffs were injured by Defendants' purported submission of low auction bids.  Plaintiffs do not allege that *they* participated in MGB auctions; nor do they allege that the supposedly suppressed auction prices somehow raised the prices *they* paid for MGBs in the secondary market.  In fact, the only entity that could have suffered any conceivable injury from the allegedly suppressed auction prices is the Mexican government.

---

[23] Moreover, the claims of Plaintiffs Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA") and MTA Defined Benefit Pension Plan Master Trust ("MTADBPPMT") should be dismissed for the additional reason that neither alleges a single instance in which it transacted in any MGB during the Class Period, whether with any Defendant or otherwise.  Those Plaintiffs therefore lack Article III standing, antitrust standing, and class standing.

Plaintiffs therefore fail to plead either injury-in-fact or that they are efficient enforcers with respect to their auction-rigging claims.  *See, e.g., Harry*, 889 F.3d at 110 (no antitrust standing unless plaintiffs "can establish that they themselves have been harmed by Defendants' activities"); *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 706 (S.D.N.Y. 2019) ("*CDOR*") (no antitrust standing because "evidence suggests that Plaintiff[s were] helped, and not harmed, by Defendants' alleged manipulation"); *SSA I*, 2018 WL 4118979, at *8 (no antitrust standing because "Plaintiffs have not plausibly alleged that they themselves were injured by the alleged conspiracy"); *Gelboim*, 823 F.3d at 779 (only those plaintiffs that suffer direct and non-speculative injuries are efficient enforcers of the antitrust laws).

### 2.    Post-auction sale prices.

Plaintiffs next allege that Defendants agreed to re-sell the MGBs they purchased at auctions at artificially inflated prices following the announcement of auction results.  (SAC ¶¶ 9, 429, 444.)  According to Plaintiffs, however, Defendants charged these inflated prices *only* in the post-auction period of the day that a given MGB was auctioned.  Despite having an opportunity to amend, Plaintiffs still do not allege that prices were inflated "on Non-Auction Days, when Defendants do *not* have new inventory of MGBs to sell."  (*Id.* ¶ 445 (emphasis added); *see also* ¶ 444 & Figure 5 (depicting average price increases in the post-auction portion of auction days).) For at least two reasons, Plaintiffs have failed to plead that they were injured by an alleged conspiracy to inflate re-sale prices for recently-auctioned MGBs.

*First*, Plaintiffs have not identified a single instance in which they purchased an MGB *on the day it was auctioned*.  That omission is fatal because Plaintiffs' SAC asserts that the purportedly inflated MGB prices "are absent on Non-Auction Days."  (SAC ¶ 445.)  Plaintiffs therefore lack antitrust standing to assert any claims relating to post-auction price-rigging.  *See*

*Harry*, 889 F.3d at 112 (dismissing antitrust claims where plaintiffs failed to plead "a specific manipulated transaction or set of transactions between a plaintiff and a defendant with the plaintiff on the (net) losing end and the defendant on the (net) winning end"); *SSA I*, 2018 WL 4118979, at *6-*7 (dismissing antitrust claims because "plaintiffs failed to allege any specific transactions that they entered into that harmed them through the defendants' misconduct").

The MGB purchases itemized in Appendix D to the SAC do not alter this conclusion. Most of those purchases took place on days when *no* MGBs were auctioned or the product that was alleged to be purchased was not auctioned.[24]  (*See* Brennan Decl., Ex. B.)  Moreover, even for purchases that took place on a day when *some* type of MGB was auctioned, Plaintiffs do not allege that they purchased the auctioned MGB as opposed to one of the hundreds of other tenors circulating in the secondary market.  (*See* SAC, App'x D.)  Tellingly, Plaintiffs still do not do so despite having been put on notice of this very defect by Defendants' previous motion to dismiss briefing, and even though Plaintiffs of course have access to all of their own transaction data. Accordingly, Appendix D does not supply a basis for antitrust standing.  *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 926 n.36 (S.D.N.Y. 2018) ("*Silver II*") ("The fact that Plaintiffs may have traded in the same 24 hour period as traders . . . discussed manipulation of the . . . markets is simply too thin a basis for the Court to infer that . . . the traders' employers caused the Plaintiffs' actual damages.").

*Second*, Plaintiffs have not alleged that they purchased an MGB in the *post*-auction portion of the day it was auctioned.  According to Plaintiffs, investors may purchase a given tenor of MGBs either before or after that tenor is auctioned because "the great majority" of auctions "reopen[] existing [MGB] issues instead of creating new issuances."  (SAC ¶ 310.)

---

[24] As noted above, auctions typically take place on Tuesdays.  (SAC ¶ 293.)

Plaintiffs also contend that the alleged conspiracy *lowered* an MGB's price before it was auctioned and *raised* its price afterwards. (*See id.* ¶¶ 444-45, Figure 5.) Thus, under Plaintiffs' own allegations, whether they purchased a given tenor of MGBs before or after it was auctioned is critical to determining whether they were helped or harmed by the alleged conspiracy[25]—but Plaintiffs continue to omit that information from their SAC. Plaintiffs' claims should be dismissed for that reason as well. *See Harry*, 889 F.3d at 115 (plaintiffs fail to plead antitrust injury when "their complaint provides just as much support for the proposition that they were benefited . . . as for the proposition that they were harmed"); *Dentsply Int'l Inc. v. Dental Brands for Less LLC,* 2016 WL 6310777, at *3 (S.D.N.Y. Oct. 27, 2016) (a plaintiff cannot plead antitrust injury when it "stand[s] to gain" from the alleged scheme).

### 3. Spread-widening.

Plaintiffs fare no better with their distinct and separate allegations that they were injured by a conspiracy to widen the bid-ask spread paid by customers in the secondary market. (SAC ¶ 502; *see also id.* ¶¶ 452-63.) Plaintiffs assert that as a result of the alleged spread-widening, they were "overcharged each time they purchased MGBs from Defendants and underpaid each time they sold MGBs to Defendants." (*Id.* ¶ 503.) But the only allegations offered in support of that conclusory assertion consist of Plaintiffs' crude comparisons of "median" bid-ask spreads from 2006 through 2017. (*Id.* ¶¶ 457-60.) These highly aggregated "medians" cannot possibly establish that Defendants widened the bid-ask spreads on *every* secondary market transaction over an eleven-year period. *See supra* at 27; *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552, at *30 (E.D. Pa.

---

[25] This distinction is important since Plaintiffs could not possibly participate in the auctions as sellers, and thus could not have been injured by artificially *suppressed* prices.

Sept. 30, 2010) ("averaging by definition glides over what may be important differences"); *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 WL 760535, at *19 (N.D. Cal. Mar. 9, 2007) ("generic averages across uncounted products through vague geographic areas provide[] insufficient support for the allegations").  Plaintiffs have alleged no more than a possibility that their own transactions were affected by the alleged spread-widening conspiracy, which is not enough to sustain their standing to sue.  *See Harry v. Total Gas & Power N. Am. Inc.*, 244 F. Supp. 3d 402, 415 n.5, 416 (S.D.N.Y. 2017) ("[F]ailure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct precludes a plausible allegation of actual injury."), *aff'd as modified*, 889 F.3d at 110; *SSA I*, 2018 WL 4118979, at *7 (no antitrust standing where plaintiffs fail to plead that the alleged conspiracy "yielded higher prices on their own trades").  In fact, no chat referencing a spread coincides with a trade listed in Appendix D. *See supra* Section I.B.2, n.21.

**B.      Plaintiffs Lack Standing to Assert Claims Regarding MGBs They Did Not Trade.**

Plaintiffs lack standing to assert any claims regarding Bondes D for an additional reason: they do not allege they even traded those bonds and thus could not have suffered any injury related to those bonds.  According to the SAC, Bondes D are distinct from the other MGBs that Plaintiffs allegedly traded and are priced differently based on different maturity dates and coupon payments.  (SAC ¶¶ 313-14.)  Because Bondes D are distinct products that Plaintiffs never bought or sold, their claims relating to Bondes D should be dismissed on Article III standing and class standing grounds.  *See Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) (the "'injury in fact' test requires . . . that the party seeking review be himself among the injured"); *see also Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014); *In re Morgan Stanley Mortg. Pass-Through*

*Certificates Litig.*, 23 F. Supp. 3d 203, 209 (S.D.N.Y. 2014) ("MissPERS could pursue its remaining direct claims, but its representative claims concerning tranches that it did not buy will fail for lack of a party with statutory . . . standing to assert them.").[26]

### C.   Plaintiffs Lack Standing to Assert Claims Arising Out of Transactions with Non-Defendants.

Plaintiffs are not efficient enforcers of the antitrust laws with respect to claims arising out of trades with non-defendants, otherwise known as "umbrella claims."  While Plaintiffs' putative class would comprise only of persons that entered into an MGB trade with a Defendant or any affiliate thereof (SAC ¶ 504), Plaintiffs claim that they "were injured and suffered harm in each MGB transaction conducted during the Class Period" (*id.* ¶ 503), regardless of whether that transaction was with a Defendant.  To the extent Plaintiffs seek to assert claims against Defendants arising out of transactions with non-defendants, Plaintiffs seek to assert umbrella claims, which are barred by a long line of cases in this Circuit under the efficient enforcer doctrine.  *See, e.g.*, *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 558-59 (S.D.N.Y. 2017); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *22 (S.D.N.Y. Mar. 28, 2017); *Sullivan v. Barclays PLC*, 2017 WL 685570, at *15 (S.D.N.Y. Feb. 21, 2017); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *15-16 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*"); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, 1999 WL 1201701, at *7 (S.D.N.Y. Dec. 15, 1999); *Gross v. New Balance Athletic Shoe*, 955 F. Supp. 242, 246-47 (S.D.N.Y. 1997).

*Sonterra* is directly on point.  There, the plaintiffs sought damages for transactions with non-defendants that incorporated Swiss Franc LIBOR, an interest rate benchmark allegedly

---

[26] Moreover, even if Plaintiffs had alleged an injury relating to Bondes D, they would not be efficient enforcers as to Bondes D claims because parties that actually traded those bonds would be the better enforcers.  *See, e.g.*, *Daniel*, 428 F.3d at 443-44.

manipulated by the defendants. 277 F. Supp. 3d at 558-59. The plaintiffs argued that they were efficient enforcers of the antitrust laws because the alleged manipulation of the benchmark directly impacted their transactions with non-defendants. *Id.* The court disagreed, holding that the impact of the alleged misconduct on transactions with non-defendants was too attenuated to satisfy the efficient enforcer standing test. *Id.* at 560-62.

Here, Plaintiffs' umbrella claims are even more attenuated than those dismissed in *Sonterra*. Plaintiffs do not allege that Defendants manipulated a benchmark price that directly impacted the prices that Plaintiffs paid under contracts that incorporated the benchmark; rather, they allege only that Defendants fixed the prices on *Defendants' own transactions*, which prices supposedly had some sort of unexplained ripple effect on Plaintiffs' transactions with non-defendants. Accordingly, this Court should follow *Sonterra* and "[t]he overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory," *LIBOR VI*, 2016 WL 7378980, at *15 n.24, and dismiss Plaintiffs' attempt to assert umbrella claims. Indeed, all four factors of the efficient enforcer doctrine support that outcome.

*First*, Plaintiffs' umbrella claims "seek to impose liability for transactions which [D]efendants did not control and of which they were likely not even aware." *Sonterra*, 277 F. Supp. 3d at 560. Plaintiffs allege only in the most conclusory of terms that they "were injured and suffered harm in each MGB transaction conducted during the Class Period" (SAC ¶ 503), and do not explain how the alleged conspiracy supposedly impacted transactions with non-defendants. *See Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014) (dismissing antitrust claims "[w]here the chain of causation between the asserted injury and the alleged restraint in the market contain[ed] several somewhat vaguely defined links"). Where, as here, "there [were] two independent actors—the [non-defendants] and the [plaintiffs]

themselves—who influence[d] the [price] of the trades at issue in this case after Defendants'

alleged overpricing," plaintiffs are not efficient enforcers. *Contant v. Bank of Am. Corp.*, 2018

WL 1353290, at *6 (S.D.N.Y. Mar. 15, 2018).[27]

Plaintiffs' claims arising from MGB transactions with non-defendants are impermissibly

speculative. Plaintiffs do not allege that market participants were *required* to transact at any

given bid or ask price (as opposed to somewhere in between), let alone that Plaintiffs were

somehow required to transact *with third parties* at Defendants' bid or ask rates. Accordingly, the

purported impact (if any) that alleged lower bid and higher ask prices from Defendants may have

had on transaction prices between Plaintiffs and third parties is hopeless guesswork. Indeed, in

any given MGB transaction between a Plaintiff and a third party, the alleged conspiracy could

just as well have benefited a Plaintiff depending on (a) whether the purported bid-ask spread

manipulation moved third-party MGB prices up, down, or not at all, and (b) whether the Plaintiff

was a buyer or a seller. Plaintiffs cannot be efficient enforcers where "it may not even be

apparent which party profited and which party was injured by the [] manipulation." *Sullivan*,

2017 WL 685570, at *19; *Sonterra*, 277 F. Supp. 3d at 560 ("In every transaction in CHF

LIBOR based derivatives to which defendants were not a party, one side would benefit from an

artificially high or low CHF LIBOR, and one side would be harmed.").

*Second*, Plaintiffs are not efficient enforcers of umbrella claims because parties that

allegedly traded directly with a Defendant are "more direct victims" of any alleged conspiracy.

*See Contant*, 2018 WL 1353290, at *3, *6; *see also Harry*, 244 F. Supp. 3d at 423 (plaintiffs

were not efficient enforcers because "more direct victims" of alleged conspiracy purchased

---

[27] *See also LIBOR VI*, 2016 WL 7378980, at *16 (finding that the chain of causation between defendants' actions and plaintiffs' injuries was broken where third parties could independently decide to incorporate U.S. Dollar LIBOR into their transactions with plaintiffs, a decision "over which defendants had no control, in which defendants had no input, and from which defendants did not profit").

allegedly price-fixed product); *Sullivan*, 2017 WL 685570, at *18 (plaintiffs who transacted with non-defendants were not efficient enforcers in part because plaintiffs who dealt directly with defendants were more direct victims).

*Third*, it would be "exceptionally complex," if not impossible, to isolate any impact of Defendants' alleged conduct on umbrella claims. *Sonterra*, 277 F. Supp. 3d at 564. Calculating alleged umbrella damages would require the Court to speculate as to what the bid-ask spread and transaction price would have been absent the alleged conspiracy in every single transaction between a Plaintiff and a third party, and then to calculate damages for each transaction. Courts in this District have rejected umbrella claims where the court would have to speculate as to what Plaintiffs' trading prices would have been absent the alleged manipulation. *See, e.g.*, *Sullivan*, 2017 WL 685570, at *15, *18-19 (plaintiffs were not efficient enforcers because, among other things, plaintiffs had not offered "a coherent explanation as to how their damages evidence would not be steeped in speculation"); *Sonterra*, 277 F. Supp. 3d at 563-64 (dismissing umbrella claims for similar reasons).

*Finally*, any recoveries based on umbrella claims would "impose liability that is wildly disproportionate to [Defendants'] [alleged] gain[s]." *Sullivan*, 2017 WL 685570, at *16. By pursuing umbrella claims, Plaintiffs seek to recover on each of their MGB transactions regardless of any Defendant involvement in those transactions. Permitting umbrella claims would thus "enlarge[] the scope of private antitrust enforcement beyond the Sherman Act's intent." *Sonterra*, 277 F. Supp. 3d at 561. For example, under Plaintiffs' theory of liability, in the situation where person A buys an MGB from a Defendant and then sells that MGB to person B, who in turn sells that MGB to person C, persons A, B, and C all would be permitted to recover from Defendants for their alleged injuries, as long as each of them bought at least one MGB from

any Defendant at any time during the eleven-year alleged class period.  Such a recovery would

be manifestly unfair:  it would penalize Defendants three times over for the same alleged

conduct.  *See, e.g.*, *Sullivan*, 2017 WL 685570, at *19 (finding that damages were duplicative

with respect to non-defendant transactions because in some instances both sides to a transaction

could claim to have suffered injury).  And even if Plaintiffs argued that they should be entitled to

only one recovery in the scenario described above, Plaintiffs do not explain how damages would

be apportioned among the alleged "victims"—a highly complex task that would involve

considering the timing, pricing, and sizes of individual trades.  *See Sonterra*, 277 F. Supp. 3d at

565-66 (dismissing umbrella claims because "plaintiffs' injuries appear likely to be

extraordinarily difficult to calculate and could lead to benumbing damages amounts that far

exceed the aggregate harm to third parties").

     All four efficient enforcer factors thus support dismissal of Plaintiffs' umbrella claims.

## III.    THE FTAIA BARS PLAINTIFFS' AUCTION CONSPIRACY CLAIMS.

     Plaintiffs' auction conspiracy claims also continue to be barred by the FTAIA because

those claims are extraterritorial in nature.

     The FTAIA excludes from the scope of the Sherman Act any conduct "involving trade or

commerce . . . with foreign nations."  15 U.S.C. § 6a.  The FTAIA recognizes only two

exceptions:  (i) import activity involving foreign commerce, *Lotes Co. v. Hon Hai Precision*

*Indus. Co.*, 753 F.3d 395, 404 (2d Cir. 2014) (the "Import Exception"), and (ii) conduct that "has

a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic [or] import . . .

commerce" and "'gives rise to a claim under' the Sherman Act," *id.* at 404, 413-14 (the

"Domestic Effects Exception").  To satisfy the Domestic Effects Exception, there must be a

"reasonably proximate causal nexus" between the overseas conduct and its alleged substantial

domestic effects, reflecting "antitrust law's classic aversions to remote injuries."  *Id.* at 411.

Plaintiffs cannot avail themselves of the Import Exception because, by their own allegations, Defendants' alleged conspiracy to "rig" MGB auctions involved auctions run by the Mexican government that took place in Mexico, and bids submitted by Mexican entities, eight of which were "designated MGB market makers" in Mexico.  (SAC ¶ 65.)  Plaintiffs contend that the Mexican market-maker Defendants allegedly "participate[d] in the government-run MGB auctions" and allegedly coordinated their bids.  (*Id.* ¶¶ 294, 429.)  In other words, Plaintiffs' auction-rigging claims implicate *only* transactions between the Mexican market-maker Defendants and their auction counterparty, the government of Mexico, not any transactions with U.S.-based investors.  Accordingly, the Import Exception does not apply to the auction claims. *See Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395-96 (2d Cir. 2002) (Import Exception did not apply to claims of price-fixing in foreign auction services because, "[w]hile some of the goods purchased in those auctions may ultimately have been imported by individuals in the United States, the object of the conspiracy was the price that the defendants charged for their auction services, not any import market for those goods"), *abrogated in part on other grounds by F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581,  599-600 (S.D.N.Y 2015) (holding that the Import Exception does not apply to wholly foreign transactions).

With the Import Exception unavailable, Plaintiffs can overcome the FTAIA's extraterritoriality bar only by pleading that the alleged conduct falls within the Domestic Effects Exception, *i.e.*, that it had a "direct, substantial, and reasonably foreseeable" effect on U.S. commerce.  15 U.S.C. § 6a(1); *Lotes*, 753 F.3d at 398.  But Plaintiffs do not allege that the purported auction-rigging had any domestic effect whatsoever.  And even if they did, those effects would be limited ripple effects in secondary market prices that indirectly impacted separate transactions in the United States, not the "direct," "substantial" and "reasonably foreseeable"

effects on U.S. trade or commerce required to satisfy the Domestic Effects Exception. (*See, e.g.*, SAC ¶ 519 (alleging only that the conspiracy caused Plaintiffs to be injured, not that the conspiracy had a "direct, substantial, or reasonably foreseeable effect" on U.S. trade or commerce, as required by the exception).)   Plaintiffs' allegations therefore do not satisfy the requirements of the Domestic Effects Exception.[28]

Because Plaintiffs fail to satisfy either the Import Exception or the Domestic Effects Exception to the FTAIA, the FTAIA bars their auction conspiracy claims.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT.

Plaintiffs' unjust enrichment claims should be dismissed for three independent reasons.

*First*, Plaintiffs offer no basis other than their defective conspiracy allegations for concluding that any alleged enrichment of Defendants was "unjust."  As the Court recognized in dismissing the CAC's unjust enrichment claim, failure to plead antitrust claims dooms Plaintiffs' unjust enrichment claim.  *See MGB I*, 412 F. Supp. 3d at 392.[29]  Unjust enrichment "is not a catchall cause of action to be used when others fail."  *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 227 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir.); *see also Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454, 466 (S.D.N.Y. 2019).

*Second*, any unjust enrichment claim based on alleged direct transactions between a Plaintiff and a Defendant is barred because those transactions would be governed by contracts

---

[28] *See Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*, 2017 WL 4402564, at *10 (S.D.N.Y. Sept. 30, 2017) (holding that "[p]laintiff's attenuated chain of causation is insufficient to establish a direct, substantial, or reasonably foreseeable effect under the FTAIA"), *aff'd*, 942 F.3d 88 (2d Cir. 2019); *Latino Quimica-Amtex v. Akzo Nobel Chems. B.V.*, 2005 WL 2207017, at *9 (S.D.N.Y. Sept. 8, 2005) ("As the allegation does not even plead that it was the effect on U.S. commerce, rather than an effect on foreign commerce, that gave rise to Plaintiffs' claim, it is patently inadequate to plead the necessary direct causal link."); *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 417 (S.D.N.Y. 2000) (holding that the Domestic Effects Exception was not satisfied where effect of foreign conduct on U.S. plaintiff was not "direct" but rather "indirect and derivative").

[29] Plaintiffs who lack antitrust standing also cannot bring a claim for unjust enrichment. *See Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013).

between the parties.  Unjust enrichment claims are available only "in the absence of an actual agreement between the parties." *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *16 (S.D.N.Y. Aug. 18, 2017).

*Third*, Plaintiffs cannot assert unjust enrichment claims against a Defendant based on MGB transactions with other persons.[30]  *See, e.g.*, *FrontPoint*, 2017 WL 3600425, at *16; *In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 315-16 (S.D.N.Y. 2017), *aff'd sub nom. Prime Int'l Trading v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019).  And even where, as here, Plaintiffs allege a conspiracy among a group of Defendants but only some Defendants are alleged to have transacted with the Plaintiffs, Plaintiffs cannot assert an unjust enrichment claim against those Defendants with whom they did not do business.  *See, e.g.*, *FrontPoint*, 2017 WL 3600425, at *16.

## V.    MOST OF PLAINTIFFS' CLAIMS ARE TIME-BARRED.

### A.    Plaintiffs' Antitrust Claims Are Partially Time-Barred.

A damages claim under the Sherman Act is subject to a four-year statute of limitations that begins to run when the cause of action accrues—*i.e.*, when an MGB transaction occurs and the Plaintiff pays an allegedly anticompetitive price—not when the Plaintiff discovers the cause of action.  15 U.S.C. § 15b; *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996).  Moreover, an

---

[30] Even as to those Defendants with whom Plaintiffs nominally plead direct dealings, they resort to contending that transactions between Plaintiffs and *non-parties* "actually occurred" between Plaintiffs and Defendants, *see, e.g.*, SAC ¶ 121 ("Thus, MGB transactions arranged by SIS or nominally involving Santander Investment Bolsa, Sociedad de Valores with customers in the U.S. market actually occurred between Santander Mexico and the U.S. customer."); ¶ 185 (similar for Deutsche Bank Mexico); ¶ 207 (similar for HSBC Mexico); ¶ 225 (similar for Bank of America Mexico); ¶ 244 (similar for JP Morgan Mexico); ¶ 266 (similar for Barclays Mexico); ¶ 285 (similar for UBS Mexico).  There is no factual amplification for those allegations, and they do not suffice to state an unjust enrichment claim against the relevant named Defendants.  Plaintiffs allege only a single direct transaction between Citibanamex and a named Plaintiff—a trade that allegedly occurred with Plaintiff Electrical Workers Pension Fund Local 103, I.B.E.W. ("IBEW 103") on December 7, 2015—but Citibanamex's records reflect no direct trades with IBEW 103 on December 7, 2015 or on any other date.  (*See* Personal Jurisdiction Br. at Part I.A; de Iturbide Decl., ¶ 19.)  Plaintiff Southeastern Pennsylvania Transportation Authority also alleges three transactions with BBVA-Bancomer, but Plaintiffs exclude those transactions from their list of transactions that allegedly occurred "on [d]ays [i]mpacted by Defendants' [m]anipulative [c]onduct."  (SAC, App'x D.)

antitrust plaintiff whose causes of action arise out of facts that took place within and outside the statutory period may recover only for those acts that fall within the statutory period. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Thus, as the first MGB complaint was filed on March 30, 2018, Plaintiffs' claims relating to transactions that took place more than four years before the filing of that complaint, *i.e.*, before March 30, 2014, are time-barred.

Plaintiffs contend that the statute of limitations should be tolled because Defendants fraudulently concealed the facts underlying Plaintiffs' claims, but Plaintiffs' allegations are insufficient to justify tolling. To successfully allege fraudulent concealment of an antitrust claim, a plaintiff must plead, with the particularity required by Rule 9(b): "(1) that the defendant concealed from [the plaintiff] the existence of his cause of action, (2) that [the plaintiff] remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that [the plaintiff's] continuing ignorance was not attributable to a lack of diligence on his part." *IRS I*, 261 F. Supp. 3d at 487. Plaintiffs' allegations do not satisfy these requirements.

### 1.    Plaintiffs do not allege affirmative acts of concealment.

To satisfy the first element of fraudulent concealment, a plaintiff must show "either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). Plaintiffs fail to adequately allege either.

Plaintiffs' allegations of "affirmative acts of concealment" are nothing more than summaries of the allegations underlying their causes of action. Plaintiffs allege that Defendants "(1) secretly disseminat[ed] confidential bidding schedules to each other and agree[d] on bids in MGB auctions; (2) implicitly represent[ed] that each Defendant was bidding competitively in the auction for MGB such that the final price represented a competitive auction; and (3) charg[ed]

43

inflated spreads to customers without disclosing that the charges reflected an agreed price set by Defendants rather than a competitive price."  (SAC ¶ 513.)

These allegations fail to show affirmative concealment for two independent reasons. First, they cannot satisfy Rule 9(b) because the allegations do not differentiate between the individual Defendants and "fail to specify the time, place, speaker, [and] even the content of alleged misrepresentations."  *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989).  Second, because these allegations are mere summaries of Plaintiffs' claims, they are not allegations of *separate* affirmative acts of concealment that could otherwise toll the statute of limitations.  *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 318-19 (S.D.N.Y. 2013) ("For equitable tolling to apply, a plaintiff may not rely on the same act that forms the basis for the claim . . . ."); *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 700 F. Supp. 1284, 1290-91 (S.D.N.Y. 1988) (holding that affirmative concealment separate from the underlying conduct is necessary to toll the statute of limitations).[31]  As such, Plaintiffs have failed to allege affirmative acts of concealment sufficient to toll the statute of limitations.

### 2.   Plaintiffs' allegations show that the alleged conspiracy was not self-concealing.

To adequately allege that a defendant engaged in a "self-concealing" conspiracy, a plaintiff must plead facts demonstrating that the nature of the conspiracy was such that, simply by carrying it out, the defendants necessarily concealed it from the plaintiff.  *See SEC v. Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007) ("A fraud conceals itself when the defendant only does what is necessary to perpetrate the fraud, and that alone makes the fraud unknowable[.]").  Plaintiffs'

---

[31] Courts often use "equitable tolling" and "fraudulent concealment" interchangeably.  *See Pearl v. City of Long Beach*, 296 F.3d 76, 81-82 (2d Cir. 2002).

allegations belie their claim that the conspiracy was self-concealing because Plaintiffs allege that the existence of the alleged conspiracy is apparent from publicly available information.

For example, Plaintiffs allege that "*dramatic*" price movements occurred only on auction days during the class period, but were "[t]ellingly . . . absent on Non-Auction Days," supposedly evidencing collusion.  (SAC ¶ 445.)[32]  If indeed there were such "dramatic" changes in price, then those changes should have been readily apparent to Plaintiffs, who had access to this pricing information throughout the eleven-year class period and allegedly experienced the impact of the alleged conspiracy throughout that time.  *See IRS I*, 261 F. Supp. 3d at 488 (holding that where the effects of an alleged antitrust conspiracy occur "in plain sight and in contrast to the market's expectations," the conspiracy is not "self-concealing"); *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *4 (D. Conn. Sept. 7, 2005) (rejecting allegations of a self-concealing conspiracy where resulting "price increases were *not* explainable by ordinary market forces").

Similarly, Plaintiffs allege that bid data obtained from Banxico shows "dramatic changes [in bid dispersion that] are indicative of collusion among the Defendants" and that fill rate data similarly shows evidence of "collusion" among Defendants during the class period.  (SAC ¶¶ 436, 438.)  And Plaintiffs also allege that Defendants increased the size of bid-ask spreads by "more than 20%" during the class period.  (*Id.* ¶ 458.)  Here again, if such "dramatic changes" actually occurred during the class period and indicated collusion, then Plaintiffs could have observed those changes at any point simply by comparing pricing information during the class period to the same information before the class period.  *See IRS I*, 261 F. Supp. 3d at 488; *In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *4.

---

[32] More specifically, for example, Plaintiffs claim that the price of 30-year Bonos "increase[d] dramatically" on Auction Days, indicating that Defendants "agree[d] to sell MGBs following the auction at fixed artificially higher prices."  (SAC ¶¶ 444-45.)

In addition to such long-available pricing information, Plaintiffs have sought to support their allegations by relying on information that was available at least as early as October 2013. In a prior complaint filed by one of the Plaintiffs, Boston Retirement System ("BRS"), BRS cited comments that CNBV president Jaime Gonzalez Aguade made in 2017 referring to sanctions issued in October 2013 against two Defendants for engaging in "collusion and anticompetitive behavior" with respect to Bonos.  (No. 18-cv-4294 (May 14, 2018), ECF No. 1, ¶ 164.)  The Mexican press reported on those sanctions when they were publicly issued in October 2013.[33] Thus, if Plaintiffs are correct that these 2013 reports were indicative of "collusion and anticompetitive behavior," then the reports put Plaintiffs on notice of their allegations by at least October 2013.[34]  Plaintiffs' SAC deleted these allegations, but Plaintiffs cannot "by these omissions 'erase[]' the admissions" in their prior complaint.  *Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) (alteration in original), *abrogated in part on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  And in any event, the Court can take judicial notice of the articles.  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Plaintiffs cannot have it both ways.  If there allegedly were "dramatic changes" in MGB prices and spreads during the alleged class period, and if press reports signaled collusion in the

---

[33] *See* El Financiero, *CNBV multa con 39 mdp a instituciones financieras* (Nov, 1, 2013), http://www.elfinanciero.com.mx/archivo/cnbv-multa-con-39-mdp-a-instituciones-financieras; Sentido Comun, *Bank of America, Barclays, Merrill Lynch, RBS multados por CNBV* (Nov. 1, 2013), http://bs.sentidocomun.com.mx/articulo.phtml?id=6596&auth=qkpzienvbq73btr; Jeanette Leyva, El Financiero, *La CNBV ya ha multado a bancos por los Bonos M* (July 24, 2017), http://www.elfinanciero.com.mx/economia/la-cnbv-ya-ha-multado-a-bancos-por-los-bonos-m.  The articles refer to alleged misconduct concerning transactions in "BONOS M." "BONOS" and "BONOS M" are used interchangeably and refer to the same instruments.   Rebeca Acosta-Arellano & Claudia Alvarez-Toca, Banco de Mexico, *The Mexican Government Securities Market* § 2.1 n.2, http://www.banxico.org.mx/elib/mercado-valores-gub-en/OEBPS/Text/iien.html.

[34] BRS also alleged that a 1993 analysis of Cetes weekly auctions and a 2001 study of the secondary market for Cetes both suggested that there was collusion in the MGB market, which further supports that Plaintiffs should have been monitoring the MGB auctions and secondary market for irregularities.  (No. 18-cv-4294 (May 14, 2018), ECF No. 1, ¶ 163.)

MGB market as early as 2013, then the alleged conduct was not self-concealing. *See IRS I*, 261
F. Supp. 3d at 489 ("[A]ll that is necessary to cause the tolling period to cease is for there to be
reason to suspect the probability of any manner of wrongdoing."); *Woori Bank v. Merrill Lynch*,
923 F. Supp. 2d 491, 495-96 (S.D.N.Y. 2013) (plaintiff may not "simultaneously claim[] that the
generalized evidence cited as the basis of its complaint—the vast majority of which involves
factual allegations published prior to [the limitations period]—is sufficiently detailed to state a
cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently
particular to cause the statute of limitations to run"), *aff'd*, 542 F. App'x 81 (2d Cir. 2013).

### 3.      Plaintiffs do not allege the exercise of due diligence.

Plaintiffs also fail to satisfy the third prong of the fraudulent concealment test because they
do not allege that they performed any due diligence or that the exercise of due diligence would
have been futile.  *See CDOR*, 368 F. Supp. 3d at 703-04 (plaintiff failed to adequately allege that
it "performed due diligence," offering merely the conclusory allegation that "[p]laintiff and the
[c]lass had no knowledge of [d]efendants' unlawful and self-concealing manipulative acts and
could not have discovered same by exercise of due diligence"); *Hinds*, 620 F. Supp. 2d at 521
(holding that plaintiffs failed to allege fraudulent concealment where they pled only that they did
not discover and could not have discovered the alleged conspiracy through reasonable diligence).
Plaintiffs do not allege, for example, that they ever engaged in any investigation to determine the
source of the allegedly "dramatic" changes in MGB auction bids, post-auction prices, and bid-ask
spreads during the class period.  Nor do they allege that they ever investigated potential collusion
in the MGB market following Mexican press reports of sanctions for alleged collusion and
anticompetitive behavior in October 2013.  Plaintiffs' failure to exercise due diligence prohibits
them from invoking equitable tolling of the statute of limitations.  *See Butala v. Agashiwala*, 916
F. Supp. 314, 320 (S.D.N.Y. 1996) (holding that plaintiffs failed to carry "the burden of pleading

their own diligence with particularity, [where the] Complaint [was] utterly lacking in the details of what steps the plaintiffs took to investigate . . . once they were on inquiry notice of the probability they had been defrauded").

Plaintiffs' assertion that they were not on inquiry notice until April 2017 when the COFECE investigation was announced (*see, e.g.*, Pls. Ltr. to Hon. Oetken at 3 (Apr. 23, 2019), ECF No. 154), or any assertion they may make that they were not on inquiry notice until COFECE issued the SO in September 2019 (*see* SAC ¶ 375), are also precluded by Plaintiffs' own allegations of "dramatic" changes in MGB prices and spreads and public disclosures of alleged collusion *during* the class period, which put them on inquiry notice much earlier than either of those announcements.

### B.    Plaintiffs' Unjust Enrichment Claims Are Partially Time-Barred.

Plaintiffs' unjust enrichment claims are also partially time-barred.  For the New York resident Plaintiffs, the applicable period is three years.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *163 n.186 (S.D.N.Y. Oct. 20, 2015).  For the non-New York resident Plaintiffs, under New York's borrowing statute, CPLR § 202, the limitations period is the shorter of (1) New York's statute of limitations or (2) the statutes of limitations of the states where the injuries occurred.  *Pricaspian Dev. Corp. v. Total S.A.*, 2009 WL 4163513, at *6-7 (S.D.N.Y. Nov. 25, 2009), *aff'd*, 397 F. App'x 673 (2d Cir. 2010).  Under New York law, a claim for unjust enrichment "accrues at the time and in the place of the injury."  *Id.* at *6.

With the exception of Plaintiff Oklahoma Firefighters Pension Retirement System ("OFPRS"), an Oklahoma resident, New York's statute of limitations for unjust enrichment is equal to, or shorter than, the statute of limitations in the state where the Plaintiff resided.[35]

---

[35] Plaintiffs MaBSTOA and MTADBPPMT are residents of New York, so their unjust enrichment claims are subject only to New York's statute of limitations.    The remaining Plaintiffs, with the exception of OFPRS, are residents of

Because the first MGB complaint was filed on March 30, 2018, the unjust enrichment claims of the non-OFPRS Plaintiffs are time-barred insofar as they are based on transactions more than three years before that date—*i.e.*, March 30, 2015.  OFPRS' unjust enrichment claims are subject to a two-year statute of limitations, *City of Tulsa v. Bank of Okla.*, 280 P.3d 314, 320-21 (Okla. 2011), so its unjust enrichment claims based on transactions occurring before March 30, 2016 are time-barred.

The fraudulent concealment doctrine does not save Plaintiffs' unjust enrichment claims. For equitable tolling to apply under New York law, the plaintiff "must show that the defendant wrongfully concealed its actions, such that plaintiff was unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner, or that defendant's actions induced plaintiff to refrain from commencing a timely action."  *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 467 (S.D.N.Y. 2015).   Similarly, under Oklahoma law, "[o]ne relying on fraudulent concealment to toll the statute of limitations must not only show that he did not know the facts constituting a cause of action, but that he exercised reasonable diligence to ascertain said facts."  *Masquat v. Daimler Chrysler Corp.*, 195 P.3d 48, 55 (Okla. 2008).[36]  For the reasons explained above, Plaintiffs' allegations of fraudulent concealment are insufficient to toll New York's or Oklahoma's statutes of limitations.  *See supra* Section V.A.[37]  Plaintiffs' untimely unjust enrichment claims therefore should be dismissed.

---

Massachusetts, Pennsylvania, or the United States Virgin Islands, all of which have statutes of limitations equal to or longer than three years.  *Sentinel Prods. Corp. v. Mobile Chem. Co.*, 2001 WL 92272, at *23 (D. Mass. Jan. 17, 2001) (six-year or three-year statute of limitations, depending on the essential nature of the claim, in Massachusetts); *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997) (four-year statute of limitations in Pennsylvania); *Patterson v. U.S. Virgin Islands*, 2013 WL 12250859, at *3 (D.V.I. May 8, 2013) (six-year statute of limitations in the Virgin Islands).

[36] *See also Masquat*, 195 P.3d at 55 ("[I]f the means of knowledge exist and the circumstances are such as to put a man of ordinary prudence on inquiry, it will be held that there was knowledge of what could have been readily ascertainable by such inquiry.").

[37] In fact, Plaintiffs have an even weaker case for tolling these states' statutes of limitations, as neither New York nor Oklahoma recognizes the theory of self-concealing wrongs in this context.  *See Fertitta v. Knoedler*

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' claims should be dismissed with prejudice.


Dated: February 21, 2020                    Respectfully submitted,

                                             /s/ Adam S. Hakki
                                            Adam S. Hakki
                                            K. Mallory Brennan
                                            Dennis D. Kitt
                                            SHEARMAN & STERLING LLP
                                            599 Lexington Avenue
                                            New York, New York 10022
                                            Tel:  (212) 848-4000
                                            Fax:  (212) 848-7179
                                            ahakki@shearman.com
                                            mallory.brennan@shearman.com
                                            dennis.kitt@shearman.com

                                            *Attorneys for Defendant Bank of America Mexico,*
                                            *S.A., Institución de Banca Múltiple, Grupo*
                                            *Financiero Bank of America*

---

*Gallery, LLC*, 2015 WL 374968, at *9 (S.D.N.Y. Jan. 29, 2015) (Oetken, J.) (stating that under New York law, "the self-concealing fraud doctrine applies—if it applies at all—to ordinary fraud claims"); *Smith v. Baptist Found. of Okla.*, 50 P.3d 1132, 1142 (Okla. 2002) (doctrine historically applied only to breach of trust claims).  To allege fraudulent concealment sufficient to toll the statute of limitations on their unjust enrichment claims, Plaintiffs would have to allege an affirmative act of concealment, which they have not done.

/s/ Arthur J. Burke (on consent)[38]
Arthur J. Burke
Paul S. Mishkin
Adam G. Mehes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:  (212) 450-4000
Fax:  (212) 450-4800
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
adam.mehes@davispolk.com

*Attorneys for Defendant BBVA Bancomer, S.A.,
Institución de Banca Múltiple, Grupo Financiero
BBVA Bancomer*


/s/ Boris Bershteyn
Boris Bershteyn
Susan Saltzstein
Kamali P. Willett
Leonardo Villalobos
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
4 Times Square
New York, New York 10036
Tel:  (212) 735-3000
Fax:  (212) 735-2000
boris.bershteyn@skadden.com
susan.saltzstein@skadden.com
kamali.willett@skadden.com
leonardo.villalobos@skadden.com

*Attorneys for Defendant HSBC México, S.A.,
Institucion de Banca Múltiple, Grupo Financiero
HSBC*

---

[38] Moving Defendants have used electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s/ Alan Schoenfeld
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
AND DORR LLP
250 Greenwich Street, 45 Floor
New York, New York 10007
Tel:  (212) 937-7294
Fax:  (212) 230-8888
alan.schoenfeld@wilmerhale.com

Steven F. Cherry
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, District of Columbia 20006
Tel:  (202) 663-6321
Fax:  (202) 663-6363
steven.cherry@wilmerhale.com

*Attorneys for Defendant Banco Santander (Mexico)
S.A. Institución de Banca Múltiple, Grupo
Financiero Santander Mexico*

/s/ Lev L. Dassin
Lev L. Dassin
Roger A. Cooper
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel:  (212) 225-2000
Fax:  (212) 225-3999
ldassin@cgsh.com
racooper@cgsh.com

Leah Brannon
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, District of Columbia 20037
Tel:  (202) 974-1500
Fax:  (202) 974-1999
lbrannon@cgsh.com

*Attorneys for Defendant Banco Nacional de Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero Banamex*

/s/ John Terzaken
John Terzaken
Karen M. Porter
Jonathan R. Myers
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, District of Columbia 20001
Tel:  (202) 636-5500
Fax:  (202) 636-5502
john.terzaken@stblaw.com
karen.porter@stblaw.com
jonathan.myers@stblaw.com

Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Tel:  (212) 455-3539
Fax:  (212) 455-2502
jyoungwood@stblaw.com

*Attorneys for Defendant Deutsche Bank México,
S.A. Institución de Banca Múltiple*