# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MEXICAN GOVERNMENT BONDS ANTITRUST LITIGATION<br><br><br>This Document Relates to:<br><br>ALL ACTIONS | Master Docket No. 18-cv-02830 (JPO)<br><br>CLASS ACTION |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOVING DEFENDANTS' JOINT MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND
    A.  The MGB Market ............................................................................................... 2

    B. Direct, "Smoking Gun" Evidence of Defendants' Conspiracy ............................ 4

    C. Seven Defendants Were Formally Charged by COFECE with Conduct that
    Constitutes a *Per Se* Violation of the Sherman Act. ........................................... 5

    D. Economic Analyses Confirm the Existence and Anticompetitive Effect of
    Defendants' Price-Fixing Conspiracy ................................................................. 6
        1. Defendants' conspiracy imposed supra-competitive costs on MGB investors by
        artificially inflating bid-ask spreads ............................................................ 7
        2. Defendants coordinated auction bids to control the supply of MGBs .......... 8
        3. Defendants agreed to sell MGBs purchased at auction at artificially inflated prices ...... 8
        4. Defendants gave up risk-free profits in the Market Maker Option Program to benefit
        their co-conspirators ................................................................................... 9

    E. Defendants' Misconduct Directly Injured Plaintiffs .......................................... 9

ARGUMENT

I.      PLAINTIFFS PLEAD A PLAUSIBLE ANTITRUST CONSPIRACY

    A. The SAC Cures the Deficiencies Identified in *MGB I* .................................... 10

    B. The Pleading Standard on a Motion to Dismiss ............................................... 10

    C. Plaintiffs Plead Direct Evidence of an Unlawful Agreement Involving All
    Defendants ...................................................................................................... 11
        1.  Defendants' chat transcripts constitute direct evidence of conspiracy. ...... 12
        2. At least one Defendant's application for leniency from COFECE constitutes
        direct evidence of an overarching conspiracy. ........................................... 15

    D. The SAC Alleges Additional Evidence Supporting the Plausibility of the Alleged
    Overarching Conspiracy Involving All Defendants ........................................... 16
        1.  COFECE's investigation has uncovered evidence of Defendants' conspiracy ...... 17
        2. The abrupt changes in Defendants' MGB pricing following COFECE's
        announcement of its investigation give rise to a plausible inference of
        conspiracy .................................................................................................. 19
        3. Defendants engaged in multiple acts which would have been against their
        individual economic self-interest in the absence of conspiracy .................... 22

4. Defendants exchanged a high degree of interfirm communications ........................25
5. Defendants shared a common motive to conspire ........................................26
6. The MGB market was susceptible to collusion. .......................................27

II.     DEFENDANTS CONSPIRED THROUGHOUT THE CLASS PERIOD ........................28
III.    PLAINTIFFS HAVE ANTITRUST STANDING ..........................................29

A. The SAC Plausibly Alleges That Plaintiffs Suffered an Antitrust Injury. ...............29

B. Plaintiffs Are Efficient Enforcers. .............................................34
        i. Directness ...............................................................34
        ii. Non-speculative injury. ..................................................35
        iii.    There is no risk of duplicative recovery or complex apportionment. ...........35

C. Plaintiffs Have Antitrust Standing as to All MGBs, Including BONDES D ..............36

D. Defendants' "Umbrella Standing" Section is Inapplicable Here. ....................38

IV.     THE FTAIA DOES NOT BAR PLAINTIFFS' SHERMAN ACT CLAIM ...........................40

V.      PLAINTIFFS STATE A VIABLE CLAIM FOR UNJUST ENRICHMENT ......................42

VI.     ALL OF PLAINTIFFS CLAIMS ARE TIMELY ..........................................44

A. Plaintiffs' Antitrust Claim Was Filed Within the Limitations Period ...................45
        1. At the earliest, Plaintiffs were on inquiry notice beginning April 19, 2017 ....................45
        2. Plaintiffs allege sufficient facts to support equitable tolling. ................................47

B. Plaintiffs' unjust enrichment claims are within the statute of limitations. ...........48

CONCLUSION ..........................................................................49

# TABLE OF AUTHORITIES

### Cases

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016) ...................................................................................19, 27, 35,48

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ................................................................................................................10

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987) ................................................................................................................14

*Ariz. v. Maricopa Cty. Med. Soc'y*,
  457 U.S. 332 (1982) ............................................................................................................................25

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ............................................................................................................................34

*B & R Supermarket, Inc. v. MasterCard Int'l Inc.*,
  No. 17-cv-2738 (MKB)(JO), 2018 WL 4445150 (E.D.N.Y. Sept. 18, 2018)....................................27

*B&R Supermarket v. Visa, Inc.*,
  No. 17-cv-2738 (MKB)(JO), 2018 WL 4921661 (E.D.N.Y. July 20, 2018)......................................26

*Bais Yaakov of Spring Valley v. Educ. Testing Serv.*,
  251 F. Supp. 3d 724 (S.D.N.Y. 2017)................................................................................................39

*Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*,
  No. 16Civ.4226 (RJS), 2017 WL 4402564 (S.D.N.Y. Sept. 30, 2017) .............................................42

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ............................................................................................................................36

*BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*,
  603 F. App'x. 57 (2d Cir. 2015)..........................................................................................................48

*Brewer v. Hashim*,
  738 F. App'x 34 (2d Cir. 2018)...........................................................................................................44

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ............................................................................................................................29

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*,
  No. 07Civ.3610, 2008 WL 1007634 (S.D.N.Y. Apr. 9, 2008)............................................................39

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ................................................................................................................17

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) ................................................................................26

*Cenedella v. Metro. Museum of Art*,
   348 F. Supp. 3d 346 (S.D.N.Y. 2018) ..................................................................23

*Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*,
   763 F. Supp. 2d 759 (W.D.N.C. 2011) ........................................................... 13, 14

*City of Tulsa v. Bank of Okla.*,
   280 P.3d 314 (Okla. 2011) ...................................................................................49

*Continental Ore Co. v. Union Carbide & Carbon*,
   *Co.*, 370 U.S. 690 (1962 ) ....................................................................................11

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. 2018) ................................................ 37, 40, 41, 45

*Dennis v. JPMorgan Chase & Co.*,
   No. 16-cv-6496 (LAK), 2020 WL 729789 (S.D.N.Y. Feb. 13, 2020) ....................29

*Eastman Kodak Co. v. Henry Bath LLC*,
   936 F.3d 86 (2d Cir. 2019) ........................................................................... 11, 15

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ..........................................................................................40

*Fertitta v. Knoedler Gallery, LLC*,
   No. 14–CV–2259 (JPO), 2015 WL 374968 (S.D.N.Y. Jan. 29, 2015) .................49

*FrontPoint Asian Event Driven Fund, L.P., et al., v. Citibank*,
   No. 16 Civ. 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) .............. 35, 46

*Gargiulo v. Isolagen, Inc.*,
   527 F. Supp. 2d 384 (E.D. Pa. 2007) ..................................................................45

*Gatt Comm'ns, Inc. v. PMC Assocs.*,
   711 F.3d 68 (2d Cir. 2013) ..................................................................................34

*Gelboim v. Bank of America Corp.*,
   823 F.3d 759 (2d. Cir. 2016) .........................................................................passim

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) ..........................................................................................36

*Gym Door Repairs, Inc. v. New York City Dept. of Educ.*, No.,
   12 Civ. 7387, 2015 WL 3883243 (S.D.N.Y. June 23, 2015) ...............................15

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ............................................................................................35

*Harry v. Total Gas & Power N. Am. Inc.*,
   889 F.3d 104 (2d Cir. 2018) ................................................................................30

*Hawkins v. MedApproach Holdings, Inc.*,
   13. Civ. 5434, 2015 WL 8480076 (S.D.N.Y. Nov. 30, 2015) ............................46

*Hexcel Corp. v. Ineos Polymers, Inc.*,
   No. 2:09-cv-5334, MRP, 2010 WL 11520539 (C.D. Cal. Feb. 23, 2010) ..........35

*Hinds Cty. v. Wachovia Bank N.A.*,
   790 F. Supp. 2d 106 (S.D.N.Y. 2011) ...........................................................10, 18

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   885 F. Supp. 2d 617 (S.D.N.Y. 2012) ................................................................44

*Hughes v. LaSalle Bank, N.A.*,
   419 F. Supp. 2d 605 (S.D.N.Y. 2006) ................................................................49

*In re Commodity Exch., Inc.*,
   213 F. Supp. 3d 631 (S.D.N.Y. 2016) .......................................... 18, 20, 32, 40

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ................................................................................30

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   681 F. Supp. 2d 141 (S.D.N.Y. 2009) ................................................................25

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015) .......................................................12, 30, 42

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   No. 13 Civ. 7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ...............passim

*In re Generic Pharm. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ..................................................................23

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..............................................................18

*In re GSE Bonds Antitrust Litig.*,
   No. 19-cv-1704 (JSR), 2019 WL 5791793 (S.D.N.Y. Oct. 15, 2019) ....... 12, 23, 28, 30

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019) ...........................................................passim

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ................................................................................ 17, 29

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..................................................................... 11, 46

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) .......................................................................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  962 F. Supp. 2d 606 (S.D.N.Y. 2013) ..................................................................... 6, 43

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  No. MDL2262 NRB, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015).................................48

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016).............................................. 32, 33, 38, 39, 47

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018)......................................................... 12, 15, 23, 31

*In re Mexican Gov't Bonds Antitrust Litigation*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019) ...................................................................passim

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  23 F. Supp. 3d 203 (S.D.N.Y 2014) ..........................................................................37

*In re Mylan N.V. Sec. Litig.*,
  379 F. Supp. 3d 198 (S.D.N.Y. 2019) .......................................................................22

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ..............................................................................13

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  894 F. Supp. 703 (S.D.N.Y. 1995) ...........................................................................20

*In re Platinum and Palladium Antitrust Litig.*,
  No. 1:14-cv-9391-GHW,  2020 WL 1503538 (S.D.N.Y. March 29, 2020) ......................34

*In re Propranolol Antitrust Litig.*,
  249 F. Supp. 3d 712 (S.D.N.Y. 2017).......................................................................27

*In re Publ'n Paper Antitrust Litig.*,
  No. 304MD1631SRU, 2005 WL 2175139 (D. Conn. Sept. 7, 2005)..................................46

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) ................................................................................. 16, 27

*In re SSA Bonds Antitrust Litig.*,
   No. 16 CIV. 3711 (ER), 2018 WL 4118979 (S.D.N.Y. Aug. 28, 2019) ..............................................31

*In re SSA Bonds Antitrust Litig.*,
   420 F. Supp. 3d 219 (S.D.N.Y. Oct. 4, 2019) ............................................................................ 21, 22

*In re SSA Bonds Antitrust Litig.*,
   No. 16 CIV. 3711 (ER), 2020 WL 1445783 (S.D.N.Y. Mar. 25, 2020) ....................................... 22, 31

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) ...............................................................................................13

*Indovino v. Tassinari*,
   No. Cv-05-4167 JS AKT, 2006 WL 2505232 (E.D.N.Y. Aug. 28, 2006) ..........................................49

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
   127 F. Supp. 2d 411 (S.D.N.Y. 2000) ........................................................................................42

*Iowa Public Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   340 F. Supp. 3d 285 (S.D.N.Y. 2018) ...................................................................................passim

*Kottler v. Deutsche Bank AG*,
   607 F. Supp. 2d 447 (S.D.N.Y. 2009) ........................................................................................43

*Kruman v. Christie's Int'l PLC*,
   284 F.3d 384 (2d Cir. 2002) ......................................................................................................42

*Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*, No. 03Civ.10312(HBDF),
   2005 WL 2207017 (S.D.N.Y. Sept. 8, 2005) .............................................................................42

*LC Capital Partners, LP v. Frontier Ins. Grp.*,
   318 F.3d 148 (2d Cir. 2003) ......................................................................................................46

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) .....................................................................................................40

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
   753 F.3d 395 (2d Cir. 2014) ......................................................................................................41

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................................30

*Masquat v. Daimler Chrysler Corp.*,
   195 P.3d 48 (Okla. 2008) ..........................................................................................................49

*Merced Irrigation Dist. v. Barclays Bank PLC*,
   165 F. Supp. 3d 122 (S.D.N.Y. 2016) ........................................................................................49

*Myun-Uk Choi v. Tower Research Capital LLC,*
    890 F.3d 60 (2d Cir. 2018) ................................................................................ 42, 44

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
    693 F.3d 145 (2d Cir. 2012) ........................................................................36, 37, 38

*Nypl v. JPMorgan Chase & Co.,*
    No. 15Civ.9300(LGS), 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) ....................................35

*Prescott v. Nationwide Mut. Ins. Co.,*
    No. 17Civ.6508(ENV)(ST), 2019 WL 7842538 (E.D.N.Y. Aug. 11, 2019) .......................45

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon,*
    775 F.3d 154 (2d Cir. 2014) ...............................................................................37

*Sanner v. Bd. of Trade of Chi.,*
    62 F.3d 918 (7th Cir. 1995) ................................................................................40

*Sonterra Capital Master Fund Ltd., et al., v. Credit Suisse Group AG, et al.,*
    277 F. Supp. 3d 521 (S.D.N.Y. 2017) ................................................................ 39, 41

*Sonterra Capital Master Fund Ltd. v. UBS AG,*
    No. 17-944-cv, 2020 WL 1544478 (2d Cir. Apr. 1, 2020) ............................................ 30, 31

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC,*
    366 F. Supp. 3d 516 (S.D.N.Y. 2018) ................................................................ 40, 41

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ............................................................................ 17, 24

*State Farm Mut. Auto. Ins. Co. v. Rabiner,*
    749 F. Supp. 2d 94 (E.D.N.Y. 2010) .......................................................................49

*State of N.Y. v. Hendrickson Bros., Inc.,*
    840 F.2d 1065 (2d Cir. 1988) .............................................................................. 47

*Sullivan v. Barclays PLC,*
    13-cv-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ..................................passim

*Tera Grp., Inc. v. Citigroup, Inc.,*
    No. 17 Civ. 4302 (RJS), 2019 WL 3457242 (S.D.N.Y. July 30, 2019) ................................25

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ......................................................................... 11, 13, 23, 27

*U.S. v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2019) ............................................................................ 13, 16

*United States v. Alex Brown & Sons, Inc.,*
   No. 96 CIV 5313 (RWS), 1997 WL 314390 (S.D.N.Y. Apr. 24, 1999) .................................33

*Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC,*
   127 F. Supp. 3d 156 (S.D.N.Y. 2015) .................................................................................19

*Williams-Guillaume v. Bank of Am., N.A.,*
   130 A.D.3d 1016 (N.Y. 2015) .............................................................................................48

**Statutes**

15 U.S.C. § 6a          ...............................................................................................................40

**Other Authorities**

ORG. FOR ECON. COOPERATION & DEV., DAF/COMP/AR(2019)23, ANNUAL REPORT ON
COMPETITION POLICY DEVELOPMENTS IN MEXICO—2018 at Table 1 (May 31, 2019), available at
https://www.cofece.mx/wp-content/uploads/2019/06/2018-Annual-Report_final.pdf. .................19

## INTRODUCTION

For at least eleven years, Defendants, the dominant banks in the market for Mexican

Government Bonds ("MGBs") through their membership in the Bank of Mexico's ("Banxico's")

exclusive Market Maker Program,[1] colluded to fix the prices of MGBs and extract illicit profits from

unsuspecting investors in the United States. The Second Consolidated Amended Class Action

Complaint ("SAC") alleges detailed facts that plausibly show that each Defendant named in the SAC

participated in the alleged conspiracy, including chatroom transcripts among Defendants' MGB

traders.

To effectuate their conspiracy, Defendants: (i) shared private, commercially-sensitive

information regarding their respective clients' orders; (ii) disclosed information about their bank's

respective proprietary trading positions and strategies; (iii) coordinated their MGB trading; and (iv)

jointly agreed on supra-competitive MGB prices to quote customers. ¶¶ 6 -9, 399-424.[2]

Plaintiffs are eight pension funds domiciled in the United States and its Territories. Between

January 1, 2006 and April 19, 2017 ("the Class Period," ¶ 504), Plaintiffs allege that they transacted

MGBs directly with Defendants at artificial, non-competitive prices as a result of Defendants'

scheme. ¶¶ 14-21. Plaintiffs were overcharged by a Defendant in every MGB purchase and

underpaid by a Defendant in every MGB sale. *Id.* To recover for their injuries and for those suffered

by a Class of similarly situated investors, Plaintiffs assert claims against Defendants under the

---

[1] The Defendants who have joined this motion to dismiss ("Moving Defendants") are Banco Nacional de México, S.A., Institución de Banca Múltiple, Grupo Financiero Banamex ("Citibanamex"); Banco Santander (México), S.A., Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander Mexico"); Bank of America México, S.A., Institución de Banca Multiple, Grupo Financiero Bank of America ("Bank of America Mexico"); BBVA Bancomer S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer"); Deutsche Bank México, S.A., Institución de Banca Múltiple ("Deutsche Bank Mexico"); and HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico"). Defendants are Moving Defendants, along with Barclays Bank México, S.A., Institución de Banca Múltiple, Grupo Financiero Barclays México ("Barclays Mexico") and Banco J.P. Morgan, S.A., Institución de Banca Múltiple, J.P. Morgan Grupo Financiero ("JPMorgan Mexico").

[2] "¶" and "SAC" refer to the Second Consolidated Amended Class Action Complaint, ECF No. 163.

Sherman Act and for unjust enrichment.

On September 30, 2019, the Court dismissed Plaintiffs' First Consolidated Amended Class Action Complaint ("FAC"), without prejudice, holding that it failed to allege facts sufficient to plausibly connect any defendant to that alleged conspiracy. *In re Mexican Gov't Bonds Antitrust Litigation*, 412 F. Supp. 3d 380 (S.D.N.Y. 2019) ("*MGB I*").

The SAC now includes allegations reflecting two major developments that occurred subsequent to Plaintiffs' filing of the FAC, confirming that each Defendant named in the SAC participated in an unlawful conspiracy in the MGB market. *First*, the SAC now includes "smoking gun" evidence —such as chat transcripts—that two cooperating co-conspirator Defendants (the "Cooperating Defendants") provided to Plaintiffs. ¶¶ 396-428. The allegations in the SAC provide evidence plausibly linking each individual Defendant to the conspiracy, curing any pleading deficiency the Court identified in *MGB I.*

*Second*, the Mexican federal antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), described its investigatory findings that seven Defendants had "an agreement in place," ECF No. 186-1 at 4, to "limit the supply" and "manipulate the price" of MGBs over a ten-year period.  *Id* at 3. Consistent with these findings, COFECE filed formal charges against seven Defendants herein and ███████████████████████. COFECE's charging documents also revealed ██████████████████████████████████████████ ███████████████████████████████████. ¶¶ 375-90. Accordingly, the Court should now deny Defendants' motion to dismiss the SAC for failure to state a claim.

## FACTUAL BACKGROUND

### A.    The MGB Market

The Mexican Government issues bonds to raise capital and fund deficits. ¶ 291. These include four varieties: Federal Treasury Certificates ("CETES") (¶¶ 302-05), Fixed-Rate Federal

Government Development Bonds ("BONOS") (¶¶ 306-10), Inflation-Hedged Federal Government Development Bonds ("UDIBONOS") (¶¶ 311-12), and Federal Government Development Bonds ("BONDES D") (¶¶ 313-15) (collectively, "MGBs"). MGBs are issued through regularly scheduled auctions conducted by Banco de Mexico ("Banxico"), the Mexican central bank. ¶¶ 293-94. These auctions are limited to a group of pre-approved financial institutions, consisting mostly of Banxico-designated "Market Makers." ¶¶ 294-96, 316-20.

Market Makers are granted exclusive privileges, including access to syndicated auctions where Banxico reopens existing bond issues (¶¶ 295, 310, 408) and the Market Maker Option Program. ¶¶ 447-49. In exchange for these privileges, Banxico requires Market Makers to provide liquidity in the MGB market. ¶ 316. Market Makers must submit competitive bids for a pro rata share of bonds issued in each auction, adding up to a collective share of 100% of the MGBs offered. ¶ 318. Market Makers must also provide "two-way quotes"—*i.e.*, a "bid" price at which Market Makers will purchase MGBs from, and an "ask" price at which they will sell MGBs to—investors, for each MGB. ¶¶ 318-19. Each Market Maker is required to maintain a minimum 7% quarterly market share measured by transaction volume. ¶ 3. Eight out of nine Defendants—and all Moving Defendants—were Market Makers during the Class Period.[3] ¶ 65. This market structure concentrated MGB supply among Defendants, which accounted for more than 80% of dealer activity during the Class Period. ¶¶ 323-24, 326.

The MGB market is an over-the-counter market (¶ 322) characterized by relatively low liquidity and large customer flows. ¶ 327. Accordingly, Defendants' MGB trading desks followed a "flow trading" model, whereby dealers earn profits by anticipating customer demand and adjusting prices and trading positions accordingly. ¶¶ 328-29 Defendants earn profits in the MGB market by

---

[3] Moving Defendants were the "exclusive Market Makers" (¶¶ 294, 325) except for ING Mexico, which withdrew from the program in 2011. ¶¶ 420-21.

3

selling MGBs to investors at higher prices than they purchase MGBs, as frequently as possible. ¶ 69. This structure incentivized traders to pool information about expected customer flows to adjust pricing and avoid holding trading positions that would be negatively affected by changes in supply and demand. ¶¶ 331-32.

### B. Direct, "Smoking Gun" Evidence of Defendants' Conspiracy.

During the Class Period, Defendants used their dominant position in the MGB market to manipulate prices and restrain supply. Instead of competing, Defendants' MGB trading desks operated as a single unitary desk that worked to boost their profits as a group. ¶ 6.

Shortly after the Court issued *MGB I*, Plaintiffs received direct evidence of Defendants' conspiracy—including chat transcripts, trade data, and other materials—from two Cooperating Defendants. ¶¶ 5-6, 429. The SAC supplements the allegations in the FAC by quoting excerpts of bilateral and multilateral chats among Defendants' traders, in which the traders: (i) shared private, commercially-sensitive information regarding their respective clients (*e.g.,* ¶ 413 ███████████

███████████████████████████, ¶ 402 ████████████████,

███████████████████████████████████████████,

¶ 403 ████████████████████████████████

███████; (ii) disclosed information about their bank's respective proprietary trading positions and strategies (*e.g.,* ¶ 404 ████████████████████████████

███████████████████████████; (iii) coordinated

their MGB trading (*e.g.* ¶ 404 ████████████████████████

██████████████████████████; and (iv) jointly

agreed on supra-competitive MGB prices to quote customers. ¶ 413 ███████████

████████████████████████████████████████

███████████; *see also* ¶¶ 6 -7, 399-424. By sharing non-public, private information about

4

customer inflow and outflow in chatrooms, over the phone, and in in-person meetings, Defendants were able to unlawfully coordinate prices and trading positions ahead of anticipated investor demand. ¶¶ 6 -7, 399-424.

Appendix A is a chart collecting the chats pleaded in the SAC, which were furnished to Plaintiffs by Cooperating Defendants. Collectively, the chats provide direct "smoking gun" evidence of a price-fixing conspiracy in which Defendants Bank of America Mexico, Barclays Mexico, BBVA Mexico, Citibank Mexico, Deutsche Bank Mexico, JPMorgan Mexico, HSBC Mexico, and UBS Mexico each participated. *See* App'x A.

### C. Seven Defendants Were Formally Charged by COFECE with Conduct that Constitutes a *Per Se* Violation of the Sherman Act.

On September 23, 2019, COFECE issued formal charges against Defendants Bank of America Mexico, BBVA-Bancomer, JPMorgan Mexico, Citibanamex, Santander Mexico, Deutsche Bank Mexico, and Barclays Mexico for engaging in "absolute monopolistic practices"—which are equivalent to *per se* violations of the Sherman Act (¶¶ 391-394)—in the MGB market. COFECE also formally charged ███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████.

On the same date, COFECE issued a 600+-page Statement of Objections ("SO") containing evidence of an agreement among Defendants to: (1) fix prices; (2) restrain supply; (3) allocate markets; (4) rig bids; and/or (5) exchange information for the purpose of fixing prices, restraining supply, rigging bids, or allocating markets in the MGB market. ¶¶ 391-393. On October 14, 2019, Sergio Lopez, head of COFECE's investigative authority, announced in a radio interview that COFECE's investigation found evidence of an overarching agreement to manipulate MGB bond prices over a span of ten years. ¶ 395.  In particular, as reflected in a transcript submitted by Defendants with their motion to dismiss, Mr. Lopez stated:

> [T]here existed elements that led us to believe that there was **an agreement in place** concerning what I have just told you, in order to manipulate the price and thus restrict the supply in the market for intermediation of debt securities.

ECF No. 186-1 at 4 (emphasis added).

### D. Economic Analyses Confirm the Existence and Anticompetitive Effect of Defendants' Price-Fixing Conspiracy.

Economic analyses show that Defendants' collusion directly impacted MGB prices and had persistent, market-wide effects. Plaintiffs conducted several analyses to observe Defendants' behavior in the MGB market and measure its impact on prices.[4] Consistent with COFECE's SO and the chats provided by the Cooperating Defendants, these analyses reflect an overarching conspiracy among Defendants over time to increase profits by overcharging and underpaying MGB investors, including Plaintiffs and the Class.

---

[4] Notwithstanding the "informational handicaps" that plaintiffs often confront in pleading market manipulation cases, *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 618 (S.D.N.Y. 2013), these analyses are robust and each includes data from all Defendants. *See* SAC, Part VIII. Defendants criticize the SAC's use of median prices. *See* Moving Defs.' Mem. of Law in Supp. of Their Joint Mot. to Dismiss for Failure to State a Claim ("Defs.' Br."), ECF No. 185, at 33. That argument cuts both ways. That Defendants' misconduct caused median prices to be artificial supports the inference that Defendants' conspiracy had market-wide effects.

1.  <u>Defendants' conspiracy imposed supra-competitive costs on MGB investors by artificially inflating bid-ask spreads.</u>

Bid-ask spreads reflect the prices that dealers charge customers to trade bonds. ¶ 453. In competitive markets, dealers compete for customers by offering superior prices in the form of narrower bid-ask spreads. ¶¶ 453-56.

Plaintiffs developed several analyses to measure the impact of COFECE's announcement in April 2017 that it had found evidence of anticompetitive conduct by dealers in the MGB market. First, Plaintiffs compared the bid-ask spreads quoted by Defendants during the Class Period to the bid-ask spreads quoted by Defendants after COFECE announced its investigation in April 2017. This analysis showed that Defendants quoted substantially wider bid-ask spreads during the Class Period than after COFECE's announcement. ¶¶ 457-59. Defendants' quoted spreads for BONOS in all tenors narrowed by *more than 20%* following COFECE's announcement (¶¶ 457-58), while Defendants' quoted spreads for CETES narrowed by an even larger percentage. ¶ 459. The results were similar when Plaintiffs cut the years 2006-2009 from the analysis to eliminate any potential impact from macroeconomic events during that time period. ¶ 460. These analyses were statistically significant with a confidence degree of 99.9% for all tenors observed. ¶ 459.

The analysis also showed that, after COFECE's announcement, Defendants quoted significantly narrower bid-ask spreads than non-Defendant dealers with a presence in the MGB market. *Compare* ¶¶ 457-60, *with* ¶ 461. This should be expected given that non-Defendant dealers maintain smaller market shares and lack the advantages that Banxico provides to Market Makers. ¶¶ 316-17. During the Class Period, however, Defendants did not quote narrower bid-ask spreads than non-Defendant dealers. *Compare* ¶¶ 457-60, *with* ¶ 461. This result suggests that, during the Class Period, Defendants did not use their privileges gained through Banxico's Market Maker Program to compete for market share by offering superior prices to customers, as they did after

COFECE's announcement. *See* ¶ 461.[5]

The dramatic decline in Defendants' quoted spreads following COFECE's announcement indicates that Defendants' conspiracy caused prices to be artificial throughout the MGB market.

### 2. Defendants coordinated auction bids to control the supply of MGBs.

Plaintiffs' analysis also shows that Defendants colluded in auctions to restrain MGB supply. ¶¶ 353-54. Plaintiffs compared the amount of dispersion, *i.e.*, variation, among Defendants' auction bids during the Class Period to those after COFECE's announcement. ¶¶ 432-33. This analysis shows that Defendants' bids exhibited significantly less variation and were clustered significantly closer together prior to COFECE's announcement in April 2017, at which point the variation suddenly increased. ¶ 436. The pre-announcement clustering indicates that Defendants coordinated on bids ahead of the auction throughout the Class Period, allowing them to rig auction outcomes and allocate MGB supply amongst themselves. ¶¶ 435-36. When adjusted for broader market volatility, the post-announcement increase in dispersion becomes even more pronounced. ¶¶ 437-38.

### 3. Defendants agreed to sell MGBs purchased at auction at artificially inflated prices.

As Market Makers, Defendants were required to bid for a pro rata share of MGBs issued in each auction. ¶ 318. Defendants acquired a substantial majority of bonds issued in these auctions— 91% of BONOS and 73% of UDIBONOS—and thus controlled new MGB inventory available for sale to investors. ¶ 324.[6] That Defendants controlled a substantial majority of newly-issued MGBs suggests that Defendants, rather than other market participants, controlled the supply of newly-

---

[5] Defendants are incorrect when they claim that their conspiracy could have only imposed supra-competitive bid-ask spreads on customers if they engaged in "a pervasive scheme to inflate bid-ask spreads." *See* Defs.' Br. at 24-25. A bid-ask quote contains two prices—a price at which the dealer will buy bonds ("bid") and a price at which the dealer will sell bonds ("ask"). ¶ 453. Thus, when dealers collude to raise prices they cause the "ask" price to increase, which is reflected in a wider bid-ask spread. ¶ 456. Sharing customer order flow information had the same effect, because defendants used this information to adjust pricing. ¶¶ 330-35.

[6] Defendants likely controlled an even larger portion of newly-issued MGBs available for sale to investors because other auction participants include non-dealers that do not buy bonds for resale to investors, such as the Mexican Finance Ministry and state-licensed pension administrators. *See* ¶ 440.

issued MGBs available for resale after each auction.

Plaintiffs analyzed normalized MGB prices throughout each trading day during the Class Period. This analysis showed that MGB prices rose dramatically following auctions when Defendants all had new inventory of MGBs to sell to investors. ¶¶ 444-46. For example, the average normalized spot price of 30-year BONOS increased by between 20 and 60 basis points (0.20% to 0.60%) once Defendants purchased those MGBs and made them available for sale to investors. ¶ 445. These price spikes were absent on days without auctions. ¶ 445. Higher prices meant higher profits for Defendants and increased costs for Plaintiffs and other investors.

4. <u>Defendants gave up risk-free profits in the Market Maker Option Program to benefit their co-conspirators.</u>

An analysis of Banxico's Market Maker Option Program also reflects the existence of an agreement among Defendants. Under this program, Market Makers can purchase additional MGBs the day after an auction at the previous day's auction price. ¶ 447. Absent collusion, bidding during the Market Maker Option Program should be highly competitive since Defendants already know the bond price. ¶ 451. However, an analysis of bids placed in the program demonstrates that Defendants received their desired allocation more than 50% of the time prior to April 19, 2017. After COFECE's announcement, Defendants' success rate in the Market Maker Option Program decreased by more than 10%, reflecting greater competition among Defendants for bonds in the Market Maker Option Program. ¶ 450. This indicates that Defendants agreed to coordinate bids in the Market Maker Option Program during the Class Period, and that Defendants gave up the chance to secure MGBs at favorable prices to support the efforts of the cartel. ¶ 451.

**E. Defendants' Misconduct Directly Injured Plaintiffs.**

All eight Plaintiffs transacted in MGBs in the United States with multiple Defendants during the Class Period. ¶¶ 14-21; SAC, App'x D. Plaintiffs allege that they suffered economic injuries on

these transactions because they were overcharged on their MGB purchases and underpaid on their MGB sales as a direct result of Defendants' conspiracy. ¶¶ 14-21, 501-503; SAC, App'x D.

## ARGUMENT

I.    **PLAINTIFFS PLEAD A PLAUSIBLE ANTITRUST CONSPIRACY.**

### A.  The SAC Cures the Deficiencies Identified in *MGB I.*

In antitrust conspiracy cases, "allegations connecting defendants to the conspiracy must be viewed in light of the complaint as a whole." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 172 (2d Cir. 2012) ("*Anderson News*"). In *MGB I*, the Court held that "an antitrust complaint must provide some basis for inferring that the specific defendants participated in the alleged conspiracy." *MGB I*, 412 F. Supp. 3d at 388-89 (citing *Hinds Cty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106 (S.D.N.Y. 2011)); *Iowa Public Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018) ("*Stock Loans*"); and *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019) ("*GSE Bonds I*")). The SAC satisfies the Court's standard with extensive, new allegations of direct evidence linking each individual Defendant to the pleaded conspiracy. These new allegations—including quotations from explicitly conspiratorial chats between Defendants' traders (*see supra* at 4-5) and COFECE's findings that seven Defendants engaged in absolute monopolistic practices (*see supra* at 5-6)—not only provide direct evidence of conspiracy (*see infra* at 11-16) but also place Plaintiffs' statistical evidence in a context that plausibly links misconduct by the Defendants named in the SAC to the price artificiality alleged in the economic and statistical evidence pleaded in the SAC. *See infra* at 17-28.

### B.  The Pleading Standard on a Motion to Dismiss.

"'[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" *Sullivan v. Barclays PLC*, 2017 WL 685570, at *12

(S.D.N.Y. Feb. 21, 2017) ("*Euribor*").[7] Thus, Defendants must overcome "a high hurdle in the context of a motion to dismiss." *Stock Loans*, 340 F. Supp. 3d at 312.  On a Rule 12(b)(6) motion, the "Court must assume all well-pleaded facts to be true," *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 460 (S.D.N.Y. 2017), and it is the "[C]ourt's obligation to view the evidence and interpret the allegations in the light most favorable to the plaintiffs, drawing reasonable inferences in their favor.*" Eastman Kodak Co. v. Henry Bath LLC ("Aluminum IV")*, 936 F.3d 86, 93 (2d Cir. 2019).

Antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each [because] the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Co.*, 370 U.S. 690, 699 (1962). Moreover, "in antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) (quoted in *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019)). "So long as the allegations are plausible, plaintiff's burden has been met; the Court may not 'cho[ose] between two plausible inferences that may be drawn from factual allegations' at this stage." *GSE Bonds I*, 396 F. Supp. 3d at 361 (quoting *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 781 (2d. Cir. 2016)).

### C. Plaintiffs Plead Direct Evidence of an Unlawful Agreement Involving All Defendants.

As the Court explained in *MGB I*, "a plaintiff may, of course assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." 412 F. Supp. 3d at 388. The SAC does just that by pleading "rare smoking gun" electronic

---

[7]  Unless otherwise noted, citations are omitted.

chat transcripts in which traders at competing banks expressly agree to fix MGB prices. *GSE Bonds I*, 396 F. Supp. 3d at 361. *See also In re GSE Bonds Antitrust Litig.* ("*GSE Bonds II*"), 2019 WL 5791793, at *3 (S.D.N.Y. Oct. 15, 2019) (holding that even a single collusive chat is sufficient to plausibly allege a defendant's participation in a price-fixing scheme); *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*Silver Fix II*"), 332 F. Supp. 3d 885, 901 (S.D.N.Y. 2018) ("The chat messages included in the TAC are direct evidence of an anticompetitive agreement to manipulate the silver markets.").

    1.   <u>Defendants' chat transcripts constitute direct evidence of conspiracy.</u>

    Chats and instant messages among horizontal competitors that reflect an agreement on prices are "paradigmatic examples of communications relevant to a horizontal-price fixing scheme." *Silver Fix II*, 332 F. Supp. 3d at 901-02. The SAC includes direct evidence of Defendants' unlawful agreement in the form of transcripts of both bilateral and multilateral chats supplied by Cooperating Defendants in which Defendants' traders: (i) shared private commercially-sensitive information regarding their respective clients; (ii) disclosed information about their bank's respective proprietary trading positions and strategies; (iii) coordinated their MGB trading; and (iv) jointly agreed on supra-competitive MGB prices to quote to customers. ¶¶ 6-7, 399-424.

    Multiple courts in this District have recognized that similar chatroom transcripts are direct evidence sufficient to plausibly plead "a meeting of minds in an unlawful arrangement" among multiple banks for multiple years. *Euribor*, 2017 WL 685570, at *23-24 (finding direct evidence of an agreement to fix Euribor over six years from allegations of 12 chats among 10 defendants); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, ("*FX I*"), 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (holding that plaintiffs alleged direct evidence of an agreement over almost 10 years by quoting communications from chats in which 12 defendants shared non-public information and collusive trading strategies). Like those in *FX I*, *Euribor*, *Silver Fix II*, and *GSE Bonds I* and *II*, these chats reflect Defendants' agreement to fix MGB prices during the Class Period.

Defendants[8] improperly try to dismember them and Plaintiffs' allegations generally.

Defendants' first attempt to bifurcate the single, overarching conspiracy alleged in the SAC into an

"auction conspiracy" and a separate "spread-widening conspiracy," *e.g.*, Moving Defs.' Mem. of Law

in Supp. of Their Joint Mot. to Dismiss for Failure to State a Claim ("Defs.' Br."), ECF No. 185, at

14, 23, must be rejected as a matter of antitrust law. Courts consistently reject defendants' attempts

to attack the allegations against them in such a piecemeal fashion. *See U.S. v. Apple, Inc.*, 791 F.3d

290, 319 (2d Cir. 2019) ("In antitrust cases, '[t]he character and effect of a conspiracy are not to be

judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"). *See*

*also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 518–19 (S.D.N.Y. 1996)

("Defendants contend that Plaintiffs' Complaint alleges not a single conspiracy but thousands of

mini-conspiracies . . . A plain reading of the Complaint, however, confirms Plaintiffs'

characterization of their Complaint, the allegations of which must be taken as true for purposes of

the instant motion."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal.

2010) ("The Court agrees with plaintiffs that defendants may not recast plaintiffs' allegations, and

plaintiffs have consistently alleged a single, overriding conspiracy spanning the entire class period.").[9]

The chats alleged in the SAC point to a single conspiracy in which the same traders

employed by the same Defendants colluded in both MGB auctions and the secondary market.

*Compare* ¶ 399 ███████████████████████████████████████████████

---

[8] All references in this memorandum to arguments advanced by "Defendants" in support of dismissal refer to the arguments of "Moving Defendants" only. *See supra* at 1 n.1.

[9] Defendants also repeatedly incorrectly argue that the overarching conspiracy alleged by Plaintiffs is somehow facially implausible. *See* Defs. Br. at 13, 15, 23-24. Courts in this Circuit recognize that where, as here, a small number of firms dominate a concentrated market (¶¶ 3, 292), they can more easily collude on prices through informal communications. *See Todd*, 275 F.3d at 209 ("[A] very small handful of firms in a more highly concentrated market may be less likely to require the kind of sophisticated data dissemination alleged in this case."). Defendants' case concerns a *pro se* complaint alleging the existence of "a nationwide network of fraudulent sham non-profits [set up] for purposes of destroying small businesses and business owners and monopolizing interstate commerce for global corporate interests." *Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d 759, 763 (W.D.N.C. 2011). *Chubirko* is not comparable to allegations that a handful of market maker banks agreed to fix bond prices in an era in which antitrust regulators around the world have uncovered years-long price-fixing schemes among financial market intermediaries. ¶¶ 464-500.



Defendants are also incorrect about the adequacy of exemplary chat evidence because, "[c]ontrary to defendants' argument, there is no rule that isolated occurrences of conspiratorial conduct do not qualify as direct evidence." *GSE Bonds I*, 396 F. Supp. 3d at 361. The chatroom communications included in the SAC are illustrative examples of Defendants' agreement to fix MGB prices during the Class Period. Courts in this District have consistently rejected attempts to limit the scope of a conspiracy to the examples alleged in a complaint. *See, e.g.*, *Euribor*, 2017 WL 685570, at *31 (rejecting argument that alleged conspiracy to manipulate Euribor was limited to the "specific dates and targets" reflected in exemplary chats because "those allegations do not purport to be the exclusive universe of defendants' alleged manipulation"); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("*FX III*") ("Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in the litigation, but do not merit dismissal at this phase.").[10]

---

[10] Because *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987) was decided at summary judgment, rather than the motion to dismiss stage, Defendants' reliance on it in support of this argument is inapposite. *Id.* at 251-52 ("The principal issue in this appeal is whether Apex has produced enough evidence in support of the claimed conspiracy to survive defendants' motions for summary judgment.").

14

Moreover, the tone of the chat messages themselves, particularly when reviewed in the light most favorable to Plaintiffs, suggest that these are not isolated occurrences, but instead reflect Defendants' general business practices in the MGB market. *See GSE Bonds I*, 396 F. Supp. 3d at 361 (sustaining antitrust claims based on four chat logs where "the tone of the conversations suggests that these were not isolated instances.")

The chats excerpted in the SAC reveal Defendants' conspiracy as it was executed and maintained, through a steady stream of bilateral and multilateral communications. Defendants' demand for a chat spelling out all the details of the comprehensive conspiracy, Defs.' Br. at 17, 25, seeks to impose a standard that is not required by law and, in any event, does not fit the reality of how long-term antitrust conspiracies work. *See Silver Fix II*, 332 F. Supp. 3d at 903-04 ("The Court also rejects Defendants' argument that because the chats do not demonstrate 'systemic inter-firm communications by high-level executives,' they are not indicative of an antitrust conspiracy. In a market manipulation case such as this, the traders at each bank are key. Whether these communications are sufficient to prove a single, unified conspiracy is a question for summary judgment or trial.").

Moreover, Defendants' attempts to classify certain chatroom conversations as "routine exchanges of market information or market color" (Defs.' Br. at 16) improperly asks the Court to construe the chats "in the light least favorable to the plaintiffs." *Aluminum IV,* 936 F.3d at 97. It is enough that Plaintiffs have put forth a plausible interpretation of the electronic communications set forth in the SAC. *See, e.g., Gym Door Repairs, Inc. v. New York City Dept. of Educ.*, 2015 WL 3883243, at *5 (S.D.N.Y. June 23, 2015) ("[W]hether a finder of fact will choose to credit Defendants' interpretation of the email exchange . . . [is] not resolvable at the pleadings stage.").

2.  <u>At least one Defendant's application for leniency from COFECE constitutes direct evidence of an overarching conspiracy.</u>

In *MGB I*, the Court considered Plaintiffs' earlier allegations that a Defendant had applied for and received leniency from COFECE in exchange for demonstrating the existence of a price-fixing cartel and its own participation in the cartel. The Court held that these allegations did not suffice to serve as direct evidence against any particular Defendant and declined to reach the question of whether Plaintiffs had adequately alleged the existence of a conspiracy. 412 F. Supp. 3d at 389. In the SAC, Plaintiffs plead newly discovered details concerning the COFECE applicant. Specifically, the SAC alleges that the unnamed entity's successful leniency application has been disclosed by COFECE itself in the *same* SO that charges Defendants with anticompetitive conduct (¶¶ 376-77), and that acceptance into COFECE's leniency program requires that the applicant "demonstrate *with evidence* that the applicant participated in an absolute monopolistic practice" (¶ 360 (emphasis added)) together with co-conspirators. ¶ 359. Further, by linking the leniency applicant with the seven charged Defendants in the SO, COFECE confirmed that those seven Defendants were among the leniency applicant's co-conspirators. ¶¶ 375-76. These facts establish clearly that the leniency applicant provided evidence incriminating itself and its co-conspirators and obviate any need for the Court to "indulge the inferential leap from cooperation to culpability." *MGB I*, 412 F. Supp. 3d at 389.[11]

---

[11] Defendants cite a Third Circuit decision for the proposition that direct evidence of conspiracy "requires no inferences." Defs.' Br. at 15 (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011)). However, the Second Circuit has considered and expressly rejected this position, endorsing the logical opposite. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012) ("Some courts have [denied summary judgment] by reasoning that 'direct evidence ... requires no inferences to establish the proposition or conclusion being asserted.'…All evidence, including direct evidence, can sometimes require a factfinder to draw inferences to reach a particular conclusion…") (internal citations omitted).

**D. The SAC Alleges Additional Evidence Supporting the Plausibility of the Alleged Overarching Conspiracy Involving All Defendants.**

Although the direct evidence presented above sufficiently pleads an agreement among Defendants to fix MGB prices, the SAC also pleads additional factual allegations that fully support a plausible inference of conspiracy. These allegations, when considered "as a whole," *Apple*, 791 F.3d at 319, with the direct evidence pleaded in the SAC, provide a sufficient basis for the Court to conclude that Plaintiffs plausibly allege an overarching conspiracy to fix MGB prices.

1. COFECE's investigation has uncovered evidence of Defendants' conspiracy.

The existence of government findings and enforcement actions against Defendants relating to the same alleged misconduct support the inference of conspiracy. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (recognizing allegations of pending federal and state investigations as supporting plausible inference of conspiracy). Here, COFECE's investigation has advanced to the point of filing formal charges and issuing a 600+-page summary of inculpatory evidence against seven Defendants. ¶ 375. On October 14, 2019, head of COFECE's investigative authority Sergio Lopez described the nature of the evidence that the investigation uncovered as evidence that MGB Market Makers formed an agreement over a period of ten years to manipulate MGB prices and withhold MGB inventory from the market. ¶ 395 & n.50; Brennan Decl. Ex. A, ECF 186-1at 3, 4 (COFECE [Mr. Lopez]: "[T]here existed elements that led us to believe that there was ***an agreement in place*** concerning what I have just told you, in order to manipulate the price and thus restrict the supply in the market for intermediation of debt securities").[12] The SO issued at the conclusion of COFECE's investigation charged seven Defendants and ███████████████ with engaging in "absolute monopolistic practices" in violation of Mexican competition law (¶¶ 375,

---

[12] Lopez's statements conclusively rebut Defendants' speculation that COFECE's investigation "focused" on inter-dealer transactions. Defs.' Br. at 20. This counterfactual argument also ignores Plaintiffs' detailed allegations about the role of each of the ███████████████ in pricing MGB transactions with U.S. parties, including Plaintiffs and the Class. ¶¶ 114, 135, 153, 178, 220, 239, 261, 280.

379), and evidence cited within the SO implicated Defendants HSBC Mexico and UBS Mexico in the same conduct. ¶¶ 399-400.[13] COFECE's formal charges against seven Defendants provide regulatory corroboration for Plaintiffs' allegations of "wrongdoing *on behalf* of Defendants here." *MGB I*, 412 F. Supp. 3d at 391.

The SO evidence further demonstrates that discovery is likely to reveal more evidence of Defendants' misconduct. In drafting the SAC, Plaintiffs had access to only two versions of the SO, issued to two out of seven charged Defendants. ¶ 425. In these versions, hundreds of pages of evidence against five other Defendants—that have all moved for dismissal of the SAC—were redacted. ¶ 426. Defendants' statement that Plaintiffs' SO allegations "detail[] *all* the evidence that COFECE found that could potentially support liability against seven of the nine Defendants" is therefore false. Defs.' Br. at 19 n.18 (emphasis added).

Defendants' strained attempt to reduce these allegations to nothing more than "the existence of a government investigation" (Defs.' Br. at 21) is belied by the very cases they cite on this point. *See, e.g.*, *In re Commodity Exch., Inc.*, ("*Gold*")*,* 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016) ("Significantly, none of the regulatory investigations cited by Plaintiffs has *advanced to the point of charging any of the Defendants with colluding* to manipulate the price of gold, and DOJ's Antitrust Division has *closed its investigation without charging anyone.*") (emphasis added); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) ("[G]overnment investigations may be used to bolster the plausibility of § 1 claims… the persuasive weight accorded to allegations contained in *outstanding criminal indictments* should fall somewhere in between a government investigation and a guilty plea.")

---

[13] COFECE's decision not to pursue charges against these Defendants at this time does not decrease the independent value of the direct evidence provided by the SO. Plaintiffs here need not constrain their theory to match COFECE's charging decisions, which are driven by a host of discretionary factors not applicable to private civil claims in a U.S. court. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002) ("*Corn Syrup*") (listing reasons why a regulator's decision not to prosecute an alleged antitrust conspiracy should not shield defendants from private civil liability).

(emphasis added); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) ( "It is unknown whether the investigation *will result in indictments* or nothing at all.") (emphasis added).[14]

Defendants' argument that there is a mismatch between COFECE's investigatory findings and the SAC also fails. Defs.' Br. at 8-10, 20-21, 27. COFECE charged seven Defendants with engaging in "absolute monopolistic practices"—rather than describing Defendants' agreement in terms of "spread widening" or "auction rigging"—because that is the term under Mexican law that is the equivalent of charging Defendants with a *per se* violation of the Sherman Act. ¶¶ 391-95. The fact that COFECE used this broad legal terminology to describe Defendants' course of anticompetitive conduct provides *more* support for the inference that Defendants formed an overarching conspiracy, not less. The interview with the Head of COFECE's Investigatory Authority that Defendants submitted with their brief further confirms that COFECE found evidence of "an agreement in place" among Defendants here to fix prices in the MGB market and restrain MGB supply. ECF No. 186-1 at 4.

    2.  <u>The abrupt changes in Defendants' MGB pricing following COFECE's announcement of its investigation give rise to a plausible inference of conspiracy.</u>

Here, Plaintiffs have pleaded factual allegations of economic and statistical evidence showing that Defendants' pricing changed dramatically following the April 2017 announcement that

---

[14] Similarly, Defendants' attempt to downplay the SO as containing formally "preliminary, non-binding" conclusions (Defs.' Br. at 2) misses the point. Plaintiffs do not need to allege a conviction to prevail on a Rule 12(b)(6) motion. The fact that a regulator reviewed the evidence and determined that Defendants engaged in anticompetitive conduct in the MGB market supports the plausibility of the alleged conspiracy. Defendants urge the Court to consider the possibility that "COFECE may ultimately conclude that there was no violation at all, as it has done in the past," citing one example in which COFECE acquitted defendants following the issuance of an SO. Defs.' Br. at 8 & n.10. Defendants neglect to mention, however, how uncommon that outcome is. For example, in 2018, the last year for which full data are available, COFECE issued seven SOs concerning alleged anticompetitive conduct, and zero of them resulted in an adjudication of no liability. *See* ORG. FOR ECON. COOPERATION & DEV., DAF/COMP/AR(2019)23, ANNUAL REPORT ON COMPETITION POLICY DEVELOPMENTS IN MEXICO—2018 at Table 1 (May 31, 2019), available at https://www.cofece.mx/wp-content/uploads/2019/06/2018-Annual-Report_final.pdf. *See also Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (courts may take judicial notice of "documents filed with governmental entities and available on their official websites"); Defs.' Br. at 4 n.2 (same).

COFECE was investigating their manipulation of MGBs. Courts in this District have consistently found that similar statistical analyses support the existence of an antitrust conspiracy in financial services cases. *See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) ("*ISDAfix I*") (sustaining an antitrust claim based in part on an allegation that defendants "simultaneously ceased" their unlawful pricing scheme when they learned of government investigations); *GSE Bonds I*, 396 F. Supp. 3d at 365 (holding that "direct evidence of price-fixing activity, as supplemented by the statistical evidence" was sufficient to plausibly allege a price-fixing conspiracy among bond dealers).

The SAC contains multiple economic analyses demonstrating that Defendants' conspiracy caused dysfunctional MGB pricing patterns during the Class Period that abruptly ended once COFECE announced its investigation. For instance, the SAC alleges evidence that Defendants' MGB auction bids were abnormally clustered (¶¶ 431-39), that Defendants' MGB bid-ask spread quotes were abnormally wide (¶¶ 452-63),[15] and that Defendants regularly coordinated to artificially inflate MGB prices following auctions. ¶¶ 444-46. *See also supra* at 6-9 (summarizing the details of the SAC's economic evidence).

Plaintiffs' economic evidence also shows a dramatic rise in MGB bid dispersion—adjusted for macroeconomic volatility—following the announcement of COFECE's investigation. ¶¶ 430-39 & Figures 1–2. Because bid dispersion is directly related to pricing uncertainty among market participants (¶434), and because Defendants dominated MGB auction bidding (¶ 292), this analysis provides strong evidence that Defendants knew their competitors' bidding strategy and chose to

---

[15] Judge Sweet considered a similar statistical allegation 25 years ago and concluded that it bolstered the inference of conspiracy at the pleading stage. *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) ("[A]fter DOJ began its investigation into allegations of fixed spreads, the spreads of major securities traded on Nasdaq narrowed . . . The nature of the conspiracy is sufficiently pleaded in this case to withstand a motion to dismiss.").

align their bids during the Class Period. *See Gold I*, 213 F. Supp. 3d at 660 (recognizing defendants'
clustered gold spot quotes as supporting inference of conspiracy).

In *MGB I*, the Court held that an earlier version of Plaintiffs' economic evidence was "not
irrelevant to Plaintiffs' claim that a conspiracy existed." 412 F. Supp. 3d at 390. Still, the Court
declined to credit the analyses in the FAC as supporting the inference of conspiracy "in the absence
of any other allegations that would allow the Court to infer the participation of the individual
Defendants." *Id.* The SAC now does just that.  With the additional allegation in the SAC of the chats
and the COFECE SO individually implicating all the Defendants in the conspiracy, the SAC's
detailed analyses of uncompetitive pricing conditions support a plausible inference of conspiracy
involving all Defendants.

In *GSE Bonds I*, Judge Rakoff credited a similar set of statistical analyses that measured bond
prices during and after the alleged class period. *GSE Bonds II*, 396 F. Supp. 3d at 359 . There, as here,
the plaintiffs' statistical analysis showed that the defendants imposed higher transaction costs during
the Class Period by inflating the prices of bonds as they became available for resale in the secondary
market and inflated bid-ask spreads that they quoted to investors. *See id.* at 359. The court held that
this evidence, coupled with chatroom transcripts showing different groups of defendants fixing
bond prices, was sufficient to plausibly allege a market-wide conspiracy to restrain the GSE bond
market. *See id.* at 362-363. Here, as in *GSE Bonds,* the SAC pleads economic and statistical evidence
of an anticompetitive pricing scheme among Defendants that abruptly ended, and ties each
individual Defendant to that scheme with direct evidence, including chats by each Defendant's
traders, linking each Defendant to the conspiracy.

Defendants' cases are distinguishable. *First, In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d
219 (S.D.N.Y. Oct. 4, 2019) ("*SSA II*") involved an alleged conspiracy among a group of dealers in
what plaintiffs maintained was a unitary "SSA Bond market," but which the allegations showed to be

a market comprised of a multitude of bonds issued by a broad array of heterogeneous national, regional, multi-national, and sub-sovereign (*i.e.* government agencies) entities from around the world. *See SSA II*, at 226, 238. Entities as economically and geographically diverse as the African Development Bank, Canada's provincial governments, the German federal government, and a refinancing vehicle for French banks were all alleged to issue bonds into a single "SSA Bond market" via syndications in which defendants sometimes, but not always, participated.[16] The plaintiffs did not allege the defendants' estimated market share, either individually or collectively. *See id.* at 238.[17] The court reviewed chat messages (which remain under seal) and found that they were insufficient to support the inference of a broad conspiracy among defendants to restrain the "SSA bond market." *Id.* at 238-239.[18]

In stark contrast, the MGB market here is homogenous and unitary.  It consists of bonds from a single issuer (the Mexican national government) and the secondary market is subject to Defendants' near-total influence in terms of market share, stemming from their obligation in the first instance to bid on 100% of the MGBs issued at auction.  Consequently, the market features which made an overarching conspiracy implausible in *SSA Bonds* are what enhance the plausibility of the alleged conspiracy to restrain competition in the MGB market.

*Second*, in *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 209 (S.D.N.Y. 2019) (Oetken, J.), the Court determined that evidence which "boil[ed] down to a single April 23, 2014 phone call . . . [and did] not identify which employees were involved, where the call took place, or the contours of

---

[16] *See* Second Cons. Am. Class Action Compl. at ¶¶ 115-119, *In re SSA Bonds Antitrust Litig.,* No. 16-cv-3711(ER) (S.D.N.Y. Nov. 3, 2017), ECF No. 306, ("SSA Bonds Complaint").

[17] The defendants "often served as underwriters" for "a handful of issuers…[that] represented about 40% of the total SSA issuance market." *Id.* ¶ 119.

[18] In a later decision issued after *SSA Bonds II,* the court distinguished *GSE Bonds I* and *GSE Bonds II* on the basis that "GSE bonds have a benchmark rate that the defendants allegedly manipulated but SSA bonds do not." *In re SSA Bonds Antitrust Litig.,* 2020 WL 1445783, at *5 (S.D.N.Y. Mar. 25, 2020) ("*SSA Bonds III*"). Respectfully, there were no allegations that the defendants manipulated a benchmark rate in *GSE Bonds. See GSE Bonds I,* 396 F. Supp. 3d at 357-360.

the alleged agreements" did not meet Rule 9(b)'s heightened pleading requirements. By contrast, the SAC names each specific employee involved in each price-fixing chat, provides the date, quotes the language used to fix prices, and describes the impact on the market for MGBs. ¶¶ 6-7, 399-424.[19] These allegations are easily sufficient to meet Rule 8(a)'s notice pleading standard.

3.  Defendants engaged in multiple acts which would have been against their individual economic self-interest in the absence of conspiracy.

The trader chats collected in the SO and revealed by Cooperating Defendants illustrate a pattern of conduct that would be uneconomic under competitive conditions. For instance, Defendants' decision to pool market-sensitive pricing information, rather than compete against one another by quoting independently determined prices (¶¶ 396-404), and without concern for rivals taking advantage of the information (¶ 420) would not make sense outside of a conspiracy. *See Todd*, 275 F.3d at 212 ("Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices.").

Courts in this District recognize that allegations of traders sharing current and future pricing information and trading strategies with competitors is highly suggestive of an anticompetitive agreement. *GSE Bonds II*, 2019 WL 5791793, at *3 (quoting *Silver Fix II*, 332 F. Supp. 3d at 904 ("[I]t is not rational for horizontal competitors to share current pricing information absent the existence of an anticompetitive agreement."); *see also In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 449-50 (E.D. Pa. 2018) ("information exchange . . . indisputably facilitates and supports an inference of an agreement"). Indeed, the private sharing of current and future pricing information among horizontal competitors has repeatedly been held to violate the Sherman Act on its own. *See*

---

[19] For the same reason, *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358-59 (S.D.N.Y. 2018), is inapposite. In that case, plaintiff alleged no direct evidence at all and did not provide *any* details concerning the alleged dates or ringleaders of the conspiracy. Here, each of the chats alleged in the SAC contain dates and names, each statistical analysis is labelled with date ranges, and the dates are corroborated by COFECE's findings. ¶ 395.

*Todd*, 275 F.3d at 211.

The SAC provides numerous examples of chat transcripts showing that the Defendants shared highly sensitive, non-public information about their trading positions and customer orders. *See, e.g.,* ¶ 6 ████████████████████; ¶ 399 █████████████████ ████████████████████████████████████████████ ██████████████████████; ¶ 400 ███████████████████ ███████████████████████████████████████████; ¶ 402 ██████████████████████████████████████████████ █████████████████; ¶ 403 ██████████████████████ ██████████████████████; ¶ 415 ████████████████ ██████████████████. The SAC explains how exchanging this information would swiftly damage an MGB Market Maker absent that dealer's membership in the alleged conspiracy. In March 2011, traders from ██████████████████████ █████████████████████████████████████████████████ ██████████████████████████████ ¶¶ 240-241. ████████████████████████ (¶ 240), ████████████ ██████████████████ *See* ¶¶ 294, 353. The same inference arises from Defendants' decision to sell MGBs at supra-competitive prices (¶¶ 413-17), when they could have competed on price to secure a greater market share. *Compare* ¶ 418 ███████████████████ ██████████████████████, *with Starr*, 592 F.3d at 324 ("In a competitive industry . . . a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs.").

Allegations that Defendants engaged in conduct that only makes economic sense in the context of a conspiracy leads to the plausible inference of conspiracy, regardless of whether the

conduct may be susceptible to other interpretations. *Stock Loans,* 340 F. Supp. 3d at 322.

    4.  <u>Defendants exchanged a high degree of interfirm communications.</u>

The SO and evidence provided by Cooperating Defendants reveal that Defendants, who putatively acted as competitors in the MGB market, maintained "constant communication" in "permanent interbank chatrooms," bilateral electronic chats, telephone calls, and in-person meetings. ¶ 397. *See also* ¶¶ 399-421 (quoting dozens of chat transcripts, which constitute a small percentage of the chat evidence produced in the SO and by Cooperating Defendants); ¶ 422 (Defendants communicated regularly on the phone about MGB trading); ¶ 423 (Defendants' traders regularly met in person). These allegations support the inference of conspiracy. *See Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *20 (S.D.N.Y. July 30, 2019) (recognizing allegations of "regular communications…between Defendants' clearing divisions" as indicative of conspiracy).

Defendants' suggestion that interfirm communications are relevant only if they directly concern collusion, Defs.' Br. at 21-22, is wrong. To support plausibility at the pleading stage, interfirm communications "need not necessarily be conspiratorial communications." *Stock Loans*, 340 F. Supp. 3d at 32; *see In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 175-76 (S.D.N.Y. 2009) (rejecting defendants' argument on summary judgment that "evidence of [] frequent and friendly communications between the defendants" must themselves demonstrate a collusive agreement).

Further, Defendants' purported "procompetitive rationale," Defs. Br. at 21, for their many interfirm communications fails. *First*, this argument asks the Court to ignore the clearly anticompetitive content of the many communications quoted in the SAC. ¶¶ 399-421. *Second*, Plaintiffs' allegations of a horizontal price-fixing conspiracy are not subject to a rule of reason analysis, and Defendants nowhere argue that they should be. Accordingly, Defendants' theory of "procompetitive" benefit cannot negate the well-pleaded allegations of an unlawful conspiracy, and

in any event are irrelevant and cannot be considered in connection with Plaintiffs' claim of a *per se* illegal conspiracy. *See Ariz. v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 351 (1982) ("[This] argument indicates a misunderstanding of the *per se* concept. The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.").

The SO also confirms the relevance of Plaintiffs' allegations of a "game of musical chairs" in which MGB traders routinely moved from Defendant to Defendant during the Class Period. *Compare* ¶¶ 339-52 (describing the "web of connections" that facilitated collusion among Defendants), *with* ¶¶ 379-90, 410 ██████████████████████████████ ██████████████████████. Contrary to Defendants' misreading, Defs.' Br. at 22, *MGB I* found trader movement allegations to be "unavailing" only in the absence of specific allegations plausibly tying particular Defendants to the alleged conspiracy. 412 F. Supp. 3d at 391. The SAC not only rectifies this deficiency by pleading facts from the SO and chat evidence tying each Defendant to the conspiracy, but it specifically demonstrates the importance of trader mobility to COFECE's preliminary finding of conspiracy.[20]

5.   Defendants shared a common motive to conspire.

Several chats excerpted in the SAC demonstrate that Defendants not only stood to gain from conspiring to fix MGB prices but would lose considerably from acting independently and challenging the cartel's hegemony. *See* ¶ 420-21 ██████████████████████████  █████████████████████████████████████████████ ████████████████████. This dynamic created a common motive to join the

---

[20] The SAC accordingly does not rely on a contention that "[t]he mere opportunity to conspire…*by itself* support[s] the inference" of conspiracy. *MGB I*, 412 F. Supp. 3d at 391 (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993)) (emphasis added). Plaintiffs do not allege this fact *by itself* but in the context of a substantial collection of diverse factual allegations. *See Capital Imaging Assocs.*, 996 F.2d at 545 (holding that the totality of plaintiff's evidence sufficed to create a genuine issue sufficient to withstand summary judgment).

conspiracy rather than stay on the outside and become its victim. *See B&R Supermarket v. Visa, Inc.*, 2018 WL 4921661, at *4 (E.D.N.Y. July 20, 2018) ("Discover might plausibly [conspire], among other reasons, to avoid losing market share to the other networks by failing to join them in the [] conspiracy."), *adopted by B & R Supermarket, Inc. v. MasterCard Int'l Inc.*, 2018 WL 4445150 (E.D.N.Y. Sept. 18, 2018). *See also See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017) (holding that plaintiffs may sufficiently plead "common motive" by articulating "facts, specific to the market at issue, suggesting that the defendants had an incentive to manipulate prices") (citing *Gelboim*, 823 F.3d at 766).

As in other financial products price-fixing cases, Defendants could not attain the increased MGB profits they sought without conspiring. *See ISDAfix I* ., 175 F. Supp. 3d at 55 ) ("[T]he very nature of ISDAfix suggests that any attempt to unilaterally control ISDAfix would be risky and likely futile."). Defendants acted as one another's eyes and ears, allowing each one to aggregate competitively sensitive information to predict order flows and auction outcomes and thereby avoid losses. *See* ¶¶ 409-12 (chats showing successful Defendants' traders sharing position information to avoid injuring one another). By conspiring, Defendants limited the risks and uncertainties of competition in financial markets.

6.   The MGB market was susceptible to collusion.

The high degree of concentration in the MGB market (*see supra* at 3) facilitated Defendants' implementation of their price-fixing agreement. *See In re Publ'n Paper*, 690 F.3d at 65 (explaining that industries "controlled by a limited number of sellers" are "conducive to collusion"); *In re Propranolol*, 249 F. Supp. 3d at 716 ("Economic factors make the Propranolol market susceptible to collusion, including industry concentration . . ."). COFECE's finding that Defendants fixed MGB prices for a span of ten years (¶ 395) through chat rooms and phone calls reinforces the importance of market concentration to the success of the scheme. *See Todd*, 275 F.3d at 209 (explaining that "very small

handful of firms in a more highly concentrated market may be less likely to require the kind of sophisticated data dissemination" to effectively collude on prices).

## II.     DEFENDANTS CONSPIRED THROUGHOUT THE CLASS PERIOD

The SAC substantiates the alleged Class Period of January 1, 2006 to April 19, 2017 (¶ 504) with several key facts. *First*, head of COFECE's Investigative Authority Sergio Lopez reported that COFECE's investigation found evidence of collusion over a span of ten tears. ¶ 395. *Second*, Plaintiffs' economic analyses show low MGB auction bidding dispersion (¶ 433), low MGB auction fill rate volatility (¶¶ 442-43), a higher Market Maker Option fill rate (¶ 450), and wider bid-ask spreads (¶¶ 457, 459, 462) between January 2006 and April 2017.

Defendants make much of the fact that Plaintiffs' exemplary chat evidence includes excerpts only from 2010 to 2013. Defs.' Br. at 28-29. Judge Rakoff recently considered a similar set of alleged facts in *GSE Bonds II.*, 2019 WL 5791793. There, although plaintiffs pleaded a class period ending in 2016, their chat evidence extended only until 2014. *Id.* at *4. The court rejected defendants' argument that the class period must be constrained to the available direct evidence at the pleading stage, because the direct evidence was supplemented by statistical analyses showing dysfunctional pricing in the relevant market for the entirety of the class period. There as here, because "Plaintiffs have already provided direct evidence that each defendant participated in a price-fixing conspiracy and sufficient indirect evidence showing that the conspiracy continued [for the full class period]… plaintiffs are thus entitled to the benefit of the presumption that all defendants were engaged in the conspiracy until that time." *Id.* at *5. Further, Plaintiffs' access to chat evidence was limited by the fact that only two out of nine Defendants have provided any cooperation materials. ¶ 5. *See also GSE Bonds I*, 396 F. Supp. 3d at 361 ("[P]laintiffs are not expected to marshal evidence (especially at this early stage) of every single time defendants unlawfully conspired. Moreover, the tone of the conversations suggests that these were not isolated instances.").

Nor does COFECE's decision to charge Defendants for misconduct from 2010 to 2014 change this calculation. Lopez' announcement concerning ten years of collusion (¶ 395) makes clear that the agency injected other discretionary factors into its choice to prosecute only a subset of the misconduct. *See Corn Syrup*, 295 F.3d at 664-65 (rejecting defendants' argument that the Department of Justice's decision not bring an antitrust action means there must have been no conspiracy, because, "The Justice Department has limited resources…[it] may have felt that there was little to be gained, so far as securing greater compliance with the Sherman Act was concerned, by suing these defendants for fixing the price of HFCS. It may also have felt that the antitrust class action bar had both the desire and the resources to prosecute such a suit vigorously, as indeed it has done."). Regardless, challenges to plaintiffs' definition of a class period are not suited for resolution on a Rule 12(b)(6) motion and should be deferred until the class certification stage. *See Dennis v. JPMorgan Chase & Co.*, 2020 WL 729789, at *6 (S.D.N.Y. Feb. 13, 2020) ("*BBSW II*").

## III.    PLAINTIFFS HAVE ANTITRUST STANDING

Courts must assume the existence of an antitrust violation when assessing whether a plaintiff has antitrust standing. *Gelboim*, 823 F.3d at 772. Plaintiffs have antitrust standing when they suffer an "antitrust injury" and are "efficient enforcers" of the antitrust laws. *Id.* Plaintiffs here sufficiently allege both components.

### A.  The SAC Plausibly Alleges That Plaintiffs Suffered an Antitrust Injury.

"Antitrust injury" is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Plaintiffs here suffered antitrust injury by paying too much or receiving too little in each MGB transaction as a direct result of Defendants' alleged unlawful conspiracy to fix

MGB prices. ¶¶ 9, 14–21, 501–03, 519-21.[21] Any harm to Plaintiffs in the form "of having to pay supra-competitive prices as a result of a horizontal price-fixing conspiracy is the quintessential antitrust injury." *FX I.*, 74 F. Supp. 3d at 598 . *See also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) ("In this case, the plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct. Such an injury plainly is of the type the antitrust laws were intended to prevent.") (internal quotation marks omitted). Plaintiffs here suffered antitrust injury, where "the anticompetitive effect of the Banks' alleged conspiracy would be that consumers got less for their money"—and is the type of core injury that the antitrust laws were designed to remedy. *Gelboim*, 823 F.3d at 772-73.

The SAC's economic analyses demonstrate that Defendants' conspiracy rendered MGB pricing artificial throughout the Class Period. Secondary market MGB prices were artificially high as a result of Defendants' coordinated auction-day price spikes (¶¶ 444-46), and Defendants' bid-ask spreads were artificially wide for both long-tenor (¶¶ 457-58) and short-tenor (¶ 459) MGBs, inflating Plaintiffs' MGB purchase prices and depressing Plaintiffs' MGB sale prices. *See supra* at 7. Because Plaintiffs purchased and sold MGBs during this period in which both purchase and sale prices were artificial, they suffered an antitrust injury.[22] *Accord Harry v. Total Gas & Power N. Am. Inc.*,

---

[21] Contrary to Defendants' assertion (Defs.' Br. at 30 n.25), the SAC alleges that Plaintiffs Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA") and MTA Defined Benefit Pension Plan Master Trust ("MTADBPPMT") each transacted millions of dollars' worth of MGBs directly with multiple Defendants during the Class Period. ¶¶ 16-17. *See also Sonterra Capital Master Fund Ltd. v. UBS AG*, 2020 WL 1544478, at *3 (2d Cir. Apr. 1, 2020) ("*Yen LIBOR*") ("[O]n a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

[22] Even if the Court were to find that any Plaintiff alleged injury only in its purchases or in its sales, such Plaintiff would still have antitrust standing. Although Defendants attempt to distort the allegations by separately analyzing price inflation and bid-ask spread injuries (Defs.' Br. at 31-34), Plaintiffs actually allege a single overarching conspiracy that operated simultaneously on multiple elements of the MGB market (*see supra* at 13-14). This multi-pronged approach is a common feature of price-fixing conspiracies. *See, e.g., GSE Bonds II*, 2019 WL 5791793 (single conspiracy to inflate the prices of newly-issued bonds and soon to be off-the-run bonds, and to quote artificially wide bid-ask spreads); *FX III*, 2016 WL 5108131, at *2 (single conspiracy to "fix [both] benchmark rates and bid/ask spreads"). Because, as a result of

889 F.3d 104, 112 n.3 (2d Cir. 2018) ("A plaintiff and defendant need not have been trading

simultaneously so long as a plaintiff pleads facts indicating that the defendant's actions caused price

artificiality during the time in which plaintiff was trading."); *Silver Fix II*, 332 F. Supp. 3d at 923 n.34

("Among other things, statistical analysis of market prices and quotes or allegations based on

government enforcement actions may suffice to allege the expected impact of a manipulative tactic

on a given market and the expected frequency of manipulation.") (citing *Total Gas*, 889 F.3d at 113;

*FX III*, 2016 WL 5108131, at *20-22); *SSA Bonds I* , 2018 WL 4118979, at *7 n.19  ("Plaintiffs are []

required to plausibly allege harm to them, and one way of doing so is through an analysis of market

prices.").[23]

Defendants advance no argument as to the *type* of injury alleged; they contend only that

Plaintiffs' allegations fail to plead an injury-in-fact at all. Defs.' Br. at 30. Their argument calls for an

exorbitant and legally unnecessary degree of transaction-level detail, right down to the time of day of

purchase. Defs.' Br. at 32-33. However, the correct standard requires Plaintiffs to plead "some

reason to believe" short of "speculation" that they suffered injury. *Total Gas*, 889 F.3d at 115. *See also*

*Yen LIBOR*, 2020 WL 1544478, at *3 ("[A]t the motion to dismiss stage, Plaintiffs need not prove

the allegations in their complaint 'definitively.'"). The SAC does this and alleges that every one of

---

Defendants' conspiracy, neither purchase nor sale prices "reflected ordinary market conditions," *Gelboim*, 823 F.3d at 772, any Plaintiffs that bought or sold MGBs suffered the same antitrust injury.

[23] The courts in *Total Gas*, *Silver Fix II*, and *SSA Bonds* dismissed antitrust claims precisely because the plaintiffs before them failed to plead evidence of price artificiality. *See Silver II*, 332 F. Supp. 3d at 923 n.34; *SSA Bonds I*, 2018 WL 4118979, at *6-7; *Total Gas*, 889 F.3d at 109 (noting that plaintiffs alleged an injury based only on "shockwaves from Defendants' market manipulation at [certain natural gas] hubs [that] reverberated through to trading at [an entirely different hub]"). In a subsequent decision in the *SSA Bonds* action, Judge Ramos distinguished *GSE Bonds I* in part on the basis that "GSE bonds have a benchmark rate that the defendants allegedly manipulated but SSA bonds do not." *SSA Bonds III*, 2020 WL 1445783, at *5. Respectfully, *GSE Bonds* did *not* allege the manipulation of a benchmark—the complaint used example chats coupled with economic evidence to allege market-wide effects from defendants' alleged conspiracy to rig the secondary market for GSE Bonds. *See GSE Bonds I*, 396 F. Supp. 3d at 361-363. The SAC contains similar allegations, and is thus far closer to the complaint in *GSE Bonds I. See* ¶ 395; ¶¶ 444-46 (alleging that Defendants systematically inflated MGB prices during the Class Period); ¶¶ 457-63 (alleging that Defendants' conspiracy caused artificially wide bid-ask spreads during the Class Period).

Plaintiffs' MGB transactions with a Defendant was price-fixed. Defendants' conspiracy rendered MGB prices consistently artificial throughout the Class Period. ¶¶ 429-63.[24]

Further, Defendants mischaracterize Plaintiffs' economic analyses. Figure 5 and Appendix C in the SAC show dramatic price increases for multiple tenors of BONOS and CETES, on auction days following the auction, throughout the Class Period. This demonstrates that Defendants' collusion in the MGB auctions caused prices to spike artificially higher. *See In re London Silver Fixing, Ltd., Antitrust Litig., ("Silver Fix I")*, 213 F. Supp. 3d 530, 545, 549 (S.D.N.Y. 2016) (holding that the strong temporal correlation of defendants' spot quotes and price reversions supports a pleading stage inference that defendants caused the reversions). These analyses do not show that "inflated MGB prices are absent on Non-Auction Days" (Defs.' Br. at 31), but rather that the observed "*price movements* are absent on Non-Auction days." ¶ 445 (emphasis added).

Neither these analyses nor Plaintiffs' allegations suggest that MGB prices returned to normal on non-auction days.[25] Rather, Plaintiffs allege that these price spikes caused lingering effects throughout the trading week, injuring them in each MGB transaction. ¶ 503. Similarly, Defendants' counterfactual challenge to Plaintiffs' allegations concerning the duration of price artificiality, Defs.' Br. at 31-33, is premature at this stage and will ultimately require resolution with expert testimony.

---

[24] Although Plaintiffs are not required to trace direct evidence to Plaintiffs' transactions at the pleading stage, Plaintiffs allege that they were injured on multiple trades coinciding with the chats alleged in the SAC. *See, e.g.*, ¶ 7█ ██████████████████████████████████████████████████████████ and SAC, App'x D ██████████████████████████████████████████████; ¶ 404 █████████████████████████████████████████████████████████████ and SAC, App'x D █████████████████████████████████████████); ¶ 418 ██████████████████████████████████████████████████████ and SAC, App'x D █████████████████████████████████████████.

[25] Since these analyses measure "normalized" MGB prices, the non-auction day value represents only the evolution of MGB prices over the course of a non-auction trading day, not the absolute value of MGB prices traded on those days. Accordingly, the fact that the analysis resets each trading day does not suggest that prices returned to competitive levels overnight. Further, the fact that Defendants' conspiracy lowered MGB prices in the hour preceding auctions (¶¶ 444-45) does not mean that the impact of Defendants' previous price inflation was fully cancelled out or that competitive market conditions were restored.

*See Silver Fix I*, 213 F. Supp. 3d at 557 (finding antitrust standing and explaining that, "a significant evidentiary record will need to be developed before the Court can determine what role any such lingering suppression played in the losses suffered by Plaintiffs at various points"); *Gold I*, 213 F. Supp. 3d at 658 (same).[26]

Defendants' challenge to Plaintiffs' bid-ask spread analysis is similarly meritless. Defendants insist without proof that before-and-after median market prices "cannot possibly establish that Defendants widened the bid-ask spreads on *every* secondary market transaction over an eleven-year period." Defs.' Br. at 33. *See also id.* at 14 (characterizing the alleged conspiracy as a "herculean feat"). Defendants thereby improperly invite the Court to deny the truth of the allegations and to infer—in their favor—that Plaintiffs may have paid only legitimate spreads. Such an inference is impermissible at the pleading stage. *Gelboim*, 823 F.3d at 769.[27]

Furthermore, Plaintiffs need not allege that Defendants engaged in a separate decision to widen each and every spread. *See United States v. Alex Brown & Sons, Inc.*, 1997 WL 314390, at *13 (S.D.N.Y. Apr. 24, 1999) (finding that market makers successfully fixed spreads for "a large number of years" by adhering to an industry "quoting convention"); Press Release, Competition Commission, Comco fines Swiss franc Spread cartel (Dec. 21, 2016) (finding that four banking institutions colluded to consistently quote wider bid-ask spreads to other parties and narrower spreads within the cartel).[28]

---

[26] Defendants also acknowledge that Plaintiffs specifically allege 46 auction-day MGB purchases. Brennan Decl. Ex. B, ECF No. 186-2. The plausible inference favorable to Plaintiffs, which must be drawn at the pleading stage, *Gelboim*, 823 F.3d at 769, is that every Plaintiff purchased post-auction MGBs from Defendants on an initial resale.

[27] Defendants' assertion that there is no "price-setting structure" in the MGB market (Defs.' Br. at 24) ignores the chats in the SAC showing that Defendants coordinated to manipulate end-of-day valuations to benefit the conspiracy. *See, e.g.*, ¶¶ 401, 404, 408, 416, 418.

[28] The press release is available at available at https://www.weko.admin.ch/weko/en/home/latest-news/press-releases/nsb-news.msg-id-65053.html.

Defendants present no support for their suggestion that the alleged conspiracy could have somehow benefitted Plaintiffs. Defs.' Br. at 33, 37. By definition, an artificially suppressed bid rate reduces the price a Market Maker Defendant is willing to pay the customer, and an artificially inflated ask rate increases the price the customer must pay the Market Maker Defendant. ¶¶ 455-56.

**B. Plaintiffs Are Efficient Enforcers.**

"Antitrust standing" focuses on a plaintiff's proximity to the alleged harm. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters,* 459 U.S. 519, 536-37 & n.34 (1983). Courts in the Second Circuit determine whether a party is a proper antitrust plaintiff on the basis of: (1) the directness of the asserted injury; (2) the existence of more direct victims; (3) whether damages would be "highly speculative," and (4) whether there is a "risk of duplicate recoveries" or that damages would be difficult to apportion among possible victims. *See Gelboim*, 823 F.3d at 778. This inquiry is a "general balancing test," *Stock Loans*, 340 F. Supp. 3d at 332, in which the weight assigned to each factor varies with the circumstances of a particular case. *Gatt Comm'ns, Inc. v. PMC Assocs.*, 711 F.3d 68, 78 (2d Cir. 2013). Defendants abandon any argument regarding whether Plaintiffs satisfy the Second Circuit's efficient enforcer factors, despite recognizing them as the governing standard. Defs.' Br. at 29. Although not required, Plaintiffs' allegations satisfy all four factors.

i.   *Directness.*

It is well-recognized that "direct counter-parties to transactions with the price-fixer" suffer direct injury. *Euribor*, 2017 WL 685570, at *18.[29] Here, Plaintiffs suffered direct injuries and are the most direct victims because they transacted millions of dollars of MGBs directly with Defendants. ¶¶ 14–21, 501–03; App'x D. In fact, Defendants never dispute that Plaintiffs purchased MGBs

---

[29] It is only when the converse is true that the "efficient enforcer" factors warrant the court's careful application. *See In re Platinum and Palladium Antitrust Litig.*, 2020 WL 1503538, at *6-7 (S.D.N.Y. March 29, 2020) ("*Platinum II*") ("Plaintiffs do not allege that the OTC Plaintiff transacted directly with any Defendant. Accordingly, the analysis of the four efficient enforcer factors as applied to the OTC Plaintiff focuses on whether it qualifies as an efficient enforcer, even though it did not transact directly with Defendants.").

directly from them. *See* ¶¶ 66–90; 98–290 (detailing direct purchases of MBGs from Defendants). "[I]t is difficult to think of a more direct victim" than Plaintiffs, "given that [they] entered into transactions directly with" Defendants. *FrontPoint Asian Event Driven Fund, L.P., et al., v. Citibank, N.A., et al. ("SIBOR I")*, 2017 WL 3600425 , at *12 (S.D.N.Y. Aug. 18, 2017).

    ii.  *Non-speculative injury.*

  Moreover, Plaintiffs' claimed damage here—being overcharged or underpaid as a result of the Defendants' anticompetitive acts—is readily identifiable and not speculative. *ISDAfix I*, 175 F. Supp. 3d at 61; *Hexcel Corp. v. Ineos Polymers, Inc.*, 2010 WL 11520539, at *4 (C.D. Cal. Feb. 23, 2010) ("[T]he harm is not speculative because it can be measured directly by the overcharge.") (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 491, 494 (1968)). Plaintiffs allege that Defendants agreed to manipulate prices by fixed amounts that can be quantified through discovery. ¶¶ 444, 452. *See also Nypl v. JPMorgan Chase & Co.*, 2017 WL 3309759, at *6 (S.D.N.Y. Aug. 3, 2017) (holding that "demonstrating what price Plaintiffs would have paid but for the collusion…[is] for a later stage of the litigation").

    iii.  *There is no risk of duplicative recovery or complex apportionment.*

  This factor favors Plaintiffs as well. Plaintiffs "do not present a danger of 'duplicate recovery' and complex damage apportionment." *FX III*, 2016 WL 5108131, at *8. Plaintiffs are not just efficient enforcers, but the only enforcers; there are no other pending lawsuits seeking recovery for injury caused by Defendants' conspiracy, and COFECE's action is not pursuing restitution to injured parties in the United States. *See id.* ("As to foreign investigations, duplicative recovery is highly unlikely as the [Class] is defined to include only 'persons' that are either domiciled or transacted in the United States.").

### C.  Plaintiffs Have Antitrust Standing as to All MGBs, Including BONDES D.

Contrary to Defendants' argument, Defs.' Br. at 34-35, Plaintiffs have standing to assert claims on behalf of Class members who traded BONDES D, even though Plaintiffs do not allege that they traded that particular MGB. In a putative class action, a plaintiff has class standing if it plausibly alleges "(1) that [it] personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) ("*NECA*") (internal quotation marks omitted) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982); *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)) (internal quotation marks omitted).

As detailed above, Plaintiffs allege that they were directly injured by Defendants' conspiracy to fix MGB prices. ¶¶ 14-21, 501-03. The same conspiracy that fixed the prices of the MGBs traded by Plaintiffs also fixed the prices of BONDES D—traded by members of the putative Class—in the same way. *See Euribor*, 2017 WL 685570, at *8 (holding that plaintiffs have class standing when their injury "'flowed from' the same conduct and the same parties" as those of class members).

The SAC alleges that "all MGBs"—including BONDES D—"have core features in common that distinguish them as a single class of debt securities." ¶ 292. The Mexican government issues BONDES D in auctions dominated by Defendants, just as it does with the other three MGBs. ¶ 313. The SAC further alleges that Defendants engaged in conduct as to BONDES D that was identical to their conduct as to the other MGBs. Defendants control the supply of BONDES D in the United States, along with the supply of other MGBs available for sale. ¶ 292. Thus, the conduct that caused Plaintiffs injury in transactions of other MGBs "implicates the same set of concerns" as the conduct that injured other Class members who transacted BONDES D during the Class Period. *NECA*, 693 F.3d at 162.

Judge Kaplan reached a similar conclusion in *BBSW I*, which concerned an alleged conspiracy to fix the prices of several derivatives linked to the BBSW interest rate benchmark. *Dennis v. JPMorgan Chase & Co.,* 343 F. Supp. 3d 122, 159(S.D.N.Y. 2018) . Named plaintiffs, who transacted in various BBSW-linked derivatives but not BBSW-linked forward rate agreements ("FRAs") and Bank Bill Futures, had standing to assert claims on behalf of persons injured in transactions of those instruments because, as here, liability turned on the same misconduct as to all relevant products. *Id.* ("That plaintiffs and the purported class members transacted in different derivatives is relevant only to the question of damages because plaintiffs have sufficiently alleged that BBSW was a component of the prices of the derivatives in which they transacted as well as of the FRAs described in the amended complaint.") *See also Euribor*, 2017 WL 685570, at *8 (reaching the same conclusion in an action concerning manipulation of the Euribor benchmark); *NECA*, 693 F.3d at 162 (holding that investors had class standing to pursue claims concerning offerings of mortgage-backed certificates other than the offering which they were injured, because those claims were founded on misstatements by the same originators).

Defendants' cases, Defs.' Br. at 34-35, do not change this conclusion. *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.* concerned an attempt by plaintiffs with time-barred claims to bring new direct claims in an existing class action. 23 F. Supp. 3d 203 (S.D.N.Y. 2014). In fact, the court specifically reaffirmed the applicability of *NECA*'s holding in cases such as this one. *See id.* at 207-08 ("[C]lass standing-that is, standing to assert claims on behalf of purchasers of Certificates from other Offerings, or from different tranches of the same Offering-does not turn on whether [plaintiff] would have statutory or Article III standing to seek recovery for misleading statements in those Certificates' Offering Documents.") (quoting *NECA*, 693 F.3d at 158).

Similarly, in *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, the putative class plaintiffs asserted claims against the trustee of 530 different residential mortgage-

backed securities trusts, alleging that the trustee breached various contractual and fiduciary duties with respect to each trust. 775 F.3d 154, 163 (2d Cir. 2014). The Second Circuit distinguished these allegations from its holding in *NECA*, explaining that any assessment of the trustee's breaches would require "examining its conduct with respect to each trust," whereas the *NECA* plaintiff's claims concerned "the *same* misstatements across multiple offerings." *Id.* at 162 (emphasis in original). Here, Defendants do refer to any separate BONDES D misconduct; they simply point out that BONDES D had "different maturity dates and coupon payments" than other MGBs. Defs.' Br. at 34. Any argument that this minor difference is sufficient to defeat class standing was foreclosed by *NECA*. 693 F.3d at 150, 164 (holding that plaintiff had class standing to assert claims across various tranche levels, even though "[e]ach tranche [had] a different risk profile, paying a different rate of interest depending on the expected time to maturity and the degree of subordination, or protection against the risk of default.")

### D. Defendants' "Umbrella Standing" Section is Inapplicable Here.

The concept of "umbrella standing" plays no role in assessing Plaintiffs' antitrust standing here. Umbrella standing becomes an issue only when a plaintiff's injuries arise from transactions with a non-conspirator that charged supra-competitive prices as a result of the conspiracy. *Silver Fix I*, 213 F. Supp. 3d at 555. The Second Circuit has held that the antitrust standing inquiry focuses on whether *the plaintiff* has standing. *See Gelboim*, 823 F.3d at 772 ("Two issues bear on antitrust standing: [1] have appellants suffered antitrust injury? [2] are appellants efficient enforcers of the antitrust laws?"). However, Defendants essentially ask the Court (Defs.' Br. 35–39) to issue an advisory opinion about a circumstance not present here, whether umbrella standing would be appropriate if plaintiffs with no direct transactions with Defendants had brought this action.

When Defendants argue for "dismissal of Plaintiffs' umbrella claims" (Defs.' Br. 39), they appear to be seeking a premature ruling that the pool of commerce upon which Plaintiffs can seek

damages may not include transactions with non-Defendants. Whether Plaintiffs are entitled to recover from Defendants based on an umbrella theory of damages—based on inflated prices paid on trades with non-Defendants—is a question for a later stage. Umbrella damages are not a "claim," and it is therefore inappropriate for Defendants to move for their "dismissal" under Rule 12(b)(6). *See Bais Yaakov of Spring Valley v. Educ. Testing Serv.*, 251 F. Supp. 3d 724, 750 (S.D.N.Y. 2017) (holding that resolution of a dispute over the scope of statutory damages is "premature" on a Rule 12(b)(6) motion); *Burkina Wear, Inc. v. Campagnolo, S.R.L.*, 2008 WL 1007634, at *3 (S.D.N.Y. Apr. 9, 2008) ("[T]he question whether a plaintiff has stated a claim turns not on whether he has asked for the proper remedy but whether he is entitled to any remedy.").

*Sonterra Capital Master Fund Ltd., et al., v. Credit Suisse Group AG, et al., ("CHF LIBOR I")*, cited by Defendants, supports Plaintiffs' standing argument. In *CHF LIBOR I*, Judge Stein ruled that plaintiffs that transacted directly with defendants (the only group analogous to Plaintiffs here) are efficient enforcers. 277 F. Supp. 3d 521, 558-59 (S.D.N.Y. 2017). This holding clearly compels finding efficient enforcer status for Plaintiffs. *See also Gelboim*, 823 F.3d at 780 (holding that the efficient enforcer inquiry "reflect[s] a concern about *whether the putative plaintiff* is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement.") (emphasis added). Defendants' argument must be rejected.

Regardless, there is no categorical rule excluding investors who did not purchase directly from Defendants from being efficient enforcers of the antitrust laws. *Silver Fix I*, 213 F. Supp 3d. at 554 ("[C]ourts have found that differently-situated plaintiffs may have standing to assert antitrust injuries, provided that each plaintiff suffered a unique and sufficiently direct injury as a result of defendants' anticompetitive conduct.").[30] In this case, Defendants' dominance of MGB supply (¶

---

[30] Adopting a rule limiting antitrust standing to direct counterparties alone "would effectively eliminate private enforcement with respect to all claims brought by [those] who transact via an exchange rather than OTC." *Silver Fix I*, 213 F. Supp. 3d 556 (declining to adopt this categorical rule).

292), defeats any "umbrella" standing concerns. *See BBSW I*, 343 F. Supp. 3d at 165 ("The Court is not persuaded that concerns related to umbrella standing need bear on this case…. the conspiracy alleged here involves essentially all of the entities that contribute to setting BBSW and asserts that these banks and brokers affected the price of all derivatives priced or benchmarked by reference to BBSW.").

Finally, calculating damages for MGB transactions with third parties is neither "exceptionally complex" nor speculative. (Defs.' Br. at 37-38). At a later stage of the litigation, Plaintiffs will have an opportunity to present expert testimony proving what the prevailing market price for each MGB would have been throughout the Class Period absent Defendants' manipulation. *See FX III*, 2016 WL 5108131, at *11 ("A damages calculation for a market manipulation scheme, though it may require expert testimony, is hardly beyond the ken of the federal courts.") (quoting *Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918, 930 (7th Cir. 1995)). Such calculations are a routine aspect of price-fixing litigation, rendering Defendants' argument meritless. *See e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002); *Gold I*, 213 F. Supp. 3d at 658.

## IV.   THE FTAIA DOES NOT BAR PLAINTIFFS' SHERMAN ACT CLAIM

Plaintiffs' antitrust claim is not barred by the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, which exempts from the Sherman Act "(nonimport) activity involving foreign commerce." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 548 (S.D.N.Y. 2018) ("*GBP LIBOR I*") (quoting *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004)). The SAC alleges that each Defendant sold MGBs into the United States, provides details of specific sales by each Defendant, and describes the mechanics of how each U.S. sale was structured. *See* ¶¶ 107-24 (Santander Mexico); ¶¶ 130-50 (BBVA-Bancomer); ¶¶ 152-71 (Citibanamex); ¶¶ 173-92 (Deutsche Bank Mexico); ¶¶ 194-211 (HSBC Mexico); ¶¶ 213-30 (Bank of America Mexico). *See also* ¶¶ 14-21 (alleging that each Plaintiff transacted MGBs with multiple

Defendants). These transactions are plainly imports and therefore fall squarely within the regulatory domain of the Sherman Act. *See CHF LIBOR I*, 277 F. Supp. 3d at 569; *FX III*, 2016 WL 5108131, at *13 ("In a situation where a U.S. entity operating in the United States trades FX with a foreign desk of a Defendant, the FTAIA does not apply and the claim is not barred because of the statute's import commerce exclusion (or exception).").

Moreover, the FTAIA permits a plaintiff to bring Sherman Act claims concerning "foreign anticompetitive conduct" that has a "a reasonably proximate causal nexus" to an injury in the United States. *BBSW I*, 343 F. Supp. 3d at 172 (quoting *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir. 2014)). The statute's focus is on the "anti-competitive *effects* within the United States," not on the presence of some foreign "*conduct* of defendants." *Euribor*, 2017 WL 685570, at *22 (emphasis in original). *See also id.* ("In adopting the FTAIA, Congress expressly endorsed an extraterritorial application of the Sherman Act."). The SAC alleges that Defendants' conspiracy had profound effects on MGB investments in the United States. *See Sonterra Capital Master Fund, Ltd., et al. v. Barclays Bank PLC, ("GBP LIBOR")*, 366 F. Supp. 3d 516, 549 (S.D.N.Y. 2018) (rejecting an FTAIA challenge on the basis of the allegedly foreseeable effects of defendants' foreign price-fixing conduct in the U.S.); *BBSW I*, 343 F. Supp. 3d at 172-73 (same). Indeed, the limitation of the Class to U.S.-based traders and transactions (¶ 504) is alone sufficient to defeat Defendants' FTAIA challenge. *See CHF LIBOR I*, 277 F. Supp. 3d at 569.

Defendants respond by artificially slicing off an "auction conspiracy" from Plaintiffs' overarching conspiracy claim. Defs.' Br. at 39. This counterfactual argument fails for the reasons explained above. *See supra* at 13-14. The cases relied on by Defendants also fail to save their argument.

- In *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 401 (2d Cir. 2002), the court rejected defendants' FTAIA argument, expressly finding that plaintiffs' allegations, like the

allegations here, "could be described as an agreement to fix prices in a foreign auction market that made possible an agreement to fix prices in the domestic [] market."

- Several other cases cited by Defendants applied the FTAIA only to reject the claims of foreign plaintiffs operating in foreign markets. *FX I*, 74 F. Supp. 3d at 600; *Latino Quimica-Amtex S.A. v. Akzo Nobel Chems. B.V.*, 2005 WL 2207017, at *9 (S.D.N.Y. Sept. 8, 2005); *Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*, 2017 WL 4402564, at *1 (S.D.N.Y. Sept. 30, 2017).

- *FX I* expressly upheld the Sherman Act claims of all domestic plaintiffs. 74 F. Supp. 3d at 598. Each Plaintiff in this litigation is based in, and alleges injury on transactions that occurred in, the United States. ¶¶ 14-21.

- Finally, in *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 417 (S.D.N.Y. 2000), plaintiffs specifically pleaded that each of the retail tracking markets at issue is entirely separate from the others. Plaintiffs here allege that Mexican Government-designated intermediaries of the MGB market, acting through their affiliates, targeted U.S. investors with MGBs obtained at auctions in Mexico. ¶¶ 98-100, 104.

## V.  PLAINTIFFS STATE A VIABLE CLAIM FOR UNJUST ENRICHMENT

Under New York law, a plaintiff asserting a claim for common law unjust enrichment must allege "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (footnote omitted). Plaintiffs' claim in the SAC easily satisfies all three factors.

*First*, Defendants benefitted by selling MGBs "at fixed artificially higher prices," ¶ 444, fixing "the bid-ask spread at which they transacted with consumers . . . artificially wider," ¶ 452, and

collecting "supra-competitive profits on every transaction of MGBs," ¶ 528, resulting in "millions of dollars in excess profits that they could not have collected in the absence of their conspiracy." ¶ 99. *Second*, Defendants' gain was at Plaintiffs' expense. Plaintiffs incurred artificially higher transaction costs on their MGB trades with Defendants as a result of Defendants' unlawful conduct. ¶ 429. Thus, Defendants' collusion caused Plaintiffs to pay more when purchasing MGBs from Defendants and receive less when selling MGBs to Defendants than they would have absent Defendants' illegal conduct. ¶¶ 503, 519, 528. *Finally*, if Plaintiffs' allegations prove true, Plaintiffs were unfairly deprived of their money. ¶¶ 529-30. The claim is straightforward.

Defendants advance three theories as to why Plaintiffs' unjust enrichment claim should be dismissed. Not one has merit. *First*, Defendants incorporate their Sherman Act argument that Plaintiffs' substantive collusion allegations are "defective." Defs.' Br. at 41. This argument ignores that the two causes of action have different tests: unjust enrichment does not require Plaintiffs to allege conspiracy, and the Sherman Act claim does not depend on "equity and good conscience." Regardless, even if the Court would accept the argument that Plaintiffs' unjust enrichment claim and Sherman Act claim rise and fall together, both rise here, based in large part on the new facts alleged in this SAC.

*Second*, Defendants argue that Plaintiffs' unjust enrichment claim stems from "direct transactions between a Plaintiff and a Defendant" that "would be governed by contracts between the parties." Defs.' Br. at 41-42. This result "is not countenanced by New York law." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 630 n.28 (S.D.N.Y. 2013). *See also id.* at 630 ("If a plaintiff could not assert a claim for unjust enrichment based on any conduct by the defendant that affected the 'consideration' the plaintiff received under a contract with the defendant, unjust enrichment claims would effectively be barred whenever a contract between the plaintiff and the defendant existed.") Whether the *illegal* conduct complained of here is covered by the contract

cannot be resolved without discovery. *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 468 (S.D.N.Y. 2009) ("Here, there is a dispute … whether the Plaintiffs were induced to enter into the agreements as a result of fraud. Accordingly, it is not appropriate to dismiss the claim of unjust enrichment at this stage based on the purported existence of a contract.").

*Finally*, Defendants argue that dismissal of Plaintiffs' unjust enrichment claim is warranted because Plaintiffs cannot assert it "against a Defendant based on MGB transactions with other persons" or "against those Defendants with whom they did not do business." Defs. Br. at 42.[31] Not so. "[A] New York unjust enrichment claim requires no 'direct relationship' between plaintiff and defendant." *Tower Research*, 890 F.3d at 69. Rather, a plaintiff need only establish a "modest" connection. *See id.* Here, Plaintiffs allege that Defendants directly caused inflated MGB prices. ¶¶ 14-21, 519, 528.

## VI.   ALL OF PLAINTIFFS CLAIMS ARE TIMELY

At the pleading stage, courts dismiss claims on statute of limitations grounds only in exceptional cases where "a complaint clearly shows the claim is out of time." *Brewer v. Hashim*, 738 F. App'x 34, 34 (2d Cir. 2018). *See also GSE Bonds I*, 396 F. Supp. 3d at 368 ("At a minimum, defendants' arguments do not conclusively establish that the statute of limitations applies, and so dismissal on that ground would be premature."). The pleadings here show that all Defendants seeking dismissal were named in this lawsuit within *one year* of COFECE's announcement raising inquiry notice of a possible conspiracy.[32] Accordingly, Plaintiffs' claims are timely on their face.

---

[31] Defendants contend that "Plaintiffs who lack antitrust standing also cannot bring a claim for unjust enrichment." Defs. Br. at 41 n.29. As explained, *supra* Part III, Plaintiffs have antitrust standing. Regardless, the proximity analysis for unjust enrichment claims logically should not be identical to the antitrust standing analysis, because unjust enrichment claims, unlike Sherman Act claims, do not carry a penalty of treble damages. *See also MGB I*, 412 F. Supp. 3d at 392 (recognizing that an unjust enrichment plaintiff need not demonstrate that it is an "efficient enforcer").

[32] Every Moving Defendant was named in the initial Complaint, filed by Plaintiffs OFPRS and IBEW 103 on March 30, 2018. ECF No. 1.

### A. Plaintiffs' Antitrust Claim Was Filed Within the Limitations Period.

#### 1. At the earliest, Plaintiffs were on inquiry notice beginning April 19, 2017.

The four-year limitations period for Sherman Act claims does not begin to run until a plaintiff is on notice that it has been harmed by defendants' unlawful conduct. *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 885 F. Supp. 2d 617, 627 (S.D.N.Y. 2012). Here, Plaintiffs did not have inquiry notice of Defendants' illegal conduct until April 19, 2017, when COFECE announced it discovered evidence of price-fixing and collusion in the MGB market. ¶ 515.

Defendants' preferred inquiry notice dates are not supported by the factual allegations. *First*, Defendants seize on an allegation in a superseded pleading filed by Plaintiff Boston Retirement System ("BRS"), which refers to La Comisión Nacional Bancaria y de Valores' ("CNBV") October 2013 sanction of two banks for anticompetitive behavior in the MGB market. Defs.' Br. at 46. However, as Defendants acknowledge, the conduct alleged by Plaintiffs in this action formed the basis of a *separate* CNBV investigation that began only in the summer of 2017 and concluded with a separate round of penalties on five Defendants here and several other entities and traders. *Id.* at 10. The timeline compels the conclusion that the October 2013 fines concerned a separate, unrelated scheme, not capable of providing Plaintiffs notice of the conspiracy at issue here. *See Prescott v. Nationwide Mut. Ins. Co.*, 2019 WL 7842538, at *11 (E.D.N.Y. Aug. 11, 2019) (holding that inquiry notice is not triggered by a plaintiff's constructive knowledge of a "separate problem" with defendant's business); *BBSW I*, 343 F. Supp. 3d at 195-96 (accepting as plausible plaintiffs' argument that individual defendants' price manipulation settlements could not have put them on inquiry notice of a "widespread conspiracy" to fix prices).[33]

---

[33] Defendants' alternative suggestion, that analyses of MGB pricing in 1986-1991 and 1996-2000 could have triggered inquiry notice as to a course of misconduct beginning in 2006 (Defs.' Br. at 46 n.34), is even more farfetched. It is also contradicted by Plaintiff BRS' allegation that these earlier instances of pricing irregularity were addressed by reforms "in the early 2000s." No. 18-cv-4294 (May 14, 2018), ECF No. 1, ¶ 163. *See Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 384, 394 (E.D. Pa. 2007) (holding that inquiry notice from a prior clinical trial failure was defeated when an "adjustment to the

*Second*, Defendants' contention that Plaintiffs were put on notice of the conspiracy by the existence of raw pricing data, Defs.' Br. at 45, has been rejected by multiple courts in this District. *See GSE Bonds I*, 396 F. Supp. 3d at 367-68; *SIBOR I*, 2017 WL 3600425, at *13; *FX III*, 2016 WL 5108131, at *16; *Euribor*, 2017 WL 685570, at *27 ("But it is unclear how the plaintiffs could have recognized that the daily quotes were manipulated based on the bare fact of their publication, any more than any other consumer—or a compliance department or senior executive of the defendants—would recognize artificially fixed prices."). *See also Hawkins v. MedApproach Holdings, Inc.*, 13. Civ. 5434, 2015 WL 8480076, at *3 (S.D.N.Y. Nov. 30, 2015) (holding that a plaintiff is not required "to conduct complicated statistical analysis…to uncover alleged malfeasance."). The raw data does not convey anything about Defendants' conspiracy in the absence of context highlighting the significance of the data. Defendants accuse Plaintiffs of trying to "have it both ways" (Defs.' Br. at 46) by alleging that the pricing data was sufficient to support the inference of conspiracy but not to independently trigger inquiry notice. But "exactly the same argument could be leveled at defendants: they cannot simultaneously claim the pricing data is innocent and reveals nothing, yet should have galvanized plaintiffs to action immediately." *GSE Bonds I*, 396 F. Supp. 3d at 368 n.6.[34]

Further, because Plaintiffs' economic evidence of collusion utilizes a comparison of pre-April 19, 2017 and post-April 19, 2017 price data (¶¶ 429-63), Plaintiffs *could not possibly* have had notice of the significance of this data prior to April 19, 2017. *See GSE Bonds I*, 396 F. Supp. 3d at 368

---

point system for measuring results ma[de] it unlikely for the problem to recur") (citing *LC Capital Partners, LP v. Frontier Ins. Grp.*, 318 F.3d 148, 155 (2d Cir. 2003)).

[34] Defendants' cases are inapposite. *In re Interest Rate Swaps Antitrust Litig.* says nothing at all about price movements causing inquiry notice; its concern was the failure of a trading platform to evolve in line with market expectations "in plain sight." 261 F. Supp. 3d 430, 488 (S.D.N.Y. 2017). *In re Publ'n Paper Antitrust Litig.* concerned an industry in which price increases are announced publicly and transparently, defeating any presumption of self-concealment. *Compare* 2005 WL 2175139, at *4 (D. Conn. Sept. 7, 2005) ("there is nothing in the complaint that indicates why the plaintiffs, on hearing the price increase announcements, would have been misled"), *with* ¶ 512 (alleging that "the MGB market is highly opaque.," lacking any "centralized exchanges on which market participants can trade MGBs and view current MGB prices").

("And this ignores the fact that many patterns in plaintiffs' data would not have become clear until after 2016, when the conspiracy supposedly ended and the pricing suddenly changed dramatically.").

    2.   <u>Plaintiffs allege sufficient facts to support equitable tolling.</u>

The doctrine of fraudulent concealment tolls an applicable limitations period when a plaintiff establishes: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *See State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). Plaintiffs allege facts supporting each element here.

Plaintiffs plead the first element with allegations that Defendants affirmatively concealed their misconduct by confining their conspiracy-related communications to private meetings, phone calls, online chats, and secret bidding schedules. ¶ 512-13. *See also* ¶¶ 396-428 (excerpting collusive chats among Defendants' traders); *FX III*, 2016 WL 5108131, at *16 (finding concealment based on allegations "that the entirety of the alleged conspiracy took place in private chat rooms and private instant messages"). Defendants' counterfactual argument that these affirmative concealment allegations lack specificity of "time, place, speaker [and] content" (Defs.' Br. at 44) is plainly refuted by the SAC's chat excerpts, each of which includes both names and dates. ¶¶ 399-424. Plaintiffs also allege that Defendants engaged in multiple forms of price-fixing (*see, e.g.*, ¶ 392-93, 514), an inherently self-concealing form of misconduct. *Hendrickson Bros.*, 840 F.2d at 1083–84; *Silver Fix I*, 213 F. Supp. 3d at 572.[35]

---

[35] Contrary to Defendants' argument (Defs.' Br. at 44), Plaintiffs do not rely on the same allegations to plead both conspiracy and fraudulent concealment. For instance, Plaintiffs refer to Defendants' attempts to undermine COFECE's investigation (¶ 371) and Defendants' representation that they bid competitively in MGB auctions. ¶ 514. Neither of these facts is itself a component of Plaintiffs' antitrust or unjust enrichment allegations. In any event, the same allegations may properly serve to plead both substantive claims and fraudulent concealment of those claims. *See FX III*,

Finally, Plaintiffs allege that they remained ignorant of Defendants' conduct within the limitations period "[d]espite monitoring their investments and regularly following financial media*,*" and that such ignorance is not attributable to a lack of due diligence (¶ 515), satisfying the second and third prongs of fraudulent concealment. *See Stock Loans*, 340 F. Supp. 3d at 336-37 (holding that plaintiffs satisfied the second and third prongs by "argu[ing] that they had no prior knowledge of the collusion, which was brought to light only by counsel's recent investigation" and alleging that they "regularly monitor[ed] new[s] reports concerning the financial industry and the stock lending market").[36]

### B.  Plaintiffs' unjust enrichment claims are within the statute of limitations.

Defendants concede that New York law supplies the limitations period for unjust enrichment claims asserted by all Plaintiffs except for Oklahoma Firefighters Pension and Retirement System ("OFPRS"). Defs.' Br. at 48. Because New York law imposes a six-year limitations period, the unjust enrichment claims of these seven Plaintiffs are accordingly facially timely. *See Williams-Guillaume v. Bank of Am., N.A.*, 130 A.D.3d 1016, 1017 (2d Dep't 2015).[37] Since Defendants' misconduct continued until at least April 19, 2017, well within the six-year period preceding the filing of all the complaints, the "continuing violation" doctrine tolls the statute of

---

2016 WL 5108131, at *16 ("The same secret communications that plead conspiracy also plead the three elements of fraudulent concealment.").

[36] *See also Stock Loans*, 340 F. Supp. 3d at 336 ("That other industry participants and market regulators did not catch wind of the conspiracy shows, in Plaintiffs' view, that Plaintiffs could not have acquired knowledge of it through the exercise of reasonable diligence. The Court agrees.") (internal citation omitted). Regardless, "requiring Plaintiffs, 'at the motion to dismiss stage, to make a showing of reasonable diligence' would be 'premature.'" *ISDAfix I*, 175 F. Supp. 3d at 67 (quoting *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x. 57, 59 (2d Cir. 2015)).

[37] Defendants incorrectly argue for a three-year limitations period. Defs.' Br. at 48. However, since Plaintiffs' claim seeks restitution (¶ 529), a six-year period applies. *Stock Loans*, 340 F. Supp. 3d at 333. *LIBOR IV*, relied on by Defendants, confirms that the three-year limitations period pertains only for "unjust enrichment claim[s] sounding in tort for monetary relief." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *163 n.186 (S.D.N.Y. Oct. 20, 2015).

limitations in its entirety. *See Hughes v. LaSalle Bank, N.A.*, 419 F. Supp. 2d 605, 614 (S.D.N.Y. 2006), *vacated on other grounds*, 2007 WL 4103680 (2d Cir. 2007).

As to OFPRS, its unjust enrichment claim is subject to a two-year period beginning at the time of discovery. *City of Tulsa v. Bank of Okla.*, 280 P.3d 314, 320-21 (Okla. 2011). Because Plaintiffs did not discover their injury before April 19, 2017, all the complaints consolidated in this action were filed well within the two-year period.

Plaintiffs' unjust enrichment claims are facially timely under both New York and Oklahoma law, and tolling analysis is accordingly unnecessary. Regardless, the "equitable tolling" doctrine, similar to fraudulent concealment under federal law, tolls the limitations period for Plaintiffs' unjust enrichment claims. *See Indovino v. Tassinari*, 2006 WL 2505232, at *4–5 (E.D.N.Y. Aug. 28, 2006) (applying New York law); *Masquat v. Daimler Chrysler Corp.*, 195 P.3d 48, 54-55 (Okla. 2008) (applying Oklahoma law).[38]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Second Amended Consolidated Class Action Complaint for failure to state a claim should be DENIED.

---

[38] Defendants' contention that the doctrine of self-concealing injury does not apply under New York law is wrong. The case they rely on, *Fertitta v. Knoedler Gallery, LLC*, 2015 WL 374968, at *9 (S.D.N.Y. Jan. 29, 2015) (Oetken, J.), does not address unjust enrichment claims and simply holds that the New York law version of self-concealment applies to claims for fraud but not for breach of warranty. However, claims for unjust enrichment sound in fraud rather than contract. *See State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 103-04 (E.D.N.Y. 2010) (explaining that the six-year limitations period for New York unjust enrichment claims derives from N.Y. C.P.L.R. § 213(8), the section concerning actions "based upon fraud," and not from N.Y. C.P.L.R. § 213(2), the section concerning actions "upon a contractual obligation or liability"). For this reason, courts have held that a claim for New York unjust enrichment may be tolled on the basis of self-concealment. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 135-37 (S.D.N.Y. 2016). Whether or not the doctrine of self-concealment applies under Oklahoma law is irrelevant, because the Oklahoma limitations period begins at the moment of discovery, i.e. April 19, 2017. *See supra.*

Dated: April 21, 2020
White Plains, New York

Respectfully submitted,

LOWEY DANNENBERG P.C.

/s/ *Vincent Briganti*
Vincent Briganti
Christian Levis
Roland R. St. Louis, III
44 South Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: vbriganti@lowey.com
clevis@lowey.com
rstlouis@lowey.com

Charles Kopel
100 Front Street, Suite 520
West Conshohocken, PA 19428
Tel: (215) 399-4770
Fax: (914) 997-0035
Email:  ckopel@lowey.com

*Interim Lead Class Counsel*

Joseph J. Tabacco, Jr.
Todd Seaver
BERMAN TABACCO
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382
Email: jtabacco@bermantabacco.com
tseaver@bermantabacco.com

Patrick T. Egan
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: (617) 542-8300
Fax: (617)542-1194
Email: pegan@bermantabacco.com

Christopher M. Burke
SCOTT+SCOTT
ATTORNEYS AT LAW LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101

Tel.: (619) 233-4565
Fax: (619) 233-0508
Email: cburke@scott-scott.com

Peter A. Barile, III
Thomas K. Boardman
SCOTT & SCOTT
ATTORNEYS AT LAW LLP
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 519-0523
Fax: (212) 223-6334
Email:  pbarile@scott+scott.com
        tboardman@scott-scott.com

Fred T. Isquith
Thomas H. Burt
Betsy S. Manifold
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel.: (212) 545-4600
Email: isquith@whafh.com
        burt@whafh.com
        manifold@whafh.com

Scott Martin
HAUSFELD LLP
33 Whitehall Street
14th Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
Email: smartin@hausfeld.com

Michael D. Hausfeld
Hilary K. Scherrer
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
        hscherrer@hausfeld.com

Michael P. Lehmann
HAUSFELD LLP

51

600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com

Lesley E. Weaver
Matthew S. Weiler
Emily C. Aldridge
BLEICHMAR FONTI & AULD LLP
555 12th Street, Suite 1600
Oakland, CA 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020
Email:  lweaver@bfalaw.com
           mweiler@bfalaw.com
           ealdridge@bfalaw.com

Javier Bleichmar
BLEICHMAR FONTI & AULD LLP
7 Times Square, 27th Floor
New York, NY 10036
Tel.: (212) 789-1340
Fax: (212) 205-3960
Email: jbleichmar@bfalaw.com

Regina M. Calcaterra
CALCATERRA LAW GROUP LLP
1140 Avenue of the Americas,
9th Floor
New York, NY 10036
Tel.: (212) 899-1760
Email: rcalcaterra@calcaterra.law

John Radice
Daniel Rubenstein
RADICE LAW FIRM, P.C.
34 Sunset Blvd.
Long Beach, NJ 08008
Tel.: (646) 245-8502
Fax: (609) 385-0745
Email: jradice@radicelawfirm.com
           drubenstein@radicelawfirm.com

Eric L. Young
SHEPHERD FINKELMAN

MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Tel.: (610) 891-9880
Fax: (866) 300-7367
Email: eyoung@sfmslaw.com

William J. Ban
Michael A. Toomey
BARRACK, RODOS & BACINE
11 Times Square
640 8th Avenue, 10th Floor
New York, NY 10022
Tel.: (212) 688-0782
Fax: (212) 688-0782
Email: wban@barrack.com
         mtoomey@barrack.com

Jeffrey A. Barrack
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838
Email: jbarrack@barrack.com
         jgittleman@barrack.com

*Counsel for Plaintiffs*