UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: MEXICAN GOVERNMENT
BONDS ANTITRUST LITIGATION

18-CV-2830 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs, eight U.S. pension funds, brought this consolidated putative class action

against nine Mexican banks and their affiliates and ten unidentified "John Does."  Plaintiffs

allege that Defendants conspired to manipulate the market for Mexican government bonds,

violating Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and common law unjust

enrichment.

Six defendants ("Moving Defendants") have moved to dismiss this third amended

complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  For

the reasons that follow, the motion is denied.

## I.    Background

The facts and procedural history of this case are described in detail in this Court's prior

---

[1] Moving Defendants are Banco Nacional de México, S.A., Institución de Banca
Múltiple, Grupo Financiero Banamex ("Citibanamex"); Banco Santander (México), S.A.,
Institución de Banca Múltiple, Grupo Financiero Santander México ("Santander Mexico"); Bank
of America México, S.A., Institución de Banca Multiple, Grupo Financiero Bank of America
("Bank of America Mexico"); BBVA México, S.A., Institución de Banca Múltiple, Grupo
Financiero BBVA México ("BBVA Mexico"); Deutsche Bank México, S.A., Institución de
Banca Múltiple ("Deutsche Bank Mexico"); and HSBC México, S.A., Institución de Banca
Múltiple, Grupo Financiero HSBC ("HBMX").

opinions.[2]  Here, the Court recounts the background necessary to resolve the motion before it, as well as the new facts alleged for the first time in the third amended complaint.

### A.    Factual Background

Unless otherwise noted, the facts are drawn from Plaintiffs' third amended complaint (ECF No. 307 ("TAC")) and are presumed true for the purpose of resolving this motion.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 76 (2d Cir. 2015).

### 1.    Mexican government bonds

Plaintiffs are domestic investors and pension funds that "collectively purchased and sold hundreds of millions of dollars' worth of [Mexican government bonds] . . . with Defendants." (TAC ¶¶ 12, 91, 511.)  Mexican government bonds ("MGBs") are a genre of debt security that the Mexican government uses to "raise capital, fund budget deficits, and control Mexico's monetary supply."  (*Id.* ¶ 1.)

The Mexican government sells MGBs to only "an exclusive group" of approved market makers, which the government requires to compete in a competitive auction when the MGBs are released.  (*Id.* ¶ 3.)  From January 1, 2010 to December 31, 2014 (the "Class Period"), the Mexican government gave the MGB market maker status to only nine banks: the six Moving Defendants, two other named defendants that settled their cases in 2020 (Barclays Mexico and JPMorgan Mexico ("Settling Defendants")), and ING Mexico (collectively the "Market Makers").  (*Id.* ¶ 3; ECF Nos. 273, 274; ECF No. 325 ("Opp.") at 14.)  The Market Makers would then turn around and sell the MGBs on the secondary market to customers, including

---

[2] *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380 (S.D.N.Y. 2019) (ECF No. 158) ("*MGB I*"); *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830, 2020 WL 7046837 (S.D.N.Y. Nov. 30, 2020) (ECF No. 222); *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830, 2022 WL 950955 (S.D.N.Y. Mar. 30, 2022) (ECF No. 278).

Plaintiffs.  (TAC ¶¶ 3-4.)  Because of this exclusive access to the primary market, the Market

Makers "control an overwhelming majority of the MGB supply available in the United States."

(*Id.* ¶ 295.)  For one type of MGB, the six Moving Defendants and two Settling Defendants

"controlled approximately 90% of the total number" of the bonds sold at auction; for another

type, they controlled 70%.  (*Id.* ¶ 327.)

MGBs are usually distributed in the primary market at the Mexican government's

"regularly scheduled auctions" where Market Makers, "as the exclusive government-approved"

middlemen, submit bids for the amount of MGBs they intend to buy and the price they are

willing to pay.  (*Id.* ¶¶ 296-97.)

Market Makers then participate as intermediaries in the secondary market, where they

both sell MGBs to customers and buy them back again.  (*See id.* ¶¶ 323, 464-66.)  The margin

between a Market Maker's bid price they quote to customers looking to sell MGBs in the

secondary market and the price at which they sell MGBs to customers (the "ask" price) is known

as the "bid-ask spread."  (*Id.* ¶ 323.)  "Wider bid-ask spreads, therefore, result in greater profits

because Defendants can buy MGBs at a lower price from their customers and sell those bonds to

others for more money."  (*Id.* ¶ 467.)

### 2.    Alleged Conspiracy

While Plaintiffs' previous complaints alleged that Defendants rigged auctions in the

primary MGB market from 2006 to 2017,[3] the third amended complaint both "streamlines the

Class Period and focuses on Defendants' anticompetitive conduct in the secondary market

(where Defendants trade MGBs with Plaintiffs and other investors)."  (Opp. at 18.)  Plaintiffs

now allege that, between 2010 to 2014, Defendants conspired to manipulate the MGB secondary

---

[3] *See* ECF No. 1 at 4, 50-51; ECF No. 75 at 4, 69-71; ECF No. 163 at 4, 124-26.

market in two main ways.  First, they allege that Defendants worked together to sell the MGBs

they purchased in the primary auction "at artificially higher prices" to investors.  (TAC ¶ 460.)

Second, they allege that Defendants conspired to "fix the bid-ask spread artificially wider in

MGB transactions."  (*Id.*)  "Absent collusion, dealers will compete against each other by offering

'narrower' (i.e. smaller) [bid-ask] spreads to customers."  (*Id.* ¶ 466.)  However, by colluding on

both the bid price and the ask price, Plaintiffs allege that Defendants were able to widen their

bid-ask spreads, "result[ing] in greater profits because Defendants can buy MGBs at a lower

price from their customers and sell those bonds to others for more money."[4]  (*Id.* ¶ 467.)

        To support their claims, Plaintiffs rely on (i) dozens of chatroom transcripts showing

electronic communications between Defendants' employees, (ii) statistical data purportedly

graphing the economic impact of Defendants' conspiracy, and (iii) the outcome of investigations

by two Mexican government regulators.[5]

### i.    Chatroom transcripts

        Plaintiffs have added to their complaint dozens of excerpts from "permanent interbank

---

        [4] Because both of these alleged conspiracies rely on artificially setting MGB prices (both the selling price and the purchasing price), the Court refers to both schemes generally as "price fixing."

        [5] Plaintiffs also cite the frequent lateral movement of MGB traders between financial institutions, including Defendants, and the imposition of fines in other, unrelated regulatory investigations against Defendants.  (TAC ¶¶ 11, 342-54, 479, 482, 501.)  The Court has already rejected both categories of evidence.  *MGB I*, 412 F. Supp. 3d at 391.  Horizontal mobility in a market may indicate the opportunity to share confidential information, but "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred."  *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).  And allegations of wrongdoing in other markets should not be considered in unrelated anti-trust claims.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting similar "if it happened there, it could have happened here," reasoning); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 661-62 (S.D.N.Y. 2016) (refusing to consider evidence of regulatory investigations in other precious metals markets for an antitrust claim about price fixing in the gold market).

chatrooms,"[6] involving at least one employee from each Moving Defendant.[7] (*See id.*

¶¶ 415-54.) These chats range from December 15, 2010, to November 6, 2013 (*id.* ¶¶ 415, 449)

and include:[8]

- **December 15, 2010**
  - Barclays Mexico [Adolfo Estrada]: Now sell the nov38. Raise it.
  - Deutsche Bank Mexico [Jorge Clasing]: Yeah. (*Id.* ¶ 415.)
- **March 24, 2011**
  - BBVA-Bancomer [Enrique de la Torre]: How are you?
  - JPMorgan Mexico [Pablo Limon]: All Good with the very positive market.
  - BBVA-Bancomer [Enrique de la Torre]: can I feel that positivism? What am I missing?
  - JPMorgan Mexico [Pablo Limon]: Only for you pls, we saw foreigners buying in the long part. Big. Pls only for you.
  - BBVA-Bancomer [Enrique de la Torre]: 1,000? I imagine[].
  - JPMorgan Mexico [Pablo Limon]: Much more, can't give details. (*Id.* ¶ 418.)
- **July 15, 2011**
  - Barclays Mexico [Adolfo Estrada]: sell me 16's [BONOs maturing in 2016] bro. Hahaha.
  - Bank of America Mexico [Manuel Perez]: I don't have any.
  - Barclays Mexico [Adolfo Estrada]: If you are short help me to raise it [yields] for a bit.
  - Bank of America Mexico [Manuel Perez]: hahaha. I'm very short.
  - Barclays Mexico [Adolfo Estrada]: No then let's raise it bro. Really with the syndication next week they don't have any reason to be this low.
  - Bank of America Mexico [Manuel Perez]: I agree. Recommend to the gringos to buy 18s [BONO maturing in 2018] sell those m*thers [BONO maturing in 2016].
  - Barclays Mexico [Adolfo Estrada]: Yes I will do that.
  - Bank of America Mexico [Manuel Perez]: This way I help you.
  - Barclays Mexico [Adolfo Estrada]: Help me in the 16 and I help you in the 18.
  - Bank of America Mexico [Manuel Perez]: Ok. At valuation. There it is. (*Id.* ¶ 425.)
- **February 2, 2012**

---

[6] Plaintiffs explain that these transcripts, which were not excerpted in their first two complaints, were obtained from Settling Defendants "as part of [their] settlement agreements." (Opp. at 17.)

[7] Plaintiffs allege that "several of Defendants' traders formed a group that they referred to as the 'hamster squad,'" but the third amended complaint does not identify exactly which traders were a part of this group. (*See id.* ¶ 414.)

[8] The Court does not include all of the transcript excerpts from the third amended complaint, but rather selects the chats with the clearest connection to the alleged conspiracy. Emphasis is omitted.

- o   Barclays Mexico [Adolfo Estrada]: I'm buying at 42
- o   Deutsche Bank Mexico [Jorge Clasing]: Ok. I'm in brother, I'm in. We make money and take care of ourselves.
- o   Barclays Mexico [Adolfo Estrada]: good, brother. Good teamwork. (*Id.* ¶ 7.)
- **September 21, 2012**
  - o   Citibanamex [Javier Gonzalez]: how do you see it. I mean it's only if it works for you to lower you a little. And I won't go out to var or anything. Do you like it.
  - o   JPMorgan Mexico [Gonzalo Rivas]: ok. Thanks a lot.
  - o   Citibanamex [Javier Gonzalez]: and we see if it goes down and you have the other 50 at 70 how do you see it. I won't hinder you I won't even put prices. . . . do you know what happens that if the flow comes this will stay unfunded but here I will let you know what is happening.
  - o   JPMorgan Mexico [Gonzalo Rivas]: of course. Where I'm going is that if you lower it you destroy me. Right now.
  - o   Citibanamex [Javier Gonzalez]: not at all bro what happened. I will not even touch it.
  - o   JPMorgan Mexico [Gonzalo Rivas]: thank you very much my javi. If you want to lower it you know that I will purchase them from you.
  - o   Citibanamex [Javier Gonzalez]: not to you let me know what is going on. Yes of course. Come brother. When you finish I will get in. I'll put bid at 74 not to hinder.
  - o   JPMorgan Mexico [Gonzalo Rivas]: let's wait for the closing do you agree . . . . of the 72 you do not worry that from here to the closing it does not go up. . . . really bro we have to trust. Here we are many if one says we have to raise I have to raise." (*Id.* ¶¶ 437-38.)
- **April 18, 2013**
  - o   Citibanamex [Javier Gonzalez]: ok, we'll attack as the day progresses.
  - o   JPMorgan Mexico [Gonzalo Rivas]: it's all going to be flows. We'll monitor each other if we see anything, ok? I'm at the anchor to keep it working jun-16 [BONO maturing in June 2016].
  - o   Citibanamex [Javier Gonzalez]: awwww. The pilar sure bro. I will also let you know if I see anything. . . .
  - o   Citibanamex [Javier Gonzalez]: no fucking way bro. An offshore is asking me 400 from 22 [BONO maturing in 2022. I put 63-61 and he did nothing to me. TO THE ATTACK! MY COCO. (*Id.* ¶ 419.)
- **July 9, 2013**
  - o   Deutsche Bank Mexico [Gerardo Frias]: Tell me where the cheese is and in which side. Because I need it today. . . .
  - o   HSBC Mexico [Manuel Abello]: The meat is in the 27 [BONO maturing in 2027].
  - o   Deutsche Bank Mexico [Gerardo Frias]: Should I buy it?
  - o   HSBC Mexico [Manuel Abello]: Wait, I'll give you the entrance. (*Id.* ¶ 416.)
- **August 1, 2013**
  - o   Santander Mexico [Pablo Limon]: WHAT DO YOU LIKE?
  - o   JPMorgan Mexico [Gonzalo Rivas]: 24s [MBONOS maturing in 2024] for sale and for sale on the market in 24.
  - o   Santander Mexico [Pablo Limon]: OK
  - o   JPMorgan Mexico [Gonzalo Rivas]: yesterday they lifted 150 mio USD plus 50mio

more on the 23rd and today another 80 mio USD all in. Total taken [w]as 3000.

o <u>Santander Mexico [Pablo Limon]</u>: YES, I'M GOING TO BUY SOME. (*Id.* ¶ 445.)

### ii.    Statistical Evidence

Plaintiffs have re-alleged two kinds of statistical evidence originally included in their amended complaint (*compare* ECF No. 75 ¶¶ 317-31 *with* TAC ¶¶ 460-73), and which the Court has already discussed in greater detail in its 2019 opinion, *see MGB I*, 412 F. Supp. 3d at 384-86.

To briefly summarize, Plaintiffs first provide statistical evidence that shows the increase in price of MGBs after the auctions in the primary market. (TAC ¶¶ 461-463 figs. 1-4.) Plaintiffs allege that these changes show that Defendants sold the MGBs they had obtained in the primary market at artificially inflated prices. (*Id.* at 136.) Plaintiffs include four graphs that compare the average normalized price of four different types of MGBs both before the announcement of auction results and after, in thirty-minute increments. (*Id.* at 137-39, figs. 1-4.) Plaintiffs also compare auction days to non-auction days across the same time span. (*Id.*)

Second, Plaintiffs provide a graph of the median bid-ask spread of Defendants during the class period (2010 to 2014) as compared to the four years afterwards (2015 to 2019). (*Id.* at 140, fig. 5.) This graph shows an increase in the bid-ask spread across one particular type of MGB. (*Id.*) Plaintiffs allege that these data show that Defendants charged wider bid-ask spreads than would occur in a competitive market. (*Id.* ¶¶ 464-73.)

### iii.    Regulatory Investigations

Finally, Plaintiffs cite two regulatory investigations into Moving Defendants for anticompetitive misconduct in the MGB secondary market. On April 19, 2017, Mexico's antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE") announced an investigation into "price-fixing and collusion in the 'government bond intermediation market.'" (TAC ¶ 355.) Shortly thereafter, Mexico's securities and banking regulator, Comisión

Nacional Bancaria y de Valores ("CNBV") "began its own parallel investigation" into this alleged anti-competitive misconduct.  (*Id.* ¶ 369.)  On October 14, 2019, COFECE's investigative chief announced that the regulator's investigation "found evidence of collusion to manipulate MGB prices during a span of ten years."  (*Id.* ¶ 398.)

The third amended complaint includes new information about COFECE's findings, which were made public in early 2021.[9]  (*Id.* ¶ 5.)   Though Plaintiffs note that "large portions" of COFECE's final resolution "remain redacted from public view" (*id.* ¶ 6), the public press release states that the regulator fined Moving Defendants Citibanamex, Santander Mexico, Bank of America Mexico, BBVA Mexico, and Deutsche Bank Mexico; Settling Defendants, Barclays Bank Mexico and JPMorgan Mexico; and eleven traders, "a total of 35 million 75 thousand Mexican pesos" for "anticompetitive practices, carried out between 2010 and 2013."[10]  The press release goes on to say:

> [The fines are implemented] because they colluded in some operations of the secondary market for the service of intermediation of debt securities issued by the Mexican government.  To this end they exchanged messages (chats) using technological communication platforms that banks hire as work tools.

---

[9] ECF No. 313 at 19 & n.11 (citing Press Release, *COFECE Sanctions Banks and Natural Persons Who Established Illegal Agreements in the Secondary Market for the Intermediation of Government Debt Securities* (Jan. 25, 2021), https://www.cofece.mx/wp-content/uploads/2021/02/COFECE-001-2021_English.pdf).

In ruling on a motion to dismiss, courts "may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint."  *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir.2005); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015) (taking judicial notice of "fines levied by regulators in three countries against six Defendants" in determining whether plaintiffs adequately pleaded claims arising under Sections 1 and 3 of the Sherman Act). Though Plaintiffs do not attach this press release to their third amended complaint, they heavily rely on its existence and the information included in it as a basis for their claims.  (*See* TAC ¶¶ 5, 399-406.)

[10] *See* Press Release, *supra* n.9.

8

The Commission proved . . . that the aforementioned banks and traders established 142 agreements contrary to the Federal Economic Competition Law (LFCE, per its acronym in Spanish), to manipulate prices, establish the obligation to not commercialize and/or acquire certain government securities in specific transactions (not general agreements), which had a direct impact on the price of the related instruments in said transactions of the secondary market.[11]

In 2017, the CNBV also fined Moving Defendants BBVA Mexico, Citibanamex, and Deutsche Bank Mexico; Settling Defendant Barclays Bank Mexico; Credit Suisse; and individual traders and for "simulating bond trades to pump up volumes," though the CNBV allegedly "did not find evidence of price manipulation."[12]  (TAC ¶ 369.)

### B.    Procedural History

This case was originally filed in 2018, and thus its procedural history is lengthy. Applicable to this motion, Plaintiffs filed their third amended complaint on June 12, 2024. (TAC.)  Moving Defendants moved to dismiss (ECF No. 312) and filed a supporting memorandum (ECF No. 313 ("Mem.")) on July 29, 2024, and HBMX filed a supplemental memorandum (ECF No. 315).  Plaintiffs opposed the motion on September 13, 2024 (Opp.), and Moving Defendants replied in support of their motion on October 14, 2024 (ECF Nos. 329, 330).

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

[11] *See* Press Release, *supra* n.9.

[12] ECF No. 313 at 20 & n.12 (citing Michael O'Boyle, *Mexico Fines Global Banks for Inflating Bond Trading Volumes*, Reuters (Nov. 14, 2018), https://www.reuters.com/article/markets/us/mexico-fines-global-banks-for-inflating-bond-trading-volumes-idUSL2N1XO22J/).

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint will be dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In ruling on a motion to dismiss, the Court must accept the plaintiff's factual allegations as true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

## III.    Discussion

Defendants contend that Plaintiffs fail to state a claim under the Sherman Act or common law because (1) Plaintiffs have failed to allege a plausible antitrust conspiracy, (2) Plaintiffs lack antitrust standing, (3) Plaintiffs fail to adequately allege unjust enrichment, and (4) most claims are time barred. (Mem. 13-14.) The Court addresses each argument in turn.

### A.      Antitrust Conspiracy

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. "Horizontal price-fixing conspiracies among competitors are unlawful *per se*, that is, without further inquiry." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016). To determine the existence of such a conspiracy, "[t]he crucial question [is] . . . whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quotation marks omitted).

Whether or not the allegations support the formation of an anticompetitive "agreement" is a question of law for the Court to decide at the motion to dismiss stage. *See id.* at 135-36. Plaintiffs may survive a motion to dismiss by "alleg[ing] enough facts to support the inference that a conspiracy actually existed," *id.* at 136, by providing either (1) "direct evidence" of a conspiratorial agreement or (2) evidence of defendants' "parallel conduct" combined with

10

so-called "'plus factors' that provide a basis to infer that a conspiracy arose." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024) ("*Treasuries*") (quoting *Citigroup*, 709 F.3d at 136).

Here, Plaintiffs allege that the dozens of chatroom conversations between Defendants' traders, including agreements to fix prices, constitute direct evidence.  Direct evidence must be "explicit" rather than pieced together through inferences.  *Treasuries*, 92 F.4th at 391 (quotation marks omitted).  Examples of direct evidence include "a recorded phone call in which two competitors agreed to fix prices at a certain level, or an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price."  *Id.* (cleaned up).  "Direct evidence may also include transcripts of [chatroom] communications between competitors."  *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-CV-2601, 2023 WL 11646009, at *6 (S.D.N.Y. Sept. 25, 2023); *see also In re GSE Bonds Antitrust Litig.*, No. 19-CV-1704, 2019 WL 5791793, at *3 (S.D.N.Y. Oct. 15, 2019) ("*GSE Bonds I*") (holding that chatroom transcripts which included two traders "sharing pricing information" was "direct evidence plausibly linking [defendants] to the established price-fixing conspiracy"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 590-91 (S.D.N.Y. 2015) (holding that chatrooms and instant messages where "market-sensitive information" was shared with rivals "including price-information, customer information and their net trading positions" were direct evidence (quoting *Citigroup*, 709 F.3d at 136)).

Even with the market slang used by Defendants' traders in the chatroom transcripts quoted by Plaintiffs, direct agreements to price fix are clear.[13]  In several of these chats, traders

---

[13] These explicit agreements to price-fix are what differentiate this case from *Treasuries*. There, the Second Circuit held that five chatroom transcript excerpts over the course of one year where traders were sharing "innocuous market shop-talk" did not qualify as direct evidence of an

explicitly agreed to raise the price of MGBs.  On December 15, 2010, Barclays Mexico's trader told Deutsche Bank Mexico's trader "Now sell the nov38.  Raise it,"[14] to which the Deutsche Bank Mexico trader responded, "Yeah."  (TAC ¶ 415.)

 On July 15, 2011, Barclays Mexico's trader told Bank of America's trader, "If you are short help me to raise it [yields] for a bit. . . . No then let's raise it bro.  Really with the syndication next week they don't have any reason to be this low," to which the Bank of America trader responded:  "I agree.  Recommend to the gringos to buy 18s sell those m*thers."  (*Id.* ¶ 421 (alteration in original).)  The traders then agreed to "help" each other fix the price of two different MGBs.  (*Id.*)

On September 12, 2012, JPMorgan Mexico's trader told Citibanamex's trader:  "Where I'm going is that if you lower it you destroy me.  Right now."  (*Id.* ¶ 437.)  Citabanamex's trader responded, "not at all bro . . . . I will not even touch it."  (*Id.*)  JPMorgan Mexico's trader thanked him, ending their conversation, "let's wait for the closing do you agree . . . of the 72 you do not worry that from here to the closing it does not go up. . . . really bro we have to trust.  Here we are many if one says we have to raise I have to raise."  (*Id.* ¶¶ 437-38.)

On July 9, 2013, Deutsche Bank's trader told HBMX's trader:  "Tell me where the cheese is and in which side.  Because I need it today. . . ."  (*Id.* ¶ 416.)  HBMX's trader responded:  "The meat is in the 27 [MGB maturing in 2027]. . . . Wait, I'll give you the

---

agreement.  92 F.4th at 394-96.  However, those transcripts showed no evidence of explicit agreements to raise prices, unlike the transcripts in this case.  *See id.* at 394.

[14] Plaintiffs state that this abbreviation stands for a certain type of MGB that matures in November of 2038.  Opp. at 21.  Defendants do not challenge this interpretation.  The Court finds this reading plausible and adopts it for this term and the similar ones that follow, making reasonable inferences in favor of the Plaintiffs.

entrance." (*Id.*)[15]

These excerpts read as explicit agreements between Defendants to raise the price of certain MGBs in concert.[16]  Plaintiffs have thus met their burden at this stage to adequately allege the existence of a conspiracy in violation of the Sherman Act.

### B.    Antitrust Standing

Defendants argue, alternatively, that Plaintiffs lack standing to bring an antitrust suit. (Mem. at 39.)  "To establish antitrust standing, a plaintiff must show (1) antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors."  *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 258-59 (2d Cir. 2023) (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021) ("*Schwab II*")).

### 1.    Antitrust Injury

By plausibly alleging Defendants' horizontal price fixing during the Class Period—when Plaintiffs purchased MGBs and paid more for the bonds than they would have in a competitive market—Plaintiffs have adequately alleged antitrust injury.  "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they

---

[15] Similar transcript excerpts include traders from BBVA Mexico and Santander Mexico, thus connecting the conspiracy to all Moving Defendants.  (*See* TAC ¶¶ 418, 435, 445, 446.)

[16] Because the Court has found evidence of direct agreements, it need not determine the existence of parallel conduct or adequate "plus factors," such as the outcome of COFECE and CNBV's investigations, which are required in cases without direct agreements.  *See Citigroup*, 709 F.3d at 136-37; *see also In re European Gov. Bonds Antitrust Litig.*, 2023 WL 11646009, at *8 ("As the Court is persuaded that here the chatroom logs suffice as direct evidence of a conspiracy at the pleading stage under the plausibility standard, it need not engage in the analysis of conscious parallelism and plus factors.").  Thus, HBMX's argument in its supplemental memorandum that dismissal is warranted in its case, given that COFECE did not end up fining the bank, is unavailing.  (ECF No. 315.)

suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (holding that plaintiffs, who were "purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct," adequately pleaded antitrust injury).

In addition to the chatroom transcripts discussed above, which show Defendants' traders agreeing to artificially raise the price on certain MGBs and collude on the bid-ask spread, Plaintiffs also provide statistical evidence of an increase in the median bid-ask spread on various MGBs during the Class Period compared to the five years afterwards. (TAC at 140, fig. 5.) By virtue of eight of the nine Market Makers agreeing to charge more for MGBs and buy them back for less, Defendants caused Plaintiffs to pay more for MGBs and gain back less upon resale than they would have in a truly competitive market. Plaintiffs allege that they "collectively purchased and sold hundreds of millions of dollars' worth of MGBs in the United States during the Class Period with Defendants." (*Id.* ¶ 511.) And they attach an accounting of dozens of those transactions to the third amended complaint, chronicling the many times when Plaintiffs paid more for MGBs or sold them back for less than they would have in a competitive market. (*See* ECF No. 307-2.)

Plaintiffs have thus "identified an illegal anticompetitive practice (horizontal price-fixing), have claimed an actual injury placing [plaintiffs] in a worse position as a consequence of the [defendants'] conduct, and have demonstrated that their injury is one the antitrust laws were designed to prevent." *Gelboim*, 823 F.3d at 775 (quotation marks omitted). That is all that is required to "plausibly allege[] antitrust injury." *Id.*

### 2.    Efficient Enforcer

Plaintiffs have also adequately alleged facts that satisfy the four factors required to be an "efficient enforcer" of antitrust law.  *Schwab II*, 22 F.4th at 112.  These factors include:

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*Platinum*, 61 F.4th at 259 (quoting *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021)).

First, Plaintiffs have alleged direct injury caused by Defendants' price fixing:  They purchased MGBs from and resold them to Defendants during the Class Period, paying more for the bonds and collecting less upon resale than they would have in a competitive market.  (TAC ¶ 511; ECF No. 307-2.)  Second, Defendants have not identified a better class to "vindicate the public interest in antitrust enforcement" than a group of Plaintiffs that "collectively purchased and sold hundreds of millions of dollars' worth of MGBs in the United States during the Class Period with Defendants."[17]  (*Id.* ¶ 511.)  Third, Plaintiffs' claims are not impermissibly speculative.  They have identified a specific horizontal price-fixing conspiracy within a narrow

---

[17] Defendants assert that Plaintiffs did not trade in one specific subset of MGB, "Bondes D," and thus "parties that actually traded those bonds would be better enforcers."  (Mem. at 44.) However, Defendants do not identify any party that has actually come forward to do so within the statutory time limit (which Defendants also argue has now passed).  (*See* Mem. at 51.) Further, though Plaintiffs have not asserted any specific transactions involving Bondes D specifically, the conspiracy to price fix across MGBs impacts all identified subsets of those bonds.  Thus, the Court is confident that Plaintiffs (and possibly future class members who did purchase Bondes D) will be efficient enforcers of antitrust law in this collective scheme.  *See Sullivan v. Barclays PLC*, No. 13-CV-2811, 2017 WL 685570, at *8 (S.D.N.Y. Feb. 21, 2017) ("Because any injury suffered by those who transacted in [a certain type of interest rate derivatives] 'flowed from' the same conduct and the same parties who allegedly caused injury to plaintiffs, the Court concludes that plaintiffs have alleged class standing on behalf of those who transacted in [those derivatives].").

market controlled by a small number of financial institutions.  Plaintiffs have kept detailed

records of their MGB transactions with Defendants (see ECF No. 307-2) and have statistical data

documenting difference in bid-ask spread between the Class Period and in a competitive market

(TAC at 140, fig. 5).  Thus, while "'damages calculation might be complicated,' the damages are

not so speculative as to weigh against antitrust standing in this case." *Platinum*, 61 F.4th at 262

(quoting *Apple Inc. v. Pepper*, 587 U.S. 273, 286 (2019)).  And fourth, Defendants have not

identified any material concerns about complex apportionment or duplicative recovery, beyond

what is "within judicially manageable limits."[18]  *See Schwab II*, 22 F.4th at 119.  Ultimately, by

satisfying all four efficient enforcer requirements, Plaintiffs are well situated "to perform the

office of a private attorney general and thereby vindicate the public interest in antitrust

enforcement." *Gelboim*, 823 F.3d at 780 (cleaned up).

Plaintiffs have shown that they experienced an antitrust injury and that they are the

proper parties to bring this enforcement suit.  Thus, they have established antitrust standing.

## C.    Unjust Enrichment

Defendants also move to dismiss Plaintiffs' unjust enrichment claims.  A claim for unjust

enrichment under New York law requires a showing that "(1) the other party was enriched, (2) at

that party's expense, and (3) that it is against equity and good conscience to permit the other

party to retain what is sought to be recovered." *Columbia Mem'l Hosp. v. Hinds*, 38 N.Y.3d 253,

275 (N.Y. 2022) (cleaned up).  "The 'essence' of such a claim 'is that one party has received

---

[18] Defendants argue that Plaintiffs should not be able to proceed with any claims that "aris[e] out of trades with non-defendants, otherwise known as 'umbrella claims.'"  (Mem. at 45.)  However, Plaintiffs were directly impacted parties who did transact (frequently) with Defendants, and thus do not trigger the "umbrella standing" concern of "third parties" that transacted with "a non-cartel member" and then attempted to bring an antitrust suit "against cartel members who rigged the market as a whole."  *See Schwab II*, 22 F.4th at 117.

money or a benefit at the expense of another.'"  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.

2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 381 (4th Dep't

1999)).

Defendants first argue that, should the Court dismiss Plaintiffs' antitrust claims, it must

necessarily dismiss their unjust enrichment claims.  (Mem. at 49.)  But the Court has already

determined that Plaintiffs have adequately pleaded their antitrust claims, and that Plaintiffs have

presented adequate evidence that they were paying higher prices for MGBs and reselling them

for less than they otherwise would have in a competitive market.  *See supra* Section III.A.

Further, "equity and good conscience" would certainly "militate against" permitting Defendants

engaged in a horizontal price-fixing cartel from retaining the monetary benefits they extracted

from running this illegal scheme.  *Columbia Mem'l Hosp.*, 38 N.Y.3d at 275.

Defendants counter that an unjust enrichment claim is barred here because there is a

contractual relationship between Plaintiffs and Defendants, and the terms of the contract must

override such claim.  (Mem. at 49.)  But "[t]he predicate for dismissing quasi-contract claims is

that the contract at issue clearly covers the dispute between the parties."  *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 630 (S.D.N.Y. 2013) (quotation marks

omitted).  And while investment contracts must have existed between Plaintiffs and Defendants

for the MGBs exchanged, such contracts would not "clearly cover the subject matter now at

issue," that is, whether Defendants were permitted to collude on MGB resale prices in the

secondary market.  *See id.* (cleaned up).

Defendants' motion is thus denied with respect to the unjust enrichment claims.

## D.    Timeliness

Finally, Defendants argue that "all but seven months' of Plaintiffs' purported class period

is not actionable [because] all claims before March 30, 2014 are time-barred."  (Mem. at 51.)

Though private antitrust claims are "forever barred unless commenced within four years after the cause of action accrued," 15 U.S.C. § 15b, Plaintiffs contend that the statute of limitations was tolled due to Defendants' fraudulent concealment.  (Opp. at 55.)

"[T]he Sherman Act's four-year time bar can be equitably tolled only in rare and exceptional circumstances.  One such circumstance is where the plaintiff can demonstrate fraudulent concealment." *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 603 (2d Cir. 2024) (cleaned up).  To adequately allege fraudulent concealment, "an antitrust plaintiff must establish: (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *Id.* (quotation marks omitted).  Further, "[t]he plaintiff must plead the fraudulent concealment with particularity, in accordance with Federal Rule of Civil Procedure 9(b)." *Id.*  However, "because resolution of a claim of fraudulent concealment is intimately bound up with the facts of the case, it often cannot be decided at the motion to dismiss stage." *In re Commodity Exch., Inc.*, 213 F.Supp.3d 631, 675 (S.D.N.Y. 2016) (quotation marks omitted).

As for Plaintiffs' unjust enrichment claims, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of actions accrued." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir.1998).  But even assuming Plaintiffs' claims arose in the states and territory where they are based, those courts toll statutes of limitations for fraudulent concealment when plaintiffs allege elements either mirroring this Circuit's requirements or, in the case of Massachusetts, less onerous to

plaintiffs.[19]

### 1.    Concealment

"To plead concealment, the plaintiff can either: (1) identify affirmative steps taken by the defendant to conceal the plaintiff's claim; or (2) show that the defendant's misconduct was inherently self-concealing." *Phhhoto Inc.*, 123 F.4th at 604-05 (cleaned up).

A price-fixing conspiracy is "inherently self-concealing." *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-CV-2601, 2020 WL 4273811, at *10 (S.D.N.Y. July 23, 2020) ("*EGB I*") (quoting *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, No. 00-CV-7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004). But, as the Second Circuit pointed out in a bid-rigging conspiracy, "[i]n order to endure, [the conspiracy] must remain concealed from the victim of the collusive bids." *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1084 (2d Cir. 1988).

This conspiracy was conducted entirely through private conversations to which Plaintiffs would not have been privy. Further, Defendants' traders' own chats indicate their intent to keep the scheme secret. On November 6, 2013, a trader from Barclays Mexico told a Deutsche Bank Mexico trader: "Brother I have to get out of the chats with other banks, I'm going to leave this chat permanently. Let me make it clear that it has nothing to do with you, don't think badly of me. . . . It is because of BARCAP EM markets internal compliance." (TAC ¶ 449.) Deutsche Bank's trader replied: "There is no problem," to which Barclays' trader responded: "Write my cell number down you fool." (*Id.*) This conversation indicates that as soon as an internal control

---

[19] *See Masquat v. DaimlerChrysler Corp.*, 195 P.3d 48, 54-55 (Okla. 2008) (enumerating the elements of fraudulent concealment under state common law: concealment, notice, and reasonable diligence); *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 248-49 (Pa. 2021) (same); *Gerald v. R.J. Reynolds Tobacco Co.*, 67 V.I. 441 (V.I. Super. 2017) (same); *Simcuski v. Saeli*, 44 N.Y.2d 442, 448, 454 (N.Y. 1978) (same); *Hays v. Ellrich*, 31 N.E.3d 1064, 1073-74 (Mass. 2015) (applying an "actual knowledge" standard and rejecting inquiry notice when a seller of securities "owes a fiduciary duty to the purchaser" under state statute).

measure was implemented that could implicate the privacy of the chatrooms, traders engaged in this conduct looked for ways to further conceal their private, illicit dealings.

Defendants argue that their actions were not concealed because analysis of the publicly available market data Plaintiffs identified in their amended complaint would have revealed that anticompetitive conduct was at play. (Opp. at 55.) But even assuming that sufficient public data were available to compare price trends in the MGB market during the Class Period versus before or afterwards, "requiring potential plaintiffs to conduct exhaustive statistical analysis of millions of transactions, just on the off chance that it would reveal some suspicious behavior, would be absurd." *GSE Bonds I*, 396 F. Supp. 3d at 367-68. Putting such an onerous standard on potential antitrust plaintiffs would seriously threaten the viability of antitrust law, and the Court declines to do so.

Thus, Plaintiffs have adequately alleged concealment.

### 2. Lack of Notice

Plaintiffs must next establish that they remained ignorant of their cause of action "until some point within four years of the commencement of [their] action." *Phhhoto Inc.*, 123 F.4th at 606-07 (quotation marks omitted). "This element is not met, and the plaintiff's claim of fraudulent concealment is defeated, if the plaintiff . . . had either: (1) actual notice, or (2) inquiry notice of the facts giving rise to its claim, and thereafter failed to inquire." *Id.* at 607 (quotation marks omitted).

Defendants allege that Plaintiffs had, at minimum, inquiry notice "at least as early as October 2013." (Mem. at 56.) Defendants explain that because of a citation in Plaintiffs' original complaint that referenced sanctions "against two Defendants for engaging in 'collusion and anticompetitive behavior' with respect to" a particular kind of MGB, Plaintiffs were on notice of their cause of action. (*Id.*)

"The standard for inquiry notice is objective, imputing knowledge to the plaintiff where 'storm warnings' would cause a person of ordinary intelligence to consider it probable that the defendant had engaged in wrongdoing." *Phhhoto Inc.*, 123 F. 4th at 607 (cleaned up).  To warrant dismissal of a complaint, "there must be uncontroverted evidence clearly demonstrating when the plaintiff should have discovered the challenged conduct." *Id.* (cleaned up).

Defendants have not met their burden here.  The article they cite mentioning CNBV sanctions against two Defendants stemmed from a conspiracy with several non-Defendant banks in 2008.[20]  Such reporting about a past anticompetitive conspiracy, with largely different key players, and in a single subset of MGBs, does not suffice to have put Plaintiffs on notice about the conspiracy they allege took place from 2010 to 2014.  And, Plaintiffs rightfully point out, this very article states that the sanctions were implemented "to prevent a similar situation from occurring in the future."  (Opp. at 58 (emphasis omitted).)  In fact, if Plaintiffs were closely tracking the outcome of the 2008 conspiracy investigation, the fines implemented in 2013 against two of Defendants could have had the impact of deterring Plaintiffs from probing into a possible second MGB conspiracy so close on the heels of the first.  It would be entirely reasonable for investors to assume that financial institutions fined for anticompetitive misconduct would start abiding by the law after such a public admonition and financial penalty.

Plaintiffs state that they first had notice of this conspiracy on April 19, 2017, after COFECE announced that it had obtained evidence of "price-fixing and collusion in the 'government bond intermediation market.'"  (TAC ¶ 355.)  Such public announcement by a key regulator in the field is the kind of "red flag" or "storm warning" courts in this Circuit look for in

---

[20] *CNBV multa con 39 mdp a instituciones financieras*, EL FINANCIERO (Nov. 1, 2013), http://www.elfinanciero.com.mx/archivo/cnbv-multa-con-39-mdp-a-instituciones-financieras.

determining inquiry notice.  *See Phhhoto Inc.*, 2024 WL 5049375, at *10-13.  But because

COFECE's announcement was within the four-year period before Plaintiffs commenced this suit,

Plaintiffs have adequately alleged this element.

### 3.    Reasonable Diligence

Defendants argue that Plaintiffs failed to conduct due diligence by conducting their own

investigation after the Mexican press published articles in 2013 about the CNBV's investigation

into two Defendants for misconduct in a different federal bond market.  This, Defendants

contend, coupled with "dramatic" changes in MGB prices and bid-ask spreads, should have put

Plaintiffs on alert to investigate further.   (Mem. at 57.)

"As an initial matter, [the plaintiff] must have been on inquiry notice of some illegality

before having a responsibility to respond with reasonable diligence."  *Merced Irrigation Dist. v.*

*Barclays Bank PLC*, 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016).  And while a plaintiff "cannot

simply rest on the allegedly self-concealing nature of the conspiracy," ignoring the due diligence

element, "a plaintiff's failure to exhaustively turn over every stone that might conceal illicit

conduct would not foreclose a finding of fraudulent concealment if the relevant facts and

circumstances indicate that such efforts would be impractical or fruitless."  *EGB I*, 2020 WL

4273811, at *11.

Plaintiffs have alleged that they "monitor[ed] their investments and regularly follow[ed]

financial media," but that there was no way for them to uncover this particular scheme "until

April 19, 2017 when COFECE disclosed that it had found evidence of anticompetitive conduct

by dealers in the MGB market."  (TAC ¶ 529.)  The Court agrees that Plaintiffs were not on

inquiry notice until the Mexican regulators announced their investigations in this particular

conspiracy, rather than, as Defendants allege, the CNBV's 2013 announcement about a different

anticompetitive conspiracy.  Given that Plaintiffs commenced this suit less than a year after

COFECE's announcement (*see* ECF No. 1), they acted sufficiently quickly and diligently to investigate their own claims after that point.

Ultimately, as the Second Circuit has recently pointed out, "the allegations concerning [plaintiff's] diligence," and all other allegations in the complaint, "can be disputed and potentially disproven in the discovery process." *Phhhoto Inc.*, 123 F.4th at 613. However, at the motion to dismiss stage, Plaintiffs need only plausibly plead the elements of their claims, with sufficient particularity. *See id.* They have done so here, and thus Defendants' motion is denied.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is DENIED. Defendants shall file an answer within fourteen days after the date of this opinion and order. *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to close the motion at Docket Number 312.

SO ORDERED.

Dated: January 15, 2025
New York, New York

J. PAUL OETKEN
United States District Judge